IN UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Case No. 12-14009-FF
_____

DR. BERND WOLLSCHLAEGER, *et al.*,
Plaintiffs/Appellees,

vs.

GOVERNOR, STATE OF FLORIDA, *et al.*,
Defendants/Appellants.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

**BRIEF FOR APPELLANTS**
_____

PAMELA JO BONDI
ATTORNEY GENERAL

Timothy D. Osterhaus (FBN 133728)
Solicitor General
Timothy.Osterhaus@myfloridalegal.com
Jason Vail (FBN 298824)
Assistant Attorney General
Diane G. DeWolf (FBN 059719)
Rachel E. Nordby (FBN 056606)
Deputy Solicitors General
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
(850) 410-2672 (fax)
*Counsel for State Appellants*

## AMENDED CERTIFICATE OF INTERESTED PERSONS & CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-1, Appellants/Defendants provide the following certificate of interested persons:

1.    The Honorable Marcia G. Cooke, U.S. District Judge

**Defendants/Appellants**:

2.    Armstrong, John H., present Florida Surgeon General and Secretary of the Department of Health

3.    Averoff, Magdalena, Fla. Board of Medicine Member

4.    Bearison, Fred, Fla. Board of Medicine Member

5.    Dudek, Elizabeth, Secretary of the Agency for Health Care Administration

6.    El Sanadi, Nabil, Fla. Board of Medicine Member

7.    Espinola, Trina, Fla. Board of Medicine Member

8.    Farmer, Frank, former Florida Surgeon General and Department Secretary

9.    Goersch, Brigitte Rivera, Fla. Board of Medicine Member

10.   Lage, Onelia, Fla. Board of Medicine Member

11.   Levine, Bradley, Fla. Board of Medicine Member

12.   Mullins, Donald, Fla. Board of Medicine Member

13.   Nuss, Robert, Fla. Board of Medicine Member

14.   Orr, James, Fla. Board of Medicine Member

15.   Rosenberg, Jason, Fla. Board of Medicine Member

16.   Scott, Rick, Governor of Florida

17.   Shugarman, Richard G., Fla. Board of Medicine Member

18.   Stringer, Merle, Fla. Board of Medicine Member

19.   Thomas, George, Fla. Board of Medicine Member

20.   Tucker, Elisabeth, Fla. Board of Medicine Member

21.   Winchester, Gary, Fla. Board of Medicine Member

22.   Zachariah, Zachariah, Fla. Board of Medicine Member

**Plaintiffs/Appellees**:

23.   American Academy of Family Physicians, Florida Chapter

24.   American College of Physicians, Florida Chapter

25.   Fox-Levine, Shannon

26.   Gutierrez, Roland

27.   Sack, Stanley

28.   Schaechter, Judith

29. Schechtman, Tommy

30. Wollschlaeger, Bernd

**Defendants/Appellants' counsel**:

31. DeWolf, Diane G.

32. Nordby, Rachel E.

33. Osterhaus, Timothy D.

34. Vail, Jason

**Plaintiffs/Appellees' counsel**:

35. Guiliano, Douglas

36. Hallward-Driemeier, Douglas

37. Kainen, Dennis G.

38. Lowy, Jonathan

39. Lucas, Hal

40. Manheim, Bruce

41. Mullins, Edward

42. Ripa, Augustine

43. Vice, Daniel

**Others**:

44.    Brady Center to Prevent Gun Violence

45.    National Rifle Association (NRA)

46.    Thompson, David, Counsel for the NRA

September 17, 2012                    /s/ Timothy D. Osterhaus
                                     Counsel for Defendants/Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument will assist the Court due to the important constitutional issues involved in the District Court's invalidation of a state statute on grounds that it violates the First Amendment's Free Speech Clause.

## CERTIFICATE OF TYPE/VOLUME

Counsel for the State Appellants certifies that the text of the brief is presented in 14-point Times New Roman typeface and contains 9,120 words (Microsoft Word count) in compliance with Federal Rule of Appellate Procedure Rule 32(a).

/s/ Timothy D. Osterhaus
Counsel for Defendants/Appellants

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

CERTIFICATE OF TYPE/VOLUME.......................................................................i

TABLE OF CONTENTS...........................................................................................ii

TABLE OF AUTHORITIES ...................................................................................iv

STATEMENT OF JURISDICTION.........................................................................xi

STATEMENT OF THE ISSUES...............................................................................1

STATEMENT OF THE CASE AND FACTS ...........................................................2

      The Firearms Owners' Privacy Act........................................................2

      The Complaint & District Court Proceedings ..................................7

      The Summary Judgment Order...................................................................7

STANDARD OF REVIEW .....................................................................................10

SUMMARY OF THE ARGUMENT ......................................................................11

ARGUMENT ...........................................................................................................15

I.     The Plaintiffs' Lawsuit Is Non-Justiciable Because The Act Expressly
      Allows The Speech That Plaintiffs Claim is Infringed By the Act...............15

      A.    The Plaintiffs' Lawsuit and the District Court's Decision Hinge
           on an Incorrect Belief that the Act Prohibits Physicians From
           Asking About Firearms.. ....................................................................15

B.    There is No Controversy or Injury in Fact Because the Act Allows Physicians To Ask and Advise Patients About Firearms Safety ................................................................................... 19

II.    The Act Comports With Constitutional Free Speech Standards. .................. 25

A.    The Act Regulates Professional Conduct and Its Inhibition of Speech is Merely Incidental. .............................................................. 25

B.    The Act Should Be Upheld Even if it Imposes More Than an Incidental Burden on Speech ................................................................ 31

1.  Section 790.338 furthers a substantial state interest ...................... 32

2.  The Act directly and materially advances the State's asserted interests ........................................................................................ 34

3.  The Act is narrowly tailored to the State's goals ........................... 36

III.    The Act Is Not Unconstitutionally Vague. .................................................... 37

CONCLUSION ...................................................................................................... 40

CERTIFICATE OF SERVICE ............................................................................... 41

# TABLE OF AUTHORITIES

**Cases**

*Accountant's Soc. of Va. v. Bowman,*
  860 F.2d 602 (4th Cir. 1988) ................................................................26

*Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla.,*
  No. 11-13457, slip op. (11th Cir. Sept. 15, 2012) ................................20

*Ass'n for Children for Enforcement of Support Inc. v. Conger,*
  899 F.2d 1164 (11th Cir. 1990) ............................................................20

*Bankshot Billiards, Inc. v. City of Ocala,*
  634 F.3d 1340 (11th Cir. 2011) ............................................................37

*Barbano v. Madison Cnty.,*
  922 F.2d 139 (2d Cir. 1990) .................................................................29

*Blodgett v. Holden,*
  275 U.S. 142 (1927) .............................................................................18

*Bob Jones Univ. v. United States,*
  461 U.S. 574 (1983) .............................................................................32

*Burson v. Freeman,*
  504 U.S 191 (1992) ..............................................................................32

*CBS Inc. v. PrimeTime 24 Joint Venture,*
  245 F.3d 1217 (11th Cir. 2001) ............................................................15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ....................................................................... 14, 31

*Chicago & Grand Trunk R. Co. v. Wellman,*
  143 U.S. 339 (1892) .............................................................................20

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) ...............................................................................26

iv

*Conn. Bar Ass'n v. U.S.*,
    620 F.3d 81 (2d Cir. 2010) ..................................................................31

*Crowell v. Benson*,
    285 U.S. 22 (1932) ...........................................................................19

*DA Mortg., Inc. v. City of Miami Beach*,
    486 F.3d 1254 (11th Cir. 2007) ..................................................... 27, 37

*Dermer v. Miami-Dade Cnty.*,
    599 F.3d 1217 (11th Cir. 2010) ........................................................ 20

*Falanga v. State Bar of Ga.*,
    150 F.3d 1333 (11th Cir. 1998) ..........................................................34

*Flanigan's Enters. Inc. v. Fulton Cnty.*,
    596 F.3d 1265 (11th Cir. 2010) ..........................................................34

\*Fla. Bar v. Went-for-It Inc.*,
    515 U.S. 618 (1995) .................................................................. 31, 34, 36

*Giboney v. Empire Storage & Ice Co.*,
    336 U.S. 490 (1949) .........................................................................29

*Harrell v. The Fla. Bar*,
    608 F.3d 1241 (11th Cir. 2010) ..........................................................22

*Harrison v. Benchmark Elecs. of Huntsville Inc.*,
    593 F.3d 1206 (11th Cir. 2010) ..........................................................29

*Hill v. Colorado*,
    530 U.S. 703 (2000) .........................................................................33

*Hooper v. California*,
    155 U.S. 648 (1895) .........................................................................19

*Hudson v. Michigan*,
    547 U.S. 586 (2006) .........................................................................33

*Hurley v. Irish-American Gay, Lesbian, & Bisexual Grp. of Boston*,
515 U.S. 557 (1995) ........................................................28

*Jacksonville Prop. Rights Ass'n, Inc. v. City of Jacksonville*,
635 F.3d 1266 (11th Cir. 2011)........................................22

*Johnson v. Bryco Arms*,
224 F.R.D. 536 (E.D.N.Y 2004)........................................33

*Kolender v. Lawson*,
461 U.S. 352 n.8 (1983) ..................................................37

*Lee v. City of Columbus*,
636 F.3d 245 (6th Cir. 2011) ...........................................29

*Locke v. Shore*,
634 F.3d 1185 (11th Cir. 2011) ............................ 13, 26, 30

*Lowe v. SEC*,
472 U.S. 181 (1985) .............................................. 26, 30

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......................................................20

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ...................................................32

*Nat'l Fed'n of Indep. Bus.v. Sebelius*,
132 S. Ct. 2566 (2012) ........................................ 17, 18, 33

*N.H. Right to Life Political Action Comm. v. Gardner*,
99 F.3d 8 (1st Cir. 1996) .................................................21

*Ohralik v. Ohio State Bar Ass'n*,
436 U.S. 447 (1978) .......................................................29

*Owens v. Storehouse, Inc.*,
984 F.2d 394 (11th Cir. 1993) .........................................10

*Parsons v. Bedford*,
   3 Pet. 433 (1830) ...................................................................17

*Pittman v. Cole*,
   267 F.3d 1269 (11th Cir. 2001) .........................................22

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ............................................................29

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984) ............................................................32

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ..............................................................29

*Rust v. Sullivan*,
   500 U.S. 173 (1991) ............................................................22

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) ...............................................27

*Sciarrino v. City of Key West*,
   83 F.3d 364 (11th Cir. 1996) ..............................................34

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653 (2011) ............................................... 29, 31

*This That & The Other Gift & Tobacco Inc. v. Cobb Cnty.*,
   285 F.3d 1319 (11th Cir. 2002) .........................................37

*Thompson v. Western States Med. Ctr.*,
   535 U.S. 357 (2002) ..............................................................8

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*,
   607 F.3d 742 (11th Cir. 2010) ...........................................10

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ............................................................31

*U.S. v. Rigas*,
490 F.3d 208 (2d Cir. 2007) ................................................................37

*United States v. Ferreira*,
13 How. 40 (1852) ................................................................................20

*United States v. Lanier*,
520 U.S. 259 (1997) ..............................................................................37

*Valley Forge Christian Coll. v. Ams. United for Separation of
Church & State, Inc.,* 454 U.S. 464 (1982) ..........................................20

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates*,
455 U.S. 489 & n.7 (1982) ...................................................................39

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) ..............................................................................31

*Whalen v. Roe*,
429 U.S. 589 (1977) ..............................................................................33

\*  *Wilson v. State Bar of Ga.*,
132 F.3d 1422 (11th Cir. 1998) ............................................ 12, 21, 26

*Wisconsin v. Mitchell*,
508 U.S. 476 (1993) ..............................................................................28

## Federal Constitutional Provisions & Statutes

U.S Const. art. III, § 2. .......................................................... 12, 20

U.S Const. amend. I (Free Speech Clause).................................... *passim*

28 U.S.C. § 1291 .......................................................................x

28 U.S.C. § 1331 .......................................................................x

42 U.S.C. § 12112(d)(2) ............................................................30

## State Constitutional Provisions & Statutes

Art. I, §8, Fla. Const...................................................................32

Art. I, §23, Fla. Const.................................................................33

§ 120.565(1), Fla. Stat................................................................22

§ 379.2431, Fla. Stat. ................................................................28

§ 395.1055, Fla. Stat. ..................................................................6

§ 456.072, Fla. Stat. ....................................................................6

§ 634.271, Fla. Stat. ..................................................................28

§ 641.039, Fla. Stat. ..................................................................28

§ 790.338, Fla. Stat. (The Firearms Owners' Privacy Act) ........... *passim*
   § 790.338(1), Fla. Stat. ...................................... *passim*
   § 790.338(2), Fla. Stat. ...................................... *passim*
   § 790.338(5), Fla. Stat. ...................................... *passim*
   § 790.338(6), Fla. Stat. ...................................... *passim*
   § 790.338(8), Fla. Stat. ..............................................6

§ 817.568, Fla. Stat. ..................................................................28

§ 843.0855, Fla. Stat. ................................................................28

§ 843.20(2)(a), Fla. Stat. ...........................................................28

§ 1006.147, Fla. Stat. ................................................................28

**Other Authorities**

Fed. R. App. P. 32(a) ............................................................................... i

Fla. Senate, http://www.flsenate.gov/Session/Bill/2011/0155 .............................2, 5

Health Insurance Portability and Accountability Act of 1996 (HIPAA).................36

## <u>STATEMENT OF JURISDICTION</u>

This appeal is from a final judgment entered upon an order of final summary judgment of the United States District Court in favor of the Plaintiffs. The district court's jurisdiction was based on the presence of a federal question under 28 U.S.C. § 1331. This Court has jurisdiction over the final judgment pursuant to 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

The district court enjoined an act of the Florida Legislature that prohibits discrimination against gun owners by health care facilities and practitioners. The Plaintiff-physicians claim that the Act violates their free speech rights by prohibiting them from asking patients about firearms. The issues for this Court are:

I.    Whether Plaintiffs' case is justiciable insofar as the Act explicitly permits the very speech that Plaintiffs allege to be infringed (and State Defendants acknowledge that the Act permits it).

II.   If this case is justiciable, whether the Free Speech Clause forbids Florida from regulating the conduct of health care providers (a) by prohibiting them from recording information about patients' ownership of firearms in patient medical records that is "not relevant" to patient medical care or safety, or to the safety of others; (b) by urging that they "should refrain" from asking about patients' ownership of firearms unless it is relevant to a patient's medical care or safety, or to the safety of others; and (c) by prohibiting them from discriminating or unnecessarily harassing patients who own firearms.

III.  If this case is justiciable, whether the Act is unconstitutionally vague.

## STATEMENT OF THE CASE AND FACTS

The district court ruled that the "Firearms Owners' Privacy Act" (Fla. Stat. § 790.338), is unconstitutional on its face. [D105] [1] Not only did the district court conclude that the Act violates the First Amendment's Free Speech Clause by preventing health care practitioners from asking patients about firearms safety—activity that the Act actually allows—but also that the Act's recordkeeping, anti-discrimination, and anti-harassment provisions violate free speech rights. *Id.*

The State Defendants—the Governor of Florida and officials of Florida's Board of Medicine, Agency for Health Care Administration, and Department of Health—now appeal because section 790.338 was broadly misconstrued and incorrectly enjoined. Whereas the Act explicitly preserves the right of physicians to ask patients about firearms-related medical and safety issues, the court misconstrued the Act to gag them from asking about firearms.

## The Firearms Owners' Privacy Act

In 2011, the Florida Legislature passed House Bill (HB) 0155 (later codified as section 790.338, Florida Statutes (the "Firearms Owners' Privacy Act")) to address constituents' complaints about discrimination and harassment of gun owners by health care providers. [D87] *See also* Fla. Senate,

---

[1] Citations to the record on appeal are [D#:*] or [D# ¶*] where # is district court's docket entry number and * is the page or paragraph number.

http://www.flsenate.gov/Session/ Bill/2011/0155. Legislators described difficulties faced by patient-constituents as follows:

- One legislator described an incident in Ocala where a pediatrician, during a routine doctor's visit, asked a patient's mother whether there were firearms in the home. Having privacy concerns, the mother would not answer the question, whereupon the doctor terminated their relationship and gave them 30 days to find a new pediatrician. [D87 ¶ 3]

- Another legislator told of a doctor's appointment involving his own daughter. After answering a pediatrician's question about gun ownership, the pediatrician asked that he remove the gun from his home. To the legislator, the doctor's conduct constituted "a political … attack on the constitutional right to own a possessive [sic] firearm." [D87 ¶ 5]

- Another legislator stated that "[a] lot of this [Bill] stems [from the] well-documented case in Ocala" and because "a family was told that it's a Medicaid necessity … to answer a firearms question." [D87 ¶ 6] He also spoke of receiving an email describing "a mother who was separated from her children while medical personnel not only interrogated the children about gun ownership but put that in their medical record." *Id.*

- Another legislator from a different part of the state reported that constituents had also pressed him about the problem and recounted that a

constituent of his called and told him "that a doctor had refused care upon a nine year old … that was in their custody … because they wanted to know if they had a firearm in their home."  [D87 ¶ 8]

- Another legislator reported that "many of my own constituents ask[ed] me to rebalance this [discrimination against gun-owning patients] equation."  [D87 ¶ 7]

- Another legislator also was concerned about patients being falsely told that disclosing firearm ownership was a Medicaid requirement.  [D87 ¶ 9] In this regard, National Rifle Association representative Marion Hammer reported to a legislative committee that:  "One family, with a foster child, was told by the pediatrician's office that Medicaid would not pay claims if they didn't answer gun questions."  [D87 ¶ 10] Hammer told of another incident where a child was refused an examination after a mother would not answer whether there was a gun in the home. *Id.* The doctor then sent her a bill and had collectors pursue them when they refused to pay.  In Hammer's words:  "One father feared the doctor would retaliate and call social services because the anti-gun doctor thinks the gun in the home creates a dangerous environment for a child."  *Id.* Hammer advocated to the committee that "[q]uestioning patients about gun ownership to satisfy a political agenda … needs to stop."  *Id.*

In response to constituent concerns, the Florida Legislature passed a bill that took account of both the privacy of gun owners and the practice of providers to ask patients about firearms safety.[2] *See* Fla. Stat. § 790.338. *See also* Fla. Senate, http://www.flsenate.gov/Session/Bill/2011/ 0155 (passing 88-30 and 27-10 in the House and Senate, respectively). As codified, the Act states in relevant part:

> **790.338  Medical privacy concerning firearms; prohibitions; penalties; exceptions.—**
>
> (1)  A health care practitioner … may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.
>
> (2)  A health care practitioner … shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.
>
> *       *       *

---

[2] The record reflects that the American Medical Association, American Academy of Pediatrics (AAP), the AAP's Florida chapter (FAAP), the American Academy of Family Physicians (AAFP), and the AAFP's Florida chapter (FAFP), have published practice guidelines and policies recommending that physicians advise as to the prevention of injuries, including from firearms. [D87 ¶¶4, 16, 17] The AAP and the FAAP "recommend that pediatricians incorporate questions about firearms into the patient history process," and both the AAFP and the FAFP have policies stating that firearm safety education to patients is a necessity. [D87 ¶16] The American College of Physicians (ACP) and its Florida chapter (FACP) also have a policy that encourages physicians to actively counsel patients about the dangers of firearms in the home and how to reduce the risk of injury. [D87 ¶17]

(4)   A patient may decline to answer or provide any information regarding ownership of a firearm by the patient or a family member of the patient, or the presence of a firearm in the domicile of the patient or a family member of the patient. A patient's decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician's authorization to choose his or her patients.

(5)   A health care practitioner … may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.

(6)   A health care practitioner … shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination.

The Act expressly protects the ability of health care facilities and practitioners to ask patients (verbally or in writing) regarding firearms as is "relevant to the patient's medical care or safety, or the safety of others"; whereas they "should refrain" from asking and not record "not relevant" information about firearms ownership. Fla. Stat. § 790.338(1)-(2). It also prohibits discrimination against and unnecessary harassment of gun owners. Fla. Stat. § 790.338(5)-(6). Violations of the Act constitute grounds for disciplinary action by the Florida Board of Medicine, which could assess a fine, order the return of fees collected, issue a letter of reprimand, require compulsory remedial medical education, or revoke a license. Fla. Stat. § 790.338(8); *see also* [D87 ¶11] (*citing* Fla. Stat. §§ 790.338(8); 395.1055; 456.072(1)(mm)–(2); 456.072(2)).

## The Complaint & District Court Proceedings

Before the Act was applied or interpreted by state officials, the plaintiff physicians and associations whose members are physicians filed a lawsuit facially challenging the law. [D1, D15 (Am. Compl.)] Plaintiffs' single-count suit alleged that the Act violates the First and Fourteenth Amendments to the United States Constitution by "abridging the[ir] freedom … to communicate with and to counsel their patients … in practicing preventive medicine, regarding minimizing the risks associated with firearms"; by failing to give adequate notice of the prohibited conduct; and by "abridging the[ir] freedom … to receive [information about firearms from patients] as part of their preventive care." [D15 ¶ 92] The Plaintiffs sought and received an order from the district court preliminarily enjoining the law. [D80]

## The Summary Judgment Order

The parties stipulated facts and filed cross motions for summary judgment, upon which the district court entered an order substantially granting final summary judgment for the Plaintiffs and against the Defendants.[3] [D87; D105] In its order,

---

[3] The order granted Defendant's motion in part, holding that Plaintiffs did not establish an injury-in-fact with respect to subsection (3), relating to emergency medical technicians and paramedics, subsection (4), relating to a patient's right to decline to provide information about firearms and leaving intact existing law relating to a physicians right to choose her patients, and subsection (7), which relates to insurers. [D105:23-24] The order otherwise denied Defendants' motion.

the district court construed subsections (1), (2), (5), and (6) of the Act to be a content-based ban on speech about firearms. [D105:11, 24-25]

The district court grounded the order in its belief that the Act *forbids* physicians from asking or counseling patients about firearms safety. [D105:11] The court construed the Act to allow physicians to ask patients about "household chemicals, risky recreational activities, sexual conduct, or drugs and alcohol" but not firearms. *Id.* It stated that "the provisions prohibit discrimination and harassment based on one narrow subject or viewpoint—the exercise of the right to own and possess a gun." *Id*. Given the statute's one-subject designation, the court concluded that the Act is a content-based restriction on speech for which the state could not show a compelling or substantial interest. [D105:10-11] The Act, it stated, "aims to restrict a practitioner's ability to provide truthful, non-misleading information to the patient (or record such information), whether relevant or not at the time of the consult with the patient." [D105:14] It also described the Act as a "ban" on "truthful, non-misleading speech," and warned that courts must be "especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." [D105:14-15 (quoting *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 375 (2002))]

The court accused the state of "insert[ing] itself in the doctor-patient relationship, prohibiting and burdening speech necessary to the proper practice of

preventative medicine, thereby preventing patients from receiving truthful, non-misleading information." [D105:18] "This law," it held, "chills practitioners' speech in a way that impairs the provision of medical care and may ultimately harm the patient." [D105:19] Patients, the court asserted, may not be capable of raising the issue of firearms on their own and thus "may not receive appropriate, possibly life-saving, information about firearm safety." [D105:20] The court suggested that a content-neutral provision would be an effective alternative to the anti-harassment and anti-discrimination provisions. *Id.*

The court did not mention that the text of the Act does not *really* forbid doctors from asking patients about firearms—it says only that they "should refrain" from asking, except as is relevant to patient "medical care or safety, or to the safety of others." Fla. Stat. §790.338(2). The court rejected the State's argument that the statute sprang in part from the State's interest in protecting the right to keep and bear arms. [D105:15] In the court's opinion, that right "is irrelevant to this law; therefore I do not find that it is a legitimate or compelling interest for it." *Id.* The court also rejected as "dubious" the State's asserted interest in preventing discrimination based on firearm ownership and dismissed the extensive testimony of legislators that described constituent problem (cited above) as merely "anecdotal." [D105:16]

The trial court also held that the inquiry and record-keeping provisions are

vague because it is unclear whether "relevant" refers to a present or a future time. It likewise held the anti-harassment provision vague based on the inclusion of the adverb "unnecessarily." [D105:22] Although it agreed with the State that the terms "discriminate" and "harass" have ordinary meanings that are readily clear to a person of common intelligence, in the end the court did not accord the ordinary meanings of "relevant" and "unnecessarily" any deference. *Id.*

Ultimately, the trial court severed subsections (1), (2), (5), and (6) from the Act, holding these sections unconstitutional, and enjoined the state from enforcing them. [D105:23-25; D106] The State Defendants filed this timely appeal.

## STANDARD OF REVIEW

This court reviews *de novo* a district court's grant of summary judgment, applying the same legal standards as the district court. *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 607 F.3d 742 (11th Cir. 2010). This is a facial challenge initiated prior to a law's effective date with no disputed factual issues. This Court's review involves whether the district court's legal conclusions and remedy were proper as a matter of law. *See Owens v. Storehouse, Inc.,* 984 F.2d 394, 397 (11th Cir. 1993).

## SUMMARY OF THE ARGUMENT

The district court's decision enjoining most of the Firearms Owner's Privacy Act (Fla. Stat. § 790.338) should be reversed and remanded for dismissal because this case is not justiciable. Plaintiffs' case is built on a misinterpretation of the Act. They alleged incorrectly, and the district court wrongly accepted, that the Act *on its face* prohibits physicians from asking and advising patients about firearms safety. But the law does not prohibit the speech that Plaintiffs allege is infringed, nor does it violate free speech rights.

The crux of Plaintiffs' allegations is that they wish to ask patients if they have guns and, if so, to discuss firearm safety. The Act does not forbid this activity.  Subsection (2) urges only that physicians "should refrain" from asking firearms-related questions; but "[n]otwithstanding" this admonishment, it explicitly permits providers to ask questions about firearms, either verbally or in writing, that are "relevant to the patient's medical care or safety, or the safety of others." Fla. Stat. § 790.338(2). The record-keeping provision in subsection (1) allows doctors to record similarly relevant firearms ownership information into a patient's medical record. The Act proscribes *only* inquiries within the doctor-patient relationship and recordkeeping about firearms that is *not relevant* to medical and safety concerns. And speech irrelevant to medical and safety concerns was not alleged by Plaintiffs to be of any concern. Plaintiffs' case should find no further

11

footing in misinterpretations of the Act. Courts must construe laws in ways that would render them valid, so as not create constitutional infirmity. This facial challenge cannot succeed because the Act explicitly contradicts Plaintiffs' reading and a plain reading avoids constitutional problems.

Also, because Plaintiffs alleged only a speech interest that is actually permitted by the Act, this case presents no actual harm or real controversy. It should be dismissed as non-justiciable. Federal courts may only hear live "cases" and "controversies" (U.S. Const. art. III, § 2), and Plaintiffs have not pled facts sufficient to confer standing. Because Plaintiffs may ask and advice patients about firearms safety in the manner they allegedly want, there is no likelihood that a favorable decision will redress an imminent injury. And the State Defendants have no intention of *mis*interpreting the Act to forbid questions about firearms safety. Where "no credible threat of prosecution looms, the [alleged "chill" on speech] is insufficient to sustain the burden that Article III imposes. A party's *subjective fear* that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is *objectively reasonable*." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (emphasis added).

If this Court does decide to rule on the merits of Plaintiffs' claim, the district court's ruling that the Act is a content-based restriction of speech should be

reversed. The Act regulates professional conduct, not speech. The district court incorrectly lumped together the Act's recordkeeping, irrelevant questioning, discrimination, and harassment provisions—subsections (1), (2), (5), and (6)—and found them all to be content-based speech restrictions. But this Court has recognized that "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011). In this case, any speech restriction is merely incidental to the Act's regulation of conduct by health care providers; specifically, the Act seeks respect for the privacy and rights of gun owners and to prevent discrimination and unnecessary harassment. The district court did not appropriately distinguish between professional conduct and speech in construing the Act. For instance, the Act's recordkeeping, discrimination, and harassment provisions were enjoined as violating free speech rights even though they do not address speech per se. Traditionally, courts have *not* recognized anti-discrimination and anti-harassment provisions, like subsections (5) and (6), to come within the ambit of the Free Speech Clause. Subsection (2) similarly has only an incidental burden on speech, but, like the rest of the Act, aims to ensure respect for privacy and Second Amendment rights, and to eliminate discrimination against gun-owners.

Should this Court consider the Act to impose more than incidental burdens on speech, it should nonetheless be upheld. Under *Central Hudson's* familiar intermediate scrutiny standard, the Act furthers a substantial state interest; directly and materially advances state interests; and is narrowly tailored to the state's goals.

Finally, the Act is not unconstitutionally vague on its face because it clearly communicates what conduct is prohibited and certainly is not impermissibly vague in all of its applications.

Thus, this case should be reversed and remanded for dismissal because it is not justiciable; or, if this Court reaches the merits, the Act should be upheld because it is a permissible regulation of professional conduct that does not violate free speech rights.

# ARGUMENT

### I. The Plaintiffs' Lawsuit Is Non-Justiciable Because The Act Expressly Allows The Speech That Plaintiffs Claim is Infringed by the Act.

#### A. The Plaintiffs' Lawsuit and the District Court's Decision Hinge on the Incorrect Belief that the Act Prohibits Physicians From Asking About Firearms.

Plaintiffs' lawsuit and the district court's decision rest on the false premise that the Act broadly prohibits questions and advice by doctors relating to firearms safety. It does not. In fact, the Act bars none of the questions that Plaintiffs allege in the Amended Complaint are infringed by the Act. Because this case involves no actual harm or a real controversy, it is non-justiciable and should be dismissed.

The starting point here, as in most every case involving statutory construction, is with the statute's own language. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001). The importance of the statutory text is particularly acute in this case where the plaintiffs claim that the statute *on its face* bans speech necessary to the practice of preventive medicine. Throughout the Amended Complaint, Plaintiffs refer to the Act as the "Physician Gag Law" and have based their lawsuit on a belief that the Act "punish[es] health care professionals simply for asking questions of, and providing information to, their patients about firearms safety." [D15 ¶ 1]

The district court likewise interpreted the Act to ban health care providers from speaking about firearms:

> physicians may ask a new patient … to fill out an initial intake questionnaire that includes questions about household chemicals, risky recreational activities, sexual conduct, or drugs and alcohol kept in the home, but not whether the patient owns a firearm.

[D105:10-11] The Order says that the Act "restrict[s] a practitioner's ability to provide truthful, non-misleading information to a patient (or record such information), whether relevant or not" [D105:14], and "prohibit[s] and burden[s] speech necessary to the proper practice of preventative medicine, thereby preventing patients from receiving truthful, non-misleading information." [D105:18].

But all of these descriptions conflict with the actual text of the Act, which does not gag or ban doctors from asking or advising patients about firearms safety. Just the opposite, the Act says only that doctors "should refrain" from asking questions about firearms, but that they can make "verbal or written inquir[ies as to patients'] ownership of a firearm or ammunition … or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient [as is] relevant to the patient's medical care or safety, or the safety of others." Fla. Stat. § 790.338(2).

Subsection (1) also expressly allows health care practitioners to enter relevant information about firearms ownership into a patient's medical records. It only proscribes the entry of information that "is not relevant to the patient's medical care or safety, or the safety of others." And here, Plaintiffs have claimed no interest or injury arising from any wish to give counsel or record information that is *not* relevant to patient medical care, safety, or the safety of others.

In holding the Act unconstitutional because it supposedly prohibits firearms safety-related inquiries and advice, the district court introduced the very infirmity upon which it enjoined the Act. The district court's order—especially in the context of a facial challenge—departs from a basic tenant of statutory construction that obliges courts to construe laws in a way that renders them valid. *See Nat'l Fed'n of Indep. Bus.v. Sebelius*, 132 S. Ct. 2566, 2593 (2012) ("No court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution.") (quoting *Parsons v. Bedford*, 3 Pet. 433, 448-49 (1830)). Despite that bedrock principle, the district court here, in an apparent effort to render the Act unconstitutional rather than to preserve it, repeatedly extracted meanings from the Act that do not appear in the statutory text. For example, the court noted that Plaintiffs "seriously wish to ask their patients about firearms and discuss firearm safety with their patients [however t]he Firearm Owner's Privacy Act at least

*arguably* forbids this activity." [D105:7] It also characterized the Act "to restrict a practitioner's ability to provide truthful, non-misleading information to a patient … whether relevant or not at the time of the consult with the patient." [D105:14] But no language in the Act even arguably forbids such activity. The Act provides only that practitioners "should refrain" from asking about firearms or ammunition except as is relevant to medical care or safety. Fla. Stat. §790.338(2).  Had the Court adopted a deferential constitutional construction as required in a facial challenge, then it would have concluded that the Act *allows* such activity, not that it arguably forbids it.

Similarly, the Act does not "insert [the State] in the doctor-patient relationship prohibiting and burdening speech necessary to the proper practice of preventative medicine, thereby preventing patients from receiving truthful, non-misleading information." [D105:18]  Conversely, the most straightforward reading of the Act is that it encourages practitioners to respect patients' right to privacy and it forbids discrimination and unnecessary harassment of patients based on their status as firearms owners. The Act does not restrict the good faith provision of truthful or non-misleading information about firearms safety.

The trial court here had a duty to adopt the meaning that would save the Act, even if another meaning could be inferred. *See Sebelius*, 132 S. Ct. at 2593 (citing *Blodgett v. Holden*, 275 U.S. 142, 148 (1927)). It failed to do so, and its decision

should be reversed. As the Supreme Court has made clear for over 200 years, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Id.* at *2594* (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)) (internal quotation marks omitted). "The question is not whether this is the most natural interpretation of the [statute], but only whether it is a 'fairly possible' one." *Id.* (citing *Crowell v. Benson*, 285 U.S. 22, 62 (1932). Particularly in light of the principle that a statute will be construed in such a manner as to avoid a constitutional question whenever possible, the Act must not be read to forbid firearms safety questions and advice. The State Defendants, as the Act's would-be enforcers, certainly do not interpret the Act to reach any further. Because Plaintiffs' lawsuit misinterprets the Act to create a constitutional infirmity, and the Act does not actually affect the speech that concerns the Plaintiffs, the Act was wrongly enjoined.

## B. There is No Controversy or Injury in Fact, Because the Act Allows Physicians To Ask and Advise Patients About Firearms Safety.

Because Plaintiffs' Amended Complaint hinges completely upon misinterpretations of the Act's prohibitions, and Plaintiffs actually can ask questions about firearms to promote patient safety, this case does not present a live controversy or offer Plaintiffs the prospect of meaningful relief.

The Constitution only permits federal courts to hear live "cases" and

"controversies." U.S. Const. art. III, § 2. The question of standing is "crucial" because federal courts are constitutionally bound to "*only* entertain" real and vital controversies in which a favorable decision will actually redress an injury. *Am. Civil Liberties Union of Fla., Inc. v. Dixie Cnty., Fla.,* No. 11-13457, slip op. at 6-7 (11th Cir. Sept. 15, 2012).

> The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments . . . "is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy." *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345(1892). Otherwise, the power "is not judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *United States v. Ferreira*, 13 How. 40, 48 (1852).

*Id.* (*quoting Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982)). An essential part of standing is that the plaintiff suffered an injury that is "concrete and particularized," not "conjectural" or "hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). And it is the plaintiffs responsibility to "plead facts that are sufficient to confer standing and demonstrate that the claim is ripe for determination." *Dermer v. Miami-Dade Cnty.*, 599 F.3d 1217, 1220 (11th Cir. 2010) (citing *Ass'n for Children for Enforcement of Support, Inc. v. Conger*, 899 F.2d 1164, 1165 (11th Cir. 1990).

This case presents no imminent injury or live controversy because the

challenged statute does not prohibit the speech in which Plaintiffs allegedly want to engage. In *Wilson v. State Bar of Georgia*, 132 F.3d 1422 (11th Cir. 1998), for example, this Court held that suspended and disbarred attorneys lacked standing to bring a pre-enforcement First Amendment challenge to the State Bar's restrictions upon their activities. The plaintiffs alleged that the challenged provisions chilled protected speech and, in support of this, provided affidavit evidence detailing a specific example of an attorney who refrained from working on a judicial campaign out of fear that such conduct would violate the Bar's rules. *Wilson*, 132 F.3d at 1428. In determining that the plaintiffs lacked standing, this Court focused on the absence of an injury in fact—"[I]f no credible threat of prosecution looms, the chill is insufficient to sustain the burden that Article III imposes. A party's *subjective fear* that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is *objectively reasonable*." *Id.* (quoting *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 14 (1st Cir. 1996)) (emphasis added) (internal quotation marks omitted). Supporting the absence of an injury in fact was the State Bar's repeated and consistent position that the challenged provisions applied to professional conduct and did not apply to the scenarios put forth by the plaintiffs.

Here, very similarly, Plaintiffs lack an objectively reasonable, well-founded fear that the Act either applies or will be enforced against the questions and advice

that they allegedly wish to offer. State Defendants do not construe the Act contra-textually to forbid questions about firearms safety and would not so apply it. *See Rust v. Sullivan,* 500 U.S. 173, 184 (1991) ("substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it"); *cf. Jacksonville Prop. Rights Ass'n, Inc. v. City of Jacksonville*, 635 F.3d 1266, 1274-75 (11th Cir. 2011) (even in voluntary cessation cases, government enjoys a presumption that it will not apply laws unconstitutionally); *see also Harrell v. The Fla. Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) ("we have applied a 'rebuttable presumption' in favor of governmental actors").[4]

The Act leaves all of the Plaintiffs' alleged speech interests unaffected. The crux of the Plaintiffs' allegations, as discussed above, is that they wish to ask

---

[4] Prior to filing suit, Plaintiffs did not seek an advisory opinion from the Board of Medicine (*see* Fla. Stat. § 120.565(1)) to determine if the Act actually prohibits their desired speech. Such an opinion would have saved the time and expense of this litigation. *See, e.g., Harrell,* 608 F.3d at 1261-62 ("Given the distinct possibility . . . that agency review will eliminate the need for judicial review, and given the role of the ripeness doctrine in 'protect[ing] … agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties,' we may require that First Amendment plaintiffs seek determinations with varying degrees of finality from agencies whose rules or decisions they seek to challenge on an as-applied basis." (citations omitted)); *Pittman v. Cole,* 267 F.3d 1269, 1279-80 (11th Cir. 2001) (finding a claim against the Alabama State Bar unripe because plaintiffs "jumped the gun" and, relying on an informal advisory opinion, sought an injunction before requesting a formal advisory opinion from the Bar).

patients if they have guns and, if so, to discuss firearm safety hazards so as to prevent injuries. Specifically, they allege the following harms:

- The Act punishes physicians "simply for asking questions of, and providing information to, their patients about firearm safety." [D15 ¶ 1]

- The Act "has [immediately restricted the exercise of Plaintiffs] constitutional right to speak freely to their patients, in the exercise of their best medical judgment, regarding safe gun ownership [and] increase[d] the risk of further injuries and loss of lives." [D15 ¶ 70]

- Plaintiffs have "been forced to curtail or eliminate entirely their practice of preventive health care." [D15 ¶ 73]

- Plaintiff Wollschlaeger now refrains from discussing firearms as part of his preventive counseling, and has removed from his new patient questionnaire questions about "whether the patient had a gun in the home and whether it was safely locked." [D15 ¶ 74]

- Plaintiff Schaechter refrains from asking follow-up questions to patients' parents who avoid answering or show hostility to firearms screening questions. Also, her employer has asked physicians not to use a pre-printed questionnaire with questions about firearms. [D15 ¶ 76-77]

- Plaintiff Schechtman continues to ask patients about firearm safety and to record such information in patient medical records, but will refrain if patients or their parents seem upset by questions. [D15 ¶ 79-80]

- Plaintiff Sack no longer asks patients directly about firearms in their homes, but instead frames firearms safety advice in a hypothetical discussion about "if" firearms are in the home. He feels restrained from pursuing follow-up discussions with sensitive patients. [D15 ¶ 81-82]

- Plaintiff Fox-Levine's questionnaire now omits questions about firearms, though she still advises patients about firearms safety. [D15 ¶ 83-84]

- Plaintiff Gutierrez counsels and inquires about the presence of a firearm in patients' homes along with other health and safety risks. But now he is "extremely nervous" about it. He refrains from asking follow-up questions or having discussions with patients who do not answer firearms questions. [D15 ¶ 85-86]

Nothing in the Act prohibits the health- and safety-related inquiries and advice that the Plaintiffs allege as "harms" from the Act.[5] The Act's plain language

---

[5] That a patient may decline to answer firearms questions (*see* subsection (4)) does not change things; patients could always before refuse to answer a doctor's questions. But even then, the law does not silence health care providers from providing firearms safety advice. *See* Fla. Stat. § 790.338(2) ("[n]otwithstanding" privacy, doctors may address firearms as is relevant to medical care or safety).

makes clear that providers may question and advise patients about firearms safety just as they might with other medical and safety risks. And State Defendants acknowledge that doctors may do so.

In sum, this case presents no controversy, injury in fact, or prospect for meaningful relief. Because Plaintiffs' harm allegations are based on a plain misreading of the Act and not actually prohibited, the district court's order should be reversed and this case remanded for dismissal.

## II.     The Act Comports With Constitutional Free Speech Standards.

For the reasons discussed above, this Court should not reach the merits of Plaintiffs' speech claim. But if it reaches the merits, the district court's ruling that the Act restricts speech based on content should be reversed because it regulates professional conduct and only incidentally effects speech.

### A. The Act Regulates Professional Conduct and Its Inhibition of Speech Is Merely Incidental.

The district court broadly misread the Act, lumped together subsections (1), (2), (5), and (6), and determined that they are all content-based speech restrictions. [D105:12] But the court erred in applying strict scrutiny because the Act regulates professional conduct that does not fall within the ambit of the Free Speech Clause.

This Court has recognized that "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so

long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Locke*, 634 F.3d at 1191(quoting *Accountant's Soc. of Va. v. Bowman,* 860 F.2d 602, 604 (4th Cir. 1988)); *see also Wilson,* 132 F.3d at 1430 (noting that regulations of occupational conduct with an incidental effect on speech cannot withstand First Amendment scrutiny). Justice White's influential opinion in *Lowe v. SEC* likewise distinguished professional practice from speech, observing that "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech." 472 U.S. 181, 228 (1985) (White, J., concurring). In fact, the Supreme Court has recognized that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes … but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

Here, the district court's decision did not correctly distinguish professional conduct from speech when construing the Act.

### 1. Subsections (1), (5), and (6)

It is most clear that subsections (1), (5), and (6) of the Act regulate professional conduct and not speech. Subsection (1) is a recordkeeping provision that prohibits health care facilities and practitioners from entering irrelevant information about gun ownership into a patient's medical records. Subsections (5)

and (6) prohibit facilities and practitioners from discriminating or unnecessarily harassing patients who own guns. These provisions set practice standards that, at most, incidentally affect speech. In fact, there need be no speech at all to violate the Act. The Act might be applied, for instance, to a provider that marks patient records and censures firearms owners alone by:

- cancelling and rescheduling their appointments without notice;

- making them wait an excessively long time for appointments;

- delaying their test results arbitrarily;

- mailing them bills for unperformed services; and

- refusing them equal opportunities for referrals to specialists.

At most, the Act incidentally affects speech, while targeting discriminatory professional conduct. Also, Plaintiffs cannot meet the facial test that the Act could *never* be applied constitutionally. *See DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254 (11th Cir. 2007).

Moreover, courts have routinely recognized that anti-discrimination and anti-harassment provisions, like subsections (5) and (6), cannot properly be challenged on free speech grounds. *Saxe v. State Coll. Area Sch. Dist*., 240 F.3d 200, 206 (3d Cir. 2001) ("There is of course no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause."). These provisions differ little from other anti-discrimination and anti-

27

harassment laws—Title VII, the Americans with Disabilities Act, the Age Discrimination Act, and the Rehabilitation Act—that do not "target speech or discriminate on the basis of content, [but] rather on the act of discriminating against individuals." *Hurley v. Irish-American Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 572 (1995)*; see also Wisconsin v. Mitchell*, 508 U.S. 476, 487-89 (1993) (recognizing that Title VII is a permissible content-neutral regulation of *conduct* under the First Amendment.).[6]

Thus, the Act's recordkeeping, discrimination, and harassment provisions, at the very least, should be upheld as run-of-the-mill professional conduct regulations that are outside the ambit of the Free Speech Clause.

### 2. Subsection (2)

As discussed above, subsection (2) does not restrict health care providers from asking or advising patients about firearms safety, but only says that they "should refrain" from firearms interrogations <u>if</u> they have no good faith medical or safety reason for asking. Heightened free speech-related scrutiny of subsection (2)

---

[6] Under Florida law, "harassment" generally refers to conduct that serves no legitimate purpose but causes substantial emotional distress. *See, e.g*., Fla. Stat. § 843.20(2)(a). It is prohibited by Florida law in many contexts, including: the protection of marine life (Fla. Stat. § 379.2431); filing civil actions (§ 634.271); protecting public officers (§ 843.0855); using another's personal information (§ 817.568); marketing health insurance (§ 641.039); and bullying at public schools (§ 1006.147). The district court thus erred by not reading the Act, as it might have read any other anti-harassment law, to prohibit specific conduct.

is unwarranted because, like the rest of the Act, it targets professional conduct. It protects patients' privacy and patients' rights to keep firearms, as well as helps to prevent speech-involved discrimination and harassment. And its burden on speech is incidental to its legitimate regulation of professional conduct. "Professional regulation is not invalid, nor is it subject to first amendment strict scrutiny, merely because it restricts some kinds of speech." *Bowman*, 860 F.3d at 604 (citing *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 456-57 (1978)).

> [T]he First Amendment does not prevent restrictions directed at … conduct from imposing incidental burdens on speech. That is why a ban on race-based hiring may require employers to remove "'White Applicants Only'" signs, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.,*[547 U.S. 47, 62 (2006)]; why "an ordinance against outdoor fires" might forbid "burning a flag," *R.A.V.[ v. City of St. Paul,* 505 U.S. 377, 385 (1992)]; and why antitrust laws can prohibit "agreements in restraint of trade," *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949).

*Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664-65 (2011).

Furthermore, many courts, including this one, have ruled that questioning may be curtailed to prevent discrimination. *See, e.g.*, *Harrison v. Benchmark Elecs. Huntsville Inc.*, 593 F.3d 1206, 1212 (11th Cir. 2010) (noting that preemployment inquiries about the presence of a disability are unlawful); *Barbano v. Madison Cnty.*, 922 F.2d 139, 143 (2d Cir. 1990) (questioning a woman about her family plans per se unlawful under Title VII); *Lee v. City of Columbus,* 636 F.3d 245, 255 (6th Cir. 2011) (citing a federal regulation stating, "a recipient may not make a

preemployment inquiry or conduct a preemployment medical examination of an applicant to determine whether the applicant is an individual with handicaps"). Subsection (2) operates similarly to 42 U.S.C. § 12112(d)(2), which prohibits questions of job applicants about whether they have a disability, but allows questions relevant to whether they can perform job-related tasks.

Subsection (2) must also be analyzed differently from a general restriction because it applies solely to speech offered in the context of a professional-patient relationship. As this Court recognized recently in *Locke v. Shore*: "There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients." 634 F.3d at 1191. Justice White in *Lowe* distinguished between professional and ordinary speech regulations by whether one has taken "the affairs of a client personally in hand and purport[ed] to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances, [which is] properly viewed as engaging in the practice of a profession." 472 U.S. at 232. Thus, the Act's regulation of questioning during a doctor's visit "is incidental to the conduct of the profession [and government] cannot be said to have enacted a limitation on freedom of speech … subject to First Amendment scrutiny." *Id.*

Because subsection (2)'s affect on speech is both incidental to the regulation of professional conduct and bound up with the patient-doctor relationship, it does not violate the Plaintiffs' free speech rights and is not subject to strict scrutiny.

## B. The Act Should Be Upheld Even if it Imposes More Than an Incidental Burden on Speech.

Even if this Court considers subsection (2) to impose more than an incidental burden on speech, it should nonetheless be upheld. Government may regulate professional speech and need not survive strict scrutiny to do so. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 561 (1980); *Conn. Bar Ass'n v. United States,* 620 F.3d 81, 93 (2d Cir. 2010). The district court applied strict scrutiny based on a misreading of *Sorrell* [D105:12], a case that actually applied the *substantial* interest test from *Central Hudson*. *See* 447 U.S. at 564. *Central Hudson's* intermediate-level scrutiny applied to commercial speech requires that a regulation: further a substantial governmental interest; directly and materially advance its interest; and be narrowly tailored. *See Fla. Bar v. Went-for-It Inc.,* 515 U.S. 618, 624 (1995).[7]

_____

[7] The district court was incorrect in construing the Act to restrict speech based upon content. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 643 (1994); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)( "The government's

**1. Section 790.338 furthers a substantial state interest.**

The Act serves a number of substantial governmental interests, including: (1) the protection of Second Amendment rights to own or possess a firearm, (2) the protection of privacy rights, (3) the prevention of barriers for gun owners to receive health care, and (4) the prevention of discrimination and harassment. These are substantial, even compelling, interests.

First, the right to keep and bear arms for personal protection is guaranteed by the U.S. and Florida Constitutions. U.S. Const., amend. II; Fla. Const. art. I, § 8. It is a fundamental right. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036-37 (2010). Government has a compelling interest in protecting fundamental rights from infringement by private individuals. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984) (sex discrimination); *Bob Jones Univ. v. U.S.*, 461 U.S. 574 (1983) (race discrimination); *Burson v. Freeman*, 504 U.S 191, 199, 208 (1992) (voting discrimination). And government may protect the exercise of fundamental rights even if it burdens the exercise of rights by other individuals. *See, e.g.*, *Bob Jones Univ.,* 461 U.S. at 604  (addressing how the government's interest outweighed private religious interests and permissibly burdened religious rights).

---

purpose is the controlling consideration."). Here, the Act is not content-based because it addresses goals that are "justified without reference to the content." *Id.*

Second, the Act protects privacy rights by shielding patients from interrogation about firearms in the absence of a good faith medical or safety reason. Indeed, subsection (2) implicates the right of privacy in the *home* by proscribing irrelevant questions about firearms kept there. *See Hudson v. Michigan*, 547 U.S. 586, 621 (2006) (detailing how the rights of privacy in a home have long been recognized in Anglo-American law); Fla. Const. art. I, § 23 (protecting privacy rights). Even the district court recognized that Florida has a substantial interest in protecting privacy. [D105:17, 19]; *see also Whalen v. Roe*, 429 U.S. 589 (1977) (recognizing right to privacy to avoid disclosure of personal matters); *Johnson v. Bryco Arms*, 224 F.R.D. 536, 543 (E.D.N.Y 2004) ("The purchase of a firearm—because of the social, political, and moral controversy that may surround it in our culture—arguably merits heightened protection.").

Third, the state has a compelling interest to ensure that health care is available to citizens who need it, irrespective of whether they own guns. Here the district court was spot on in acknowledging that the state has a substantial interest in eliminating barriers to access to medical care. [D105:18-19]; *see also Sebelius*, 132 S. Ct. at 2609 (Ginsburg, J. concurring) (describing the provision of health care as "a concern of national dimension"); *Hill v. Colorado*, 530 U.S. 703, 729 (2000) (noting the importance of access to health care).

Fourth, Florida aims to prevent discrimination and harassment against gun owners. Courts have often recognized the prevention of discrimination and harassment to be a substantial interest. *See, e.g.*, *Sciarrino v. City of Key West*, 83 F.3d 364, 367 (11th Cir. 1996) ("The Supreme Court has explicitly concluded that preventing vexation or harassment of the listener constitutes a legitimate interest."). The district court also recognized this interest, concluding that Florida's interest in preventing discrimination is not merely substantial, but compelling. [D105:15]

## 2. The Act directly and materially advances the State's asserted interests.

The second prong of intermediate scrutiny requires the defendants to give evidence that its actions will in fact advance its substantial interests. *Went-For-It Inc.*, 515 U.S. at 626. The State's evidentiary burden can be satisfied in a number of ways, including by direct testimony, studies, surveys, judicial findings, a general consensus about the problem, even simple common sense, or anecdotes. *Id.* at 628. While the evidence cannot be conclusory or speculative, it is not required to be "empirical data … accompanied by surfeit of background information." *Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1340-41 (11th Cir. 1998); *see also Flanigan's Enters. Inc. v. Fulton Cnty.*, 596 F.3d 1265, 1278-79 (11th Cir. 2010).

Here, actual discrimination experienced by gun owners in Florida directly motivated the Legislature to pass the Act. *See supra* pp. 3-5 (legislative debate). Among other things, the Legislature heard that: a woman was given 30 days to find a new physician after she refused to answer questions about firearms in her home; a patient was asked by a physician to remove firearms from his home; a facility separated a mother from her children while interrogating them about firearms; a physician refused to care for a nine-year-old boy because he wanted to know about firearms in the home; citizens were falsely told that Medicaid required them to disclose their firearm ownership and would not pay if they refused to answer; a doctor refused to examine a child when the mother refused to answer firearms questions; and a facility billed for services not delivered after a family refused to answer questions about their firearms. *Id.*

These experiences show that the Legislature's action in passing the Act overwhelmingly was based on real concerns about protecting constituent privacy and preventing discrimination and harassment during doctor's visits.[8] The Act materially advances these concerns by having physicians respect patient firearms-related privacy, avoid irrelevant probing and records as to the ownership of firearms, and not discriminate or harass gun owners.

---

[8] Subsection (4) of the Act allows physicians to terminate a relationship with a patient. But if a physician continues to see a patient who owns firearms, the patient must not be subjected to discrimination or harassment.

### 3. The Act is narrowly tailored to the State's goals.

The Act's firearms-related prohibitions are narrowly tailored and directly relate to the State's aims of protecting privacy, safeguarding the exercise of Second Amendment rights, preventing discrimination and harassment, and eliminating barriers to medical care.

To satisfy intermediate scrutiny, a measure need "not necessarily [adopt] the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but … a means narrowly tailored to achieve the desired objective." *Went-For-It Inc.*, 515 U.S. at 632 (internal quotation marks omitted). Here, the Act is narrowly targeted at specific professional conduct. It is not broadly applicable but applies to speech only within the context of the health care provider-patient relationship. Also, it restricts only conduct that is not relevant to patient's medical care or safety, where patient rights and care could be harmed for no good or valid reason.[9] Thus, the Act is narrowly tailored to advance the state's substantial goals.

---

[9] The district court said that prevailing federal and state privacy laws were enough to protect patient confidentiality and satisfy the state's goals. But those laws, such as the Health Insurance Portability and Accountability Act of 1996 (HIPAA), only govern public disclosure. Whereas subsection (1)'s recordkeeping provision ensures that irrelevant information about firearms does not enter patient medical records and facilitate discrimination by current or future providers.

### III. The Act Is Not Unconstitutionally Vague.

Finally, the Act is not unconstitutionally vague. In fact, it is explicit that Plaintiffs may undertake the very speech that they allege to be prohibited.

The touchstone measure of vagueness is whether a statute makes it "reasonably clear" what conduct is prohibited. *Bankshot Billiards, Inc. v. City of Ocala,* 634 F.3d 1340, 1349 (11th Cir. 2011) (*quoting United States v. Lanier*, 520 U.S. 259, 267 (1997)); *see also DA Mortgage v. City of Miami Beach*, 486 F.3d 1254 (11th Cir. 2007) ("The traditional test for whether a statute … is void on its face is if it is so vague that 'persons of common intelligence must necessarily guess at its meaning and differ as to its application'") (citation omitted). Great precision is not demanded; all that is required is that the language conveys a sufficiently definite warning that can be commonly understood. *This That and The Other Gift and Tobacco Inc. v. Cobb County*, 285 F.3d 1319, 1325 (11th Cir. 2002). Also, "courts are more tolerant of a vague statute that 'simply regulates business behavior.'" *Bankshot Billiards,* 634 F.3d at 1350 (*quoting Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983)).

Here the Plaintiffs identified a few supposedly vague terms. First it argued that the word "relevant" is vague as used in the Act. But the use of this term conforms to its plain meaning, which courts have never had a problem understanding. *See e.g., U.S. v. Rigas*, 490 F.3d 208. 234 (2d Cir. 2007).

"Relevant" denotes something that relates to an issue. *Id.* As used in the Act, the phrase "relevant to the patient's medical care or safety" communicates that providers should not interrogate the patients in their office about firearms if it is unrelated to medical or safety concerns. It contains no temporal limitation. So the reader can also reasonably conclude that a good faith inquiry can be made with respect to either current or foreseeable medical- and safety-related concerns consistent with medical standards.

The phrase "shall respect a patient's right to privacy" is equally understandable and, in fact, the district court does not explain why it thought the phrase was vague. This phrase reasonably communicates that patients' Second Amendment rights should be respected and that they should not be forced to answer questions about their firearms via coercive threats. The Legislature was very concerned, for example, that constituents were falsely told by health care providers that Medicaid requires them to answer firearms questions on penalty of losing health care benefits. *See*, *supra*, pp. 3-4.

Finally, "unnecessarily harassing" is reasonably clear. When read in the context of the Act as a whole, it communicates that health care providers should not disparage nor make access or treatment more difficult for gun-owning patients just because they choose to exercise Second Amendment rights. The use of "unnecessarily" also gives room to health providers to challenge patients to

improve their health or safety situation, e.g., "You should stop abusing illegal drugs" or "Be wary of storing firearms accessible to small children." Even if a patient considers such admonitions harassing, the inclusion of "unnecessarily" gives the benefit of the doubt to doctors' ability to give good faith medical and safety advice consistent with the Act's other provisions.

Futhermore, Plaintiffs cannot show that the Act "is impermissibly vague in *all* of its applications [and] in the sense that no standard of conduct is specified at all." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 494-95 & n.7 (1982). Instead, the Act makes the prohibited conduct reasonably clear:  health care providers must not interrogate patients about firearms or record such information in patient records if it is not relevant to a patient's medical care or safety, or the safety of others. And they must not discriminate against or harass patients because they keep or own firearms.

## CONCLUSION

Based on the foregoing, State Defendants/Appellants respectfully request that the district court's order enjoining the Act be reversed and remanded with instructions that this case be dismissed as non-justiciable; or, if this Court reaches the merits, that the Act be upheld as a constitutional regulation of professional conduct.

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL

/s/ Timothy D. Osterhaus
Timothy D. Osterhaus (FBN 133728)
Solicitor General
Timothy.Osterhaus@myfloridalegal.com
Jason Vail (FBN 298824)
Assistant Attorney General
Diane G. DeWolf (FBN 059719)
Rachel E. Nordby (FBN 056606)
Deputy Solicitors General
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3300
(850) 410-2672 (fax)
*Counsel for State Appellants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing brief has been delivered to a third-party carrier for express delivery to the Court and furnished by U.S. Mail to the following on September 17, 2012:

Edward M. Mullins
Astigarraga Davis Mullins &
Grossman, P.A.
701 Brickell Avenue, 16th Floor
Miami, FL  33131-2847

Dennis G. Kainen
Weisberg & Kainen, PLC
1401 Brickell Avenue, Suite 800
Miami, FL 33131-3504

Augustine Ripa
Douglas Hallward-Driemeier
Bruce S. Manheim, Jr.
Julia Lewis
Ropes & Gray LLP
700 12th Street NW, Suite 900
Washington, DC 20005

Hal Michael Lucas
Hal M. Lucas, P.A.
701 Brickell Avenue, Suite 1650
Miami, FL  33131

Daniel R. Vice
Jonathan E. Lowy
Brady Center
Legal Action Project
1225 Eye Street NW, Suite 1100
Washington, DC 20005

/s/ Timothy D. Osterhaus
Counsel for State Appellants