No. 12-14009

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DR. BERND WOLLSCHLAEGER, *et al.*,

*Plaintiffs-Appellees*,

v.

GOVERNOR STATE OF FLORIDA, *et al.*,

*Defendants-Appellants*.

Appeal from the United States District Court for the Southern District of Florida
Case No. 1:11-cv-22026-MGC (Honorable Marcia G. Cooke)

**BRIEF OF AMICUS CURIAE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC. SUPPORTING APPELLANTS AND REVERSAL**

Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER AND KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600

*Counsel for Amicus Curiae*

*Wollschlaeger, et al. v. Governor of Florida, et al.*       *Case No. 12-14009*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Amicus Curiae National Rifle Association of America, Inc. has no parent

corporations.  It has no stock, and no publicly held company owns 10% or more of

its stock.

Pursuant to 11th Cir. R. 26.1-1, the undersigned counsel certifies that, in

addition to the persons and entities identified in Appellants' opening brief, the

following persons may have an interest in the outcome of this case.

**Counsel for Amicus Curiae National Rifle Association of America, Inc.**

Cooper, Charles J.

Patterson, Peter A.

September 24, 2012

Charles J. Cooper / L.A.L.
Charles J. Cooper
*Counsel for Amicus Curiae*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES.........................................................................................ii

STATEMENT OF THE ISSUES ............................................................................... 1

INTEREST OF AMICUS........................................................................................... 1

INTRODUCTION ...................................................................................................... 2

SUMMARY OF ARGUMENT.................................................................................. 4

ARGUMENT.............................................................................................................. 5

I.      The Act Does Not Interfere With Doctor-Patient Communications Regarding Firearms Safety. ............................................................................................... 5

II.     Plaintiffs Lack Standing to Challenge the Act............................................. 11

III.    The Act Does Not Violate the First Amendment.......................................... 13

IV.    The Act Is Not Unconstitutionally Vague..................................................... 27

CONCLUSION ........................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**                                                                        **Page**

*Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602 (4th Cir. 1988) .............. 18, 19

* *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990)............................. 8

*American Library Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992) ........................ 12

*Butler v. Thornburgh*, 900 F.2d 871 (5th Cir. 1990)................................................. 7

*C.G. Willis, Inc. v. Director, Office of Workers' Comp. Programs,*
    31 F.3d 1112 (11th Cir. 1994) ......................................................................... 28

*Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010)...................................................... 6

*Clark v. Martinez*, 543 U.S. 371, 125 S. Ct. 716 (2005)............................................ 8

*Coleman v. DeWitt*, 282 F.3d 908 (6th Cir. 2002) .................................................. 23

*Conant v. Walters*, 309 F.3d 629 (2002) ................................................................ 22

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 115 S. Ct. 2371 (1995) .......... 19, 26

*Gentile v. State Bar of Nev.*, 501 U.S. 1030, 111 S. Ct. 2720 (1991) ..................... 20

* *Gonzales v. Carhart*, 550 U.S. 124, 127 S. Ct. 1610 (2007).................................... 28

*Hishon v. King & Spalding*, 467 U.S. 69, 104 S. Ct. 2229 (1984).......................... 12

*Holder v. Humanitarian Law Project*, 130 S. Ct. 2705 (2010)............................... 28

*Horton v. City of St. Augustine*, 272 F.3d 1318 (11th Cir. 2001)............................ 27

* *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557, 115 S. Ct. 2338 (1995) ............................................................ 13

*Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999)......................................................... 28

*Laird v. Tatum*, 408 U.S. 1, 93 S. Ct. 2318 (1972) ................................................. 12

*Legal Servs. Corp. v. Velasquez*, 531 U.S. 533, 121 S. Ct. 1043 (2001).......... 19, 20

*Lopez v. Candaele*, 630 F.3d 775 (9th Cir. 2010) ................................................... 12

* *Lowe v. SEC*, 472 U.S. 181, 105 S. Ct. 2557 (1985)............................................... 18

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753, 114 S. Ct. 2516 (1994) ...................................................... 24, 25

*Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990 (1977)........................... 17

*Mohamed v. Palestinian Auth.*, 132 S. Ct. 1702 (2012)......................................... 25

ii

*Mullins Coal Co. v. Director, Office of Workers' Comp. Programs*,
    484 U.S. 135, 108 S. Ct. 427 (1987) ................................................................ 28

\* *Planned Parenthood of Se. Pa. v. Casey*,
    505 U.S. 833, 112 S. Ct. 2791 (1992) ...................................................... 17, 18

*Qwest Corp. v. FCC*, 258 F.3d 1191 (10th Cir. 2001) ............................................. 6

*Regional Air, Inc. v. Canal Ins. Co.*, 639 F.3d 1229 (10th Cir. 2011) ..................... 7

*Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244 (1984) ............... 24

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*,
    547 U.S. 47, 126 S. Ct. 1297 (2006) ............................................................... 13

*State v. Thomas*, 528 So.2d 1274, 1275 (Fla. Dist. Ct. App. 1988) .......................... 7

*Thompson v. Western States Med. Ctr.*,
    535 U.S. 357, 122 S. Ct. 1497 (2002) ............................................................. 19

*Union Elec. Co. v. Consolidation Coal, Co.*, 188 F.3d 998 (8th Cir. 1999) ............. 7

\* *United States v. Eckhardt*, 466 F.3d 938 (11th Cir. 2006) ................................ 13, 30

*United States v. Lampley*, 573 F.2d 783 (3d Cir. 1978) .......................................... 13

*United States v. Maria*, 186 F.3d 65 (2d Cir. 1999) ................................................. 6

*United States v. Robinson*, 922 F.2d 1531 (11th Cir. 1991) ..................................... 6

*United States v. Rogers*, 14 F. App'x 303 (6th Cir. 2001) ........................................ 7

*University of S. Fla. v. Tucker*, 374 So. 2d 16 (Fla. Dist. Ct. App. 1979) ............ 6, 7

*Virginia v. American Booksellers Ass'n*, 484 U.S. 393, 108 S. Ct. 636 (1975) ........ 9

*Williams v. Taylor*, 529 U.S. 420 (2000) .................................................................. 6

\* *Wilson v. State Bar of Ga.*, 132 F.3d 1422 (11th Cir. 1998) .................................. 12

## Constitutional and Legislative Materials

42 U.S.C. § 12112(d)(2)(A) ..................................................................................... 16

42 U.S.C. § 1320d ..................................................................................................... 11

42 U.S.C. § 300aa-11 ........................................................................................... 28, 29

46 U.S.C. § 3507 ....................................................................................................... 29

38 C.F.R. § 21.284 .................................................................................................... 28

FLA. STAT.

§ 381.026(4)(b) ........................................................................ 2, 26

§ 456.053(5)(a) ............................................................................ 26

§ 456.0575 ................................................................................... 26

§ 456.072(1)(mm) ......................................................................... 2

§ 456.073(4) ............................................................................... 12

§ 458.305(3) ............................................................................... 26

§ 458.327(1)(a) ........................................................................... 26

§ 790.338 ........................................ 2, 3, 5, 6, 6, 9, 10, 11, 16, 25, 27, 29, 30

§ 790.381.026(4)(b)(8)–(11) ........................................................ 2

## Other

AAP, Committee on Injury and Poison Prevention, *Firearm-Related Injuries Affecting the Pediatric Population*, 105 PEDIATRICS 888 (2000) ........... 14, 15

ACP, *Firearm Injury Prevention: Position Summary*, *at* http://www.acponline.org/pressroom/guncontrol.htm .................................. 15

BLACK'S LAW DICTIONARY 784 (9th ed. 2009) ....................................... 30

Brief for Organizations Committed to Protecting the Public's Health as Amici Curiae in Support of Respondents at 1, *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) (No. 08-1521), 2010 WL 59033 ........................ 15, 17

Brief for Petitioners and Cross-Respondents, *Casey*, 505 U.S.833, 112 S. Ct. 2791 (1992) (No. 91-744), 1992 WL 551419 .............................. 17

Brief of the AAP *et al.* as Amici Curiae in Support of Petitioners at 1, *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) (No. 07-290), 2008 WL 157189 .................................................................... 15

House H&HS Comm. Hearing at 42:35 (April 5, 2011) (Dr. Jeff Scott, Florida Medical Ass'n), *available at* http://myfloridahouse.gov/Sections/PodCasts/PodCastArchives.aspx ........... 2

House H&HS Comm. Hearing at 43:00 (Marion Hammer, NRA), *available at* http://myfloridahouse.gov/Sections/PodCasts/PodCastArchives.aspx ........... 9

http://www.healthychildren.org/English/safety-prevention/all-around/pages/ Gun-Safety-Keeping-Children-Safe.aspx ..................................................... 15

Judiciary Comm. Hr'g on HB155 at 41:35 (Apr. 12, 2011) (Rep. Brodeur), *available at* http://myfloridahouse.gov/Sections/PodCasts/PodCastArchives.aspx ..... 9

Sarah Clune, *Report:  Push for Electronic Medical Records Overlooks Security Gaps*, pbs.org, May 17, 2011, at http://www.pbs.org/newshour/rundown/2011/05/report-push-for-electronic-medical-records-overlooks-security-gaps.html ...................... 23, 24

## STATEMENT OF THE ISSUES

1.    Whether Plaintiffs have standing to maintain this action.

2.    Whether provisions of Florida's Firearm Owners' Privacy Act Violate the First Amendment.

3.    Whether provisions of the Firearm Owners' Privacy Act are void for vagueness.

## INTEREST OF AMICUS

The National Rifle Association of America, Inc. ("NRA") is the Nation's foremost and oldest defender of Second Amendment rights. The NRA is also a strong supporter of First Amendment rights, as demonstrated by its participation in cases such as *McConnell v. FEC*, 540 U.S. 93, 124 S. Ct. 619 (2003). The NRA championed the Firearm Owners' Privacy Act in response to its Florida members' experiences of being asked intrusive questions about gun ownership during visits to the doctor's office. The NRA and its members have a strong interest in the Act's validity. The parties have consented to the filing of this brief.[1]

---

[1] No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person – other than the NRA, its members, or its counsel – contributed money that was intended to fund preparing or submitting this brief.

## INTRODUCTION

Before the Court is the district court's decision striking down several provisions of Florida's "Act Relating to the Privacy of Firearms Owners," CS/CS/HB 155, codified at FLA. STAT. §§ 790.338, 381.026(4)(b)(8)–(11), 456.072(1)(mm) ("Firearm Owners' Privacy Act" or "the Act"), which regulates the practice of medicine in Florida by providing for "[m]edical privacy concerning firearms" and by addressing discrimination against, and harassment of, those individuals who choose to exercise their fundamental constitutional right to keep and bear arms, R.20-3 at 2.  The Act was endorsed by both the NRA and the Florida Medical Association,[2] and it was enacted following a number of incidents (identified in the legislative history) between doctors and patients concerning Second Amendment rights.  For example, on one occasion, "a pediatrician asked a patient's mother" during "a routine doctor's visit" if "there were firearms in the home."  *Id*. at 3.  When the mother "refused to answer, the doctor" told the mother "that she had 30 days to find a new pediatrician."  *Id*.

There are several provisions of the Act at issue here:  Section 790.338(1) bars licensed health care practitioners and health care facilities from "intentionally enter[ing] any disclosed information concerning firearm ownership into the

---

[2] *See* House H&HS Comm. Hr'g at 42:35 (Apr. 5, 2011) (Dr. Jeff Scott, Florida Medical Ass'n); *id.* at 43:00 (Marion Hammer, NRA), *available at* http://myfloridahouse.gov/Sections/PodCasts/PodCastArchives.aspx.

patient's medical record *if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.*"

Section 790.338(2) provides that practitioners "shall respect a patient's right to privacy and *should* refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearms in a private home or other domicile.... *Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.*"

Section 790.338(5) provides that practitioners "may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms."

Section 790.338(6) provides that a practitioner "shall respect a patient's legal right to own or possess a firearm and *should* refrain from unnecessarily harassing a patient about firearm ownership during an examination."

The plain language of these provisions simply recommends that practitioners "should refrain" from asking questions about firearms unless related to medical care or safety. The statute at most thus imposes a remote restriction on health care practitioners' speech. And even if the statute did restrict speech, Supreme Court

3

precedent makes clear that the state can regulate doctor-patient speech as part of its power to regulate the practice of medicine, especially where, as here, doctors retain unfettered discretion to discuss the medical care and safety of their patients.

## SUMMARY OF ARGUMENT

1.    "[T]ruthful, non-misleading speech" about firearms safety is not the "direct target of the [Firearm Owners' Privacy] Act." R.105 at 19.  To the contrary, the Act targets discrimination against and harassment of individuals who exercise their fundamental right to keep and bear arms, while leaving physicians free to exercise their good faith medical judgment in discussing firearms safety with patients.

2.    Although Plaintiffs claim that the Act chills their speech with their patients, the Act does not restrict the speech in which Plaintiffs wish to engage. Plaintiffs thus have no objectively reasonable basis for fearing disciplinary action under the Act; they therefore lack standing to challenge it.

3.    Plaintiffs' First Amendment claim fails on the merits.  Again, the Act targets discrimination and harassment, not speech, and it is thus akin to unquestionably constitutional anti-discrimination laws like the Americans with Disabilities Act and Title VII of the Civil Rights Act.  Even if viewed as a speech regulation, the Act is a reasonable regulation of speech incidental to the practice of medicine well within the State's constitutional authority to enact.

4

4.      Plaintiffs vagueness challenge also fails.  The terms used by the Act,

such as "relevant" and "harassing," are not obscure, and they provide sufficient

guidance to allow Plaintiffs to conform their conduct to the law's requirements.

The Act's provision for physicians to exercise their good-faith medical judgment

further alleviates any vagueness concerns.

## ARGUMENT

**I.      The Act Does Not Interfere With Doctor-Patient Communications
Regarding Firearms Safety.**

It is imperative to correct the district court's misreading of the Firearm

Owners' Safety Act, for that misreading pervades the district court's analysis.

According to the district court, the "direct target" of the Act is "truthful, non-

misleading speech," and the Act thus "impairs the provision of medical care and

may ultimately harm the patient" by "preventing [the] patient[] from receiving

truthful, non-misleading information" about firearms safety.  R.105 at 18-19.  But

the Act's plain text demonstrates that it does no such thing.

1.      Section 790.338(2) states that physicians "should refrain from making

a written inquiry or asking questions concerning the ownership of a firearm or

ammunition by the patient or by a family member of the patient, or the presence of

a firearm in a private home or domicile of the patient or a family member of the

patient," but a physician who "in good faith believes that this information is

relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry."

First, this provision is precatory, not mandatory, for it states that physicians "*should* refrain from making" inquiries about firearms. The words of a statute must be given "their ordinary, contemporary, common meaning," *Williams v. Taylor*, 529 U.S. 420, 431, 120 S. Ct. 1479, 1488 (2000), and "the common meaning of 'should' " does not command but merely "suggests or recommends a course of action," *United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999). Indeed, this Court has held that a rule stating that a person " 'should withhold all further comment'… is precatory rather than mandatory," and therefore could not be the basis for imposing disciplinary sanctions. *United States v. Robinson*, 922 F.2d 1531, 1534 (11th Cir. 1991). *See also Carey v. Wolnitzek*, 614 F.3d 189, 206 (6th Cir. 2010) (Ethical canons providing that elected judges " 'should not' " solicit campaign contributions are "hortatory," but canons saying they " 'shall not' " are mandatory.); *Qwest Corp. v. FCC*, 258 F.3d 1191, 1200 (10th Cir. 2001) (The use of "should" merely "indicates a recommended course of action, but does not itself imply the obligation associated with 'shall.' "). Of special import in interpreting the words of the Florida Legislature is the doctrine of the Florida Courts that "[u]se of the word 'should' indicates" that the rule "is discretionary rather than mandatory in nature." *University of S. Fla. v. Tucker*, 374 So.2d 16, 17 (Fla. Dist. Ct. App.

6

1979). *See also State v. Thomas*, 528 So.2d 1274, 1275 (Fla. Dist. Ct. App. 1988) ("[S]hould ... expresses mere appropriateness, suitability or fittingness.").

The Legislature's use of the mandatory "shall" earlier in the very same sentence confirms that its use of the hortatory "should" was deliberate. Under § 790.338(2), physicians "*shall* respect a patient's right to privacy and *should* refrain from making a written inquiry or asking questions" about firearms. When "a legislature uses different terms in the very same statutory provision, [courts] take cognizance of that choice by presuming the legislature intended the different words to carry with them (their traditional) different meanings." *Regional Air, Inc. v. Canal Ins. Co.*, 639 F.3d 1229, 1238 (10th Cir. 2011). The "common meaning of the term 'should' suggests or recommends a course of action, while the ordinary understanding of 'shall' describes a course of action that is mandatory." *Maria*, 186 F.3d at 70. *See also Union Elec. Co. v. Consolidation Coal Co.*, 188 F.3d 998, 1001 (8th Cir. 1999); *Butler v. Thornburgh*, 900 F.2d 871, 876-77 (5th Cir. 1990). Thus, in *United States v. Rogers*, 14 F. App'x 303 (6th Cir. 2001), the Sixth Circuit held that "Congress's use of the mandatory 'shall' eight words before 'should' further indicates that Congress apprehended a distinction between the two terms," and that Congress meant the latter instruction to be merely "hortatory," *id.* at 305. The same is true with respect to the hortatory recommendation about physician gun

7

inquiries in section 790.338(2). The statute on its face merely makes a
recommendation and it thus raises no First Amendment issue at all.

In resisting this conclusion, the district court reasoned that interpreting "the
law as hortatory would render meaningless the law's provision that violations of
the law shall constitute grounds for disciplinary action." R.80 at 9. But this is
simply not so, for the Act contains several firm commands, such as the anti-
discrimination provision, that would remain the subject of disciplinary action.
Furthermore, while "[t]he word 'should' *can* impose a mandatory rule of conduct,"
*id.*, that is not the word's common meaning, and such usage is particularly unlikely
here where the legislature also used the word "shall" in the very same statutory
provision.

At any rate, even if the Act were ambiguous, a hortatory reading of "should
refrain" – a reading to which the text is readily susceptible – avoids any First
Amendment issue. This Court thus has "an obligation to construe [it] narrowly."
*American Booksellers v. Webb*, 919 F.2d 1493, 1500 (11th Cir. 1990). "[W]hen
deciding which of two plausible statutory constructions to adopt, a court must
consider the necessary consequences of its choice. If one of them would raise a
multitude of constitutional problems, the other should prevail." *Clark v. Martinez*,
543 U.S. 371, 380-81, 125 S. Ct. 716, 724 (2005). Indeed, "[i]t has long been a
tenet of First Amendment law that in determining a facial challenge to a statute, if

it be 'readily susceptible' to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397, 108 S. Ct. 636, 644-45 (1975). Here, the district court not only failed to heed this basic canon of statutory interpretation, its interpretation seems designed to invalidate the statute.

Second, in keeping with § 790.338(2)'s *recommendation* that physicians "*should* refrain" from inquiring about guns, it expressly guarantees that they may make such inquiries: "*Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.*" Thus, this exception is limited not by an objective standard, but only by the physician's subjective "good faith."

Third, the inquiry provision in all events addresses only what a physician may *ask* a patient, not what *information* a physician may provide. As the Act's sponsor explained, this is by design:

> One of the important provisions of this is that it does in no way prohibit a safety conversation. And so in Florida where it is estimated that we have 8 million handguns, I hope that this bill actually increases the number of safety conversations.… My view on this is everyone should ... get the firearms lecture.

Judiciary Comm. Hr'g on HB155 at 41:35 (Apr. 12, 2011) (Rep. Brodeur), *available at* http://myfloridahouse.gov/Sections/PodCasts/PodCastArchives.aspx.

9

2.    Sections 790.338(5) and (6) state that a physician "may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition" and "should refrain from unnecessarily harassing a patient about firearm ownership during an examination." These provisions target discrimination and harassment, not speech, and they do nothing to impair doctor-patient discussions of firearms safety – indeed, like the inquiry provision, the anti-harassment provision is simply a recommendation, not a command.

The district court expressed concern that the anti-harassment provision could stifle doctor-patient communication by causing doctors to refrain from engaging in even good-faith questioning about firearms for fear that a patient may find such questions "unnecessarily harassing." *See* R.105 at 7. But given the Act's express protection of good-faith inquiries about firearm ownership, the anti-harassment provision simply cannot be interpreted to bar such inquiries. And in any event, section 790.338(4) guarantees that "a patient may decline to answer or provide any information regarding ownership of a firearm by the patient."

3.    Section 790.338(1) states that a physician "may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others." This provision does not

10

even purport to be a restriction on physician speech; it regulates only medical

record-keeping, which is subject to extensive government regulation. *See, e.g.*, 42

U.S.C. § 1320d *et seq*. More importantly, the restriction applies only when the

physician *knows* firearm-ownership information is irrelevant – *i.e.*, it applies only

when the physician knows that there is no legitimate reason to enter such

information in the patient's medical records. Again, nothing in this provision

impairs doctor-patient discussions of firearms safety.

## II.    Plaintiffs Lack Standing to Challenge the Act.

The district court found that Plaintiffs have standing because the Act has

"caused Plaintiffs' injury by chilling their speech." R.105 at 7. But Plaintiffs

express no desire to engage in activity that the Act forbids or discourages – *i.e.*,

discriminating against or harassing patients and asking about and recording

information that Plaintiffs themselves deem wholly irrelevant. To the contrary,

Plaintiffs simply wish to "(1) ask[] patients about firearm ownership, (ii) follow[]-

up on routine questions regarding firearm ownership, (iii) provid[e] patient intake

questionnaires that include questions about firearms, or (iv) orally counsel[]

patients about firearm safety." *Id.* at 6. As the foregoing discussion of the Act

makes clear, so long as Plaintiffs are acting in good faith, the Act does not even

"arguably forbid[]" them from engaging in any of "this activity." *Id.* at 7.

Plaintiffs claim that their speech is nonetheless chilled by the Act. But "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14, 93 S. Ct. 2318, 2325-26 (1972). "A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). Regardless how genuine or strong Plaintiffs' alleged fears of discipline may be,[3] they are not objectively reasonable, for the Act by its terms simply does not restrict the speech in which they claim they wish to engage, and the State does not argue otherwise. *See Lopez*, 630 F.3d at 788 ("plaintiffs' claims of future harm lack credibility when the challenged speech restriction by its terms is not applicable to the plaintiffs, or the enforcing authority has disavowed the applicability of the challenged law to the plaintiffs").[4]

---

[3] *See e.g.*, *Lopez v. Candaele*, 630 F.3d 775, 792 (9th Cir. 2010) ("injury-in-fact does not turn on the strength of plaintiffs' concerns about a law, but rather on the credibility of the threat that the challenged law will be enforced against them"); *American Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C. Cir. 1992) ("[W]hether plaintiffs have standing ... depends on how likely it is that the government will attempt to use these provisions against them ... and not on how much the prospect of enforcement worries them.").

[4] The prospect of negative ramifications from an unfounded patient-initiated complaint with the Department of Health is likewise remote given that patient complaints remain confidential unless probable cause of a violation is found. *See* FLA. STAT. § 456.073(4).

## III.  The Act Does Not Violate the First Amendment.

1.    The First Amendment does not give a physician the right to discriminate against and/or harass a patient who chooses to exercise her fundamental Second Amendment right own a firearm, merely because that discrimination or harassment may take the form of speech.  "It has *never* been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written or printed."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 62, 126 S. Ct. 1297, 1308 (2006) (emphasis added).  "[I]nvidious private discrimination … has *never* been accorded affirmative constitutional protections," *Hishon v. King & Spalding*, 467 U.S. 69, 78, 104 S. Ct. 2229, 2235 (1984) (emphasis added), and anti-discrimination laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination," *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572, 115 S. Ct. 2338, 2346 (1995).  *See also United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006) (speech intended to "harass and frighten … is not constitutionally protected"); *United States v. Lampley*, 573 F.2d 783, 787 (3d Cir. 1978).

Here, the legislature had before it ample evidence of firearm owners being targeted by medical professionals in Florida. Examples of incidents that were recounted during the legislative process include:

- A pediatrician advising a patient's mother that she had 30 days to find a new pediatrician when the mother refused to indicate whether she had firearms in the home, R.87 at 1;

- A doctor asking the father of a patient if he owned a firearm, and then asking the father to remove that gun from the home, *id.* at 2;

- A family being misinformed that it was "a Medicaid necessity ... to answer a firearms question," *id*. at 3; and

- A mother being separated from her children while medical personnel interrogated the children about guns, *id*.

These and other incidents reflected in the legislative record did not take place in a vacuum – some prominent medical groups have long crusaded against guns and the exercise of Second Amendment rights. For example, the American Academy of Pediatrics (AAP) – the Florida chapter of which is a plaintiff here – has advocated "bans of handguns" and advised pediatricians to "urge parents who possess guns to remove them ... from the home." AAP, Committee on Injury and Poison Prevention, *Firearm-Related Injuries Affecting the Pediatric Population*, 105 PEDIATRICS 888, 893 (2000). The group's website not only advises parents "to

14

NEVER have a gun in the home," but it also encourages them to spread the anti-gun message: "[f]ind out if there are guns in the homes where your children play" and, "[i]f so, talk to the adults in the house about the dangers of guns to their families." *See* http://www.healthychildren.org/English/safety-prevention/all-around/pages/Gun-Safety-Keeping-Children-Safe.aspx. Indeed, in its amicus curiae briefs to the Supreme Court in recent cases involving the Second Amendment, the AAP announced its goal of "removing handguns from homes and communities across the country." Brief of the AAP *et al.* as Amici Curiae in Support of Petitioners at 1, *District of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008) (No. 07-290), 2008 WL 157189; Brief for Organizations Committed to Protecting the Public's Health as Amici Curiae in Support of Respondents at 1, *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) (No. 08-1521), 2010 WL 59033.[5]

Against this backdrop, the Florida Legislature was plainly justified in passing *all* the challenged provisions of the Firearm Owners' Privacy Act. The anti-discrimination and anti-harassment provisions, of course, directly address discrimination against and harassment of gun owners. The inquiry and medical-

---

[5] The AAP is not alone in seeking to prevent the exercise of constitutional rights. The American College of Physicians (ACP) – the Florida chapter of which is also a plaintiff here – "thinks that physicians must become more active in … community efforts to restrict ownership and sale of handguns." ACP, *Firearm Injury Prevention: Position Summary*, *at* http://www.acponline.org/pressroom/guncontrol.htm.

records provisions, in turn, facilitate this aim by reducing the likelihood that the identity of members of the protected class will become known – particularly when their gun ownership is wholly irrelevant to their medical care. This is not a novel strategy. In order to protect disabled individuals from discrimination in the job market, for example, the Americans with Disabilities Act (ADA) generally prohibits prospective employers from "mak[ing] inquiries of a job applicant as to whether such applicant is an individual with a disability." 42 U.S.C. § 12112(d)(2)(A).

The district court attempted to distinguish the Firearm Owners' Privacy Act from "permissible" anti-discrimination laws like the ADA and Title VII of the Civil Rights Act on the grounds that such laws "proscrib[e] discrimination based on certain protected classes, such as gender, race, or disability," while the Firearm Owners' Privacy Act allegedly does not. R.105 at 11. This distinction, however, is immaterial. Like the ADA and Title VII, the Act identifies an individual trait – "exercise of the constitutional right to own and possess firearms or ammunition," § 790.338(5) – and prohibits discrimination on the basis of that trait. Indeed, the district court's suggestion that a "content-neutral" anti-discrimination provision "would be an available, effective alternative" is difficult to fathom. R.105 at 20. *Every* anti-discrimination law must be content-based in the sense that it must

identify *what type of discrimination is prohibited* – be it discrimination on the basis of race, sex, disability, or, here, exercise of Second Amendment rights.

    2.    The Act does not violate the First Amendment for an additional reason: it is a reasonable regulation of speech incidental to the practice of medicine. In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791 (1992), the plaintiffs challenged a Pennsylvania law requiring physicians to provide women with certain information before performing an abortion. They argued that because the law "compel[led]" doctors' speech it was "subject to exacting First Amendment scrutiny and [could] survive only if it [was] narrowly tailored to promote a compelling governmental interest." Brief for Petitioners and Cross-Respondents, *Casey*, 505 U.S.833, 112 S. Ct. 2791 (1992) (No. 91-744), 1992 WL 551419, at *54 (quotation marks omitted). The Supreme Court agreed that physicians' "First Amendment rights" were "implicated, but only as part of the practice of medicine, subject" not to strict scrutiny but "to *reasonable licensing and regulation by the State*." *Casey*, 505 U.S. at 884, 112 S. Ct. at 2824 (opinion of O'Connor, Kennedy, and Souter, JJ.) (emphasis added).[6] There was thus "no constitutional infirmity" in the challenged provision. *Id.*

---

[6] This opinion is controlling on this point because it represents the "position taken by those Members [of the Court] who concurred in the judgment[] on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990, 993 (1977) (quotation marks omitted). Four other justices would have applied rational basis review to sustain the challenged provision. *See Casey*, 505 U.S. at 967-68,

Like the law at issue in *Casey*, the Firearm Owners' Privacy Act regulates speech only as part of the practice of medicine. The line between such regulations and outright speech restrictions is not drawn, as the district court would have it, between laws that "burden … truthful, non-misleading speech within the scope of the profession" and those that do not. R.105 at 13. Rather, "[o]ne who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession.… [T]he professional's speech is incidental to the conduct of the profession." *Lowe v. SEC*, 472 U.S. 181, 232, 105 S. Ct. 2557, 2584 (1985) (White, J., concurring in the result). It is only when "the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, [that] government regulation ceases to function as a legitimate regulation of professional practice with only incidental impact on speech." *Id.*; *see Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) ("Justice White's concurrence provides sound, specific guidelines for determining" the "point at which a measure is no longer a

---

112 S. Ct. at 2867-68 (Rehnquist, C.J., concurring in judgment part and dissenting in part, joined by White, Scalia, and Thomas, JJ.). To the extent this differs from the "reasonable regulation" standard applied by the controlling opinion, it is even more deferential to the State.

regulation of a profession but a regulation of speech."). Florida clearly has not crossed this line.

The Supreme Court cases cited by the district court on this point are not to the contrary. *Thompson v. Western States Med. Ctr.*, 535 U.S. 357, 122 S. Ct. 1497 (2002), involved not doctor-patient communications but rather advertising of certain prescription drugs; indeed, the "parties agreed that the advertising and soliciting prohibited by the [challenged law] constitute[d] commercial speech," *id.*, 535 U.S. at 366, 122 S. Ct. at 1503. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 115 S. Ct. 2371 (1995), likewise involved a regulation of commercial speech – direct-mail solicitation by personal-injury lawyers. *Id.*, 515 U.S. at 623, 115 S. Ct. at 2375-76. Finally, *Legal Services Corp. v. Velasquez*, 531 U.S. 533, 121 S. Ct. 1043 (2001), involved a government grant program designed to assist persons unable to afford legal assistance in noncriminal proceedings, but that restricted attorneys in litigation funded by the program from challenging a law's constitutionality. The case turned not on whether the restricted speech was professional speech, but rather on whether it was a permissible limitation on speech funded by government subsidy. *See id.*, 531 U.S. at 543-44, 121 S. Ct. at 1051. The Court held that it was not, but not for reasons that are relevant here: the limitation "distort[ed] the legal system" through a "serious and fundamental restriction on advocacy of attorneys and the functioning of the judiciary" that had

19

the effect of "insulat[ing] the Government's interpretation of the Constitution from judicial challenge." *Id.*, 531 U.S. at 544, 547, 121 S. Ct. 1050, 1052.

Citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S. Ct. 2720 (1991), the district court also stated that "which constitutional standard should be applied in professional speech cases is still an unsettled question of law." R.105 at 13. Whether this is an accurate description of the state of the law with respect to the attorney speech at issue in *Gentile*, *Casey* demonstrates that it is not the case with respect to doctors' speech. And *Gentile*, at any rate, is not inconsistent with *Casey*'s reasonableness standard for professional speech. The regulation at issue there – a state restriction on *public* statements by attorneys representing parties in pending cases – had been applied to "ban … political speech critical of the government and its officials." *Gentile*, 501 U.S. at 1034, 111 S. Ct. at 2724 (opinion of Kennedy, J.). Even so, the Court applied "a less demanding standard than that established for regulation of the press." *Gentile*, 501 U.S. at 1074, 111 S. Ct. 2744. The Court "balance[d] … the First Amendment rights of attorneys in pending cases and the State's interest in fair trials," and held that the regulation satisfied this balancing test (although it struck it down as void for vagueness). *Id.*, 501 U.S. at 1075, 111 S. Ct. at 2745.

3.    To the extent it regulates speech at all, the Firearm Owners' Privacy Act easily satisfies *Casey*'s reasonable regulation test. Indeed, given the important

interests served by the Act and the narrowness with which the challenged
provisions are drawn, the Act would satisfy even the most exacting First
Amendment scrutiny.

The district court nonetheless held that the Act's challenged provisions
cannot survive a "balancing" of the "State's legitimate interests … against the
practitioners' free speech rights." R.105 at 18. This holding, however, is plagued
both by the district court's overly broad view of the law's effect on speech and its
overly narrow view of the State's interests it serves.

4.    Any impact the law may have on protected speech is exceedingly
remote. Even if the hortatory provisions were interpreted to be mandatory, the Act
would simply (a) prohibit a physician from discriminating against and harassing
patients, and (b) leave to the physician's good faith judgment whether to ask a
patient about firearm ownership and to record any response in the patient's records.
Even so interpreted, in other words, the Act would not interfere with "the free flow
of truthful, non-misleading information" between the doctor and patient. *Id.*

Indeed, against the backdrop of acrimony between patients and physicians
over the issue of firearm ownership and statements by some medical organizations
condemning guns and gun ownership, it is apparent that the Act is designed to
*foster*, not interfere with, the doctor-patient relationship. Patients now have reason
to believe that doctors who ask patients about gun ownership and who record the

21

answers in the patients' medical records are motivated by their good faith medical judgment, not by an ideological or other non-medical agenda. And by clarifying that doctors cannot discriminate against patients on account of answers they give to such questions, the Act makes it more likely that patients will participate in the conversation.

The Act is thus nothing like the federal policy at issue in *Conant v. Walters*, 309 F.3d 629 (2002), which punished doctors for recommending that patients use medical marijuana – a recommendation protected by the law of the state where the doctors practiced, *id.* at 632. That policy truly did inhibit communication of information to patients for it flatly prohibited a physician, unlike the Firearm Owners' Privacy Act, from "exercising his or her medical judgment" on what to recommend to a patient. *Id*. at 638. Further, by striking down the challenged federal policy, *Conant*, unlike the district court decision here, was "consistent with principles of federalism that have left *states* as the primary regulators of professional conduct." *Id*. at 639 (emphasis added).

5.    The Firearm Owners' Privacy Act advances several important State interests. First, the Act facilitates the exercise of Second Amendment rights by protecting citizens who choose to exercise those rights from discrimination and harassment in the provision of medical care. The district court rejected this interest as "irrelevant" and a "legislative illusion," apparently because the Act does not

address a literal prohibition on the ownership or possession of guns. R.105 at 15. But discrimination and harassment by doctors certainly *deters* the exercise of Second Amendment rights, and "[p]rotecting the ability to exercise a fundamental right is a compelling state interest." *Coleman v. DeWitt*, 282 F.3d 908, 913 (6th Cir. 2002).

Second, and relatedly, the Act serves the State's interest in protecting the privacy of patients' exercise of Second Amendment rights. The district court accepted that this interest is at least a legitimate one, R.105 at 17, but questioned whether "the confidentiality of this information is at risk," *id*. at 17 n.5. As an initial matter, this does not account for the fact that some patients wish not to disclose this information *to their doctors*. While the "provision that allows a patient to simply refuse to answer any questions about firearm ownership" certainly addresses this concern, *id*., that provision is buttressed by the provisions discouraging doctors from asking about the subject in the first place and from harassing patients who choose to exercise their right to stay mum. Furthermore, with respect to patients who do choose to share this information with their doctors, it is a common-sense proposition that recording it in their medical records will increase the likelihood that others will gain access to it. Indeed, this concern will only grow more pressing as more and more health care providers move to the use of electronic medical records. *See, e.g.*, Sarah Clune, *Report: Push for Electronic*

*Medical Records Overlooks Security Gaps*, pbs.org, May 17, 2011, at

http://www.pbs.org/newshour/rundown/2011/05/report-push-for-electronic-

medical-records-overlooks-security-gaps.html.

Third, the Act serves the State's compelling interest in reducing the

likelihood that individuals will suffer discrimination and harassment in the

provision of medical care. As the Supreme Court has held, "acts of invidious

discrimination in the distribution of publicly available ... services ... cause unique

evils that government has a compelling interest to prevent." *Roberts v. United*

*States Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 3255 (1984).

Indeed, the compelling interest in protecting individuals from discrimination

and harassment is particularly acute in the medical context, as a patient may

already be in a fragile psychological state and exigent circumstances may

circumscribe a patient's choice of providers. The State thus has a strong interest in

protecting both the "psychological" and the "physical ... well-being of the patient

held 'captive' by medical circumstance." *Madsen v. Women's Health Ctr., Inc.*,

512 U.S. 753, 768, 114 S. Ct. 2516, 2526 (1994). Applying this reasoning, the

Court in *Madsen* upheld an injunction restraining pro-life demonstrators from loud

protests "within earshot of the patients" inside an abortion clinic, reasoning that the

"First Amendment does not demand that patients at a medical facility undertake

Herculean efforts to escape the cacophony of political protests." *Id.*, 512 U.S. at

24

772, 114 S. Ct. at 2528. If a State may take special steps to protect patients at medical facilities from unwanted speech and conduct originating *outside* those facilities, surely they may do the same when the speech and conduct originates *from doctors themselves*.

The district court deemed the State's anti-discrimination interest "dubious" because the Act "does not prevent a physician from terminating the doctor-patient relationship if the patient refuses to answer questions regarding firearm ownership." R.105 at 16. To be sure, the Act "does not alter existing law regarding a physician's authorization to choose his or her patients." § 790.338(4). But the fact that the legislature chose to balance its interest in preventing discrimination with other legitimate interests does not render that interest "dubious." Indeed, "[n]o legislation pursues its purposes at all costs." *Mohamed v. Palestinian Auth.*, 132 S. Ct. 1702, 1710 (2012). And it was certainly legitimate for the legislature to strike the balance it struck here – for both the doctor's *and* the patient's benefit: A doctor should not be forced to continue a doctor-patient relationship when he is so incensed by a patient declining to answer a question about gun ownership that he desires to terminate it.

The district court also faulted the State for relying on "anecdotal information" to support this interest. R.105 at 16. But certainly nothing more was required, particularly in light of the slight imposition the Act imposes on

physicians' First Amendment rights. Indeed, even in "applying strict scrutiny" the Supreme Court has "permitted litigants … to justify [speech] restrictions based solely on history, consensus, and simple common sense." *Florida Bar*, 515 U.S. at 628, 115 S. Ct. at 2378 (quotation marks omitted).

Fourth, consistent with *Casey*, the Act serves the State's important interest in regulating the medical profession. Indeed, Florida heavily regulates speech incidental to medical practice. Practicing medicine without a license is a third degree felony. FLA. STAT. § 458.327(1)(a). Individuals thus lawfully cannot engage in speech consisting of "diagnosis, treatment, operation, or prescription for any … physical or mental condition" without the State's prior permission. *Id*. § 458.305(3). Doctors are to provide patients with "information concerning diagnosis, planned course of treatment, alternatives, risks, and prognosis" – but not when patients "refuse this information." *Id.* § 381.026(4)(b)(3). Doctors must notify patients in person about harmful adverse incidents. *Id.* § 456.0575. Doctors generally cannot refer patients to entities in which they have an investment interest. *Id*. § 456.053(5)(a). We could multiply these examples.

The Firearm Owners' Privacy Act is another reasonable regulation of medical practice. It exhorts doctors to stick to *practicing medicine* when examining patients, rather than pushing their own political agendas, and it protects patients from doctors who refuse to do so. And as we have explained, the

Legislature had ample reason to believe that some doctors *need* this encouragement in the context of Second Amendment rights.

### IV.    The Act Is Not Unconstitutionally Vague.

1.    The district court also erred by finding the record-keeping, inquiry, and anti-harassment provisions void for vagueness.  First, to survive a vagueness challenge, a statute's prohibition must be clear enough to "enable[] the ordinary citizen to conform his or her conduct to the law."  *Horton v. City of St. Augustine*, 272 F.3d 1318, 1330 (11th Cir. 2001).  But, again, at least with respect to the inquiry and anti-harassment provisions *there is no prohibition* to which anyone must "conform his or her conduct," because the provisions are merely hortatory. These provisions *require nothing* and *compel nothing* and therefore could not be unconstitutional even if they were vague.  There can be no chilling effect on speech where the law merely makes a recommendation that the speaker is not compelled to obey.

Second, even the hortatory recommendation to refrain from firearms inquiries is subject to a broad exception for inquiries that the physician "*in good faith* believes" are "relevant to the patient's medical care or safety, or the safety of others."  § 790.338(2).  The record-keeping limitation likewise applies only when the physician "*knows*" that gun-ownership information "is not relevant to the patient's medical care or safety, or the safety of others."  § 790.338(1).  These

27

scienter requirements eviscerate Plaintiffs' vagueness claim because "scienter

requirements alleviate vagueness concerns." *Gonzales v. Carhart*, 550 U.S. 124,

149-50, 127 S. Ct. 1610, 1628 (2007). The "Act cannot be described as 'a trap for

those who act in good faith.' " *Id. See also Karlin v. Foust*, 188 F.3d 446, 473

(7th Cir. 1999) (holding that a statute under which "a physician may rely on his or

her 'best medical judgment' [to comply] ... provides fair warning of the conduct

expected of physicians and is more than adequate to protect against any arbitrary

enforcement of [the law] by state officials").

Third, "perfect clarity and precise guidance have never been required even

of regulations that restrict expressive activity," *Holder v. Humanitarian Law

Project*, 130 S. Ct. 2705, 2719 (2010), and the meaning of the purportedly

objectionable terms employed by the statute are hardly obscure or unfamiliar.

2.    **"Relevant."** The Act employs the term "relevant" five times, in each

instance followed by the phrase "to the patient's medical care." The concept of

medical relevance is firmly embedded in the law.[7]

---

[7] *See, e.g., Mullins Coal Co. v. Director, Office of Workers' Comp.
Programs*, 484 U.S. 135, 149-52, 108 S. Ct. 427, 434-37 (1987) (regulations
providing for the admissibility of "all relevant medical evidence" in black-lung
claims); *C.G. Willis, Inc. v. Director, Office of Workers' Comp. Programs*, 31 F.3d
1112, 1115 (11th Cir. 1994) ("relevant medical diagnosis" needed before employer
can be held accountable); 38 C.F.R. § 21.284 (treatment available based on
"relevant medical findings"); 42 U.S.C. § 300aa-11 (petitions under National
Vaccine Injury Compensation program require "available relevant medical

Noting Plaintiffs' contention that, "in the context of preventive medicine, information about a patient's use or possession of firearms is always relevant," R.105 at 21-22, the district court hesitated to accept an interpretation of the relevance exception that allegedly "would render that clause meaningless or superfluous" and thus found the provisions containing the exception unconstitutionally vague, *id.* at 21. But the district court's concern lacks merit: the inquiry and record-keeping provisions apply broadly to "health care practitioner[s]," §§ 790.338(1)&(2), not just to practitioners of preventive medicine. While a primary care physician may in good faith believe that a patient's firearms ownership is always relevant, the same may not be the case for, say, an eye doctor. Furthermore, while Plaintiffs may have a good faith belief that information about a patient's gun ownership is always relevant, it does not follow that *all* preventive care practitioners think the same way. The district court's concern about "meaningless or superfluous" statutory language is thus misplaced, and it does not render the straightforward relevance exceptions unconstitutionally vague.

3.    "**Unnecessarily Harassing.**" In *Eckhardt*, this Court rejected a vagueness challenge to a federal statute that outlawed making "harassing" telephone calls. "[T]he telephone harassment statute provided sufficient notice of

_____

records"); 46 U.S.C. § 3507 (vessel owners required to "preserve relevant medical evidence" in cases of sexual assault).

29

its prohibitions because citizens need not guess what terms such as 'harass' and 'intimidate' mean." *Eckhardt*, 466 F.3d at 944. The meaning of such terms "can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning." *Id.* The same is true here. Thus the harassment from which physicians "should refrain" under § 790.338(6) includes "[w]ords, conduct, or action ... directed at a specific person" that "annoys" that person "and serves no legitimate purpose." BLACK'S LAW DICTIONARY 784 (9th ed. 2009). The inclusion of the adverb "unnecessarily" does not change matters. To the contrary, it simply underscores the provision' s discouragement of haranguing patients about firearms ownership for no legitimate purpose.

## CONCLUSION

For these reasons, the judgment below should be reversed.

Dated: September 24, 2012          Respectfully submitted,

*Charles J. Cooper / L.A. L*

Charles J. Cooper
David H. Thompson
Peter A. Patterson
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 220-9600

*Counsel for Amicus Curiae*

30

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in

FED. R. APP. P. 32(a)(7)(B). This brief contains 6,994 words.

September 24, 2012

*Charles J. Cooper*/L.A.L.

Charles J. Cooper
*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 24, 2012, a true and correct copy of the foregoing, with first class postage prepaid, has been deposited in the U.S. Mail and properly addressed to the Court and to the persons whose names and addresses are listed below:

| | |
|---|---|
| Pam Bondi<br>Jason Vail<br>Timothy David Osterhaus<br>Attorney General's Office<br>PL-01 The Capitol<br>Tallahassee, FL 32399-1050 | Gerald Edward Greenberg<br>Gordon McRae Mead Jr.<br>Stearns Weaver Miller Weissler<br>    Alhadeff & Sitterson, PA<br>150 Flagler St. Ste 2200<br>Miami, FL 33130 |
| Dennis G. Kainen<br>Weisberg & Kainen, PL<br>1401 Brickell Ave., Ste. 800<br>Miami, FL 33131-3504 | Anthony T. Caso<br>Center for Constitutional Jurisprudence<br>Chapman Univ. School of Law<br>1 University Dr.<br>Orange, CA 92866 |
| Douglas Hallward-Driemeier<br>Bruce S. Manheim Jr.<br>Julia Lewis<br>Augustine Ripa<br>Ropes & Gray LLP<br>700 12th St. NW, Ste. 900<br>Washington, DC 20005 | Thomas Richard Julin<br>Hunton & Williams, LLP<br>1111 Brickell Ave. Ste. 2500<br>Miami, FL 33131 |
| Jonathan E. Lowy<br>Daniel R. Vice<br>Brady Center to Prevent Gun Violence<br>1225 Eye St. NW, Ste. 1100<br>Washington, DC 20005 | Randall C. Marshall<br>ACLU Foundation of Florida, Inc.<br>4500 Biscayne Blvd. Ste. 340<br>Miami, FL 33137 |
| Hal Michael Lucas<br>Hal M. Lucas, P.A.<br>701 Brickell Ave., Ste. 1650<br>Miami, FL 33131 | Edward M. Mullins<br>Astigarraga Davis Mullins & Grossman,<br>    PA<br>Ste. 1650<br>701 Brickell Ave. Fl. 16<br>Miami, FL 33131 |

September 24, 2012

_Lizzie A. Lipovsky_
Lizzie A. Lipovsky