# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

### Case No. 12-14009-FF
_____

### DR. BERND WOLLSCHLAEGER, *et al.*,
Plaintiffs – Appellees,

v.

### GOVERNOR, STATE OF FLORIDA, *et al.*,
Defendants – Appellants.

_____

**On Appeal from the United States District Court**
**For the Southern District of Florida**
**Miami Division**

_____

**BRIEF FOR APPELLEES**
**DR. BERND WOLLSCHLAEGER,** *et al.*

_____

Elizabeth N. Dewar
(application pending)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: 617-951-7845

Douglas H. Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz (application pending)
ROPES & GRAY LLP
700 12th Street NW, Suite 900
Washington, D.C. 20005
Telephone: 202-508-4600

[Additional counsel listed on following page.]

[Counsel, cont.]

Edward M. Mullins
Hal M. Lucas
ASTIGARRAGA DAVIS MULLINS &
GROSSMAN, P.A.
701 Brickell Avenue, 16th Floor
Miami, Florida 33131-2847
Telephone:  (305) 372-8282

Jonathan E. Lowy
Daniel R. Vice
BRADY CENTER TO PREVENT GUN
VIOLENCE
1225 Eye Street NW, Suite 1100
Washington, DC 20005
Telephone:  (202) 289-7319

*Counsel for Appellees Dr. Bernd Wollschlaeger,* et al.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

**Wollschlaeger v. Governor, State of Florida, *et al.* (Case No. 12-14009-FF)**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Eleventh Circuit Rule 26.1-1, Appellants/Defendants provide the following certificate of interested persons:

1.     The Honorable Marcia G. Cooke, U.S. District Judge

**Defendants/Appellants:**

2.     Armstrong, John H., present Florida Surgeon General and Secretary of the Department of Health

3.     Averoff, Magdalena, Fla. Board of Medicine Member

4.     Bearison, Fred, Fla. Board of Medicine Member

5.     Dudek, Elizabeth, Secretary of the Agency for Health Care Administration

6.     El Sanadi, Nabil, Fla. Board of Medicine Member

7.     Espinola, Trina, Fla. Board of Medicine Member

8.     Farmer, Frank, former Florida Surgeon General and Department Secretary

9.     Goersch, Brigitte Rivera, Fla. Board of Medicine Member

10.    Lage, Onelia, Fla. Board of Medicine Member

11.    Levine, Bradley, Fla. Board of Medicine Member

12.    Mullins, Donald, Fla. Board of Medicine Member

13.    Nuss, Robert, Fla. Board of Medicine Member

**<u>Wollschlaeger v. Governor, State of Florida,</u>** *et al.* **(Case No. 12-14009-FF)**

14.    Orr, James, Fla. Board of Medicine Member

15.    Rosenberg, Jason, Fla. Board of Medicine Member

16.    Scott, Rick, Governor of Florida

17.    Shugarman, Richard G., Fla. Board of Medicine Member

18.    Stringer, Merle, Fla. Board of Medicine Member

19.    Thomas, George, Fla. Board of Medicine Member

20.    Tucker, Elisabeth, Fla. Board of Medicine Member

21.    Winchester, Gary, Fla. Board of Medicine Member

22.    Zachariah, Zachariah, Fla. Board of Medicine Member

**Plaintiffs/Appellees:**

23.    American Academy of Pediatrics, Florida Chapter

24.    American Academy of Family Physicians, Florida Chapter

25.    American College of Physicians, Florida Chapter

26.    Fox-Levine, Shannon

27.    Gutierrez, Roland

28.    Sack, Stanley

29.    Schaechter, Judith

30.    Schechtman, Tommy

31.    Wollschlaeger, Bernd

## Wollschlaeger v. Governor, State of Florida, *et al.* (Case No. 12-14009-FF)

**Defendants/Appellants' counsel:**

32.     DeWolf, Diane G.

33.     Nordby, Rachel E.

34.     Osterhaus, Timothy D.

35.     Vail, Jason

**Plaintiffs/Appellees' counsel:**

36.     Dewar, Elizabeth

37.     Goetz, Mariel

38.     Guiliano, Douglas

39.     Hallward-Driemeier, Douglas

40.     Kainen, Dennis G.

41.     Lowy, Jonathan

42.     Lucas, Hal

43.     Manheim, Bruce

44.     Mullins, Edward

45.     Ripa, Augustine

46.     Vice, Daniel

**Amici and Others:**

47.     Brady Center to Prevent Gun Violence

48.     National Rifle Association (NRA)

**Wollschlaeger v. Governor, State of Florida, *et al.* (Case No. 12-14009-FF)**

49.     Center for Constitutional Jurisprudence (CCJ)

50.     Doctors for Responsible Gun Ownership (DRGO)

51.     Heckenlively, Bryan, Counsel for Center to Prevent Gun Violence

52.     Thompson, David, Counsel for the NRA

53.     Patterson, Peter, Counsel for the NRA

54.     Cooper, Charles, Counsel for the NRA

55.     Eastman, John, Counsel for CCJ and DRGO

56.     Caso, Anthony, Counsel for CCJ and DRGO

s/ Douglas Hallward-Driemeier

Dated: October 29, 2012

Douglas Hallward-Driemeier
ROPES & GRAY LLP
*Counsel for Appellees*

**STATEMENT REGARDING ORAL ARGUMENT**

Appellees respectfully request oral argument in this case because it may significantly assist the Court in determining the important constitutional issues involved in this appeal, including whether the Firearm Owners' Privacy Act violates Appellees' free speech and due process rights under the First and Fourteenth Amendments to the U.S. Constitution.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE

DISCLOSURE STATEMENT ........................................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................ v

TABLE OF AUTHORITIES ................................................................ viii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................ 1

STATEMENT OF THE CASE............................................................ 2

     A.    Firearm Safety Counseling as Preventive Care ......................... 3

     B.    The Firearm Owners' Privacy Act ....................................... 4

     C.    The Law's Impact on Appellees' Speech ................................ 9

     D.    Appellees' Challenge to the Law ...................................... 11

     E.    Standard of Review ................................................... 13

SUMMARY OF THE ARGUMENT .................................................... 13

ARGUMENT ............................................................................ 18

I.    Appellees Have Standing To Bring This Challenge....................... 18

     A.    Appellees Have Suffered an Injury-in-fact in the Form of

Self-censorship. ..................................................... 18

B.     The State's Insistence that the Statute Does Not Impose Any Restriction on Appellees' Speech Is At Odds with the Law's Text, Its Legislative History, and the State's Own Characterizations ....................................22

II.   The Firearm Owners' Privacy Act Is a Content-Based Speech Restriction That Fails Strict Scrutiny ...................................................................27

    A.     The Challenged Provisions are Subject to Strict Scrutiny .....................28

    B.     The Act Does Not Further a Compelling State Interest..........................33

    C.     The Act is Not the Least Restrictive Means of Achieving a Legitimate State Interest.....................................................................................40

    D.     The Law Is Not a Permissible Regulation of Medical Professionals .....43

    E.     The Statute is Not Immune from First Amendment Scrutiny as an Antidiscrimination Statute .....................................................................47

    F.     Nor Is the Law Permissible as a Commercial Speech Regulation..........50

III.  The Act Is Unconstitutionally Vague ............................................................53

IV.  The Act Is Unconstitutionally Overbroad......................................................58

CONCLUSION ....................................................................................................60

CERTIFICATE OF COMPLIANCE......................................................................61

CERTIFICATE OF SERVICE ..............................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abramson v. Gonzalez,*

 949 F.2d 1567 (11th Cir. 1992) ..........................................................51

*Ashcroft v. Free Speech Coalition,*

 535 U.S. 234, 122 S.Ct. 1389 (2002)................................................59

*Barbano v. Madison Cnty.,*

 922 F.2d 139 (2d Cir. 1990) ..............................................................47

*Beaulieu v. City of Alabaster,*

 454 F.3d 1219 (11th Cir. 2006) ........................................................18

*Bloedorn v. Grube,*

 631 F.3d 1218 (11th Cir. 2011) ........................................................21

*Borrero v. United Healthcare of New York, Inc.,*

 610 F.3d 1296 (11th Cir. 2010) ........................................................19

*Brown v. Entm't. Merchants Ass'n,*

 131 S. Ct. 2729 (2011)......................................................................37

*\*Burk v. Augusta-Richmond Cnty.,*

 365 F.3d 1247 (11th Cir. 2004) ........................................28, 29, 30, 42

*\*Cal. Democratic Party v. Jones,*

 530 U.S. 567, 120 S.Ct. 2402 (2000).............................................34, 35

*Carey v. Brown*,

   447 U.S. 455, 100 S.Ct. 2286 (1980)....................................................................39

*Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*,

   447 U.S. 557, 100 S.Ct. 2343 (1980)....................................................................50

*Clark v. Cmty. for Creative Non-Violence*,

   468 U.S. 288, 104 S.Ct. 3065 (1984)....................................................................30

*Coates v. City of Cincinnati*,

   402 U.S. 611, 91 S.Ct. 1686 (1971)......................................................................58

*\*Conant v. Walters*,

   309 F.3d 629 (9th Cir. 2002) ...........................................................29, 46, 55, 57

*Craig v. Floyd Cnty., Georgia*,

   643 F.3d 1306 (11th Cir. 2011) ...........................................................................13

*DA Mortg., Inc. v. City of Miami Beach*,

   486 F.3d 1254 (11th Cir. 2007) ...........................................................................30

*Dallio v. Spitzer*,

   343 F.3d 553 (2d Cir. 2003) .................................................................................24

*District of Columbia v. Heller*,

   554 U.S. 570, 128 S.Ct. 2783 (2008)....................................................................35

*Dolan v. Postal Serv.*,

   546U.S. 481, 126 S.Ct. 1252 (2006).....................................................................31

*FCC v. League of Women Voters*,

    468 U.S. 364, 104 S.Ct. 3106 (1984)..................................................................36

*Fla. Bar v. Went For It, Inc.*,

    515 U.S. 618, 115 S.Ct. 2371 (1995)................................................................50

*Ford v. St. Elizabeth Hospital*,

    No. 92-CV-511, 1993 WL 330036 (N.D.N.Y. Aug. 20, 1993).........................47

*Giaccio v. Pennsylvania*,

    382 U.S. 399, 86 S.Ct. 518 (2003)..................................................................58

*\*Harrell v. Florida Bar*,

    608 F.3d 1241 (11th Cir. 2010) ..................................................................passim

*\*Harris v. Mexican Specialty Foods, Inc.*,

    564 F.3d 1301 (11th Cir. 2009) ..................................................................53, 58

*Harrison v. Benchmark Elecs. Huntsville, Inc.*,

    593 F.3d 1206 (11th Cir. 2010) .........................................................................48

*Hill v. Colorado*,

    530 U.S. 703, 120 S.Ct. 2480 (2000)................................................................29

*\*In re Davis*,

    565 F.3d 810 (11th Cir. 2009) ....................................................................26, 54

*Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*,

    601 F.2d 809 (5th Cir. 1979) .............................................................................22

*Kleindienst v. Mandel*,

 408 U.S. 753, 92 S.Ct. 2576 (1972)....................................................................29

*Legal Services Corp. v. Velazquez*,

 531 U.S. 533, 121 S.Ct. 1043 (2001)................................................................45

*Locke v. Shore*,

 634 F.3d 1185 (11th Cir. 2011) .........................................................................43

*Madsen v. Women's Health Center, Inc.*,

 512 U.S. 753, 114 S.Ct. 2516 (1994)................................................................39

*Martin v. City of Struthers*,

 319 U.S. 141, 63 S.Ct. 862 (1943)....................................................................38

*Mason v. Florida Bar*,

 208 F.3d 952 (11th Cir. 2000) ..........................................................................50

*Nat'l Adver. Co. v. City of Miami*,

 402 F.3d 1335 (11th Cir. 2005) ........................................................................18

*Planned Parenthood v. Casey*,

 505 U.S. 833, 112 S.Ct. 2791 (1992)................................................................46

*Planned Parenthood v. Rounds*,

 530 F.3d 724 (8th Cir. 2008) ............................................................................46

*R.A.V. v. City of St. Paul, Minn.*

 505 U.S. 377, 112 S.Ct. 2538 (1992)....................................................28, 40, 49

*Reno v. ACLU*,

    521 U.S. 844 (1997)........................................................................26, 53

*Richardson v. Reno*,

    162 F.3d 1338 (11th Cir. 1998) ........................................................26

*Rowan v. U.S. Post Office Dep't*,

    397 U.S. 728, 90 S.Ct. 1484 (1970).....................................................39

*Saxe v. State Coll. Area Sch. Dist.*,

    240 F.3d 200 (3d Cir. 2001) .......................................................33, 49

*Simon & Schuster, Inc. v. Members of NY State Crime Victims Bd.*,

    502 U.S. 105, 112 S.Ct. 501 (1991)..............................................38, 57

*Seattle Times Co. v. Rhinehart*,

    467 U.S. 20, 104 S. Ct. 2199 (1984).....................................................32

*Solantic, LLC v. City of Neptune Beach*,

    410 F.3d 1250 (11th Cir. 2005) ............................................28, 31, 33

*Sorrell v. IMS Health Inc.*,

    131 S. Ct. 2653 (2011)..................................................................passim

*Stuart v. Huff*,

    834 F.Supp.2d 424 (M.D.N.C. 2011) ..................................................51

*Tenn. v. Lane*,

    541 U.S. 509, 124 S.Ct. 1978 (2004)....................................................47

*Thomas v. Collins,

    323 U.S. 516, 65 S.Ct. 315 (1945).........................................................44, 55, 57

Thompson v. W. States Med. Ctr.,

    535 U.S. 357, 122 S.Ct. 1497 (2002)...................................................................43

*Trammel v. United States,

    445 U.S. 40, 100 S.Ct. 906 (1980)...............................................................29, 46

United States v. Alexander,

    100 F.3d 24 (5th Cir. 1996) ...............................................................................24

United States v. Anderson,

    798 F.2d 919 (7th Cir.1986) ..............................................................................23

United States v. Gondek,

    65 F.3d 1 (1st Cir. 1995).....................................................................................23

United States v. Locke,

    471 U.S. 84 (1985)..............................................................................................26

*United States v. Playboy Entm't Grp., Inc.,

    529 U.S. 803 (2000)................................................................................28, 37, 40

*United States v. Stevens,

    130 S. Ct. 1577 (2010).........................................................................26, 28, 58

United States v. United Foods, Inc.,

    533 U.S. 405, 121 S.Ct. 2334 (2001).................................................................50

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,

425 U.S. 748, 96 S.Ct. 1817 (1976)....................................................29

*Vill. of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*,

455 U.S. 489, 102 S.Ct. 1186 (1982)...........................................53, 54

*Ward v. Rock Against Racism*,

491 U.S. 781 (1989)...........................................................................31

*Wash. State Grange v. Wash. State Republican Pty.*,

552 U.S. 442, 128 S.Ct. 1184 (2008)................................................58

*Weaver v. Bonner*,

309 F.3d 1312 (11th Cir. 2002) ........................................................58

*Wilson v. State Bar of Ga.*,

132 F.3d 1422 (11th Cir. 1998) ...................................................43, 44

CONSTITUTIONAL AUTHORITIES

*First Amendment to the U.S. Constitution ....................................passim

Second Amendment to the U.S. Constitution..................................passim

*Fourteenth Amendment to the U.S. Constitution ..........................passim

STATUTES

18 U.S.C. §922(t)...............................................................................35

28 U.S.C. §1291....................................................................................1

28 U.S.C. §1331....................................................................................1

42 U.S.C. §§12101 *et seq*........................................................................47

42 U.S.C. §12112 .....................................................................................47

Fla. St. §456.057 ....................................................................................41

Fla. St. §456.072(k) ..................................................................................7

Fla St. §456.072(l)(nn) .......................................................................7, 24

Fla. St. §790.338 ..............................................................................passim

Fla. St. §790.065 ....................................................................................35

*Health Ins. Portability & Accountability Act of 1996*, 42 U.S.C. §1320d *et*

 *seq*. ...............................................................................................36, 41

## OTHER AUTHORITIES

H.R. 0155C (Apr. 7, 2011) ................................................................5, 7, 30

H.R. 0155E (Apr. 12, 2011)................................................................5, 31

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction over the action brought by Appellees Dr. Bernd Wollschlaeger, Dr. Judith Schaechter, Dr. Tommy Schechtman, Dr. Stanley Sack, Dr. Shannon Fox-Levine, Dr. Roland Gutierrez, the Florida Chapter of the American Academy of Pediatrics, the Florida Chapter of the American Academy of Family Physicians, and the Florida Chapter of the American College of Physicians (collectively, "Appellees") under 28 U.S.C. §1331. This Court has jurisdiction over this appeal of a final judgment in favor of Appellees pursuant to 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

The District Court below granted summary judgment in Appellees' favor and permanently enjoined Appellants (hereinafter, "the State") from enforcing certain provisions of the Firearm Owners' Privacy Act, CS/CS/HB 155 (June 2, 2011) (codified at Fla. St. §§790.338, 381.026, 456.072, 395.1055), a Florida statute that prohibits health care practitioners from asking patients about firearms, from recording information about firearms in patients' medical records, and from "unnecessarily harassing" or "discriminat[ing] against" patients based on their ownership of firearms. The issues on appeal are:

1.    Whether this action by Appellees—physicians who have self-censored their speech in fear of the severe consequences of violating the statute—is justiciable;

2.    Whether the law, as a speaker- and content-based restriction on speech, violates Appellees' First Amendment right to freedom of speech;

3.    Whether the law is void for vagueness under the Due Process Clause because it does not provide fair notice of what it proscribes; and

4.    Whether the law is unconstitutionally overbroad because it curtails a much greater number of constitutionally protected exchanges than the few, if any, situations in which it might constitutionally be applied.

## STATEMENT OF THE CASE

Following cross motions for summary judgment, the District Court below permanently enjoined the State from enforcing certain provisions of the Firearm Owners' Privacy Act, holding that the Act violates Appellees' right to freedom of speech and is void for vagueness. Summary Judgment Order, D105.[1] Neither party raised any disputed issues of fact. *See* D105:5. Accordingly, the facts described below are undisputed.

---

[1] Citations to the record are [D#:*] or [D#¶*] where # is the District Court's docket entry number and * is the page or paragraph number.

## A.     Firearm Safety Counseling as Preventive Care

Inquiring about firearm ownership and recording such information in a patient's medical record is a routine part of the effective practice of preventive medicine for many health care practitioners.  Joint Statement of Undisputed Facts in Support of Cross Motions for Summary Judgment, D87¶¶16-24.  National physicians' organizations have recognized firearm safety as a critical public health issue, because unintentional injury (including by firearms) is the leading cause of death and morbidity among children older than one year, adolescents, and young adults.  *See* D87¶¶17, 25.  The record in this case is replete with undisputed evidence regarding the extent of firearms-related injuries and deaths in Florida, including both empirical evidence and tragic stories of accidents involving Appellees' patients and others.[2]

To help prevent these needless losses, the American Academy of Pediatrics ("AAP"), its Appellee Florida chapter ("FAAP"), the American College of Physicians, its Appellee Florida chapter ("FACP"), the American Academy of Family Physicians, and its Appellee Florida chapter ("FAFP") all recommend counseling families about firearm injury prevention.  *See* D87¶¶16-17.  To facilitate this counseling, AAP and FAAP recommend that physicians incorporate

---

[2] *See, e.g.*, FACP Decl., D18-2:8 (relating statistics on injuries and deaths from firearm-related accidents); FAAP Decl., D17¶14 (same); Schaechter Decl., D21¶¶5-7 (describing experiences with firearm-related accidents); Welty Decl., D31¶4 (same).

questions about firearms into the patient history process. *Id.* (quotation marks omitted).

Accordingly, as part of their practice of preventive medicine, many practitioners, including Appellees, routinely ask patients about a variety of potential health and safety risks, including household chemicals, swimming pools, drugs, alcohol, tobacco, and firearms. *See* D87¶18. Many practitioners, including Appellees, use written screening questionnaires for new patients or patients scheduled for annual check-ups, in which they ask about a variety of health and safety risks, including access to firearms. *See* D87¶¶18-19. Some physicians, including Appellees, also verbally inquire about risks, including firearms. *See* D87¶¶18-19, 30.[3]

**B.     The Firearm Owners' Privacy Act**

On June 2, 2011, Florida Governor Rick Scott signed into law the Firearm Owners' Privacy Act. *See* CS/CS/HB 155 ("An act related to the privacy of firearm owners."). The law was prompted by reports of doctors asking patients and families questions about firearms that were viewed by some patients as unduly intrusive or offensive. D87¶¶3-10 (collecting incidents reported in legislative debates). In addition, a few legislators reported that unidentified constituents had

---

[3] *See also* Schaechter Decl., D21¶10; Schechtman Decl., D22¶7; 7/19/11 Schaechter Decl., D73-3¶¶2, 22; 7/18/11 Wollschlaeger Decl., D73-4¶5; 7/18/11 Schechtman Decl., D73-5¶3.

been falsely told by physicians that patients could be denied Medicaid benefits if they refused to answer questions about firearms. D87¶¶9-10. The most frequently cited incident took place in Ocala, Florida, where the mother of a minor patient refused to answer a pediatrician's routine question about firearms in her home, and, following a disagreement about the propriety of the question, the pediatrician asked the mother to find a new physician. *See* D87¶¶3, 6, 9. Legislators and other supporters of the law considered these inquiries part of an anti-gun "political agenda" on the part of practitioners, D87¶10, and "a . . . political attack on the constitutional right to own a possessive firearm," D87¶5. Legislative committee reports further identified the fact that "'professional medical groups have adopted policies that encourage or recommend that physicians ask patients about the presence of a firearm in the house.'" D87¶4 (quoting Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 2 (Apr. 7, 2011) (D20-3) (citing AAP and American Medical Association recommendations); Fla. Judiciary Comm., H.R. Staff Analysis, H.R. 0155E, at 2 (Apr. 12, 2011) (D20-4) (same)).

The Act provides that practitioners "shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient." Fla. St. §790.338(2) ("no-inquiry

provision"). The no-inquiry provision contains an exception providing that a practitioner "may" inquire about firearms "notwithstanding" the no-inquiry provision when a practitioner believes "in good faith" that the information is "relevant to the patient's medical care or safety, or the safety of others." *Id*. The law also prohibits practitioners from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others." *Id.* §790.338(1) ("no-recording provision"). The law does not define the term "relevant" as used in the no-inquiry or no-recording provisions. A separate provision of the statute that Appellees did not challenge, and which remains in force, provides that patients "may decline to answer" practitioners' questions regarding firearms. *Id*. §790.338(4).

The law further provides that practitioners "shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination," *id.* §790.338(6) ("harassment provision"), and bars "discriminat[ing] against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition," *id.* §790.338(5) ("discrimination provision").[4] The law does not

---

[4] The challenged provisions apply both to individual practitioners as well as "health care facilit[ies]" (collectively, "practitioners"). *See id*. §§790.338(1)-(2), (5)-(6).

6

define either "discriminat[ion]" or "unnecessar[y] harass[ment]." *See id*. Neither the harassment nor the discrimination provision contains an exception for speech made with a good faith belief in its relevance to medical care or safety, or any other exception. A separate provision of the statute provides that "[a] patient's decision not to answer a question" regarding firearms "does not alter existing law regarding a physician's authorization to choose his or her patients," *id*. §790.338(4), which means that a physician may terminate the physician-patient relationship if a patient refuses to provide information regarding firearms.[5]

The law provides both that "[v]iolating *any* of the provisions of § 790.338" "shall constitute grounds for which disciplinary actions . . . may be taken," *id*. §456.072(1)(nn) (emphasis added), and, more specifically, that "[v]iolations of the provisions of subsections (1)-(4) constitute grounds for disciplinary action," *id*. §790.338(8).

The law took effect on June 2, 2011. *See* CS/CS/HB 155 §4. The same day, the Florida Board of Medicine ("Board" or "Board of Medicine") declared that violations of the law would be adjudicated under existing disciplinary guidelines for "'failure to comply with a legal obligation.'" D87¶12 (citation omitted); *see*

---

[5] *See* D20-3:4-5 (Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 3-4 (Apr. 7, 2011) (describing standards governing termination of the physician-patient relationship, including that "Florida statutes do not currently contain any provisions that dictate when physicians and patients can terminate a doctor-patient relationship")).

Fla. St. §456.072(k) (providing that "[f]ailing to perform any statutory or legal obligation placed upon a licensee" is grounds for discipline).

Practitioners accused of violating the law face disciplinary proceedings and sanctions including fines up to $10,000 per offense and revocation of their medical licenses. D87¶11; *see* Fla. Admin. Code r. 64B8-8.001(2)(g) (providing a range of penalties for "[f]ailure to perform legal obligation," including, for a first violation, "based upon the severity of the offense and the potential for patient harm, from a letter of concern to revocation or denial, and an administrative fine from $1,000.00 to $10,000.00").

The Board's June 2, 2011 minutes summarize the law as providing that practitioners "shall not ask about firearm ownership or possession" without a good-faith belief in the information's relevance; are "prohibit[ed from] entering firearm ownership information into a patient's medical record" without the same good-faith belief; "may not discriminate against a patient solely on basis [sic] of ownership or possession of a firearm"; and "shall not harass a patient about firearm ownership." D87¶12.

On June 14, 2011, the Board mailed a letter from its Executive Director to all Florida physicians informing them that the law had "take[n] effect" and that it "establishe[d] grounds for discipline." D71-1:2; D87¶13. (More than one month later, on July 18, 2011, six days after oral argument on Appellees' motion for a

preliminary injunction, the Board published online a second letter purporting "[t]o clarify" that the law only "recommends" against inquiries about firearms, D87¶14.)

## C.    The Law's Impact on Appellees' Speech

Upon the law's passage, Appellees and other practitioners became concerned that the preventive care in which they routinely engaged, described above, violated the law and put them at risk of disciplinary sanctions. *See* D87¶¶32-38. They documented these concerns in more than a dozen declarations submitted to the District Court. *See* D17-31, D73. These practitioners were uncertain as to the precise scope of the law's "relevance" exception.[6] They noted their practice of inquiring about firearms as a routine matter of preventive medicine, even when they had no basis to believe, in advance, that such an inquiry was relevant to the particular patient beyond the general interest in gathering patient information and providing appropriate safety counseling. *See* D87¶¶18-19, 29-34. They also did not know what sort of conduct would be considered "unnecessar[y] harass[ment]" or "discriminat[ion]" under the statute's terms.[7] The practitioners feared that a wide range of their current practices regarding firearm topics was now prohibited by the law. *See* D87¶¶26-38. And many were fearful of

---

[6] *See, e.g.*, Welty Decl., D31¶¶12-14; Schaechter Decl., D21¶¶14-15; Schechtman Decl., D22¶11; Wollschlaeger Decl., D23¶11; Fox-Levine Decl., D24¶¶10-11, 13; King Decl., D25¶10; Goodman Decl., D26¶¶10-11; Edwards Decl., D27¶¶12-13; Gutierrez Decl., D28¶¶11-13; Leland Decl., D30¶¶11-12.

[7] *See, e.g.*, Fox-Levine Decl., D24¶13; Goodman Decl., D26¶11; Gutierrez Decl., D28¶¶13, 17; Wollschlaeger Decl., D23¶11; Edwards Decl., D27¶13.

even the prospect of being accused of violating the law—let alone actually being sanctioned—since even an accusation of professional misconduct would adversely affect them.[8]

As a result, Appellees and other practitioners censored their speech in a variety of ways. *See* D87¶¶26-38. Some practitioners stopped asking patients or families about firearms altogether. *See, e.g.*, D87¶¶32-33. Others ceased using a question about firearms on their routine questionnaires but continued some oral counseling regarding firearms. D87¶¶33-34. Some ceased using written materials at the instruction of their employer; for example, the University of Miami instructed all practicing faculty members to "refrain from using any pre-printed material that contain these type of [firearm] questions." D87¶39. Some continued to ask about firearm ownership but did not follow up to the same extent they did previously. *See* D87¶36. Still others, unwilling to give up this part of their practice of medicine, continued their practices unchanged, but in fear of the potentially "devastating" professional consequences of a Board enforcement action. *See* D87¶31; Leland Decl., D30¶¶10-12; Welty Decl., D31¶¶4, 12-14.

---

[8] *See, e.g.*, Schaechter Decl., D21¶23; Edwards Decl., D27¶15; Goodman Decl., D26¶12; Schechtman Decl., D22¶13; Leland Decl., D30¶11; Fox-Levine Decl., D24¶18; Wollschlaeger Decl., D23¶11; Welty Decl., D31¶13.

**D.    Appellees' Challenge to the Law**

Four days after the Act was signed, on June 6, 2011, Appellees filed the instant action, challenging the law's constitutionality under the First and Fourteenth Amendments.  D1.  On June 24, 2011, Appellees filed an Amended Complaint and a motion for a preliminary injunction against the law's enforcement.  D15-16.

On September 14, 2011, the District Court granted Appellees' motion.  D80.  The court found that Appellees had shown that their challenge to the law's constitutionality was likely to succeed, that Appellees' self-censorship constituted an irreparable harm, that the balance of hardships tipped in Appellees' favor, and that a preliminary injunction was consistent with the public interest.  *See id*.

On June 29, 2012, following cross-motions for summary judgment, the court entered an order granting final summary judgment for Appellees, and permanently enjoined the State from enforcing the statute's no-inquiry, no-recording, discrimination, and harassment provisions.  D105:24-25.

The court first held that Appellees had suffered an actual injury and had standing, since "they are currently engaging in self-censorship to avoid potential disciplinary action," and the self-censorship was objectively reasonable.  *Id.* at 6-7.

On the merits, the court held that the law restricted "only one subject matter—firearm ownership," making it a content-based restriction on speech, *id.* at

11, and that it failed strict scrutiny, *id.* at 13-14. The court rejected as insufficient the State's proffered compelling interests. *Id.* at 14-17. The asserted interest of protecting patients' Second Amendment rights was not compelling because the law "does not affect nor interfere with a patient's right to continue to own, possess or use firearms." *Id.* at 15. Although the State has a compelling interest in "protecting its citizens from some types of discrimination or harassment," the State had presented insufficient evidence that there truly were "barriers to the receipt of medical care arising from discrimination or harassment based on firearm ownership" in Florida. *Id.* at 15-16. Further, the court noted, the law provides "only remote, if any, support for the State's asserted purpose," because it "does not prevent a physician from terminating the doctor-patient relationship if a patient refuses to answer questions regarding firearm ownership." *Id.* at 16. Finally, the court held that protecting "privacy" related to firearm ownership and possession was not a compelling interest, because firearm ownership was already highly regulated, including through requirements to disclose personal information before obtaining a firearm or certain licenses. *Id.* at 17. The "State fail[ed] to provide any evidence that the confidentiality of this information is at risk," and the asserted privacy interest was, regardless, "adequately protected by the Act's provision that allows a patient to simply refuse to answer any questions about firearm ownership." *Id.* at 17 n.5.

The court further held that, even if the State's interests were compelling, the law failed strict scrutiny because the challenged provisions were not the "least restrictive means" to accomplish the State's purported goals. *Id.* at 20-21.

The court found, in the alternative, that the law failed to satisfy a "less demanding standard" applicable to regulations of professional conduct, because Appellees' free speech interests in "speak[ing] freely to their patients" trumped the attenuated governmental interests allegedly furthered by the law. *Id.* at 13-14, 20.

Finally, the court held that the law's no-inquiry, no-recording, and harassment provisions were unconstitutionally vague. *Id.* at 21-23.

The court permanently enjoined the State from enforcing the four challenged provisions of the law. *Id.* at 24-25. This appeal followed.

## E.    Standard of Review

Appellate courts review an entry of summary judgment *de novo*, construing all facts and inferences in favor of the nonmoving party. *Craig v. Floyd Cnty., Georgia*, 643 F.3d 1306, 1309 (11th Cir. 2011).

## SUMMARY OF THE ARGUMENT

The Florida legislature enacted the Firearm Owners' Privacy Act in an effort to stifle what certain legislators perceived to be a political agenda on the part of physicians who were asking patients about the presence of guns in their homes and warning of the dangers associated with firearms. The law applies only to health

care practitioners, who its supporters perceived to be hostile to firearm ownership, and restricts only communications about firearms, not other topics of preventive medicine or any other subject, including subjects irrelevant to medical care. Such speaker- and content-based restrictions on speech are forbidden by the First Amendment unless they can satisfy strict scrutiny. The Firearm Owners' Privacy Act indisputably cannot survive strict scrutiny; the State does not even try to defend it under that standard. Instead, the State seeks to avoid judicial review altogether or to urge a lesser standard of scrutiny. But those efforts fail, and the District Court's order enjoining enforcement of the challenged provisions of the Act should be affirmed.

First, contrary to the State's contentions on appeal, the no-inquiry provision is not merely a hortatory legislative recommendation, and Appellees have standing to challenge it. The Act provides that practitioners "shall respect" patients' privacy and "should refrain" from asking about firearms. The provision then sets forth an exception granting practitioners permission to inquire about firearms "[n]otwithstanding" the foregoing, but only in specified circumstances. There would, of course, be no need for such a grant of permission if the law did not establish a prohibition. The legislature confirmed that "should refrain" is mandatory by specifying that practitioners who violate the no-inquiry provision are subject to discipline, and also by characterizing the harassment provision—which

uses the same "shall respect … should refrain" formulation—as a "prohibition." The Board of Medicine likewise has recognized the no-inquiry provision as a prohibition it will enforce, and the State's own briefs are hopelessly inconsistent on this point. Moreover, because the Act was adopted in response to speech virtually indistinguishable from the preventive medicine and counseling in which Appellees wish to engage, Appellees have self-censored their speech to avoid accusations that they are violating its prohibitions. Appellees therefore clearly have standing.

The Act's challenged provisions do not merely regulate medical professionals' "conduct" with an incidental effect on speech. Rather, all four provisions were enacted in response to, and were intended to prohibit, precisely the kind of communications around firearm safety in which Appellees have engaged. Indeed, the State's brief on appeal and those of its *amici* confirm that the Act was intended to address the perceived "difficulties" posed by physicians who asked questions about firearms that some patients found unwelcome, or whose firearm safety messages were perceived by some patients as anti-gun harassment and discrimination. Although the State hypothesizes certain forms of physical intimidation or discriminatory conduct, such as forcing firearm owners to wait longer or delaying their test results, there is no evidence of widespread discriminatory conduct of that type. Although the State may regulate the professions to ensure the provision of competent services, it may not adopt

viewpoint-discriminatory restrictions on speech that are designed to limit the communication of disfavored ideas.

The State's proffered justifications cannot save the challenged provisions of the Act. As an initial matter, the State has failed to identify any compelling interest that those provisions further. Although styled a protection of firearm owners' "privacy," any such interest is fully addressed by the statute's guarantee, which Appellees did not challenge, that patients can decline to answer any questions about firearms. In any event, firearms already are regulated heavily, including through certain disclosure requirements, and medical records already enjoy considerable privacy protections. To the extent the law was designed to protect the sensitivities of firearm owners who find the question off-putting or who, for whatever reason, would prefer not to be reminded about the risks of improper firearm storage, that is not an interest that can overcome First Amendment rights.

Even more fundamentally, any legitimate interest that the State may have could be addressed without the Act's unnecessary restrictions on practitioner-patient communications. For example, the Act prohibits practitioners from inquiring of, or recording information about, firearm ownership even if the patient would welcome the exchange and having that information in the patient's file. The State cannot presume that all patients will find the speech unwelcome. And, to the extent that the State has for the first time on appeal identified harassing or

discriminatory *acts* that it desires to prevent, the State could adopt legislation narrowly targeting that conduct.  The State cannot, however, adopt vague anti-harassment or anti-discrimination prohibitions with the stated intent of curbing practitioners' speech, and then justify those provisions with reference to hypothetical harms.  In the First Amendment context, the State must demonstrate that speech restrictions respond to an actual, widespread problem, not simply supposition or anecdote.

Finally, the District Court was correct to hold that the challenged provisions are unconstitutionally vague.  The statute does not define the standard of "relevance" in the no-inquiry and no-recording provisions' safe-harbor, nor does it define "unnecessarily harassing" or "discrimination."  Without definitions, these provisions easily could be interpreted to prohibit speech routinely engaged in by Appellees.  Indeed, in light of the speech that the law was specifically designed to combat, Appellees have every reason to fear that those provisions will be invoked against Appellees' own speech.  And the harassment provision cannot be saved by resort to dictionary definitions of "harassment" as annoying someone without legitimate purpose.  As the Supreme Court has held, violation of a statute cannot turn on whether a particular listener may find the speaker's message annoying.

The District Court's order should be affirmed.

# ARGUMENT

## I.  APPELLEES HAVE STANDING TO BRING THIS CHALLENGE

As the District Court recognized, Appellees have standing to make this challenge because the Act chills their speech.  D105:5-8.  The State contends that Appellees lack a redressable injury-in-fact, and, indeed, that there is no Article III controversy at all, because the statute does not "*really*" prohibit any speech by Appellees.  State Br. 9, 15-25.  This argument is at odds with the Act's text, its legislative history, and the State's own positions in this litigation.  The State's unconvincing protestations that the statute is a nullity cannot save it from judicial review.[9]

---

[9] The State rightly does not renew its ripeness arguments on appeal.  *Cf.* D105:8-10.  "[R]eview of a suit's ripeness is at its most permissive in cases concerning putative violations of the First Amendment."  *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005).  Ripeness turns on "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development."  *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) (internal quotations and citations omitted).  These factors favor Appellees, since (1) delayed review would inflict serious hardship on Appellees, who are censoring their own speech, *see supra* at 26; (2) there is no ongoing administrative action with which judicial intervention would interfere, *see Harrell v. Florida Bar*, 608 F.3d 1241, 1261 (11th Cir. 2010); and (3) additional factual development is unnecessary to this facial challenge (and, in any event, the State does not dispute that the statute has chilled Appellees' speech, *see, e.g.*, D87¶¶32-38).  Although claiming Appellees could have sought an advisory opinion from the Board of Medicine, State Br. 22 n.4, the State rightly refrains from contending that administrative exhaustion was required.  *See Harrell*, 608 F.3d at 1258-59 (exhaustion of facial challenge not required if a non-speculative threat of enforcement exists).

### A. Appellees Have Suffered an Injury-in-fact in the Form of Self-censorship

"[I]t is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences. [T]he injury is self-censorship." *Harrell*, 608 F.3d at, 1254 (internal quotation marks omitted). To establish an injury-in-fact, such plaintiffs must demonstrate that (1) they "seriously wish[] to engage in expression that is at least arguably forbidden by the . . . law"; (2) the applicable "rules are at least arguably vague"; and (3) "there is at least some minimal probability that the challenged rules will be enforced if violated." *Id.* at 1254, 1260 (internal quotations and citations omitted).

These three criteria are easily met here. First, Appellees wish to engage in speech that is "at least arguably" forbidden by the law.[10] It is undisputed that the law caused Appellees to curtail their practices of asking patients about firearms as part of routine preventive medicine, recording related information, and following up with patients regarding firearm safety. *See* D87¶¶18-24, 29-38. The law certainly "arguably" forbids such speech. For example, the law permits inquiries

---

[10] Appellees FAAP, FAFP, and FACP do not claim independent injuries but instead seek to vindicate the rights of their individual members who, like the named Appellees, would have standing. *See Borrero v. United Healthcare of New York, Inc.*, 610 F.3d 1296, 1305 (11th Cir. 2010). Throughout this brief, in discussing the injuries this law inflicts, "Appellees" refers to the individual appellees as well as members of FAAP, FAFP, and FACP.

regarding firearms or recording related information only if the practitioner "in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others." Fla. St. §790.338(2); *see also id.* §790.338(1). This exception arguably implies that there must be some particularized, non-routine circumstance present to justify making the inquiry or recording; otherwise, if such questions are always "relevant"—as some practitioners believe, D87¶¶29-30—the exception would swallow the rule. *Cf.* Fla St. §790.338(3) (adopting narrow "medical emergency" or "imminent danger" standard for gun inquiries by EMTs). Practitioners also would arguably violate the discrimination provision by treating patients previously known to own a firearm differently in follow-up visits—for instance, by counseling them more closely about firearms if suicidal ideation is suspected. And a physician who persists in questioning a patient regarding firearms after the patient initially refuses to answer a firearms question—as some practitioners wish to do, *see* D87¶36—arguably violates the harassment provision, because such persistence could be "unnecessarily harassing" given the patient's expressed opposition to answering. Significantly, neither the discrimination nor harassment provision provides a "good faith" exception. Fla. St. §790.338(6); *id.* §790.338(5).

Second, the law is "at least arguably vague." *Harrell*, 608 F.3d at 1265. Among other problems, described further *infra* at Part III, the law does not give

practitioners notice whether routine inquiries about firearms and recording related information as a part of preventive medicine, not founded on particularized circumstances, qualify for the "relevant" safe-harbor.  Further, the law does not define either "unnecessarily harassing" or "discriminate," leaving practitioners to guess what patients will deem objectionable.  And, as discussed further below, the law's vagueness has been confirmed by the State's continued inability to articulate a consistent, coherent meaning for its provisions.

Third, there is also "at least some minimal probability that the challenged rules will be enforced if violated."  *Harrell*, 608 F.3d at 1260.  The statute provides that violations of all four challenged provisions, including the no-inquiry provision, "constitute grounds for disciplinary action," Fla. St. §790.338(8), and the Board of Medicine already has determined how violators of the law will be disciplined, *see* D87¶12.  Moreover, the mere fact that the State is defending this recently-enacted law in court suggests that it intends to enforce it.  *See Harrell*, 608 F.3d at 1257.  Appellees need not expose themselves to potential disciplinary proceedings or wait until the law is enforced against them to justify their reasonable fear and self-censorship.  *See Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011).[11]

---

[11] The punishments available for violations of this law typically are reserved for egregious misconduct, like obtaining a license through bribery or making

Immediate review is not only appropriate under this Court's standing jurisprudence; it is also necessary to avoid further irreparable harm to both Appellees and their patients. As this Court has recognized, in the First Amendment context there is nothing to be gained by "permit[ting] the contours of regulation to be hammered out case by case in a series of enforcement proceedings . . . While the 'hammering out' continues so do the vices of vagueness; the appellants' uncertainty about the reach of [the law] will force them to continue to restrict their . . . activities." *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 820 (5th Cir. 1979); *see also Harrell*, 608 F.3d at 1264 n.8 (finding "no point in allowing . . . a series of necessarily arbitrary opinions applying" vague rules).

### B. The State's Insistence that the Statute Does Not Impose Any Restriction on Appellees' Speech Is At Odds with the Law's Text, Its Legislative History, and the State's Own Characterizations

The Firearm Owners' Privacy Act was enacted for the express purpose of curtailing physicians' speech on the subject of firearm ownership. The State acknowledged as much below. *See* D49:18 (opposing "[a] ruling for Plaintiffs [that] will permit physicians to continue to make inquiries about these constitutional rights [of firearm ownership]"). On appeal, however, the State argues that "the text of the Act does not *really* forbid doctors from asking patients

---

fraudulent representations. *See* Fla. St. §456.072. Practitioners fear harm to their reputations and careers even from the mere filing of a complaint. *See* D88¶2.

about firearms," stressing the statute's "should refrain" language.  State Br. 9.

Likewise, the State argues that under the "relevance" exception the statute "bars

none of the questions that Plaintiffs allege . . . are infringed by the Act."  *Id.* at 15;

*see also* NRA Br. 6-9.  This attempt to interpret-away the statute's speech

restrictions fails.

1.     First, the notion that the law is merely hortatory, rather than

mandatory, is utterly untenable.  The law was partly prompted by an incident in

which a patient's mother objected to a "question" about firearm ownership, which

she "felt . . . invaded her privacy."  D87¶3 (quoting committee report describing

Ocala incident).  In redressing this supposed privacy invasion, the law provides

that practitioners "shall respect a patient's right to privacy and should refrain from

making a written inquiry or asking questions concerning the ownership of a

firearm."  Fla St. §790.338(2).  The law's use of the word "should" instead of

"shall" in the second instance is not determinative.  As numerous courts have

observed, depending on context, the word "should" can impose a mandatory rule

of conduct.[12]  Here, the context makes clear that "should" is mandatory.  The

---

[12] *See, e.g.*, *United States v. Anderson*, 798 F.2d 919, 924 (7th Cir.1986) ("We note
that the word 'should' is defined as 'the past tense of shall,' (Webster's New
World Dictionary at 1349 (1962)) and as listed in Roget's Thesaurus means 'be
obliged, must . . . have to.'  The common interpretation of the word 'should' is
'shall' and thus . . . imposes a mandatory rule of conduct[.]"); *United States v.
Gondek*, 65 F.3d 1, 3 (1st Cir. 1995) (interpreting "should" in the Sentencing
Guidelines as "shall" because "[n]o qualification is stated or suggested")

sentence quoted above is followed immediately by another stating that "notwithstanding this provision," practitioners "*may* make such a verbal or written inquiry" in specified circumstances. *Id*. (emphasis added). This grant of authority—"may make such . . . inquiry" "notwithstanding" the preceding sentence—makes no sense unless the preceding sentence establishes a mandatory prohibition.

This understanding is confirmed by other provisions of the statute and how the State has characterized them. The law expressly provides that "[v]iolations of the provisions of subsections (1)-(4) constitute grounds for disciplinary action . . ." Fla. St. §790.338(8). The statute thus could not be clearer that subsection (2), the no-inquiry provision, is not merely hortatory. *See also* Fla. St. §456.072(1)(nn) ("[v]iolating *any* of the provisions of s. 790.338" "shall constitute grounds for which disciplinary actions . . . may be taken") (emphasis added). And the legislature itself characterized the harassment provision as "prohibiting harassment," *see* CS/CS/HB 155, although that provision uses the same "shall respect . . . and should refrain" formulation as the no-inquiry provision, *see* Fla. St. §790.338(6). On appeal, the State repeatedly characterizes the harassment provision as a "prohibition" against harassment. *See* State Br. at 1, 6, 18, 27, 35

(superseded by statute); *United States v. Alexander*, 100 F.3d 24, 27 (5th Cir. 1996) (same) (superseded by statute); *see also Dallio v. Spitzer*, 343 F.3d 553, 562 (2d Cir. 2003) ("the word 'should' is legally variable").

n.8, 39.  The State does not explain why the phrase "should refrain" is mandatory in the harassment provision, yet hortatory in the no-inquiry provision.  To the contrary, the State at one point characterizes the no-inquiry provision as "proscrib[ing] . . . inquiries" that do not satisfy the relevance exception.  *Id. at* 11.  Finally, the Board of Medicine has characterized the no-inquiry provision as providing that practitioners "shall not ask about firearm ownership" and has announced its statutory authorization to impose disciplinary sanctions for violations of all four challenged provisions.  *See* D87¶12 (minutes of June 2, 2011 Rules/Legislative Comm. of the Bd. of Medicine).  Thus, the State's contention that the no-inquiry provision is hortatory does not withstand scrutiny.

2.     Second, the State's strained "interpretation" of the relevance exceptions as encompassing all of the speech in which Appellees wish to engage, including making routine inquiries, *see* D105:23-25, cannot be reconciled with the law's text and history.  The law's plain purpose was to *limit* practitioners' inquiries regarding firearms in order to further a purported privacy interest supposedly "invaded" by routine firearms questions.  As the District Court recognized, interpreting the relevance exception so broadly as to permit all practitioners to ask all patients about firearms as a routine part of preventive care—without any assessment of a particular patient's circumstances—would contravene, not carry

out, the legislature's intent in passing the law. *See* D105:22.[13] The canon of constitutional avoidance has no application where, as here, the interpretation urged on the court would contravene the statute's very purpose.[14] This Court "cannot read statutory language in a way that renders it wholly meaningless," even to save the statute from constitutional attack. *In re Davis*, 565 F.3d 810, 823 (11th Cir. 2009).

The State's own shifting account of the statute's prohibitions further demonstrates the reasonableness of Appellees' fears that routine inquiries and counseling about firearms would not be regarded as "relevant." The State formerly acknowledged that routinely asking a parent or children about firearm ownership and then engaging in counseling regarding safe firearm practices would be prohibited by the law. *See* D49:7 (claiming that the law's disciplinary sanctions would apply in situations "such as those that animated the passage of the act . . .

---

[13] Furthermore, the law's only concrete indication of the required degree of "relevance" suggests a far more stringent definition—one of "medical emergency" or "imminent danger or threat." *See* Fla. St. §790.338(3) (providing that emergency medical technicians and paramedics cannot make inquiries about firearms unless they have a good faith belief that the "information . . . is necessary to treat a patient during the course and scope of a medical emergency or that the presence or possession of a firearm would pose an imminent danger or threat to the patient or others").

[14] *See United States v. Stevens*, 130 S. Ct. 1577, 1591-92 (2010) ("'[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction.'") (citing *Reno v. ACLU*, 521 U.S. 844, 884 (1997)); *Richardson v. Reno*, 162 F.3d 1338, 1360 (11th Cir. 1998) ("[C]ourts cannot press statutory construction to the point of disingenuous evasion even to avoid a constitutional question.") (quoting *United States v. Locke*, 471 U.S. 84, 96 (1985)).

where no relevant basis for the question exists" and then discussing incidents indistinguishable from routine preventative medicine practices).[15]

Finally, no matter how capacious the statute's "relevance" standard might be, the State's prohibition against "irrelevant" speech concerning gun safety still unconstitutionally restricts Appellees' First Amendment rights. The State cannot force practitioners to put their speech through a State-imposed "relevance" filter before speaking with their patients.[16] By singling out gun-related speech by practitioners, the State has forced Appellees to self-censor in order to avoid disciplinary proceedings. Appellees therefore have standing to challenge the Act.

## II. THE FIREARM OWNERS' PRIVACY ACT IS A CONTENT-BASED SPEECH RESTRICTION THAT FAILS STRICT SCRUTINY

The Firearm Owners' Privacy Act's no-recording, no-inquiry, harassment, and discrimination provisions cannot withstand the strict scrutiny applied to speaker- and content-based restrictions on speech. A content-based regulation is

---

[15] The specific examples the State discussed included an incident in which "a pediatrician asked [a Florida state representative, at an appointment for his daughter] if he owned a firearm and [] instructed [him] to remove it from his home," and another incident in which "a pediatrician interrogated [children] about firearm ownership" during an office visit while their mother was out of the room. D49:7.

[16] Furthermore, the law's "unnecessar[y] harass[ment]" and discrimination provisions contain no "good faith" safe-harbor that could purportedly save them via a narrowing construction. *See* Fla. St. §§790.338(5)-(6). Thus, if a patient views a practitioner's speech as "unnecessarily harassing" or discriminatory in some way, that patient may file a complaint against the practitioner with the Board of Medicine, with respect to which the practitioner's good faith belief in the relevance of the speech will not be a defense.

constitutional "only if it constitutes the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005) (citation omitted). As such, "'[c]ontent-based regulations are presumptively invalid,'" *id.* at 1259 (quoting *R.A.V. v. City of St. Paul, Minn.* 505 U.S. 377, 382, 112 S.Ct. 2538, 2566 (1992)), and "'the Government bears the burden to rebut that presumption,'" *Stevens,* 130 S. Ct. at 1584 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 817 (2000)). "Few laws survive such scrutiny." *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1255 (11th Cir. 2004). As the District Court rightly held twice, the government has no compelling interest in restricting practitioners' speech, and in any event the Firearm Owners' Privacy Act is not the least restrictive means of furthering the State's ends. D80:15-20; D105:14-20. The State apparently concedes that the law cannot withstand strict scrutiny; it does not even attempt to defend the law under that standard.

### A.    The Challenged Provisions are Subject to Strict Scrutiny

Because the Act restricts protected speech on the basis of its content—specifically, speech by practitioners on the subject of firearms—it is subject to strict scrutiny. As an initial matter, the Firearm Owners' Privacy Act regulates speech protected by the First Amendment. Numerous courts have recognized that the First Amendment protects the exchange of information between practitioner

and patient and, in particular, the gathering of information from the patient to provide medical care. *See, e.g.*, *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906 (1980) ("[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."); *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002) ("An integral component of the practice of medicine is the communication between a doctor and a patient."); *see also Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011) (noting that "consumer's concern for the free flow of . . . speech . . . has great relevance in the fields of medicine and public health, where information can save lives" (internal quotation omitted)). Patients also have a right to *receive* information from their doctors under the First Amendment. *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57, 96 S.Ct. 1817, 1823 (1976) ("[T]he protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both. . . [F]reedom of speech 'necessarily protects the right to receive.'") (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762-63, 92 S.Ct. 2576, 2581 (1972)).

A restriction on speech is considered content-neutral only if it "'places no restrictions on—and clearly does not prohibit—either a particular viewpoint or any subject matter,'" *Burk*, 365 F.3d at 1252 (quoting *Hill v. Colorado*, 530 U.S. 703, 723, 120 S.Ct. 2480, 2493 (2000)), and if it "is 'justified without reference to the

content of the regulated speech,'" *DA Mortg., Inc. v. City of Miami Beach*, 486 F.3d 1254, 1266 (11th Cir. 2007) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065 (1984)).

The Act's restrictions are plainly speaker- and content-based because they restrict only practitioners' freedom to inquire about or discuss "a particular subject matter"—namely, firearms. *Burk*, 365 F.3d at 1254. Practitioners—and only practitioners—are prohibited from inquiring or recording information *about firearms* unless they satisfy the State's standard of "relevance," Fla. St. §§790.338(1)-(2); but they are not barred from inquiring about or including any other irrelevant information. Similarly, only persistent or unwelcome counseling *about firearms* is prohibited by the discrimination and harassment provisions, *see id.* §§790.338(5)-(6); practitioners remain free to engage in supposed "unnecessarily harassing" speech regarding any other subject.

These provisions thus single out speech concerning a particular subject matter—firearms—by a particular group of speakers—health care practitioners—precisely because the Florida legislature determined that "it should [no longer] be an accepted practice for a doctor to inquire about a patient's firearm ownership." D20-3:3 (Fla. Health & Human Servs. Comm., H.R. Staff Analysis, H.R. 0155C, at 2 (Apr. 7, 2011)); D20-4:3 (Fla. Judiciary Comm., H.R. Staff Analysis, H.R.

0155E, at 2 (Apr. 12, 2011)); *see* Fla. St. §§790.338(1)-(2), (5)-(6).[17]  The

legislative reports singled out for criticism AAP's policy of encouraging

pediatricians to "incorporate questions about guns into their patient history taking."

D20-3:3; D20-4:3.  The law's limitation to practitioners reflects that it was directed

at a particular viewpoint—what legislators perceived as anti-gun advocacy by

doctors concerned about firearms-related health risks.  Those who spoke in favor

of the bill made clear it was intended to counter a perceived anti-gun "political

agenda," D87¶10, deemed by one legislator to be "a political . . . attack on the

constitutional right to own a possessive firearm," D87¶5 (quoting statement of

Rep. Artiles).  It is thus plain that the Act is founded on outright discrimination

against Appellees' speech on the basis of its content.[18]  As such, strict scrutiny

applies.  *Solantic*, 410 F.3d at 1258.

　　　The State's contention that the no-recording, discrimination, and harassment

provisions do not regulate speech, *see* State Br. 26-28, is unavailing.  To begin

---

[17] A court may look to a law's legislative history and intended purpose when
determining whether it discriminates against a particular viewpoint and when
construing its operative terms.  *See Dolan v. Postal Serv.*,546 U.S. 481, 486, 126
S.Ct. 1252, 1257 (2006); *Sorrell*, 131 S. Ct. at 2663 ("Any doubt that § 46331(d)
imposes an aimed content-based burden on detailers is dispelled by the record and
by formal legislative findings.").

[18] The State's sole contention to the contrary is an unexplained assertion in a
footnote that "the Act is not content-based because it addresses goals that are
'justified without reference to the [speech's] content.'"  State Br. 31-32 n.7
(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  To the
contrary, the Act's purported principal goal is to protect against invasions of
firearm owners' privacy caused by various forms of speech about firearms.

with, recording information in a patient's charts—thereby communicating in writing with the patient's current and future care-providers— is plainly speech. In *Sorrell v. IMS Health, Inc.*, for example, the Supreme Court held that a statute restricting sale, disclosure, and use of data on doctors' prescribing practices by certain speakers was a content-based speech restriction, in part because "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated." 131 S. Ct. at 2665 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32, 104 S. Ct. 2199 (1984)). Here, likewise, the no-recording provision is a content-based restriction on speech, because it restricts the uses and dissemination of information by a particular group of speakers (medical practitioners), regarding a particular subject (firearms).

The discrimination and harassment provisions similarly regulate speech. The Act was designed to counter a specific viewpoint, a perceived anti-gun message, seen by some as "a political . . . attack on the constitutional right to own a possessive firearm." D87¶5; *see also* D87¶¶3-10 (statements by Florida legislators evidencing concern or disagreement with practitioners' firearm safety message). These are the hallmarks of a content-based, viewpoint discriminatory law restricting *speech*. Indeed, the only specific discriminatory *conduct* identified in the legislative history or addressed in the legislation—ending the physician-patient

relationship, *see* D87¶3—is permitted under the statute, *see* Fla. St. §790.338(4).

And the legislative history contains no indication whatsoever that the Florida

legislature sought only to target "non-expressive, physically harassing conduct"

towards a firearm-owning patient. *Cf.* State Br. 27 (quoting *Saxe v. State Coll.*

*Area Sch. Dist.*, 240 F.3d 200, 206 (3d Cir. 2001)). Indeed, throughout this

litigation, the State has asserted that the statute was intended to respond to events

involving verbal or expressive behavior—not physically threatening conduct. *See,*

*e.g.*, *id.* at 2-4 (citing incidents in which practitioners "asked a patient's mother

whether there were firearms in the home"; "asked that [the patient's parent]

remove the gun from his home"; and "interrogated" patients regarding firearms);

*see also* D87¶¶2-10. The harassment provision therefore is most naturally read as

prohibiting purportedly "harassing" speech.

### B. The Act Does Not Further a Compelling State Interest

In order to justify these presumptively invalid content-based restrictions on

speech, the State bears the burden of proving that the Act "advanc[es] a compelling

government interest." *Solantic*, 410 F.3d at 1258. Abstract interests stated at a

high level of generality—for example, a general interest in "protecting privacy"—

are insufficient. *See id.* at 1268 (rejecting supposed compelling state interest

"offered only at the highest order of abstraction"). As the Supreme Court

explained in *California Democratic Party v. Jones*, the "determination [as to

whether an interest is compelling] is not to be made in the abstract, by asking whether fairness, privacy, etc., are highly significant values; but rather by asking whether the *aspect* of fairness, privacy, etc., addressed by the law at issue is highly significant." 530 U.S. 567, 584, 120 S.Ct. 2402, 2413 (2000). Thus, in *Jones,* the Court held that California's asserted interest in protecting the privacy of voters' party affiliations could not "conceivably be considered a 'compelling' one," because "[i]f such information were generally so sacrosanct, federal statutes would not require a declaration of party affiliation as a condition of appointment to certain offices." *Id.* at 585, 2413.

In furtherance of its inapposite commercial speech analysis, *see infra* Part II.F, the State has suggested a number of allegedly "substantial" government interests that it claims justify the law: "(1) the protection of Second Amendment rights to own or possess a firearm; (2) the protection of privacy rights, (3) the prevention of barriers for gun owners to receive health care, and (4) the prevention of discrimination and harassment." State Br. 32. None of these interests is "substantial," much less compelling.

First, as the District Court held, the speech restricted by the statute "simply does not interfere with the right to keep and bear arms," D105:15, nor does the statute further that right in any way. The Second Amendment protects the right of "law-abiding, responsible citizens" to "retain," "to have in custody," "to hold," and

"to carry" weapons, including firearms, in the home for purposes of self-defense, and subject to regulation. *See District of Columbia v. Heller*, 554 U.S. 570, 582-84, 128 S.Ct. 2783, 2792-94 (2008). But the Second Amendment does not restrict the First Amendment right to speak about firearms and their risks. And the Firearm Owners' Privacy Act has no impact on patients' or any individuals' rights to keep and bear arms; it pertains only to the content of inquiries and discussions *about* firearms. The State's and *amici*'s attempts to transform this dispute into a Second Amendment case thus fail.

Nor can the State's asserted interest in protecting the privacy of firearm owners be considered compelling. As the District Court found, "[i]nformation regarding firearm ownership is not sacrosanct," D105:17; *see Cal. Democratic Party v. Jones*, 530 U.S. 567, 585, 120 S.Ct. 2402, 2414 (2000). Regulations "already circumscribe the privacy protections over the limited information this law seeks to protect—the fact that a patient owns or possesses a firearm." D105:16-17. Both Florida and the federal government regulate firearms, including gun purchases and carrying. For example, before purchasing a firearm from a licensed gun dealer, Florida residents must submit a wide range of personal information and undergo a background check. Fla. St. §790.065; 18 U.S.C. §922(t). Likewise, carrying a concealed firearm requires obtaining a license. *See id.* §§790.01,

790.06.9.[19]  It is impossible to purchase a firearm from a gun dealer legally or to choose to carry it concealed "anonymously" in Florida.  Accordingly, the State's asserted interest in protecting "privacy in firearm ownership" is not compelling.

The weight of any such "privacy" interest is further reduced by the fact that the confidentiality of the class of communications at issue in the Act—those made in the context of a practitioner-patient relationship—is *already* protected under state and federal law, as the State acknowledges, *see* State Br. 36 n.9 (citing the Health Insurance Portability and Accountability Act of 1996).  *See FCC v. League of Women Voters*, 468 U.S. 364, 396, 104 S.Ct. 3106, 3126 (1984) ("[T]he substantiality of [the government's] asserted interest is dubious" where the statute "provides only ineffective or remote support for the government's purpose.") (internal quotation omitted).[20]

---

[19] Furthermore, Florida law dictates how residents must store their firearms within their own homes.  *See* Fla. St. §790.174(1) (person who has stored a firearm "and who knows or reasonably should know that a minor is likely to gain access to the firearm . . . shall keep the firearm in a securely locked box or container or in a location which a reasonable person would believe to be secure or shall secure it with a trigger lock").  Ironically, then, the Firearm Owners' Privacy Act inhibits practitioners from giving advice that would help patients avoid committing a crime.

[20] For the first time on appeal, the State suggests that the Act also "implicates the right of privacy in the *home* by proscribing irrelevant questions about firearms kept there."  State Br. 33.  Unsurprisingly, the State cites no authority supporting the proposition that the right of privacy in one's home is violated by the mere asking of a question about the existence *vel non* of a potentially unsafe object in that home. (Indeed, patients are routinely asked about a host of constitutionally-protected intimate activity that takes place at home.)

The State's asserted interest in preventing discrimination and harassment of firearm owners also falls short, because the State has offered "no evidence" to suggest a widespread problem of discrimination or harassment. D105:16; *see Sorrell v. IMS Health, Inc.,* 131 S. Ct. 2653, 2669 (2011) ("It is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' by pharmaceutical marketers can sustain a broad content-based rule . . ."). As already discussed, the statute does not counter the only form of "discrimination" discussed in the legislative history—practitioners refusing to care for patients who refuse to discuss firearms, *see* D87:¶3; instead, the statute expressly continues to allow physicians to terminate the doctor-patient relationship based on a patient's refusal to answer firearm questions, *see* Fla. St. §790.338(4). Although the State, for the first time on appeal, proffers a few hypothetical examples to illustrate actions that it would view as constituting "discriminat[ion]" under the statute, *see* State Br. 27, the State does not cite any evidence that such conduct occurs with any frequency. A content-based rule certainly cannot be justified by an imaginary problem.[21]

---

[21] *See U.S. v. Playboy Entm't. Grp., Inc.*, 529 U.S. 803, 821-22, 120 S.Ct. 1878, 1890-1891 (2000) (rejecting proffered compelling interest because it was "impossible to know how widespread the problem in fact is, and the only indicator in the record is a handful of complaints"); *see also id.* at 822 ( "the Government must present more than anecdote and supposition"; [t]he question is whether an actual problem has been proved"); *accord Brown v. Entm't. Merchants Ass'n*, 131 S. Ct. 2729, 2735, 2739 (2011) (stating that, to prevail under strict scrutiny, "[t]he state must specifically identify an 'actual problem' in need of solving," and "ambiguous proof will not suffice") (quoting *Playboy*, 529 U.S. at 822-23).

Nor can the statute be justified by concern for individuals who feel "harassed" or "discriminated against" by the mere asking of firearm questions. To begin, the statute restricts the freedom of those patients who actually *prefer* to be asked such questions and to receive appropriate information regarding firearms as part of their preventive care; Appellees' patients typically express gratitude and appreciation for discussions about firearm risks and the safe storage practices that can mitigate those risks. D87¶¶21, 28.[22] As to those patients who might take offense at the questions, the Supreme Court has "often had occasion to repeat" that the fact that a listener "may find speech offensive is not a sufficient reason for suppressing it." *Simon & Schuster, Inc. v. Members of NY State Crime Victims Bd.*, 502 U.S. 105, 118, 112 S.Ct. 501, 509 (1991) (internal quotations omitted). While the State may sometimes have an interest in giving effect to a would-be listener's *decision* not to hear a speaker's message, the State cannot restrict speech on the *assumption* that *all* would-be listeners do not wish to hear the message. *Martin v. City of Struthers*, 319 U.S. 141, 143-44, 63 S.Ct. 862, 863 (1943) (holding that, notwithstanding interest in protecting against intrusion, ordinance restricting canvassing impermissibly "substitutes the [community's] judgment . . .

---

[22] *See also* Gutierrez Decl., D28¶8; King Decl., D25¶7; Sack Decl., D29¶8; Wollschlaeger Decl., D23¶9; Welty Decl., D31¶8.

for the judgment of the individual householder" and interferes with the right to decide whether to receive the message).[23]

Finally, the State asserts an interest in "ensur[ing] that health care is available to citizens who need it, irrespective of whether they own guns." State Br. 33. But the law does nothing to further this interest. Rather, the law actually *restricts* the provision of effective medical care, by sharply limiting the flow of truthful, non-misleading information regarding firearm safety. Further, as already discussed, the law's own terms make clear that it does not affect existing law regarding a practitioner's right to terminate the doctor-patient relationship. *See* Fla. St. §790.338(4). Because the statute does not further this interest, the interest cannot justify the statute's speech restrictions.

---

[23] The NRA suggests that this principle does not apply in a doctor's office, because of the State's "interest protecting both the 'psychological' and the 'physical . . . well-being of the patient held 'captive' by medical circumstances.'" NRA Br. 24-25 (quoting *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 768, 114 S.Ct. 2516, 2526 (1994)). To the contrary, the Supreme Court has repeatedly described captive audiences to make the opposite point: In a democracy, "we are often 'captives' outside the sanctuary of the home and subject to objectionable speech." *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491 (1970). The existence of a captive audience did not save even *content-neutral* speech restrictions in *Madsen* itself, *see* 512 U.S. at 773-75, let alone overbroad, content-based speech restrictions like those imposed here. *See also Carey v. Brown*, 447 U.S. 455, 460-62, 471, 100 S.Ct. 2286, 2289-2291, 2295-2296 (1980) (striking down content-based statute prohibiting non-labor picketing in front of residences); *Sorrell*, 131 S. Ct. at 2669 (striking down content-based statute prohibiting distribution of pharmacy records aimed at protecting doctors from unwelcome conversations with sales representatives in the doctors' offices, reasoning that "[m]any are those who must endure speech they do not like, but that is a necessary cost of freedom").

Thus, the State has identified no compelling interest sufficient to meet strict scrutiny.

### C. The Act is Not the Least Restrictive Means of Achieving a Legitimate State Interest

Even assuming one or more of the State's proffered interests were compelling, the statute still fails strict scrutiny because it plainly is not the least restrictive means of achieving the State's aims.

A content-based restriction on speech, such as the Firearm Owners' Privacy Act, must be both "narrowly tailored to promote a compelling Government interest" and the least restrictive means of accomplishing the State's ends: "If a less restrictive alternative would serve the Government's purpose, the legislature *must* use that alternative." *Playboy*, 529 U.S. at 813 (emphasis added). Moreover, when a statute is content-based on its face, "[t]he existence of adequate content-neutral alternatives . . . 'undercuts significantly' any defenses of such a statute." *R.A.V.*, 505 U.S. at 395.

For at least two reasons, the no-inquiry and no-recording provisions are not the least restrictive means of furthering the State's aims. First, with respect to patient privacy, patients may simply decline to *answer* any such "inquiries" put to them. And, of course, if patients decline to answer such inquiries, their medical records will not reflect whether or not they own firearms. The statute thus could have served the state's purported privacy objectives by resting on subsection (4) of

the law, not challenged here, which states that patients may decline to answer such inquiries, *see* Fla. St. §790.338(4).  To the extent the legislature wishes to mitigate adverse practical consequences of patients' declining to answer questions about firearms, *cf*. State Br. 27 (hypothesizing that a practitioner might discriminate against or harass firearm owners by "cancelling and rescheduling their appointments without notice" or "making them wait an excessively long time for appointments"), the legislature must pass laws narrowly tailored to address those adverse practical consequences rather than broadly restricting practitioners' speech.  A second respect in which the no-inquiry provision is not the least restrictive means is that it prohibits all inquiries and recording of information, rather than being tailored to those who object.  Many patients appreciate questions regarding firearm ownership as part of their preventive care, *see* D87¶¶21, yet the law contains no carve-out or defense on the ground that a patient consented to the inquiry or recording.  Including such a carve-out is another way in which the no-inquiry and no-recording provisions could be less restrictive.

Furthermore, with respect to the no-recording provision, the State's interests already are served by less restrictive alternatives: existing state and federal laws that explicitly protect the confidentiality of patients' medical records.  *See, e.g.*, *Health Ins. Portability & Accountability Act of 1996*, 42 U.S.C. §1320d *et seq.*; Fla. St. §456.057.  The State's only explanation as to why those laws are

insufficient to protect patients' privacy is that those laws "only govern public disclosure," and fail to prevent "discrimination by current or future providers." State Br. 36. However, the least restrictive means of preventing such discrimination by current and subsequent providers would be to prohibit those specific acts of disclosure or discrimination themselves, rather than restricting the speech altogether in order to foreclose the possibility of such disclosure or discrimination in the future.

The law also does not constitute the least restrictive means of accomplishing the aims of the harassment and discrimination provisions. The State "could, for example, target only offensive behavior or the manner of delivery of speech without regard to viewpoint or subject matter." *Burk*, 365 F.3d at 1255. That is, instead of imposing undefined prohibitions on "harassment" or "discrimination" with respect to the subject matter of firearms, the legislature could define "harassment" and "discrimination" by reference to specific *conduct* that the legislature seeks to prohibit, and bar that conduct. For example, if the conduct the State describes on page 27 of its brief truly is the intended target of these provisions, the legislature could include an appropriately tailored definition in the law proscribing such conduct. *See* State Br. 27 (describing conduct such as "cancelling and rescheduling [firearm owners'] appointments without notice" and "delaying their test results arbitrarily").

Thus, there are numerous less restrictive ways to further the State's purported ends. Because "regulating speech must be a last—not first—resort," *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373, 122 S.Ct. 1497, 1507 (2002), the law cannot stand.

### D.   The Law Is Not a Permissible Regulation of Medical Professionals

The State attempts to avoid strict scrutiny by arguing that the Firearm Owners' Privacy Act is a permissible regulation of medical professionals, and that any restrictions on speech are merely incidental. The State's argument simply cannot be squared with the law's text, history, and plain purpose, which amply demonstrate that the law's principal target is indeed practitioners' *speech* about firearms.

The professional regulation cases upon which the State relies simply affirm a State's authority to impose licensing and supervision requirements on professions. *See, e.g.*, *Locke v. Shore*, 634 F.3d 1185, 1189-92 (11th Cir. 2011) (upholding requirement that interior designers in commercial settings obtain license to practice); *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1429-30 (11th Cir. 1998) (upholding ban on "substantial client contact" for disbarred lawyers). But even such regulations of professional conduct are permissible under the First Amendment only if their limitation on free speech "'is merely the incidental effect of observing an otherwise legitimate regulation." *Locke*, 634 F.3d at 1191. In

*Wilson*, for example, this Court upheld state bar rules prohibiting disbarred attorneys who worked in law offices from contacting clients. The rules were akin to a licensing requirement aimed at "preventing the unauthorized practice of law in a law office by the suspended lawyer," and therefore "govern[ed] occupational conduct," not speech. *Wilson*, 132 F.3d at 1429 (internal quotations omitted).

As Justice Jackson wrote in his oft-cited concurrence in *Thomas v. Collins*, 323 U.S. 516, 544-45, 65 S.Ct. 315, 329 (1945), the purpose of professional regulations is to "shield[] the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency." This law is plainly *not* designed for this purpose. It is not a licensing requirement primarily regulating *conduct*, nor is it designed to prevent practice by the unlicensed or licensed practitioners' exceeding their licenses' bounds. In fact, the State itself acknowledges firearm safety as an appropriate area of preventive care. *See* State Br. 24-25. Rather, the law directly, on its face, targets and regulates *speech* on the subject of firearms: the asking of questions, the recording of answers, and the provision of counseling regarding firearm safety (if in an "unnecessarily harassing" or "discrimin[atory]" manner). As the State itself acknowledges, the law was prompted by events in which physicians *asked questions* regarding firearms, to which patients objected, *see* D87¶3, and the law was intended to restrict certain speech perceived as objectionably "political," D87¶5. Indeed, the State and the

NRA list protected speech as the primary examples of practitioners' supposed "target[ing]" of patients in a "crusade" against Second Amendment rights to which the harassment and discrimination provisions were addressed. State Br. 3-4; NRA Br. 4. Such speech includes "asking [a] father that he remove [a] gun from the home" and "interrogat[ing] the children about guns." NRA Br. 14; State Br. 3. The State cannot now defend the law as redressing hypothetical conduct, such as "delaying . . . test results" or "refusing [patients] equal opportunities for referrals to specialists," State Br. 27, of which there was *no* evidence before the legislature. *See supra* n. 21.

The State enacted the law to counter a perceived "political . . . attack" on gun ownership, D87¶5. The First Amendment forbids such viewpoint-discriminatory restrictions on speech within the lawful practice of a profession in an effort "to exclude certain vital theories and ideas." *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 548, 121 S.Ct. 1043, 1052 (2001) (holding that attorney-client communications are "constitutionally protected expression" and therefore the First Amendment barred Congress from prohibiting recipients of Legal Services Corporation funds from representing clients in challenges to welfare law). As the Supreme Court reiterated last Term, a law that "imposes a burden based on the content of speech and the identity of the speaker" "imposes more than an incidental burden on protected expression" and warrants "heightened scrutiny,"

even if lesser scrutiny might be appropriate absent viewpoint discrimination. *Sorrell*, 131 S. Ct. at 2665.

Finally, *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791 (1992), cited by the NRA, NRA Br. 17, supports Appellees' position. *Casey* upheld a statute requiring physicians to advise patients about risks associated with abortion. *id.* at 881-87. The plurality concluded that, because the law required *disclosure* of truthful, non-misleading medical information and did "not prevent the physician from exercising his or her medical judgment," *id.* at 884, it was not unconstitutional.[24] The Act does the opposite. Rather than requiring physicians to *provide* information relevant to a medical procedure, the State is *blocking* communications due to their content and perceived viewpoint. There is no legitimate State interest in restricting the disclosure of health and safety information by physicians to their patients. *See Conant*, 309 F.3d at 636-38; *Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913 (1980) (A "physician must know all that a patient can articulate" because "barriers to full disclosure would impair diagnosis and treatment.").

---

[24] *See Planned Parenthood v. Rounds*, 530 F.3d 724, 734-35 (8th Cir. 2008) (*Casey* held that a State "can use its regulatory authority to require a physician to provide truthful, non-misleading information relevant to a patient's decision to have an abortion.").

**E.    The Statute is Not Immune from First Amendment Scrutiny as an Antidiscrimination Statute**

The State also asserts that the discrimination, harassment, and no-recording provisions are immune from First Amendment challenge because they are indistinguishable from laws like the American Disabilities Act or Title VII of the Civil Rights Act.  State Br. 27-30.  This contention is specious.  Those statutes were enacted for the purpose of preventing discriminatory *conduct* against individuals within classes that had suffered documented and pervasive discrimination.  Title VII does not prohibit speech, *per se*; inquiries about certain subjects—such as an applicant's pregnancy—constitute only *evidence* of a discriminatory motive behind an adverse employment *decision*.  *See Ford v. St. Elizabeth Hospital*, No. 92-CV-511, 1993 WL 330036, *3-6 (N.D.N.Y. Aug. 20, 1993); *Barbano v. Madison Cnty.*, 922 F.2d 139, 141-46 (2d Cir. 1990).  Similarly, the ADA comprehensively targets extensively documented and widespread discriminatory *conduct* against persons with disabilities incident to employment (Title I of the ADA), public services, programs and activities (Title II), and public accommodations (Title III).  *See* 42 U.S.C. §§12101 *et seq*.; *Tenn. v. Lane*, 541 U.S. 509, 516–17, 124 S.Ct. 1978, 1984-85 (2004).  Only Title I prohibits disability-related inquiries, *see* 42 U.S.C. §12112, in an effort to prevent "employers from using pre-employment medical inquiries 'to exclude applicant with disabilities . . . before their ability to perform the job [is] even evaluated.'"

*Harrison v. Benchmark Elecs. Huntsville, Inc.*, 593 F.3d 1206, 1213-14 (11th Cir. 2010) (quoting H.R. Rep No. 101-485, pt. 2 at 1). Thus, the ADA's incidental speech restriction serves only to facilitate the reduction of pervasive discriminatory *conduct* against disabled persons.

In stark contrast, disfavored speech is the primary target of the Firearm Owners' Privacy Act. The focus of the legislative debates leading up to the law's passage was *speech* certain patients and legislators found offensive. *See, e.g.*, D87¶3 (describing Ocala incident involving a doctor's statements to a patient's mother, who "felt that *the question* invaded her privacy"); D87¶4 (quoting legislative report stating that no law currently prohibited practitioners "from *asking* a patient whether he or she owns a firearm"); D87¶5 (describing Representative Artiles's outrage at his daughter's doctor *asking* him if he owned a firearm and then *asking* him to remove it from his home) (all emphases added).

The State's newly-minted examples of ways in which the Act's discrimination and harassment provisions "might be applied" to bar conduct, State Br. 27, do not help the State's cause. The State cites no evidence in the record that these allegedly "discriminatory" or "unnecessarily harassing" practices presented a widespread problem before the law's passage. *See id*.

Finally, the State claims that "courts have routinely recognized that anti-discrimination and anti-harassment provisions, like subsections (5) and (6), cannot

properly be challenged on free speech grounds." *Id*. This statement is simply incorrect. *Saxe*, the Third Circuit case the State cites, in fact stands for *exactly the opposite* point: that anti-harassment or anti-discrimination laws are subject to scrutiny under the First Amendment just like other laws. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204-10 (3d Cir. 2001) (Alito, J.) (reversing district court's determination that "harassment" was not protected activity under the First Amendment, instead recognizing "the very real tension between anti-harassment laws and the Constitution's guarantee of freedom of speech"). *Saxe* recognized that "[n]o court or legislature has ever suggested that unwelcome speech directed at another's 'values' may be prohibited under the rubric of anti-discrimination." *Id.* at 210. In short, *Saxe*, which struck down the school policy at issue on overbreadth grounds, underscores the constitutional vulnerability—not immunity—of the Act's discrimination and harassment provisions.[25]

This Court should thus reject the State's attempt to "recast" the law into a "run-of-the-mill anti-discrimination law." *See* D105:3-4. Because the Act is a content-based restriction on speech, it is subject to nothing less than strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) (applying strict scrutiny to strike down content-based law penalizing "fighting words" ordinarily not protected

---

[25] It is worth noting that, unlike the undefined provisions here, the anti-harassment policy in *Saxe* included several paragraphs defining "harassment" and describing examples. Even with this definitional content, however, the policy remained unconstitutionally overbroad. *See id.* at 216.

by the First Amendment); *see also Sorrell*, 131 S. Ct. at 2665 (applying "heightened scrutiny" to law regulating commercial speech because the law "imposes a burden based on the content of speech and the identity of the speaker").

### F.     Nor Is the Law Permissible as a Commercial Speech Regulation

The State's third-line attempt to evade strict scrutiny also fails.  The Act does not regulate commercial speech.  Even if it did, it still could not pass constitutional muster.

Tellingly, the State omits any argument regarding why it believes commercial speech is at issue here.  *See* State Br. 31-36.  It is not.  Commercial speech is "usually defined as speech that does no more than propose a commercial transaction."  *United States v. United Foods, Inc.*, 533 U.S. 405, 409, 121 S.Ct. 2334, 2337 (2001).  Such speech typically is "related solely to the economic interests of the speaker and its audience."  *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n*, 447 U.S. 557, 561, 100 S.Ct. 2343, 2349 (1980) (emphasis added); *accord Mason v. Florida Bar*, 208 F.3d 952, 955 (11th Cir. 2000).  Accordingly, for example, lawyer advertising is commercial speech.  *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 115 S.Ct. 2371 (1995); *Mason*, 208 F.3d 952.

Here, by contrast, there can be no claim that the speech restricted by the law simply "propose[s] a commercial transaction," *United Foods*, 533 U.S. at 409.  The

law has no relation to "the economic interests" of practitioners or patients—and the State does not argue otherwise. Rather than concerning advertising or some other attempt to obtain new "business" from patients, the speech at issue occurs between practitioners and patients who are already in a confidential relationship, and concerns the patients' care. *See Stuart v. Huff*, 834 F.Supp.2d 424, 431 (M.D.N.C. 2011) (rejecting "contention that [physician-patient speech regarding abortion] is 'commercial' and thus subject to a lower degree of scrutiny").

In any event, the law would not be constitutional even applying the "intermediate scrutiny" standard the State advances, *see* State Br. 31-36. Under that standard, the State must show that (1) the law is justified by "a *substantial* governmental interest"; (2) that interest is "*directly advanced* by the restriction"; and (3) "there is a *reasonable fit* between the legislature's ends and the *narrowly tailored means* chosen to accomplish those ends." *Abramson v. Gonzalez*, 949 F.2d 1567, 1575 (11th Cir. 1992).[26]

As for the first two parts of the test, the Act does not directly advance a substantial interest. As already discussed, *see supra* at 50-51, the law does not affect patients' Second Amendment rights, because it pertains only to *speech* about firearms. Likewise, any "privacy" interest purportedly advanced is insubstantial,

---

[26] For commercial speech to be entitled to First Amendment protection, it must be truthful and non-misleading. *See Abramson*, 949 F.2d at 1575. The State does not dispute that Appellees' speech is truthful and non-misleading.

given the heavy regulation of firearm ownership, patients' freedom to refuse to provide such information, and the confidentiality the law already accords to information reported in the course of the physician-patient relationship. *See supra* at 51-52. Nor is the State's purported interest in preventing discrimination and harassment of firearm owners substantial, where that interest appears to stem from anecdotal evidence of individuals simply feeling offended by practitioners' speech. *See supra* at 53-55. Finally, an interest in protecting access to medical care is not advanced by this law, which *limits* practitioners' provision of preventive care to patients (and affirms practitioners' right to terminate patient relationships as they see fit). *See supra* at 55.

Furthermore, the law's provisions are a poor fit for serving the State's purported aims. As explained above, *see supra* at 56-59, there are numerous other ways in which the State could have accomplished those aims without directly restricting Appellees' speech. Above all, the law is a poor fit because it restricts practitioners' speech even with the many patients who *welcome* firearms-related preventive care.

Accordingly, even assuming the law regulates commercial speech—and it does not—it nevertheless violates Appellees' First Amendment rights.

## III.  THE ACT IS UNCONSTITUTIONALLY VAGUE

In addition to violating the First Amendment, the Act violates the Due

Process Clause because it is unconstitutionally vague.  A law is unconstitutionally

vague if it "either forbids or requires the doing of an act in terms so vague that

[persons] of common intelligence must necessarily guess at its meaning and differ

as to its application," because such a law "fail[s] to put potential violators on notice

that certain conduct is prohibited . . . and provide explicit standards for those who

apply the law."  *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310

(11th Cir. 2009) (internal quotations omitted).  "[V]agueness of [a content-based]

regulation raises special First Amendment concerns because of its obvious chilling

effect on free speech," *Reno v. ACLU*, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 2344

(1997), and "a more stringent vagueness test should apply," *Vill. of Hoffman*

*Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S.Ct. 1186,

1193-94 (1982).  The no-inquiry, no-recording, discrimination, and harassment

provisions cannot meet this stringent standard.

First, the statute's no-inquiry and no-recording provisions fail to give

practitioners notice regarding when they may ask about firearms or record such

information.  The provisions sweepingly bar *any* recording or making *any* inquires

concerning firearm ownership, *unless* the practitioner believes in good faith "that

this information is relevant to the patient's medical care or safety, or the safety of

others." *Id.* §790.338(2); *see also id*. §790.338(1). The law does not specify whether practitioners must make a particularized finding of relevance for each patient asked about firearms, or whether they may rely on a general belief that such inquiries are always relevant to patients' medical care and safety. Nor does the law state whether the information must be believed relevant at the time the inquiry is made, or whether belief in potential relevance suffices.

Because a reading that information about firearms is always "relevant" would render the statute meaningless, practitioners reasonably fear that it requires some higher, unspecified level of "relevance." *See In re Davis*, 565 F.3d at 823 ("We cannot read statutory language in a way that renders it wholly meaningless or nonsensical."). The only well-defined level of relevance in the statute—in a provision applicable to emergency medical technicians and paramedics—sets a high bar, requiring a "medical emergency" or "imminent danger or threat" before inquiries regarding firearms are permissible. Fla. St. §790.338(3). That standard, of course, would never be met in the context of standard screening questions used in effective, tailored preventive medicine. *See* D87¶¶29, 31.

Second, the harassment and discrimination provisions likewise are void for vagueness. The law fails to define either of the operative terms: "unnecessarily harassing" or "discriminate." *See* Fla. St. §§790.338(5)-(6). Instead, practitioners are left to guess what conduct is prohibited. With respect to the "unnecessar[y]

harass[ment]" provision, this failure is particularly problematic given Appellees'

well-documented and reasonable fears that patients may hold diverse views of

what constitutes "unnecessary harassment." *See, e.g.*, State Br. 3 (recounting

legislator's objection to being questioned about firearms because "*[t]o the*

*legislator*, the doctor's conduct constituted 'a political . . . attack'") (emphasis

added).[27]  Such uncertainty "is not permissible under the First Amendment."

*Conant*, 309 F.3d at 639 (striking down statute criminalizing speech by doctors

that "the patient believes to be a recommendation of marijuana") (citing *Thomas v.*

*Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 325 (1945) (striking down statute that put

speaker "wholly at the mercy of the varied understanding of his hearers")).

The discrimination provision is similarly unclear.[28]  Although one might

have expected, in light of the statute's origin with the Ocala incident, that this

provision was intended to prohibit physicians from ending relationships with

patients based on their refusal to answer questions about gun ownership, another

---

[27] *See also, e.g.*, Goodman Decl., D26¶11 (describing fear that patient's parent who "expressed anger at the possibility of doctors asking questions about firearms" "may consider simple discussions of firearm safety . . . 'unnecessar[y] harass[ment]' under the law"); Gutierrez Decl., D28¶¶13, 17 (describing interaction in which, following a patient's refusal to answer firearm question, he "did not ask specific questions or press this patient further" because of fear of violating, or being accused of violating, harassment provision); Edwards Decl., D27¶¶13-14.

[28] Although the District Court did not find the discrimination provision to be unconstitutionally vague, the court struck it down as an unconstitutional restriction on free speech.  D105:20-22.  Appellees address the discrimination provision's vagueness for the sake of completeness.

provision of the statute makes explicit that the statute does *not* alter the rule that a physician is free to cease providing services to a patient for any reason. *See* Fla. St. §790.338(4). Practitioners therefore are left to guess what activity *would* be prohibited by the discrimination provision. The State's suggestion of several hypothetical examples in its opening brief, State Br. 27, is its first attempt to identify specific conduct that would violate the provision. *See* D49:16 (defining "discrimination" in this provision as "treating a person differently based on . . . gun ownership"). The State cites no evidence of a widespread problem with incidents of these kinds, and Appellees have no basis for believing that "discriminat[ion]" under the statute is actually limited to such egregious conduct.

The State's fundamentally incoherent account of the statute's meaning in the course of this litigation further supports a conclusion that its provisions are unconstitutionally vague. On the one hand, the State insists that the statute does not restrict the speech of practitioners acting in good faith. *See* State Br. 22-24. Before the District Court, for example, the State described the no-inquiry provision as "essentially codif[ying] what is a standard and accepted practice, *i.e.*, physicians may ask any questions that they in good faith believe are relevant to their patient's care." D49:5-6. On the other hand, the State acknowledges that the statute was passed following, and was designed to prevent, incidents in which practitioners' conduct was indistinguishable from this "standard and accepted practice." Thus, in

the very same brief below, the State also claimed that the no-inquiry prohibition "appl[ies] in situations (such as those that animated the passage of the Act, discussed below) where no relevant basis for the question exists." *Id*. at 7. The State then described "incidents" indistinguishable from routine preventive care screening interviews—such as the Ocala incident, whether a mother took offense to being asked whether there were firearms in her home, *see* D87¶¶3, 6—and highlighted for condemnation Appellees' practices of asking patients about firearms in situations some patients would find "unreasonable and intrusive," D49:7-8. According to the State, these practices were the "types of incidents" the law was meant to proscribe. *Id*.; *accord* State Br. 2-3 (describing these same speech-based incidents as "difficulties faced by patient[s]"); *see also* NRA Br. 14 (describing routine exchanges with patients highlighted in the legislative history as "target[ing]" patients based on a "crusade against guns").

In sum, then, the State's position appears to be that the statute permits Appellees and other practitioners acting in good faith to ask any questions, record any information, and follow up with preventive counseling on firearm safety— unless, in their patients' subjective judgment, such speech is excessively intrusive, amounts to a harassing "interrogation," or is otherwise "unreasonable." Such a statute is, of course, an anathema to the First Amendment. *See Simon & Schuster*, 502 U.S. at 118; *Conant*, 309 F.3d at 639; *Thomas*, 323 U.S. at 535. It also

violates due process.  As the Supreme Court held in *Coates v. City of Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686 (1971), a law "whose violation may entirely depend upon whether or not [another person] is annoyed" cannot stand, since "[c]onduct that annoys some people does not annoy others."  *Id*. at 613-14; *cf.* NRA Br. 30 (offering definition of "harassment" as "'[w]ords, conduct, or action . . . directed at a specific person' that 'annoys' that person 'and serves no legitimate purpose'") (quoting BLACK'S LAW DICTIONARY 784 (9th ed. 2009)).

The record thus demonstrates that the Act is void for vagueness, because it "is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits" and the State disciplinary authorities "free to decide, without any legally fixed standards, what is prohibited and what is not."  *Harris*, 564 F.3d at 1311 (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03, 86 S.Ct. 518 (2003)).

## IV.  THE ACT IS UNCONSTITUTIONALLY OVERBROAD

Even assuming that certain applications of the Act to abusive conduct would be constitutionally permissible, the law is nevertheless void because "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Stevens*, 130 S. Ct. at 1587 (quoting *Wash. State Grange v. Wash. State Republican Pty.*, 552 U.S. 442, 449 n.6, 128 S.Ct. 1184 (2008)); *Weaver v. Bonner*, 309 F.3d 1312, 1318 (11th Cir. 2002).  The overbreadth doctrine "prohibits the [State] from banning [even] unprotected speech

if a substantial amount of protected speech is prohibited or chilled" as a result. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255, 122 S.Ct. 1389, 1404 (2002).

The law is plainly overbroad. It regulates and restricts *every* practitioner's speech on the subject of firearms. As a result, a wide swath of practitioners' daily interactions with patients has been affected. Indeed, on its face, the law appears to preclude even *consented-to* inquiries or recording of information, such that even patients who would welcome firearms questions and related counseling may not receive it. Appellees' experience demonstrates that, while they have asked numerous patients about gun ownership on a daily basis, and engaged in discussions about firearm safety with many of those patients, they have rarely if ever had a patient object to the question. *See* D87¶¶21, 24.[29] These undisputed facts demonstrate that the statute restricts substantially more constitutionally protected exchanges than the few situations in which the statute might potentially constitutionally be applied, assuming any exist.

---

[29] *See also* Sack Decl., D29¶8; Gutierrez Decl., D28¶8; Schaechter Decl., D21¶11; Edwards Decl., D27¶13.

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted,

Dated: October 29, 2012      s/Douglas H. Hallward-Driemeier

Elizabeth N. Dewar
(application pending)
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Telephone: 617-951-7845

Edward M. Mullins
Hal M. Lucas
ASTIGARRAGA DAVIS MULLINS &
GROSSMAN, P.A.
701 Brickell Avenue, 16th Floor
Miami, Florida 33131-2847
Telephone: (305) 372-8282

Douglas H. Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz (application pending)
ROPES & GRAY LLP
700 12th Street NW, Suite 900
Washington, D.C. 20005
Telephone: 202-508-4600

Jonathan E. Lowy
Daniel R. Vice
BRADY CENTER TO PREVENT GUN
VIOLENCE
1225 Eye Street NW, Suite 1100
Washington, DC 20005
Telephone: (202) 289-7319

*Counsel for Appellees Dr. Bernd
Wollschlaeger,* et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE/VOLUME LIMITATIONS UNDER RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because:

__X__ **this brief contains 13,983 words, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii),**

*or*

_____ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

__X__ **this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font,**

or

this brief has been prepared in a monospaced typeface using *[state name and version of word processing program]* with *[state number of characters per inch and name of type style].*

Dated: October 29, 2012

s/ Douglas Hallward-Driemeier
_____

Douglas Hallward-Driemeier
ROPES & GRAY LLP
*Counsel for Appellees*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing brief has been delivered to a third-party carrier for express delivery to the Court and furnished by U.S. Mail to the following on October 29, 2012:

Pamela Jo Bondi, Attorney General
Timothy D. Osterhaus, Solicitor General
Jason Vail, Assistant Attorney General
Diane G. DeWolf, Deputy Solicitor General
Rachel E. Nordby, Deputy Solicitor General
OFFICE OF THE ATTORNEY GENERAL
PL-01, The Capitol
Tallahassee, FL 32399

Charles J. Cooper
David H. Thompson
Peter A. Patterson
Cooper and Kirk, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036

John C. Eastman
Anthony T. Caso
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University Drive
Orange, CA 92886

Dated: October 29, 2012

s/ Douglas Hallward-Driemeier
Douglas Hallward-Driemeier
ROPES & GRAY LLP
*Counsel for Appellees*