IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DR. BERND WOLLSCHLAEGER, *et al.*,
Plaintiffs/Appellees,

vs.

GOVERNOR, STATE OF FLORIDA, *et al.*,
Defendants/Appellants.

Appeal from the United States District Court
For the Southern District of Florida

**BRIEF *AMICUS CURIAE* FOR AMERICAN MEDICAL
ASSOCIATION, AMERICAN ACADEMY OF PEDIATRICS,
AMERICAN ACADEMY OF CHILD AND ADOLESCENT
PSYCHIATRY, AMERICAN ACADEMY OF FAMILY PHYSICIANS,
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS,
AMERICAN COLLEGE OF SURGEONS, AMERICAN COLLEGE
OF PREVENTIVE MEDICINE, AMERICAN COLLEGE OF
OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN
CONGRESS OF OBSTETRICIANS AND GYNECOLOGISTS, AND
AMERICAN PSYCHIATRIC ASSOCIATION
SUBMITTED IN SUPPORT OF PLAINTIFFS/APPELLEES AND
SUPPORTING AFFIRMANCE**

**(Continued on next page)**

Jon N. Ekdahl
Leonard A. Nelson
American Medical Association
Office of General Counsel
515 N. State St., 14th Floor
(312) 464-5532
*Of Counsel*

Richard H. Levenstein
Kramer, Sopko & Levenstein, P.A.
2300 SE Monterey Rd., Suite 100
Stuart, FL 34995
(772) 288-0048
*Counsel of Record*

**Attorneys for *Amici Curiae***

## Certificate of Interested Persons and Corporate Disclosure Statement

*Amici* certify that, to the best of their knowledge, the Certificate of Interested Persons in the Brief of Plaintiffs/Appellees is complete.

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* state that they have no parent corporation and there is no corporation, publicly held or otherwise, that owns 10% or more of any of their stock.

# Table of Contents

Page

Certificate of Interested Persons and                     3
      Corporate Disclosure Statement

Table of Authorities                                     6

Statement of Identity and Interest of *Amici* and of        8
      Source of Authority to File Brief

FRAP Rule 29(c)(5) Statement                   9

Statement of the Issues                              9

Summary of the Argument                       9

Argument and Citations of Authority          11

I.    A Justiciable Controversy Exists Because the Firearm  11
       Owners' Privacy Act Expressly Limits the Permissible
       Communications of Physicians, Including the Plaintiffs,
       And the Effects of that Limitation are Suffered
       Immediately Through Self-Censorship.

II.   The Injuries Physicians and Patients Incur as a Result  20
       Of the Firearm Owners' Privacy Act are Substantial.

       A.   Physician Inquiries About Firearm Ownership  20
            Comply with Professional Medical Standards,
            Even in Situations in Which such Inquiries may
            Initially Appear Irrelevant to Medical Care or Safety.

       B.   The Firearm Owners' Privacy Act Prevents  25
            Physicians from Taking Reasonable Measures
            To Protect Themselves from Claims of Medical
            Malpractice.

III.   Any Countervailing State Interest in Limiting    26
Physicians' Communications About Their Patients'
Firearm Ownership Is at Most Negligible.

Conclusion    28

Certificate of Compliance with FRAP 32(a)(7)    30

Certificate of Service    30

# Table of Authorities

Page(s)

**Cases**

*Beaulieu v. City of Alabaster*, 454 F.3d 1219 (11th Cir. 2006)　14

*Bond v. United States*, 131 S.Ct. 2355 (2011)　15

\* *Conant v. Walters,* 309 F.3d 629 (9th Cir. 2002)　29

\* *Corley v. United States*, 556 U.S. 303,　16
　129 S.Ct. 1558 (2009)

*Davis v. Federal Election Commission*, 554 U.S. 724,　12
　128 S.Ct. 2759 (2008)

*Horne v. Flores*, 557 U.S. 423, 129 S.Ct. 2579 (2009)　12

\* *International Society for Krishna Consciousness of*　17,19
　*Atlanta v. Eaves*, 601 F.2d 809 (5th Cir. 1979)

*Myers v. Toojay's Management Corp.*,　16
　640 F.3d 1278 (11th Cir. 2011)

\* *Sorrell v. IMS Health, Inc.,* 131 S.Ct. 2653 (2011)　27

*Trammel v. United States*, 445 U.S. 40, 100 S.Ct. 906 (1980)　22

\**United States v. Alvarez*, 132 S.Ct. 2537 (2012)　29

\* *Virginia State Bd. of Pharmacy v. Virginia Citizens*　24
　*Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817 (1972)

**Constitutional Authorities**

First Amendment to the U.S. Constitution　*Passim*

Second Amendment to the U.S. Constitution　*Passim*

U.S. Constitution, Article III　12

Fla. Const. Art. I, § 8                                              19

**Statutes**

Fla. Stat. § 456.072                                              11,12

Fla. Stat. § 456.073                                              19

Fla. Stat. § 790.338                                              *Passim*

**Other Authorities**

American Academy of Child & Adolescent Psychiatry          21
    Policy Statement: Children and Guns (2011)

American Academy of Pediatrics Statement,                       20
    "Firearms-Related Injuries Affecting the Pediatric
    Population," 130 *Pediatrics, No. 5* (2012

American Medical Association Policy Statement                  21
    H-145.990, "Prevention of Firearm
    Accidents of Children"

*Guidelines for Adolescent Health Care*                         21
    (American College of Obstetricians & Gynecologists,
    2d Ed. 2011)

H.G. Gardner, "Office-Based Counseling for Unintentional       20
    Injury Prevention," 119 *Pediatrics, No. 1* (2007)

L. Murtagh, "Censorship of the Patient-Physician Relationship:   10
    A New Florida Law," 306 *JAMA* 1131 (2011)

## Statement of Identity and Interest of *Amici* and of Source of Authority to File Brief

*Amici* are professional associations of physicians, residents and medical students. *Amicus* the American Medical Association is the largest such association in the United States. The remaining *amici* are national specialty medical societies that represent their members in matters of public concern. All *amici* have members that practice in the State of Florida and whose ability to practice medicine is detrimentally affected by Florida's Firearm Owners' Privacy Act ("the Act").

*Amici* believe that the practice of medicine is both one of the most important and most difficult of human endeavors. Such practice requires a complete focus by the physician on the patient, so the physician can employ all of the physician's wisdom and skills on the patient's behalf. *Amici* oppose any disruption of that focus, such as the intrusions created by the Act.

*Amici* file this brief to protect the First Amendment rights of their members. Even more importantly, though, *amici* file this brief to ensure that their members' patients can receive the full medical care they deserve.

All parties have consented to the filing of this brief.

## FRAP Rule 29(c)(5) Statement

No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and no person other than *amici* contributed money that was intended to fund preparing or submitting this brief.

## Statement of the Issues

*Amici* adopt the Statement of the Issues as set forth in the Brief of Plaintiffs/Appellees.

## Summary of the Argument

The Plaintiffs' challenge to the Act presents a justiciable controversy. The Act singles out health care practitioners, including the members of the medical profession, for regulation, and it causes an immediate and concrete modification of physicians' ability to communicate freely in their medical practices. Plaintiffs thus have legal standing to bring their suit, and the issues are ripe for decision. The Defendants' argument of nonjusticiability is based on a selective and distorted reading of the Act.

On the merits, the Act prevents physicians from communicating with their patients so as to provide medical care under the accepted standards of the medical profession. Not only do physicians lose the right to express themselves freely, but their patients are deprived of the full range of medical

care and professionalism that they should and do expect from their physicians. L. Murtagh, "Censorship of the Patient-Physician Relationship: A New Florida Law," 306 *JAMA* 1131 (2011) (describing the ethical dilemmas physicians face in complying with the Act). Furthermore, the statutory restraint on record keeping prevents physicians from taking a routine precaution that might enhance their defense against charges of medical malpractice.

By contrast, the Act does little or nothing to protect interests that might somehow counterbalance this loss of rights of physicians and their patients. The Defendants' justifications are, again, based on a distorted reading of the Act. Manifestly, the Act is *not* intended to protect health care. Rather, it is a ploy to accommodate the concerns of those Floridians who fear exposure to speech that will offend their notions of political correctness; concerns that fall outside the purview of legal protection. The Act passes neither strict nor intermediate First Amendment scrutiny.

The Act thus facially violates physicians' (and their patients') guarantee of Freedom of Speech. The trial court should be affirmed.[1]

---

[1] This brief focuses on the unconstitutionality of §§ 1 and 2 of the Act. While *amici* believe that §§ 5 and 6 of the Act are also invalid, the trial court order of summary judgment [Dkt. 105] and the Plaintiffs' Brief fully address those issues, and so *amici* will not repeat their arguments.

<u>Argument and Citations of Authority</u>

I. **A Justiciable Controversy Exists Because the Firearm Owners' Privacy Act Expressly Limits the Permissible Communications of Physicians, Including the Plaintiffs, and the Effects of that Limitation are Suffered Immediately Through Self-Censorship.**

The Firearm Owners' Privacy Act, Fla. Stat. § 790.338, states, *inter alia*, as follows:

> "(1) A health care practitioner … may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.

> (2) A health care practitioner … should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.

> \* \* \* \*

> (8) Violations of the provisions of subsections (1) – (4) constitute grounds for disciplinary action under § 456.072(2)."

Fla. Stat. § 456.072(2), in turn, provides for various forms of discipline that the Florida Board of Medicine can impose against a physician, including permanent revocation of the physician's medical license. Fla. Stat. § 456.072(1)(k) reemphasizes that a physician can be subjected to penalties, including license revocation, for "[f]ailing to perform

any statutory … obligation placed upon a licensee." And, to dispel any lingering doubts, Fla. Stat. § 456.072(1)(nn), states, yet a third time, that a physician can be disciplined for violating "any" of the provisions of the Act.

The Defendants' Brief argues that the Plaintiffs, all of whom are practicing physicians subject to the Act or are associations of such physicians, lack standing to bring this suit under Article III of the Federal Constitution, thus making the case non-justiciable. In fact, however, the Plaintiffs do satisfy the legal requirements for standing.

To establish Article III standing, a plaintiff must present an injury that is concrete, particularized, and actual or imminent, fairly traceable to the defendant's challenged action, and redressable by a favorable ruling. *E.g.*, *Horne v. Flores*, 557 U.S. 423, 445, 129 S.Ct. 2579, 2592 (2009). The purpose of the standing requirement is to ensure that the party invoking federal jurisdiction has a personal interest in the outcome and the court is rendering something more than an advisory opinion of law. *Davis v. Federal Election Commission*, 554 U.S. 724, 732, 128 S.Ct. 2759, 2769 (2008). The Plaintiffs' suit easily passes these tests.

The Act is directed specifically toward health care practitioners, which the individual Plaintiffs and the members of the association Plaintiffs clearly are. It restricts the information they are allowed to write in the

medical records they create and maintain concerning their patients, and it restricts what they can say to their patients, thus injuring rights of expression protected under the First Amendment. The Plaintiffs are members of the class of persons best suited to challenge the validity of the Act, and, because a violation of the Act could jeopardize their livelihoods as professionals required to be licensed, they have a stake in the outcome.

Moreover, the injury the Plaintiffs face is immediate. As the Defendants have detailed in their own brief, the individual Plaintiffs, based on their interpretation of the Act, have curtailed their communications with their patients. [DB, at 2-5, 35].[2] This curtailment is not conjectural or uncertain; it has already occurred.

Furthermore, no serious argument could be raised about redressability, in that, if this Court finds the Act invalid, the statutory impediment to the Plaintiffs' free communication will be removed. Thus, a favorable judicial decision will redress their injury. *Amici* incorporate the discussion of the redressability issue from pages 7-8 of the decision below [Dkt. 105].[3]

The Defendants, essentially ignoring the question of standing to sue over § 1 of the Act, assert the Plaintiffs are overreacting, as § 2 of the Act

---

[2] The initials "DB" stand for "Defendants' Brief."
[3] Page numbers of the decision below are the pages of the summary judgment order entered at lower court docket number 105 [Dkt. 105].

uses the ambiguous phrase "should refrain from making," rather than a more forceful expression, such as, *e.g.*, "shall not make." Thus, according to the Defendants, the Act does not genuinely inhibit the Plaintiffs' communications. [DB at, 6,9,11,16,18, and 28]. The Defendants further assert that the Plaintiff physicians should simply wait until they are actually prosecuted for violation of the Act, as their injury will not be fully manifested until a prosecution runs its course. [DB at 12,19,21,22, and 25]. These arguments, however, are at odds with the language, structure, and context of the Act.

Defendants barely consider § 1 of the Act, which prohibits physicians from making certain entries in the medical record of a patient maintained by the physician. This prohibition unambiguously forbids conduct that would otherwise be lawful. Because § 1 causes injury to the physician Plaintiffs, they have standing to challenge its validity. As this Court has held in *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1230 (11th Cir. 2006), a plaintiff's "specific, serious, and plausible intent and desire to engage in conduct that arguably would violate [a law]" is sufficient to create standing to challenge that law, particularly when the challenge is based on a claimed deprivation of First Amendment rights of expression.

While Defendants might assert that the State of Florida has an interest in restricting entries that may be made in a medical record, that is a different issue from the threshold question of whether such proscription causes an ascertainable injury to physicians. *Bond v. United States*, 131 S.Ct. 2355, 2362 (2011) (Consideration of the merits of a case should not be confused with the issue of justiciability, which addresses a case's suitability for judicial resolution). Here, the Plaintiffs are unable to make the notations they would otherwise make in their patients' medical records, and they have therefore satisfied all the requirements for standing to challenge § 1 of the Act.

The Plaintiffs have also established standing to challenge § 2 of the Act. Taken in isolation from the rest of the Act, the requirement that a physician "should refrain" from specified conduct could, conceivably, be considered ambiguous as to whether it imposes a mandatory proscription or a merely optional recommendation. Reading that phrase in isolation, the Defendants suggest that the State of Florida is simply making a friendly suggestion, without legal repercussions for a physician's acting otherwise. Such reading, however, fails when the "should refrain" sentence is considered in the context of the entire Act.

The "should refrain" language is immediately followed by a safe harbor provision:

> "Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry." Fla. Stat. § 790.338(2)

If, as the Defendants argue, the "should refrain" provision is merely aspirational, then physicians are allowed to ask questions or make a written inquiry about ownership of firearms or ammunition, whether or not the physicians are acting in good faith. This, though, would mean that the safe harbor provision quoted above is surplusage. However, as with any statutory reading, the language of the Act must be interpreted so that all of its provisions are given meaning and purpose. *Myers v. Toojay's Management Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011). This basic rule of construction is possible only if the "should refrain" provision is given a clear meaning. The Florida Legislature would not have had to create the safe harbor quoted above unless the "should refrain" language of the preceding sentence is understood to actually prohibit conduct.

In *Corley v. United States*, 556 U.S. 303, 129 S.Ct. 1558 (2009), the Supreme Court held that a statute encompassing both a general rule and a "safe harbor" provision should be interpreted so that both sections have meaning and effect, even though, the statute there had to be read contra-

textually to reach this result. The present case, of course, is far easier. This Court need not violate the text to read meaning into both sentences of § 2 of the Act. It need only find that the "should refrain" requirement is far more than a suggestion – it is a positive command.

The Defendants assert that the Plaintiffs' fears are overblown and Plaintiffs' lack "an objectively reasonable, well-founded fear that the Act either applies or will be enforced" against them. [DB at 21].[4] However, the three-fold statutory threat to the physicians' medical licenses, as detailed above, is enough to put fear into any reasonable physician. The safe harbor provides little assurance that a physician's medical license will be insulated from attack, as what may be a "good faith" belief to one person may not be deemed good faith to another.

Moreover, the mere investigation of a potential breach of the Florida laws of medical licensure carries substantial practical repercussions for physicians. When physicians apply for membership on hospital medical staffs, including when they seek renewal of existing memberships, they are

---

[4] Defendants' repeated assurances that they should be trusted to apply the Act only in a constitutional manner, *see* DB at 12 and 22, are insufficient to avoid a chill on physicians' speech. Physicians, as law abiding citizens, will honor the Firearm Owners' Privacy Act if valid, even if prosecutors may decline to enforce it vigorously. *See, International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 818 (5th Cir. 1979) (Plaintiffs have a right to challenge the constitutionality of a statute even if the statute may presently be "more a curiosity than a vital fact of life.").

generally required to disclose and then explain any pending investigations against them, however unfounded such investigations may be. Similarly, an investigation of professional misconduct in one state usually triggers a "follow-up" investigation in another state in which a physician may be licensed or seek licensure. *See, e.g.*, Florida Board of Medicine Medical Doctor Application for Licensure Questions 17c ("Are you currently under investigation in any jurisdiction for any act or offense that would constitute a violation of Section 458.331, Florida Statutes?") and 17d ("Have you ever been notified, invited or required to appear before **any** licensing agency for a hearing on a complaint of **any** nature including, but not limited to, a charge or violation of the Medical Practice Act, involving unprofessional or unethical conduct?" [**Bold typeface** in original]).[5]

The Defendants' Brief cites several examples of Florida citizens' making public complaints about what those citizens perceive to be affronts to their right of privacy or their right to possess firearms, as well as the manifest evidence that government officials in Florida are responsive to such complaints. [DB at 2-5,35]. Under these circumstances, it would be objectively reasonable and well founded for physicians to fear vigorous

---

[5] The license application form can be found at
http://www.doh.state.fl.us/mqa/medical/me_applications.html.

prosecution under Florida's medical licensure laws if they should even slightly transgress the standards for impermissible communications under the Act. This is particularly true in light of the provisions in Florida's medical licensure laws allowing citizens to initiate disciplinary proceedings through their own complaints. Fla. Stat. § 456.073(1) (Complaint against licensee must be investigated if complaint is signed and in legally sufficient form). Physicians can avoid such prosecution by curbing their communications, but this necessitates their relinquishing rights guaranteed under the First Amendment, an injury sufficient to trigger standing to sue. *International Society for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 819-820 (5th Cir. 1979) (finding jurisdiction in the plaintiffs' preenforcement challenge of an allegedly unconstitutional law that interfered with the way they would normally conduct their affairs, as they had an interest in knowing exactly how far they could go without being punished).[6]

---

[6] As indicated at n. 1, *supra*, this Brief does not focus on §§ 5 and 6 of the Act. However, § 5 forbids discrimination "based solely upon the patient's constitutional right to own and possess firearms or ammunition." The Constitution of the State of Florida provides that the right to bear arms is subject to statutory limitation, Fla. Const. Art. I, § 8 (a) & (c), and a physician may well misunderstand the exact metes and bounds of this constitutional right. Likewise, § (6) of the Act prohibits "unnecessarily harassing a patient about firearm ownership during an examination," and a physician may not know just what is meant by "unnecessary" harassment. A physician who guesses wrong about what is forbidden under §§ 5 and 6 of the Act faces the same jeopardy as described in the principal text.

The issues raised in this case are thus suitable for challenge, and the Plaintiffs have standing to assert that challenge.

II.    **The Injuries Physicians and Patients Incur as a Result of the Firearm Owners Privacy Act are Substantial.**

    A.    **Physician Inquiries About Firearm Ownership Comply with Professional Medical Standards, Even in Situations in Which such Inquiries may Initially Appear Irrelevant to Medical Care or Safety.**

Unintentional injuries are the leading cause of death in children over one year of age. H.G. Gardner, "Office-Based Counseling for Unintentional Injury Prevention," 119 *Pediatrics, No. 1* (2007). More specifically, firearm-related deaths are one of the top three causes of death in American youth. American Academy of Pediatrics Statement, "Firearms-Related Injuries Affecting the Pediatric Population," 130 *Pediatrics, No. 5* (2012). Even when not fatal, injuries from firearms can have severe immediate and long term consequences for children and their parents. Primary care physicians, such those represented by *amici*, play a key role in educating parents about the risks associated with possession of firearms in homes with children.

Physicians are experienced in identifying the potential risks associated with firearms possession. Thus, a physician is well positioned to warn a parent that an inquisitive toddler is likely to play with the parent's handgun

unless secured or that a teenager who shows symptoms of depression or impulsivity could harm himself or others if given access to a firearm. Likewise, a physician may be better able to advise an adult patient with a suicidal or overly aggressive personality about potential risks if the physician is aware that the patient owns a firearm. Such counsel is likely to carry greater weight when coming from the family physician (*Guidelines for Adolescent Health Care* (American College of Obstetricians & Gynecologists, 2d Ed. 2011), at 29) or from an experienced psychiatrist ("Policy Statement: Children and Guns" American Academy of Child & Adolescent Psychiatry (2011)), than from a layman.

For these reasons, questions about home firearm possession should be and are a routine part of the patient history inquiries that physicians ask of their patients, usually conducted near the onset of the relationship as part of a general assessment of everyday risks (including such matters as traffic safety, water safety, household chemicals, tobacco, and drug abuse). In recognition of the role such communications play in patient care, the medical profession has consistently recommended them. *E.g.*, American Medical Association Policy H-145.990, "Prevention of Firearm Accidents of Children," available at https://ssl3.ama-assn.org/apps/ecomm/PolicyFinderForm.pl?site=www.ama-

assn.org&uri=/ama1/pub/upload/mm/PolicyFinder/policyfiles/HnE/H-145.990.HTM. All of this is common sense. *See Trammel v. United States*, 445 U.S. 40, 51, 100 S.Ct. 906, 913 (1980) ("[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment"). Both the Act and the Defendants' Brief essentially concede that discussions about firearms (and ammunition) ownership are a recognized feature of medical practice and a proper element of patient-physician interactions. [DB at 6 and n. 2].

The Act, however, forbids such discussions unless the physician has a good faith belief that those discussions are "relevant to the patient's medical care or safety, or the safety of others." This is unduly limiting. Issues of firearm ownership may appear irrelevant at the onset of the patient-physician relationship, but they may become relevant later. Unfortunately, if the inquiry about such ownership is made only after such relevance has become manifest, the therapeutic relationship between physician and patient may suffer.

Consider, for example, a parent who brings a child to see a physician on account of the child's apparent upper respiratory infection. It is hard to see that firearm ownership is immediately relevant to the treatment for this condition. Indeed, the Act assumes that in some situations knowledge of

gun ownership is irrelevant, as the preceding discussion of the "should refrain" provision of the Act points out. During the course of the physician's examination of the child, the physician observes that the child repeatedly kicks the physician or a medical assistant and spews obscenities at the parent. At this point, the physician might think it wise to counsel the parent about the harm that might arise to the child or to others if the child has access to firearms.

In the potentially heated atmosphere created by the child's inappropriate conduct, it might be difficult to broach the subject of this potential danger. If the physician were then to ask about firearm ownership, the parent, possibly defensive of the child and perhaps the parent's own parenting skills, might become uncommunicative. The situation would call for maximum delicacy in the interactions among physician, parent, and child, but at the same time the physician would want to use the opportunity to provide the parent with meaningful advice. Here, the therapeutic relationship would be enhanced if the physician had prior knowledge of firearm ownership, obtained at a less stressful time in the office visit pursuant to a routine intake questionnaire concerning general household health risks.

The dilemma of one time apparently irrelevant information about firearm ownership later becoming relevant could be repeated under any number of comparable scenarios, for adults as well as for children. Under the strictures of the Act, the physician would have to compromise the physician's duty to provide the best possible medical care for the patient, including those patients (undoubtedly the vast majority) who would have no problem in responding to questions about firearms ownership, especially if those questions were posed routinely at the onset of the office visit. This "should refrain" restriction in the Act is a violation of the First Amendment rights of the physician's patients, as well as the First Amendment rights of the physician. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817 (1972) (holding that would-be recipients of information had standing to challenge a law restricting communications, as Freedom of Speech protects the right to receive information as well as the right to promulgate it).

Thus, contrary to the Defendants' assertions, the Act, if found valid, would seriously interfere with a physician's ability to communicate with the physician's patients and thereby compromise the physician's ability to provide optimal professional care.

**B.    The Firearm Owners' Privacy Act Prevents Physicians from Taking Reasonable Measures to Protect Themselves from Claims of Medical Malpractice.**

As noted *supra*, the Defendants' Brief pays little heed to § 1 of the Act, which prohibits entry of certain information into a patient's medical record, but this is also a significant infringement of a physician's personal liberty. This section of the statute makes it illegal for a physician to "enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others." To appreciate the implications, it is again helpful to consider a specific scenario to illustrate the harm this restriction could cause.

Suppose that, during an office visit, a child's parent refuses to answer the physician's question about firearms ownership. Arguably, such refusal might be deemed to bear little relevance to medical care or safety. Thus, the physician might decide that a memorialization of the refusal must, under the strictures of the Act, be omitted from the medical record. Subsequently, it could turn out that there was an unsecured handgun in the home, and the child, who suffered from a severe personality disorder, used the weapon to cause injury.

The physician might then be sued for malpractice. The parent might assert that the physician was told about the presence of the gun, but, according to the parent, the physician, in violation of the standards of the medical profession, failed to counsel about proper firearm safety. In this situation, it would immeasurably help the physician's defense if the physician could demonstrate that a contemporaneous notation had been made in the medical record created by the physician of an inquiry about firearm ownership, but the parent had refused to answer. Because of the Act, the physician would be unable to provide such a notation.

III.  **Any Countervailing State Interest in Limiting Physicians' Communications About Their Patients' Firearm Ownership Is at Most Negligible.**

If the Act were a reasonable mechanism for effectuating an important public interest, this would be a substantially different case. The Act, however, does nothing to further any legitimate state interest, and the Act thus fails to counterbalance its deprivation of First Amendment rights.

The Defendants' Brief attempts to characterize the Act as a regulation of professional conduct, with only an incidental burden on speech. [DB at 25-31]. However, the thrust of the Act, particularly §§ 1 and 2, is to determine what health care professionals can and cannot say or write regarding a topic which, as Defendants acknowledge, carries political

overtones. [DB at 3-4]. The goal of these provisions of the Act is not to provide better medical care; rather, their object is to insulate those patients who possess firearms from hearing that such possession may carry negative consequences for health and safety.

Likewise, contrary to the Defendants' assertions the Act does not preserve Second Amendment or privacy rights. The Second Amendment is a limitation on government's power to proscribe the bearing of arms, but it is not a prohibition of private speech. Decision below [Dkt. 105], at 15. Similarly, physician inquiries about matters which are or may become relevant to their patients' medical care are not an invasion of their patients' privacy. Those patients who are affronted by being asked about firearm ownership can simply decline to answer. Whatever minimal interest the State might have in saving those patients from having their political sensitivities upset is vastly outweighed by the interest of physicians and the interests of patients not so affronted in being able to communicate freely. As held in *Sorrell v. IMS Health, Inc.,* 131 S.Ct. 2653 (2011), the state's interest in protecting against coercive or harassing speech does not justify a law that infringes so haphazardly even as to commercial communications. "Many are those who must endure speech they do not like, but that is a necessary cost of freedom." *Id.*, at 2669.

The court below provided a thoughtful and scholarly discussion of why the Defendants' purported justifications for the Act were inadequate to support its constitutionality. The Act does little or nothing to advance any legitimate interests of the State of Florida or its citizens. The Act survives neither a strict nor an intermediate scrutiny analysis. As *amici* are unable to improve on the lower court's reasoning in this regard, they adopt it. *See* decision below [Dkt. 105] at 14-21.[7]

## Conclusion

The lower court correctly found the Act burdens the Plaintiffs' First Amendment rights, and that burden is immediate. Nothing would be gained by deferring adjudication of the Act's validity until an actual prosecution. Such delay would not clarify the legal issues, but it would cause physicians to censor their own speech. That is a very real injury, to physicians and their patients. The Plaintiffs thus have standing, and this case is justiciable.

On the merits, the Act inhibits physicians from communicating with their patients about issues which may become relevant to their patients' health and safety. It also inhibits physicians from making a reasonable, inoffensive notation in their patients' medical records, even though such notation would cause no legally recognized harm to the patient (or anyone

---

[7] For the same reason, *amici* adopt the overbreadth and vagueness arguments of Plaintiffs' Brief, as they pertain to all counts.

else) and might protect the physician against a claim of medical malpractice. Any benefits that might be attributable to the Act, to the extent they may exist at all, are far outweighed by the burdens the Act imposes on the First Amendment rights of physicians and their patients. "The mere potential for the exercise of [government censorial] power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *United States v. Alvarez*, 132 S.Ct. 2537, 2548 (2012).

As held in *Conant v. Walters*, 309 F.3d 629, 636 (9th Cir. 2002), the government is properly enjoined from investigating conduct that could lead to revocation of a medical license if such investigation is based solely on attempt to censor constitutionally protected communications between physician and patient. The lower court determination that the Act violates the First Amendment should therefore be affirmed.

Date: November 5, 2012

_____
Richard H. Levenstein,
Attorney for *Amici Curiae*

Jon N. Ekdahl
Leonard A. Nelson
American Medical Association
Office of General Counsel
515 N. State St., 14th Floor
(312) 464-5532

Richard H. Levenstein
Kramer, Sopko & Levenstein, P.A.
2300 SE Monterey Rd., Suite 100
Stuart, FL 34995
(772) 288-0048  FL Bar # 235296
*Counsel of Record*

## Certificate of Compliance with FRAP 32(a)(7)

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 4820 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Date: November 5, 2012

_____

Richard H. Levenstein

Attorney for *Amici Curiae*

## Certificate of Service

I HEREBY CERTIFY that a true copy of the foregoing brief has been
delivered to a third-party carrier for express delivery to the Court and
furnished by U.S. Mail to the following on November 5, 2012:

Pamela Jo Bondi, Attn'y Gen.
Timothy D. Osterhaus, Sol. Gen.
James Vail, Assist. Attn'y Gen.
Diane G. DeWolfe, Dep. Sol. Gen.
Rachel E. Nordby, Dep. Sol. Gen.
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399

Charles J. Cooper
David H. Thompson
Peter A. Patterson
Cooper and Kirk, PLLC
1523 New Hampshire Ave., NW
Washington, D.C. 20036

John C. Eastmen
Anthony T. Caso
Center for Constitutional
Jurisprudence
c/o Chapman University
School of Law
One University Drive
Orange, CA 92886

Douglas H. Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz
Ropes & Gray LLP
700 12th Street NW, Suite 900
Washington, D.C. 20005

Elizabeth N. Dewar
Ropes & Gray LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600

Edward M. Mullins
Hal M. Lucas
Astigarraaga Davis Mullins &
Grossman, P.A.
701 Brickell Avenue, 16th Floor
Miami, Florida 33131-2847

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
1225 Eye Street, NW, Suite 1100
Washington, D.C. 20005

Date: November 5, 2012

Richard H. Levenstein
Attorney for *Amici Curiae*

G:\DBD\2012\Wollschlaeger Brief (11th Cir.).doc