Case No. 12-14009-FF

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

DR. BERND WOLLSCHLAEGER, et al.,
Plaintiffs/Appellees,
vs.
GOVERNOR STATE OF FLORIDA, et al.,
Defendants/Appellants.

───────────────────────────────────────────────

Amicus Curiae Brief in Support of Affirming the Judgment for Plaintiffs/Appellees
of the ACLU Foundation of Florida, Inc., Alachua County Medical Society,
Broward County Medical Association, Broward County Pediatric Society, Palm
Beach County Medical Society, Florida Public Health Association, University of
Miami School of Law Children and Youth Clinic, Children's Healthcare Is a Legal
Duty, Inc., and Early Childhood Initiative Foundation

───────────────────────────────────────────────
───────────────────────────────────────

On Appeal from the United States District Court
for the Southern District of Florida

───────────────────────────────────────

Thomas R. Julin, Jamie Z. Isani &
  Patricia Acosta
HUNTON & WILLIAMS LLP
1111 Brickell Ave., Ste. 2500
Miami, FL 33131
305.810.2516

Randall C. Marshall
COOPERATING ATTORNEYS ACLU
  FOUNDATION OF FLORIDA, INC.
4500 Biscayne Blvd., Ste. 340
Miami, FL 33137
786.363.2700

Gerald E. Greenberg
GELBER SCHACHTER & GREENBERG, P.A.
1441 Brickell Ave., Ste. 1420
Miami, Florida 33131
305.728.0953

Gordon M. Mead, Jr.
STEARNS WEAVER MILLER WEISSLER
  ALHADEFF & SITTERSON, P.A.
Museum Tower, Ste. 2200
150 West Flagler Street
Miami, Florida 33130
305.789.3200

Attorneys for the Amici Curiae

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

The following is a complete list of the trial judge, all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case on appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held company that owns 10 percent or more of the party's stock, and other identifiable legal entities related to a party:

ACLU Foundation of Florida, Inc., amicus curiae

Acosta, Patricia, counsel for amicus curiae

Alachua County Medical Society, amicus curiae

American Academy of Family Physicians, Florida Chapter, plaintiff-appellee

American Academy of Pediatrics, Florida Chapter, plaintiff-appellee

American College of Physicians, Florida Chapter, plaintiff-appellee

Armstrong, John H., present Florida Surgeon General and Secretary of the Department of Health, defendant-appellant

Averoff, Magdalena, Fla. Board of Medicine Member, defendant-appellant

Bearison, Fred, Fla. Board of Medicine Member, defendant-appellant

Brady Center to Prevent Gun Violence

Broward County Medical Association, The, amicus curiae

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Broward County Pediatric Society, The, amicus curiae

Caso, Anthony, Counsel for CCJ and DRGO

Center for Constitutional Jurisprudence (CCJ), amicus curiae

Children's Healthcare Is a Legal Duty, Inc. (CHILD), amicus curiae

Cooke, Marcia G., U.S. District Judge

Dewar, Elizabeth, plaintiffs-appellees' counsel

DeWolf, Diane G., defendants-appellants' counsel

Doctors for Responsible Gun Ownership (DRGO), amicus curiae

Dudek, Elizabeth, Secretary of the Agency for Health Care Administration, defendant-appellant

Early Childhood Initiative Foundation, amicus curiae

Eastman, John, Counsel for CCJ and DRGO

El Sanadi, Nabil, Fla. Board of Medicine Member, defendant-appellant

Espinola, Trina, Fla. Board of Medicine Member, defendant-appellant

Farmer, Frank, former Florida Surgeon General and Department Secretary, defendant-appellant

Florida Public Health Association, The, amicus curiae

Fox-Levine, Shannon, plaintiff-appellee

Gelber Schacter & Greenberg, P.A., counsel for amici curiae

Goersch, Brigitte Rivera, Fla. Board of Medicine Member, defendant-appellant

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Goetz, Mariel, plaintiffs-appellees' counsel

Greenberg, Gerald E., counsel for amici curiae

Guiliano, Douglas, plaintiffs-appellees' counsel

Gutierrez, Roland, plaintiff-appellee

Hallward-Driemeier, Douglas, plaintiffs-appellees' counsel

Heckenlively, Bryan, Counsel for Center to Prevent Gun Violence

Hunton & Williams LLP, counsel for amici curiae

Isani, Jamie Zysk, counsel for amici curiae

Julin, Thomas R., counsel for amici curiae

Kainen, Dennis G., plaintiffs-appellees' counsel

Lage, Onelia, Fla. Board of Medicine Member, defendant-appellant

Levine, Bradley, Fla. Board of Medicine Member, defendant-appellant

Lowy, Jonathan, plaintiffs-appellees' counsel

Lucas, Hal, plaintiffs-appellees' counsel

Manheim, Bruce, plaintiffs-appellees' counsel

Marshall, Randall C., counsel for amici curiae

Mead, Gordon M., Jr., counsel for amici curiae

Mullins, Donald, Fla. Board of Medicine Member, defendant-appellant

Mullins, Edward, plaintiff-appellees' counsel

National Rifle Association (NRA), amicus curiae

C3-of-5

Nordby, Rachel E., defendants-appellants' counsel

Nuss, Robert, Fla. Board of Medicine Member, defendant-appellant

Orr, James, Fla. Board of Medicine Member, defendant-appellant

Osterhaus, Timothy D., defendants-appellants' counsel

Palm Beach County Medical Society

Patterson, Peter, Counsel for the NRA

Ripa, Augustine, plaintiffs-appellees' counsel

Rosenberg, Jason, Fla. Board of Medicine Member, defendant-appellant

Sack, Stanley, plaintiff-appellee

Schaechter, Judith, plaintiff-appellee

Schechtman, Tommy, plaintiff-appellee

Scott, Rick, Governor of Florida, defendant-appellant

Shugarman, Richard G., Fla. Board of Medicine Member, defendant-appellant

Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A., counsel for Amici Curiae

Stringer, Merle, Fla. Board of Medicine Member, defendant-appellant

Thomas, George, Fla. Board of Medicine Member, defendant-appellant

Thompson, David, Counsel for the NRA

Tucker, Elisabeth, Fla. Board of Medicine Member, defendant-appellant

University of Miami School of Law Children and Youth Clinic

C4-of-5

Vail, Jason, defendants-appellants' counsel

Vice, Daniel, plaintiffs-appellees counsel

Winchester, Gary, Fla. Board of Medicine Member, defendant-appellant

Wollschlaeger, Bernd, plaintiff-appellee

Zachariah, Zachariah, Fla. Board of Medicine Member, defendant-appellant

s/Thomas R. Julin
_____
Thomas R. Julin

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ............................................C1

TABLE OF CITATIONS ............................................................... iii

STATEMENT OF THE ISSUES..............................................................1

INTRODUCTION ........................................................................1

THE AMICI CURIAE, THEIR INTERESTS
& THEIR AUTHORITY TO FILE ...........................................................2

 The ACLU of Florida ..............................................................2

 The Medical Societies..............................................................3

 The Children and Youth Care Groups ...............................................4

AUTHORSHIP & FUNDING OF THE BRIEF....................................................5

ARGUMENT ............................................................................6

I. The Statute is an Unconstitutional Prior
Restraint on the Plaintiffs' Speech ..................................................6

 A. The Law is a Prior Restraint on Speech
Protected by the First Amendment......................................................6

  1. The Law Restrains the Speech
in Which the Plaintiffs Engage .......................................................7

  2. The Restrained Speech is
Protected by the First Amendment .....................................................11

   a. Inquiries are Protected by the First Amendment............11

   b. Harassment Considered "Unnecessary" by
Some is Protected by the First Amendment ...................14

B.    The State's Justifications for the Law are Insufficient ........................16

    1.    Licensing Does Not Provide a Justification
        for Imposition of this Prior Restraint .........................................16

    2.    The Law Cannot Survive Strict Scrutiny ..................................21

        a.    The Law is Unnecessary to Protect
            Second Amendment or Putative Privacy Interests .........22

        b.    Protecting Patients From Harassment
            is Not a Compelling Government Interest .....................24

II.  The Statute Infringes on Patients' Right
    to Receive Information from their Doctors ...................................25

CONCLUSION ........................................................................................28

CERTIFICATE OF COMPLIANCE ...................................................... vii

CERTIFICATE OF SERVICE ............................................................. viii

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

## TABLE OF CITATIONS

CASES                                                                   PAGE(S)

*44 Liquormart, Inc. v. Rhode Island,*
   517 U.S. 484 (1996)..................................................................................17

*Board of County Commissioners v. Umbehr,*
   518 U.S. 668 (1996)..................................................................................17

*Cantwell v. Connecticut,*
   310 U. S. 296 (1940)................................................................................12

*CBS Broadcasting, Inc. v. Cobb,*
   470 F. Supp. 2d 1365 (S.D. Fla. 2006)......................................12, 13

*CBS Inc. v. Smith,*
   681 F. Supp. 794 (S.D. Fla. 1988)..............................................12, 13

*Central Hudson Gas & Electric Corp. v. Publice Service Commission,*
   447 U.S. 557 (1980)..................................................................................17

*Clean-Up '84 v. Heinrich,*
   759 F.2d 1511 (11th Cir. 1985) ..................................................12, 13

*Cohen v. California,*
   403 U.S. 15 (1971)....................................................................................23

*Connick v. Myers,*
   461 U.S. 138 (1983)..................................................................................15

*Edenfield v. Fane,*
   507 U.S. 761 (1993)..................................................................................17

*Erznoznik v. City of Jacksonville,*
   422 U.S. 205 (1975)..................................................................................23

*Florida Bar v. Went For It, Inc.,*
   515 U.S. 618 (1995)..................................................................................17

*Gomez v. Village of Pinecrest,*
   41 So. 3d 180 (Fla. 2010) ..........................................................................8

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

*Greater New Orleans Broadcasting Association v. United States*,
  527 U.S. 173 (1999)........................................................................17

*Kleindienst v. Mandel*,
  408 U. S. 753 (1972)......................................................................26

*Lamont v. Postmaster General*,
  381 U. S. 301 (1965)......................................................................26

*Locke v. Shore*,
  634 F.3d 1185 (11th Cir. 2011) ....................................................21

*Lowe v. SEC*,
  472 U.S. 181 (1985)..................................................................19, 20

*McDonald v. City of Chicago*,
  130 S. Ct. 3020 (2010)..................................................................22

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
  460 U.S. 575 ................................................................................16

*Murdock v. Pennsylvania*,
  319 U. S. 105 (1943)................................................................12, 13

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
  505 U.S. 833 (1992)......................................................................18

*Polk County v. Dodson*,
  454 U. S. 312 (1981)......................................................................17

*Procunier v. Martinez*,
  416 U. S. 396 (1974)......................................................................26

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*,
  502 U.S. 105 (1991)......................................................................16

*\*Snyder v. Phelps*,
  131 S. Ct. 1207 (2011)........................................................10, 14, 15

*\*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011)............................................................passim

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

*Spence v. Washington,*
418 U. S. 405 (1974) ........................................................................................23

*Street v. New York,*
394 U.S. 576 (1969) ........................................................................................23

*\*Thomas v. Collins,*
323 U.S. 516 (1945) ...........................................................................18, 19, 20

*Thompson v. Western States Medical Center,*
535 U.S. 357 (2002) ...................................................................................17, 26

*United States v. Playboy Entertainment Group, Inc.,*
529 U.S. 803 (2000) ........................................................................................16

*Velasquez v. Legal Services Corp.,*
531 U.S. 533 (2001) ........................................................................................17

*Velez v. Miami-Dade County Police Department,*
934 So. 2d 1162 (Fla. 2006) .............................................................................8

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,
Inc.,*
425 U.S. 748 (1976) ........................................................................................26

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,*
536 U.S. 150 (2002) ........................................................................................12

*Young v. Apartments, Inc. v. Town of Jupiter,*
529 F.3d 1027 (11th Cir. 2008) ..................................................................25, 26

*Zauderer v. Office of Disciplinary Counsel,*
471 U.S. 626 (1985) ........................................................................................18

CONSTITUTIONAL PROVISIONS, STATUTES & RULES

U.S. Const. amend. I ..................................................................................passim

U.S. Const. amend. II ......................................................................................22

U.S. Const. amend. XIV ............................................................................16, 22

Investment Advisers Act of 1940 ....................................................................19

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Chapters 456-68, Florida Statutes ........................................................................18

Fla. Stat. § 456.072(1)(mm) ...................................................................................7

Fla. Stat. § 790.338 .......................................................................................passim

<u>OTHER AUTHORITIES</u>

Susan Nevelow Mart, *The Right to Receive Information,* 95 Law Libr. J. 175
(2003) .............................................................................................................26

The Children's Defense Fund, *Protect Children Not Guns 2012*,
http://www.childrensdefense.org/child-research-data-
publications/data/protect-children-not-guns-2012.html (visited October 8,
2012) ..............................................................................................................27

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

## STATEMENT OF THE ISSUES

I.      Whether the district court properly determined that:

A.      The Florida's Firearm Owners' Privacy Act is not simply a dead letter, but rather actually prohibits speech protected by the First Amendment in which the plaintiffs and many others would engage but for the Act; and

B.      The Act is a content-based prior restriction on the speech of healthcare professionals that cannot survive First Amendment scrutiny.

II.     Whether the district court also could have held that the plaintiffs have standing to assert the rights of their patients to receive information from them and that the Act violates their patients' rights to hear the questions that their healthcare providers want to ask them.

## INTRODUCTION

Although fully supportive of the judgment entered in favor of the plaintiffs/appellees, the amici curiae filing this brief agree with the State that in many instances inquiries to patients about firearms and ammunition have little, if anything, to do, with a patient's medical care or safety.  These inquiries often are made during patient intake and then used to engage the patients in political discussions relating to gun ownership.  The amici also are willing to accept for purposes of their argument that the law at issue here prohibits such inquiries and subsequent discussion.  The amici curiae filing this brief also accept that when

medical personnel engage their patients in such political discussions, some patients, particularly gun owners, may regard the communications as unnecessary harassment and that the State reasonably can interpret the law as prohibiting such communications. In essence, the amici curiae proceed on the assumption that the statute is not a dead letter, that it will be effective to ban substantial speech, and that the plaintiffs and their members would be punished for violation of the statute if they continued with business as usual. Such a law patently violates the First Amendment rights of both the doctors whom it restrains and of those patients who do not want their doctors muzzled.

## THE AMICI CURIAE, THEIR INTERESTS, & THEIR AUTHORITY TO FILE

The parties have consented to the filing of this brief. The amici curiae have obtained the consent of their governing officials or boards to file this brief. Their identities and interests are as follows:

### The ACLU of Florida

The American Civil Liberties Union (ACLU) is our nation's guardian of liberty, working daily in courts, legislatures and communities to defend and preserve the individual rights and liberties guaranteed to all people in this country by the Constitution and laws of the United States. Since its founding in 1920, the nonprofit, nonpartisan ACLU has grown to an organization of over 500,000 members and supporters, with offices in almost every state. The ACLU of Florida,

with headquarters in Miami, is the local affiliate of the national organization.

The ACLU is the nation's oldest and largest defender of freedom of speech and expression for all persons and all points of view.

<u>The Medical Societies</u>

The Alachua County Medical Society was established in the late 1800s and represents more than 1000 physicians, residents and students in Alachua, Levy, Dixie and Gilchrist Counties.

The Broward County Medical Association (BCMA) unites 1,500 allopathic and osteopathic physicians, of all specialties, toward the fulfillment of a common goal: providing access to healthcare of the highest quality for the residents of Broward County.

The Broward County Pediatric Society was formed in 2000, to serve as a resource for community leaders in helping shape decisions that affect the health, safety and well-being of children and their families. The Society has approximately 100 pediatricians and pediatric subspecialists as members.

The Palm Beach County Medical Society has been a trusted leader in addressing healthcare issues facing physicians since 1919. The Society listens to physicians' ideas and concerns and represents their interests with elected officials and healthcare organizations.

The Florida Public Health Association was founded in 1931 to advance

3

public health through advocacy, education and networking.

All five medical societies have joined this brief to protect their members' speech rights at this critical time when healthcare reform is at the forefront of the nation's political agenda. They fear that if the state can censor questions regarding firearm and ammunition ownership, it may impose additional speech restrictions that have nothing to do with the practice of medicine and everything to do with a political agenda.

<u>The Children and Youth Care Groups</u>

Four of the amici curiae are organizations that advocate for the health and well-being of children.

Children's Healthcare Is a Legal Duty, Inc. (CHILD) is a non-profit organization with members in 45 states dedicated to protecting children from medical neglect. CHILD believes that a child's right to health and safety should take precedence and that children deserve equal protection of the law. CHILD has a particular concern about public policies that allow child abuse, neglect, or endangerment and opposes the challenged law because it would prohibit physicians from giving unconstrained advice on the risks of guns.

The Early Childhood Initiative Foundation is an organization aimed toward providing "universal readiness" or making available affordable high quality health, education, and nurturing for all of the Miami-Dade County's community of

approximately 160,000 children between birth and age five. Under the leadership of its president, David Lawrence, Jr., the Initiative works toward the social, physical, emotional and intellectual growth of all children so that they are ready and eager to be successful in the first grade and, indeed, life.

The Children and Youth Clinic is an in-house legal clinic, staffed by faculty and students at the University of Miami School of Law, which advocates for the rights of children in abuse and neglect, medical care, mental health, disability, and other legal proceedings. The Children and Youth Clinic works to ensure that children are treated with dignity and respect by public health, education, child welfare and juvenile justice systems that are charged with their care, schooling, protection, safety and treatment.

The children's advocacy organizations all have a strong interest in ensuring that doctors, like other citizens, remain free to question their patients about firearm and ammunition ownership – regardless of whether the inquiries are part of a preventative healthcare regimen or simply the expression of an opinion or viewpoint.

## AUTHORSHIP & FUNDING OF THE BRIEF

No party's counsel authored this brief or contributed money intended to fund preparation or submission of this brief; and no person, other than the amici curiae, their members or counsel, contributed money intended to fund preparing or

submission of the brief.

## ARGUMENT

## I.

### The Statute is an Unconstitutional Prior Restraint on the Plaintiffs' Speech

The law at issue does not apply generally to all persons. It singles out, for different treatment, healthcare practitioners, facilities, and providers. It also does not restrain all speech that is irrelevant to patient medical care and safety or all speech that is harassing of patients. Instead, it singles out, on the basis of content, irrelevant inquiries and unnecessary harassment that relates to the ownership of guns and ammunition. These features of the law transform it from a mere regulation of the practice of medicine or a prohibition on harmful conduct into a classic content-based prior restraint of speech. The licensed status of these specific citizens does not provide any justification for the imposition of the prior restraint at issue. Moreover, the supposed privacy interests of the patients are not at all protected by the statute; instead, they are a mere pretext for the State's suppression of speech with which it disagrees.

A. The Law is a Prior Restraint on Speech in Which
   Plaintiffs Engage That is Protected by the First Amendment

The law applies to two types of speech in which the plaintiffs are engaged – (1) unrestrained inquiry into gun and ammunition ownership unrelated to medical care and safety and (2) unnecessary harassment of patients who decline to answer

such questions.

### 1.   The Law Restrains the Speech in Which the Plaintiffs Engage

The parties are in agreement that section 790.338(2), Florida Statutes, commands that healthcare practitioners, facilities and providers not ask questions of their patients regarding gun and ammunition ownership when they do not regard such inquiries as relevant to the patients' medical care or safety.  Specifically, the State asserted below that the act provides "physicians should refrain from asking about firearm ownership."[1]  (DE-49 at 5).  More pointedly, the State acknowledged that the law would "apply in situations (such as those that animated passage of the act, discussed below) where no relevant basis for the question exists."  (DE-49 at 7); *see also* Appellants' Br. at 11 ("The Act proscribes … inquiries … about firearms that [are] not relevant to medical and safety concerns.").  The situation referenced in this passage is the July 21, 2010, exchange between Amber Ullman and Dr. Chris Okonkwo.  While plaintiffs maintain that inquiries about gun ownership almost *always* bear on medical care and safety, if such speech always

---

[1]   The fact that section 790.338(2) does not directly command speakers not to ask questions of their patients and instead directs that they "should refrain" from asking specified questions is of no moment, because the practitioner, facility or provider who does not refrain from making such inquiries will be in violation of the statute and subject to the sanctions provided by sections 456.072(1)(mm) and 790.338(8), Florida Statutes.

bore on medical care and safety, this would render the statute a nullity.[2]  It is a fundamental rule of statutory construction that statutes should not be read to accomplish nothing.  When a court interprets a statute, "it must give full effect to all statutory provisions. Courts should avoid readings that would render part of a statute meaningless."  *Gomez v. Village of Pinecrest*, 41 So. 3d 180, 185 (Fla. 2010) (quoting *Velez v. Miami-Dade County Police Dep't*, 934 So. 2d 1162, 1165 (Fla. 2006)).  Amici curiae believe that questions concerning gun ownership could at times be regarded in good faith by most reasonable practitioners as irrelevant to medical care or safety.  Indeed, the record developed by the parties supports the proposition that doctors ask irrelevant questions about guns.  For example, the lead plaintiff, Dr. Wollschlaeger, a practicing family physician, stated in his declaration, that "I generally use . . . patient questionnaires as the basis for taking an in-depth, individualized patient history."  (DE-23 ¶ 7).  He goes on to state that before passage of the law "I included questions about firearm ownership."  (DE-23 ¶ 8).  He does not reserve these inquiries for patients who have been the victims of

---

[2]    For purposes of this argument, the *amici curiae* accept the State's position that the statute can survive plaintiffs' vagueness attack.  At worst for plaintiffs, however, the State's implausible and counterintuitive interpretation of what the statute prohibits and permits proves that it is unconstitutionally vague. The subjective standards used by the law make ascertainment of its reach difficult, and the severe sanctions on the licensed professional who violate the statute make credible the plaintiffs' arguments that the statute chills significant speech that the Legislature constitutionally may not reach.

violence, who have young children, or who have mental disabilities. His practice was to propound these questions to *all* patients whether they came to him with a common cold, a broken leg, high blood pressure, diabetes, or any other ailment.

The District Court, which recognized that the question may have no relevance to many patients, offered these examples:

> On a regular medical visit, hi, I'm Marcia Cooke. I'm here to talk to you about my flu. What's the issue about the gun?
>
> \*          \*          \*
>
> I am Marcia Cook[e], I have a three-year-old and I have a seven-year-old. Well, Ms. Cooke, have you thought about appropriate firearm safety? This is when the question would come. Why would you have it as an initial screening question?

(Transcript at 8).

The amici curiae note that these questions and those on a standard intake questionnaire may be – by design – broad. These questions are examples of where this statute has a very real and immediate impact on a substantial amount of speech by many healthcare practitioners and providers. The statute subjects practitioners to discipline if they continue to engage in the use of their preliminary screening questionnaires or if they follow up with further oral questions on the same topic.

The State points out that the law does not preclude doctors "from providing firearm safety information to patients by, for example, providing a pamphlet (or other written information) or giving verbal advice explaining the risks associated with firearms and the safety precautions persons who own firearms should take."

9

(DE-49 at 5). It does not dispute, however, that it acts as an effective ban on inquiries into gun and ammunition ownership other than those deemed by the State relevant to medical care and safety. So a threshold issue in the case below was and here on appeal is whether the asking of irrelevant questions is protected by the First and Fourteenth Amendments.

The State contends that the plaintiffs lack standing to maintain this action because the prohibition in the law against irrelevant inquiries does not prohibit a practitioner who wishes to lecture a patient on the perils of gun ownership from doing so. Yet, the State also makes clear that it would regard section 790.338(6) as prohibiting such lecturing as unnecessary harassment. The State argued below that the law "would apply in situations (such as those that animated the passage of the act, discussed below) . . . where the patient refuses to answer and the physician continues to make inquiry in bad faith and to harass or discriminate." (DE-49 at 7). Again, the referenced "situation" is the Ocala incident in which the doctor makes an initial inquiry about gun ownership and then follows with further inquiries or arguments with respect to ownership.[3] Thus, the statute provides an

---

[3] While the plaintiffs themselves may contend that the sort of patient screening and lecturing in which they engage is not harassment, it is plain from the history of the statute's text and history as well as the arguments of the State that it is precisely the sort of inquiring and unnecessary harassment targeted by the law. Of course, one person may well view delivery of a given message as of vital importance to the Republic, while another considers it nothing but harassment.

10

effective restraint on precisely the type of speech in which the plaintiffs wish to engage and thus the plaintiffs do have standing to challenge the law. [4]

### 2.   The Restrained Speech is Protected by the First Amendment

With it clear that the law prohibits speech in which the plaintiffs engage, the next issue for the Court is whether medically irrelevant questions that may be regarded as harassing are protected by the First Amendment.

### a.   Inquiries are Protected by the First Amendment

The asking of a question conveys to the listener that the questioner wants an answer.  Other times it conveys that the questioner would like the listener to take certain action or that the questioner holds certain beliefs.  It does not necessarily

---

This is why the law violates the First Amendment not only through what it clearly does prohibit, but also by banning or chilling of speech that the State never intended to reach.  *See Snyder v. Phelps,* 131 S. Ct. 1207, 1219 (2011) (holding that "outrageous" is a "highly malleable standard" which created an "unacceptable" risk that it would stifle public debate).

[4]   The State argues that the statute at issue should be interpreted to avoid constitutional doubts, but in the First Amendment context courts have made clear that such limits must be found in the statute's text, binding construction or well-accepted practice and that courts "will not write nonbinding limits into a silent state statute."  *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 770 & n.11 (1988); *see also Conchatta Inc. v. Miller*, 458 F.3d 258, 265 (3d Cir. 2006); *Ways v. City of Lincoln, Neb.*, 274 F.3d 514, 519 (8th Cir. 2001).  The State here vacillates in its interpretation of the statute and certainly fails to point to such limits in the text of the statute itself, which the State at times seems to suggest prohibits nothing at all while at other times arguing, consistent with its text, that the statute separately prohibits both irrelevant and harassing questioning and speech.

convey why the question has been posed or the significance that the answer might have, but it is beyond dispute that the asking of a question is a critically important form of speech that enables communication. A law banning a reporter from asking sources questions about a topic deemed off-limits by the state would cripple freedom of the press. A law prohibiting citizens from asking each other whether they support particular political candidates, hold religious beliefs, advocate particular practices or standards, or own guns would destroy the freedom of speech secured by the First Amendment.

The right of one citizen to ask another citizen a question is the basis of numerous decisions of the Supreme Court, the Eleventh Circuit, and district courts within the Eleventh Circuit. *See, e.g., Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton,* 536 U.S. 150 (2002) (protecting right to ask for contributions); *Cantwell v. Connecticut,* 310 U. S. 296 (1940) (invalidating licensing of solicitations); *Murdock v. Pennsylvania*, 319 U. S. 105, 108 (1943) (same); *Clean-Up '84 v. Heinrich,* 759 F.2d 1511 (11th Cir. 1985) (protecting the right to ask a voter to sign a petition); *CBS Broad., Inc. v. Cobb,* 470 F. Supp. 2d 1365 (S.D. Fla. 2006) (invalidating on First Amendment grounds statute that interferes with solicitations); *CBS Inc. v. Smith,* 681 F. Supp. 794, 802 (S.D. Fla. 1988) (recognizing the First Amendment right to ask question regarding how one voted). Although each case involves questions being asked in a different context

than that here, they all recognize the fundamental speech value that questions have. In *Watchtower, Cantwell,* and *Murdock*, the Court afforded First Amendment protection to go to the private home of another citizen and ask for a contribution to a religious cause. In *Clean-Up '84*, this Court recognized a First Amendment right to ask other citizens near polling places to sign a political petition. In *Cobb* and *Smith*, the district court recognized the right of journalists to approach voters at polling places to ask for whom they had cast their votes. From the privacy of the residential home to the public setting of a polling place, a citizen's right to ask questions is protected.

Until the enactment of the law at issue, no State in the Union had passed legislation to prohibit a doctor from asking a patient a question that is *not* relevant to the patient's medical care or safety. It is unique in its approach and frightening in precisely what it purports to do – to stop one citizen from asking a question of another about a topic that the State has deemed to be off limits. If such a law is permissible, then so too might be a law prohibiting a doctor from asking a patient to contribute to a religious cause, to sign a political petition, or to say for whom he or she cast his or her vote in the prior election. And this would be true even though all other citizens clearly enjoy constitutional protection for the making of such inquiries in all other settings just as they enjoy the right to ask others about their gun ownership.

13

b.    Harassment Considered "Unnecessary"
by Some is Protected by the First Amendment

In order to determine whether unduly harassing speech is protected by the First Amendment, the Court need look no further than the Supreme Court's 2011 decision in *Snyder v. Phelps,* 131 S. Ct. 1207 (2011). *Snyder* arose from a tort action against picketers at military funerals who communicated their belief that God hates the United States for its tolerance of homosexuality, particularly in the military. The picketers peacefully displayed signs stating, for example, "Thank God for Dead Soldiers," "Fags Doom Nations," "America is Doomed," "Priests Rape Boys," and "You're Going to Hell." The father of a deceased solider whose funeral was being picketed in this fashion sued the picketers and a jury returned a verdict in his favor for millions of dollars. The picketers asserted that their harassing speech involved a matter of public concern and was thus shielded it from tort liability.

The Supreme Court ruled in favor of the picketers. It explained that "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id.* at 1216 (citation omitted). The Court further explained that the "arguably 'inappropriate or controversial character of a statement is irrelevant to the question. . . .'" *Id.* (citation omitted). Firearm and ammunition ownership is a quintessential matter of public concern. This is reflected not only in the campaigns waged by

14

such groups as the American Academy of Pediatrics and the debate that led to the enactment of the law at issue, but also by the amicus curiae brief of the National Rifle Association. (NRA Brief at 15 & n.5) (discussing the national debate that has taken place).

When speech involves a matter of public concern, as here, it "cannot be restricted simply because it is upsetting or arouses contempt. 'If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *Snyder*, 131 S. Ct. at 1219 (citation omitted). The Court in *Snyder* vacated the jury's verdict although it had found, and the Supreme Court accepted, that the speech at issue fairly could be characterized as "outrageous" and "intentionally inflicting emotional distress." *Id.* [5]

---

[5] The statute here is not limited to speech that traditionally has been defined as tortious or that has been recognized as inflicting the sort of injury that would give rise to common law actions. Instead, it subjects to punishment inquiries about firearm and ammunition ownership that are irrelevant to medical care or safety and regarded as unnecessary harassment on the same topic. Consequently, the speech engaged in by the plaintiffs is protected by the First Amendment even if it were not characterized as involving a matter of public concern. In *Connick v. Myers*, 461 U.S. 138, 147 (1983), the Supreme Court held that government employees could not be subjected to discipline by their employers if their speech involved a matter of public concern, but the Court also was careful to explain that, "We in no sense suggest that speech on private matters falls into one of the narrow and well-defined classes of expression which carries so little social value, such as obscenity, that the State can prohibit and publish such expression by all persons in its jurisdiction."

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. / STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

B.     The State's Justifications for the Law are Insufficient

When a statute prohibits protected speech on the basis of its content and by the identity of the speaker, it is subject to strict scrutiny. "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 812 (2000). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell v. IMS Health Inc.,* 131 S. Ct. 2653, 2664 (2011) (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) (content-based financial burden); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Rev.*, 460 U.S. 575 [(1983)] (speaker-based financial burden)). "In the ordinary case it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory." *Sorrell,* 131 S. Ct. at 2667.

The State offers the Court one argument for not applying strict scrutiny (Appellants' Br. at 25) and several arguments regarding why the law should survive whatever scrutiny is applied (*id.* at 31-36). Neither position has any merit.

1.     Licensing Does Not Provide a
       Justification for Imposition of this Prior Restraint

The primary justification of the law advocated is that it should be viewed as nothing more than a regulation of the medical profession and not as a restriction on speech. Such regulation, the State contends, may be upheld under the Fourteenth

16

Amendment Due Process Clause as long as it serves any rational basis. Government attempts to uphold speech restrictions on licensees under the rational basis standard routinely have been rejected when the speech restriction did not bear a reasonable relationship to the purpose of the licensing scheme. In *Sorrell,* for example, pharmacies were required to be licensed by the State to ensure that they employ persons with proper training and skills to fill prescriptions. The imposition of the license provided no justification for lessening the First Amendment scrutiny imposed by a law that prohibited pharmacies from publishing, for marketing purposes, information that they learned from prescriptions about the drugs that doctors prescribe. *Sorrell,* 131 S. Ct. 2653. The same was true in many other prior decisions involving government licensees.[6] Similarly, when the government employs or contracts with private parties, it may not use the employment or contract to impose restraints on the speech of the recipients unrelated to the purpose for which they have been retained.[7]

---

[6] *See, e.g., Thompson v. Western States Medical Center,* 535 US 357 (2002) (pharmacies); *Fla. Bar v. Went For It, Inc.,* 515 U.S. 618 (1995) (lawyers); *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173 (1999) (broadcasters); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996) (liquor stores); *Edenfield v. Fane*, 507 U.S. 761 (1993) (accountants); *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980) (public utility).

[7] *See, e.g., Velasquez v. Legal Servs. Corp.,* 531 U.S. 533 (2001) (lawyers retained to represent the poor cannot be prohibited from advising clients regarding suits against the government); *Bd. of County Comm'rs v. Umbehr,* 518 U.S. 668

17

*Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833 (1992), is an example of a case where the state imposes regulations affecting speech that *are* directly related to the purpose of a license. The regulation in that case required physicians to "provide information about the risks of abortion, and childbirth" to women seeking abortions. Moreover, the law in *Casey* compelled, rather than restrained speech. The government's burden to justify compelled speech is significantly lower than its burden to ban speech. *See, e.g., Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985) (disclosure requirements are allowed if "reasonably related to the State's interest in preventing deception of consumers").

Healthcare practitioners, facilities, and providers all are required to hold a license; the license allows them to engage in a profession, for which the state imposes a host of conditions that must be met. *See generally* Chapters 456-68, Florida Statutes. The State plainly has the power to regulate healthcare practitioners in order to protect public health. Such regulation, however, "must not trespass upon the domains set apart for free speech." *Thomas v. Collins,* 323 U.S.

---

(1996) (government contractors cannot be terminated for speech unrelated to their role as contractors); *cf. Polk County v. Dodson,* 454 U. S. 312, 321-322 (1981) (holding that a public defender does not act "under color of state law" because he "works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client" and because there is an "assumption that counsel will be free of state control").

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. / STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

516, 532 (1945). Justice Jackson, concurring in *Thomas*, a case that challenged imposition of a licensing requirement on paid labor organizers, made an observation particularly *apropos* to this case. He wrote:

> A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor, or any other kind of right, including recommending that his hearers organize to support his views. Likewise, *the state may prohibit the pursuit of medicine as an occupation without its license, but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought.*

*Id.* at 544 (Jackson, J., concurring) (emphasis added). Yet, this is quite close to what the State of Florida has done through the challenged laws – it has prohibited healthcare providers from making inquiries of patients and unnecessarily harassing patients regarding matters that the provider regards of importance. This, the State may not do.

"The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind through regulating the press, speech, and religion. In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Thomas,* 323 U.S. at 545.

In *Lowe v. SEC,* 472 U.S. 181 (1985), the majority of the Supreme Court narrowly read the Investment Advisers Act of 1940 so that it would not prohibit "nonpersonalized investment advice and commentary in securities newsletters"

19

unless the author was registered as an investment adviser under the act. This allowed the Court to avoid the issue of whether the First Amendment would prohibit such a burden from being imposed on speech.[8] Justice White's famous concurrence in *Lowe* gave the licensing/First Amendment problem close consideration, which is relevant here. The concurrence, also joined by Chief Justice Warren E. Burger and then-Justice William H. Rehnquist, concluded the Act *did* apply to the newsletters at issue and so proceeded to analyze the circumstances under which a licensing requirement can be used to lessen the First Amendment scrutiny that a speech restriction imposes. The concurrence looked to the aforementioned comments of Justice Jackson in *Thomas,* 323 U.S. at 548, and concluded that the First Amendment prohibits the government from requiring a speaker to obtain a license in order to communicate general information to potential investors that is unrelated to a specific fiduciary undertaking. Again, this is very close to what the State of Florida has done in enacting a law that directs healthcare personnel to refrain from making inquiries that are *not* relevant to medical matters for which a patient goes to see a doctor. The State of Florida has ordered that when the doctors step out of their roles as ordinary doctors and into

---

[8]    The breadth of the statute at issue here prevents the Court from avoiding the constitutional issues that it raises. The statute here clearly prohibits speech in which the plaintiffs engage.

their roles as citizens, they must forfeit the First Amendment rights that they otherwise would enjoy and it has attempted to use its power to regulate the medical profession as justification for this result. This argument makes no logical sense and it has no basis in case law.

This also is not a case like *Locke v. Shore,* 634 F.3d 1185 (11th Cir. 2011), in which the State simply has prescribed conditions on a license have nothing more than an incidental impact on the speech rights of the licensed professional. The statute at issue in *Locke* merely prohibited unlicensed persons from providing interior design advice to clients. It did not prohibit licensed interior designers from speaking with their clients about matters unrelated to interior design or require interior designers to obtain a license as a condition precedent to their communicating with clients regarding matters irrelevant to interior designing. In this case, the Legislature has targeted speech *unrelated* to the practice of medicine for suppression.

2.   <u>The Law Cannot Survive Strict Scrutiny</u>

The State has described the interests that justify the law as "the constitutional rights of . . . patients to freely exercise their right to keep and bear arms" and "privacy interests under Florida laws that make firearm ownership confidential." (DE-49 at 13-14; *see also* Appellants' Br. at 13).

21

a.     The Law is Unnecessary to Protect
Second Amendment or Putative Privacy Interests

To begin, the amicus curiae filing this brief do not dispute here that "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago,* 130 S. Ct. 3020, 3042 (2010).  That said, the Second Amendment imposes no restriction on the right of private actors, such as healthcare practitioners, facilities, and providers to make inquiries of their fellow citizens regarding their ownership of firearms or ammunition, to harass their fellow citizens regarding their ownership of firearms or ammunition, or to take action that would be discriminatory on the basis of firearm or ammunition ownership.

Sections 790.338(2) and (6) do nothing to prohibit discrimination on the basis of firearm or ammunition ownership; they merely prohibit communications related to those topics.  To the extent that the State has an interest in prohibiting discrimination, it has done so through sections 790.338(4), (5) and (7).

Sections 790.338(2) and (6) do shield patients from speech that some may regard as objectionable, but shielding citizens from speech that is objectionable is neither a compelling, substantial, nor legitimate role for the State of Florida to play.  "Much that we encounter offends our esthetic, if not our political and moral sensibilities. Nevertheless, the Constitution does not permit government to decide

22

which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 210–211 (1975); *see also Cohen v. California*, 403 U.S. 15, 21 (1971) (the burden normally falls upon the viewer to "avoid further bombardment of [his] sensibilities simply by averting [his] eyes"); *Spence v. Washington*, 418 U.S. 405, 412 (1974) ("'It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers'") (quoting *Street v. New York,* 394 U.S. 576, 592 (1969)).

The law also cannot be justified on the basis that the State has an interest in protecting patients against inquiries into or harassment regarding matters that bear on their exercise of their constitutional rights generally because the law is not drawn in a manner to achieve either of this objective. It does not prohibit doctors from inquiring about religion, political views, sexual practices, race, or other matters that involve the exercise of constitutional rights or that may be irrelevant to medical care or safety. A regulation of speech cannot survive First Amendment scrutiny where it is not "drawn to serve" the interest for which it was enacted. *Sorrell,* 131 S. Ct. at 2668. Given that the State does not generally confine the scope of inquiries a doctor can make about the exercise of constitutional rights, the State cannot justify the burden that the statute places on the expression of

23

healthcare practitioners, facilities, and providers.

It also is significant that the statute is applicable solely to those in the healthcare field. Numerous other professionals such as lawyers, engineers, real estate brokers, and financial advisers remain free under this statutory scheme to make inquiries of their clients regarding their firearm and ammunition ownership and to harass them about it. Such underinclusiveness of a scheme of regulation shows that the objective of the State is simply to suppress the viewpoint of those who are the target of the regulation rather than to advance any legitimate interest that the State might have in protecting the privacy of gun owners. In *Sorrell*, the Supreme Court held similar underinclusiveness of a state restriction on speech was fatal to its defense. "Privacy," Justice Kennedy wrote, "is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers." 131 S. Ct. at 2672.

> b. Protecting Patients From Harassment
>    is Not a Sufficient Government Interest

In *Sorrell*, the defendants argued that a speech restraint could be upheld because it had been enacted to protect doctors from unnecessary harassment. *Sorrell,* 131 S. Ct. at 2669 ("The State . . . contends that § 4631(d) protects doctors from 'harassing sales behaviors'"). The Court accepted that the restrained speech in fact allowed the unnecessary harassment of doctors to take place, but rejected this as a legitimate basis for upholding the challenged law. "Many are those who

24

must endure speech they do not like," Justice Kennedy wrote for the Court, "but that is a necessary cost of freedom." *Id.* The *Sorrell* decision also questioned the State's need to protect doctors from harassing salespeople in light of the fact that doctors who felt harassed simply could decline to see them. *Id.* at 2669-70 ("Doctors who wish to forego detailing altogether are free to give 'No Solicitation' . . .instructions to their office managers"). So, too, a patient is free to walk out of the office of a doctor who makes unwanted inquiries or who engages in what the patient deems to be harassing speech. The State's argument that the statute is needed to protect patients from harassment not only fails under strict scrutiny, but lacks even a rational basis.

II.

The Statute Infringes on Patients' Right
to Receive Information from their Doctors

Plaintiffs brought the action primarily to safeguard their own First Amendment rights, but they also had standing to prosecute the action for the protect the rights of their patients. This Court has recognized that even though parties ordinarily may only assert their own rights, an "exception to this rule . . . allows businesses to advocate, on behalf of their clients and customers, against discriminatory actions that interfere with that business relationship." *Young v. Apartments, Inc. v. Town of Jupiter,* 529 F.3d 1027, 1041 (11th Cir. 2008). To have such standing a party must itself have an injury in fact, the party must have a

25

close relationship with the third party, and a hindrance must exist to the third party's ability to protect its own rights. *Id.* at 1042.

Plaintiffs well demonstrated the adverse impact that the law has on their own right to question their patients, they have a close relationship with their patients, and the patients themselves have no means even to learn that they have been singled out from other citizens for shielding from questions about firearm and ammunition ownership, let alone, in most instances, a means to challenge such a restraint.

The right to receive information is recognized as of equal First Amendment import as the right to convey information. *See generally* Susan Nevelow Mart, *The Right to Receive Information,* 95 Law Libr. J. 175 (2003). "[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 757 (1976). In *Thompson v. Western States Medical Center,* 535 U.S. 357 (2002), the Supreme Court fully considered the impact that laws restricting the speech of pharmacists would have on consumers not before the Court. *See also Lamont v. Postmaster General*, 381 U. S. 301 (1965) (rights of citizens to receive political publications sent from abroad); *Kleindienst v. Mandel*, 408 U. S. 753, 762-763 (1972) (holding that freedom of speech "'necessarily protects the right to receive'"); *Procunier v. Martinez*, 416 U. S. 396, 408-409

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. / STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

(1974) (holding censorship of prison inmates' mail equally infringed the rights of non-inmates to whom the correspondence was addressed).

Although some patients may regard the questioning at issue as "unnecessary harassment," others undoubtedly would welcome it. The receipt of advice concerning gun safety, no matter how wide-ranging or considered by others to be untethered to patient health, is particularly critical for children, who face a heightened risk of harm from improperly secured firearms. A recent publication by The Children's Defense Fund, *Protect Children Not Guns 2012*, reported that almost eight children and teens die every day by gunfire. http://www.childrensdefense.org/child-research-data-publications/data/protect-children-not-guns-2012.html (visited October 8, 2012). It also states that 2,793 children and teens died from gunfire in the United States in 2009, that the number of preschoolers killed by guns in 2009 was nearly double the number of law enforcement officers killed in the line of duty that year, and that 13,791 children and teens were victims of non-fatal firearm injuries that year. Moreover, children also have a unique interest in receiving this information because they might not even know what to ask about gun safety unless guided by a physician. The physicians' declarations in this case make clear that they have substantially curtailed their questioning about gun ownership and advice about gun safety in the wake of the passage of the law. *E.g.*, (DE-17 ¶¶ 27-28; DE-18 ¶ 17; DE-19 ¶ 16;

27

DE-21 ¶¶ 15-21; DE-22 ¶ 15; DE-23 ¶¶ 11-14; DE-24 ¶¶ 11-13).  This curtailment of speech has deprived patients, including families and children, of the right to hear the physicians' queries and advice concerning firearm and ammunition ownership.

<u>CONCLUSION</u>

The Court should affirm the decision below.

Hunton & Williams LLP

By ___ s/ Thomas R. Julin _____
       Thomas R. Julin, Jamie Z. Isani & Patricia Acosta
       Florida Bar Nos. 325376, 728861 & 614599
       1111 Brickell Avenue - Suite 2500
       Miami, FL  33131
       305.810.2516 fax 1601
       tjulin or jisani or pacosta@hunton.com

Gerald E. Greenberg
Fla. Bar No. 440094
Gelber, Schacter & Greenberg, P.A.
1441 Brickell Ave. Ste. 1420
Miami, Florida 33131
305.728.0953 Fax 0951
ggreenberg@gsgpa.com

Gordon M. Mead, Jr.  & Julie Fishman Berkowitz
Fla. Bar Nos. 049896 & 017293
Stearns Weaver Miller Weissler Alhadeff
& Sitterson, P.A.
150 West Flagler Street
Miami, Florida 33130
305.789.3200 Fax 3395

Randall C. Marshall
Fla. Bar No. 181765
Cooperating Attorneys ACLU Foundation  of
 Florida, Inc.
4500 Biscayne Boulevard, Suite 340
Miami, Florida 33137
786-363-2700 Fax 1108

Attorneys for the *Amici Curiae*

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF &  SITTERSON, P.A.

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this brief complies with the requirements of FRAP Rule 32(a)(7)(B)(i) inasmuch as the brief, exclusive of the Certificate of Interested Persons and Corporate Disclosure Statement, Certificate of Service, Table of Contents, Table of Citations and Authorities, and this certificate, contains 6,814 words and is printed in 14 point Times New Roman proportionally spaced typeface.

_____
s/ Thomas R. Julin
Thomas R. Julin

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this brief was sent by U.S.

Mail on November 5, 2012, to:

> Pamela J. Bondi, Attorney General
> Timothy D. Osterhaus Solicitor General
> Jason Vail, Assistant Attorney General
> Diane G. DeWolf, Deputy Solicitors General
> Rachel E. Nordby, Deputy Solicitors General
> Office of the Attorney General
> PL-01, The Capitol
> Tallahassee, FL 32399
>
> Douglas Hallward-Driemeier
> Bruce S. Manheim, Jr.
> Mariel Goetz
> Ropes & Gray LLP
> 700 12th Street, NW, Suite 900
> Washington, DC 20005-3948
>
> Elizabeth N. Dewar
> Ropes & Gray LLP
> Prudential Tower
> 80 Boylston Street
> Boston, MA 02199-3600
>
> Jonathan E. Lowy
> Daniel R. Vice
> Brady Center to Prevent Gun Violation
> 1225 Eye Street, NW, Suite 1100
> Washington, DC 20005
>
> Edward Maurice Mullins
> Hal Michael Lucas
> Astigarraga Davis Mullins & Grossman
> 701 Brickell Avenue 16th Floor
> Miami, FL 33131-2847

Hunton & Williams LLP / Gelber Schacter & Greenberg / ACLU Foundation of Florida, Inc. /
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.

Dennis Gary Kainen
Weisberg & Kainen
1401 Brickell Avenue
Suite 800
Miami, FL 33131-3554

Charles J. Cooper
David H. Thompson
Peter A. Petterson
Cooper and Kirk, PLLC
1523 New Hampshire avenue, NW
Washington, D.C.  20036

John C. Eastman
Anthony T. Caso
Center for Constitutional Jurisprudence
c/o Chapman University School of Law
One University School of Law
One University Drive
Orange, CA  92886


s/ Thomas R. Julin
Thomas R. Julin

HUNTON & WILLIAMS LLP / GELBER SCHACTER & GREENBERG / ACLU FOUNDATION OF FLORIDA, INC. /
STEARNS WEAVER MILLER WEISSLER ALHADEFF &  SITTERSON, P.A.