**No. 12-14009-FF**

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

═══════════════════════════════════════════════

DR. BERND WOLLSCHLAEGER, *et al.*,
*Plaintiffs-Appellees*,

v.

GOVERNOR OF STATE OF FLORIDA, *et al.*,
*Defendants-Appellants.*

═══════════════════════════════════════════════

On Appeal from the U.S. District Court for the Southern District of Florida
Case No. 1:11-cv-22026-MGC (Hon. Marcia G. Cooke)

═══════════════════════════════════════════════

**BRIEF OF AMICI CURIAE AMERICAN PUBLIC HEALTH
ASSOCIATION, AMERICAN ASSOCIATION OF SUICIDOLOGY,
SUICIDE AWARENESS VOICES OF EDUCATION, AND LAW CENTER
TO PREVENT GUN VIOLENCE IN SUPPORT OF APPELLEES AND
AFFIRMANCE**

═══════════════════════════════════════════════

Bryan H. Heckenlively
David H. Fry (application pending)
Justin S. Weinstein-Tull
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

*Counsel for Amici Curiae*

*Wollschlaeger, et al. v. Governor of Florida, et al.*          *Case No. 12-14009*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Circuit Rule 26.1-1, the undersigned counsel certifies that, in addition to the persons and entities identified in the briefs submitted to date in this appeal, the following persons may have an interest in the outcome of this case:

**Amici Curiae**

American Association Of Suicidology

Law Center To Prevent Gun Violence

American Public Health Association

Suicide Awareness Voices Of Education

**Counsel for Amici Curiae**

Fry, David H.

Heckenlively, Bryan H.

Weinstein-Tull, Justin S.

November 5, 2012          */s/ Bryan H. Heckenlively*
                          Bryan H. Heckenlively
                          Counsel for Amici Curiae

<u>**TABLE OF CONTENTS**</u>

STATEMENT OF THE ISSUE ...............................................................1

INTEREST OF AMICI ..........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................4

ARGUMENT ........................................................................................6

I.    FLORIDA'S GAG RULE VIOLATES PATIENTS' FIRST
      AMENDMENT RIGHT TO RECEIVE INFORMATION FROM
      THEIR DOCTORS ON FIREARM SAFETY ...............................6

      A.    The First Amendment Right to Receive Information Is Firmly
            Grounded in Supreme Court Precedent ................................7

      B.    Florida's Gag Rule Abridges the Right to Receive Information .......12

II.   GUNS IN THE HOME INCREASE THE RISK OF SUICIDE,
      HOMICIDE, AND DEATH FROM ACCIDENTAL SHOOTING ............19

      A.    Guns in the Home Increase the Risk of Accidental Death and
            Injury ..................................................................................20

      B.    Guns in the Home Increase the Risk of Suicide .................................23

      C.    Guns in the Home Increase the Risk of Serious Injury or Death
            from Domestic Violence ....................................................28

CONCLUSION ....................................................................................31

i

# TABLE OF CITATIONS

**FEDERAL CASES**

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484, 116 S. Ct. 1495 (1996)....................17

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
  457 U.S. 853, 102 S. Ct. 2799 (1982)....................4, 11

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310, 130 S. Ct. 876 (2010)....................18

*\*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ....................passim

*Conn. Bar Ass'n v. United States*,
  620 F.3d 81 (2d Cir. 2010) ....................12

*Dist. of Columbia v. Heller*,
  554 U.S. 570, 128 S. Ct. 2783 (2008)....................2

*Edenfield v. Fane*,
  507 U.S. 761, 113 S. Ct. 1792 (1993)....................18

*Griswold v. Connecticut*,
  381 U.S. 479, 85 S. Ct. 1678 (1965)....................9

*In re Express-News Corp.*,
  695 F.2d 807 (5th Cir. 1982) ....................4

*Kleindienst v. Mandel*,
  408 U.S. 753 ....................10

*Kreimer v. Bureau of Police*,
  958 F.2d 1242 (3d Cir. 1992) ....................12

*\*Lamont v. Postmaster General*,
  381 U.S. 301, 85 S. Ct. 1493 (1965)....................8, 9

*Martin v. City of Struthers*,
  319 U.S. 141, 63 S. Ct. 862 (1943)....................7, 9

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010)......................................................................................2

*Metro Broad., Inc. v. FCC*,
497 U.S. 547, 110 S. Ct. 2997 (1990).............................................................11

*Neinast v. Bd. of Trs.*,
346 F.3d 585 (6th Cir. 2003) ..........................................................................12

*New Directions Treatment Servs. v. City of Reading*,
490 F.3d 293 (3d Cir. 2007) ...........................................................................12

*Powers v. Ohio*,
499 U.S. 400, 111 S. Ct. 1364 (1991)..............................................................12

*Procunier v. Martinez*,
416 U.S. 396, 94 S. Ct. 1800 (1974)................................................................10

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367, 89 S. Ct. 1794 (1969)................................................................10

*Reno v. ACLU*,
521 U.S. 844, 117 S. Ct. 2329 (1997)..............................................................11

*Singleton v. Wulff*,
428 U.S. 106, 96 S. Ct. 2868 (1976)................................................................12

*Stanley v. Georgia*,
394 U.S. 557, 89 S. Ct. 1243 (1969).............................................................4, 9

*Thomas v. Collins*,
323 U.S. 516, 65 S. Ct. 315 (1945)....................................................................7

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357, 122 S. Ct. 1497 (2002)........................................................14, 18

*\*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
425 U.S. 748, 96 S. Ct. 1817 (1976)..........................................................passim

*Willis v. Town of Marshall*,
426 F.3d 251 (4th Cir. 2005) ...........................................................................12

CONSTITUTIONAL PROVISIONS

*U.S. Const., amend. I ......................................................................passim

OTHER AUTHORITIES

1 Smolla & Nimmer on Freedom of Speech § 2:73 ..................................6

Teresa L. Albright & Sandra K. Burge, *Improving Firearm Storage Habits: Impact of Brief Office Counseling by Family Physicians*,
16 J. OF THE AM. BD. OF FAMILY PRACTICE 40 (2003) ................................19, 20

Joseph L. Annest et al., *National Estimates of Nonfatal Firearm-Related Injuries: Beyond the Tip of the Iceberg*,
273 J. OF THE AM. MED. ASSOC. 1749 (1995)....................................20

Frances Baxley & Matthew Miller, *Parental Misperceptions About Children and Firearms*,
160 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 542 (2006) .......................23

ERWIN CHEMERINSKY,
FEDERAL JURISDICTION 86 (5th ed. 2007)...........................................13

Boston Children's Hospital, *Firearm Safety*,
http://www.childrenshospital.org/az/Site905/mainpageS905P0.html...............22

David A. Brent et al., *Firearms and Adolescent Suicide: A Community Case-Control Study*,
147 AM. J. OF DISEASES OF CHILD 1066 (1993)...................................27

David A. Brent et al., *Risk Factors for Adolescent Suicide: A Comparison of Adolescent Suicide Victims with Suicidal Inpatients*,
45 ARCHIVES OF GEN. PSYCHIATRY 581 (1988) ..................................28

David A. Brent et al., *The Presence and Accessibility of Firearms in the Homes of Adolescent Suicides*,
266 J. OF THE AM. MED. ASSOC. 2989 (1991)...............................27, 28

Jacquelyn C. Campbell et al., *Intimate Partner Homicide: Review and Implications of Research and Policy*,
8 TRAUMA, VIOLENCE, & ABUSE 246 (2007)...............................28, 29

Jacquelyn C. Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*,
93 AM. J. OF PUB. HEALTH 1089 (2003) ..........................................................29

Jacquelyn C. Campbell et al., *The Danger Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate Partner Femicide*,
24 J. OF INTERPERSONAL VIOLENCE 653 (2009)...........................................30, 31

Philip J. Cook et al., *The Medical Costs of Gunshot Injuries in the United States*,
281 J. OF THE AM. MED. ASSOC. 447 (1999) ......................................................20

Philip J. Cook & Jens Ludwig, U.S. Dep't of Justice, Nat'l Inst. of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms* (1997) ................................................................................................22

Linda L. Dahlberg et al., *Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study*,
160 AM. J. EPIDEMIOLOGY 929 (2004).........................................................24, 25

James A. Fox & Marianne W. Zawitz, *Homicide Trends in the United States* (2007), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/htius.pdf.............29

Shannon Frattaroli & Jon S. Vernick, *Separating Batterers and Guns: A Review and Analysis of Gun Removal Laws in 50 States*,
30 EVALUATION REV. 296 (2006) ......................................................................30

David C. Grossman et al., *Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents: The Source of the Firearm*,
153 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 875 (1999) .......................28

DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH (2004) ...........................20, 21

Donna L. Hoyert & Jiaquan Xu, *Deaths: Preliminary Data for 2011*,
61 NAT'L VITAL STAT. REP. 1, 42 (Table 2), *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_06.pdf................................24

Renee M. Johnson et al., *Are Household Firearms Stored Less Safely in Homes with Adolescents*,
160 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 788 (2006) ..................22, 23

Arthur L. Kellermann et al., *Injuries and Deaths Due to Firearms in the Home*,
45 J. TRAUMA 263 (1998) ..................................................................30

Arthur L. Kellermann et al., *Suicide in the Home in Relation to Gun Ownership*,
327 NEW ENG. J. MED. 467 (1992) ......................................................24, 25, 27

Guohua Li et al., *Factors Associated with the Intent of Firearm-Related Injuries in Pediatric Trauma Patients*,
150 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 1160 (1996) .....................23

Susan Nevelow Mart, *The Right to Receive Information*,
95 LAW LIBR. J. 175 (2003) ................................................................7

Matthew Miller et al., *Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths Among Women*,
79 J. URB. HEALTH 26 (2002) ..............................................................26

Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*,
33 ACCIDENT ANALYSIS & PREVENTION 477 (2001) .........................................21

Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths, Suicide, and Homicide Among 5-14 Year Olds*,
52 J TRAUMA: INJURY, INFECTION, & CRITICAL CARE 267 (2002) .....................26

Matthew Miller et al., *Household Firearm Ownership and Rates of Suicide Across the 50 United States*,
62 J OF TRAUMA: INJURY, INFECTION, & CRITICAL CARE 1029 (2007).........25, 26

Matthew Miller et al., *Household Firearm Ownership and Suicide Rates in the United States*,
13 EPIDEMIOLOGY 517 (2002) ....................................................25, 27

Matthew Miller et al., *The Epidemiology of Case Fatality Rates for Suicide in the Northeast,* ,
43 ANNALS OF EMERGENCY MED. 723 (2004) ...................................................26

Fotios C. Papadopoulos et al., *Preventing Suicide and Homicide in the United States: The Potential Benefit in Human Lives*,
169 PSYCHIATRY RESEARCH 154 (2009)...........................................................25

Emily F. Rothman et al., *Batterers' Use of Guns to Threaten Intimate Partners*,
    60 J. AM. MED. WOMEN'S ASS'N 62 (2005) ......................................................30

Rebecca S. Spicer & Ted R. Miller, *Suicide Acts in 8 States: Incidence and Case Fatality Rates by Demographics and Method*,
    90 AM. J. PUB. HEALTH 1885 (2000) ..................................................................26

Kathleen M. Sullivan, *Two Concepts of Freedom of Speech*,
    124 HARV. L. REV. 143 (2010) ...........................................................................18

U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention and Control, Web-Based Injury Statistics Query and Reporting System ("WISQARS"), Leading Cause of Death Report, 2010,
    http://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html.........................22, 27

U.S. Dep't of Health and Human Servs., *Costs of Intimate Partner Violence Against Women in the United States*, March 2003 .............................................29

U.S. Dep't of the Treasury, U.S. Secret Serv., *An Interim Report on the Prevention of Targeted Violence in Schools* (2000)..........................................23

Violence Policy Ctr., *Kids in the Line of Fire: Children, Handguns, and Homicide* (2001), http://www.vpc.org/studies/fireintr.htm. ...............................22

Douglas J. Wiebe, *Firearms in U.S. Homes as a Risk Factor for Unintentional Gunshot Fatality*,
    35 ACCIDENT ANALYSIS & PREVENTION 711 (2003).   .....................................21

Douglas J. Wiebe, *Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study*,
    41 ANNALS OF EMERGENCY MED. 771 (2003) ...................................................25

## STATEMENT OF THE ISSUE

The Florida Gag Rule chills speech by doctors that would provide patients with truthful, potentially lifesaving information about firearm safety. Does this violate the patients' First Amendment right to receive information?

## INTEREST OF AMICI

Amici are not-for-profit organizations united by a commitment to protecting the American public's health, safety, and well-being. Each organization is dedicated to preventing violence, injury, and suicide by making sure the public is informed as to the risks associated with keeping a firearm in the home.

The American Public Health Association ("APHA") is the oldest, largest, and most diverse organization of public health professionals in the world and has been working to improve public health since 1872. The Association aims to protect all Americans and their communities from preventable, serious health threats—including injuries and deaths caused by guns—and strives to ensure that community-based health promotion and disease prevention activities and preventive health services are universally accessible in the United States. APHA represents a broad array of health professionals and others who care about their own health and the health of their communities.

The American Association of Suicidology ("AAS") seeks to understand and prevent suicide. Founded in 1968, AAS is a membership organization for all those

1

involved in suicide prevention and intervention, or touched by suicide.  AAS leads

the advancement of scientific and programmatic efforts in suicide prevention

through research, education and training, the development of standards and

resources, and survivor support services.

Suicide Awareness Voices Of Education ("SAVE") was one of the nation's

first organizations dedicated to the prevention of suicide and was a co-founding

member of the National Council for Suicide Prevention.  SAVE is one of today's

leading national not-for-profit organizations with staff dedicated to prevent suicide.

Its work is based on the foundation and belief that through awareness and

education, the stigma of suicide and brain illnesses can be reduced and suicide can

be prevented.

Law Center To Prevent Gun Violence ("Law Center") is a national law

center focused on providing comprehensive legal expertise in support of gun

violence prevention and the promotion of smart gun laws.  The Law Center is a

non-profit organization founded by attorneys that remains dedicated to preventing

the loss of lives caused by gun violence by providing in-depth legal expertise and

information on America's gun laws.  As an *amicus*, the Law Center (formerly

Legal Community Against Violence) has provided informed analysis in a variety

of firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570,

128 S. Ct. 2783 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).

All parties have consented to filing of this brief.  No party's counsel authored the brief in whole or in part.  No party, party's counsel, or other person contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The parties and the State's amici focus on whether Florida's Gag Rule violates the First Amendment rights of doctors and other health care providers. Amici agree with Appellees that the Gag Rule chills doctors' speech and cannot survive strict scrutiny.  But Amici concentrate here on the First Amendment rights of a different group: the patients who are deprived of critical information about gun safety they otherwise would have received.

As the Supreme Court has repeatedly emphasized, the First Amendment "'protects the right to receive information and ideas.'"  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866-67, 102 S. Ct. 2799, 2808 (1982) (quoting *Stanley v. Georgia*, 394 U.S. 557, 564, 89 S. Ct. 1243, 1247 (1969)).  *See also, e.g.*, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57, 96 S. Ct. 1817, 1823 (1976).  Although not explicit in the text, the right to receive information "follows ineluctably" from the speaker's right to disseminate it.  *Pico*, 457 U.S. at 867, 102 S. Ct. at 2808.  "Indeed, the right to hear and the right to speak are flip sides of the same coin."  *Conant v. Walters*, 309 F.3d 629, 643 (9th Cir. 2002) (Kozinski, J., concurring).  As such, "[t]he public right to receive information has been repeatedly recognized and applied to a vast variety of information."  *In re Express-News Corp.*, 695 F.2d 807, 808-09 & n.2 (5th Cir. 1982) (collecting cases).

Under this line of cases, patients have a First Amendment right to receive information from their doctors. The Ninth Circuit made that clear ten years ago in striking down a policy closely resembling Florida's Gag Rule. After Arizona and California voters passed laws permitting the use of marijuana for medical purposes, the federal government responded by announcing that doctors who recommended medical marijuana would lose their prescription licenses. California doctors and patients brought suit to challenge the policy and the Ninth Circuit affirmed a permanent injunction blocking its enforcement on First Amendment grounds. While the infringement on doctors' speech was enough to support the injunction, the Court noted the patients' First Amendment interest as well. *Conant*, 309 F.3d at 636 (describing "core First Amendment interests of doctors *and patients*") (emphasis added). And in a concurrence, Judge Kozinski forcefully explained why that result was even more important to patients than it was to doctors. He found it "perfectly clear that the harm to patients from being denied the right to receive candid medical advice [was] far greater than the harm to doctors from being unable to deliver such advice." *Id.* at 643 (Kozinski, J., concurring). It was the patients, after all, who would miss out on the "competent medical advice" that might have helped ease their suffering. *Id.* at 644.

The same is true here. Not only does the Gag Rule deny doctors their right to speak, it also denies patients their right to information and advice on firearm

safety.  Those patients and their families are the ones who bear the risks associated

with that deprivation.

Those risks are grave indeed.  Study after study has demonstrated the

devastating effects firearms have on public health in this country.  Guns in the

home increase the risks of suicide, homicide, and death from accidental shooting.

Guns in the home increase the risk that intimate partner violence will result in

death.  Perhaps most troubling, children and adolescents with access to guns are in

much greater danger than those without such access.

These statistics, and the tragedy that underlies each number, are what

motivate doctors to ask patients whether they have access to guns and how those

guns are stored or secured.  They also explain why patients' awareness of firearm

safety can be lifesaving.  This Court should affirm the district court to protect

patients' right to receive that information and the public health benefits that come

with it.

## **ARGUMENT**

### I.     **FLORIDA'S GAG RULE VIOLATES PATIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION FROM THEIR DOCTORS ON FIREARM SAFETY.**

It is well established that the First Amendment puts the right to receive

information on equal footing with the right to disseminate it.  *See* 1 Smolla &

Nimmer on Freedom of Speech § 2:73 ("While we usually think of the First

Amendment as empowering speakers to speak, it might well be understood as embracing a concomitant right of listeners to listen, viewers to view, or readers to read."). Prospective speakers and prospective listeners alike have an interest in the free flow of discourse unimpeded by government interference or preference. This right extends to protect Florida patients who, but for the Gag Rule, would have received potentially lifesaving information from their doctors.

### A.    The First Amendment Right to Receive Information Is Firmly Grounded in Supreme Court Precedent.

The Supreme Court's recognition of listeners' rights dates at least to *Martin v. City of Struthers*, 319 U.S. 141, 63 S. Ct. 862 (1943). *See also* Susan Nevelow Mart, *The Right to Receive Information*, 95 LAW LIBR. J. 175 (2003) (tracing the history of the doctrine). In *Martin*, the plaintiff successfully challenged a local ordinance preventing door-to-door distribution of handbills. In reaching that result, the Supreme Court noted the aim of the First Amendment was "to encourage a freedom which [the Framers] believed essential if vigorous enlightenment was ever to triumph over slothful ignorance." *Martin*, 319 U.S. at 143, 63 S. Ct. at 868. On a practical level, "[t]his freedom embraces the right to distribute literature, and *necessarily protects the right to receive it*." *Id.* (internal citation omitted, emphasis added). *See also Thomas v. Collins*, 323 U.S. 516, 534, 65 S. Ct. 315, 324 (1945) (holding that state law requiring labor organizers to

7

register inhibited plaintiff organizer's right to speak and workers' right "to hear what he had to say").

The Court picked up on that thread in *Lamont v. Postmaster General*, 381 U.S. 301, 85 S. Ct. 1493 (1965). *Lamont* involved a federal statute that required the postal service not to deliver any "communist political propaganda" from foreign countries. When the postal service received mail meeting that description, it would send a notice to the intended recipient, which the recipient had to return to consent to delivery. Two individuals who received the notice brought an as-applied challenge to the statute, arguing that the notice procedure violated the First Amendment. *Id.* at 302-05, 85 S. Ct. at 1494-96. The Supreme Court agreed "on the narrow ground that the addressee in order to receive his mail must request in writing that it be delivered," which was "an unconstitutional abridgement of the *addressee's* First Amendment Rights." *Id.* at 306-07, 85 S. Ct. at 1496 (emphasis added).

Justice Brennan highlighted this reasoning in a concurrence. He noted the difficulty that addressees would have in asserting the First Amendment rights of those sending propaganda, who were not before the court and were based abroad. *Id.* at 307-08, 85 S. Ct. at 1497 (Brennan, J., concurring). But he agreed with the Court's decision because "the addressees assert[ed] First Amendment claims in their own right: they contend[ed] that the Government is powerless to interfere

8

with the delivery of the material because the First Amendment 'necessarily

protects the right to receive it.'" *Id.* at 308, 85 S. Ct. at 1497 (quoting *Martin*, 319

U.S. at 143, 63 S. Ct. at 863).

Justice Brennan's concurrence also elaborated on the constitutional

underpinnings of the right to receive. Citing examples from elsewhere in the

Court's precedent, he observed that "the protection of the Bill of Rights goes

beyond the specific guarantees to protect . . . those equally fundamental personal

rights necessary to make the express guarantees fully meaningful." *Id.* This

included, in his view, the right to receive information:

> The dissemination of ideas can accomplish nothing if
> otherwise willing addressees are not free to receive and
> consider them. It would be a barren marketplace of ideas
> that had only sellers and no buyers.

*Id. See also Griswold v. Connecticut*, 381 U.S. 479, 482-83, 85 S. Ct. 1678, 1680-

81 (1965) (right to receive information is essential to ensure that Government does

not "contract the spectrum of available knowledge" because without "peripheral

rights the specific rights would be less secure").

By 1969, the Court saw it as "well established that the Constitution protects

the right to receive information and ideas . . . regardless of their social worth."

*Stanley v. Georgia*, 394 U.S. 557, 564, 89 S. Ct. 1243, 1247 (1969). The same

year, in upholding the FCC's "fairness doctrine" for allocating broadcast time, the

Court cited "the right of the public to receive suitable access to social, political,

9

esthetic, moral, and other ideas and experiences." *Red Lion Broad. Co. v. FCC*,

395 U.S. 367, 390, 89 S. Ct. 1794, 1807 (1969).  And in *Kleindienst v. Mandel*,

408 U.S. 753, 92. S. Ct. 2576 (1972), the Court reaffirmed the right to receive

information in a suit by a group of American professors challenging the State

Department's refusal to issue a temporary visa to a Marxist scholar.  The

professors argued that the visa denial violated their First Amendment rights

because they were deprived of the opportunity to "hear [the scholar's] views and

engage him in a free and open academic exchange." *Id.* at 760, 92 S. Ct. at 2580.

Although the Court ultimately declined to hold that the professors' interest was

strong enough to *compel* the State Department to grant the visa, it confirmed that

the Government's actions abridged the professors' First Amendment right to

receive information. *Id.* at 764-65, 92 S. Ct. at 2582-83. *See also Procunier v.*

*Martinez*, 416 U.S. 396, 408-09, 94 S. Ct. 1800, 1809 (1974) (recognizing that

censoring letters written by prisoners implicated the First Amendment rights of

those to whom the letters would have been sent).

Another leading case, *Virginia Board of Pharmacy*, 425 U.S. at 756-57, 96

S. Ct. at 1823, involved a Virginia statute barring pharmacies from advertising

drug prices.  The Court held that the consumers who brought the suit had a First

Amendment interest based on the right to receive information: "where a speaker

exists, as is the case here, the protection afforded is to the communication, to its

source and to its recipients both." *Id.* at 756, 96 S. Ct. at 1823.  In a footnote, the

Court rejected the dissent's contention that the right to receive should not apply

where there are other sources of information available.  *Id.* at 757 n.15, 96 S. Ct. at

1823.  Simply put, "If there is a right to advertise, there is a reciprocal right to

receive the advertising." *Id.* at 757, 96 S. Ct. at 1823.

The Court cemented the right to receive information in *Pico*, 457 U.S. at

866-67, 102 S. Ct. at 2808, recognizing the interest of students challenging a

school board's decision to remove certain books from school libraries.  As the

Court explained, the right to receive information "is an inherent corollary of the

rights of free speech and press that are explicitly guaranteed by the Constitution, in

two senses." *Id.* at 867, 102 S. Ct. at 2808.  First, echoing Justice Brennan in

*Lamont*, it "follows ineluctably from the *sender's* First Amendment right to send."

*Id.*  And second, "the right to receive ideas is a necessary predicate to the

*recipient's* meaningful exercise of his own rights" as a citizen.  *Id.*

Since *Pico*, the public's First Amendment right to receive information has

been recognized over and over again.  *See, e.g.*, *Reno v. ACLU*, 521 U.S. 844, 874,

117 S. Ct. 2329, 2346 (1997) (adults' right to receive pornography); *Metro Broad.,*

*Inc. v. FCC*, 497 U.S. 547, 567, 110 S. Ct. 2997, 3010 (1990) (as in *Red Lion*,

"public's right to receive a diversity of views" in broadcasts), *overruled on other*

*grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S. Ct. 2097

(1995); *Willis v. Town of Marshall*, 426 F.3d 251, 259-60 (4th Cir. 2005) (right to

listen to public music performances); *Conn. Bar Ass'n v. United States*, 620 F.3d

81, 90-91 (2d Cir. 2010) (debtor's interest in receiving information from

bankruptcy attorney); *Neinast v. Bd. of Trs.*, 346 F.3d 585, 591 (6th Cir. 2003)

(public's right to access public library); *Kreimer v. Bureau of Police*, 958 F.2d

1242, 1255 (3d Cir. 1992) (same).  In short, that right is now firmly embedded in

our understanding of the First Amendment.

## B.    Florida's Gag Rule Abridges the Right to Receive Information.

As Appellees explain in their brief, Florida's Gag Rule inhibits doctors'

speech concerning firearm safety.  The statute chills not only questions about gun

ownership, but also warnings about the risks associated with guns and instructions

for ensuring that guns are stored and used safely.  Because doctors never

communicate this information, patients do not receive it, and the Gag Rule

infringes upon the patients' First Amendment right to receive information.[1]

---

[1]While Amici agree that Appellees have standing based upon their own First
Amendment injuries, they also have standing to vindicate *patients'* First
Amendment interests.  Because Appellees sustained an injury in fact, they can
establish so-called "third party standing" by showing (1) a close relationship with
the patients; and (2) some impediment to the patients bringing suit themselves.  *See*
*Powers v. Ohio*, 499 U.S. 400, 410-11, 111 S. Ct. 1364, 1370-71 (1991).  Both are
present here.  The Supreme Court has found the doctor-patient relationship to be a
sufficiently close one for doctors to assert patients' interests in a variety of
contexts.  *See Singleton v. Wulff*, 428 U.S. 106, 116-17, 96 S. Ct. 2868, 2875-76
(1976) (restriction on abortions); *see also, e.g.*, *New Directions Treatment Servs. v.*
*City of Reading*, 490 F.3d 293, 300, 308 n.11 (3d Cir. 2007) (law allegedly

The Ninth Circuit's *Conant* decision illustrates how that analysis applies in a case like this.  In 1996, the citizens of both California and Arizona passed ballot initiatives allowing patients to use and doctors to recommend marijuana for medical purposes without penalty under state law.  *Conant*, 309 F.3d at 632.  This, of course, did not supersede federal drug laws prohibiting the use of marijuana, so the Clinton Administration responded with a policy providing that "recommending or prescribing Schedule I controlled substances is not consistent with the 'public interest' (as that phrase is used in the Federal Controlled Substances Act)."  *Id.* (quoting the policy).  Under the Administration policy, any doctor who recommended or prescribed marijuana would lose his or her license to prescribe controlled substances.  *Id.*

California patients eligible for medical marijuana and doctors who treated eligible patients sued to enjoin the policy.  They took issue with the policy only insofar as it would penalize doctors who merely *recommended* that their patients use marijuana for medical purposes.  *Id.* at 633.  The district court agreed this was a problem under the First Amendment and issued a preliminary injunction and later a permanent one under which the federal government could not initiate a criminal

---

discriminating against methadone patients).  And patients here are unlikely to sue to vindicate their own interests because they will generally not be aware that doctors are depriving them of information.  *See* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 86 (5th ed. 2007) (defending third-party standing for criminal defendant to challenge race-based exclusion of jurors because "[p]rospective jurors who are struck on the basis of race will not know of the discriminatory pattern").

investigation or "revoke[e] any physician class member's DEA registration merely because the doctor makes a recommendation for the use of medical marijuana based on sincere medical judgment." *Id.* at 634 (quoting the district court).

The Ninth Circuit affirmed the injunction. As an initial matter, the court recognized that the conduct protected by the injunction was not (at least not necessarily) criminal. Recommending medical marijuana was not itself a crime, and the injunction was drawn to allow discipline for any doctor who *intended* to incite illegal use and therefore could be guilty of aiding and abetting. *Id.* at 634-36. Yet the government's policy nonetheless would "strike at the core First Amendment interests of doctors *and patients*." *Id.* at 636 (emphasis added).

Among other things, the court flatly rejected the government's attempt to justify its policy by arguing that "a doctor-patient discussion about marijuana might lead the patient to make a bad decision." *Id.* at 637. As the Supreme Court has made clear, it is anathema to the First Amendment to assume that patients will make bad decisions if given truthful information. *See id.* (citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373-75, 122 S. Ct. 1497, 1507-08 (2002) (striking down statute barring advertisement of compounded drugs)); *see also Va. Bd. of Pharmacy*, 425 U.S. at 770, 96 S. Ct. at 1829 (First Amendment requires courts to "assume that [] information is not in itself harmful, that people will perceive their

own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them").

The attempts by Amicus National Rifle Association of America, Inc. ("NRA") to distinguish *Conant* miss the mark. *See* Brief of Amicus Curiae National Rifle Association of America, Inc. Supporting Appellants and Reversal ("NRA Br.") at 22. The NRA first falls back on the disingenuous argument that the Florida Gag Rule does not prevent doctors from doing whatever they think is best. As Appellees have demonstrated, that argument ignores that the chilling effect of the Gag Rule extends beyond the limited reading of the statute urged by Appellants and the NRA. Brief for Appellees Dr. Bernd Wollschlaeger, et al. ("Br. of Appellees") at 22-27. Second, the NRA notes that *Conant* reinforced values of federalism by striking down a federal incursion into state regulation of medical practice. That was simply an afterthought in *Conant*. After the court completed its analysis, it noted that the result was "consistent with"—not required by— "principles of federalism." *See Conant*, 309 F.3d at 639. More important, as Appellees have also explained, the Gag Rule goes well beyond the type of professional regulation permitted by the First Amendment. Br. of Appellees at 43-46.

Judge Kozinski's concurrence in *Conant* highlighted the significance of the patients' interests. He agreed that the impact on doctors' First Amendment rights

15

justified the injunction.  But that was not "the fulcrum of th[e] dispute" because it was the patients "denied information crucial to their well-being" who would bear the brunt of the federal government's policy.  *Conant*, 309 F.3d at 639-40.  Judge Kozinski noted the number of reputable medical professionals and organizations who had concluded that marijuana was a suitable choice for certain patients not responding to conventional treatment.  *Id.* at 640-43.  Regardless whether this conclusion was correct, it was sufficiently credible that affected patients and their families deserved "candid and reliable information about" medical marijuana.  *Id.* at 643.  Indeed, citing the Supreme Court cases discussed above, Judge Kozinski concluded that the patients had a First Amendment right to that information.  *Id.* As he put it, "the right to hear and the right to speak are flip sides of the same coin," with the right to receive information "no less protected by the First Amendment than the right to speak."  *Id.*  But his insight was more practical:

> In this case, for instance, it is perfectly clear that the harm to patients from being denied the right to receive candid medical advice is far greater than the harm to doctors from being unable to deliver such advice.  While denial of the right to speak is never trivial, the simple fact is that if the injunction were denied, the doctors would be able to continue practicing medicine and go on with their lives more or less as before.  It is far different for patients who suffer from horrible disabilities . . . .

*Id.* at 643-44.

The Florida Gag Rule puts patients at a similar disadvantage.  Appellees and the district court have explained well why the Gag Rule violates the First Amendment.  Because it infringes on a doctor's right to speak, it has a concomitant impact on a patient's right to receive information and violates the First Amendment for that reason as well.  It deprives patients of truthful, evidence-based information concerning the risks of gun ownership, exposing them to harm that could otherwise be avoided.  These risks are explained in detail on the next section of the brief; they are severe and demonstrated by compelling scientific evidence.  And, as in *Conant*, suppressing this information affects patients more dearly than it does doctors.  The harm to a doctor barred from offering his or her best professional advice is significant, but it pales in comparison to the devastation wrought when a family loses a child because they were not counseled about gun safety.

The First Amendment stands for the principle that the public benefits from more, not less, truthful information.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503, 116 S. Ct. 1495, 1508 (1996) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good.").  As one leading commentator put it, "the First Amendment precludes the government from keeping consumers in ignorance of truthful information because it thinks it knows better than they do

17

what is good for them."  Kathleen M. Sullivan, *Two Concepts of Freedom of Speech*, 124 HARV. L. REV. 143, 158 (2010).  This is true for patients purchasing pharmaceutical drugs.  *See Thompson*, 535 U.S. at 373-75, 122 S. Ct. at 1507-08; *Va. Bd. of Pharmacy*, 425 U.S. at 769-70, 96 S. Ct. at 1829-30.  It is true for patients who might do better with alternative treatments.  *See Conant*, 309 F.3d at 637.  And it is true for patients who face health and safety risks they may not be aware of or may need assistance evaluating.

Existing law gives doctors no power to *force* patients to give up their guns, and that is not what the district court's injunction will do.  Nor will every patient who receives information from his or her doctor forego keeping a gun in the house. But truthful information about gun safety will allow each patient to make a better-informed decision about gun ownership.[2]  Under the First Amendment, patients have the right to receive this information from their doctors and decide what to do with it.  *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 130 S. Ct. 876, 899 (2010) ("The Government may not . . . deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration."); *Edenfield v. Fane*, 507 U.S. 761, 767, 113 S. Ct. 1792, 1798

---

[2] Other sources of information available to patients about gun ownership may not be reliable.  "[I]nformation obtained from chat rooms and tabloids cannot make up for the loss of individualized advice from a physician with many years of training and experience."  *Conant*, 309 F.3d at 644 (Kozinski, J., concurring).

(1993) ("But the general rule is that the speaker, and the audience, not the government, assess the value of the information presented.").

## II.    GUNS IN THE HOME INCREASE THE RISK OF SUICIDE, HOMICIDE, AND DEATH FROM ACCIDENTAL SHOOTING.

Ensuring that patients may receive gun safety information from doctors is especially important in light of the strong empirical links between gun ownership and gun injury.  As described below, gun ownership is associated with increased rates of accidental injury and death, increased rates of suicide, and increased chances that intimate partner violence will result in death.  Gun ownership is also associated with increased rates of suicide and accidental death and injury in children and adolescents.  Many guns stored in the home are unlocked and accessible and provide a deadly opportunity for children to injure themselves or other children, accidentally or intentionally.

Doctors are capable of effectively counseling their patients to practice gun safety.  A study on firearm storage counseling by family physicians found that 64 percent of participants who received verbal firearm storage safety counseling from their doctors improved their gun safety by the end of the study.  Teresa L. Albright & Sandra K. Burge, *Improving Firearm Storage Habits: Impact of Brief Office Counseling by Family Physicians*, 16 J. OF THE AM. BD. OF FAMILY PRACTICE 40, 40 (2003).  Controlling for demographics, the study showed that participants who

received counseling from their doctors were three times more likely to increase their gun safety than participants who received no counseling. *Id.*

That study, read in concert with the empirical connection between gun ownership and gun injury set out below, demonstrates the damage that Florida's Gag Rule will cause, should it be enforced. Preventing doctors from counseling their patients on gun safety deprives Florida residents of the opportunity to reduce the incidence of child and adult gun injuries.

A. **Guns in the Home Increase the Risk of Accidental Death and Injury.**

Many Americans die of gun injuries each year. Between 1965 and 2000, over 60,000 Americans died from unintentional firearms injuries. DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH 27 (2004). The number of persons accidentally injured by firearms is far greater than the number unintentionally killed: for each accidental gun fatality, an estimated thirteen persons are treated in hospital emergency rooms for accidental shootings. Joseph L. Annest et al., *National Estimates of Nonfatal Firearm-Related Injuries: Beyond the Tip of the Iceberg*, 273 J. OF THE AM. MED. ASSOC. 1749, 1751 (1995).[3]

---

[3] These gun injuries produce significant monetary cost. One study estimated that at a mean medical cost of $17,000 per gun injury, gunshot injuries in the United States in 1994 produced $2.3 billion in lifetime medical costs, of which $1.1 billion was borne by U.S. taxpayers. Philip J. Cook et al., *The Medical Costs of Gunshot Injuries in the United States*, 281 J. OF THE AM. MED. ASSOC. 447, 447 (1999).

Household gun ownership is strongly correlated with increased firearm fatalities. A study of the nearly 30,000 unintentional firearm-related deaths in the United States between 1979 and 1997 found a statistically significant association between gun availability and the rate of unintentional firearms deaths across all age groups. Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477, 477 (2001). Compared to states with the fewest guns, states with the most guns have, on average, nine times the rate of unintentional firearm deaths—results that held across race and gender and that controlled for urbanization, poverty, and regional location. *Id.*; *see also* HEMENWAY, *supra*, at 28-29 (concluding that between 1991 and 2000, the risk of fatal firearms accidents was 10 times greater in high gun ownership states than in low gun ownership states).

Another study of gun deaths that used nationally-representative mortality data found that persons who died from an accidental shooting were more than three times as likely to have had a gun in their home compared with the control group. Douglas J. Wiebe, *Firearms in U.S. Homes as a Risk Factor for Unintentional Gunshot Fatality*, 35 ACCIDENT ANALYSIS & PREVENTION 711, 713-14 (2003). Having more than one gun in the home increased the risk of accidental death even further. *Id.*

Too often, children suffer the unintended consequences of home gun ownership. "Children and teens in the United States are killed with handguns more often than with all other weapons combined." Violence Policy Ctr., *Kids in the Line of Fire: Children, Handguns, and Homicide* (2001), http://www.vpc.org/studies/fireintr.htm. In 2010, homicide from firearms was the second leading cause of death for persons 15 to 24 years of age. U.S. Dep't of Health & Human Servs., Ctrs. for Disease Control & Prevention, Nat'l Ctr. for Injury Prevention and Control, Web-Based Injury Statistics Query and Reporting System ("WISQARS"), Leading Causes of Death Reports, 2010, http://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html (last visited Nov. 2, 2012). Most unintentional firearm-related deaths among children occur in or around the home—50 percent at the home of the victim and 40 percent at the home of a friend or relative—and occur when children play with loaded and accessible guns. Boston Children's Hospital, *Firearm Safety*, http://www.childrenshospital.org/az/Site905/mainpageS905P0.html.

Poor gun safety practices lead, in part, to child gun injury. Approximately one of three handguns is kept loaded and unlocked. Philip J. Cook & Jens Ludwig, U.S. Dep't of Justice, Nat'l Inst. of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms*, at 7 (1997). *See also* Renee M. Johnson et al., *Are Household Firearms Stored Less Safely in Homes with Adolescents*, 160

ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 788, 789 (2006) (finding that 28.8

percent of parents with children 12 years or younger and 41.7 percent of parents

with children ages 13 to 17 kept an unlocked firearm in the home).  That statistic is

particularly troubling in light of the fact that children know where to find their

parents' guns.  In one 2006 study, 73 percent of children under age 10 reported

knowing the location of their parents' firearms, and 36 percent admitted they had

handled the weapons.  Frances Baxley & Matthew Miller, *Parental Misperceptions*

*About Children and Firearms*, 160 ARCHIVES OF PEDIATRIC & ADOLESCENT MED.

542, 544 (2006).  It is therefore unsurprising that 89 percent of unintentional

shooting deaths of children occur in the home and that most of these deaths occur

when children are playing with a loaded gun in their parents' absence.  Guohua Li

et al., *Factors Associated with the Intent of Firearm-Related Injuries in Pediatric*

*Trauma Patients*, 150 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 1160, 1162

(1996).[4]

**B.     Guns in the Home Increase the Risk of Suicide.**

In addition to increasing the risk of unintentional death and injury, guns in

the home increase the risk of suicide.  Doctors should be permitted to alert patients

---

[4] Access to firearms in the home also increases the risk of intentional shootings by children and adolescents.  A study of 37 school shootings in 26 states found that, in more than 65 percent of the cases, the shooter got the gun from his or her home or that of a relative.  U.S. Dep't of the Treasury, U.S. Secret Serv., *An Interim Report on the Prevention of Targeted Violence in Schools*, at 6 (2000).

to this increased risk, especially patients who may be more prone to suicide due to depression or other mental illness or have at-risk household members. The Florida Gag Rule would prevent doctors from determining whether their patients are at increased risk of suicide by gun and may prevent doctors from speaking about that risk to their patients.

In 2010, there were more than 38,000 suicides in America; more were committed with a firearm than by all other methods combined. Donna L. Hoyert & Jiaquan Xu, *Deaths: Preliminary Data for 2011*, 61 NAT'L VITAL STAT. REP. 1, 42 (Table 2), *available at* http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_06.pdf. Most firearm-related suicides happen in the home. Linda L. Dahlberg et al., *Guns in the Home and Risk of a Violent Death in the Home: Findings from a National Study*, 160 AM. J. EPIDEMIOLOGY 929, 929 (2004). Many studies have demonstrated that occupants of homes with guns are at a substantially increased risk of suicide compared with occupants of homes without guns.

One well-known analysis found that homes in which a suicide had occurred were 4.8 times more likely to contain a firearm than similarly situated neighborhood homes that had not experienced a suicide. Arthur L. Kellermann et al., *Suicide in the Home in Relation to Gun Ownership*, 327 NEW ENG. J. MED. 467 (1992). Homes where a firearm was stored loaded carried an even greater suicide

risk. *Id.* at 470. Homes with handguns were associated with a suicide risk almost twice as high as homes with long guns. *Id.*

One study examined a representative sample of deaths in the United States and compared suicide victims with those who had died from nonviolent causes. Among persons aged 15 years or older, those living in a home with a gun were at a 5.6-fold increased risk of suicide versus death by other causes. Dahlberg et al., *supra*, at 933. Another study compared suicide victims with a matched group of living control subjects identified through a national health study. Among that group of adults, suicide victims were 3.44 times as likely to have a gun in their home as the control group. *See* Douglas J. Wiebe, *Homicide and Suicide Risks Associated with Firearms in the Home: A National Case-Control Study*, 41 ANNALS OF EMERGENCY MED. 771, 771 (2003).

Another series of studies found that average suicide rates are higher in states with higher rates of household firearm ownership. Fotios C. Papadopoulos et al., *Preventing Suicide and Homicide in the United States: The Potential Benefit in Human Lives*, 169 PSYCHIATRY RESEARCH 154 (2009); Matthew Miller et al., *Household Firearm Ownership and Suicide Rates in the United States*, 13 EPIDEMIOLOGY 517 (2002). That relationship persists even after controlling for differences among states in poverty, urbanization, unemployment, mental illness, and alcohol or drug abuse. Matthew Miller et al., *Household Firearm Ownership*

*and Rates of Suicide Across the 50 United States*, 62 J OF TRAUMA: INJURY,

INFECTION, & CRITICAL CARE 1029 (2007).  States with the highest prevalence of

household firearm ownership had suicide rates about 60 percent higher than states

with the lowest level of firearm ownership; that result holds true for men, women,

and children.  Matthew Miller et al., *Firearm Availability and Unintentional*

*Firearm Deaths, Suicide, and Homicide Among 5-14 Year Olds*, 52 J TRAUMA:

INJURY, INFECTION, & CRITICAL CARE 267, 272 (2002); Matthew Miller et al.,

*Firearm Availability and Suicide, Homicide, and Unintentional Firearm Deaths*

*Among Women*, 79 J. URB. HEALTH 26 (2002).

Suicide attempts by firearm are far more lethal than other methods of

attempted suicide.  One study found that more than 90 percent of all suicide

attempts with a firearm, if serious enough to require hospital treatment, result in

death.  Suicide attempts by jumping, by comparison, carry a 34 percent fatality

rate; suicide attempts by drug poisoning carry a two percent fatality rate.  Matthew

Miller et al., *The Epidemiology of Case Fatality Rates for Suicide in the Northeast*,

43 ANNALS OF EMERGENCY MED. 723, 726 (2004).  Other studies have confirmed

the extremely deadly nature of firearm-related suicide attempts.  *See, e.g.*, Rebecca

S. Spicer & Ted R. Miller, *Suicide Acts in 8 States: Incidence and Case Fatality*

*Rates by Demographics and Method*, 90 AM. J. PUB. HEALTH 1885 (2000).

Because firearms are such a lethal method of suicide, doctors must be able to ask

their patients—and especially those already at risk of suicide—about their gun

ownership.

Tragically, suicide by children is often committed with a firearm.  In 2010

alone, 748 children ages 10 through 19 committed suicide using a firearm.  In the

same year, over 40 percent of all suicides in adolescents 15 through 19 years of age

were committed with a firearm.  WISQARS, Leading Cause of Death Report,

2010, http://webappa.cdc.gov/sasweb/ncipc/leadcaus10_us.html.

As with adults, suicides among children are strongly associated with the

presence of a gun in the home of the victim.  *See generally* Matthew Miller et al.,

*Household Firearm Ownership and Suicide Rates in the United States*, 13

EPIDEMIOLOGY 517 (2002); Arthur L. Kellermann et al., *Suicide in the Home in*

*Relation to Gun Ownership*, 327 NEW ENG. J. MED. 467 (1992).  For adolescents,

"the more guns in the home, the more likely suicide by firearms was to occur."

David A. Brent et al., *Firearms and Adolescent Suicide: A Community Case-*

*Control Study*, 147 AM. J. OF DISEASES OF CHILD 1066, 1068 (1993).

The association between guns in the home and child suicide has been

confirmed by a number of studies.  One found that adolescent suicide victims were

more than twice as likely as either suicide attempters or non-suicidal psychiatric

patients to have had a gun in their home.  David A. Brent et al., *The Presence and*

*Accessibility of Firearms in the Homes of Adolescent Suicides*, 266 J. OF THE AM.

MED. ASSOC. 2989 (1991). Another found that firearms were 2.7 times more likely to have been present in the homes of adolescent suicide victims as compared to psychiatric inpatients who had attempted or considered suicide. David A. Brent et al., *Risk Factors for Adolescent Suicide: A Comparison of Adolescent Suicide Victims with Suicidal Inpatients*, 45 ARCHIVES OF GEN. PSYCHIATRY 581, 585 (1988). More than 75 percent of guns used by youth in suicide attempts and unintentional injuries were kept in the home of the victim, a relative, or a friend. David C. Grossman et al., *Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents: The Source of the Firearm*, 153 ARCHIVES OF PEDIATRIC & ADOLESCENT MED. 875, 875 (1999).

**C.     Guns in the Home Increase the Risk of Serious Injury or Death from Domestic Violence.**

Preventing doctors from asking their patients about gun ownership significantly curtails their ability to counsel women in abusive relationships. It prevents doctors from fully evaluating the risks of injury and death to women in abusive relationships and consequently prevents doctors from alerting those women to the increased risks of death and injury that guns in the house pose.

Death by domestic violence is a very real risk for women. Women in the United States are murdered by intimate partners or former partners approximately nine times more often than they are murdered by strangers. Jacquelyn C. Campbell et al., *Intimate Partner Homicide: Review and Implications of Research and*

*Policy*, 8 TRAUMA, VIOLENCE, & ABUSE 246, 247 (2007) (analyzing 2004 Bureau of Justice statistics).  The Centers for Disease Control and Prevention's National Violence Against Women Survey estimates that approximately 5.3 million intimate partner violence victimizations occur among U.S. women ages 18 and older every year.  U.S. Dep't of Health and Human Servs., *Costs of Intimate Partner Violence Against Women in the United States*, March 2003.

Firearms play a leading role in these tragic statistics.  From 1990 to 2005, over two-thirds of female intimate partner homicide victims were killed by guns. James A. Fox & Marianne W. Zawitz, *Homicide Trends in the United States* 102 (2007), *available at* http://bjs.ojp.usdoj.gov/content/pub/pdf/htius.pdf.  Of women killed by their husbands, 68 percent were killed by guns.  *Id.*  As these numbers suggest, firearms are the most common weapon used in intimate partner homicides. *Id.*

The mere presence of or access to a firearm dramatically increases the risk that a woman in an abusive relationship will be killed by intimate partner violence. An abusive partner's access to a firearm increases the risk of homicide eightfold for women in physically abusive relationships.  *See* Jacquelyn C. Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 AM. J. OF PUB. HEALTH 1089, 1092 (2003).  And because firearms are so deadly, domestic violence incidents involving firearms are twelve

times more likely to result in a death compared to non-firearm abuse incidents.  *See*

Shannon Frattaroli & Jon S. Vernick, *Separating Batterers and Guns: A Review*

*and Analysis of Gun Removal Laws in 50 States*, 30 EVALUATION REV. 296, 297

(2006) (citation omitted).

Guns in abusive homes may also be used to threaten, intimidate, and coerce

domestic violence victims.  Those threats may leave lasting psychic scars that can

contribute to posttraumatic stress disorder.  Emily F. Rothman et al., *Batterers'*

*Use of Guns to Threaten Intimate Partners*, 60 J. AM. MED. WOMEN'S ASS'N 62,

66 (2005).[5]

Doctors can help women protect themselves from intimate partner violence

by informing women of the risks they face.  Researchers have developed a danger

assessment tool that assesses the risk to individual women in abusive relationships

of homicide or violence.  *See* Jacquelyn C. Campbell et al., *The Danger*

*Assessment: Validation of a Lethality Risk Assessment Instrument for Intimate*

*Partner Femicide*, 24 J. OF INTERPERSONAL VIOLENCE 653 (2009).  One of the

factors the tool considers is whether the abuser owns a gun.  *Id.* at 655.  If a doctor

learns, through a full assessment of a patient's life circumstances, that the patient is

---

[5] Women rarely use guns in the home to protect themselves from their abusers.  A
gun kept in the home is 22 times more likely to be used in an unintentional
shooting, a criminal assault or homicide, or an attempted or completed suicide than
to be used to injure or kill in self defense.  *See* Arthur L. Kellermann et al., *Injuries*
*and Deaths Due to Firearms in the Home*, 45 J. TRAUMA 263, 265 (1998).

at high risk for homicide, the doctor can recommend that the patient leave the relationship or seek help.

These recommendations are crucial because women in abusive relationships often underestimate their risk of being killed by their partners. *Id.* at 670 (citation omitted). Doctors can help correct women's understanding of their own risks, *id.*, which may encourage at-risk women to attempt to lower their risk levels by seeking shelter, applying for a protective order, or engaging in safety planning with a social worker. Doctors would be unable to adequately assess and communicate the risk of homicide and violence against women in abusive relationships, however, if they are prohibited from inquiring about gun ownership by Florida's Gag Rule.

## <u>CONCLUSION</u>

Florida patients have a strong interest in receiving gun safety information from their doctors. Gun safety information can help patients prevent gun injury, be it accidental injury, suicide, harm to children, or intimate partner violence. Florida's gag rule violates patients' First Amendment right to that information. For these reasons and those stated in Appellees' brief, the judgment of the district court should be affirmed.

Respectfully submitted,

November 5, 2012                    MUNGER, TOLLES & OLSON LLP

By: */s/ Bryan H. Heckenlively*
       Bryan H. Heckenlively
       Counsel for Amici Curiae

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief contains no more than 7,000 words, exclusive

of the certificates, tables, and interest of amici, as required by Federal Rules of

Appellate Procedure 29(d) and 32(a).

November 5, 2012              */s/ Bryan H. Heckenlively*
                              Bryan H. Heckenlively

CERTIFICATE OF SERVICE

U.S. Court of Appeals for the Eleventh Circuit Case Number: 12-14009

I hereby certify that I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on November 5, 2012. I certify that those participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I hereby certify that a true and correct copy of this brief was sent by U.S. Mail to the following on November 5, 2012.

Pamela J. Bondi, Attorney General
Timothy D. Osterhaus, Solicitor General
Jason Vail, Assistant Attorney General
Diane G. DeWolf, Deputy Solicitor General
Rachel E. Nordby, Deputy Solicitor General
Office of the Attorney General
PL-01, The Capital
Tallahassee, FL 32399

Douglas Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz
Ropes & Gray LLP
700 12th Street, NW, Suite 900
Washington, DC 20005-3948

Elizabeth N. Dewar
Ropes & Gray LLP
Prudential Tower
80 Boylston Street
Boston, MA 02199-3600

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violation
1225 I Street, NW, Suite 1100
Washington, DC 20005

Edward Maurice Mullins
Hal Michael Lucas
Astigarraga Davis Mullins & Grossman
701 Brickell Avenue, 16th Floor
Miami, FL  33131-2847

Dennis Gary Kainen
Weisberg & Kainen
1401 Brickell Avenue, Suite 800
Miami, FL  99313-3554

Charles J. Cooper
David H. Thompson
Peter A. Petterson
Cooper and Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC  20036

John C. Eastman
Anthony T. Casso
Center for Constitutional Jurisprudence
c/o of Chapman University School of Law
One University Drive
Orange, CA  92886

Thomas R. Julin
Jamie Z. Isani
Patricia Acosta
Hunton and Williams
1111 Brickell Avenue, Suite 2500
Miami, FL  33131

Gerald E. Greenberg
Gelber, Schacter & Greenberg, P.A.
1441 Brickell Avenue, Suite 1420
Miami, FL  33131

Gordon M. Mead
Julie Fishman Berkowitz
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
150 West Flagler Street
Miami, FL  33130

Randall C. Marshall
Cooperating Attorneys ACLU Foundation of Florida, Inc.
4500 Biscayne Blvd., Suite 340
Miami, FL  33137

*s/ Bryan H. Heckenlively*
Bryan H. Heckenlively
