

OFFICE OF THE ATTORNEY GENERAL
Timothy D. Osterhaus
Solicitor General

**PAM BONDI**
**ATTORNEY GENERAL**
**STATE OF FLORIDA**

PL-01 The Capitol
Tallahassee, FL 32399-1050
Phone (850) 414-3681   Fax (850) 410-2672

RECEIVED
CLERK
MAR 07 2013
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

March 6, 2013

Mr. John Ley, Clerk
United States Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re:   No. 12-14009, *Wollschlaeger v. Governor, State of Florida.*

Dear Mr. Ley:   *FF*

This letter provides supplemental authority pursuant to Appellate Rule 28(j).

On February 26, 2013, the Supreme Court of the United States decided *Clapper v. Amnesty International, USA*, __ S.Ct. __, 2013 WL 673253 (2013). The *Clapper* opinion extensively addresses Article III standing in a case involving a facial challenge to a federal act. Like here, the challenge in *Clapper* was filed immediately after enactment. *Id.* at *6; Appellees' Br. at 11.

*Clapper* reiterates traditional standing principles. That is, for plaintiffs to have Article III standing, the injury threatened from a challenged law must be "certainly impending" (*id.* at *8), and not based upon "merely speculat[ion and] assumptions." *Id.* at *9. The Supreme Court refused to "endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at *10. And it likewise rejected the challengers' claim of Article III standing derived from a self-induced harm: "respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* at *11.

*Clapper* relates to this case because the Appellees here also stake their Article III standing to challenge Florida's Privacy Act (Fla. Stat. § 790.338) on "self-censorship" that does not derive from certainly impending harm, but on speech they think could be "'at least arguably' forbidden by law." Appellees' Br. at 19. Appellees find "at least some minimal probability" of enforcement of the Act against them and of "potential disciplinary proceedings." *Id.* at 21.

Conversely, the State Appellants have argued that Appellees' self-censure does not provide Article III standing or render the Act unlawfully "chilling." Appellants assert

that there is no prospect for the Act to be enforced against Appellees' professional speech: it "bars none of the questions that Plaintiffs allege in the Amended Complaint are infringed by the Act." State Appellants' Br. at 15. Appellants believe that "because this case involves no actual harm or a real controversy, it is non-justiciable and should be dismissed." *Id.*; *see also* Reply at 4.

Respectfully Submitted,

Timothy D. Osterhaus (FBN 133728)
Solicitor General
*Timothy.Osterhaus@myfloridalegal.com*
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
(850) 414-3681; (850) 410-2672 (fax)
*Counsel for State Appellants*

cc:

Edward M. Mullins
Hal M. Lucas
Astigarraga Davis Mullins & Grossman, P.A.
701 Brickell Avenue, 16th Floor
Miami, FL 33131-2847

Douglas Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz
Elizabeth N. Dewar
Ropes & Gray LLP
700 12th Street NW, Suite 900
Washington, DC 20005

Daniel R. Vice
Jonathan E. Lowy
Brady Center
Legal Action Project
1225 Eye Street NW, Suite 1100
Washington, DC 20005



Page 1

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
**(Cite as: 2013 WL 673253 (U.S.))**

**H**

Supreme Court of the United States
James R. CLAPPER, Jr., Director of National Intelligence, et al., Petitioners
v.
AMNESTY INTERNATIONAL USA et al.

No. 11–1025.
Argued Oct. 29, 2012.
Decided Feb. 26, 2013.

**Background:** Attorneys and human rights, labor, legal, and media organizations brought action seeking a declaration that provision of Foreign Intelligence Surveillance Act (FISA) allowing surveillance of individuals who were not "United States persons" and were reasonably believed to be located outside the United States, was unconstitutional, as well as an injunction against surveillance authorized by the provision. The United States District Court for the Southern District of New York, John G. Koeltl, J., 646 F.Supp.2d 633, granted summary judgment in favor of defendants, and plaintiffs appealed. The United States Court of Appeals for the Second Circuit, Gerard E. Lynch, Circuit Judge, reversed, 638 F.3d 118, and denied rehearing en banc, 667 F.3d 163. Defendants petitioned for certiorari.

**Holdings:** The Supreme Court, Justice Alito, held that:
(1) plaintiffs failed to demonstrate the future injury they purportedly feared was certainly impending;
(2) plaintiffs failed to establish the future injury they purportedly feared was fairly traceable to the FISA provision at issue; and
(3) costs plaintiffs incurred to avoid surveillance were not fairly traceable to the FISA provision at issue.

Reversed.

Justice Breyer, filed a dissenting opinion in which Justice Ginsburg, Justice Sotomayor, and Justice Kagan joined.

West Headnotes

**[1] Federal Courts 170B 🔑12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk12 Case or Controversy Requirement
         170Bk12.1 k. In General. Most Cited Cases
    No principle is more fundamental to the judiciary's proper role in the United States's system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[2] Federal Courts 170B 🔑12.1**

170B Federal Courts
   170BI Jurisdiction and Powers in General
     170BI(A) In General
       170Bk12 Case or Controversy Requirement
         170Bk12.1 k. In General. Most Cited Cases
    One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to sue. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[3] Constitutional Law 92 🔑2450**

92 Constitutional Law
   92XX Separation of Powers
     92XX(C) Judicial Powers and Functions
      92XX(C)1 In General
       92k2450 k. Nature and Scope in General. Most Cited Cases

**Federal Civil Procedure 170A 🔑103.2**

Page 2

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[4] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
         170Ak103.1 Standing
            170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

Relaxation of standing requirements is directly related to the expansion of judicial power.

**[5] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
          170Ak103.1 Standing
             170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

**Federal Civil Procedure 170A ☞103.3**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
          170Ak103.1 Standing
             170Ak103.3 k. Causation; Redressability. Most Cited Cases

To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[6] Federal Civil Procedure 170A ☞103.3**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
          170Ak103.1 Standing
             170Ak103.3 k. Causation; Redressability. Most Cited Cases

Although imminence is a somewhat elastic concept in the context of establishing Article III standing, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes, that the injury is certainly impending. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[7] Telecommunications 372 ☞1479**

372 Telecommunications
   372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
      372X(B) Authorization by Courts or Public Officers
         372k1479 k. Review of Proceedings; Standing. Most Cited Cases

Assertion of attorneys and human rights, labor, legal, and media organizations, that there was an objectively reasonable likelihood that their communications with foreign contacts would be intercepted at some point in the future under provision of Foreign Intelligence Surveillance Act (FISA) allowing surveillance of individuals who were not "United States persons" and were reasonably believed to be located outside the United States, did not satisfy Article III standing requirement that the threatened injury be certainly impending. U.S.C.A. Const. Art. 3, § 2, cl. 1; 50 U.S.C.A. § 1881a.

**[8] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
   170AII Parties
      170AII(A) In General
          170Ak103.1 Standing
             170Ak103.2 k. In General; Injury or
Interest. Most Cited Cases

The party invoking federal jurisdiction bears the burden of establishing standing, and, at the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

summary judgment stage, such a party can no longer rest on mere allegations, but must set forth by affidavit or other evidence specific facts.

**[9] Telecommunications 372 ☞1479**

372 Telecommunications
    372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public Officers
            372k1479 k. Review of Proceedings; Standing. Most Cited Cases

Attorneys and human rights, labor, legal, and media organizations alleging that there was objectively reasonable likelihood that their communications with foreign contacts would be intercepted at some point in the future under provision of Foreign Intelligence Surveillance Act (FISA) allowing surveillance of individuals who were not "United States persons" and were reasonably believed to be located outside United States could not satisfy the Article III standing requirement that their injury be fairly traceable to that provision at issue in their action challenging its constitutionality; plaintiffs could only speculate as to whether any interception would be under the FISA provision or some other authority. U.S.C.A. Const. Art. 3, § 2, cl. 1; 50 U.S.C.A. § 1881a.

**[10] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

Plaintiffs cannot rely on speculation about the unfettered choices made by independent actors not before the court to establish Article III standing. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[11] Telecommunications 372 ☞1479**

372 Telecommunications

    372X Interception or Disclosure of Electronic Communications; Electronic Surveillance
        372X(B) Authorization by Courts or Public Officers
            372k1479 k. Review of Proceedings; Standing. Most Cited Cases

Costly and burdensome measures allegedly incurred by attorneys and human rights, labor, legal, and media organizations to protect their communications with foreign contacts from the risk of surveillance under provision of Foreign Intelligence Surveillance Act (FISA) allowing surveillance of individuals who were not "United States persons" and were reasonably believed to be located outside the United States, were not fairly traceable to the government's purported activities under the FISA provision, and therefore did not give rise to standing to challenge the constitutionality of the provision. U.S.C.A. Const. Art. 3, § 2, cl. 1; 50 U.S.C.A. § 1881a.

**[12] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.2 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

Plaintiffs cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending.

**[13] Federal Civil Procedure 170A ☞103.2**

170A Federal Civil Procedure
    170AII Parties
        170AII(A) In General
            170Ak103.1 Standing
                170Ak103.2 k. In General; Injury or Interest. Most Cited Cases

The assumption that if plaintiffs have no standing to sue, no one would have standing, is not a reason to find standing.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

*Syllabus* FN*

FN* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

*1 Section 702 of the Foreign Intelligence Surveillance Act of 1978 (FISA), 50 U.S.C. § 1881a, added by the FISA Amendments Act of 2008, permits the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not "United States persons" and are reasonably believed to be located outside the United States. Before doing so, the Attorney General and the Director of National Intelligence normally must obtain the Foreign Intelligence Surveillance Court's (FISC) approval. Surveillance under § 1881a is subject to statutory conditions, judicial authorization, congressional supervision, and compliance with the Fourth Amendment. Respondents—attorneys and human rights, labor, legal, and media organizations—are United States persons who claim that they engage in sensitive international communications with individuals who they believe are likely targets of § 1881a surveillance. On the day that the FISA Amendments Act was enacted, they filed suit, seeking a declaration that § 1881a is facially unconstitutional and a permanent injunction against § 1881a-authorized surveillance. The District Court found that respondents lacked standing, but the Second Circuit reversed, holding that respondents showed (1) an "objectively reasonable likelihood" that their communications will be intercepted at some time in the future, and (2) that they are suffering present injuries resulting from costly and burdensome measures they take to protect the confidentiality of their international communications from possible § 1881a surveillance.

*Held* : Respondents do not have Article III standing. Pp. —— – ——.

(a) To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms*, —— U.S. ——, 130 S.Ct. 2743, 177 L.Ed.2d 461. "[T]hreatened injury must be ' "certainly impending" ' to constitute injury in fact," and "[a]llegations of possible future injury" are not sufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135. Pp. —— – ——.

(b) Respondents assert that they have suffered injury in fact that is fairly traceable to § 1881a because there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under § 1881a at some point. This argument fails. Initially, the Second Circuit's "objectively reasonable likelihood" standard is inconsistent with this Court's "threatened injury" requirement. Respondents' standing theory also rests on a speculative chain of possibilities that does not establish that their potential injury is certainly impending or is fairly traceable to § 1881a. First, it is highly speculative whether the Government will imminently target communications to which respondents are parties. Since respondents, as U.S. persons, cannot be targeted under § 1881a, their theory necessarily rests on their assertion that their foreign contacts will be targeted. Yet they have no actual knowledge of the Government's § 1881a targeting practices. Second, even if respondents could demonstrate that the targeting of their foreign contacts is imminent, they can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance instead of one of the Government's numerous other surveillance methods, which are not challenged here. Third, even if respondents could show that the Government will seek FISC authorization to target respondents' foreign contacts under § 1881a, they can only speculate as to whether the FISC will authorize the surveillance. This Court is reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

judgment. See, *e.g., Whitmore, supra,* at 159–160, 110 S.Ct. 1717. Fourth, even if the Government were to obtain the FISC's approval to target respondents' foreign contacts under § 1881a, it is unclear whether the Government would succeed in acquiring those contacts' communications. And fifth, even if the Government were to target respondents' foreign contacts, respondents can only speculate as to whether their own communications with those contacts would be incidentally acquired. Pp. ——— ———.

(c) Respondents' alternative argument is also unpersuasive. They claim that they suffer ongoing injuries that are fairly traceable to § 1881a because the risk of § 1881a surveillance requires them to take costly and burdensome measures to protect the confidentiality of their communications. But respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending. Because they do not face a threat of certainly impending interception under § 1881a, their costs are simply the product of their fear of surveillance, which is insufficient to create standing. See *Laird v. Tatum,* 408 U.S. 1, 10–15, 92 S.Ct. 2318, 33 L.Ed.2d 154. Accordingly, any ongoing injuries that respondents are suffering are not fairly traceable to § 1881a. Pp. ——— ———.

*2 (d) Respondents' remaining arguments are likewise unavailing. Contrary to their claim, their alleged injuries are not the same kinds of injuries that supported standing in cases such as *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610, *Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d 415, and *Monsanto, supra.* And their suggestion that they should be held to have standing because otherwise the constitutionality of § 1881a will never be adjudicated is both legally and factually incorrect. First, " '[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.' " *Valley Forge Christian College v.*

*Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 489, 102 S.Ct. 752, 70 L.Ed.2d 700. Second, the holding in this case by no means insulates § 1881a from judicial review. Pp. ——— — ———.

638 F.3d 118, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

Donald B. Verrilli, Jr., Solicitor General, for Petitioners.

Jameel Jaffer, New York, NY, for Respondents.

Charles S. Sims, Matthew J. Morris, Proskauer Rose LLP, New York, NY, Jameel Jaffer, Counsel of Record, Steven R. Shapiro, Alexander A. Abdo, Mitra Ebadolahi, American Civil Liberties Union Foundation, New York, NY, Arthur N. Eisenburg, Christopher T. Dunn, New York Civil Liberties Union Foundation, New York, NY, for Respondents.

Robert S. Litt, General Counsel, Tricia S. Wellman, Deputy General Counsel, Bradley A. Brooker, Associate General Counsel, Office of the Director of National Intelligence, Washington, DC, Rajesh De, General Counsel, Ariane E. Cerlenko, Associate General Counsel, National Security Agency, Ft. Meade, MD, Donald B. Verrilli, Jr., Solicitor General, Counsel of Record, Stuart F. Delery, Acting Assistant Attorney General, Edwin S. Kneedler, Deputy Solicitor General, Anthony A. Yang, Assistant to the Solicitor General, Douglas N. Letter, Thomas M. Bondy, Daniel J. Lenerz, Henry C. Whitaker, Attorneys, Department of Justice, Washington, DC, for Petitioners.

For U.S. Supreme Court briefs, see:2012 WL 5078759 (Reply.Brief)2012 WL 4361439 (Resp.Brief)2012 WL 3090949 (Pet.Brief)

Justice ALITO delivered the opinion of the Court.

Page 6

— S.Ct. ——, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

*3 Section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1881a (2006 ed., Supp. V), allows the Attorney General and the Director of National Intelligence to acquire foreign intelligence information by jointly authorizing the surveillance of individuals who are not "United States persons" [FN1] and are reasonably believed to be located outside the United States. Before doing so, the Attorney General and the Director of National Intelligence normally must obtain the Foreign Intelligence Surveillance Court's approval. Respondents are United States persons whose work, they allege, requires them to engage in sensitive international communications with individuals who they believe are likely targets of surveillance under § 1881a. Respondents seek a declaration that § 1881a is unconstitutional, as well as an injunction against § 1881a-authorized surveillance. The question before us is whether respondents have Article III standing to seek this prospective relief.

> FN1. The term "United States person" includes citizens of the United States, aliens admitted for permanent residence, and certain associations and corporations. 50 U.S.C. § 1801(i); see § 1881(a).

Respondents assert that they can establish injury in fact because there is an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future. But respondents' theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be "certainly impending." *E.g., Whitmore v. Arkansas,* 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). And even if respondents could demonstrate that the threatened injury is certainly impending, they still would not be able to establish that this injury is fairly traceable to § 1881a. As an alternative argument, respondents contend that they are suffering *present* injury because the risk of § 1881a-authorized surveillance already has forced them to take costly and burdensome measures to protect the confidentiality of their international communica-

tions. But respondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending. We therefore hold that respondents lack Article III standing.

## I
### A

In 1978, after years of debate, Congress enacted the Foreign Intelligence Surveillance Act (FISA) to authorize and regulate certain governmental electronic surveillance of communications for foreign intelligence purposes. See 92 Stat. 1783, 50 U.S.C. § 1801 *et seq.;* 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions §§ 3.1, 3.7 (2d ed. 2012) (hereinafter Kris & Wilson). In enacting FISA, Congress legislated against the backdrop of our decision in *United States v. United States Dist. Court for Eastern Dist. of Mich.,* 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) ( *Keith* ), in which we explained that the standards and procedures that law enforcement officials must follow when conducting "surveillance of 'ordinary crime' " might not be required in the context of surveillance conducted for domestic national-security purposes. *Id.,* at 322–323, 92 S.Ct. 2125. Although the *Keith* opinion expressly disclaimed any ruling "on the scope of the President's surveillance power with respect to the activities of foreign powers," *id.,* at 308, 92 S.Ct. 2125, it implicitly suggested that a special framework for foreign intelligence surveillance might be constitutionally permissible, see *id.,* at 322–323, 92 S.Ct. 2125.

In constructing such a framework for foreign intelligence surveillance, Congress created two specialized courts. In FISA, Congress authorized judges of the Foreign Intelligence Surveillance Court (FISC) to approve electronic surveillance for foreign intelligence purposes if there is probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power," and that each of the specific "facilities or places at which the electronic surveillance is directed is being used, or is about to be used, by a for-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

eign power or an agent of a foreign power." §
105(a)(3), 92 Stat. 1790; see § 105(b)(1)(A),
(b)(1)(B), *ibid.*; 1 Kris & Wilson § 7:2, at 194–195;
*id.,* § 16:2, at 528–529. Additionally, Congress ves-
ted the Foreign Intelligence Surveillance Court of
Review with jurisdiction to review any denials by
the FISC of applications for electronic surveillance.
§ 103(b), 92 Stat. 1788; 1 Kris & Wilson § 5:7, at
151–153.

*4 In the wake of the September 11th attacks,
President George W. Bush authorized the National
Security Agency (NSA) to conduct warrantless
wiretapping of telephone and e-mail communica-
tions where one party to the communication was
located outside the United States and a participant
in "the call was reasonably believed to be a member
or agent of al Qaeda or an affiliated terrorist organ-
ization," App. to Pet. for Cert. 403a. See *id.,* at
263a–265a, 268a, 273a–279a, 292a–293a; *Americ-
an Civil Liberties Union v. NSA,* 493 F.3d 644, 648
(C.A.6 2007) (*ACLU* ) (opinion of Batchelder, J.).
In January 2007, the FISC issued orders authorizing
the Government to target international communica-
tions into or out of the United States where there
was probable cause to believe that one participant
to the communication was a member or agent of al
Qaeda or an associated terrorist organization. App.
to Pet. for Cert. 312a, 398a, 405a. These FISC or-
ders subjected any electronic surveillance that was
then occurring under the NSA's program to the ap-
proval of the FISC. *Id.,* at 405a; see *id.,* at 312a,
404a. After a FISC Judge subsequently narrowed
the FISC's authorization of such surveillance,
however, the Executive asked Congress to amend
FISA so that it would provide the intelligence com-
munity with additional authority to meet the chal-
lenges of modern technology and international ter-
rorism. *Id.,* at 315a–318a, 331a–333a, 398a; see *id.,*
at 262a, 277a–279a, 287a.

When Congress enacted the FISA Amendments
Act of 2008 (FISA Amendments Act), 122 Stat.
2436, it left much of FISA intact, but it "established
a new and independent source of intelligence col-

lection authority, beyond that granted in traditional
FISA." 1 Kris & Wilson § 9:11, at 349–350. As rel-
evant here, § 702 of FISA, 50 U.S.C. § 1881a (2006
ed., Supp. V), which was enacted as part of the
FISA Amendments Act, supplements pre-existing
FISA authority by creating a new framework under
which the Government may seek the FISC's author-
ization of certain foreign intelligence surveillance
targeting the communications of non-U.S. persons
located abroad. Unlike traditional FISA surveil-
lance, § 1881a does not require the Government to
demonstrate probable cause that the target of the
electronic surveillance is a foreign power or agent
of a foreign power. Compare § 1805(a)(2)(A),
(a)(2)(B), with § 1881a(d)(1), (i)(3)(A); 638 F.3d
118, 126 (C.A.2 2011); 1 Kris & Wilson § 16:16, at
584. And, unlike traditional FISA, § 1881a does not
require the Government to specify the nature and
location of each of the particular facilities or places
at which the electronic surveillance will occur.
Compare § 1805(a)(2)(B), (c)(1) (2006 ed. and
Supp. V), with § 1881a(d)(1), (g)(4), (i)(3)(A); 638
F.3d, at 125–126; 1 Kris & Wilson § 16:16, at 585.
FN2

> FN2. Congress recently reauthorized the
> FISA Amendments Act for another five
> years. See 126 Stat. 1631.

The present case involves a constitutional chal-
lenge to § 1881a. Surveillance under § 1881a is
subject to statutory conditions, judicial authoriza-
tion, congressional supervision, and compliance
with the Fourth Amendment. Section 1881a
provides that, upon the issuance of an order from
the Foreign Intelligence Surveillance Court, "the
Attorney General and the Director of National In-
telligence may authorize jointly, for a period of up
to 1 year ..., the targeting of persons reasonably be-
lieved to be located outside the United States to ac-
quire foreign intelligence information." § 1881a(a).
Surveillance under § 1881a may not be intention-
ally targeted at any person known to be in the
United States or any U.S. person reasonably be-
lieved to be located abroad. § 1881a(b)(1)–(3); see

Page 8

— S.Ct. —, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

also § 1801(i). Additionally, acquisitions under § 1881a must comport with the Fourth Amendment. § 1881a(b)(5). Moreover, surveillance under § 1881a is subject to congressional oversight and several types of Executive Branch review. See § 1881a(f)(2), (*l* ); *Amnesty Int'l USA v. McConnell,* 646 F.Supp.2d 633, 640–641 (S.D.N.Y.2009).

**\*5** Section 1881a mandates that the Government obtain the Foreign Intelligence Surveillance Court's approval of "targeting" procedures, "minimization" procedures, and a governmental certification regarding proposed surveillance. § 1881a(a), (c)(1), (i)(2), (i)(3). Among other things, the Government's certification must attest that (1) procedures are in place "that have been approved, have been submitted for approval, or will be submitted with the certification for approval by the [FISC] that are reasonably designed" to ensure that an acquisition is "limited to targeting persons reasonably believed to be located outside" the United States; (2) minimization procedures adequately restrict the acquisition, retention, and dissemination of nonpublic information about unconsenting U.S. persons, as appropriate; (3) guidelines have been adopted to ensure compliance with targeting limits and the Fourth Amendment; and (4) the procedures and guidelines referred to above comport with the Fourth Amendment. § 1881a(g)(2); see § 1801(h).

The Foreign Intelligence Surveillance Court's role includes determining whether the Government's certification contains the required elements. Additionally, the Court assesses whether the targeting procedures are "reasonably designed" (1) to "ensure that an acquisition ... is limited to targeting persons reasonably believed to be located outside the United States" and (2) to "prevent the intentional acquisition of any communication as to which the sender and all intended recipients are known ... to be located in the United States." § 1881a(i)(2)(B) . The Court analyzes whether the minimization procedures "meet the definition of minimization procedures under section 1801(h) ..., as appropriate." § 1881a(i)(2)(C). The Court also assesses whether the

targeting and minimization procedures are consistent with the statute and the Fourth Amendment. See § 1881a(i)(3)(A).[FN3]

> FN3. The dissent attempts to downplay the safeguards established by § 1881a. See *post,* at —— (opinion of BREYER, J.). Notably, the dissent does not directly acknowledge that § 1881a surveillance must comport with the Fourth Amendment, see § 1881a(b)(5), and that the Foreign Intelligence Surveillance Court must assess whether targeting and minimization procedures are consistent with the Fourth Amendment, see § 1881a(i)(3)(A).

**B**

**\*6** Respondents are attorneys and human rights, labor, legal, and media organizations whose work allegedly requires them to engage in sensitive and sometimes privileged telephone and e-mail communications with colleagues, clients, sources, and other individuals located abroad. Respondents believe that some of the people with whom they exchange foreign intelligence information are likely targets of surveillance under § 1881a. Specifically, respondents claim that they communicate by telephone and e-mail with people the Government "believes or believed to be associated with terrorist organizations," "people located in geographic areas that are a special focus" of the Government's counterterrorism or diplomatic efforts, and activists who oppose governments that are supported by the United States Government. App. to Pet. for Cert. 399a.

Respondents claim that § 1881a compromises their ability to locate witnesses, cultivate sources, obtain information, and communicate confidential information to their clients. Respondents also assert that they "have ceased engaging" in certain telephone and e-mail conversations. *Id.,* at 400a. According to respondents, the threat of surveillance will compel them to travel abroad in order to have in-person conversations. In addition, respondents declare that they have undertaken "costly and bur-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

densome measures" to protect the confidentiality of sensitive communications. *Ibid.*

## C

On the day when the FISA Amendments Act was enacted, respondents filed this action seeking (1) a declaration that § 1881a, on its face, violates the Fourth Amendment, the First Amendment, Article III, and separation-of-powers principles and (2) a permanent injunction against the use of § 1881a. Respondents assert what they characterize as two separate theories of Article III standing. First, they claim that there is an objectively reasonable likelihood that their communications will be acquired under § 1881a at some point in the future, thus causing them injury. Second, respondents maintain that the risk of surveillance under § 1881a is so substantial that they have been forced to take costly and burdensome measures to protect the confidentiality of their international communications; in their view, the costs they have incurred constitute present injury that is fairly traceable to § 1881a.

After both parties moved for summary judgment, the District Court held that respondents do not have standing. *McConnell,* 646 F.Supp.2d, at 635. On appeal, however, a panel of the Second Circuit reversed. The panel agreed with respondents' argument that they have standing due to the objectively reasonable likelihood that their communications will be intercepted at some time in the future. 638 F.3d, at 133, 134, 139. In addition, the panel held that respondents have established that they are suffering " *present* injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct." *Id.,* at 138. The Second Circuit denied rehearing en banc by an equally divided vote. 667 F.3d 163 (2011).

Because of the importance of the issue and the novel view of standing adopted by the Court of Appeals, we granted certiorari, 566 U.S. ——, 132 S.Ct. 2431, 182 L.Ed.2d 1061 (2012), and we now reverse.

## II

*7 [1][2] Article III of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." As we have explained, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) (internal quotation marks omitted); *Raines v. Byrd,* 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (internal quotation marks omitted); see, *e.g., Summers v. Earth Island Institute,* 555 U.S. 488, 492–493, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009). "One element of the case-or-controversy requirement" is that plaintiffs "must establish that they have standing to sue." *Raines, supra,* at 818, 117 S.Ct. 2312; see also *Summers, supra,* at 492–493, 129 S.Ct. 1142; *Daimler-Chrysler Corp., supra,* at 342, 126 S.Ct. 1854; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

[3][4] The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches. *Summers, supra,* at 492–493, 129 S.Ct. 1142; *Daimler-Chrysler Corp., supra,* at 341–342, 353, 126 S.Ct. 1854; *Raines, supra,* at 818–820, 117 S.Ct. 2312; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221–222, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). In keeping with the purpose of this doctrine, "[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines, supra,* at 819–820, 117 S.Ct. 2312; see *Valley Forge Christian College, supra,* at 473–474, 102 S.Ct. 752; *Schlesinger, supra,* at 221–222, 94 S.Ct. 2925. "Relaxation of standing requirements is dir-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

ectly related to the expansion of judicial power," *United States v. Richardson,* 418 U.S. 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring); see also *Summers, supra,* at 492–493, 129 S.Ct. 1142; *Schlesinger, supra,* at 222, 94 S.Ct. 2925, and we have often found a lack of standing in cases in which the Judiciary has been requested to review actions of the political branches in the fields of intelligence gathering and foreign affairs, see, *e.g., Richardson, supra,* at 167–170, 94 S.Ct. 2940 (plaintiff lacked standing to challenge the constitutionality of a statute permitting the Central Intelligence Agency to account for its expenditures solely on the certificate of the CIA Director); *Schlesinger, supra,* at 209–211, 94 S.Ct. 2925 (plaintiffs lacked standing to challenge the Armed Forces Reserve membership of Members of Congress); *Laird v. Tatum,* 408 U.S. 1, 11–16, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (plaintiffs lacked standing to challenge an Army intelligence-gathering program).

[5][6] To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. ——, ——, 130 S.Ct. 2743, 2752, 177 L.Ed.2d 461 (2010); see also *Summers, supra,* at 493, 129 S.Ct. 1142; *Defenders of Wildlife,* 504 U.S., at 560–561, 112 S.Ct. 2130. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Id.,* at 565, n. 2, 112 S.Ct. 2130 (internal quotation marks omitted). Thus, we have repeatedly reiterated that "threatened injury must be *certainly impending* to constitute injury in fact," and that "[a]llegations of *possible* future injury" are not sufficient. *Whitmore,* 495 U.S., at 158, 110 S.Ct. 1717 (emphasis added; internal quotation marks omitted); see also *Defenders of Wildlife, supra,* at 565, n. 2, 567, n. 3, 112 S.Ct. 2130; see *DaimlerChrysler Corp., supra,* at 345, 126 S.Ct. 1854; *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528

U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000); *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979).

### III
#### A

*8 Respondents assert that they can establish injury in fact that is fairly traceable to § 1881a because there is an objectively reasonable likelihood that their communications with their foreign contacts will be intercepted under § 1881a at some point in the future. This argument fails. As an initial matter, the Second Circuit's "objectively reasonable likelihood" standard is inconsistent with our requirement that "threatened injury must be certainly impending to constitute injury in fact." *Whitmore, supra,* at 158, 110 S.Ct. 1717 (internal quotation marks omitted); see also *DaimlerChrysler Corp., supra,* at 345, 126 S.Ct. 1854; *Laidlaw, supra,* at 190, 120 S.Ct. 693; *Defenders of Wildlife, supra,* at 565, n. 2, 112 S.Ct. 2130; *Babbitt, supra,* at 298, 99 S.Ct. 2301. Furthermore, respondents' argument rests on their highly speculative fear that: (1) the Government will decide to target the communications of non-U.S. persons with whom they communicate; (2) in doing so, the Government will choose to invoke its authority under § 1881a rather than utilizing another method of surveillance; (3) the Article III judges who serve on the Foreign Intelligence Surveillance Court will conclude that the Government's proposed surveillance procedures satisfy § 1881a's many safeguards and are consistent with the Fourth Amendment; (4) the Government will succeed in intercepting the communications of respondents' contacts; and (5) respondents will be parties to the particular communications that the Government intercepts. As discussed below, respondents' theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending. See *Summers, supra,* at 496, 129 S.Ct. 1142 (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore, supra,* at 157–160, 110 S.Ct. 1717 (same). Moreover, even if respondents could

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

demonstrate injury in fact, the second link in the above-described chain of contingencies—which amounts to mere speculation about whether surveillance would be under § 1881a or some other authority—shows that respondents cannot satisfy the requirement that any injury in fact must be fairly traceable to § 1881a.

[7] First, it is speculative whether the Government will imminently target communications to which respondents are parties. Section 1881a expressly provides that respondents, who are U.S. persons, cannot be targeted for surveillance under § 1881a. See § 1881a(b)(1)–(3); 667 F.3d, at 173 (Raggi, J., dissenting from denial of rehearing en banc). Accordingly, it is no surprise that respondents fail to offer any evidence that their communications have been monitored under § 1881a, a failure that substantially undermines their standing theory. See *ACLU,* 493 F.3d, at 655–656, 673–674 (opinion of Batchelder, J.) (concluding that plaintiffs who lacked evidence that their communications had been intercepted did not have standing to challenge alleged NSA surveillance). Indeed, respondents do not even allege that the Government has sought the FISC's approval for surveillance of their communications. Accordingly, respondents' theory necessarily rests on their assertion that the Government will target *other individuals*—namely, their foreign contacts.

\*9 [8] Yet respondents have no actual knowledge of the Government's § 1881a targeting practices. Instead, respondents merely speculate and make assumptions about whether their communications with their foreign contacts will be acquired under § 1881a. See 667 F.3d, at 185–187 (opinion of Raggi, J.). For example, journalist Christopher Hedges states: "I have no choice but to *assume* that any of my international communications *may* be subject to government surveillance, and I have to make decisions ... in light of that *assumption*." App. to Pet. for Cert. 366a (emphasis added and deleted). Similarly, attorney Scott McKay asserts that, "[b]ecause of the [FISA Amendments Act], we now

have to *assume* that every one of our international communications *may* be monitored by the government." *Id.,* at 375a (emphasis added); see also *id.,* at 337a, 343a–344a, 350a, 356a. "The party invoking federal jurisdiction bears the burden of establishing" standing—and, at the summary judgment stage, such a party "can no longer rest on ... 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.' " *Defenders of Wildlife,* 504 U.S., at 561, 112 S.Ct. 2130. Respondents, however, have set forth no specific facts demonstrating that the communications of their foreign contacts will be targeted. Moreover, because § 1881a at most *authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear, respondents' allegations are necessarily conjectural. See *United Presbyterian Church in U.S.A. v. Reagan,* 738 F.2d 1375, 1380 (C.A.D.C.1984) (SCALIA, J.); 667 F.3d, at 187 (opinion of Raggi, J.). Simply put, respondents can only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target. FN4

> FN4. It was suggested at oral argument that the Government could help resolve the standing inquiry by disclosing to a court, perhaps through an *in camera* proceeding, (1) whether it is intercepting respondents' communications and (2) what targeting or minimization procedures it is using. See Tr. of Oral Arg. 13–14, 44, 56. This suggestion is puzzling. As an initial matter, it is *respondents'* burden to prove their standing by pointing to specific facts, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), not the Government's burden to disprove standing by revealing details of its surveillance priorities. Moreover, this type of hypothetical disclosure proceeding would allow a terrorist (or his attorney) to determine whether he is currently under U.S. surveillance simply by filing a lawsuit chal-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 12

— S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

lenging the Government's surveillance program. Even if the terrorist's attorney were to comply with a protective order prohibiting him from sharing the Government's disclosures with his client, the court's postdisclosure decision about whether to dismiss the suit for lack of standing would surely signal to the terrorist whether his name was on the list of surveillance targets.

[9] Second, even if respondents could demonstrate that the targeting of their foreign contacts is imminent, respondents can only speculate as to whether the Government will seek to use § 1881a-authorized surveillance (rather than other methods) to do so. The Government has numerous other methods of conducting surveillance, none of which is challenged here. Even after the enactment of the FISA Amendments Act, for example, the Government may still conduct electronic surveillance of persons abroad under the older provisions of FISA so long as it satisfies the applicable requirements, including a demonstration of probable cause to believe that the person is a foreign power or agent of a foreign power. See § 1805. The Government may also obtain information from the intelligence services of foreign nations. Brief for Petitioners 33. And, although we do not reach the question, the Government contends that it can conduct FISA-exempt human and technical surveillance programs that are governed by Executive Order 12333. See Exec. Order No. 12333, §§ 1.4, 2.1–2.5, 3 CFR 202, 210–212 (1981), reprinted as amended, note following 50 U.S.C. § 401, pp. 543, 547–548. Even if respondents could demonstrate that their foreign contacts will imminently be targeted—indeed, even if they could show that interception of their own communications will imminently occur—they would still need to show that their injury is fairly traceable to § 1881a. But, because respondents can only speculate as to whether any (asserted) interception would be under § 1881a or some other authority, they cannot satisfy the "fairly traceable" requirement.

\*10 Third, even if respondents could show that the Government will seek the Foreign Intelligence Surveillance Court's authorization to acquire the communications of respondents' foreign contacts under § 1881a, respondents can only speculate as to whether that court will authorize such surveillance. In the past, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment. In *Whitmore,* for example, the plaintiff's theory of standing hinged largely on the probability that he would obtain federal habeas relief and be convicted upon retrial. In holding that the plaintiff lacked standing, we explained that "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case." 495 U.S., at 159–160, 110 S.Ct. 1717; see *Defenders of Wildlife,* 504 U.S., at 562, 112 S.Ct. 2130.

We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors. Section 1881a mandates that the Government must obtain the Foreign Intelligence Surveillance Court's approval of targeting procedures, minimization procedures, and a governmental certification regarding proposed surveillance. § 1881a(a), (c)(1), (i)(2), (i)(3). The Court must, for example, determine whether the Government's procedures are "reasonably designed ... to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons." § 1801(h); see § 1881a(i)(2), (i)(3)(A). And, critically, the Court must also assess whether the Government's targeting and minimization procedures comport with the Fourth Amendment. § 1881a(i)(3)(A).

Fourth, even if the Government were to obtain the Foreign Intelligence Surveillance Court's approval to target respondents' foreign contacts under § 1881a, it is unclear whether the Government would succeed in acquiring the communications of respondents' foreign contacts. And fifth, even if the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

Government were to conduct surveillance of respondents' foreign contacts, respondents can only speculate as to whether *their own communications* with their foreign contacts would be incidentally acquired.

*11 [10] In sum, respondents' speculative chain of possibilities does not establish that injury based on potential future surveillance is certainly impending or is fairly traceable to § 1881a.[FN5]

> FN5. Our cases do not uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about. In some instances, we have found standing based on a "substantial risk" that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm. *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. ——, ——, 130 S.Ct. 2743, 2754–2755, 177 L.Ed.2d 461 (2010). See also *Pennell v. City of San Jose,* 485 U.S. 1, 8, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988); *Blum v. Yaretsky,* 457 U.S. 991, 1000–1001, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Babbitt v. Farm Workers,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). But to the extent that the "substantial risk" standard is relevant and is distinct from the "clearly impending" requirement, respondents fall short of even that standard, in light of the attenuated chain of inferences necessary to find harm here. See *supra,* at —— – ——. In addition, plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's actual action has caused the substantial risk of harm. Plaintiffs cannot rely on speculation about " 'the unfettered choices made by independent actors not before the court.' " *Defenders of Wildlife,* 504 U.S., at 562, 112 S.Ct. 2130.

### B

[11] Respondents' alternative argu-

ment—namely, that they can establish standing based on the measures that they have undertaken to avoid § 1881a-authorized surveillance—fares no better. Respondents assert that they are suffering ongoing injuries that are fairly traceable to § 1881a because the risk of surveillance under § 1881a requires them to take costly and burdensome measures to protect the confidentiality of their communications. Respondents claim, for instance, that the threat of surveillance sometimes compels them to avoid certain e-mail and phone conversations, to "tal[k] in generalities rather than specifics," or to travel so that they can have in-person conversations. Tr. of Oral Arg. 38; App. to Pet. for Cert. 338a, 345a, 367a, 400a.[FN6] The Second Circuit panel concluded that, because respondents are already suffering such ongoing injuries, the likelihood of interception under § 1881a is relevant only to the question whether respondents' ongoing injuries are "fairly traceable" to § 1881a. See 638 F.3d, at 133–134; 667 F.3d, at 180 (opinion of Raggi, J.). Analyzing the "fairly traceable" element of standing under a relaxed reasonableness standard, see 638 F.3d, at 133–134, the Second Circuit then held that "plaintiffs have established that they suffered *present* injuries in fact—economic and professional harms—stemming from a reasonable fear of *future* harmful government conduct," *id.,* at 138.

> FN6. For all the focus on respondents' supposed need to travel abroad in light of potential § 1881a surveillance, respondents cite only one specific instance of travel: an attorney's trip to New York City to meet with other lawyers. See App. to Pet. for Cert. 352a. This domestic travel had but a tenuous connection to § 1881a, because § 1881a-authorized acquisitions "may not intentionally target any person known at the time of acquisition to be located in the United States." § 1881a(b)(1); see also 667 F.3d 163, 202 (C.A.2 2011) (Jacobs, C.J., dissenting from denial of rehearing en banc); *id.,* at 185 (opinion of Raggi, J. (same)).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

[12] The Second Circuit's analysis improperly allowed respondents to establish standing by asserting that they suffer present costs and burdens that are based on a fear of surveillance, so long as that fear is not "fanciful, paranoid, or otherwise unreasonable." See *id.,* at 134. This improperly waters down the fundamental requirements of Article III. Respondents' contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm is unavailing—because the harm respondents seek to avoid is not certainly impending. In other words, respondents cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. See *Pennsylvania v. New Jersey,* 426 U.S. 660, 664, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (*per curiam* ); *National Family Planning & Reproductive Health Assn., Inc.,* 468 F.3d 826, 831 (C.A.D.C.2006). Any ongoing injuries that respondents are suffering are not fairly traceable to § 1881a.

If the law were otherwise, an enterprising plaintiff would be able to secure a lower standard for Article III standing simply by making an expenditure based on a nonparanoid fear. As Judge Raggi accurately noted, under the Second Circuit panel's reasoning, respondents could, "for the price of a plane ticket, ... transform their standing burden from one requiring a showing of actual or imminent ... interception to one requiring a showing that their subjective fear of such interception is not fanciful, irrational, or clearly unreasonable." 667 F.3d, at 180 (internal quotation marks omitted). Thus, allowing respondents to bring this action based on costs they incurred in response to a speculative threat would be tantamount to accepting a repackaged version of respondents' first failed theory of standing. See *ACLU,* 493 F.3d, at 656–657 (opinion of Batchelder, J.).

*12 Another reason that respondents' present injuries are not fairly traceable to § 1881a is that even before § 1881a was enacted, they had a similar incentive to engage in many of the countermeas-

ures that they are now taking. See *id.,* at 668–670. For instance, respondent Scott McKay's declaration describes—and the dissent heavily relies on—Mr. McKay's "knowledge" that thousands of communications involving one of his clients were monitored in the past. App. to Pet. for Cert. 370a; *post,* at ——, —— – ——. But this surveillance was conducted pursuant to FISA authority that predated § 1881a. See Brief for Petitioners 32, n. 11; *Al–Kidd v. Gonzales,* No. 05–cv–93, 2008 WL 5123009 (D.Idaho, Dec. 4, 2008). Thus, because the Government was allegedly conducting surveillance of Mr. McKay's client before Congress enacted § 1881a, it is difficult to see how the safeguards that Mr. McKay now claims to have implemented can be traced to § 1881a.

Because respondents do not face a threat of certainly impending interception under § 1881a, the costs that they have incurred to avoid surveillance are simply the product of their fear of surveillance, [FN7] and our decision in *Laird* makes it clear that such a fear is insufficient to create standing. See 408 U.S., at 10–15, 92 S.Ct. 2318. The plaintiffs in *Laird* argued that their exercise of First Amendment rights was being "chilled by the mere existence, without more, of [the Army's] investigative and data-gathering activity." *Id.,* at 10, 92 S.Ct. 2318. While acknowledging that prior cases had held that constitutional violations may arise from the chilling effect of "regulations that fall short of a direct prohibition against the exercise of First Amendment rights," the Court declared that none of those cases involved a "chilling effect aris[ing] merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual." *Id.,* at 11, 92 S.Ct. 2318. Because "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *id.,* at 13–14, 92 S.Ct. 2318, the plaintiffs in *Laird* —and respondents here—lack

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

standing. See *ibid.*; *ACLU, supra,* at 661–662 (opinion of Batchelder, J.) (holding that plaintiffs lacked standing because they "allege[d] only a subjective apprehension" of alleged NSA surveillance and "a personal (self-imposed) unwillingness to communicate"); *United Presbyterian Church,* 738 F.2d, at 1378 (holding that plaintiffs lacked standing to challenge the legality of an Executive Order relating to surveillance because "the 'chilling effect' which is produced by their fear of being subjected to illegal surveillance and which deters them from conducting constitutionally protected activities, is foreclosed as a basis for standing" by *Laird* ).

> FN7. Although respondents' alternative theory of standing rests primarily on choices that *they* have made based on their subjective fear of surveillance, respondents also assert that third parties might be disinclined to speak with them due to a fear of surveillance. See App. to Pet. for Cert. 372a–373a, 352a–353a. To the extent that such assertions are based on anything other than conjecture, see *Defenders of Wildlife,* 504 U.S., at 560, 112 S.Ct. 2130, they do not establish injury that is fairly traceable to § 1881a, because they are based on third parties' subjective fear of surveillance, see *Laird,* 408 U.S., at 10–14, 92 S.Ct. 2318.

For the reasons discussed above, respondents' self-inflicted injuries are not fairly traceable to the Government's purported activities under § 1881a, and their subjective fear of surveillance does not give rise to standing.

## IV
### A

*13 Respondents incorrectly maintain that "[t]he kinds of injuries incurred here—injuries incurred because of [respondents'] reasonable efforts to avoid greater injuries that are otherwise likely to flow from the conduct they challenge—are the same kinds of injuries that this Court held to support standing in cases such as" *Laidlaw, Meese v. Keene,* 481 U.S. 465, 107 S.Ct. 1862, 95 L.Ed.2d

415 (1987), and *Monsanto.* Brief for Respondents 24. As an initial matter, none of these cases holds or even suggests that plaintiffs can establish standing simply by claiming that they experienced a "chilling effect" that resulted from a governmental policy that does not regulate, constrain, or compel any action on their part. Moreover, each of these cases was very different from the present case.

In *Laidlaw,* plaintiffs' standing was based on "the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms." 528 U.S., at 184, 120 S.Ct. 693. Because the unlawful discharges of pollutants were "concededly ongoing," the only issue was whether "nearby residents"—who were members of the organizational plaintiffs—acted reasonably in refraining from using the polluted area. *Id.,* at 183–184, 120 S.Ct. 693. *Laidlaw* is therefore quite unlike the present case, in which it is not "concede[d]" that respondents would be subject to unlawful surveillance but for their decision to take preventive measures. See *ACLU,* 493 F.3d, at 686 (opinion of Batchelder, J.) (distinguishing *Laidlaw* on this ground); *id.,* at 689–690 (Gibbons, J., concurring) (same); 667 F.3d, at 182–183 (opinion of Raggi, J.) (same). *Laidlaw* would resemble this case only if (1) it were undisputed that the Government was using § 1881a-authorized surveillance to acquire respondents' communications and (2) the sole dispute concerned the reasonableness of respondents' preventive measures.

In *Keene,* the plaintiff challenged the constitutionality of the Government's decision to label three films as "political propaganda." 481 U.S., at 467, 107 S.Ct. 1862. The Court held that the plaintiff, who was an attorney and a state legislator, had standing because he demonstrated, through "detailed affidavits," that he "could not exhibit the films without incurring a risk of injury to his reputation and of an impairment of his political career."

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

*Id.,* at 467, 473–475, 107 S.Ct. 1862. Unlike the present case, *Keene* involved "more than a 'subjective chill' " based on speculation about potential governmental action; the plaintiff in that case was unquestionably regulated by the relevant statute, and the films that he wished to exhibit had already been labeled as "political propaganda." See *ibid.*; *ACLU,* 493 F.3d, at 663–664 (opinion of Batchelder, J.); *id.,* at 691 (Gibbons, J., concurring).

*Monsanto,* on which respondents also rely, is likewise inapposite. In *Monsanto,* conventional alfalfa farmers had standing to seek injunctive relief because the agency's decision to deregulate a variety of genetically engineered alfalfa gave rise to a "significant risk of gene flow to non-genetically-engineered varieties of alfalfa." 561 U.S., at ——, 130 S.Ct., at 2755. The standing analysis in that case hinged on evidence that genetically engineered alfalfa " 'seed fields [we]re currently being planted in all the major alfalfa seed production areas' "; the bees that pollinate alfalfa " 'have a range of at least two to ten miles' "; and the alfalfa seed farms were concentrated in an area well within the bees' pollination range. *Id.,* at —— – ——, and n. 3, 130 S.Ct., at 2754–2755, and n. 3. Unlike the conventional alfalfa farmers in *Monsanto,* however, respondents in the present case present no concrete evidence to substantiate their fears, but instead rest on mere conjecture about possible governmental actions.

**B**

*14 [13] Respondents also suggest that they should be held to have standing because otherwise the constitutionality of § 1881a could not be challenged. It would be wrong, they maintain, to "insulate the government's surveillance activities from meaningful judicial review." Brief for Respondents 60. Respondents' suggestion is both legally and factually incorrect. First, " '[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.' " *Valley Forge Christian College,* 454

U.S., at 489, 102 S.Ct. 752; *Schlesinger,* 418 U.S., at 227, 94 S.Ct. 2925; see also *Richardson,* 418 U.S., at 179, 94 S.Ct. 2940; *Raines,* 521 U.S., at 835, 117 S.Ct. 2312 (Souter, J., joined by GINSBURG, J., concurring in judgment).

Second, our holding today by no means insulates § 1881a from judicial review. As described above, Congress created a comprehensive scheme in which the Foreign Intelligence Surveillance Court evaluates the Government's certifications, targeting procedures, and minimization procedures—including assessing whether the targeting and minimization procedures comport with the Fourth Amendment. § 1881a(a), (c)(1), (i)(2), (i)(3). Any dissatisfaction that respondents may have about the Foreign Intelligence Surveillance Court's rulings—or the congressional delineation of that court's role—is irrelevant to our standing analysis.

Additionally, if the Government intends to use or disclose information obtained or derived from a § 1881a acquisition in judicial or administrative proceedings, it must provide advance notice of its intent, and the affected person may challenge the lawfulness of the acquisition. §§ 1806(c), 1806(e), 1881e(a) (2006 ed. and Supp. V).[FN8] Thus, if the Government were to prosecute one of respondent-attorney's foreign clients using § 1881a-authorized surveillance, the Government would be required to make a disclosure. Although the foreign client might not have a viable Fourth Amendment claim, see, *e.g., United States v. Verdugo–Urquidez,* 494 U.S. 259, 261, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), it is possible that the monitoring of the target's conversations with his or her attorney would provide grounds for a claim of standing on the part of the attorney. Such an attorney would certainly have a stronger evidentiary basis for establishing standing than do respondents in the present case. In such a situation, unlike in the present case, it would at least be clear that the Government had acquired the foreign client's communications using § 1881a-authorized surveillance.

FN8. The possibility of judicial review in

Page 17

— S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

this context is not farfetched. In *United States v. Damrah,* 412 F.3d 618 (C.A.6 2005), for example, the Government made a pretrial disclosure that it intended to use FISA evidence in a prosecution; the defendant (unsuccessfully) moved to suppress the FISA evidence, even though he had not been the *target* of the surveillance; and the Sixth Circuit ultimately held that FISA's procedures are consistent with the Fourth Amendment. See *id.,* at 622, 623, 625.

Finally, any electronic communications service provider that the Government directs to assist in § 1881a surveillance may challenge the lawfulness of that directive before the FISC. § 1881a(h)(4), (6). Indeed, at the behest of a service provider, the Foreign Intelligence Surveillance Court of Review previously analyzed the constitutionality of electronic surveillance directives issued pursuant to a now-expired set of FISA amendments. See *In re Directives Pursuant to Section 105B of Foreign Intelligence Surveillance Act,* 551 F.3d 1004, 1006–1016 (2008) (holding that the provider had standing and that the directives were constitutional).

3

**\*15** We hold that respondents lack Article III standing because they cannot demonstrate that the future injury they purportedly fear is certainly impending and because they cannot manufacture standing by incurring costs in anticipation of non-imminent harm. We therefore reverse the judgment of the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

Justice BREYER, with whom Justice GINSBURG, Justice SOTOMAYOR, and Justice KAGAN join, dissenting.

The plaintiffs' standing depends upon the likelihood that the Government, acting under the authority of 50 U.S.C. § 1881a (2006 ed., Supp. V),

will harm them by intercepting at least some of their private, foreign, telephone, or e-mail conversations. In my view, this harm is not "speculative." Indeed it is as likely to take place as are most future events that commonsense inference and ordinary knowledge of human nature tell us will happen. This Court has often found the occurrence of similar future events sufficiently certain to support standing. I dissent from the Court's contrary conclusion.

I

Article III specifies that the "judicial Power" of the United States extends only to actual "Cases" and "Controversies." § 2. It thereby helps to ensure that the legal questions presented to the federal courts will not take the form of abstract intellectual problems resolved in the "rarified atmosphere of a debating society" but instead those questions will be presented "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (purpose of Article III); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (similar); *Babbitt v. Farm Workers,* 442 U.S. 289, 297, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (similar).

The Court has recognized that the precise boundaries of the "case or controversy" requirement are matters of "degree ... not discernible by any precise test." *Ibid.* At the same time, the Court has developed a subsidiary set of legal rules that help to determine when the Constitution's requirement is met. See *Lujan,* 504 U.S., at 560–561, 112 S.Ct. 2130; *id.,* at 583, 112 S.Ct. 2130 (Stevens, J., concurring in judgment). Thus, a plaintiff must have "standing" to bring a legal claim. And a plaintiff has that standing, the Court has said, only if the action or omission that the plaintiff challenges has caused, or will cause, the plaintiff to suffer an injury that is "concrete and particularized," "actual or imminent," and "redress[able] by a fa-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 18

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

vorable decision." *Id.,* at 560–561, 112 S.Ct. 2130 (internal quotation marks omitted).

No one here denies that the Government's interception of a private telephone or e-mail conversation amounts to an injury that is "concrete and particularized." Moreover, the plaintiffs, respondents here, seek as relief a judgment declaring unconstitutional (and enjoining enforcement of) a statutory provision authorizing those interceptions; and, such a judgment would redress the injury by preventing the injury. Thus, the basic question is whether the injury, *i.e.,* the interception, is "actual or imminent."

## II
### A

*16 Since the plaintiffs fear interceptions of a kind authorized by § 1881a, it is important to understand just what kind of surveillance that section authorizes. Congress enacted § 1881a in 2008, as an amendment to the pre-existing Foreign Intelligence Surveillance Act of 1978, 50 U.S.C. § 1801 *et seq.* Before the amendment, the Act authorized the Government (acting within the United States) to monitor private electronic communications between the United States and a foreign country if (1) the Government's purpose was, in significant part, to obtain foreign intelligence information (which includes information concerning a "foreign power" or "territory" related to our "national defense" or "security" or the "conduct of ... foreign affairs"), (2) the Government's surveillance target was "a foreign power or an agent of a foreign power," and (3) the Government used surveillance procedures designed to "minimize the acquisition and retention, and prohibit the dissemination, of" any private information acquired about Americans. §§ 1801(e), (h), 1804(a).

In addition the Government had to obtain the approval of the Foreign Intelligence Surveillance Court. To do so, it had to submit an application describing (1) each "specific target," (2) the "nature of the information sought," and (3) the "type of communications or activities to be subjected to the surveillance." § 1804(a). It had to certify that, in significant part, it sought to obtain foreign intelligence information. *Ibid.* It had to demonstrate probable cause to believe that each specific target was "a foreign power or an agent of a foreign power." §§ 1804(a), 1805(a). It also had to describe instance-specific procedures to be used to minimize intrusions upon Americans' privacy (compliance with which the court subsequently could assess). §§ 1804(a), 1805(d)(3).

The addition of § 1881a in 2008 changed this prior law in three important ways. First, it eliminated the requirement that the Government describe to the court each specific target and identify each facility at which its surveillance would be directed, thus permitting surveillance on a programmatic, not necessarily individualized, basis. § 1881a(g). Second, it eliminated the requirement that a target be a "foreign power or an agent of a foreign power." *Ibid.* Third, it diminished the court's authority to insist upon, and eliminated its authority to supervise, instance-specific privacy-intrusion minimization procedures (though the Government still must use court-approved general minimization procedures). § 1881a(e). Thus, using the authority of § 1881a, the Government can obtain court approval for its surveillance of electronic communications between places within the United States and targets in foreign territories by showing the court (1) that "a significant purpose of the acquisition is to obtain foreign intelligence information," and (2) that it will use general targeting and privacy-intrusion minimization procedures of a kind that the court had previously approved. § 1881a(g).

### B

*17 It is similarly important to understand the kinds of communications in which the plaintiffs say they engage and which they believe the Government will intercept. Plaintiff Scott McKay, for example, says in an affidavit (1) that he is a lawyer; (2) that he represented "Mr. Sami Omar Al-Hussayen, who was acquitted in June 2004 on terrorism charges"; (3) that he continues to repres-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 19

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

ent "Mr. Al-Hussayen, who, in addition to facing criminal charges after September 11, was named as a defendant in several civil cases"; (4) that he represents Khalid Sheik Mohammed, a detainee, "before the Military Commissions at Guantánamo Bay, Cuba"; (5) that in representing these clients he "communicate[s] by telephone and email with people outside the United States, including Mr. Al-Hussayen himself," "experts, investigators, attorneys, family members ... and others who are located abroad"; and (6) that prior to 2008 "the U.S. government had intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Al-Hussayen." App. to Pet. for Cert. 369a–371a.

Another plaintiff, Sylvia Royce, says in her affidavit (1) that she is an attorney; (2) that she "represent[s] Mohammedou Ould Salahi, a prisoner who has been held at Guantánamo Bay as an enemy combatant"; (3) that, "[i]n connection with [her] representation of Mr. Salahi, [she] receive[s] calls from time to time from Mr. Salahi's brother, ... a university student in Germany"; and (4) that she has been told that the Government has threatened Salahi "that his family members would be arrested and mistreated if he did not cooperate." Id., at 349a–351a.

The plaintiffs have noted that McKay no longer represents Mohammed and Royce no longer represents Ould Salahi. Brief for Respondents 15, n. 11. But these changes are irrelevant, for we assess standing as of the time a suit is filed, see Davis v. Federal Election Comm'n, 554 U.S. 724, 734, 128 S.Ct. 2759, 171 L.Ed.2d 737 (2008), and in any event McKay himself continues to represent Al Hussayen, his partner now represents Mohammed, and Royce continues to represent individuals held in the custody of the U.S. military overseas.

A third plaintiff, Joanne Mariner, says in her affidavit (1) that she is a human rights researcher, (2) that "some of the work [she] do[es] involves trying to track down people who were rendered by the CIA to countries in which they were tortured";

(3) that many of those people "the CIA has said are (or were) associated with terrorist organizations"; and (4) that, to do this research, she "communicate[s] by telephone and e-mail with ... former detainees, lawyers for detainees, relatives of detainees, political activists, journalists, and fixers" "all over the world, including in Jordan, Egypt, Pakistan, Afghanistan, [and] the Gaza Strip." App. to Pet. for Cert. 343a–344a.

Other plaintiffs, including lawyers, journalists, and human rights researchers, say in affidavits (1) that they have jobs that require them to gather information from foreigners located abroad; (2) that they regularly communicate electronically (e.g., by telephone or e-mail) with foreigners located abroad; and (3) that in these communications they exchange "foreign intelligence information" as the Act defines it. Id., at 334a–375a.

### III

*18 Several considerations, based upon the record along with commonsense inferences, convince me that there is a very high likelihood that Government, acting under the authority of § 1881a, will intercept at least some of the communications just described. First, the plaintiffs have engaged, and continue to engage, in electronic communications of a kind that the 2008 amendment, but not the prior Act, authorizes the Government to intercept. These communications include discussions with family members of those detained at Guantanamo, friends and acquaintances of those persons, and investigators, experts and others with knowledge of circumstances related to terrorist activities. These persons are foreigners located outside the United States. They are not "foreign power[s]" or "agent[s] of ... foreign power[s]." And the plaintiffs state that they exchange with these persons "foreign intelligence information," defined to include information that "relates to" "international terrorism" and "the national defense or the security of the United States." See 50 U.S.C. § 1801 (2006 ed. and Supp. V); see, e.g., App. to Pet. for Cert. 342a, 366a, 373a–374a.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

Second, the plaintiffs have a strong *motive* to engage in, and the Government has a strong *motive* to listen to, conversations of the kind described. A lawyer representing a client normally seeks to learn the circumstances surrounding the crime (or the civil wrong) of which the client is accused. A fair reading of the affidavit of Scott McKay, for example, taken together with elementary considerations of a lawyer's obligation to his client, indicates that McKay will engage in conversations that concern what suspected foreign terrorists, such as his client, have done; in conversations that concern his clients' families, colleagues, and contacts; in conversations that concern what those persons (or those connected to them) have said and done, at least in relation to terrorist activities; in conversations that concern the political, social, and commercial environments in which the suspected terrorists have lived and worked; and so forth. See, *e.g., id.,* at 373a–374a. Journalists and human rights workers have strong similar motives to conduct conversations of this kind. See, *e.g., id.,* at 342a (Declaration of Joanne Mariner, stating that "some of the information [she] exchange[s] by telephone and e-mail relates to terrorism and counterterrorism, and much of the information relates to the foreign affairs of the United States").

At the same time, the Government has a strong motive to conduct surveillance of conversations that contain material of this kind. The Government, after all, seeks to learn as much as it can reasonably learn about suspected terrorists (such as those detained at Guantanamo), as well as about their contacts and activities, along with those of friends and family members. See Executive Office of the President, Office of Management and Budget, Statement of Administration Policy on S. 2248, p. 4 (Dec. 17, 2007) ("Part of the value of the [new authority] is to enable the Intelligence Community to collect expeditiously the communications of terrorists in foreign countries who may contact an associate in the United States"). And the Government is motivated to do so, not simply by the desire to help convict those whom the Government believes

guilty, but also by the critical, overriding need to protect America from terrorism. See *id.,* at 1 ("Protection of the American people and American interests at home and abroad requires access to timely, accurate, and insightful intelligence on the capabilities, intentions, and activities of ... terrorists").

Third, the Government's *past behavior* shows that it has sought, and hence will in all likelihood continue to seek, information about alleged terrorists and detainees through means that include surveillance of electronic communications. As just pointed out, plaintiff Scott McKay states that the Government (under the authority of the pre–2008 law) "intercepted some 10,000 telephone calls and 20,000 email communications involving [his client] Mr. Al–Hussayen." App. to Pet. for Cert. 370a.

*19 Fourth, the Government has the *capacity* to conduct electronic surveillance of the kind at issue. To some degree this capacity rests upon technology available to the Government. See 1 D. Kris & J. Wilson, National Security Investigations & Prosecutions § 16:6, p. 562 (2d ed. 2012) ("NSA's technological abilities are legendary"); *id.,* § 16:12, at 572–577 (describing the National Security Agency's capacity to monitor "*very* broad facilities" such as international switches). See, *e.g.,* Lichtblau & Risen, Spy Agency Mined Vast Data Trove, Officials Report, N.Y. Times, Dec. 24, 2005, p. A1 (describing capacity to trace and to analyze large volumes of communications into and out of the United States); Lichtblau & Shane, Bush is Pressed Over New Report on Surveillance, N.Y. Times, May 12, 2006, p. A1 (reporting capacity to obtain access to records of many, if not most, telephone calls made in the United States); Priest & Arkin, A Hidden World, Growing Beyond Control, Washington Post, July 19, 2010, p. A1 (reporting that every day, collection systems at the National Security Agency intercept and store 1.7 billion e-mails, telephone calls and other types of communications). Cf. Statement of Administration Policy on S. 2248, *supra,* at ——— (rejecting a provision of the Senate

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

bill that would require intelligence analysts to count "the number of persons located in the United States whose communications were reviewed" as "impossible to implement" (internal quotation marks omitted)). This capacity also includes the Government's authority to obtain the kind of information here at issue from private carriers such as AT & T and Verizon. See 50 U.S.C. § 1881a(h). We are further told by *amici* that the Government is expanding that capacity. See Brief for Electronic Privacy Information Center et al. as 22–23 (National Security Agency will be able to conduct surveillance of most electronic communications between domestic and foreign points).

Of course, to exercise this capacity the Government must have intelligence court authorization. But the Government rarely files requests that fail to meet the statutory criteria. See Letter from Ronald Weich, Assistant Attorney General, to Joseph R. Biden, Jr., 1 (Apr. 30, 2012) (In 2011, of the 1,676 applications to the intelligence court, two were withdrawn by the Government, and the remaining 1,674 were approved, 30 with some modification), online at http://www.justice.gov/nsd/foia/foia_library/2011fisa-ltr.pdf. (as visited Feb. 22, 2013, and available in Clerk of Court's case file). As the intelligence court itself has stated, its review under § 1881a is "narrowly circumscribed." In re Proceedings Required by § 702(i) of the FISA Amendments Act of 2008, No. Misc. 08–01 (Aug. 17, 2008), p. 3. There is no reason to believe that the communications described would all fail to meet the conditions necessary for approval. Moreover, compared with prior law, § 1881a simplifies and thus expedites the approval process, making it more likely that the Government will use § 1881a to obtain the necessary approval.

The upshot is that (1) similarity of content, (2) strong motives, (3) prior behavior, and (4) capacity all point to a very strong likelihood that the Government will intercept at least some of the plaintiffs' communications, including some that the

2008 amendment, § 1881a, but not the pre–2008 Act, authorizes the Government to intercept.

**\*20** At the same time, nothing suggests the presence of some special factor here that might support a contrary conclusion. The Government does not deny that it has both the motive and the capacity to listen to communications of the kind described by plaintiffs. Nor does it describe any system for avoiding the interception of an electronic communication that happens to include a party who is an American lawyer, journalist, or human rights worker. One can, of course, always imagine some special circumstance that negates a virtual likelihood, no matter how strong. But the same is true about most, if not all, ordinary inferences about future events. Perhaps, despite pouring rain, the streets will remain dry (due to the presence of a special chemical). But ordinarily a party that seeks to defeat a strong natural inference must bear the burden of showing that some such special circumstance exists. And no one has suggested any such special circumstance here.

Consequently, we need only assume that the Government is doing its job (to find out about, and combat, terrorism) in order to conclude that there is a high probability that the Government will intercept at least some electronic communication to which at least some of the plaintiffs are parties. The majority is wrong when it describes the harm threatened plaintiffs as "speculative."

### IV

#### A

The majority more plausibly says that the plaintiffs have failed to show that the threatened harm is " *certainly impending.*" *Ante,* at —— (internal quotation marks omitted). But, as the majority appears to concede, see *ante,* at —— – ——, and n. 5, *certainty* is not, and never has been, the touchstone of standing. The future is inherently uncertain. Yet federal courts frequently entertain actions for injunctions and for declaratory relief aimed at preventing future activities that are reasonably likely or highly likely, but not absolutely

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 22

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

certain, to take place. And that degree of certainty is all that is needed to support standing here.

The Court's use of the term "certainly impending" is not to the contrary. Sometimes the Court has used the phrase "certainly impending" as if the phrase described a *sufficient,* rather than a *necessary,* condition for jurisdiction. See *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) ("If the injury is certainly impending that is enough"). See also *Babbitt,* 442 U.S., at 298, 99 S.Ct. 2301 (same). On other occasions, it has used the phrase as if it concerned *when,* not *whether,* an alleged injury would occur. Thus, in *Lujan,* 504 U.S., at 564, n. 2, 112 S.Ct. 2130, the Court considered a threatened future injury that consisted of harm that plaintiffs would suffer when they "soon" visited a government project area that (they claimed) would suffer environmental damage. The Court wrote that a "mere profession of an intent, some day, to return" to the project area did not show the harm was "*imminent,*" for "soon" might mean nothing more than "in this lifetime." *Id.,* at 564–565, n. 2, 112 S.Ct. 2130 (internal quotation marks omitted). Similarly, in *McConnell v. Federal Election Comm'n,* 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), the Court denied standing because the Senator's future injury (stemming from a campaign finance law) would not affect him until his reelection. That fact, the Court said, made the injury "too remote temporally to satisfy Article III standing." *Id.,* at 225–226, 124 S.Ct. 619.

On still other occasions, recognizing that " 'imminence' is concededly a somewhat elastic concept," *Lujan, supra,* at 565, n. 2, 112 S.Ct. 2130, the Court has referred to, or used (sometimes along with "certainly impending") other phrases such as "reasonable probability" that suggest less than absolute, or literal certainty. See *Babbitt, supra,* at 298, 99 S.Ct. 2301 (plaintiff "must demonstrate a *realistic danger* of sustaining a direct injury" (emphasis added)); *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d

610 (2000) ("[I]t is the plaintiff's burden to establish standing by demonstrating that ... the defendant's allegedly wrongful behavior will likely occur or continue"). See also *Monsanto Co. v. Geertson Seed Farms,* 561 U.S. ——, ——, 130 S.Ct. 2743, 2754–2755, 177 L.Ed.2d 461 (2010) (" ' "reasonable probability" ' " and "substantial risk"); *Davis,* 554 U.S., at 734, 128 S.Ct. 2759 ("realistic and impending threat of direct injury"); *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 129, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007) ("genuine threat of enforcement"); *Department of Commerce v. United States House of Representatives,* 525 U.S. 316, 333, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999) ( "substantially likely" (internal quotation marks omitted)); *Clinton v. City of New York,* 524 U.S. 417, 432, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) ( "sufficient likelihood of economic injury"); *Pennell v. San Jose,* 485 U.S. 1, 8, 108 S.Ct. 849, 99 L.Ed.2d 1 (1988) ("realistic danger" (internal quotation marks omitted)); *Blum v. Yaretsky,* 457 U.S. 991, 1001, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) ("quite realistic" threat); *Bryant v. Yellen,* 447 U.S. 352, 367–368, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980) ("likely"); *Buckley v. Valeo,* 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (*per curiam* ) ("reasonable probability"). Taken together the case law uses the word "certainly" as if it emphasizes, rather than literally defines, the immediately following term "impending."

## B
### 1

*21 More important, the Court's holdings in standing cases show that standing exists here. The Court has often *found* standing where the occurrence of the relevant injury was far *less* certain than here. Consider a few, fairly typical, cases. Consider *Pennell, supra.* A city ordinance forbade landlords to raise the rent charged to a tenant by more than 8 percent where doing so would work an unreasonably severe hardship on that tenant. *Id.,* at 4–5, 108 S.Ct. 849. A group of landlords sought a judgment declaring the ordinance unconstitutional. The Court held that, to have standing, the landlords had to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 23

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

demonstrate a " ' *realistic danger of sustaining a direct injury* as a result of the statute's operation.' " *Id.*, at 8, 108 S.Ct. 849 (emphasis added). It found that the landlords had done so by showing a likelihood of enforcement and a "probability," *ibid.*, that the ordinance would make the landlords charge lower rents—even though the landlords had not shown (1) that they intended to raise the relevant rents to the point of causing unreasonably severe hardship; (2) that the tenants would challenge those increases; or (3) that the city's hearing examiners and arbitrators would find against the landlords. Here, even more so than in *Pennell*, there is a "*realistic danger* " that the relevant harm will occur.

Or, consider *Blum, supra.* A group of nursing home residents receiving Medicaid benefits challenged the constitutionality (on procedural grounds) of a regulation that permitted their nursing home to transfer them to a less desirable home. *Id.*, at 999–1000, 102 S.Ct. 2777. Although a Medicaid committee had recommended transfers, Medicaid-initiated transfer had been enjoined and the nursing home itself had not threatened to transfer the plaintiffs. But the Court found "standing" because "the threat of transfers" was "not 'imaginary or speculative' " but "quite realistic," hence "sufficiently substantial." *Id.*, at 1000–1001, 102 S.Ct. 2777 (quoting *Younger v. Harris,* 401 U.S. 37, 42, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)). The plaintiffs' injury here is not imaginary or speculative, but "quite realistic."

*22 Or, consider *Davis, supra.* The plaintiff, a candidate for the United States House of Representatives, self-financed his campaigns. He challenged the constitutionality of an election law that relaxed the limits on an opponent's contributions when a self-financed candidate's spending itself exceeded certain other limits. His opponent, in fact, had decided not to take advantage of the increased contribution limits that the statute would have allowed. *Id* ., at 734, 128 S.Ct. 2759. But the Court nonetheless found standing because there was a "realistic and impending threat," not a certainty, that the candid-

ate's opponent would do so at the time the plaintiff filed the complaint. *Id.*, at 734–735, 128 S.Ct. 2759. The threat facing the plaintiffs here is as "realistic and impending."

Or, consider *MedImmune, supra.* The plaintiff, a patent licensee, sought a declaratory judgment that the patent was invalid. But, the plaintiff did not face an imminent threat of suit because it continued making royalty payments to the patent holder. In explaining why the plaintiff had standing, we (1) assumed that if the plaintiff stopped making royalty payments it would have standing (despite the fact that the patent holder might not bring suit), (2) rejected the Federal Circuit's "reasonable apprehension of *imminent* suit" requirement, and (3) instead suggested that a "genuine threat of enforcement" was likely sufficient. *Id.*, at 128, 129, 132, n. 11, 127 S.Ct. 764 (internal quotation marks omitted). A "genuine threat" is present here.

Moreover, courts have often found *probabilistic* injuries sufficient to support standing. In *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), for example, the plaintiffs, a group of individuals living near a proposed nuclear powerplant, challenged the constitutionality of the Price–Anderson Act, a statute that limited the plant's liability in the case of a nuclear accident. The plaintiffs said that, without the Act, the defendants would not build a nuclear plant. And the building of the plant would harm them, in part, by emitting "non-natural radiation into [their] environment." *Id.*, at 74, 98 S.Ct. 2620. The Court found standing in part due to "our generalized concern about exposure to radiation and the apprehension flowing from the *uncertainty* about the health and genetic consequences of even small emissions." *Ibid.* (emphasis added). See also *Monsanto Co., supra,* at ——, 130 S.Ct., at 2754–2755 ("A *substantial risk* of gene flow injures respondents in several ways" (emphasis added)).

See also lower court cases, such as *Mountain States Legal Foundation v. Glickman,* 92 F.3d

Page 24

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

1228, 1234–1235 (C.A.D.C.1996) (plaintiffs attack Government decision to limit timber harvesting; standing based upon increased *risk* of wildfires); *Natural Resources Defense Council v. EPA,* 464 F.3d 1, 7 (C.A.D.C.2006) (plaintiffs attack Government decision deregulating methyl bromide; standing based upon increased lifetime *risk* of developing skin cancer); *Constellation Energy Commodities Group, Inc. v. FERC,* 457 F.3d 14, 20 (C.A.D.C.2006) (standing based on increased *risk* of nonrecovery inherent in the reduction of collateral securing a debt of uncertain amount); *Sutton v. St. Jude Medical S.C., Inc.,* 419 F.3d 568, 570–575 (C.A.6 2005) (standing based on increased *risk* of harm caused by implantation of defective medical device); *Johnson v. Allsteel, Inc.,* 259 F.3d 885, 888–891 (C.A.7 2001) (standing based on increased *risk* that Employee Retirement Income Security Act beneficiary will not be covered due to increased amount of discretion given to ERISA administrator).

*23 How could the law be otherwise? Suppose that a federal court faced a claim by homeowners that (allegedly) unlawful dam-building practices created a high risk that their homes would be flooded. Would the court deny them standing on the ground that the risk of flood was only 60, rather than 90, percent?

Would federal courts deny standing to a plaintiff in a diversity action who claims an anticipatory breach of contract where the future breach depends on probabilities? The defendant, say, has threatened to load wheat onto a ship bound for India despite a promise to send the wheat to the United States. No one can know for certain that this will happen. Perhaps the defendant will change his mind; perhaps the ship will turn and head for the United States. Yet, despite the uncertainty, the Constitution does not prohibit a federal court from hearing such a claim. See 23 R. Lord, Williston on Contracts § 63:35 (4th ed. 2002) (plaintiff may bring an anticipatory breach suit even though the defendant's promise is one to perform in the future, it has not

yet been broken, and defendant may still retract the repudiation). *E.g., Wisconsin Power & Light Co. v. Century Indemnity Co.,* 130 F.3d 787, 792–793 (C.A.7 1997) (plaintiff could sue insurer that disclaimed liability for all costs that would be incurred in the future *if* environmental agencies required cleanup); *Combs v. International Ins. Co.,* 354 F.3d 568, 598–601 (C.A.6 2004) (similar).

Would federal courts deny standing to a plaintiff who seeks to enjoin as a nuisance the building of a nearby pond which, the plaintiff believes, will very likely, but not inevitably, overflow his land? See 42 Am. Jur. 2d Injunctions §§ 2, 5 (2010) (noting that an injunction is ordinarily preventive in character and restrains actions that have not yet been taken, but threaten injury). *E.g., Central Delta Water Agency v. United States,* 306 F.3d 938, 947–950 (C.A.9 2002) (standing to seek injunction where method of operating dam was highly likely to severely hamper plaintiffs' ability to grow crops); *Consolidated Companies, Inc. v. Union Pacific R. Co.,* 499 F.3d 382, 386 (C.A.5 2007) (standing to seek injunction requiring cleanup of land adjacent to plaintiff's tract because of threat that contaminants might migrate to plaintiff's tract).

Neither do ordinary declaratory judgment actions always involve the degree of certainty upon which the Court insists here. See, *e.g., Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941) (insurance company could seek declaration that it need not pay claim against insured automobile driver who was in an accident even though the driver had not yet been found liable for the accident); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–244, 57 S.Ct. 461, 81 L.Ed. 617 (1937) (insurance company could seek declaration that it need not pay plaintiff for disability although plaintiff had not yet sought disability payments). See also, *e.g., Associated Indemnity Corp. v. Fairchild Industries, Inc.,* 961 F.2d 32, 35–36 (C.A.2 1992) (insured could seek declaration that insurance company must pay liability even before

Page 25

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

insured found liable).

#### 2

*24 In some standing cases, the Court has found that a reasonable probability of *future* injury comes accompanied with *present* injury that takes the form of reasonable efforts to mitigate the threatened effects of the future injury or to prevent it from occurring. Thus, in *Monsanto Co.*, 561 U.S., at ——, 130 S.Ct., at 2754–2756 plaintiffs, a group of conventional alfalfa growers, challenged an agency decision to deregulate genetically engineered alfalfa. They claimed that deregulation would harm them because their neighbors would plant the genetically engineered seed, bees would obtain pollen from the neighbors' plants, and the bees would then (harmfully) contaminate their own conventional alfalfa with the genetically modified gene. The lower courts had found a "reasonable probability" that this injury would occur. *Ibid.* (internal quotation marks omitted).

Without expressing views about that probability, we found standing because the plaintiffs would suffer present harm by trying to combat the threat. *Ibid.* The plaintiffs, for example, "would have to conduct testing to find out whether and to what extent their crops have been contaminated." *Id.*, at ——, 130 S.Ct., at 2755. And they would have to take "measures to minimize the likelihood of potential contamination and to ensure an adequate supply of non-genetically-engineered alfalfa." *Ibid.* We held that these "harms, which [the plaintiffs] will suffer even if their crops are not actually infected with" the genetically modified gene, "are sufficiently concrete to satisfy the injury-in-fact prong of the constitutional standing analysis." *Id.*, at ——, 130 S.Ct., at 2755.

Virtually identical circumstances are present here. Plaintiff McKay, for example, points out that, when he communicates abroad about, or in the interests of, a client (*e.g.*, a client accused of terrorism), he must "make an assessment" whether his "client's interests would be compromised" should the Government "acquire the communications."

App. to Pet. for Cert. 375a. If so, he must either forgo the communication or travel abroad. *Id.*, at 371a–372a ("I have had to take measures to protect the confidentiality of information that I believe is particularly sensitive," including "travel that is both time-consuming and expensive").

Since travel is expensive, since forgoing communication can compromise the client's interests, since McKay's assessment itself takes time and effort, this case does not differ significantly from *Monsanto*. And that is so whether we consider the plaintiffs' present necessary expenditure of time and effort as a separate concrete, particularized, imminent harm, or consider it as additional evidence that the future harm (an interception) is likely to occur. See also *Friends of the Earth, Inc.*, 528 U.S., at 183–184, 120 S.Ct. 693 (holding that plaintiffs who curtailed their recreational activities on a river due to reasonable concerns about the effect of pollutant discharges into that river had standing); *Meese v. Keene*, 481 U.S. 465, 475, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987) (stating that "the need to take ... affirmative steps to avoid the risk of harm ... constitutes a cognizable injury").

#### 3

*25 The majority cannot find support in cases that use the words "certainly impending" to *deny* standing. While I do not claim to have read every standing case, I have examined quite a few, and not yet found any such case. The majority refers to *Whitmore v. Arkansas*, 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990). But in that case the Court denied standing to a prisoner who challenged the validity of a death sentence given to a *different* prisoner who refused to challenge his own sentence. The plaintiff feared that in the absence of an appeal, his fellow prisoner's death sentence would be missing from the State's death penalty database and thereby skew the database against him, making it less likely his challenges to his own death penalty would succeed. The Court found no standing. *Id.*, at 161, 110 S.Ct. 1717. But the fellow prisoner's lack of appeal would have harmed the plaintiff only if

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 26

--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452
(Cite as: 2013 WL 673253 (U.S.))

(1) the plaintiff separately obtained federal habeas relief and was then reconvicted and resentenced to death, (2) he sought review of his new sentence, and (3) during that review, his death sentence was affirmed only because it was compared to an artificially skewed database. *Id.,* at 156–157, 110 S.Ct. 1717. These events seemed not very likely to occur.

In *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006), taxpayers challenged the constitutionality of a tax break offered by state and local governments to a car manufacturer. We found no standing. But the plaintiffs would have suffered resulting injury only if that the tax break had depleted state and local treasuries and the legislature had responded by raising their taxes. *Id.,* at 344, 126 S.Ct. 1854.

In *Lujan,* the case that may come closest to supporting the majority, the Court also found no standing. But, as I pointed out, *supra,* at ——, *Lujan* is a case where the Court considered *when,* not *whether,* the threatened harm would occur. 504 U.S., at 564, n. 2, 112 S.Ct. 2130. The relevant injury there consisted of a visit by environmental group's members to a project site where they would find (unlawful) environmental depredation. *Id.,* at 564, 112 S.Ct. 2130. The Court pointed out that members had alleged that they would visit the project sites "soon." But it wrote that "soon" might refer to almost any time in the future. *Ibid.,* n. 2. By way of contrast, the ongoing threat of terrorism means that here the relevant interceptions will likely take place imminently, if not now.

The Court has, of course, denied standing in other cases. But they involve injuries *less* likely, not more likely, to occur than here. In a recent case, *Summers v. Earth Island Institute,* 555 U.S. 488, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009), for example, the plaintiffs challenged a regulation exempting certain timber sales from public comment and administrative appeal. The plaintiffs claimed that the regulations injured them by interfering with their esthetic enjoyment and recreational use of the forests. The Court found this harm too unlikely to

occur to support standing. *Id.,* at 496, 129 S.Ct. 1142. The Court noted that one plaintiff had not pointed to a specific affected forest that he would visit. The Court concluded that "[t]here may be a chance, but ... *hardly a likelihood,* " that the plaintiff's "wanderings will bring him to a parcel about to be affected by a project unlawfully subject to the regulations." *Id.,* at 495, 129 S.Ct. 1142 (emphasis added).

4

*26 In sum, as the Court concedes, see *ante,* at —— – ——, and n. 5, the word "certainly" in the phrase "certainly impending" does not refer to absolute certainty. As our case law demonstrates, what the Constitution requires is something more akin to "reasonable probability" or "high probability." The use of some such standard is all that is necessary here to ensure the actual concrete injury that the Constitution demands. The considerations set forth in Parts II and III, *supra,* make clear that the standard is readily met in this case.

3

While I express no view on the merits of the plaintiffs' constitutional claims, I do believe that at least some of the plaintiffs have standing to make those claims. I dissent, with respect, from the majority's contrary conclusion.

U.S.,2013.
Clapper v. Amnesty Intern. USA
--- S.Ct. ----, 2013 WL 673253 (U.S.), 13 Cal. Daily Op. Serv. 2081, 2013 Daily Journal D.A.R. 2452

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.