

ROPES & GRAY LLP
ONE METRO CENTER
700 12TH STREET, NW, SUITE 900
WASHINGTON, DC 20005-3948
WWW ROPESGRAY.COM

July 19, 2013

Douglas H. Hallward-Driemeier
T +1 202 508 4776
F +1 202 383 8354
douglas.hallward-driemeier@ropesgray.com

Mr. John Ley, Clerk
United States Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re: No. 12-14009, *Wollschlaeger v. Governor, State of Florida*

Dear Mr. Ley:

We submit this letter pursuant to Rule 28(j) in response to questioning at oral argument on July 18, 2013. The Court inquired whether the federal government might have access to patient medical records and, if so, whether concerns the federal government might compile a gun registry could constitute a compelling interest justifying the restrictions in the Firearm Owners' Privacy Act, Fla. Stat. 790.338, on physicians' noting firearm ownership in patient records for possible future reference.

The State never has argued the federal government has such access, and, in fact, the government has no such access. The *Health Insurance Portability and Accountability Act of 1996*, Pub. L. 104–191, 110 Stat. 1936 (1996), as amended by the *Health Information Technology for Economic and Clinical Health Act* ("HITECH"), protects individually identifiable health information from disclosure – including to federal agencies. *See, e.g.,* 45 C.F.R. §164.502 (2012) (limiting circumstances of disclosure); *id.* §164.512(a) (2011) (same). HITECH itself added additional safeguards for electronic health records. *See* 74 Fed. Reg. 56123, 56124-56126 (Oct. 30, 2009); *see also* July 17, 2013 Statement of Administrator Marilyn Tavenner, at 2, *available at* http://oversight.house.gov/wp-content/uploads/2013/07/Tavenner-CMS-Statement-PPACA-Data-Hub-7-17.pdf (explaining, with respect to ACA insurance exchanges, that available data does *not* include "personal health information," such as patient's medical history, but only basic information, *i.e.* birth date, name, and address).

With respect to firearms information, the *Patient Protection and Affordable Care Act* ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), actually *strengthens* existing privacy protections. §300gg-17(c)(3) ("None of the authorities provided to the Secretary under the [ACA] … shall be construed to authorize or may be used to maintain records of individual ownership or possession of a firearm[.]"); *Gun Violence Reduction Executive Actions*, Jan. 16, 2013, *available at* http://www.whitehouse.gov/sites/default/files/docs/wh_now_is_the_time_actions.pdf (clarifying that doctors may continue to ask questions regarding firearms).

Given this law, and since a compelling interest cannot be hypothetical, any concern that the federal government will use patient records to compile a gun registry is unsupported and does not constitute a compelling interest, even if the legislature had relied on that concern.

Please distribute a copy of this letter to the panel.

Respectfully submitted,

Douglas H. Hallward-Driemeier
Ropes & Gray LLP
One Metro Center
700 12th St NW Suite 900
Washington, DC 20005
douglas.hallward-driemeier@ropesgray.com
*Counsel for Appellees*

Enclosures

cc:


Allen C. Winsor
Pam Bondi
Jason Vail
Office of the Attorney General
PL-01, The Capital
Tallahassee, FL 32399

*Wollschlaeger v. Governor, State of Florida*

No. 12-14009

Exhibits to Rule 28(j) Letter

Exhibit 1 45 C.F.R. §164.502 (2012)

Exhibit 2 45 C.F.R. §164.512 (2011)

Exhibit 3 74 Fed. Reg. 56123 (Oct. 30, 2009)

Exhibit 4 July 17, 2013 Statement of Administrator Marilyn Tavenner, *available at* http://oversight.house.gov/wp-content/uploads/2013/07/Tavenner-CMS-Statement-PPACA-Data-Hub-7-17.pdf

Exhibit 5 42 U.S.C. §300gg-17

Exhibit 6 *Gun Violence Reduction Executive Actions*, Jan. 16, 2013, *available at* http://www.whitehouse.gov/sites/default/files/docs/wh_now_is_the_time_actions.pdf

# EXHIBIT 1

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

to develop or contribute to generalizable knowledge.

*Treatment* means the provision, coordination, or management of health care and related services by one or more health care providers, including the coordination or management of health care by a health care provider with a third party; consultation between health care providers relating to a patient; or the referral of a patient for health care from one health care provider to another.

[65 FR 82802, Dec. 28, 2000, as amended at 67 FR 53266, Aug. 14, 2002; 68 FR 8381, Feb. 20, 2003; 74 FR 42769, Aug. 24, 2009]

**§ 164.502 Uses and disclosures of protected health information: general rules.**

(a) *Standard.* A covered entity may not use or disclose protected health information, except as permitted or required by this subpart or by subpart C of part 160 of this subchapter.

(1) *Permitted uses and disclosures.* A covered entity is permitted to use or disclose protected health information as follows:

(i) To the individual;

(ii) For treatment, payment, or health care operations, as permitted by and in compliance with § 164.506;

(iii) Incident to a use or disclosure otherwise permitted or required by this subpart, provided that the covered entity has complied with the applicable requirements of § 164.502(b), § 164.514(d), and § 164.530(c) with respect to such otherwise permitted or required use or disclosure;

(iv) Pursuant to and in compliance with a valid authorization under § 164.508;

(v) Pursuant to an agreement under, or as otherwise permitted by, § 164.510; and

(vi) As permitted by and in compliance with this section, § 164.512, or § 164.514(e), (f), or (g).

(2) *Required disclosures.* A covered entity is required to disclose protected health information:

(i) To an individual, when requested under, and required by § 164.524 or § 164.528; and

(ii) When required by the Secretary under subpart C of part 160 of this subchapter to investigate or determine the covered entity's compliance with this subpart.

(b) *Standard: Minimum necessary*—(1) *Minimum necessary applies.* When using or disclosing protected health information or when requesting protected health information from another covered entity, a covered entity must make reasonable efforts to limit protected health information to the minimum necessary to accomplish the intended purpose of the use, disclosure, or request.

(2) *Minimum necessary does not apply.* This requirement does not apply to:

(i) Disclosures to or requests by a health care provider for treatment;

(ii) Uses or disclosures made to the individual, as permitted under paragraph (a)(1)(i) of this section or as required by paragraph (a)(2)(i) of this section;

(iii) Uses or disclosures made pursuant to an authorization under § 164.508;

(iv) Disclosures made to the Secretary in accordance with subpart C of part 160 of this subchapter;

(v) Uses or disclosures that are required by law, as described by § 164.512(a); and

(vi) Uses or disclosures that are required for compliance with applicable requirements of this subchapter.

(c) *Standard: Uses and disclosures of protected health information subject to an agreed upon restriction.* A covered entity that has agreed to a restriction pursuant to § 164.522(a)(1) may not use or disclose the protected health information covered by the restriction in violation of such restriction, except as otherwise provided in § 164.522(a).

(d) *Standard: Uses and disclosures of de-identified protected health information.*(1) *Uses and disclosures to create de-identified information.* A covered entity may use protected health information to create information that is not individually identifiable health information or disclose protected health information only to a business associate for such purpose, whether or not the de-identified information is to be used by the covered entity.

(2) *Uses and disclosures of de-identified information.* Health information that meets the standard and implementation specifications for de-identification under § 164.514(a) and (b) is considered

not to be individually identifiable health information, *i.e.*, de-identified. The requirements of this subpart do not apply to information that has been de-identified in accordance with the applicable requirements of § 164.514, provided that:

(i) Disclosure of a code or other means of record identification designed to enable coded or otherwise de-identified information to be re-identified constitutes disclosure of protected health information; and

(ii) If de-identified information is re-identified, a covered entity may use or disclose such re-identified information only as permitted or required by this subpart.

(e)(1) *Standard: Disclosures to business associates.* (i) A covered entity may disclose protected health information to a business associate and may allow a business associate to create or receive protected health information on its behalf, if the covered entity obtains satisfactory assurance that the business associate will appropriately safeguard the information.

(ii) This standard does not apply:

(A) With respect to disclosures by a covered entity to a health care provider concerning the treatment of the individual;

(B) With respect to disclosures by a group health plan or a health insurance issuer or HMO with respect to a group health plan to the plan sponsor, to the extent that the requirements of § 164.504(f) apply and are met; or

(C) With respect to uses or disclosures by a health plan that is a government program providing public benefits, if eligibility for, or enrollment in, the health plan is determined by an agency other than the agency administering the health plan, or if the protected health information used to determine enrollment or eligibility in the health plan is collected by an agency other than the agency administering the health plan, and such activity is authorized by law, with respect to the collection and sharing of individually identifiable health information for the performance of such functions by the health plan and the agency other than the agency administering the health plan.

(iii) A covered entity that violates the satisfactory assurances it provided as a business associate of another covered entity will be in noncompliance with the standards, implementation specifications, and requirements of this paragraph and § 164.504(e).

(2) *Implementation specification: documentation.* A covered entity must document the satisfactory assurances required by paragraph (e)(1) of this section through a written contract or other written agreement or arrangement with the business associate that meets the applicable requirements of § 164.504(e).

(f) *Standard: Deceased individuals.* A covered entity must comply with the requirements of this subpart with respect to the protected health information of a deceased individual.

(g)(1) *Standard: Personal representatives.* As specified in this paragraph, a covered entity must, except as provided in paragraphs (g)(3) and (g)(5) of this section, treat a personal representative as the individual for purposes of this subchapter.

(2) *Implementation specification: adults and emancipated minors.* If under applicable law a person has authority to act on behalf of an individual who is an adult or an emancipated minor in making decisions related to health care, a covered entity must treat such person as a personal representative under this subchapter, with respect to protected health information relevant to such personal representation.

(3)(i) *Implementation specification: unemancipated minors.* If under applicable law a parent, guardian, or other person acting *in loco parentis* has authority to act on behalf of an individual who is an unemancipated minor in making decisions related to health care, a covered entity must treat such person as a personal representative under this subchapter, with respect to protected health information relevant to such personal representation, except that such person may not be a personal representative of an unemancipated minor, and the minor has the authority to act as an individual, with respect to protected health information pertaining to a health care service, if:

(A) The minor consents to such health care service; no other consent to

such health care service is required by law, regardless of whether the consent of another person has also been obtained; and the minor has not requested that such person be treated as the personal representative;

(B) The minor may lawfully obtain such health care service without the consent of a parent, guardian, or other person acting *in loco parentis,* and the minor, a court, or another person authorized by law consents to such health care service; or

(C) A parent, guardian, or other person acting *in loco parentis* assents to an agreement of confidentiality between a covered health care provider and the minor with respect to such health care service.

(ii) Notwithstanding the provisions of paragraph (g)(3)(i) of this section:

(A) If, and to the extent, permitted or required by an applicable provision of State or other law, including applicable case law, a covered entity may disclose, or provide access in accordance with §164.524 to, protected health information about an unemancipated minor to a parent, guardian, or other person acting *in loco parentis*;

(B) If, and to the extent, prohibited by an applicable provision of State or other law, including applicable case law, a covered entity may not disclose, or provide access in accordance with §164.524 to, protected health information about an unemancipated minor to a parent, guardian, or other person acting *in loco parentis*; and

(C) Where the parent, guardian, or other person acting *in loco parentis,* is not the personal representative under paragraphs (g)(3)(i)(A), (B), or (C) of this section and where there is no applicable access provision under State or other law, including case law, a covered entity may provide or deny access under §164.524 to a parent, guardian, or other person acting *in loco parentis,* if such action is consistent with State or other applicable law, provided that such decision must be made by a licensed health care professional, in the exercise of professional judgment.

(4) *Implementation specification: Deceased individuals.* If under applicable law an executor, administrator, or other person has authority to act on behalf of a deceased individual or of the individual's estate, a covered entity must treat such person as a personal representative under this subchapter, with respect to protected health information relevant to such personal representation.

(5) *Implementation specification: Abuse, neglect, endangerment situations.* Notwithstanding a State law or any requirement of this paragraph to the contrary, a covered entity may elect not to treat a person as the personal representative of an individual if:

(i) The covered entity has a reasonable belief that:

(A) The individual has been or may be subjected to domestic violence, abuse, or neglect by such person; or

(B) Treating such person as the personal representative could endanger the individual; and

(ii) The covered entity, in the exercise of professional judgment, decides that it is not in the best interest of the individual to treat the person as the individual's personal representative.

(h) *Standard: Confidential communications.* A covered health care provider or health plan must comply with the applicable requirements of §164.522(b) in communicating protected health information.

(i) *Standard: Uses and disclosures consistent with notice.* A covered entity that is required by §164.520 to have a notice may not use or disclose protected health information in a manner inconsistent with such notice. A covered entity that is required by §164.520(b)(1)(iii) to include a specific statement in its notice if it intends to engage in an activity listed in §164.520(b)(1)(iii)(A)–(C), may not use or disclose protected health information for such activities, unless the required statement is included in the notice.

(j) *Standard: Disclosures by whistleblowers and workforce member crime victims*—(1) *Disclosures by whistleblowers.* A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce or a business associate discloses protected health information, provided that:

(i) The workforce member or business associate believes in good faith that the covered entity has engaged in conduct that is unlawful or otherwise violates professional or clinical standards,

or that the care, services, or conditions provided by the covered entity potentially endangers one or more patients, workers, or the public; and

(ii) The disclosure is to:

(A) A health oversight agency or public health authority authorized by law to investigate or otherwise oversee the relevant conduct or conditions of the covered entity or to an appropriate health care accreditation organization for the purpose of reporting the allegation of failure to meet professional standards or misconduct by the covered entity; or

(B) An attorney retained by or on behalf of the workforce member or business associate for the purpose of determining the legal options of the workforce member or business associate with regard to the conduct described in paragraph (j)(1)(i) of this section.

(2) *Disclosures by workforce members who are victims of a crime.* A covered entity is not considered to have violated the requirements of this subpart if a member of its workforce who is the victim of a criminal act discloses protected health information to a law enforcement official, provided that:

(i) The protected health information disclosed is about the suspected perpetrator of the criminal act; and

(ii) The protected health information disclosed is limited to the information listed in § 164.512(f)(2)(i).

[65 FR 82802, Dec. 28, 2000, as amended at 67 FR 53267, Aug. 14, 2002]

### § 164.504 Uses and disclosures: Organizational requirements.

(a) *Definitions.* As used in this section:

*Plan administration functions* means administration functions performed by the plan sponsor of a group health plan on behalf of the group health plan and excludes functions performed by the plan sponsor in connection with any other benefit or benefit plan of the plan sponsor.

*Summary health information* means information, that may be individually identifiable health information, and:

(1) That summarizes the claims history, claims expenses, or type of claims experienced by individuals for whom a plan sponsor has provided health benefits under a group health plan; and

(2) From which the information described at § 164.514(b)(2)(i) has been deleted, except that the geographic information described in § 164.514(b)(2)(i)(B) need only be aggregated to the level of a five digit zip code.

(b)–(d)

(e)(1) *Standard: Business associate contracts.* (i) The contract or other arrangement between the covered entity and the business associate required by § 164.502(e)(2) must meet the requirements of paragraph (e)(2) or (e)(3) of this section, as applicable.

(ii) A covered entity is not in compliance with the standards in § 164.502(e) and paragraph (e) of this section, if the covered entity knew of a pattern of activity or practice of the business associate that constituted a material breach or violation of the business associate's obligation under the contract or other arrangement, unless the covered entity took reasonable steps to cure the breach or end the violation, as applicable, and, if such steps were unsuccessful:

(A) Terminated the contract or arrangement, if feasible; or

(B) If termination is not feasible, reported the problem to the Secretary.

(2) *Implementation specifications: Business associate contracts.* A contract between the covered entity and a business associate must:

(i) Establish the permitted and required uses and disclosures of such information by the business associate. The contract may not authorize the business associate to use or further disclose the information in a manner that would violate the requirements of this subpart, if done by the covered entity, except that:

(A) The contract may permit the business associate to use and disclose protected health information for the proper management and administration of the business associate, as provided in paragraph (e)(4) of this section; and

(B) The contract may permit the business associate to provide data aggregation services relating to the health care operations of the covered entity.

(ii) Provide that the business associate will:

**EXHIBIT 2**



**§ 164.512 Uses and disclosures for which an authorization or opportunity to agree or object is not required.**

A covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508, or the opportunity for the individual to agree or object as described in § 164.510, in the situations covered by this section, subject to the applicable requirements of this section. When the covered entity is required by this section to inform the individual of, or when the individual may agree to, a use or disclosure permitted by this section, the covered entity's information and the individual's agreement may be given orally.

(a) *Standard: Uses and disclosures required by law.* (1) A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.

(2) A covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law.

(b) *Standard: uses and disclosures for public health activities*—(1) *Permitted disclosures.* A covered entity may disclose protected health information for the public health activities and purposes described in this paragraph to:

(i) A public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease, injury, vital events such as birth or death, and the conduct of public health surveillance, public health investigations, and public health interventions; or, at the direction of a public health authority, to an official of a foreign government agency that is acting in collaboration with a public health authority;

(ii) A public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect;

(iii) A person subject to the jurisdiction of the Food and Drug Administration (FDA) with respect to an FDA-regulated product or activity for which that person has responsibility, for the purpose of activities related to the quality, safety or effectiveness of such FDA-regulated product or activity. Such purposes include:

(A) To collect or report adverse events (or similar activities with respect to food or dietary supplements), product defects or problems (including problems with the use or labeling of a product), or biological product deviations;

(B) To track FDA-regulated products;

(C) To enable product recalls, repairs, or replacement, or lookback (including locating and notifying individuals who have received products that have been recalled, withdrawn, or are the subject of lookback); or

(D) To conduct post marketing surveillance;

(iv) A person who may have been exposed to a communicable disease or may otherwise be at risk of contracting or spreading a disease or condition, if the covered entity or public health authority is authorized by law to notify such person as necessary in the conduct of a public health intervention or investigation; or

(v) An employer, about an individual who is a member of the workforce of the employer, if:

(A) The covered entity is a covered health care provider who is a member of the workforce of such employer or who provides health care to the individual at the request of the employer:

(*1*) To conduct an evaluation relating to medical surveillance of the workplace; or

(*2*) To evaluate whether the individual has a work-related illness or injury;

(B) The protected health information that is disclosed consists of findings concerning a work-related illness or injury or a workplace-related medical surveillance;

(C) The employer needs such findings in order to comply with its obligations, under 29 CFR parts 1904 through 1928, 30 CFR parts 50 through 90, or under state law having a similar purpose, to record such illness or injury or to carry out responsibilities for workplace medical surveillance; and

(D) The covered health care provider provides written notice to the individual that protected health information relating to the medical surveillance of the workplace and work-related illnesses and injuries is disclosed to the employer:

(*1*) By giving a copy of the notice to the individual at the time the health care is provided; or

(*2*) If the health care is provided on the work site of the employer, by posting the notice in a prominent place at the location where the health care is provided.

(2) *Permitted uses.* If the covered entity also is a public health authority, the covered entity is permitted to use protected health information in all cases in which it is permitted to disclose such information for public health activities under paragraph (b)(1) of this section.

(c) *Standard: Disclosures about victims of abuse, neglect or domestic violence*—(1) *Permitted disclosures.* Except for reports of child abuse or neglect permitted by paragraph (b)(1)(ii) of this section, a covered entity may disclose protected health information about an individual whom the covered entity reasonably believes to be a victim of abuse, neglect, or domestic violence to a government authority, including a social service or protective services agency, authorized by law to receive reports of such abuse, neglect, or domestic violence:

(i) To the extent the disclosure is required by law and the disclosure complies with and is limited to the relevant requirements of such law;

(ii) If the individual agrees to the disclosure; or

(iii) To the extent the disclosure is expressly authorized by statute or regulation and:

(A) The covered entity, in the exercise of professional judgment, believes the disclosure is necessary to prevent serious harm to the individual or other potential victims; or

(B) If the individual is unable to agree because of incapacity, a law enforcement or other public official authorized to receive the report represents that the protected health information for which disclosure is sought is not intended to be used against the individual and that an immediate enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure.

(2) *Informing the individual.* A covered entity that makes a disclosure permitted by paragraph (c)(1) of this section must promptly inform the individual that such a report has been or will be made, except if:

(i) The covered entity, in the exercise of professional judgment, believes informing the individual would place the individual at risk of serious harm; or

(ii) The covered entity would be informing a personal representative, and the covered entity reasonably believes the personal representative is responsible for the abuse, neglect, or other injury, and that informing such person would not be in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

(d) *Standard: Uses and disclosures for health oversight activities*—(1) *Permitted disclosures.* A covered entity may disclose protected health information to a health oversight agency for oversight activities authorized by law, including audits; civil, administrative, or criminal investigations; inspections; licensure or disciplinary actions; civil, administrative, or criminal proceedings or actions; or other activities necessary for appropriate oversight of:

(i) The health care system;

(ii) Government benefit programs for which health information is relevant to beneficiary eligibility;

(iii) Entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards; or

(iv) Entities subject to civil rights laws for which health information is necessary for determining compliance.

(2) *Exception to health oversight activities.* For the purpose of the disclosures permitted by paragraph (d)(1) of this section, a health oversight activity does not include an investigation or other activity in which the individual is the subject of the investigation or activity and such investigation or

other activity does not arise out of and is not directly related to:

(i) The receipt of health care;

(ii) A claim for public benefits related to health; or

(iii) Qualification for, or receipt of, public benefits or services when a patient's health is integral to the claim for public benefits or services.

(3) *Joint activities or investigations.* Nothwithstanding paragraph (d)(2) of this section, if a health oversight activity or investigation is conducted in conjunction with an oversight activity or investigation relating to a claim for public benefits not related to health, the joint activity or investigation is considered a health oversight activity for purposes of paragraph (d) of this section.

(4) *Permitted uses.* If a covered entity also is a health oversight agency, the covered entity may use protected health information for health oversight activities as permitted by paragraph (d) of this section.

(e) *Standard: Disclosures for judicial and administrative proceedings*—(1) *Permitted disclosures.* A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:

(i) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

(ii) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:

(A) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

(B) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

(iii) For the purposes of paragraph (e)(1)(ii)(A) of this section, a covered entity receives satisfactory assurances from a party seeking protecting health information if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

(A) The party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);

(B) The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court or administrative tribunal; and

(C) The time for the individual to raise objections to the court or administrative tribunal has elapsed, and:

(*1*) No objections were filed; or

(*2*) All objections filed by the individual have been resolved by the court or the administrative tribunal and the disclosures being sought are consistent with such resolution.

(iv) For the purposes of paragraph (e)(1)(ii)(B) of this section, a covered entity receives satisfactory assurances from a party seeking protected health information, if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

(A) The parties to the dispute giving rise to the request for information have agreed to a qualified protective order and have presented it to the court or administrative tribunal with jurisdiction over the dispute; or

(B) The party seeking the protected health information has requested a qualified protective order from such court or administrative tribunal.

(v) For purposes of paragraph (e)(1) of this section, a qualified protective order means, with respect to protected health information requested under paragraph (e)(1)(ii) of this section, an order of a court or of an administrative tribunal or a stipulation by the parties to the litigation or administrative proceeding that:

(A) Prohibits the parties from using or disclosing the protected health information for any purpose other than

the litigation or proceeding for which such information was requested; and

(B) Requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

(vi) Nothwithstanding paragraph (e)(1)(ii) of this section, a covered entity may disclose protected health information in response to lawful process described in paragraph (e)(1)(ii) of this section without receiving satisfactory assurance under paragraph (e)(1)(ii)(A) or (B) of this section, if the covered entity makes reasonable efforts to provide notice to the individual sufficient to meet the requirements of paragraph (e)(1)(iii) of this section or to seek a qualified protective order sufficient to meet the requirements of paragraph (e)(1)(iv) of this section.

(2) *Other uses and disclosures under this section.* The provisions of this paragraph do not supersede other provisions of this section that otherwise permit or restrict uses or disclosures of protected health information.

(f) *Standard: Disclosures for law enforcement purposes.* A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through (f)(6) of this section are met, as applicable.

(1) *Permitted disclosures: Pursuant to process and as otherwise required by law.* A covered entity may disclose protected health information:

(i) As required by law including laws that require the reporting of certain types of wounds or other physical injuries, except for laws subject to paragraph (b)(1)(ii) or (c)(1)(i) of this section; or

(ii) In compliance with and as limited by the relevant requirements of:

(A) A court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer;

(B) A grand jury subpoena; or

(C) An administrative request, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:

(*1*) The information sought is relevant and material to a legitimate law enforcement inquiry;

(*2*) The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and

(*3*) De-identified information could not reasonably be used.

(2) *Permitted disclosures: Limited information for identification and location purposes.* Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information for the purpose of identifying or locating a suspect, fugitive, material witness, or missing person, provided that:

(i) The covered entity may disclose only the following information:

(A) Name and address;

(B) Date and place of birth;

(C) Social security number;

(D) ABO blood type and rh factor;

(E) Type of injury;

(F) Date and time of treatment;

(G) Date and time of death, if applicable; and

(H) A description of distinguishing physical characteristics, including height, weight, gender, race, hair and eye color, presence or absence of facial hair (beard or moustache), scars, and tattoos.

(ii) Except as permitted by paragraph (f)(2)(i) of this section, the covered entity may not disclose for the purposes of identification or location under paragraph (f)(2) of this section any protected health information related to the individual's DNA or DNA analysis, dental records, or typing, samples or analysis of body fluids or tissue.

(3) *Permitted disclosure: Victims of a crime.* Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information about an individual who is or is suspected to be a victim of a crime, other than disclosures that are subject to paragraph (b) or (c) of this section, if:

(i) The individual agrees to the disclosure; or

(ii) The covered entity is unable to obtain the individual's agreement because of incapacity or other emergency circumstance, provided that:

(A) The law enforcement official represents that such information is needed to determine whether a violation of law by a person other than the victim has occurred, and such information is not intended to be used against the victim;

(B) The law enforcement official represents that immediate law enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure; and

(C) The disclosure is in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

(4) *Permitted disclosure: Decedents.* A covered entity may disclose protected health information about an individual who has died to a law enforcement official for the purpose of alerting law enforcement of the death of the individual if the covered entity has a suspicion that such death may have resulted from criminal conduct.

(5) *Permitted disclosure: Crime on premises.* A covered entity may disclose to a law enforcement official protected health information that the covered entity believes in good faith constitutes evidence of criminal conduct that occurred on the premises of the covered entity.

(6) *Permitted disclosure: Reporting crime in emergencies.* (i) A covered health care provider providing emergency health care in response to a medical emergency, other than such emergency on the premises of the covered health care provider, may disclose protected health information to a law enforcement official if such disclosure appears necessary to alert law enforcement to:

(A) The commission and nature of a crime;

(B) The location of such crime or of the victim(s) of such crime; and

(C) The identity, description, and location of the perpetrator of such crime.

(ii) If a covered health care provider believes that the medical emergency described in paragraph (f)(6)(i) of this section is the result of abuse, neglect, or domestic violence of the individual in need of emergency health care, paragraph (f)(6)(i) of this section does not apply and any disclosure to a law enforcement official for law enforcement purposes is subject to paragraph (c) of this section.

(g) *Standard: Uses and disclosures about decedents*—(1) *Coroners and medical examiners.* A covered entity may disclose protected health information to a coroner or medical examiner for the purpose of identifying a deceased person, determining a cause of death, or other duties as authorized by law. A covered entity that also performs the duties of a coroner or medical examiner may use protected health information for the purposes described in this paragraph.

(2) *Funeral directors.* A covered entity may disclose protected health information to funeral directors, consistent with applicable law, as necessary to carry out their duties with respect to the decedent. If necessary for funeral directors to carry out their duties, the covered entity may disclose the protected health information prior to, and in reasonable anticipation of, the individual's death.

(h) *Standard: Uses and disclosures for cadaveric organ, eye or tissue donation purposes.* A covered entity may use or disclose protected health information to organ procurement organizations or other entities engaged in the procurement, banking, or transplantation of cadaveric organs, eyes, or tissue for the purpose of facilitating organ, eye or tissue donation and transplantation.

(i) *Standard: Uses and disclosures for research purposes*—(1) *Permitted uses and disclosures.* A covered entity may use or disclose protected health information for research, regardless of the source of funding of the research, provided that:

(i) *Board approval of a waiver of authorization.* The covered entity obtains documentation that an alteration to or waiver, in whole or in part, of the individual authorization required by §164.508 for use or disclosure of protected health information has been approved by either:

(A) An Institutional Review Board (IRB), established in accordance with 7 CFR lc.107, 10 CFR 745.107, 14 CFR

1230.107, 15 CFR 27.107, 16 CFR 1028.107, 21 CFR 56.107, 22 CFR 225.107, 24 CFR 60.107, 28 CFR 46.107, 32 CFR 219.107, 34 CFR 97.107, 38 CFR 16.107, 40 CFR 26.107, 45 CFR 46.107, 45 CFR 690.107, or 49 CFR 11.107; or

(B) A privacy board that:

(*1*) Has members with varying backgrounds and appropriate professional competency as necessary to review the effect of the research protocol on the individual's privacy rights and related interests;

(*2*) Includes at least one member who is not affiliated with the covered entity, not affiliated with any entity conducting or sponsoring the research, and not related to any person who is affiliated with any of such entities; and

(*3*) Does not have any member participating in a review of any project in which the member has a conflict of interest.

(ii) *Reviews preparatory to research.* The covered entity obtains from the researcher representations that:

(A) Use or disclosure is sought solely to review protected health information as necessary to prepare a research protocol or for similar purposes preparatory to research;

(B) No protected health information is to be removed from the covered entity by the researcher in the course of the review; and

(C) The protected health information for which use or access is sought is necessary for the research purposes.

(iii) *Research on decedent's information.* The covered entity obtains from the researcher:

(A) Representation that the use or disclosure sought is solely for research on the protected health information of decedents;

(B) Documentation, at the request of the covered entity, of the death of such individuals; and

(C) Representation that the protected health information for which use or disclosure is sought is necessary for the research purposes.

(2) *Documentation of waiver approval.* For a use or disclosure to be permitted based on documentation of approval of an alteration or waiver, under paragraph (i)(1)(i) of this section, the documentation must include all of the following:

(i) *Identification and date of action.* A statement identifying the IRB or privacy board and the date on which the alteration or waiver of authorization was approved;

(ii) *Waiver criteria.* A statement that the IRB or privacy board has determined that the alteration or waiver, in whole or in part, of authorization satisfies the following criteria:

(A) The use or disclosure of protected health information involves no more than a minimal risk to the privacy of individuals, based on, at least, the presence of the following elements;

(*1*) An adequate plan to protect the identifiers from improper use and disclosure;

(*2*) An adequate plan to destroy the identifiers at the earliest opportunity consistent with conduct of the research, unless there is a health or research justification for retaining the identifiers or such retention is otherwise required by law; and

(*3*) Adequate written assurances that the protected health information will not be reused or disclosed to any other person or entity, except as required by law, for authorized oversight of the research study, or for other research for which the use or disclosure of protected health information would be permitted by this subpart;

(B) The research could not practicably be conducted without the waiver or alteration; and

(C) The research could not practicably be conducted without access to and use of the protected health information.

(iii) *Protected health information needed.* A brief description of the protected health information for which use or access has been determined to be necessary by the IRB or privacy board has determined, pursuant to paragraph (i)(2)(ii)(C) of this section;

(iv) *Review and approval procedures.* A statement that the alteration or waiver of authorization has been reviewed and approved under either normal or expedited review procedures, as follows:

(A) An IRB must follow the requirements of the Common Rule, including the normal review procedures (7 CFR 1c.108(b), 10 CFR 745.108(b), 14 CFR 1230.108(b), 15 CFR 27.108(b), 16 CFR

1028.108(b), 21 CFR 56.108(b), 22 CFR 225.108(b), 24 CFR 60.108(b), 28 CFR 46.108(b), 32 CFR 219.108(b), 34 CFR 97.108(b), 38 CFR 16.108(b), 40 CFR 26.108(b), 45 CFR 46.108(b), 45 CFR 690.108(b), or 49 CFR 11.108(b)) or the expedited review procedures (7 CFR 1c.110, 10 CFR 745.110, 14 CFR 1230.110, 15 CFR 27.110, 16 CFR 1028.110, 21 CFR 56.110, 22 CFR 225.110, 24 CFR 60.110, 28 CFR 46.110, 32 CFR 219.110, 34 CFR 97.110, 38 CFR 16.110, 40 CFR 26.110, 45 CFR 46.110, 45 CFR 690.110, or 49 CFR 11.110);

(B) A privacy board must review the proposed research at convened meetings at which a majority of the privacy board members are present, including at least one member who satisfies the criterion stated in paragraph (i)(1)(i)(B)(2) of this section, and the alteration or waiver of authorization must be approved by the majority of the privacy board members present at the meeting, unless the privacy board elects to use an expedited review procedure in accordance with paragraph (i)(2)(iv)(C) of this section;

(C) A privacy board may use an expedited review procedure if the research involves no more than minimal risk to the privacy of the individuals who are the subject of the protected health information for which use or disclosure is being sought. If the privacy board elects to use an expedited review procedure, the review and approval of the alteration or waiver of authorization may be carried out by the chair of the privacy board, or by one or more members of the privacy board as designated by the chair; and

(v) *Required signature.* The documentation of the alteration or waiver of authorization must be signed by the chair or other member, as designated by the chair, of the IRB or the privacy board, as applicable.

(j) *Standard: Uses and disclosures to avert a serious threat to health or safety*—(1) *Permitted disclosures.* A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure:

(i)(A) Is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and

(B) Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat; or

(ii) Is necessary for law enforcement authorities to identify or apprehend an individual:

(A) Because of a statement by an individual admitting participation in a violent crime that the covered entity reasonably believes may have caused serious physical harm to the victim; or

(B) Where it appears from all the circumstances that the individual has escaped from a correctional institution or from lawful custody, as those terms are defined in § 164.501.

(2) *Use or disclosure not permitted.* A use or disclosure pursuant to paragraph (j)(1)(ii)(A) of this section may not be made if the information described in paragraph (j)(1)(ii)(A) of this section is learned by the covered entity:

(i) In the course of treatment to affect the propensity to commit the criminal conduct that is the basis for the disclosure under paragraph (j)(1)(ii)(A) of this section, or counseling or therapy; or

(ii) Through a request by the individual to initiate or to be referred for the treatment, counseling, or therapy described in paragraph (j)(2)(i) of this section.

(3) *Limit on information that may be disclosed.* A disclosure made pursuant to paragraph (j)(1)(ii)(A) of this section shall contain only the statement described in paragraph (j)(1)(ii)(A) of this section and the protected health information described in paragraph (f)(2)(i) of this section.

(4) *Presumption of good faith belief.* A covered entity that uses or discloses protected health information pursuant to paragraph (j)(1) of this section is presumed to have acted in good faith with regard to a belief described in paragraph (j)(1)(i) or (ii) of this section, if the belief is based upon the covered entity's actual knowledge or in reliance on a credible representation by a person with apparent knowledge or authority.

(k) *Standard: Uses and disclosures for specialized government functions*—(1)

*Military and veterans activities*—(i) *Armed Forces personnel.* A covered entity may use and disclose the protected health information of individuals who are Armed Forces personnel for activities deemed necessary by appropriate military command authorities to assure the proper execution of the military mission, if the appropriate military authority has published by notice in the FEDERAL REGISTER the following information:

(A) Appropriate military command authorities; and

(B) The purposes for which the protected health information may be used or disclosed.

(ii) *Separation or discharge from military service.* A covered entity that is a component of the Departments of Defense or Transportation may disclose to the Department of Veterans Affairs (DVA) the protected health information of an individual who is a member of the Armed Forces upon the separation or discharge of the individual from military service for the purpose of a determination by DVA of the individual's eligibility for or entitlement to benefits under laws administered by the Secretary of Veterans Affairs.

(iii) *Veterans.* A covered entity that is a component of the Department of Veterans Affairs may use and disclose protected health information to components of the Department that determine eligibility for or entitlement to, or that provide, benefits under the laws administered by the Secretary of Veterans Affairs.

(iv) *Foreign military personnel.* A covered entity may use and disclose the protected health information of individuals who are foreign military personnel to their appropriate foreign military authority for the same purposes for which uses and disclosures are permitted for Armed Forces personnel under the notice published in the FEDERAL REGISTER pursuant to paragraph (k)(1)(i) of this section.

(2) *National security and intelligence activities.* A covered entity may disclose protected health information to authorized federal officials for the conduct of lawful intelligence, counter-intelligence, and other national security activities authorized by the National Security Act (50 U.S.C. 401, *et seq.*) and implementing authority (*e.g.*, Executive Order 12333).

(3) *Protective services for the President and others.* A covered entity may disclose protected health information to authorized federal officials for the provision of protective services to the President or other persons authorized by 18 U.S.C. 3056, or to foreign heads of state or other persons authorized by 22 U.S.C. 2709(a)(3), or to for the conduct of investigations authorized by 18 U.S.C. 871 and 879.

(4) *Medical suitability determinations.* A covered entity that is a component of the Department of State may use protected health information to make medical suitability determinations and may disclose whether or not the individual was determined to be medically suitable to the officials in the Department of State who need access to such information for the following purposes:

(i) For the purpose of a required security clearance conducted pursuant to Executive Orders 10450 and 12698;

(ii) As necessary to determine worldwide availability or availability for mandatory service abroad under sections 101(a)(4) and 504 of the Foreign Service Act; or

(iii) For a family to accompany a Foreign Service member abroad, consistent with section 101(b)(5) and 904 of the Foreign Service Act.

(5) *Correctional institutions and other law enforcement custodial situations.* (i) *Permitted disclosures.* A covered entity may disclose to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual protected health information about such inmate or individual, if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

(A) The provision of health care to such individuals;

(B) The health and safety of such individual or other inmates;

(C) The health and safety of the officers or employees of or others at the correctional institution;

(D) The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;

(E) Law enforcement on the premises of the correctional institution; and

(F) The administration and maintenance of the safety, security, and good order of the correctional institution.

(ii) *Permitted uses.* A covered entity that is a correctional institution may use protected health information of individuals who are inmates for any purpose for which such protected health information may be disclosed.

(iii) *No application after release.* For the purposes of this provision, an individual is no longer an inmate when released on parole, probation, supervised release, or otherwise is no longer in lawful custody.

(6) *Covered entities that are government programs providing public benefits.* (i) A health plan that is a government program providing public benefits may disclose protected health information relating to eligibility for or enrollment in the health plan to another agency administering a government program providing public benefits if the sharing of eligibility or enrollment information among such government agencies or the maintenance of such information in a single or combined data system accessible to all such government agencies is required or expressly authorized by statute or regulation.

(ii) A covered entity that is a government agency administering a government program providing public benefits may disclose protected health information relating to the program to another covered entity that is a government agency administering a government program providing public benefits if the programs serve the same or similar populations and the disclosure of protected health information is necessary to coordinate the covered functions of such programs or to improve administration and management relating to the covered functions of such programs.

(l) *Standard: Disclosures for workers' compensation.* A covered entity may disclose protected health information as authorized by and to the extent necessary to comply with laws relating to workers' compensation or other similar programs, established by law, that provide benefits for work-related injuries or illness without regard to fault.

[65 FR 82802, Dec. 28, 2000, as amended at 67 FR 53270, Aug. 14, 2002]

### § 164.514 Other requirements relating to uses and disclosures of protected health information.

(a) *Standard: de-identification of protected health information.* Health information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify an individual is not individually identifiable health information.

(b) *Implementation specifications: requirements for de-identification of protected health information.* A covered entity may determine that health information is not individually identifiable health information only if:

(1) A person with appropriate knowledge of and experience with generally accepted statistical and scientific principles and methods for rendering information not individually identifiable:

(i) Applying such principles and methods, determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information; and

(ii) Documents the methods and results of the analysis that justify such determination; or

(2)(i) The following identifiers of the individual or of relatives, employers, or household members of the individual, are removed:

(A) Names;

(B) All geographic subdivisions smaller than a State, including street address, city, county, precinct, zip code, and their equivalent geocodes, except for the initial three digits of a zip code if, according to the current publicly available data from the Bureau of the Census:

(*1*) The geographic unit formed by combining all zip codes with the same three initial digits contains more than 20,000 people; and

(*2*) The initial three digits of a zip code for all such geographic units containing 20,000 or fewer people is changed to 000.

# EXHIBIT 3

sufficient time for timely receipt of mailed comments, as delivery may be subject to delay due to security procedures.

• *Hand Delivery or Courier:* Submit one original and two copies if delivering written comments by hand or by courier. Because access to the interior of the Hubert H. Humphrey Building is not readily available to persons without federal government identification, commenters are encouraged to leave their comments in the mail drop slots located in the main lobby of the building.

*B. Inspection of Public Comments*

All comments received before the close of the comment period will be available for public inspection, including any personally identifiable or confidential business information contained within each comment. We will post all comments received before the close of the comment period at *http://www.regulations.gov*.

**II. Background**

This interim final rule amends the sections within 45 CFR part 160 that relate to the authority of the Secretary of the HHS (the Secretary) to impose civil money penalties on entities that violate the HIPAA rules adopted under subtitle F of title II of HIPAA. The interim final rule amends subpart D of part 160 to conform its language to the revisions that became effective on February 18, 2009, under section 1176 of the Social Security Act (the Act), 42 U.S.C. 1320d–5, which was revised pursuant to section 13410(d) of the HITECH Act, Public Law 111–5, 123 Stat. 115, and correspondingly amends the ''Statutory basis and purpose'' section in subpart A. HHS issues these amendments as an interim final rule with request for comments to immediately provide regulated entities with additional notice as to how the Secretary's civil money penalty authority has been strengthened by the HITECH Act and to explain HHS' implementation of such authority with respect to violations occurring on or after February 18, 2009. HHS also pursues this expedited rulemaking to avoid any public misunderstanding or undue delay with respect to implementing Congress' intent to strengthen enforcement of the HIPAA rules.

We set out below the statutory and regulatory background for this interim final rule and follow with a description of our approach to this rulemaking. We then discuss each section of the interim final rule, request comments from the public, and conclude with our analyses of impact and other issues considered under applicable law.

*A. Statutory Background*

HIPAA Prior to the HITECH ACT

Subtitle F of title II of HIPAA, entitled ''Administrative Simplification,'' was enacted in 1996, for the purpose of improving the Medicare program under title XVIII of the Act, the Medicaid program under title XIX of the Act, and the efficiency and effectiveness of the health care system by encouraging the development of a health information system through the establishment of standards and requirements for the electronic transmission of certain health information. 42 U.S.C. 1320d note. To this end, subtitle F directs the Secretary to adopt national standards (HIPAA standards) for certain information-related activities and to protect the privacy and security of such information.

Under section 1172(a) of the Act, 42 U.S.C. 1320d–1(a), the HIPAA provisions apply to the following persons:

(1) A health plan.

(2) A health care clearinghouse.

(3) A health care provider who transmits any health information in electronic form in connection with a transaction referred to in section 1173(a)(1).

Under sections 1176 and 1177 of the Act, 42 U.S.C. 1320d–5 and 6, these persons or organizations, collectively referred to as ''covered entities,'' may be subject to civil money penalties and criminal penalties for violations of the HIPAA rules. HHS enforces the civil money penalties under section 1176 of the Act, and the U.S. Department of Justice enforces the criminal penalties under section 1177 of the Act.

Prior to the HITECH Act, section 1176(a) of the Act, 42 U.S.C. 1320d–5(a), authorized the Secretary to impose a civil money penalty, as follows:

(1) IN GENERAL. Except as provided in subsection (b), the Secretary shall impose on any person who violates a provision of this part [42 U.S.C. 1320d *et seq.*] a penalty of not more than $100 for each such violation, except that the total amount imposed on the person for all violations of an identical requirement or prohibition during a calendar year may not exceed $25,000.

(2) PROCEDURES. The provisions of section 1128A [42 U.S.C. 1320a–7a] (other than subsections (a) and (b) and the second sentence of subsection (f)) shall apply to the imposition of a civil money penalty under this subsection in the same manner as such provisions apply to the imposition of a penalty under such section 1128A.

Prior to the HITECH Act, section 1176(b) of the Act, 42 U.S.C. 1320d–5(b), set out limitations on the Secretary's above referenced authority to impose civil money penalties. Such limitations included prohibitions on imposing civil money penalties for: (1) An act that ''constitutes an offense punishable under section 1177'' of the Act (the criminal penalty provisions), (2) violations ''if it is established to the satisfaction of the Secretary that the person liable for the penalty did not know, and by exercising reasonable diligence would not have known, that such person violated the provision,'' and (3) violations if the failure to comply was due ''to reasonable cause and not to willful neglect'' and was corrected during a 30-day time period or pursuant to an extension determined to be appropriate by the Secretary based on the nature and circumstances of the covered entity's failure to comply.

Section 13410(d) of the HITECH Act

The HITECH Act was incorporated into ARRA to promote the adoption and meaningful use of health information technology. Subtitle D of the HITECH Act, sections 13400–13424, addresses the privacy and security concerns associated with the electronic transmission of health information. It does so, in part, through several provisions that strengthen the civil and criminal enforcement of the HIPAA rules. Many of these enforcement provisions became effective as of February 18, 2009 and are the impetus of this rulemaking. Other enforcement provisions have yet to become effective under the HITECH Act and are therefore subject to future rulemaking.

Section 13410(d) of the HITECH Act became effective February 18, 2009, revising section 1176 of the Act, 42 U.S.C. 1320d–5, to strengthen enforcement of the HIPAA rules in several ways. As modified, section 1176(a) establishes categories of violations that reflect increasing levels of culpability, requires that a penalty determination be based on the nature and extent of the violation and the nature and extent of the harm resulting from the violation, and establishes tiers of increasing penalty amounts that establish, by reference, the range of the Secretary's authority to impose civil money penalties. The revised text of section 1176(a) that became effective February 18, 2009, pursuant to section 13410(d) of the HITECH Act is as follows:

GENERAL PENALTY.

(1) IN GENERAL. Except as provided in subsection (b), the Secretary shall impose on any person who violates a provision of this part—

(A) in the case of a violation of such provision in which it is established that the person did not know (and by exercising reasonable diligence would not have known) that such person violated such provision, a penalty for each such violation of an amount that is at least the amount described in paragraph (3)(A) but not to exceed the amount described in paragraph (3)(D);

(B) in the case of a violation of such provision in which it is established that the violation was due to reasonable cause and not to willful neglect, a penalty for each such violation of an amount that is at least the amount described in paragraph (3)(B) but not to exceed the amount described in paragraph (3)(D); and

(C) in the case of a violation of such provision in which it is established that the violation was due to willful neglect—

(i) if the violation is corrected as described in subsection (b)(3)(A),[1] a penalty in an amount that is at least the amount described in paragraph (3)(C) but not to exceed the amount described in paragraph (3)(D); and

(ii) if the violation is not corrected as described in such subsection, a penalty in an amount that is at least the amount described in paragraph (3)(D).

In determining the amount of a penalty under this section for a violation, the Secretary shall base such determination on the nature and extent of the violation and the nature and extent of the harm resulting from such violation.

(2) PROCEDURES. The provisions of section 1128A (other than subsections (a) and (b) and the second sentence of subsection (f)) shall apply to the imposition of a civil money penalty under this subsection in the same manner as such provisions apply to the imposition of a penalty under such section 1128A.

(3) Tiers of penalties described.—For purposes of paragraph (1), with respect to a violation by a person of a provision of this part—

(A) the amount described in this subparagraph is $100 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $25,000;

(B) the amount described in this subparagraph is $1,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $100,000;

(C) the amount described in this subparagraph is $10,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $250,000; and

(D) the amount described in this subparagraph is $50,000 for each such violation, except that the total amount imposed on the person for all such violations of an identical requirement or prohibition during a calendar year may not exceed $1,500,000.

Section 13410(d) of the HITECH Act also revised section 1176(b) of the Act by: (1) Striking the affirmative defense for violations in which the covered entity did not know, or by reasonable diligence would not have known, of the violation (such violations are now punishable under the first tier of penalties); and (2) revising the subsection that provides an affirmative defense for a 30-day time period of correction to only require that the covered entity demonstrate the violation was not due to willful neglect (the statute previously also required a showing that the violation was due to reasonable cause). The revised statutory text of section 1176(b) that became effective February 18, 2009,[2] pursuant to section 13410(d) of the HITECH Act is as follows:

LIMITATIONS.

(1) OFFENSES OTHERWISE PUNISHABLE. No penalty may be imposed under subsection (a) and no damages obtained under subsection (d) with respect to an act if the act constitutes an offense punishable under section 1177.

(2) FAILURES DUE TO REASONABLE CAUSE.

(A) IN GENERAL. Except as provided in subparagraph (B) or subsection (a)(1)(C), no penalty may be imposed under subsection (a) and no damages obtained under subsection (d) if the failure to comply is corrected during the 30-day period beginning on the first date the person liable for the penalty knew, or by exercising reasonable diligence would have known, that the failure to comply occurred.

(B) EXTENSION OF PERIOD.—

(i) NO PENALTY.—With respect to the imposition of a penalty by the Secretary under subsection (a), the period referred to in subparagraph (A) may be extended as determined appropriate by the Secretary based on the nature and extent of the failure to comply.

(ii) ASSISTANCE.—If the Secretary determines that a person failed to comply because the person was unable to comply, the Secretary may provide technical assistance to the person during the period described in subparagraph (A). Such assistance shall be provided in any manner determined appropriate by the Secretary.

(3) REDUCTION.—In the case of a failure to comply which is due to reasonable cause and not to willful neglect, any penalty under subsection (a) and any damages under subsection (d) that is not entirely waived under paragraph (3)[3] may be waived to the extent that the payment of such penalty would be excessive relative to the compliance failure involved.

*B. Regulatory Background*

Section 1173 of the Act, 42 U.S.C. 1320d–2, and section 264 of HIPAA, require the Secretary to adopt a number of national standards to facilitate the exchange of certain health information and to protect the privacy and security of such information. The Secretary has adopted a number of national standards to that end, which include the following: Standards for Electronic Transactions and Code Sets (Transactions and Code Sets Rules); Standards for Privacy of Individually Identifiable Health Information (HIPAA Privacy Rule); Standard Unique Employer Identifier (EIN Rule); Security Standards (HIPAA Security Rule); and Standard Unique Health Identifier for Health Care Providers (NPI Rule). *See* 70 FR 20224, 20225–26 (April 18, 2005) for a more detailed description of the history of these HIPAA rules. Covered entities are required to comply with these HIPAA standards.

In addition, the Secretary promulgated rules that relate to compliance with, and enforcement of, the HIPAA rules, which are codified at 45 CFR part 160, subparts C, D, and E and collectively referred to as the Enforcement Rule. The Secretary first issued an interim final rule promulgating the procedural requirements for imposition of civil money penalties on violations of the privacy standards on April 17, 2003, Civil Money Penalties: Procedures for Investigations, Imposition of Penalties (68 FR 18896). The Secretary subsequently proposed a rule on April 18, 2005, HIPAA Administrative Simplification: Enforcement; Proposed Rule (70 FR 20224), proposing the amendment of 45 CFR part 160, subparts A (General Provisions), C (Compliance and Enforcement), and E (Procedures for Hearing), proposing a new subpart D (Imposition of Civil Money Penalties) that addressed the substantive issues related to the imposition of civil money penalties, and proposing that the above provisions be applied to all of the HIPAA rules, rather

[1] We note that, as amended, section 1176 no longer includes a subsection (b)(3)(A). We interpret this text as referencing the 30-day period in section 1176(b)(2)(A), which was designated as section 1176(b)(3)(A) prior to the HITECH Act's amendment. We request public comment on this interpretation, to the extent there is disagreement.

[2] Note that section 13410(a) of the HITECH Act further amends section 1176(b) of the Act with respect to penalties imposed on or after February 18, 2011. These changes are not reflected in the statutory text, as they have yet to become effective.

[3] We note that this reference to paragraph (3) creates a circular reference which appears to be an error. Section 13410(d) of the HITECH Act redesignated the prior paragraph (3) to paragraph (2), but did not include a conforming revision to this reference. Accordingly, we interpret this reference as being to paragraph (2) (i.e., the affirmative defense for violations that are not due to willful neglect and are timely corrected) and request public comment to the extent there is disagreement.

than only the privacy standards. The Secretary then adopted a final rule, HIPAA Administrative Simplification: Enforcement; Final Rule (71 FR 8390, February 16, 2006). The preambles of these rulemakings provide additional information that may be helpful to readers seeking a general understanding of HIPAA's compliance and enforcement scheme. Where, if at all, language in these prior preambles is contrary to language in this preamble or regulation text, the language herein applies.

Subpart D of the Enforcement Rule pertains to the imposition of civil money penalties under section 1176 of the Act and includes a number of provisions that apply to violations occurring before section 13410(d) of the HITECH Act's effective date of February 18, 2009, but that conflict with the statutory language as it has been revised with respect to violations occurring on or after February 18, 2009. Thus, the primary objectives of this interim final rule are to conform the Enforcement Rule provisions found in subpart D to the amended language in section 1176 of the Act, to provide covered entities with additional notice of the Secretary's revised statutory authority with respect to the imposition of civil money penalties, and to avoid any public misunderstanding or undue delay with respect to Congress' intent to strengthen enforcement of the HIPAA rules.

## III. Approach to the Interim Final Rule

As stated previously, this interim final rule amends several provisions of the Enforcement Rule, subpart D, to conform its language regarding HHS' imposition of civil money penalties to section 1176 of the Act, which section 13410(d) of the HITECH Act revised as of February 18, 2009. Subtitle D of the HITECH Act, which specifically pertains to privacy, contains several other provisions crafted to strengthen enforcement, some but not all of which pertain to HHS' implementation of the Enforcement Rule. We recognize that additional amendments will become necessary as such provisions become effective, but we do not adopt amendments in this interim final rule pursuant to those other provisions of subtitle D which have not yet become statutorily effective and have not, as a result, yet operated to revise HHS' enforcement authority under section 1176 of the Act.

HHS has concluded that it has good cause, under 5 U.S.C. 553(b)(B), to waive the notice-and-comment requirements of the Administrative Procedure Act (APA) and to proceed with this interim final rule. We first note that section 13410(d) of the HITECH Act's amendment of section 1176 of the Act, 42, U.S.C. 1320d–5, became effective the day after the date of enactment and that many covered entities may be unaware they are currently subject to significantly greater penalties for violations of the HIPAA rules. In addition, section 13410(d) of the HITECH Act's amendments have caused a number of provisions of the Enforcement Rule to conflict with the amended statute, and the resulting inconsistency has led to public confusion, both as to the penalty amounts for violations of the HIPAA rules and as to what defenses remain in effect. Delaying the promulgation of these conforming amendments would also forestall HHS' timely implementation of the strengthened enforcement approach mandated by statute and would maintain the status quo with respect to the heightened privacy and security concerns associated with the electronic transmission of health information among health care entities.

Based on the above reasons, we believe that delaying amendment to the Enforcement Rule, through the exercise of notice-and-comment rulemaking prior to publication of a final rule, would be impracticable, unnecessary, or contrary to public policy. Accordingly, HHS has good cause under the APA, 5 U.S.C. 553(b)(B), to waive notice-and-comment rulemaking and to proceed directly with the issuance of a final rule. At the same time, HHS is interested in the public's input and requests public comments regarding the substance of these amendments.

While HIPAA generally requires certain consultations with industry as a predicate to the issuance of the HIPAA standards, this interim final rule does not adopt standards, as the term is defined and interpreted under subtitle F of title II of HIPAA. Therefore, the requirement for such industry consultations in section 1172(c) of the Act, 42 U.S.C. 1320d–1(c), does not apply. For the same reason, the timeframes for compliance with the HIPAA rules, as set forth in section 1175 of the Act, 42 U.S.C. 1320d–4, do not apply.

## IV. Provisions in the Interim Final Rule

This interim final rule amends 45 CFR part 160, subpart D, which establishes rules relating to the imposition of civil money penalties, to conform several provisions to section 13410(d) of the HITECH Act's amendments to section 1176 of the Act, 42 U.S.C. 1320d–6, which became effective February 18, 2009. This interim final rule's amendments distinguish between violations occurring before February 18, 2009, and violations occurring on or after that date, with respect to the potential amount of the civil money penalty and the affirmative defenses available to covered entities. We discuss this interim final rule's amendments to the Enforcement Rule on a provision-by-provision basis below:

### *A. Subpart A—General Provisions*

1. Section 160.101—Statutory Basis and Purpose

Section 160.101 is amended to add the statutory citation for section 13410(d) of the HITECH Act to the list of the statutes that the requirements of the subchapter are designed to implement.

### *B. Subpart D—Imposition of Civil Money Penalties*

1. Section 160.401—Definitions

Section 160.401 is added and defines the terms of *reasonable cause, reasonable diligence* and *willful neglect,* using the same definitions currently found at § 160.410. As discussed below, we are removing these terms from § 160.410 as a conforming amendment. This reorganization of the definitions signals the application of these terms to the entirety of subpart D. We do not discuss the terms further, as we are amending their placement in the rule but not their substance. Readers who would like a better understanding of these terms are encouraged to consult prior preamble explanations at 70 FR 20224, 20237–9 (April 18, 2005) and 71 FR 8390, 8409–11 (February 16, 2006).

2. Section 160.404—Amount of Civil Money Penalties

Subsection 160.404(b) is amended to revise the range of potential civil money penalty amounts a covered entity will be subject to based on the HITECH Act's amendments of section 1176 of the Act, 42 U.S.C. 1320–5, which are currently in effect. As amended, § 160.404(b)(1) retains the range of penalty amounts enumerated prior to the statutory revision for those violations occurring before February 18, 2009. The current content of § 160.404(b)(2) is re-designated as § 160.404(b)(3). A new § 160.404(b)(2) is added which identifies the range of penalty amounts for violations occurring on or after February 18, 2009.

Section 160.404 currently implements a penalty scheme, as required by section 1176(a)(1) prior to the HITECH Act's revisions, which explicitly established the maximum penalty amount for each violation as ''not more than $100'' and

# EXHIBIT 4

**STATEMENT OF**

**MARILYN TAVENNER**

**ADMINISTRATOR,**
**CENTERS FOR MEDICARE & MEDICAID SERVICES**

**ON**

# EVALUATING PRIVACY, SECURITY, AND FRAUD CONCERNS WITH OBAMACARE'S INFORMATION SHARING APPARATUS

**BEFORE THE**

**U. S. HOUSE COMMITTEE ON OVERSIGHT & GOVERNMENT REFORM**
**SUBCOMMITTEE ON ENERGY POLICY, HEALTH CARE, AND ENTITLMENTS**

**U.S. HOUSE COMMITTEE ON HOMELAND SECURITY**
**SUBCOMMITTEE ON CYBERSECURITY, INFRASTRUCTURE PROTECTION, AND SECURITY TECHNOLOGIES**

**JULY 17, 2013**

**U. S. House Committee on Oversight and Government Reform,**

**Subcommittee on Energy Policy, Health Care**

**U.S. House Committee on Homeland Security**

**Subcommittee on Cybersecurity, Infrastructure Protection, and Security Technologies**

**"Evaluating Privacy, Security, and Fraud Concerns with**

**Obamacare's Information Sharing Apparatus"**

**July 17, 2013**

Good morning, Chairmen Lankford and Meehan, Ranking Members Speier and Clarke, and members of the Subcommittees. Thank you for the opportunity to discuss the Centers for Medicare & Medicaid Services' (CMS) progress in implementing information technology systems in support of the new Health Insurance Marketplaces. Since the passage of the Affordable Care Act, CMS has been hard at work to design, build, and test secure systems that ensure Americans are able to enroll in affordable health care coverage. Given this important work, I appreciate the interest these Committees and the Congress have shown in our progress in completing and managing these systems. I want to assure you that I am committed to applying all the appropriate laws, regulations, and business agreements to protect the security and privacy of the consumers participating in the Marketplaces. CMS brings to this task experience and success in protecting the security and privacy in programs even larger than the Marketplaces such as Medicare.

**Overview of the Marketplace Information Technology (IT) Systems**

The Affordable Care Act directs states to establish State-based Marketplaces by January 1, 2014. In states electing not to establish and operate such a Marketplace, the Affordable Care Act requires the Federal government to establish and operate a Marketplace in the state, referred to as a Federally-facilitated Marketplace. The Marketplaces will provide consumers access to health care coverage through private, qualified health plans, and consumers seeking financial assistance may qualify for insurance affordability programs made available through the Marketplace.

The insurance affordability programs include the advance payment of the premium tax credits, cost-sharing reductions, Medicaid, and the Children's Health Insurance Program (CHIP). The

advance payment of the premium tax credit may be applied automatically to the purchase of a qualified health plan through the Marketplace, reducing upfront the premiums paid by consumers. Cost-sharing reductions may also lower the amount a consumer has to pay out-of-pocket for deductibles, coinsurance, and copayments for a qualified health plan purchased through the Marketplace. In order to enroll in an insurance affordability program offered through a Marketplace, individuals must complete an application[1] and meet certain eligibility requirements.[2] Before we get further into this discussion, it is important to note that while the Marketplace application asks for personal information such as date of birth, name, or address, the Marketplace application never asks for personal health information and the Marketplace IT systems will never access or store personal health information beyond what is normally asked for in Medicaid eligibility applications.

***Eligibility, Redetermination, and Appeals Marketplace IT Systems***

To fulfill the functions specified in the Affordable Care Act, Federally-facilitated and State-based Marketplaces are developing eligibility, redetermination, and appeals systems. These systems are similar to what private issuers, Medicare Advantage issuers, and State Medicaid agencies currently use to determine eligibility, enroll applicants into health coverage, process appeals, and perform customer service, as well as prevent fraud, waste, and abuse.

These systems will:

- Determine a consumer's eligibility to enroll in a qualified health plan through a Marketplace and for insurance affordability programs;
- Redetermine consumer eligibility status during the year;
- Allow individuals to appeal an eligibility determination;
- Enroll consumers in and provide payment transactions for insurance affordability programs; and
- Provide oversight to ensure issuers comply with new Affordable Care Act consumer protections.

[1] The individual application short form is available at this website: http://www.cms.gov/CCIIO/Resources/Forms-Reports-and-Other-Resources/Downloads/marketplace-app-short-form.pdf

[2] Pursuant to 45 C.F.R. 155.305.

***Federal Data Services Hub***

CMS has developed a tool, known as the Federal data services hub (the Hub), that provides an electronic connection between the eligibility systems of the Marketplaces to already existing, secure Federal and state databases to verify the information a consumer provides in their Marketplace application. Data transmitted through the Hub will help state agencies determine applicants' eligibility to enroll in Medicaid or CHIP, and help the Federally-facilitated and State-based Marketplace eligibility systems determine an applicant's eligibility to seek health insurance coverage through a Marketplace, and their eligibility for advance premium tax credits and cost-sharing reductions.

It is important to understand that the Hub is not a database; it does not retain or store information. It is a routing tool that can validate applicant information from various trusted government databases through secure networks. It allows the Marketplace, Medicaid, and CHIP systems to query the government databases used today in the eligibility processes for many state and Federal programs. The Hub would query only the databases necessary to determine eligibility for specific applicants. The Hub increases efficiency and security by eliminating the need for each Marketplace, Medicaid agency, and CHIP agency to set up separate data connections to each database.

CMS has already completed development and the majority of the testing of the Hub services required to support open enrollment on October 1, 2013. CMS and the Internal Revenue Service (IRS) are currently testing the integration of the Hub with their IT systems, and this testing was 95 percent complete as of the end of June. CMS started testing the Hub with the other Federal partners, including the Social Security Administration (SSA) and the Department of Homeland Security (DHS), earlier this summer, and that testing will be completed by the end of August. CMS is currently testing the Hub with 40 states, and during the remainder of July and August, we will finish testing the Hub with the remaining states and territories.

***How These Systems Verify a Marketplace Application***

All State-based and Federally-facilitated Marketplaces will determine an applicant's eligibility for enrollment in a Qualified Health Plan through the Marketplace, and if the applicant requests,

to determine eligibility for an insurance affordability program. Consumers will be able to access an application through their Marketplace website, by phone, in person or by mailing a paper form. Regardless of the method a consumer uses to apply for coverage, when consumers submit their Marketplace applications, the following steps occur:

1. Social Security Numbers and U.S. citizenship or immigration status will be verified through secure connections using the Hub with the already existing databases of the SSA and the DHS. The Hub will not store or retain the data transmitted in this process.
2. For consumers seeking financial assistance through an insurance affordability program, IRS, using the Hub, will provide information to verify the income of the consumer. If a consumer does not want to apply for financial assistance, then the consumer will not be asked to provide income information. Again, the Hub will not store or retain the data used in this process.
3. If the consumer appears to be eligible for an insurance affordability program, then the Marketplace eligibility system validates the consumer's application by using the Hub to check if the applicant is enrolled in certain health care programs provided by the Department of Veterans Affairs (VA) or eligible for coverage through other programs provided by the Department of Defense (DOD), Office of Personnel Management (OPM), Peace Corps, Medicare, or state Medicaid agencies. Alternative processes have been established through rulemaking for eligibility factors not verifiable through the Hub.

***What Information is Stored?***

As clarified above, the Hub is a tool, not a database, and will therefore not store any information, since it only routes requests from Marketplace eligibility systems to already-existing Federal and state databases. The Federally-facilitated and State-based eligibility, redetermination, and appeals systems do store certain eligibility and enrollment records, including Federal appeals records, Federal consumer services records, and issuer financial information in order to fulfill their specific functions. These data will only be used to conduct these functions.[3] Access to data in the Federally-facilitated system will be limited to authorized CMS personnel through

[3] The system of records for the Federally-facilitated Marketplace IT system is more thoroughly described in the System of Records Notice (SORN) available at: http://www.gpo.gov/fdsys/pkg/FR-2013-02-06/html/2013-02666.htm.

password security, encryptions, firewalls, and secured operating systems. Personnel having access to the system have been trained in the Privacy Act and information security requirements. This limited data storage is similar to what private issuers, Medicare, and Medicaid agencies currently use to determine eligibility, enroll applicants into health coverage, process appeals, and perform customer service, as well as prevent fraud, waste, and abuse.

**Safeguarding the Marketplace IT Systems**

The privacy and security of consumer data is a top priority for CMS and our Federal, state, and private partners. We will use appropriate policies, procedures, standards and implementation specifications to ensure the privacy and security of consumer data in accordance with applicable law.

***Implementing Privacy Controls for the Marketplace IT Systems***

The Congress acknowledged the importance of protecting personal information through the Privacy Act of 1974, which establishes requirements that govern the collection, use, and disclosure of information about individuals that is maintained by a Federal executive agency in a "system of records." Since then, the Congress has passed amendments to the Privacy Act and additional legislation to assure Americans that information collected, created, used, and disclosed by Federal agencies is appropriately safeguarded. These additional protections include the Computer Matching Act, which amended the Privacy Act, and the e-Government Act of 2002. IT projects undertaken by Federal agencies and their contractors in support of the Affordable Care Act will comply with these and all other applicable Federal laws, so that the American public is assured that their personal information is protected.

Additionally, certain classes of data may be subject to additional restrictions or protection on data use or transmission. For example, information systems containing tax return information must also comply with the taxpayer privacy and safeguards requirements of Section 6103 of the Internal Revenue Code.

In order to establish controls and checkpoints within the Marketplace IT systems, CMS established a series of agreements, business processes, and protocols to ensure privacy controls

have been met. Because the databases connected to the Marketplace eligibility systems by the Hub are secure and closed government databases that already exist and comply with Federal privacy standards, most of the work of implementing privacy controls is conducted through business agreements between CMS and its Federal and state partners to assure data is being handled appropriately by all parties before data is exchanged through the Hub. To fulfill the Computer Matching Act requirements, CMS is establishing Computer Matching Agreements between CMS and each Federal and state partner. These Computer Matching Agreements describe how each Federal and state partner will exchange information, using the Hub, in a way that ensures the privacy, integrity, and verification of data disclosed during this exchange. CMS and our Federal partners have signed additional agreements about the use of data and information exchanges, as applicable. CMS began formalizing these processes with our partners in July 2011, and has refined and updated them as the Marketplace IT work has progressed.

To ensure these agreements are met, CMS conducts Privacy Impact Assessments. Before State-based Marketplaces are able to use the Hub, CMS conducts a Privacy Impact Assessment to ensure that the State-based Marketplace has met all federal privacy requirements. CMS is currently reviewing the State-based Marketplaces' Privacy Impact Assessments. Before the Hub is used to route information from Federal databases to Marketplace eligibility systems, CMS completes Federal Privacy Impact Assessments to ensure this information exchange meets the agreed-upon privacy requirements.

***Implementing Security Controls for the Marketplace IT Systems***

The Congress established security standards for Federal agencies through the Federal Information Security Management Act of 2002 (FISMA). FISMA requires each Federal agency to develop, document, and implement an agency-wide program to secure the information and information systems that support the agency's operations and assets, including those provided or managed by another agency, contractor, or other source. To implement FISMA, the National Institute of Standards and Technology (NIST) has published a series of documents[4] that provide security guidance to Federal Chief Information Security Officers. These

[4] NIST's Special Publication 800-53: http://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r4.pdf

publications provide security controls for Federal information systems derived from legislation, Executive Orders, policies, directives, regulations, standards, and business needs to protect organizations, individuals, and the nation from a diverse set of threats including hostile cyber-attacks, natural disasters, structural failures, and human errors (both intentional and unintentional). Using these materials, CMS outlined privacy and security principles that every Marketplace will use to develop privacy and security standards for any entity that collects or has access to Marketplace-related personally identifiable information.[5]

CMS will ensure that the IT used for the Marketplaces comply with applicable Federal laws, NIST controls, and security agreements through a stringent monitoring and evaluation system. CMS has a robust security monitoring system that reviews all security events, tools, requirements, and network device logs to identify, assess, and manage vulnerabilities and threats. For example, CMS publishes a monthly Continuous Monitoring Report to describe emerging concerns from a global and local perspective, along with recommendations or mitigation strategies. In addition, CMS conducts real-time monitoring to ensure that security tools are maintained through updates and patches. If changes must be made to Marketplace IT code, CMS uses a "structured change management process," which identifies, evaluates, tests, and models codes changes and is overseen and approved by a business and technical governance board, as required by NIST standards. When the Federally-facilitated Marketplace systems are operational on October 1, 2013, they will be part of the overall established CMS operational security. CMS also benefits from independent reviews by external entities to verify security policy and readiness.

**Conclusion**

CMS is committed to creating safe, secure, and resilient Marketplace IT systems and protecting personal privacy and confidentiality in collaboration with our partners while expanding access to health insurance coverage to Americans. Collectively, the tools, methods, policies procedures, and laws I have described provide a robust security framework, which helps to safeguard the Marketplace systems and data. I am confident that through our hard work and the use of industry

[5] Please see the guidance listed under "Minimum Acceptable Risk Standards" for more information: http://www.cms.gov/cciio/Resources/Regulations-and-Guidance/index.html#Affordable Insurance Exchanges

best practices, the Marketplace IT systems will help more Americans securely enroll in and afford the health care coverage that fits their needs.  Thank you for your attention to this important issue.  I would be happy to answer your questions now, and will be able to provide updates about this important topic as we steadily progress towards the beginning of open enrollment on October 1, 2013.

**Marilyn Tavenner**

**Biography**


Marilyn Tavenner is currently the Administrator for the Centers for Medicare & Medicaid Services. Previously, Ms. Tavenner was Principal Deputy Administrator for the Centers for Medicare & Medicaid Services (CMS). As the Principal Deputy Administrator, Ms. Tavenner served as the agency's second-ranking official overseeing policy development and implementation as well as management and operations.

Ms. Tavenner, a life-long public health advocate, manages the $820 billion federal agency, which ensures health care coverage for 100 million Americans, with 10 regional offices and more than 4,000 employees nationwide. CMS administers Medicare, and it provides funds and guidance to all states for their Medicaid and Children's Health Insurance (CHIP) programs. With the passage of the Affordable Care Act in March of 2010, Ms. Tavenner is also responsible for overseeing CMS as it implements the insurance reforms and Affordable Insurance Exchanges included in the health reform law.

Prior to assuming her CMS leadership role, Ms. Tavenner served for four years as the Commonwealth of Virginia's Secretary of Health and Human Resources in the administration of former Governor Tim Kaine. In this top cabinet position, she was charged with overseeing 18,000 employees and a $9 billion annual budget to administer Medicaid, mental health, social services, public health, aging, disabilities agencies, and children's services.

Before entering government service, Ms. Tavenner spent 25 years working for the Hospital Corporation of American (HCA). She began working as a nurse at the Johnson-Willis Hospital in Richmond, Va., in 1981 and steadily rose through the company. By 1993, she began working as the hospital's Chief Executive Officer and, by 2001, had assumed responsibility for 20 hospitals as President of the company's Central Atlantic Division. She finished her service to HCA in 2005 as Group President of Outpatient Services, where she spearheaded the development of a national strategy for freestanding outpatient services, including physician recruitment and real estate development.

Ms. Tavenner holds a bachelor's of science degree in nursing and a master's degree in health administration, both from the Virginia Commonwealth University.

She has worked with many community and professional organizations, serving as a board member of the American Hospital Association, as president of the Virginia Hospital Association, as chairperson of the Chesterfield Business Council, and as a life-long member of the Rotary Club. Her contributions also include providing leadership in such public service organizations as the March of Dimes, the United Way and the Juvenile Diabetes Research Foundation. In addition to numerous business awards, Ms. Tavenner has been recognized for her volunteer activities, including the 2007 recipient of the March of Dimes Citizen of the Year Award.

**EXHIBIT 5**



**(2) Highly compensated individual**

The term ''highly compensated individual'' has the meaning given such term by section 105(h)(5) of title 26.

(July 1, 1944, ch. 373, title XXVII, § 2716, as added and amended Pub. L. 111–148, title I, § 1001(5), title X, § 10101(d), Mar. 23, 2010, 124 Stat. 135, 884.)

AMENDMENTS

2010—Pub. L. 111–148, § 10101(d), amended section generally. Prior to amendment, text read as follows:

''(a) IN GENERAL.—The plan sponsor of a group health plan (other than a self-insured plan) may not establish rules relating to the health insurance coverage eligibility (including continued eligibility) of any full-time employee under the terms of the plan that are based on the total hourly or annual salary of the employee or otherwise establish eligibility rules that have the effect of discriminating in favor of higher wage employees.

''(b) LIMITATION.—Subsection (a) shall not be construed to prohibit a plan sponsor from establishing contribution requirements for enrollment in the plan or coverage that provide for the payment by employees with lower hourly or annual compensation of a lower dollar or percentage contribution than the payment required of similarly situated employees with a higher hourly or annual compensation.''

EFFECTIVE DATE

Section effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1004 of Pub. L. 111–148, set out as a note under section 300gg–11 of this title.

## § 300gg–17. Ensuring the quality of care

**(a) Quality reporting**

**(1) In general**

Not later than 2 years after March 23, 2010, the Secretary, in consultation with experts in health care quality and stakeholders, shall develop reporting requirements for use by a group health plan, and a health insurance issuer offering group or individual health insurance coverage, with respect to plan or coverage benefits and health care provider reimbursement structures that—

(A) improve health outcomes through the implementation of activities such as quality reporting, effective case management, care coordination, chronic disease management, and medication and care compliance initiatives, including through the use of the medical homes model as defined for purposes of section 3602[1] of the Patient Protection and Affordable Care Act, for treatment or services under the plan or coverage;

(B) implement activities to prevent hospital readmissions through a comprehensive program for hospital discharge that includes patient-centered education and counseling, comprehensive discharge planning, and post discharge reinforcement by an appropriate health care professional;

(C) implement activities to improve patient safety and reduce medical errors through the appropriate use of best clinical practices, evidence based medicine, and health information technology under the plan or coverage; and

(D) implement wellness and health promotion activities.

**(2) Reporting requirements**

**(A) In general**

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall annually submit to the Secretary, and to enrollees under the plan or coverage, a report on whether the benefits under the plan or coverage satisfy the elements described in subparagraphs (A) through (D) of paragraph (1).

**(B) Timing of reports**

A report under subparagraph (A) shall be made available to an enrollee under the plan or coverage during each open enrollment period.

**(C) Availability of reports**

The Secretary shall make reports submitted under subparagraph (A) available to the public through an Internet website.

**(D) Penalties**

In developing the reporting requirements under paragraph (1), the Secretary may develop and impose appropriate penalties for non-compliance with such requirements.

**(E) Exceptions**

In developing the reporting requirements under paragraph (1), the Secretary may provide for exceptions to such requirements for group health plans and health insurance issuers that substantially meet the goals of this section.

**(b) Wellness and prevention programs**

For purposes of subsection (a)(1)(D), wellness and health promotion activities may include personalized wellness and prevention services, which are coordinated, maintained or delivered by a health care provider, a wellness and prevention plan manager, or a health, wellness or prevention services organization that conducts health risk assessments or offers ongoing face-to-face, telephonic or web-based intervention efforts for each of the program's participants, and which may include the following wellness and prevention efforts:

(1) Smoking cessation.
(2) Weight management.
(3) Stress management.
(4) Physical fitness.
(5) Nutrition.
(6) Heart disease prevention.
(7) Healthy lifestyle support.
(8) Diabetes prevention.

**(c) Protection of Second Amendment gun rights**

**(1) Wellness and prevention programs**

A wellness and health promotion activity implemented under subsection (a)(1)(D) may not require the disclosure or collection of any information relating to—

(A) the presence or storage of a lawfully-possessed firearm or ammunition in the residence or on the property of an individual; or

(B) the lawful use, possession, or storage of a firearm or ammunition by an individual.

**(2) Limitation on data collection**

None of the authorities provided to the Secretary under the Patient Protection and Af-

[1] See References in Text note below.

fordable Care Act or an amendment made by that Act shall be construed to authorize or may be used for the collection of any information relating to—

(A) the lawful ownership or possession of a firearm or ammunition;

(B) the lawful use of a firearm or ammunition; or

(C) the lawful storage of a firearm or ammunition.

**(3) Limitation on databases or data banks**

None of the authorities provided to the Secretary under the Patient Protection and Affordable Care Act or an amendment made by that Act shall be construed to authorize or may be used to maintain records of individual ownership or possession of a firearm or ammunition.

**(4) Limitation on determination of premium rates or eligibility for health insurance**

A premium rate may not be increased, health insurance coverage may not be denied, and a discount, rebate, or reward offered for participation in a wellness program may not be reduced or withheld under any health benefit plan issued pursuant to or in accordance with the Patient Protection and Affordable Care Act or an amendment made by that Act on the basis of, or on reliance upon—

(A) the lawful ownership or possession of a firearm or ammunition; or

(B) the lawful use or storage of a firearm or ammunition.

**(5) Limitation on data collection requirements for individuals**

No individual shall be required to disclose any information under any data collection activity authorized under the Patient Protection and Affordable Care Act or an amendment made by that Act relating to—

(A) the lawful ownership or possession of a firearm or ammunition; or

(B) the lawful use, possession, or storage of a firearm or ammunition.

**(d) Regulations**

Not later than 2 years after March 23, 2010, the Secretary shall promulgate regulations that provide criteria for determining whether a reimbursement structure is described in subsection (a).

**(e) Study and report**

Not later than 180 days after the date on which regulations are promulgated under subsection (c),[2] the Government Accountability Office shall review such regulations and conduct a study and submit to the Committee on Health, Education, Labor, and Pensions of the Senate and the Committee on Energy and Commerce of the House of Representatives a report regarding the impact the activities under this section have had on the quality and cost of health care.

(July 1, 1944, ch. 373, title XXVII, § 2717, as added and amended Pub. L. 111–148, title I, § 1001(5), title X, § 10101(e), Mar. 23, 2010, 124 Stat. 135, 884.)

REFERENCES IN TEXT

Section 3602 of the Patient Protection and Affordable Care Act, referred to in subsec. (a)(1)(A), is section 3602 of Pub. L. 111–148 which is set out as a note under section 1305w–21 of this title but the reference probably should be to section 3502 of the Act which is set out as a note under section 256a–1 of this title.

The Patient Protection and Affordable Care Act, referred to in subsec. (c), is Pub. L. 111–148, Mar. 23, 2010, 124 Stat. 119. For complete classification of this Act to the Code, see Short Title note set out under section 18001 of this title and Tables.

AMENDMENTS

2010—Subsecs. (c) to (e). Pub. L. 111–148, § 10101(e), added subsec. (c) and redesignated former subsecs. (c) and (d) as (d) and (e), respectively.

EFFECTIVE DATE

Section effective for plan years beginning on or after the date that is 6 months after Mar. 23, 2010, see section 1004 of Pub. L. 111–148, set out as a note under section 300gg–11 of this title.

**§ 300gg–18. Bringing down the cost of health care coverage**

**(a) Clear accounting for costs**

A health insurance issuer offering group or individual health insurance coverage (including a grandfathered health plan) shall, with respect to each plan year, submit to the Secretary a report concerning the ratio of the incurred loss (or incurred claims) plus the loss adjustment expense (or change in contract reserves) to earned premiums. Such report shall include the percentage of total premium revenue, after accounting for collections or receipts for risk adjustment and risk corridors and payments of reinsurance, that such coverage expends—

(1) on reimbursement for clinical services provided to enrollees under such coverage;

(2) for activities that improve health care quality; and

(3) on all other non-claims costs, including an explanation of the nature of such costs, and excluding Federal and State taxes and licensing or regulatory fees.

The Secretary shall make reports received under this section available to the public on the Internet website of the Department of Health and Human Services.

**(b) Ensuring that consumers receive value for their premium payments**

**(1) Requirement to provide value for premium payments**

**(A) Requirement**

Beginning not later than January 1, 2011, a health insurance issuer offering group or individual health insurance coverage (including a grandfathered health plan) shall, with respect to each plan year, provide an annual rebate to each enrollee under such coverage, on a pro rata basis, if the ratio of the amount of premium revenue expended by the issuer on costs described in paragraphs (1) and (2) of subsection (a) to the total amount of premium revenue (excluding Federal and State taxes and licensing or regulatory fees and after accounting for payments or receipts for risk adjustment, risk corridors, and reinsurance under sections 18061, 18062, and 18063 of this title) for the plan year (except as provided in subparagraph (B)(ii)), is less than—

[2] So in original. Probably should be "subsection (d),".

**EXHIBIT 6**



# NOW IS THE TIME

## GUN VIOLENCE REDUCTION EXECUTIVE ACTIONS

WH.GOV/NOW-IS-THE-TIME

JANUARY
SIXTEENTH
TWO THOUSAND AND THIRTEEN

## PRESIDENT OBAMA IS NOT WAITING TO TAKE ACTON. ON JANUARY 26, 2013, HE ANNOUNCED 23 EXECUTIVE ACTIONS TO REDUCE GUN VIOLENCE THAT WILL:

1. Issue a Presidential Memorandum to require federal agencies to make relevant data available to the federal background check system.
2. Address unnecessary legal barriers, particularly relating to the Health Insurance Portability and Accountability Act, that may prevent states from making information available to the background check system.
3. Improve incentives for states to share information with the background check system.
4. Direct the Attorney General to review categories of individuals prohibited from having a gun to make sure dangerous people are not slipping through the cracks.
5. Propose rulemaking to give law enforcement the ability to run a full background check on an individual before returning a seized gun.
6. Publish a letter from ATF to federally licensed gun dealers providing guidance on how to run background checks for private sellers.
7. Launch a national safe and responsible gun ownership campaign.
8. Review safety standards for gun locks and gun safes (Consumer Product Safety Commission).
9. Issue a Presidential Memorandum to require federal law enforcement to trace guns recovered in criminal investigations.
10. Release a DOJ report analyzing information on lost and stolen guns and make it widely available to law enforcement.
11. Nominate an ATF director.
12. Provide law enforcement, first responders, and school officials with proper training for active shooter situations.
13. Maximize enforcement efforts to prevent gun violence and prosecute gun crime.
14. Issue a Presidential Memorandum directing the Centers for Disease Control to research the causes and prevention of gun violence.
15. Direct the Attorney General to issue a report on the availability and most effective use of new gun safety technologies and challenge the private sector to develop innovative technologies.
16. Clarify that the Affordable Care Act does not prohibit doctors asking their patients about guns in their homes.
17. Release a letter to health care providers clarifying that no federal law prohibits them from reporting threats of violence to law enforcement authorities.
18. Provide incentives for schools to hire school resource officers.
19. Develop model emergency response plans for schools, houses of worship and institutions of higher education.
20. Release a letter to state health officials clarifying the scope of mental health services that Medicaid plans must cover.
21. Finalize regulations clarifying essential health benefits and parity requirements within ACA exchanges.
22. Commit to finalizing mental health parity regulations.
23. Launch a national dialogue led by Secretaries Sebelius and Duncan on mental health.

**LEARN MORE AT WHITEHOUSE.GOV/NOW-IS-THE-TIME**