

HUNTON & WILLIAMS LLP
1111 BRICKELL AVENUE
SUITE 2500
MIAMI, FLORIDA 33131

TEL   305 • 810 • 2500
FAX   305 • 810 • 2460

FILE NO. 99997.032128

June 12, 2014

John Ley, Clerk of the Court
U.S. Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, FA  30303

Re:    Citation of Supplemental Authority
       *Wollschlaeger v. Governor of Florida,* Case No. 12-14009-FF

Dear Mr. Ley:

Pursuant to Eleventh Circuit Rule 28(j), amici curiae, in support of the appellees,[1] submit the attached recently published law review article, Clay Calvert, Daniel Axelrod, Justin B. Hayes & Minch Minchin, *Physicians, Firearms & Free Expression: Reconciling First Amendment Theory with Doctrinal Analysis Regarding the Right to pose Questions to Patients,* 12 First Amendment L. Rev. 1 (2013), as supplemental authority for their contention at page 16 of their amicus brief that the Court should apply strict scrutiny to determine the constitutionality of Florida's Firearm Owners' Privacy Act and should affirm the decision of the district court.

Respectfully submitted.

Hunton & Williams LLP

By     s/ Thomas R. Julin
              Thomas R. Julin & Jamie Z. Isani
              Florida Bar Nos. 325376 & 728861
              1111 Brickell Avenue - Suite 2500
              Miami, FL  33131
              305.810.2516 fax 1601
              tjulin@hunton.com or jisani@hunton.com

---

[1]    The amici submitting this notice are -- ACLU Foundation of Florida, Inc., Alachua County Medical Society, Broward County Medical Association, Broward County Pediatric Society, Palm Beach County Medical Society, Florida Public Health Association, University of Miami School of Law Children and Youth Clinic, Children's Healthcare Is a Legal Duty, Inc., and Early Childhood Initiative Foundation.



Gerald E. Greenberg
Fla. Bar No. 440094
Gelber, Schacter & Greenberg, P.A.
1441 Brickell Ave. Ste. 1420
Miami, Florida 33131
305.728.0953 Fax 0951
ggreenberg@gsgpa.com

Gordon M. Mead, Jr.  & Julie Fishman Berkowitz
Fla. Bar Nos. 049896 & 017293
Stearns Weaver Miller Weissler Alhadeff
& Sitterson, P.A.
150 West Flagler Street
Miami, Florida 33130
305.789.3200 Fax 3395
gmead@stearnsweaver.com

Randall C. Marshall
American Civil Liberties Union
PO BOX 6179
Montgomery, AL 36106-0179
334.265.2754
rmarshall@aclualabama.org

Attorneys for the *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on June 12, 2014, by Notice of Electronic Filing generated by ECF upon all counsel of record entitled to receive service, including the following:

Pamela J. Bondi
Timothy D. Osterhaus
Jason Vail
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399
850.414.3300
Timothy.Osterhaus@myfloridalegal.com

Charles J. Cooper
David H. Thompson
Peter A. Petterson
Cooper & Kirk
1523 New Hampshire Ave NW
Washington, DC 20036
202.220.9600
ccooper@cooperkirk.com

John C. Eastman
Anthony T. Caso
Center for Constitutional Jurisprudence
Chapman University School of Law
One University School of Law
1 University Dr
Orange, CA 92866-1005
916.601.1916
caso@chapman.edu

Douglas Hallward-Driemeier
Bruce S. Manheim, Jr.
Mariel Goetz
Ropes & Gray LLP
700 12th Street, NW, Suite 900
Washington, DC 20005-3948
202.508.4776
Douglas.Hallward-Driemeier@ropesgray

Bryan H. Heckenlively
Munger Tolles & Olsen, LLP
560 Mission St Floor 27
San Francisco, CA 94105-3089
415.512.4032 or 4015
Bryan.Heckenlively@mto.com

Dennis Gary Kainen
Weisberg & Kainen
1401 Brickell Avenue Suite 800
Miami, FL 33131-3554
305.374.5544
Dennis@weisbergandkainen.com

Richard Harry Levenstein
Kramer Sopko & Levenstein PA
2300 SE Monterey Rd Ste 100
Stuart, FL 34996
772.288.0048
rlevenstein@kslattorneys.com

Edward Maurice Mullins
Hal Michael Lucas
Astigarraga Davis Mullins & Grossman
701 Brickell Avenue 16th Floor
Miami, FL 33131-2847
305.372.8282
emullins@astidavis.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun
Violation
1225 Eye Street, NW, Suite 1100
Washington, DC 20005
202.289.7319
jlowy@bradymail.org

       s/ Thomas R. Julin
_____
         Thomas R. Julin

# PHYSICIANS, FIREARMS & FREE EXPRESSION: RECONCILING FIRST AMENDMENT THEORY WITH DOCTRINAL ANALYSIS REGARDING THE RIGHT TO POSE QUESTIONS TO PATIENTS

CLAY CALVERT,* DANIEL AXELROD,* JUSTIN B. HAYES* & MINCH MINCHIN*

## ABSTRACT

This Article analyzes, from both a doctrinal and theoretical perspective, the First Amendment speech interests now at stake before the United States Court of Appeals for the Eleventh Circuit in *Wollschlaeger v. Farmer*.[1] The case pivots on Florida's Firearm Owners' Privacy Act,[2] a statute supported by the National Rifle Association[3] that

---

* Professor & Brechner Eminent Scholar in Mass Communication and Director of the Marion B. Brechner First Amendment Project at the University of Florida, Gainesville, Fla. B.A., 1987, Communication, Stanford University; J.D. order of the Coif), 1991, McGeorge School of Law, University of the Pacific; Ph.D., 1996, Communication, Stanford University. Member, State Bar of California. The authors thank Victoria Colson, Sarah Papadelias and Lindsey Zionts of the University of Florida for reviewing and editing drafts of this article

* B.A., History and Communications, SUNY Cortland (2002); M.A., Journalism, Syracuse University (2003); Ph.D. student, Mass Communications, University of Florida.

* B.S., Political Science, Kennesaw State University (2011); M.A., Political Communication, University of Florida (2013).

* B.S., Journalism, University of Florida (2011); M.A. student in Mass Communication Law, University of Florida.

1. 880 F. Supp. 2d 1251 (S.D. Fla. 2012).
2. Firearm Owners--Health Care Providers--Privacy, 2011 Fla. Sess. Law Serv. Ch. 2011-112 (C.S.C.S.H.B. 155) (West) (codified as Fla. Stat. § 790.338 (2012)).

limits the ability of physicians to pose questions to patients regarding gun ownership. More importantly, the Article addresses a question left unresolved by the United States Supreme Court since its 1992 abortion opinion in *Planned Parenthood of Southeastern Pennsylvania v. Casey*[4]: what standard of judicial scrutiny should be applied to measure the validity of statutes affecting the speech of doctors within the context of the doctor-patient relationship?

## INTRODUCTION

Perhaps no recent event better illustrates the grave danger posed to young children by firearms than the December 2012 tragedy at Sandy Hook Elementary School, in which a young man carrying pistols and a semiautomatic rifle shot and killed twenty minors.[5] The incident sparked a vigorous national debate about gun control.[6] As a *New York Times* story pointed out, "[t]he reactions were considerably more broad-based than what had followed previous mass shootings, coming from Republicans as well as Democrats, from gun control advocates and those who have favored gun rights in the past, and even from the corporate and

---

3. *See* Carl Hiaasen, *Florida Loses Another Ridiculous Legal Battle*, MIAMI HERALD (July 7, 2012), http://www.kansas.com/2012/07/11/2403313/carl-hiaasen-florida-loses-another.html.

4. 505 U.S. 833 (1992).

5. *See generally* James Barron, *Gunman Massacres 20 Children at School in Connecticut; 28 Dead, Including Killer*, N.Y. TIMES, Dec. 15, 2012, at A1 (providing an initial account of the shootings).

6. *See* Jennifer Steinhauer & Charlie Savage, *Pro-Gun Democrats Signaling Openness to Limits; Town Starts the Mournful Task of Saying Goodbye*, N.Y. TIMES, Dec. 18, 2012, at A1 (reporting that in the immediate aftermath of the shootings in a Connecticut elementary school, "many pro-gun Congressional Democrats – including Senator Harry Reid of Nevada, the majority leader and a longstanding gun rights supporter – signaled an openness . . . to new restrictions on guns," and adding that "many Democrats, including several from conservative states, said Congress should take up the issue next year").

retail worlds."[7] Indeed, President Barack Obama soon promised to make gun control a central issue of his second term.[8]

Measured in hindsight against the horrendous yardstick of a child-killing tragedy, the effort by Florida in 2011, via House Bill 155,[9] to make it more difficult for physicians to question patients about firearms seems almost nonsensical.[10] In particular, Section 790.338 of the Florida Statutes, which was drafted by the National Rifle Association ("NRA")[11] and signed into law as the Firearm Owners' Privacy Act by Republican Gov. Rick Scott on June 2, 2011,[12] has been derisively dubbed the "Docs vs. Glocks"[13] law.

---

7. Adam Nagourney, *States' Leaders Proposing Steps to Control Guns*, N.Y. TIMES, Dec. 19, 2012, at A1.

8. Michael D. Shear, *Obama Vows Fast Action Pressing for Gun Control*, N.Y. TIMES, Dec. 20, 2012, at A1.

9. *See* H.B. 155, 113th Reg. Sess. (Fla. 2011). The complete legislative history, including all versions of the bill cited here, is available on the Florida House of Representatives website at http://www.myfloridahouse.gov/Sections/Bills /billsdetail.aspx?BillId=44993&.

10. It seems nonsensical to prevent physicians from asking about firearm ownership because, among other things, data suggest "that more than 75% of unintentional firearm injuries and deaths to children ages 16 and under happen in the home" and that "up to 50% of parents owning guns keep them loaded and unlocked." Marjorie S. Hardy, *Keeping Children Safe Around Guns: Pitfalls and Promises*, 11 AGGRESSION & VIOLENT BEHAV. 352, 353 (2006).

11. *See* Hiaasen, *supra* note 3 (reporting that the law was "[w]ritten by the National Rifle Association" and asserting that the NRA "had no trouble finding a stooge in the Legislature to sponsor a bill that effectively prohibited physicians from raising the subject"). The NRA has lobbied unsuccessfully for similar legislation to be passed in Alabama, Minnesota, North Carolina, Oklahoma, Tennessee and West Virginia. Andy Kroll, *After Newtown, Will NRA Still Demand a Ban on Docs Asking Kids About Guns?*, MOTHER JONES (Dec. 20, 2012, 11:10 AM), http://www.motherjones.com/mojo/2012/12/nra-docs-glocks-newtown-gun-control.

12. *See* Marc Caputo, *Judge Blocks Fla. Law Restricting Doctor Gun Talk*, TAMPA BAY TIMES (Sept. 14, 2011), http://www.tampabay.com/news/courts/judge-blocks-florida-law-restricting-doctor-gun-talk/1191547 (reporting that Scott "signed the Firearm Owners' Privacy Act into law June 2nd").

13. *See* Editorial, *Doctor Gag Law Indefensible*, ST. PETERSBURG TIMES (Fla.), Sept. 16, 2011, at 14A (noting that "[t]he law, nicknamed 'Docs vs. Glocks,' infringes upon the free speech rights of doctors and patients, and it interferes with the doctor-patient relationship").

The law provides, in relevant part, that health care practitioners in the Sunshine State shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient.[14]

The law buttresses this notion of doctors not asking about gun ownership by adding that physicians "should refrain from unnecessarily harassing a patient about firearm ownership during an examination."[15] The statute provides that if a patient is asked about firearms, he or she may refuse to answer such queries.[16]

The Florida law directly conflicts with the official advice provided to pediatricians by the American Academy of Pediatrics in 2012:

> Pediatricians and other child health care professionals are urged to counsel parents about the dangers of allowing children and adolescents to have access to guns inside and outside the home. The AAP recommends that pediatricians incorporate questions about the presence and availability of firearms into their patient history

---

14. FLA. STAT. ANN. § 790.338(2) (West 2013) (effective June 2, 2011) (emphasis added). The law allows a physician to ask about firearms only if he or she "in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others." *Id.* As addressed later in Part I, the law fails to define the term "relevant." *See infra* notes 84–87 and accompanying text.

15. FLA. STAT. ANN. § 790.338(6).

16. In particular, the statute states:

> A patient may decline to answer or provide any information regarding ownership of a firearm by the patient or a family member of the patient, or the presence of a firearm in the domicile of the patient or a family member of the patient. A patient's decision not to answer a question relating to the presence or ownership of a firearm does not alter existing law regarding a physician's authorization to choose his or her patients.

*Id.* at § 790.338(4).

taking and urge parents who possess guns to
prevent access to these guns by children.[17]

Such a stance seems like common sense, given that "[f]irearm
injuries are a major health risk of children in the United States, especially
for those living in states with a high level of gun ownership."[18] It thus
should be anything but surprising that the Florida statute sparked a fierce
First Amendment-based free speech[19] challenge filed on behalf of several
Florida physicians and physician interest groups in *Wollschlaeger v.
Farmer*.[20] "This gun lobby-backed gag law is a clear violation of the
First Amendment rights of doctors and patients to discuss the severe
risks posed by guns in the home, particularly to children," asserted Paul
Helmke, president of the Brady Center to Prevent Gun Violence, in
announcing the lawsuit supported by his organization.[21]

In June 2012, United States District Court Judge Marcia G.
Cooke issued a permanent injunction preventing Florida from enforcing
the law,[22] concluding that the law amounted to a content-based restriction

---

17. American Academy of Pediatrics, *Policy Statement: Firearm-Related
Injuries Affecting the Pediatric Population*, 130 PEDIATRICS 1416, 1421 (2012).

18. Carolin Senger et al., *Pediatric Firearm Injuries: A 10-Year Single-Center
Experience of 194 Patients*, 46 J. PEDIATRIC SURGERY 927, 927 (2011).) (citing
Matthew Miller et al., *Firearm Availability and Unintentional Firearm Deaths,
Suicide, and Homicide Among 5-14 Year Olds*, 52 J. TRAUMA 267 (2002)).

19. The First Amendment to the United States Constitution provides, in
pertinent part, that "Congress shall make no law . . . abridging the freedom of
speech, or of the press." U.S. CONST. amend. I. The Free Speech and Free Press
Clauses were incorporated nearly ninety years ago through the Fourteenth
Amendment Due Process Clause as fundamental liberties to apply to state and local
government entities and officials. *See* Gitlow v. New York, 268 U.S. 652, 666
(1925). ("[F]reedom of speech and of the press – which are protected by the First
Amendment from abridgment by Congress – are among the fundamental personal
rights and 'liberties' protected by the due process clause of the Fourteenth
Amendment from impairment by the States.").

20. 800 F. Supp. 2d 1251 (S.D. Fla. 2012).

21. Press Release, Brady Campaign to Prevent Gun Violence, Brady Center,
Ropes & Gray Filing Suit on Behalf of Doctors to Strike Down Florida Gun Law
Limiting Free Speech (June 6, 2011), *available at* http://qa.bradycampaign.org
/media/press/view/1396/.

22. *Wollschlaeger*, 880 F. Supp. 2d at 1270.

on speech[23] that "aims to restrict a practitioner's ability to provide truthful, non-misleading information to a patient (or record such information), whether relevant or not at the time of the consult with the patient."[24] The permanent injunction followed a preliminary one issued by Judge Cooke in September 2011.[25]

The issuance of a permanent injunction, however, did not end the matter, as Governor Scott quickly announced he would appeal Judge Cooke's ruling to the United States Court of Appeals for the Eleventh Circuit.[26] As *Miami Herald* columnist Fred Grimm wrote shortly after the elementary school shooting in Connecticut,[27] "the state, with Gov. Rick Scott's blessing, with your tax dollars, has taken the fight to a federal appeals court, trying to get the gag law reinstated."[28] Conversely, Governor Scott asserted the "law was carefully crafted to respect the First Amendment while ensuring a patient's constitutional right to own or possess a firearm without discrimination. I signed this legislation into law because I believe it is constitutional and I will continue to defend it."[29]

This Article examines the First Amendment interests at stake in the ongoing litigation in *Wollschlaeger*, including both the right to speak and the unenumerated right to receive speech.[30] Indeed, the complaint in

---

23. *Id.* at 1261. As Judge Cooke opined, "the law places restrictions on only one subject matter – firearm ownership." *Id.*

24. *Id.* at 1263.

25. Wollschlaeger v. Farmer, 814 F. Supp. 2d 1367, 1371 (S.D. Fla. 2011).

26. *See* Editorial, *Stop Fighting 'Gun Gag Law': Florida Should Not Waste Additional Legal Fees in Supporting an Unnecessary Law*, STUART NEWS (Fla.), Nov. 23, 2012, at 10 (asserting that "[a]fter the judge's ruling, Florida's governor announced that the state would appeal it with the U.S. Court of Appeals for the 11th Circuit").

27. *See* Barron, *supra* note 5 and accompanying text.

28. Fred Grimm, *Gun Advocates Just Change the Subject*, MIAMI HERALD (Dec. 17, 2012), http://www.miamiherald.com/2012/12/17/3146597/gun-advocates-just-change-the.html.

29. Press Release, Rick Scott: 45th Governor of Florida, Florida Appeals Federal Court Decision (July 30, 2012), *available at* http://www.flgov.com/2012/07/30/florida-to-appeal-federal-court-decision/.

30. *See* Kleindienst v. Mandel, 408 U.S. 753, 762–63 (1971) (addressing the First Amendment right to receive information); Griswold v. Connecticut, 381 U.S. 479, 482 (1965) (observing that "the State may not, consistently with the spirit of the

*Wollschlaeger* asserts both rights, including the right of Florida health care practitioners "to engage in open and free exchanges of information and advice with their patients about ways to reduce the safety risks posed by firearms,"[31] and "the First Amendment rights of patients throughout Florida to receive such information and advice from their physicians."[32] Going beyond the First Amendment doctrinal issues to the realm of free speech theory from which those doctrine spring,[33] this Article explores how traditional theories of free expression bolster the need for the Eleventh Circuit to uphold Judge Cooke's rulings enjoining the Firearm Owners' Privacy Act.

    Part I of the Article provides an overview of the legislative history behind the Firearm Owners' Privacy Act, illustrating how anecdotal incidents can spawn a piece of legislation framed by its supporters as a pro-Second Amendment[34] measure rather than an anti-

---

First Amendment, contract the spectrum of available knowledge. The right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, *the right to receive*, [and] the right to read" (emphasis added);)); Martin v. Struthers, 319 U.S. 141, 143 (1943) (asserting that the First Amendment "freedom embraces the right to distribute literature and necessarily *protects the right to receive it*" (emphasis added) (internal citation omitted); ACLU v. Alvarez, 679 F.3d 583, 592 (7th Cir. 2012) (describing the "derivative" right to receive speech and calling it "well established"); *see also* Paula E. Berg, *Lost in a Doctrinal Wasteland: The Exceptionalism of Doctor-Patient Speech Within the Rehnquist Court's First Amendment Jurisprudence*, 8 HEALTH MATRIX 153, 174 (1998) (observing that "the First Amendment protects both positive and negative speech rights – the right to speak, the right not to speak, the right to receive ideas by listening to others, and the right not to be compelled to listen to unwanted speech") (emphasis omitted).

    31. Complaint at 2, Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251 (S.D. Fla. 2012) (No. 1:11-cv-22026), *available at* http://docs.justia.com/cases/federal/district-courts/florida/flsdce/1:2011cv22026/380612/1/.

    32. *Id.*

    33. *See* Robert Post, *Reconciling Theory and Doctrine in First Amendment Jurisprudence*, *in* ETERNALLY VIGILANT: FREE SPEECH IN THE MODERN ERA 153, 153 (Lee C. Bollinger & Geoffrey R. Stone eds., 2002) (asserting that "First Amendment doctrine veers between theory and the exigencies of specific cases. The function of doctrine is both to implement the objectives attributed by theory to the Constitution and to offer principled grounds of justification for particular decisions").

    34. *See* U.S. CONST. amend. II (providing that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed").

First Amendment bill.[35] The Second Amendment, as the Supreme Court recently observed, "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."[36] Part II then analyzes both Judge Cooke's decision to grant a permanent injunction in *Wollschlaeger* and the arguments now being made by both sides on appeal to the Eleventh Circuit.

Part III deploys traditional First Amendment theories to explore the free speech interests at stake when it comes to questions and discussions regarding firearms in the doctor-patient setting. This Part attempts to begin to break new ground because previous academic scholarship and judicial decisions examining the First Amendment interests in the doctor-patient relationship have been overwhelmingly confined to state-imposed restrictions on the subjects of contraception and abortion.[37] Indeed, the Supreme Court's seminal privacy ruling in *Griswold v. Connecticut*[38] articulated a right of patients—specifically, married couples—to receive speech in the context of a state law limiting the discussion of contraception.[39] In contrast, *Wollschlaeger* does *not* involve speech about any course of medical treatment, medical procedure, or even the prescription of medications. Rather, the case hinges squarely on the First Amendment right of doctors to ask questions to learn about possible threats to the physical safety of children that may be present in private residences.[40]

---

35. *See* Gayland O. Hethcoat II, *In the Crosshairs: Legislative Restrictions on Patient-Physician Speech About Firearms*, 14 DEPAUL J. HEALTH CARE L. 1, 10 (2011) (asserting that "supporters and opponents of the Florida firearm statute have used the Second and First Amendments, respectively, to frame the law").

36. District of Columbia v. Heller et al., 554 U.S. 570, 635 (2008).

37. *See* Paula Berg, *Toward a First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. REV. 201, 202 (1994) (writing that "[i]n the United States, ideology-based restrictions on doctor-patient speech have thus far been limited to discussions about abortion and contraception").

38. 381 U.S. 479 (1964).

39. *Id.* at 482 (holding that "[t]he right of freedom of speech and press includes not only the right to utter or to print, but the right to distribute, *the right to receive*, the right to read") (emphasis added).

40. Perhaps somewhat surprisingly, a LexisNexis search of both federal and state case law reveals that only once has any court ever used the phrase "First Amendment right to ask questions," and that occurred in the context of a citizen

More significantly, Part III uses First Amendment theory to argue that restrictions imposed on physicians' right to ask questions of patients warrants use of the rigorous strict scrutiny standard of judicial review to which content-based laws typically are subjected.[41] This stands in stark contrast to the Supreme Court's decision twenty-one years ago in *Planned Parenthood of Southeastern Pennsylvania v. Casey.*[42] There, the Court held that while physicians do possess First Amendment speech rights—in *Casey*, a right not to speak[43]—those rights come only "as part of the practice of medicine, *subject to reasonable licensing and regulation by the State.*"[44]

The Supreme Court in *Casey* provided no further elaboration of the First Amendment speech rights of physicians. As the Second Circuit observed in 2010, the high court in *Casey* "dispensed with the doctors' First Amendment argument summarily, offering only the terse observation" that those rights are subject to reasonable licensing and regulation.[45] Indeed, as Professor Leslie Gielow Jacobs writes, "[l]ower courts have uniformly interpreted *Casey* to apply a 'reasonable

---

posing questions to police officers. *See* Bahnson v. Office Pima Cnty. Sheriff, No. 93-17332, 1995 U.S. App. LEXIS 12708, at *4, n.1 (9th Cir. May 24, 1995).

41. *See* Brown v. Entm't Merch. Ass'n, 131 S. Ct. 2729, 2738 (2011) (observing that "a restriction on the content of protected speech" requires a governmental entity to "demonstrate that it passes strict scrutiny" such that the regulation "is justified by a compelling government interest and is narrowly drawn to serve that interest"); United States v. Caronia, 703 F.3d 149, 163 (2d Cir. 2012) (observing that "[c]ontent-based speech restrictions are subject to 'strict scrutiny' – that is, the government must show that the regulation at issue is narrowly tailored to serve or promote a compelling government interest"); Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 957 (9th Cir. 2012) (opining that "[w]e evaluate content-based restrictions on noncommercial speech under strict scrutiny"); *see also* Aziz Z. Huq, *Preserving Political Speech From Ourselves and Others*, 112 COLUM. L. REV. SIDEBAR 16, 16 (2012) (noting that strict scrutiny, although "internally variegated" as applied by courts, purports to require that laws serve compelling government interests and are narrowly tailored to serve them).

42. 505 U.S. 833 (1992).

43. *See id.* at 884 (writing that "[a]ll that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, *the physician's First Amendment rights not to speak are implicated*") (emphasis added).

44. *Id.* (emphasis added).

45. Conn. Bar Ass'n v. United States, 620 F.3d 81, 98 n.18 (2d Cir. 2010).

relationship' test to claims by abortion providers that disclosure requirements violate their free speech rights."[46] Even more troubling, as Professor Christina Wells points out, it is quite possible to read the *Casey* opinion as denying any First Amendment speech interest, as she contends that:

> The joint opinion's real flaw came in its cavalier dismissal of petitioners' free speech argument because it did not consider abortion counseling to be a form of speech. In fact, the opinion gives one the impression that abortion counseling is so obviously a form of activity rather than speech that it is not even worth discussing at length.[47]

Indeed, Judge Cooke in *Wollschlaeger* acknowledged in her June 2012 opinion issuing a permanent injunction preventing enforcement of the Firearm Owners' Privacy Act that the question of "which constitutional standard should be applied in professional speech cases is still an unsettled question of law."[48] Although she applied the strict scrutiny standard of review in 2011 at the preliminary-injunction phase,[49] she dodged the issue in 2012 of whether strict scrutiny or a less demanding test should apply: "I need not decide which standard applies because the State would not prevail under either test."[50]

The bottom line is that *Wollschlaeger* provides a propitious opportunity to use First Amendment theory to help resolve this issue and to argue that the strict scrutiny doctrine is the more applicable test in cases involving pure speech that takes the form of questions posed to patients designed to protect children from harm. Concluding at the crossroads between First Amendment theory and doctrine, Part IV summarizes and supports this Article's arguments, reviews

---

46. Leslie Gielow Jacobs, *What the Abortion Disclosure Cases Say About the Constitutionality of Persuasive Government Speech on Product Labels*, 87 DENV. U. L. REV. 855, 888 (2010).

47. Christina E. Wells, *Abortion Counseling as Vice Activity: The Free Speech Implications of Rust v. Sullivan and Planned Parenthood v. Casey*, 95 COLUM. L. REV. 1724, 1738 (1995).

48. Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251, 1262–63 (S.D. Fla. 2012).

49. *Id.* at 1262.

50. *Id.* at 1263.

*Wollschlaeger's* possible ramifications for future case law, and remarks on how the Eleventh Circuit's decision augurs for other threats to physicians' firearm-related speech.

I. THE FIREARM OWNERS' PRIVACY ACT: LEGISLATIVE HISTORY, KEY TERMS
AND FRAMING THE DEBATE

*A. Legislative History and Key Terms*

Behind every new law, it seems, there is a combustible confluence of characters. A miffed mother,[51] a perturbed pediatrician,[52] a fervent gun-rights organization,[53] and a responsive lawmaker[54] comprise the quartet of key players largely responsible for Florida's Firearm Owners' Privacy Act.

The clash between the first two of these figures was the initial impetus for the Act. In July 2010, Amber Ullman contacted her local legislator to complain about Dr. Chris Okonkwo,[55] a board-certified pediatrician specializing in comprehensive pediatric care in the rural city of Ocala.[56] One month prior, Okonkwo reportedly told Ullman she needed to find a new doctor after the young mother refused to answer the

---

51. *See infra* notes 55–60 and accompanying text.

52. *See infra* notes 55–60 and accompanying text.

53. Specifically, the National Rifle Association, which describes itself as "widely recognized today as a major political force and as America's foremost defender of Second Amendment rights" and "the premier firearms education organization in the world." *About Us: A Brief History of the NRA*, NATIONAL RIFLE ASSOCIATION OF AMERICA, http://membership.nrahq.org/about-us.asp (last visited Oct. 30, 2013).

54. *See infra* notes 67–68 and accompanying text.

55. *See* Jay Weaver, *Miami Federal Judge Sides With 'Docs' Over 'Glocks' in Fla. Gun Rights Case*, MIAMI HERALD (July 2, 2012), http://www.miamiherald.com/2012/07/02/2879089/miami-federal-judge-sides-with.html.

56. *See Meet the Doctors*, CHILDREN'S HEALTH OF OCALA, http://www.childrenshealthofocala.com/meet-the-doctors.html (last visited Mar. 25, 2013) (providing a brief biography of Dr. Okonkwo).

pediatrician's question about whether there were firearms in her home.[57] Ullman did not understand why the query, which she viewed as privacy-invasive, was necessary during a routine checkup of Temperance, her four-month-old daughter.[58]

According to *Slate* magazine, Ullman vociferously objected to Okonkwo's question, telling him, "None of your business!"[59] When the doctor attempted to explain his rationale for posing the question, Ullman angrily retorted, "Didn't you hear what I said? None of your damn business!"[60]

This was not, however, an isolated incident, at least according to a brief filed with the Eleventh Circuit in September 2012 by Florida Attorney General Pamela Bondi.[61] Another lawmaker reported receiving an email from "a mother who was separated from her children while medical personnel not only interrogated the children about gun ownership but put that in their medical record."[62] The brief further described an incident directly involving a Florida legislator.[63] In that case, after inquiring about firearm possession, a doctor advised the lawmaker to remove a firearm from his home—advice taken by the legislator as a direct attack on his Second Amendment rights.[64] A fourth incident involved a constituent calling a legislator to report "that a doctor had refused care upon a nine-year-old . . . that was in their custody . . . because they wanted to know if they had a firearm in their home."[65]

57. Fred Hiers, *Family and Pediatrician Tangle Over Gun Question*, OCALA STAR-Banner (last updated July 24, 2010, 11:52 AM) http://www.ocala.com/article /20100724/ARTICLES/7241001.

58. *Id.*

59. Helena Rho, *The Pediatricians vs. the NRA*, SLATE (Feb. 1, 2013), http://www.slate.com/articles/health_and_science/medical_examiner/2013/02/pediat ricians_and_nra_physician_gag_rules_and_the_cdc_aca_and_states.html.

60. *Id.*

61. Brief for Appellants at 3–4., Wollschlaeger v. Scott, No. 12-14009-FF (11th Cir. Sept. 17, 2012) [hereinafter Brief for Appellants].

62. *Id.* at 3.

63. *Id.*

64. *Id.*

65. *Id.* at 3–4.

These anecdotes, along with the support of the National Rifle Association,[66] provided enough fodder for Jason Brodeur, a freshman Republican representative from Sanford, Florida, and twelve co-sponsors to introduce House Bill 155 in January 2011.[67] As one columnist for the *Palm Beach Post* wrote, the "NRA sprang into action by unleashing its fully owned subsidiary, the Florida Legislature, to criminalize the practice of responsible patient care."[68] As originally proposed, the bill provided, in relevant part that:

> [a] verbal or written inquiry by a public or private physician, nurse, or other medical staff person regarding the ownership of a firearm by a patient or the family of a patient or the presence of a firearm in a private home or other domicile of a patient or the family of a patient violates the privacy of the patient or the patient's family members, respectively.[69]

As introduced, the bill featured extremely severe punishments. Specifically, it deemed a violation to constitute a third-degree felony and subjected an offending physician to a fine of up to "$5 million if the court determines that the person knew or reasonably should have known that the conduct was unlawful."[70]

It took slightly more than four months and several amendments for the bill to move through the Florida Legislature.[71] By late April 2011, the Florida House of Representatives passed the bill by a margin of

---

66. *See* Editorial, *No Joy in Mudville*, TAMPA BAY TIMES, July 8, 2012, at 2P (noting that the law "was pushed by the National Rifle Association").

67. H.B. 155, 113th Reg. Sess. (Fla. 2011).

68. Frank Cerabino, *Talk to Me, Doc; Just Don't Ask About My Guns*, PALM BEACH POST, Feb. 24, 2011, at 1B.

69. H.B. 155, 113th Reg. Sess. (Fla. 2011) (as introduced Jan. 10, 2011), *available at* http://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx ?FileName=_h0155__.docx&DocumentType=Bill&BillNumber=0155&Session=20 11.

70. *Id.*

71. *See Doctor Gag Law Indefensible, supra* note 13, at 14A (noting that "As[a]s originally filed by Rep. Jason Brodeur, R-Sanford, and Sen. Greg Evers, R-Baker, doctors could be punished for up to five years in prison and a $5 million fine. Those pernicious elements were removed").

eighty-eight to thirty, and the next day the Senate approved it by a vote of twenty-seven to ten.[72] In its final form and as now codified as Section 790.338 of the Florida Statutes,[73] the measure makes physicians subject to disciplinary action under state laws regulating health professions.[74] The firearms law provides, in key part, that health care practitioners:

> *shall* respect a patient's right to privacy and *should* refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that *in good faith believes* that this information is *relevant* to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.[75]

The emphasized words and phrases in the above-quoted portion of the law illustrate its seemingly contradictory nature. On the one hand, the word "shall" appears to indicate the mandatory or imperative nature of the law,[76] yet the word "should" in the very same sentence intimates the law is merely suggestive or hortatory.[77] On the other hand, as a recent law journal article points out, "there have been many cases where a

---

72. *See* Firearm Owners--Health Care Providers--Privacy, 2011 Fla. Sess. Law Serv. Ch. 2011-112 (C.S.C.S.H.B. 155) (West) (codified as Fla. Stat. § 790.338 (2012)).

73. FLA. STAT. § 790.338.

74. *Id.* at § 456.072.

75. *Id.* at § 790.338(2) (emphasis added).

76. *See* Pierce v. Underwood, 487 U.S. 552, 569–70 (1988) (classifying "shall," as used in a federal statute, as "mandatory language"); *see also* Julian Velasco, *Congressional Control Over Federal Court Jurisdiction: A Defense of the Traditional View*, 46 CATH. U. L. REV. 671, 697 (1997) (noting that "the word 'shall' often denotes a mandatory meaning, particularly when used in legislation").

77. *See generally* Peter D. Webster et al., *Statutory Construction in Florida: In Search of a Principled Approach*, 9 FLA. COASTAL L. REV. 435, 468–70 (2008) (providing an overview of statutory construction in Florida, and pointing out the Florida Supreme Court's own disagreement on the meaning of the word "shall" in the case of *State v. Goode*, 830 So. 2d 817 (Fla. 2002)).

statutory 'shall' has been held to be directory or precatory or hortatory rather than mandatory."[78]

When granting a preliminary injunction thwarting enforcement of the law in September 2011, Judge Marcia Cooke wrestled with this issue of statutory construction.[79] She ultimately concluded that "laws that provide for disciplinary action in the case of violations or noncompliance are mandatory, not precatory or hortatory,"[80] and that Florida's "interpretation of the law as hortatory would render meaningless the law's provision that violations of the law shall constitute grounds for disciplinary action."[81]

How did this confusing blend of language end up in the law? According to the *Miami Herald*, "[o]riginally, the legislation banned doctors from asking about firearms at all. But the National Rifle Association and the Florida Medical Association agreed on compromise legislation that said doctors 'should' refrain from the line of questioning."[82] The compromise apparently came because "many on the Senate Health Regulation Committee" felt the original bill "was a violation of free-speech rights."[83]

---

78. Tobias A. Dorsey, *Sense and Severability*, 46 U. RICH. L. REV. 877, 902 (2012).

79. Wollschlaeger v. Farmer, 814 F. Supp. 2d 1367, 1376–77 (S.D. Fla. 2011).

80. *Id.* at 1376.

81. *Id.*

82. Marc Caputo, *Judge Blocks Florida Law Restricting Doctor Gun Talk*, MIAMI HERALD, Sept. 14, 2011, *available at* NewsBank database, Rec. No. 201109140500KNRIDDERFLMIAMIH_98a42ecc20e8daaaad667c5c9870df62. The Florida Medical Association describes itself as:

> a professional association dedicated to the service and assistance of Doctors of Medicine and Doctors of Osteopathic Medicine in Florida. The FMA represents more than 20,000 physicians on issues of legislation and regulatory affairs, medical economics and education, public health, and ethical and legal issues. We advocate for physicians and their patients to promote the public health, ensure the highest standards of medical practice, and to enhance the quality and availability of health care in the Sunshine State.

*About the FMA*, FLORIDA MEDICAL ASSOCIATION, http://www.flmedical.org/About_the_FMA.aspx (last visited Mar. 25, 2013).

83. Marc Caputo, *NRA (2nd Amendment) and FMA (1st Amendment) Call a Truce*, TAMPA BAY TIMES (Mar. 25, 2011, 6:10 PM), http://www.tampabay.com/

The second sentence of the above-quoted section[84] further convolutes matters by permitting questions about firearms, but only if a physician first possesses a good-faith belief that the information gleaned from the question would be relevant for safety purposes.[85] The law, however, fails to articulate what "relevant" means within this context or how a physician is to formulate such a good-faith belief.[86] This good-faith relevance exception was still not able to save the bill from enjoinment.[87]

A separate provision of the statute also mixes mandatory and hortatory terminology affecting a physician's freedom of speech. In particular, Section 6 provides that physicians "*shall*" respect a patient's legal right to own or possess a firearm and *should* refrain from unnecessarily harassing a patient about firearm ownership during an examination."[88]

Soon after Governor Rick Scott signed the bill into law in June, 2011, a group of medical professionals, led by Miami family health practitioner Bernd Wollschlaeger, challenged its constitutionality and sought an injunction.[89] The legal fight over the law's future quickly became, as the *Miami Herald* put it, "an ideological battle between advocates of free speech and the right to bear arms."[90] Lead plaintiff Bernd Wollschlaeger knows firsthand the dangers of censorship and the importance of being able to speak the truth; his father was a Nazi tank commander who was awarded a Knight's Cross by Adolf Hitler, and he

---

blogs/the-buzz-florida-politics/content/nra-2nd-amendment-and-fma-1st-amendment-call-truce.

84. "Notwithstanding this provision, a health care practitioner or health care facility that *in good faith believes* that this information is *relevant* to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry." FLA. STAT. § 790.338(2) (2013) (emphasis added).

85. *Id.*

86. *See infra* note 200 and accompanying text.

87. *See infra* Part II.A,

88. FLA. STAT. § 790.338(6) (emphasis added).

89. Jay Weaver, *Doctors Urge Judge to End Ban on Asking Patients About Guns*, ORLANDO SENTINEL (July 14, 2011), *available at* NewsBank, Rec. No. 1107130150.

90. Weaver, *supra* note 55.

told his son that his "teachers were all communists and liars and that a Holocaust never actually existed."[91]

The landslide of political momentum that carried the bill through the legislature was not surprising. Pro-Second Amendment regulation is common in Florida,[92] which sometimes is derisively referred to as the "Gunshine State."[93] By late 2012, Florida had issued one million active concealed-carry licenses.[94] It is a state where more than thirty percent of its citizens own guns.[95] Okonkwo, in fact, told one newspaper reporter that more than half of his patients owned guns.[96]

In recent years, Floridian pro-gun legislation has included passage of a law obliging employers to allow employees to keep guns in their vehicles[97] while at work, and county governments to allow guns in public buildings and parks.[98] Florida also has lifted the ban on guns in

91. Elaine Markowitz, *Raised in a Nazi Family, He Converted to Judaism*, TAMPA BAY TIMES (Feb. 12, 2013), http://www.tampabay.com/news/humaninterest /raised-in-a-nazi-family-he-converted-to-judaism/1274963. Bernd Wollschlaeger later converted to Judaism after discovering the history of his family. *Id.*

92. *See* Adam Weinstein, *How the NRA and Its Allies Helped Spread a Radical Gun Law Nationwide*, MOTHER JONES (June 7, 2012, 3:10 AM), http://www.motherjones.com/politics/2012/06/nra-alec-stand-your-ground?page=1.

93. Michael C. Bender & Simone Baribeau, *Florida Turns 'Gunshine State' After Years of Republican Control*, BLOOMBERG (Mar. 29, 2012, 12:01 AM), http://www.bloomberg.com/news/2012-03-29/florida-turns-gunshine-state-after-years-of-republican-control.html.

94. Michael Van Sickler, *It's Official: Florida Passes 1 Million Threshold in Concealed Weapons Permits*, TAMPA BAY TIMES (Dec. 19, 2012, 3:45 PM), http://www.tampabay.com/blogs/the-buzz-florida-politics/content/its-official-florida-passes-1-million-threshold-concealed-weapons-permits; *see also* Daniel Ruth, *Gun Frenzy Creating a Loaded Situation*, TAMPA BAY TIMES, Jan. 6, 2013, at 1P1, *available at* General OneFile, Doc. No. A314211824 (asking whether Florida really wants "to be known as the Gunshine State?," and adding that Florida recently "reached the 1 million mark in the number of folks running around with concealed weapons permits. And the state's insane 'stand your ground' law makes it so much easier and convenient for us to shoot each other over a fender-bender").

95. *See* Bender & Baribeau, *supra* note 93 (explaining that Florida, a "state of about 19 million has about 6 million gun owners").

96. *See* Hiers, *supra* note 57.

97. *See* FLA. STAT. § 790.338 (2012).

98. *See* Lizette Alvarez, *Florida Forces Towns to Pull Local Laws Limiting Guns*, N.Y. TIMES, Sept. 11, 2011, at 12N.

national forests and state parks;[99] allowed military personnel as young as seventeen to acquire concealed-weapons licenses;[100] withheld the names of concealed-carry licensees within public records; and permitted concealed-carry licensees "to briefly and openly display the firearm to the ordinary sight of another person."[101]

It thus seemed natural, if not inevitable, that Florida would pass its new physicians-and-firearms law in 2011 and, in turn, defend it as a valuable addition to its formidable body of statutes protecting the Second Amendment rights of Floridians.[102] Yet while the "Glocks" side of the debate presented its arguments in that constitutionally cloaked frame, the "Docs" were approaching this political matter through an entirely different constitutional lens. Ultimately, in their attempts to win the political debate both in the court of law and the court of public opinion, each side became purposeful with the frames through which it presented arguments and, in turn, through which the news media filtered them. Indeed, framing constitutes "a fundamental part of political communication and news reporting."[103]

### B. Issue Framing

Framing theory suggests that just as an artist understands how a physical frame surrounding her work significantly affects viewers' perceptions of the image within it, so too does the shrewd proponent of an argument or idea understand that her angles and word choices—the informational context of her contentions—can be the difference in success or failure in persuading an audience.[104] This reality manifests itself so strongly in some situations that, even when discussing the same

---

99. *See id.*

100. *See* FLA. STAT. § 790.062 (2012).

101. *See* Weinstein, *supra* note 92.

102. Toluse Olorunnipa, *Pro-Gun Proving Ground,* TAMPA BAY TIMES, Apr. 2, 2012, at 1A, *available at* General OneFile, Doc. No. A285094547.

103. Lene Aaroe, *Investigating Frame Strength: The Case of Episodic and Thematic Frames,* 28 POL. COMM. 207, 207 (2011).

104. David Tewksbury & Dietram Scheufele, *News Framing Theory and Research, in* MEDIA EFFECTS 17, 17 (Jennings Bryant & Mary Beth Oliver eds., 3d. ed. 2009).

idea, separate entities can create starkly differing narratives of the same facts.[105]

According to Professor Robert Entman, frames perform a trio of functions: diagnosing, evaluating and prescribing[106]—all three are apparent on both sides of the physicians-and-firearms debate. "Framing essentially involves selection and salience,"[107] Entman writes, adding that "[t]o frame is to select some aspects of a perceived reality and make them more salient in a communicating text, in such a way as to promote a particular problem definition, causal interpretation, moral evaluation, and/or treatment recommendation for the item described."[108]

Ultimately, as Philip Hart notes, framing is "a robust and broad theoretical approach that has been used in multiple strains of literature, research, and disciplines."[109] Framing seems particularly relevant for an issue such as the Florida law at the heart of this Article because, as Professor Entman asserts, "policy making in democratic systems can be understood as a series of continuing competitive struggles to dominate the framing of problems and solutions."[110]

The news media's significant attention paid to the Amber Ullman incident in Ocala[111] constitutes what is known as episodic framing, in which "a story focuses on individuals who illustrate and

---

105. Wan Hulaimi, *Don't Underestimate the Power of Narratives*, VETERANS TODAY (Sep. 26, 2011), http://www.veteranstoday.com/2011/09/26/dont-underestimate-the-power-of-narratives/.

106. Robert M. Entman, *Framing: Toward Clarification of a Fractured Paradigm*, 43 J. COMM. 51, 52 (1993).

107. *Id.* (emphasis omitted).

108. *Id.* (emphasis omitted). This recently was described by another scholar as "Entman's oft-cited definition of framing." Lesa Hatley Major & Kimberly K. Walker, *Newspapers Lack Substantive Reporting on Sexual Issues*, 31 NEWSPAPER RES. J. 62, 63 (2010).

109. Philip Solomon Hart, *One or Many? The Influence of Episodic and Thematic Climate Change Frames on Policy Preferences and Individual Behavioral Change*, 33 SCI. COMM. 28, 31 (2011).

110. Carole V. Bell & Robert M. Entman, *The Media's Role in America's Exceptional Politics of Inequality: Framing the Bush Tax Cuts of 2001 and 2003*, 16 INT'L J. PRESS/POLITICS 548, 553 (2011).

111. *See supra* notes 55–59 and accompanying text.

exemplify an issue."[112] Episodic framing often thus involves "human interest stories"[113] and "the lives of individuals,"[114] items to which a verbal skirmish between a young mother and a supposedly nosey doctor in a rural small town readily lends itself.[115] An *Orlando Sentinel* opinion column captures well this episodic frame:

> The problem came to Floridians' attention in the summer of 2010 when Amber Ullman took her baby daughter in to the pediatrician for a checkup. The doctor followed standard AAP [American Academy of Pediatrics] policy and asked her whether she had a gun in her home. When Mrs. Ullman refused to answer on the grounds of privacy invasion, the pediatrician terminated the mother and daughter from his practice. The pediatrician's abrupt dismissal of the mother and her baby from his practice touched a nerve. It was public reaction to inappropriate conduct by a doctor that prompted the Legislature to pass the Firearm Owner's Privacy Act.[116]

This column's assertion that a doctor's "inappropriate conduct" targeting a mother and her "baby daughter" sparked a new law reflects what Professor Oscar Gandy considers a primary attribute of episodic themes—namely, an "attempt to demonize individuals . . . as the 'bad

---

112. Jorg Matthes, *Framing Responsibility for Political Issues: The Preference for Dispositional Attributions and the Effects of News Frames*, 26 COMM. RES. REP. 82, 83 (2009).

113. Sei-Hill Kim, *Talking About Poverty: News Framing of Who is Responsible for Causing and Fixing the Problem*, 87 JOURNALISM & MASS. COMM. Q. 563, 565 (2010).

114. Oscar H. Gandy & Zhan Li, *Framing Comparative Risk: A Preliminary Analysis*, 16 HOWARD J. COMM. 71, 72 (2005).

115. For instance, former U.S. Congressman and National Rifle Association board member Bob Barr directly named Amber Ullman and referenced her clash with Dr. Okonkwo in a newspaper column castigating what he called "nosey pediatricians." Bob Barr, Op-Ed., *Doctoring Gun Owners' Privacy*, ATLANTA J.-CONST., May 2, 2011, at A12.

116. Timothy Wheeler, Editorial, *Firearm Privacy Act Protects Patients' Rights*, ORLANDO SENTINEL, Aug. 17, 2012, at A24, *available at* America's News, Record No. 12081760719915.

guys.'"[117] In this instance, a doctor is demonized while a baby and her mother are victimized.

A July 2010 story in Ullman's hometown newspaper, the *Ocala Star-Banner*, also played the episodic-framing card, naming her in the article's lead sentence: "It was a question Amber Ullman least expected Wednesday from her children's pediatrician."[118] The story's final sentence, book-ending the remark above, intimated that the doctor was, per Gandy's characterization, the bad guy. Specifically, it quoted Ullman for the proposition that her "children have to suffer because of this and that's not right."[119]

A news story in the *Palm Beach Post* about the bill that would become the Firearm Owners' Privacy Act somewhat sympathetically described Ullman as a "26-year-old mother of three" and quoted her for the proposition that her pediatrician asked a "very invasive and personal question."[120] Yet, that same article with this episodic framing also noted something else—the Florida "legislature is favoring the Second Amendment right to bear arms over the First Amendment freedom of speech."[121]

This latter claim, unlike the others addressed immediately above, employs thematic, rather than episodic, framing. Thematic framing "addresses public issues in more general context"[122] and "emphasize[s] broader trends and social conditions."[123] Both the stakeholders and the news media engaged in this type of framing when they cast the physicians-and-firearms debate as one involving the dueling constitutional interests of gun rights and speech rights.

---

117. Gandy & Li, *supra* note 114, at 72.

118. Hiers, *supra* note 57.

119. *Id.*

120. Stacey Singer, *Doctors Fear Gun Privacy Law Would Stifle Safety Questions*, PALM BEACH POST (Fla.), Apr. 23, 2011, at 4A., *available at* America's News, Record No. 1104233342402.

121. *Id.*

122. Hsiang Iris Chyi & Maxwell McCombs, *Media Salience and the Process of Framing: Coverage of the Columbine School Shootings*, 81 JOURNALISM & MASS COMM. Q. 22, 24 (2004).

123. Lesa Hatley Major, *The Mediating Role of Emotions in the Relationship Between Frames and Attribution of Responsibility for Health Problems*, 88 JOURNALISM & MASS COMM. Q. 502, 503 (2011).

For example, a January 2013 *New York Times* article plays up the Second Amendment interests while noting that the Florida physicians-and-firearms law "raised First Amendment questions."[124] A July 2012 article in the *Palm Beach Post* quoted the executive director of the Florida American Civil Liberties Union ("ACLU") for the proposition that the Florida law "is about as clear a First Amendment violation as could be," while also noting that Judge Cooke "ruled [that] the law in no way affects Second Amendment rights to bear arms but unconstitutionally violates physicians' First Amendment right to freedom of speech."[125]

The NRA and its proponents clearly attempted to frame the bill in Second Amendment terms—or so claimed their opponents, who garnered valuable opinion-column space in the mainstream news media. For instance, Thomas Julin, a Florida media defense attorney representing several friends-of-the-court challenging the law, asserted in an opinion column in the *Sun Sentinel* that:

> The mere asking of the questions, the NRA argued in Tallahassee, interfered with the patients' fundamental Second Amendment right to bear arms. While this did not make any logical sense, many state legislators apparently recognized the opportunity to attract campaign contributions from one of the nation's most well-funded lobbying organizations.[126]

The practitioners' lobby[127] framed the issue, as one might expect, in a free-speech context. Citing First Amendment concerns, the

---

124. Jane E. Brody, *Keeping Children Safe, and Away, From Firearms*, N.Y. TIMES, Jan. 8, 2013, at D7.

125. Dara Kam, *Fla. Appeals Gun Law Injunction*, PALM BEACH POST (Fla.), July 31, 2012, at 2A, *available at* America's News, Record No. 1207314327241.

126. Thomas R. Julin, *Doctors Should Have Right to Ask Patients About Their Guns*, SUN SENTINEL (Ft. Lauderdale, Fla.), July 5, 2012, at 11A, *available at* America's News, Record No. 12070454526271.

127. It should be noted that not all physicians agree with the stance taken by plaintiff Bernd Wollschlaeger. Specifically, a group called Doctors for Responsible Gun Ownership ("DRGO"), which is affiliated with the Second Amendment Foundation, describes itself as a nationwide network of physicians, scientists, medical students, and others who support the safe and lawful use of firearms.

predominant fear mongered—rightly or wrongly so—by opponents of the law was the law's chilling effect on doctors' speech. According to an amicus brief filed in November 2012 by a group of physicians and the American Civil Liberties Union, doctors across Florida allegedly engaged in self-censorship to avoid potential disciplinary action.[128]

Further asserting that the statute tramples First Amendment speech rights, Julin—along with several medical societies and the ACLU—makes the case that the law would affect the intake questionnaires commonly used by physicians for the initial screening of new patients:

> These questions are examples of where this statute has a very real and immediate impact on a substantial amount of speech by many healthcare practitioners and providers. The statute subjects practitioners to discipline if they continue to engage in the use of their preliminary screening questionnaires or if they follow up with further oral questions on the same topic.[129]

The brief filed with the Eleventh Circuit on behalf of Bernd Wollschlaeger asserts that "[i]nquiring about firearm ownership and recording such information in a patient's medical record is a routine part of the effective practice of preventive medicine for many health care practitioners."[130] The brief adds that "as part of their practice of

---

> We believe that average Americans, including young people, can be trusted to use firearms safely for the benefit of themselves and their communities. *You don't need a doctor lecturing you about guns, especially if he or she has no knowledge of firearms. And firearm safety is not something you learn in medical school.*

DRGO  *Information*,  DOCTORS  FOR  RESPONSIBLE  GUN  OWNERSHIP, http://www.drgo.us/?page_id=26 (last visited Oct. 31, 2013) (emphasis added).

128. Amicus Curiae Brief in Support of Affirming the Judgment for Plaintiffs/Appellees of the ACLU Foundation of Florida, Inc. et al. at 9–10, Wollschlaeger v. Scott, No. 12-14009-FF (11th Cir. Nov. 8, 2012) [hereinafter ACLU Amicus Brief].

129. *Id.* at 9.

130. Brief for Appellees at 3, Wollschlaeger v. Scott, No. 12-14009-FF (11th Cir. Oct. 29, 2012) [hereinafter Brief for Appellees].

preventive medicine, many practitioners, including Appellees, routinely ask patients about a variety of potential health and safety risks, including household chemicals, swimming pools, drugs, alcohol, tobacco, and firearms."[131] In an interview with a local newspaper, Wollschlaeger further added that "we don't consider ourselves fringe physicians like the governor likes to say. We are mainstream physicians who want to uphold safety. . . . We ask about a lot of things that people may find offensive, like sexual behavior."[132] NRA lobbyist Marion Hammer rejoined these contentions by pointing out that swimming pools, chemicals, poison and sexual behavior are not constitutionally protected, unlike firearm ownership.[133]

Nevertheless, the matter became a First Amendment versus Second Amendment issue, or, in other words, a matter of censorship versus discrimination. Indeed, the NRA, in an amicus brief filed with the Eleventh Circuit, alleges that the Florida law "targets discrimination against and harassment of individuals who exercise their fundamental right to keep and bear arms."[134]

Of course, the bill's very title—the Firearm Owners' Privacy Act—makes clear another thematic frame deployed by its supporters: privacy. As the NRA's Marion Hammer rhetorically asked the *American Medical News* in weaving together both the privacy and Second Amendment frames, "How much is your privacy worth? How much is your right to keep and bear arms worth?"[135]

This all suggests that framing occurred at the levels of both the news media and the litigants in the case that is this article's centerpiece. As a September 2011 editorial in the *St. Petersburg Times* framed the debate in the first paragraph:

---

131. *Id.* at 4.

132. Kristine Crane, *Should Doctors Ask Patients About Guns? Forum Airs the Debate*, GAINESVILLE SUN (Fla.), Feb. 6, 2013, at A1, *available at* http://www.gainesville.com/article/20130206/ARTICLES/130209725.

133. *Id.*

134. Brief of Amicus Curiae National Rifle Association of America, Inc. Supporting Appellants and Reversal at 4, Wollschlaeger v. Governor of Fla., No. 12-14009-FF (11th Cir. Oct. 1, 2012) [hereinafter Brief of NRA].

135. Doug Trapp, *Physicians, Gun Owners Tangle Over Florida "Don't Ask" Gun Bill*, AM. MED. NEWS (Jan. 31, 2011), http://www.amednews.com/article/20110131/government/301319963/4/.

> Florida's new law punishing doctors for questioning their patients about firearms is a prime example of the state's powerful gun lobby overstepping its bounds. The law, nicknamed "Docs vs. Glocks," infringes upon the free speech rights of doctors and patients, and it interferes with the doctor-patient relationship. That didn't stop lawmakers beholden to the National Rifle Association from passing the statute in the last legislative session, or Gov. Rick Scott from signing it into law.[136]

As the media and litigants framed the issue before the public and court as a First and Second Amendment battle, the *Wollschlaeger* court considered the merits of each side of the debate.

The next Part of this Article examines Judge Cooke's 2012 opinion granting a permanent injunction that stopped enforcement of the Firearm Owners' Privacy Act. The Part also reviews the arguments made by the parties and selected friends of the court that are now pending before the Eleventh Circuit.

II. THE BATTLE IN *WOLLSCHLAEGER*: FROM THE DISTRICT COURT TO THE ELEVENTH CIRCUIT

This Part has two sections. Section A analyzes the primary reasons why Judge Marcia Cooke permanently enjoined the Firearm Owners' Privacy Act. Section B then delves into the appellate briefs filed by both parties with the Eleventh Circuit and explores some of the critical arguments set forth in several amicus briefs filed with that court.

---

136. *Doctor Gag Law Indefensible, supra* note 13, at 14A.

*A.   The District Court Ruling*

1. The Opinion and the Standards Employed by the District Court

In June 2012, Judge Cooke issued a permanent injunction in *Wollschlaeger v. Farmer* stopping Florida from enforcing the key provisions of the Firearm Owners' Privacy Act that would affect the ability of physicians to ask patients questions about firearm possession.[137] This Section reviews Judge Cooke's analysis in reaching that determination, including her decision not to resolve the crucial question regarding the appropriate level of judicial scrutiny for laws restricting physicians' speech.[138]

Addressing the threshold query of whether the plaintiffs—physicians and physician-interest groups—had standing to challenge the Act, Judge Cooke zeroed in on the crux of their First Amendment argument. She explained that although the plaintiffs "seriously wish to ask their patients about firearms and discuss firearm safety with their patients,"[139] they "began self-censoring when the law went into effect in June 2011. Passage of the law caused Plaintiffs' injury by chilling their

---

137. Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251, 1270. (S.D. Fla. 2012). Of most significance for this article, she enjoined the provision that states:

> A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.

FLA. STAT. § 790.338(2) (2012).
138. *Wollschlaeger*, 880 F. Supp. 2d at 1263.
139. *Id.* at 1258.

speech."[140] Chilling effect arguments are often powerful in First Amendment jurisprudence,[141] and they proved to be so in this case. After concluding that standing existed because an order stopping enforcement of the law would permit the plaintiffs to resume asking firearms-related questions,[142] Judge Cooke also held the case was ripe for review because delayed adjudication would cause the plaintiffs to "continue to engage in self-censorship."[143]

Next, the court faced the central doctrinal issue: selecting the correct standard of review for determining whether the Act violated the plaintiffs' First Amendment speech interests. Here, Judge Cooke initially had little problem concluding the Act was a content-based regulation, reasoning that the Act "places restrictions on only one subject matter— firearm ownership."[144] This determination of subject matter restriction is typically important because, as Professor Dan Kozlowski notes, "the constitutional fate of a regulation under review hinges on the category [in]to which it has been placed," namely one of the three traditional First Amendment groupings of content-neutral, content-based, and viewpoint-based laws.[145]

Content-based laws are typically subject to the strict scrutiny standard of judicial review.[146] As Judge Cooke wrote in describing this standard, "[t]o survive strict scrutiny, a law must constitute the least

---

140. *Id.* at 1259.

141. *See* Citizens United v. Fed. Elections Comm'n, 558 U.S. 310, 333 (2010) (citing "the substantial, nationwide chilling effect caused" by a federal statute affecting corporate expenditures as the primary reason for the Court deciding to exercise "its judicial responsibility" to review the facial validity of that statute); *see also* Anthony Ciolli, *Chilling Effects: The Communications Decency Act and the Online Marketplace of Ideas*, 63 U. MIAMI L. REV. 137, 157 (2008) (noting that "[i]n the United States, courts have been highly conscious of the potential for a chilling effect," and asserting that "[t]he classic example of a court's concern with chilling effects" is the U.S. Supreme Court's opinion in the defamation case of *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964)).

142. *Wollschlaeger*, 880 F. Supp. 2d at 1259.

143. *Id.*

144. *Id.* at 1261.

145. Dan V. Kozlowski, *Content and Viewpoint Discrimination: Malleable Terms Beget Malleable Doctrine*, 13 COMM. L. & POL'Y 131, 131–32 (2008).

146. *See supra* note 41 and accompanying text.

restrictive means of advancing a compelling government interest."[147] She added that she previously applied strict scrutiny in her September 2011 decision granting a preliminary injunction against the Act.[148]

Yet, Judge Cooke noted that whether strict scrutiny actually is the correct rule by which to measure the constitutionality of the Act was not so obvious. As mentioned earlier, she wrote that "which constitutional standard should be applied in professional speech cases is still an unsettled question of law."[149] Indeed, Professor Robert Post wrote in 2007 that there is currently a "complex and difficult relationship between the First Amendment and the regulation of professional speech of doctors. The nature of this relationship is unfortunately obscure and controversial."[150] It was into these constitutionally choppy waters that Judge Cooke waded.

She explained that the law conceivably could be analyzed under the balancing test used in *Gentile v. State Bar of Nevada.*[151] In *Gentile*, the Supreme Court ruled on the constitutionality of a state law preventing attorneys from engaging in pretrial publicity that might prejudice the adjudicative process.[152] The justices in *Gentile* fractured badly, with Justice Anthony Kennedy delivering two parts of the opinion for the Court,[153] and Chief Justice William Rehnquist writing two other parts of the Court's opinion.[154]

---

147. *Wollschlaeger*, 880 F. Supp. 2d at 1262. She added that she previously applied strict scrutiny in her September 2011 decision granting a preliminary injunction against the Act. *Id.* at 1262; *see also* Wollschlaeger v. Farmer, 814 F. Supp. 2d 1367, 1379 (S.D. Fla. 2011) (opining that "[t]he plain language of the law, with reference to its legislative history, leads me to conclude that the Firearms Owners' Privacy Act is content-based. Having so determined, I must analyze whether the law will likely survive strict scrutiny") (citations omitted).

148. *Wollschlaeger*, 880 F. Supp. 2d at 1262.

149. *Id.* at 1262–63.

150. Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* 2007 U. ILL. L. REV. 939, 944 (2007).

151. 501 U.S. 1030 (1991).

152. *Id.* at 1033 (setting forth the relevant part of Nevada Supreme Court Rule 177 at issue in the case).

153. *Id.* at 1032 (noting that Justice Kennedy "delivered the opinion of the Court with respect to Parts III and VI").

154. *Id.* at 1062 (noting that Chief Justice Rehnquist "delivered the opinion of the Court with respect to Parts I and II").

The Chief Justice, in writing Part II of the opinion for the Court, observed that "our decisions dealing with a lawyer's right under the First Amendment to solicit business and advertise, contrary to promulgated rules of ethics, have *not* suggested that lawyers are protected by the First Amendment to the same extent as those engaged in other businesses."[155] Rehnquist wrote that the speech of attorneys, at least in the context of representing clients in pending cases, may be regulated "under a less demanding standard."[156] He added that "[w]hen a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question."[157]

While this opinion may be construed as applying only to attorney speech, Judge Cooke deployed both *Gentile* and strict scrutiny because, as attorney David T. Moldenhauer argues, *Gentile* serves "as a template for the regulation of speech by professionals that participate in crucial public functions."[158] Like attorneys, doctors are professionals who engage in a heavily regulated practice,[159] and courts have suggested that restrictions on doctors' speech may be subject to a standard of review less rigorous than strict scrutiny. Indeed, it is important to note that the Supreme Court in *Casey* "refused to apply strict scrutiny to the physicians' compelled speech claims."[160]

Professor Paula Berg argues that the high court's abortion-related rulings during William Rehnquist's tenure as Chief Justice "stand for the troubling proposition that the First Amendment does not prohibit the federal government from manipulating the content of physician-

---

155. *Id.* at 1073 (emphasis added).

156. *Id.* at 1074.

157. *Id.* at 1075.

158. David T. Moldenhauer, *Circular 230 Opinion Standards, Legal Ethics and First Amendment Limitations on the Regulation of Professional Speech by Lawyers*, 29 SEATTLE U. L. REV. 843, 887 (2006).

159. As the U.S. Supreme Court observed more than a century ago, "[t]here is perhaps no profession more properly open to such regulation than that which embraces the practitioners of medicine." Watson v. Maryland, 218 U.S. 173, 176 (1910).

160. Scott W. Gaylord & Thomas J. Molony, *Casey and a Woman's Right to Know: Ultrasounds, Informed Consent, and the First Amendment*, 45 CONN. L. REV. 595, 630 (2012).

patient speech, in both publicly and privately financed settings, in order to *promote a particular ideology or to accomplish a policy unrelated to patient health.*"[161] This emphasized language is pivotal within the context of *Wollschlaeger* because it suggests that limiting doctors' speech in order to serve ideological goals related to the promotion of Second Amendment rights—even at the expense of patient health—may be constitutionally permissible.

What type of standard, then, is the *Gentile* balancing test, and how did Judge Cooke apply it in her permanent injunction of Florida's law? Under *Gentile*, the Court appeared to apply a more heightened form of scrutiny than rational basis review. Specifically, Chief Justice Rehnquist contended that the law in question passed constitutional muster because it served a "substantial state interest in preventing prejudice to an adjudicative proceeding" and was "narrowly tailored to achieve" the state's interest.[162] The language used in the Court's opinion thus resembles that of the intermediate scrutiny test, under which a law is constitutional if it: "(1) advances a 'substantial' government interest; (2) does not 'burden substantially more open speech than is necessary' (i.e., the statute must be narrowly tailored); and (3) leaves open 'ample alternative channels for communication.'"[163]

As Professor Brian Freeman explains, if a law dealing with "the regulation of expressive conduct is unrelated to the suppression of free speech, intermediate scrutiny will be used and the Court will apply a balancing test, often upholding the challenged regulation."[164] Furthermore, Freeman states that intermediate scrutiny "is less

---

161. Paula E. Berg, *Lost in a Doctrinal Wasteland: The Exceptionalism of Doctor-Patient Speech Within the Rehnquist Court's First Amendment Jurisprudence*, 8 HEALTH MATRIX 153, 158 (1998) (emphasis added).

162. Gentile v. State Bar of Nev., 501 U.S. 1030, 1076 (1991).

163. Free Speech Coal. v. United States, 677 F.3d 519, 535 (3d Cir. 2012) (citations omitted); *see also* Perry Educ. Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45 (1983) (writing that the government may "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication") (citations omitted).

164. Brian A. Freeman, *Expiating the Sins of Yoder and Smith: Toward a Unified First Amendment Exemptions from Neutral Laws of General Applicability*, 66 MO. L. REV. 9, 28 (2001).

demanding than strict scrutiny but more stringent than rational basis review."[165] Therefore, the Gentile balancing test approximates an intermediate level of scrutiny.

### 2. Interests Asserted by Florida to Uphold the Law

In *Wollschlaeger*, Judge Cooke opted not to pick between strict scrutiny and the *Gentile* balancing formula because, as noted earlier, Florida "would not prevail under either test."[166] In reaching this conclusion, she either rejected or devalued in serial fashion each of the state's asserted interests underlying the Act.[167]

Before doing so, however, she emphasized a point that apparently troubled her beyond the content-based nature of the Act itself. Specifically, she pointed out that the Act bans "truthful, non-misleading speech"[168]—a fact she characterized as "curious"[169] because "[t]he purpose of preventive medicine is to discuss with a patient topics that, while perhaps not relevant to a patient's medical safety at the time, informs the patient about general concerns that may arise in the future."[170] She intimated that such governmental paternalism in preventing the public from evaluating for itself truthful, non-misleading speech made her especially skeptical when evaluating Florida's alleged interests.[171] Florida asserted a quartet of interests: (1) protecting Second Amendment rights; (2) preventing harassment and discrimination of patients; (3) safeguarding patients' privacy; and (4) regulating the medical profession.[172]

Initially, Judge Cooke rebuffed Florida's assertion that it has an "interest in protecting its citizens' fundamental rights"[173] to keep and bear arms. She reasoned here that the "State's arguments rest on a

---

165. *Id.* at 24.
166. Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251, 1263 (S.D. Fla. 2012).
167. *See infra* notes 172–201 and accompanying text.
168. *Wollschlaeger*, 880 F. Supp. 2d at 1263.
169. *Id.*
170. *Id.*
171. *Id.* at 1263–64.
172. *See infra* notes 173–201 and accompanying text (examining Judge Cooke's analysis of these four interests).
173. *Wollschlaeger*, 880 F. Supp. 2d at 1264.

legislative illusion"[174] because "[p]rotecting the right to keep and bear arms is irrelevant to this law."[175] That's because no portion of the statute includes language that actually safeguards the ability of Floridians to own, possess, or transport firearms.[176] Put differently, Florida's enactment of a law that prevents doctors from posing gun ownership queries does nothing to further protect the Second Amendment interests of Floridians. Thus, as Judge Cooke wrote, Florida did not possess either "a legitimate or compelling interest"[177] on the Second Amendment issue.

The judge then turned her attention to a second, different interest asserted by Florida—preventing doctors from discriminating against and harassing patients based upon their gun ownership.[178] Judge Cooke, however, explained that the Act did not truly protect gun-owning patients from discrimination because physicians could still terminate patient relationships for refusal to answer questions about firearm ownership.[179] Furthermore, the judge's primary reasons for rejecting the harassment/discrimination argument boiled down to both an abject lack of evidence of such problems and the fact that any umbrage a patient might, in fact, take at a firearm-ownership query does not alone justify enactment of a speech-prohibiting statute.[180] As she put it, "[t]here is no evidence that such alleged harassment and discrimination is widespread or pervasive. A concern for some patients who may be offended or uncomfortable by questions regarding firearm ownership is insufficient to justify this law."[181] The latter assertion, of course, comports with the larger First Amendment principle that speech cannot be restricted by the government simply because it may offend.[182] Thus, just as she did with

---

174. *Id.*

175. *Id.*

176. *Id.*

177. *Id.*

178. *Id.*

179. *Id.* at 1264–65.

180. *Id.*

181. *Id.* at 1264 (citing Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2669 (2011)).

182. As former Justice David Souter encapsulated it, "merely protecting listeners from offense at the message is not a legitimate interest of the government." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 455 (2002) (Souter, J., dissenting).

Florida's Second Amendment interest, Judge Cooke concluded that Florida's interest in preventing harassment and discrimination was neither legitimate nor compelling.[183]

Next, Judge Cooke addressed Florida's argument that "it has an interest in protecting individuals' privacy rights related to firearm ownership and possession."[184] Although she noted that Florida "has a legitimate interest, although perhaps not a compelling one, in protecting patients' privacy regarding their firearm ownership or use,"[185] she determined that Florida "fails to provide any evidence that the confidentiality of this information is at risk."[186] Once again, the lack of supporting evidence doomed Florida's assertion of a compelling interest, as the interest was devalued to the level of legitimacy.

Finally, turning to Florida's interest in regulating the medical care profession, Judge Cooke rejected the idea that such an interest was compelling, citing the plaintiffs' argument that the Act limits their "ability to make inquiries of their patients to determine what issues are relevant to their care and may require further consultation."[187] Judge Cooke, however, tossed Florida a very small legal bone, opining that its interest in regulating professions "*may* be a legitimate one."[188]

The bottom line was that Florida only had two legitimate interests and not a single compelling one left standing after Judge Cooke's analysis. The Act, in brief, could not pass muster under strict scrutiny.[189] Judge Cooke thus turned to balancing those two remaining legitimate interests under *Gentile* against the First Amendment interests of the plaintiffs.[190] As with her analysis of the quartet of interests set forth above, it was largely a matter of lack of evidentiary support that spelled defeat for Florida.[191] For instance, Judge Cooke noted that while Florida "may have, in the abstract, a legitimate interest in protecting

---

183. *Wollschlaeger*, 880 F. Supp. 2d at 1264.
184. *Id.* at 1265.
185. *Id.*
186. *Id.* at n.5.
187. *Id.* at 1265.
188. *Id.* (emphasis added).
189. *See supra* note 41 and accompanying text (noting that strict scrutiny requires the existence of a compelling interest).
190. *Wollschlaeger,* 880 F. Supp. 2d at 1265–66.
191. *See id.* at 1266.

patients' privacy regarding their firearm ownership or use," the Sunshine State nonetheless "fails to provide any evidence that the confidentiality of this information is at risk."[192]

Although acknowledging Florida possesses "a legitimate interest in regulating the medical profession,"[193] she found this interest was outweighed because the Act "does not impose a mere incidental burden on speech. Rather, truthful, non-misleading speech is the direct target of the Act."[194] The restriction of such speech, she reasoned, could directly harm a patient, and the Act's good-faith relevance exception for allowing firearms questions described earlier[195] could not save it:

> A physician may ask in an initial questionnaire about lifestyle choices or high-risk activities *even though the physician does not, at that time, have a good faith belief that the information is relevant to that patient's medical care.* The purpose of the inquiry is so that the practitioner can determine what subject matters require further follow-up in the practice of preventive medicine. The restrictions at issue here are especially problematic because, as Plaintiffs note, there may be cases where, unless the practitioner makes an initial inquiry about firearms (albeit with no good faith basis, at the time of the questioning, that it is relevant), the patient may not know to raise the issue herself and may not receive appropriate, possibly life-saving, information about firearm safety.[196]

Adding constitutional insult to Florida's already injured Act, Judge Cooke went beyond this as-applied analysis to declare part of it void for vagueness.[197] Specifically, and as previously described in Part

---

192. *Id.* at 1266.

193. *Id.*

194. *Id.* at 1266–67.

195. *See supra* note 75 and accompanying text (quoting the statute).

196. *Wollschlaeger*, 880 F. Supp. 2d at 1267 (emphasis added).

197. *Id.* at 1269; *see generally* Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) (observing that "[i]t is a basic principle of due process that an enactment is

I,[198] the Act allows a physician to ask about firearm ownership if she "in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others."[199] Focusing on the phrase "relevant to the patient's medical care or safety," Judge Cooke opined that:

> [i]n the context of preventive medicine, which is a forward-looking practice, it is unclear whether the clause means "relevant at the time of the consult with the patient" or "relevant at any time in the future." The uncertainty regarding this standard is especially problematic in this case, where it has a chilling effect on speech, and, by extension, on the effectiveness of the practice of preventive medicine.[200]

Ultimately, Judge Cooke permanently enjoined the speech-restrictive portions of the Act.[201] The next section of this article examines some of the arguments now being made by the parties and selected friends of the court on appeal to the Eleventh Circuit.

## B.   Overview of Arguments on Appeal to the Eleventh Circuit

In late 2012, briefs in *Wollschlaeger* were filed with the U.S. Court of Appeals for the Eleventh Circuit by both parties and multiple friends of the court.[202] This section provides a brief synopsis of some of

---

void for vagueness if its prohibitions are not clearly defined" such that they fail to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"); ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES & POLICIES 910 (2d ed. 2002) (observing that "[a] law is unconstitutionally vague if a reasonable person cannot tell what speech is prohibited and what is permitted. Unduly vague laws violate due process whether or not speech is regulated").

198. *See supra* Part I.

199. FLA. STAT. § 790.338(2) (2013).

200. *Wollschlaeger*, 880 F. Supp. 2d at 1268.

201. *Id.* at 1270.

202. Oral arguments occurred on July 18, 2013. ACLU on State Appeal of Challenge to Law Banning Doctors from Asking About Guns: "Just Plain Dumb", THE TALLAHASSEE O (July 22, 2013) http://tallahasseeo.com/2013/07/22/aclu-on-

their key arguments, hitting the highlights rather than giving a detailed critique.

1.  Brief for Appellants[203]

Perhaps the most interesting argument on appeal made by the State of Florida is that the Act's inclusion of both the hortatory word "should"[204] and the good-faith relevance exception[205]—which provides that "a health care practitioner or health care facility that in *good faith* believes that this information is *relevant* to the patient's medical care or safety, or the safety of others, *may*"[206] inquire about firearms possession—guts the plaintiffs' entire assertion that their First Amendment right to ask firearms-related questions is violated.

With a somewhat subtle dig at Judge Cooke, Florida contends that the district "court did not mention that the text of the Act does not *really* forbid doctors from asking patients about firearms – it says only that they 'should refrain' from asking, except as is relevant to patient 'medical care or safety, or to the safety of others.'"[207] The emphasis on "really" appears in the original brief, which suggests that Florida's opinion is that this is an important—even critical—point misunderstood by or, more charitably, overlooked by Judge Cooke.[208]

Indeed, this is the lynchpin of Florida's argument to the Eleventh Circuit. As the state's brief later elaborates (emphasis once again in the original):

> Plaintiffs' case is built on a misinterpretation of the Act. They alleged incorrectly, and the district court wrongly accepted, that the Act *on its face* prohibits physicians from asking and advising patients about firearms safety. But the law does not prohibit the

---

state-appeal-of-challenge-to-law-banning-doctors-from-asking-about-guns-just-plain-dumb.

203. Brief for Appellants, *supra* note 61.
204. *See supra* note 75 and accompanying text.
205. *See supra* note 75 and accompanying text.
206. FLA. STAT. § 790.338(2) (2013) (emphasis added).
207. Brief for Appellants, *supra* note 61, at 9.
208. *Id.*

speech that Plaintiffs allege is infringed, nor does it
violate free speech rights. The crux of Plaintiffs'
allegations is that they wish to ask patients if they
have guns and, if so, to discuss firearm safety. The
Act does not forbid this activity.[209]

Parsed differently and more bluntly, the plaintiffs simply don't
get it; they've got nothing to worry about due to the hortatory
phraseology and the good-faith relevance provision. As Florida asserts,
"the Act explicitly contradicts Plaintiffs' reading and a plain reading
avoids constitutional problems"[210] because the Act "does not gag or ban
doctors from asking or advising patients about firearms safety."[211]

Florida's second significant argument—one also designed to cut
the plaintiffs' First Amendment case off early—is that "[t]he Act
regulates professional conduct, not speech."[212] Expanding on this
argument, the brief filed by Attorney General Pamela Bondi on behalf of
Florida contends that:

any speech restriction is merely incidental to the
Act's regulation of conduct by health care
providers; specifically, the Act seeks respect for the
privacy and rights of gun owners and to prevent
discrimination and unnecessary harassment. The
district court did not appropriately distinguish
between professional conduct and speech in
construing the Act.[213]

A third facet of Florida's argument plays on the judicial
uncertainty described both in the Introduction and in Section A of this
part regarding the appropriate standard of judicial review for measuring
laws affecting doctors' speech. Specifically, Florida argues that if the
appellate court rejects its argument that the Act only incidentally burdens
speech, then the Eleventh Circuit should apply intermediate scrutiny
rather than strict scrutiny.[214] Somewhat oddly—given that the Act is not

---

209. *Id.* at 11.
210. *Id.* at 12.
211. *Id.* at 16.
212. *Id.* at 13.
213. *Id.*
214. *Id.* at 31.

about advertising—the state cites[215] the intermediate scrutiny standard from the commercial speech case of *Central Hudson Gas & Electric Corp. v. Public Service Commission*[216] as the correct rule here rather than either the *Gentile* balancing formula described in Section A or the intermediate scrutiny standard embraced by the high court for time, place, and manner regulations.[217]

Fourth, and finally, Florida argues that the Act is not unduly vague.[218] Given the state's heavy reliance on the good-faith relevance exception for its assertion that the Act does not restrict physicians' ability to pose questions about firearms,[219] it is not surprising that a key piece of its vagueness argument relates to that provision. Florida asserts that:

> "Relevant" denotes something that relates to an issue. As used in the Act, the phrase "relevant to the patient's medical care or safety" communicates that providers should not interrogate the patients in their office about firearms if it is unrelated to medical or safety concerns. It contains no temporal limitation. So the reader can also reasonably conclude that a good faith inquiry can be made with respect to either current or foreseeable

---

215. *Id.*

216. 447 U.S. 557 (1980). As the Court formulated that test:

> For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566.

217. *See generally* Ashutosh Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence*, 2007 U. ILL. L. REV. 783, 788–91 (2007) (describing the intermediate scrutiny standard as used for time, place, and manner regulations).

218. Brief for Appellants, *supra* note 61, at 37.

219. *See supra* notes 195–99 and accompanying text.

medical- and safety-related concerns consistent with medical standards.[220]

With this overview of Florida's appellate court arguments in mind, the next section examines the plaintiffs-physicians' arguments to the Eleventh Circuit.

### 2.  Brief for Appellees[221]

In laying the factual predicate for their case for affirmance of Judge Cooke's permanent injunction, the plaintiffs-appellees initially assert both the customariness[222] and the importance[223] of the firearms-related speech in which they wish to engage. They bolster their position regarding the significance of that speech by noting that medical organizations, including the American Academy of Pediatrics and the American Academy of Family Physicians, "recommend counseling families about firearm injury prevention."[224]

Turning to the terms of the Firearm Owners' Privacy Act, the brief highlights the ambiguousness of the Act's good-faith relevance exception.[225] Specifically, the plaintiffs-appellees assert concerns about the scope of the provision and write that they often ask "about firearms as a routine matter of preventive medicine, even when they had no basis to believe, in advance, that such an inquiry was relevant to the particular patient beyond the general interest in gathering patient information and providing appropriate safety counseling."[226] Put differently, they frequently pose questions about firearms during the patient intake

---

220. Brief for Appellants, *supra* note 61, at 38 (citation omitted).

221. Brief for Appellees, *supra* note 130.

222. *See id.* at 3 (asserting that "[i]nquiring about firearm ownership and recording such information in a patient's medical record is *a routine part* of the effective practice of preventive medicine for many health care practitioners") (emphasis added).

223. *See id.* (asserting that "[t]he record in this case is replete with undisputed evidence regarding the extent of firearms-related injuries and deaths in Florida, including both empirical evidence and tragic stories of accidents involving Appellees' patients and others").

224. *Id.*

225. *See supra* note 75 and accompanying text (addressing this provision).

226. Brief for Appellees, *supra* note 130, at 9.

process *without* knowing whether those questions will later prove relevant.

In addition, the plaintiffs-appellees assert vagueness issues relating to both how and when "relevance" is to be determined under this exception. Specifically, they argue the Act "does not specify whether practitioners must make a particularized finding of relevance for each patient asked about firearms, or whether they may rely on a general belief that such inquiries are always relevant to patients' medical care and safety."[227] In other words, is relevance to be determined on a patient-by-patient basis or is it universally applicable across the patient population?

Further attacking the good-faith relevance exception, the plaintiffs-appellees argue that the very imposition of a government-imposed "relevance" hurdle is unduly intrusive.[228] As they put it, "no matter how capacious the statute's 'relevance' standard might be, the State's prohibition against 'irrelevant' speech concerning gun safety still unconstitutionally restricts Appellees' First Amendment rights. The State cannot force practitioners to put their speech through a State-imposed 'relevance' filter before speaking with their patients."[229]

Summarizing their overall argument—and highlighting the key debate about whether strict scrutiny or a lesser standard should be applied—the plaintiffs-appellees write:

> The law applies only to health care practitioners . . . not other topics of preventive medicine or any other subject . . . . Such speaker- and content-based restrictions on speech are forbidden by the First Amendment unless they can satisfy strict scrutiny. The Firearm Owners' Privacy Act indisputably cannot survive strict scrutiny; the State does not even try to defend it under that standard. Instead, the State seeks to avoid judicial review altogether or to urge a lesser standard of scrutiny. But those efforts fail, and the District

---

227. *Id.* at 54.
228. *See id.* at 27.
229. *Id.*

Court's order enjoining enforcement of the challenged provisions of the Act should be affirmed.[230]

Among other points made in their Eleventh Circuit brief, the plaintiffs-appellees argue:

- the Act regulates physicians' speech, not just their conduct;[231]
- despite the Act's use of the word "should" described earlier,[232] the Act nonetheless is mandatory and not hortatory;[233]
- the Act negatively affects the rights of patients to receive speech that they might want to hear;[234]
- key terms are unconstitutionally vague, including the standard of relevance in the good-faith exception provision;[235] and
- the Act not only restricts the right of physicians to speak, but also the right of patients to receive speech.[236]

With these summaries of the appellate court arguments of both parties in mind, the article briefly addresses arguments made in key amicus briefs.

### 3. The NRA Comes to Florida's Defense

Given the framing of the case described in Part I as one pitting Second Amendment rights against First Amendment interests, it is anything but surprising that the NRA filed a friend-of-the-court brief on Florida's behalf.[237] The heart of the NRA's argument buttresses Florida's central assertion—namely, that the Act "simply *recommends* that practitioners 'should refrain' from asking questions about firearms unless related to medical care or safety. The statute at most thus imposes a

---

230. *Id.* at 13–14.

231. *Id.* at 15.

232. *See supra* notes 75–80 and accompanying text.

233. Brief for Appellees, *supra* note 130, at 14.

234. *See id.* at 16 (writing that "the Act prohibits practitioners from inquiring of, or recording information about, firearm ownership even if the patient would welcome the exchange and having that information in the patient's file. The State cannot presume that all patients will find the speech unwelcome").

235. *Id.* at 17.

236. *Id.* at 29.

237. Brief of NRA, *supra* note 134.

remote restriction on health care practitioners' speech."[238] Physicians are, under the NRA's construction of the Act, "free to exercise their good faith medical judgment in discussing firearms safety with patients."[239]

The NRA argues that the Florida legislature's inclusion of the word "should" in the sentence stating that doctors "shall respect a patient's right to privacy and *should* refrain from making a written inquiry or asking questions concerning the ownership of a firearm"[240] makes the precatory nature of the statute clear.[241] The NRA contends that such statutory construction also allows the court to avoid the larger constitutional issues, asserting that "even if the Act were ambiguous, a hortatory reading of 'should refrain' – a reading to which the text is readily susceptible – avoids any First Amendment issue."[242]

Furthermore, the NRA asserts that the Act merely protects patients from harassment and discrimination based upon their gun ownership. As described earlier in this article,[243] the Act includes a provision holding that doctors "shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination."[244] Another provision provides that doctors "may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition."[245] Playing on the framing of the case as one pitting constitutional interests against each other, the NRA asserts that "[t]he First Amendment does not give a physician the right to discriminate against and/or harass a patient who chooses to exercise her fundamental Second Amendment right [to] own a firearm, merely because that discrimination or harassment may take the form of speech."[246] The NRA adds that "the Act facilitates the exercise of Second Amendment rights by protecting citizens who choose to exercise those

---

238. *Id.* at 3 (emphasis added).

239. *Id.* at 4.

240. FLA. STAT. § 790.338(2) (2013) (emphasis added).

241. Brief of NRA, *supra* note 134, at 5–8.

242. *Id.* at 8.

243. *See supra* notes 10 and 73 and accompanying text.

244. FLA. STAT. § 790.338(6) (2013).

245. FLA. STAT. § 790.338(5) (2013).

246. Brief of NRA, *supra* note 134, at 13.

rights from discrimination and harassment in the provision of medical care."[247]

### 4.   The ACLU and Health Care Organizations Weigh In

The ACLU Foundation of Florida filed an amicus brief that was joined by multiple medical and healthcare organizations, such as the Broward County Pediatric Society, the Palm Beach County Medical Society, and the Florida Public Health Association.[248] Raising both the interests of doctors and patients, the brief asserts that the Act "patently violates the First Amendment rights of both the doctors whom it restrains and of those patients who do not want their doctors muzzled."[249]

The heart of their argument is that by singling out health-care practitioners for regulation—not all professions or occupations—and by targeting a specific subject for regulation, the Act amounts to a:

> [C]lassic content-based prior restraint of speech. The licensed status of these specific citizens does not provide any justification for the imposition of the prior restraint at issue. Moreover, the supposed privacy interests of the patients are not at all protected by the statute; instead, they are a mere pretext for the State's suppression of speech with which it disagrees.[250]

The ACLU brief emphasizes the point that in-take questionnaires used by doctors often include many questions on a wide-range of topics, not simply gun ownership. As they assert:

> These questions are examples of where this statute has a very real and immediate impact on a substantial amount of speech by many healthcare practitioners and providers. The statute subjects practitioners to discipline if they continue to engage in the use of their preliminary screening

---

247. *Id.* at 22.
248. ACLU Amicus Brief, *supra* note 128.
249. *Id.* at 2.
250. *Id.* at 6.

questionnaires or if they follow up with further oral
questions on the same topic.[251]

With this overview of both Judge Cooke's 2012 ruling and the
arguments now being made on appeal to the Eleventh Circuit in mind,
the article next turns to the critical, unresolved question about the
standard of scrutiny that should be applied to analyze the Act. In an
effort to bridge theory with doctrine, Part III deploys traditional First
Amendment philosophies to argue that restrictions imposed on
physicians' right to ask questions of patients warrants the use of strict
scrutiny.

### III. RECONCILING FIRST AMENDMENT SPEECH RIGHTS WITH FREE SPEECH THEORY IN THE CONTEXT OF PHYSICIAN-POSED QUESTIONS TO PATIENTS

Federal courts have long recognized that the First Amendment
protects the ability of doctors to advise patients. "The right of the doctor
to advise his patients according to his best lights seems so obviously
within First Amendment rights as to need no extended discussion,"
observed Justice William O. Douglas in 1961.[252] Yet, a gray area remains
today regarding the standard by which courts should review the legality
of restrictions imposed on doctors' speech.

That gray area exists because the Supreme Court has failed to
extend the discussion about physicians' free speech rights in the
subsequent half-century since Douglas' remarks. The Court has offered
only cursory comments, such as those noted earlier in *Planned
Parenthood v. Casey*,[253] suggesting a reasonableness standard for the
regulation of physicians' speech.[254]

More than forty years after Douglas' statement above, the U.S.
Court of Appeals for the Ninth Circuit weighed in on the matter, opining
that "[a]n integral component of the practice of medicine is the
communication between a doctor and a patient. Physicians must be able
to speak frankly and openly to patients. That need has been recognized

---

251. *Id.* at 9.
252. Poe v. Ullman, 367 U.S. 497, 513 (1961) (Douglas, J., dissenting).
253. 505 U.S. 833 (1992).
254. *See supra* notes 41–44 and accompanying text.

by the courts through the application of the common law doctor-patient privilege."[255] Even then, the extent to which the First Amendment protects physicians' speech remained unclear and unsettled.[256]

This part of the article explores First Amendment theory-based rationales for protecting Florida physicians' speech rights and their patients' rights to receive speech, as well as why courts should uphold those rights under the strictest possible standard of review. Initially, it is necessary to note the constitutional questions left unresolved in *Rust v. Sullivan*,[257] and to discuss why the reasonableness standard in *Casey* should not apply today in *Wollschlaeger*. A 1994 article by Professor Paula Berg is one of the very few extended scholarly discussions delving into such questions and doctor-patient speech within the larger context of First Amendment theory.[258]

Berg notes that cases dealing with "ideology-based restrictions on doctor-patient speech have thus far been limited to discussions about abortion and contraception."[259] *Rust* and *Casey*, she points out, were two of the first cases in which the Court "had to face the issue of whether restrictions on the content of doctor-patient speech violate the First Amendment."[260]

In *Rust*, the Court considered the constitutionality of a regulation prohibiting federal funds for programs that offered "counseling concerning the use of abortion as a method of family planning."[261] In response to challenges from physicians that the statute violated their First Amendment rights, Chief Justice William Rehnquist, writing for the majority, opined that the government was well within its rights to prohibit such speech because "when the Government appropriates public funds to establish a program it is entitled to define the limits of that program."[262]

---

255. Conant v. Walters, 309 F.3d 629, 636 (9th Cir. 2002).
256. *See* Post, *supra* note 150, at 944 (arguing that the "relationship between the First Amendment and the regulation of professional speech of doctors . . . is unfortunately obscure and controversial").
257. 500 U.S. 173 (1991).
258. Berg, *supra* note 37.
259. *Id.* at 202.
260. *Id.* at 204.
261. 42 C.F.R. § 59.8(a)(1) (1989).
262. *Rust*, 500 U.S. at 194. Chief Justice Rehnquist added that:

As Berg notes, "the *Rust* opinion left unclear whether the Court would permit government to impose viewpoint-based regulations on doctor-patient speech that occurred in private settings."[263] Unfortunately, the Court also left unanswered whether "traditional relationships such as that between doctor and patient should enjoy protection under the First Amendment from Government regulation, even when subsidized by the Government."[264] Chief Justice Rehnquist chose not to resolve this question, arguing that the regulation did not "significantly impinge upon the doctor-patient relationship" because a physician was not required "to represent as his own any opinion that he does not in fact hold."[265] He added that "[t]he doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program."[266] One year later, the Court offered a somewhat more nuanced outlook on the First Amendment rights of physicians in *Casey*.

While the law at issue in *Rust* dealt with *silencing* physician speech, in *Casey* the Court considered a Pennsylvania statute[267] requiring that "a woman seeking an abortion give her informed consent prior to the abortion procedure."[268] In other words, the law *compelled* physicians to inform patients about abortion-related health risks and to "tell patients

---

> The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other.

*Id.* at 193.

263. Berg, *supra* note 37, at 211.
264. *Rust*, 500 U.S. at 200.
265. *Id.* at 200.
266. *Id.*
267. 18 PA. CONS. STAT. § 3205 (2012). The statute provides, in pertinent part, that "[n]o abortion shall be performed or induced except with the voluntary and informed consent of the woman upon whom the abortion is to be performed or induced." *Id.*
268. Planned Parenthood v. Casey, 505 U.S. 833, 844 (1992).

about the availability of printed materials, which described the fetus and listed agencies that offered alternatives to abortion."[269]

A plurality of the Court upheld the speech-related provision, despite acknowledging that "the physician's First Amendment rights not to speak are implicated."[270] The plurality reasoned that the speech in question was "part of the practice of medicine, subject to reasonable licensing and regulation by the State."[271] The plurality also qualified that such regulations are constitutional as long as the compelled speech is "truthful" or "nonmisleading."[272]

Furthermore, and especially relevant for this article, Chief Justice Rehnquist joined the plurality in upholding this provision, but offered in a concurrence with what Professor Berg describes as a "due process-based standard for assessing governmental regulation of the content of doctor-patient discourse."[273] Under this standard, according to Rehnquist, the government may regulate physician speech if the regulation "is rationally related to the State's interest."[274] Thus, in this landmark case, both the plurality opinion and the Chief Justice's concurring opinion appear to indicate that doctor-patient speech only merits a reasonableness or rational-basis standard of review.

*Rust* and *Casey* provide the unstable foundation for the current state of First Amendment protections for doctor-patient speech. There are, however, several key differences between the contested laws in *Rust* and *Casey* and the Firearms Owners' Privacy Act at issue in *Wollschlaeger*. First, although the regulation in *Rust* sought to silence physician speech, it only applied within the context of government-funded programs. Conversely, the Florida law applies to all physicians in the state, regardless of whether they receive public funds.

Second, as discussed in the Introduction, some consider the informed-consent requirement in *Casey* to constitute a form of conduct rather than speech.[275] The Firearms Owners' Privacy Act, however,

---

269. Berg, *supra* note 37, at 214.
270. *Casey*, 505 U.S. at 884.
271. *Id.*
272. *Id.* at 882.
273. Berg, *supra* note 37, at 217.
274. *Casey*, 505 U.S. at 968 (Rehnquist, C.J., concurring).
275. *See* Wells, *supra* note 47, at 1738.

clearly prohibits pure speech, namely whether doctors can ask questions and advise patients about firearm ownership and safety. The Act does not regulate medical procedures, which might constitute conduct.

Finally, if the law in *Casey* is treated as regulating speech, it does so by *compelling* physicians to speak. The Florida law, on the other hand, prevents speech about firearms unless physicians, in good faith, believe it is medically relevant. Specifically, by prohibiting inquiries about firearms on in-take questionnaires, the law prevents speech as pure and simple as posing a question—a question that can later be used to help doctors fully inform patients about their health and safety.

While the 1994 article by Professor Berg broke ground in applying First Amendment theory to doctor-patient speech, her discussion remains confined to the context of patient rights in the *Rust* and *Casey* decisions. Specifically, she uses First Amendment theory to critique those decisions and to argue for the protection of a patient's right to receive medical information, rather than the right of doctors to speak and give medical advice. She contends that:

> the Court [in *Rust* and *Casey*] did not recognize that the principal constitutional threat posed by government restrictions on the content of doctor-patient speech is not their infringement on physicians' speech rights. Rather, the more serious peril of such measures is that they enable government to impose its orthodoxy on medical decision making by limiting and biasing the medical information available to patients.[276]

These limitations, Berg argues, threaten a patient's ability to discover the truth[277] and to obtain self-fulfillment[278] based on two of the prominent traditional First Amendment theories.

Unlike Berg's work, this article uses First Amendment theories to argue for the constitutionally protected rights of patients to receive information *and* for the free speech rights of doctors to dispense it.[279] To

---

276. Berg, *supra* note 37, at 206.
277. *Id.* at 235.
278. *Id.* at 238.
279. *See supra* notes 10–12.

do so, this part applies the three traditional First Amendment theories pertaining to: (1) democratic self-governance; (2) human dignity, self-fulfillment and individual autonomy; and (3) the attainment of truth through unfettered discussion in the marketplace of ideas. This part concludes by discussing how these theories necessitate the use of strict scrutiny standard in the review of Florida's Firearms Owners' Privacy Act.

## A.  Democratic Self-Government

Few discussions, today, are as fraught with politics as those involving gun legislation.[280] Philosopher and educator Alexander Meiklejohn long ago recognized the need to protect speech related to political issues and matters of public concern.[281] As Professor Pierre J. Schlag put it, Meiklejohn believed that "in a democratic society self-government is an important value and that political or public speech is essential to self-government."[282] For Meiklejohn, the First Amendment acted not as a means to protect speech in and of itself, but it served the "positive enterprise of cultivating the general intelligence upon which the success of self-government so obviously depends."[283] In his 1948 book on the subject, Meiklejohn narrowly confined First Amendment protections to that speech which serves self-government. Nothing illustrates this point better than when Meiklejohn declared:

> The guarantee given by the First Amendment is not, then, assured to all speaking. It is assured only to speech which bears, directly or indirectly, upon issues with which the voters have to deal – only, therefore, to the consideration of matters of public

280.  *See* David Sherfinski, *Senate Panel Approves First Post-Newtown Gun Control Bill*, WASH. TIMES, Mar. 8, 2013, at A1, *available at* http://www.washingtontimes.com/news/2013/mar/7/new-gun-buying-restrictions-pass-senate-panel/?page=all .

281.  ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948).

282.  Pierre J. Schlag, *An Attack on Categorical Approaches to Freedom of Speech*, 30 UCLA L. REV. 671, 707 (1983).

283.  MEIKLEJOHN, *supra* note 281, at 17.

> interest. Private speech, or private interests in
> speech, on the other hand, has no claim whatever to
> the protection of the First Amendment.[284]

As Schlag points out, this assertion leaves us with a vague definition of political speech.[285] Nonetheless, Meiklejohn believed speech regarding political issues merited the utmost protection because the ultimate goal of free speech is "the voting of wise decisions."[286]

If one takes Meiklejohn's original theoretical framework at face value, speech about firearm ownership and safety constitute political or public speech. After all, firearm safety is a matter of public concern, and given the current climate surrounding guns, gun ownership, and adopting new laws to limit gun possession, one cannot deny the political implications of such discussions.[287] Furthermore, even if doctors somehow collude to ask questions about firearms for political reasons, such as to spread some sort of anti-gun message to their patients, then physicians clearly are engaging in speech that indirectly attempts to influence a public issue. Therefore, the democratic self-governance theory would likely place the doctors' speech at the highest level of First Amendment protection.

However, Meiklejohn's original assertion about the importance of political speech drew criticism from many First Amendment scholars. In a 1949 review of Meiklejohn's book, Zechariah Chafee claims that Meiklejohn overlooked important First Amendment protections for other non-political forms of speech such as "science, art, drama, and poetry."[288] Chafee believed that the framers of the Constitution surely had these other forms of speech in mind when drafting the First Amendment. More recently, Rodney Smolla observes that the framers "were renaissance minds, engaged by science, art, literature, philosophy, morality, religion, architecture, horticulture, law, business, and

---

284. *Id.* at 94.

285. Schlag, *supra* note 282, at 708.

286. MEIKLEJOHN, *supra* note 281, at 25.

287. *See* Sherfinski, *supra* note 280, at A1.

288. Zechariah Chafee, Book Reviews, 62 HARV. L. REV. 891, 897 (1949) (reviewing ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (1948)).

politics."[289] Smolla critiques Meiklejohn's original claim that all ideas rather than all speakers should be protected, arguing that "the state lacks the moral entitlement to presume to dictate what is 'worth saying' and when 'everything worth saying' has been said."[290]

In 1961, in response to critics, Meiklejohn adapted his theory on the self-government functions of the First Amendment, adding that "there are many forms of thought and expression within the range of human communications from which the voter derives the knowledge, intelligence, sensitivity to human values: [sic] the capacity for sane and objective judgment which, so far as possible, a ballot should express."[291] He argued that speech relating to education, "[t]he achievements of philosophy and the sciences," "[l]iterature and the arts," and "[p]ublic discussion of public issues, together with the spreading of information and opinion bearing on those issues" would also fall under the scope of First Amendment protection.[292]

Other scholars have discussed the importance of the self-governance theory, with emphasis on Meiklejohn's revised interpretation that included other, non-political forms of expression. Notably, Thomas Emerson observed that "freedom of expression is essential to provide for participation in decision making by all members of society."[293] For Emerson, free expression not only covers political matters but also "embraces the right to participate in the building of the whole culture, and includes freedom of expression in religion, literature, art, science, and all areas of human learning and knowledge."[294]

Florida and its supporters take a large leap in spreading the notion that doctors are deliberately attacking the Second Amendment rights of patients by asking questions about firearms. As lead plaintiff-physician Bernd Wollschlaeger noted, questions about firearms are simply a form of preventative medicine,[295] especially for doctors whose

---

289. RODNEY A. SMOLLA, FREE SPEECH IN AN OPEN SOCIETY 14 (1993).

290. *Id.* at 16.

291. Alexander Meiklejohn, *The First Amendment is an Absolute*, 1961 SUP. CT. REV. 245, 256 (1961).

292. *Id.* at 257.

293. THOMAS L. EMERSON, THE SYSTEM OF FREEDOM OF EXPRESSION 7 (1970).

294. *Id.*

295. Brief for Appellees, *supra* note 130, at 3.

patients are children. Regardless of the political controversy surrounding gun laws such as the Florida Firearm Owners' Privacy Act, the ability of doctors to pose questions about, and advise patients regarding, guns deserves free speech protections under the democratic self-governance theory.

To enhance what Meiklejohn calls "the range of human communication from which the voter derives"[296] the ability to make informed decisions, doctors must be able to consult with patients about firearm safety, and alert them to any health and safety risks. For example, doctors might provide patients with advice on securing guns and that guidance, in turn, could translate to a patient voting for a sheriff, district attorney or legislator who advocates for legislation that keeps guns out criminals' hands. That seems to be a very real possibility given that thieves stole an average of more than 230,000 guns per year "during burglaries and other property crimes in the six-year period from 2005 through 2010."[297] Many stolen guns, in turn, end up playing a role in crimes.[298]

Meanwhile, guns are a leading killer of children in United States.[299] A thirty-year snapshot of child-gun death and injury data reveals that firearms killed more than 116,000 minors between 1979 and 2009.[300] So, doctor-patient conversations regarding guns can potentially save lives, but that is not the only reason that the constitutional rights of doctors to speak (and patients to listen) should be protected. The democratic self-governance theory protects doctor-patient conversations

---

296. Meiklejohn, *supra* note 291, at 256.

297. *See* LYNN LANGTON, U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CRIME DATA BRIEF: FIREARMS STOLEN DURING HOUSEHOLD BURGLARIES AND OTHER PROPERTY CRIMES 2005-2010 1 (2012), *available at* http://www.bjs.gov/content/pub/pdf/fshbopc0510.pdf (last visited Oct. 31, 2013) (detailing federal data regarding stolen firearms).

298. *See* CTR. FOR GUN POLICY AND RESEARCH, BLOOMBERG SCH. OF PUB. HEALTH, JOHNS HOPKINS UNIV., FACT SHEET: STOLEN GUNS 1 (2003), *available at* http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/guns_theft_fs.pdf (last visited Oct. 31, 2013).

299. *See* CHILDREN'S DEFENSE FUND, PROTECT CHILDREN, NOT GUNS 2 (2012) *available at* http://www.childrensdefense.org/child-research-data-publications/data/protect-children-not-guns-2012.pdf (last visited Oct. 31, 2013).

300. *Id.* at 4.

regarding guns because the dissemination of knowledge about the risks and safety measures associated with firearms can help citizens make better informed decisions at the ballot box regarding the candidates and gun-related initiatives about which they vote.

## B.  Human Dignity, Self-Fulfillment & Individual Autonomy

Nothing describes the relationship between the practice of medicine and the respect for human dignity better than the Hippocratic Oath under which a "physician's duty [is] not merely to make his or her own judgments, but also, to make those judgments for the sole purpose of benefiting his or her patient."[301] The Hippocratic Oath, which is administered to medical students upon graduation from medical school, includes two key themes: "the promises of acting in the best interest of the patient and of confidentiality."[302] Indeed, in one translation of the original oath, physicians promise, "according to [their] ability and judgment," to "keep [their patient] from harm and injustice."[303]

In a profession so concerned with protecting the dignity and autonomy of patients,[304] it would be hard to argue that the First Amendment theories of human dignity, individual autonomy and self-fulfillment do not apply in the context of doctor-patient discourse.

Indeed, a rich body of literature exists regarding the relationship between First Amendment protections for free expression and one's sense of dignity, autonomy, and self-fulfillment.[305] As Emerson puts it, "[t]he proper end of man is the realization of his character and potentialities as a human being. For the achievement of this self-realization the mind must be free."[306] Furthermore, restrictions on speech violate man's human dignity and "elevate society and the state to a despotic command over him and [places] him under the arbitrary control

---

301. Grant H. Morris, *Dissing Disclosure: Just What the Doctor Ordered*, 44 ARIZ. L. REV. 313, 314 (2002).

302. Howard Markel, *"I Swear by Apollo" – On Taking the Hippocratic Oath*, 350 NEW ENG. J. MED. 2026, 2028 (2004).

303. *Id.*

304. *Id.*

305. *See generally* EMERSON, *supra* note 293.

306. *Id* at 6.

of others."[307] Given the close relationship between thought and speech, Smolla argues that censorship often violates a person's dignity and autonomy as an independent, reasoning being.[308]

At the same time, First Amendment theories involving human dignity and self-fulfillment offer protection to both doctors and patients when they converse. Protecting doctor-patient discourse reinforces the human dignity of patients to sort through the information they receive from doctors, so patients can feel a sense of fulfillment as they make informed decisions about health and well- being. Simply put, the free speech interests of doctor-patient discourse apply equally to the right of patients to receive medical information and to independently evaluate it for themselves.

Professor Berg reinforces these points in her article on physician-patient speech and First Amendment theory. She stresses that "[d]octor-patient speech is essential to maintaining patients' autonomy, self-determination, and dignity in the face of illness."[309] Berg explains that "[i]nformation is a patient's only shield against fear and uncertainty, which can reduce even powerful, educated, and self-assertive individuals to quaking passivity. Through candid discussions with their physicians, patients are able to retain autonomy and control over their lives and their bodies."[310] For the sake of a patient's dignity as a human being and his or her individual autonomy, Berg believes doctor-patient speech should be awarded the utmost of First Amendment protections.

The operative question, however, remains: does this theory still relate to the issue at the centerpiece of this article because the speech at stake – questions about firearms – is not necessarily medical in nature? Furthermore, one might still question whether the ability of doctors to ask patients if they own firearms is really related to the human dignity and self-fulfillment of patients.

Dissenting in *Rust*, Justice Henry Blackmun, along with Thurgood Marshall and John Paul Stevens, aptly points out that, beyond medical treatment, a patient also "seeks a physician's aid . . . for

---

307. *Id.*
308. SMOLLA, *supra* note 289, at 10–11.
309. Berg, *supra* note 37, at 237 (footnote omitted).
310. *Id.* at 237–38 (footnote omitted).

guidance, professional judgment, and vital emotional support."[311] As Berg puts it, "patients commonly seek physicians' advice for highly personal, nonmedical problems. When it works, the outcome of this discourse is a mutually determined treatment decision that reflects the best judgment of the doctor and patient about how to proceed."[312]

Yet, in *Wollschlaeger*, Judge Cooke points out in her permanent injunction of the Firearms Owners' Privacy Act, the prohibition on asking questions about firearms in the Florida law prevents patients from receiving helpful safety information about which they might otherwise not have asked.[313] Furthermore, the Act goes so far as to silence discussion about firearms for patients who actively want to hear relevant safety information.[314] Thus, the Florida law violates patients' individual autonomy and prevents the self-fulfillment that comes when individuals make health and wellness decisions based on their right to be informed or advised by their physicians.

Of course, some patients may not want to hear firearm safety information. The Florida law was spurred by anecdotal information about supposed episodes of harassment and discrimination against firearm owners visiting doctors' offices across the Sunshine State.[315] The late First Amendment theorist C. Edwin Baker contended that paternalistic regulations that shield people from speech they may otherwise not want to hear nonetheless violate the listener's dignity and integrity.[316] In order to protect the listener's autonomy and dignity, Baker argued, individuals

---

311. Rust v. Sullivan, 500 U.S. 173, 218 (1991) (Blackmun, J., dissenting).

312. Berg, *supra* note 37, at 237 (footnote omitted).

313. *See* Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251, 1265–66 (S.D. Fla. 2012).

314. *See* Brief for Appellees, *supra* note 130, at 16 (writing that "[T]he Act prohibits practitioners from inquiring of, or recording information about, firearm ownership even if the patient would welcome the exchange and having that information in the patient's file. The State cannot presume that all patients will find the speech unwelcome.").

315. *See supra* Part I (providing background on the legislative history of the Act).

316. *See generally* C. EDWIN BAKER, HUMAN LIBERTY AND FREEDOM OF SPEECH (1989).

should be treated "as agents who can either reject or accept views that they hear."[317]

Especially relevant to the context of this discussion, Baker stressed that a law attempting to ban or regulate speech "to protect people from harms that result because the listener adopts certain perceptions or attitudes disrespects the responsibility and freedom of the listener."[318] In short, individuals should possess the autonomy to make up their own minds about the speech they hear and the information they receive; any paternalistic attempt to protect listeners from hearing such speech disrespects a listener's dignity as a rational human being. Regardless of whether patients want to learn about firearms safety, First Amendment theories related to human dignity, individual autonomy, and self-fulfillment still protect this speech.

Furthermore, the First Amendment also should protect physician speech because doctors themselves deserve the human dignity and self-fulfillment that flows from free expression. Whether doctors are performing medical procedures or engaging in discourse regarding the best means for a patient's health and safety, they are fulfilling their Hippocratic responsibility in preventing "harm and injustice."[319] Surely, one can't deny that physicians may also experience a sense of dignity and self-fulfillment by carrying on the doctor-patient discourse and helping others. According to Smolla, humans "possess certain entitlements to dignity and autonomy by sheer virtue of their humanity."[320] Doctors, therefore, should not be forced by the state to relinquish these entitlements when they enter a hospital or medical facility.

Of course, as discussed earlier in the context of *Casey*, the Court has ruled that the medical profession is "subject to reasonable licensing and regulation."[321] On the other hand, as some scholars have noted, *Casey* treated the informed-consent requirement as a regulation of medical conduct rather than speech.[322] Indeed, as Emerson notes, "the

---

317. *Id.* at 59.
318. *Id.* at 56.
319. *See* Markel, *supra* note 302, at 2028 (stating the Hippocratic Oath).
320. SMOLLA, *supra* note 289, at 11.
321. Planned Parenthood v. Casey, 505 U.S. 833, 884 (1992).
322. *See, e.g.*, Wells, *supra* note 47, at 1738.

state is entitled to exercise control over action – whether by prohibiting or compelling it."[323] The Florida law does not regulate, compel or otherwise prohibit conduct; instead, it centers on expression, namely speech in the form of a question. Speech, according to Emerson, "occupies an especially protected position"[324] as "the fountainhead of all expression of the individual personality."[325] Furthermore, speech warrants more protection because it "is normally conceived as doing less injury to other social goals than action."[326]

Even in the context of the physician-patient relationship, it would be a stretch to assert that asking questions rises to the level of conduct rather than expression. Unlike the abortion-related cases in which statutes compelled or silenced speech directly related to a medical procedure, the questions asked about firearms only lead to more speech—specifically, advice about firearm safety. Viewed in this light, the First Amendment theories of human dignity, autonomy and self-fulfillment also protect physician speech and the right to pose questions.

For Baker, respect for human dignity and autonomy entails providing people with the ability "to use their bodies and minds to develop and express themselves."[327] Thus, all people have "an equal right to try to influence the nature of their collective worlds."[328] Furthermore, this First Amendment theory implies that every individual "has the right to use speech . . . to influence or interact with others in a manner that corresponds to her values."[329] As noted earlier, the American Academy of Pediatrics, in representing the values of pediatricians, strongly urge all physicians who deal with the health care of children to ask parents about firearm ownership and advise them about firearm safety.[330] Thus, when physicians give this advice, they are attempting to influence others about their values relating to firearm safety.

---

323. EMERSON, *supra* 293, at 8–9.
324. *Id.* at 8.
325. *Id.* at 9.
326. *Id.*
327. BAKER, *supra* note 316, at 59.
328. *Id.*
329. *Id.*
330. American Academy of Pediatrics, *supra* note 17, at 1421.

Yet, Florida severely limits doctors' ability to influence the world around them and to provide patients with the tools and knowledge for their own safety. Physicians who fear punishment for asking questions about particular topics cannot fully perform their duties to the best of their abilities. Although they may operate in a heavily regulated industry, physicians still deserve the feeling of dignity and autonomy that comes with the ability to express one's thoughts about issues of health and safety and, indeed with the case of guns, life and death. Without protecting frank and open discussion by physicians about these issues, the Act prevents physicians from feeling a sense of self-fulfillment at the end of the day from knowing they offered potentially life-saving advice about firearms safety to their patients.

## C. Attainment of Truth through the Marketplace of Ideas

What is a visit to the doctor other than a patient's attempt to find answers to questions relating to her health and wellbeing? In other words, interactions with physicians facilitate patients' searches for the truth about themselves – their health, their illnesses, their conditions. Freedom of speech as a means to attain the truth is part of a strong tradition in First Amendment theory. As Emerson maintains, a person "who seeks knowledge and truth must hear all sides of the question, consider all alternatives, test his judgment by exposing it to opposition, and make full use of different minds."[331]

John Stuart Mill championed this notion in his classic tome, *On Liberty*.[332] For Mill, open discussion was the only way one could obtain the truth. "[O]nly through diversity of opinion," Mill wrote, "is there, in the existing state of human intellect, a chance of fair play to all sides of the truth."[333] In his analysis of *On Liberty*, K.C. O'Rourke succinctly describes Mill's central thesis: "The ultimate origin of truth . . . is part of the insight of the individual intellect. Discussion serves to bring these insights before the public mind. And this is a further reason why each

---

331. EMERSON, *supra* note 293, at 6–7.
332. JOHN STUART MILL, ON LIBERTY (Gertrude Himmelfarb ed., Penguin Books 1974) (1859).
333. *Id.* at 111.

person should be free to express opinions on all subjects."[334] The idea that free speech and open discussion will allow individuals to obtain a better understanding of the truth serves as the basis for many First Amendment protections.

Indeed, the relationship between free speech and the attainment of truth has now commonly been associated with the marketplace of ideas theory. As early as 1919, when the Supreme Court decided *Abrams v. United States*,[335] Justice Oliver Wendell Holmes' dissenting opinion stated "that the best test of truth is the power of the thought to get itself accepted in the competition of the market."[336] Although it lay quietly in Holmes' dissent at the time, as legal scholar Sean Michael McGuire recently observed, the marketplace theory serves as "the dominant metaphor used in First Amendment jurisprudence."[337] Given the relationship between the practice of medicine and the search for truth, it follows that the marketplace of ideas would justify First Amendment protections for doctor-patient discourse, at least to some extent.

As Professor Berg aptly puts it, "a primary goal of doctor-patient discourse is to discover the 'patient's truth'–the best course of medical treatment in light of that patient's unique configuration of objective and subjective characteristics."[338] In the context of the Florida law, doctor-patient discourse would lead to the best way to keep children safe from firearm-related incidents. Furthermore, restrictions on physician speech, Berg argues, hinder "the discovery of truth by preventing patients from learning about options that they otherwise might have chosen."[339] Many parents might be unaware of the dangers of firearms to children in the home. As Dan Baum recently observed in a *Wall Street Journal* article,

---

334. K.C. O'ROURKE, JOHN STUART MILL AND FREEDOM OF EXPRESSION: THE GENESIS OF A THEORY 90 (2001).

335. 250 U.S. 616 (1919).

336. *Id.* at 630 (Holmes, J., dissenting).

337. Sean Michael McGuire, *Media Influence and the Modern American Democracy: Why the First Amendment Compels Regulation of Media Ownership*, 4 CARDOZO PUB. L. POL'Y & ETHICS J. 689, 693 (2006).

338. Berg, *supra* note 37, at 235.

339. *Id.* at 247.

"[a]ccidental child death is one of the few gun statistics that has grown worse since 1999."[340]

Furthermore, the give and take of the marketplace facilitates discovery of truth for both doctors and patients. Berg contends that "conversations with numerous patients over time enhance doctors' scientific and medical knowledge about diseases, medications, procedures, symptomology, diagnoses, and the practice of medicine in general."[341] For that matter, doctor-patient dialogues about guns might lead parents to learn about new ways to safely store guns or keep them from children. Without the ability for doctors to ask questions and offer advice about firearm safety, both the doctor and the patient miss out on the opportunity to discover truths and expand their knowledge about health and safety.

### D.  *Why First Amendment Theory Requires the Application of Strict Scrutiny to Test the Validity of the Firearms Owners' Privacy Act*

The discussion above demonstrates how key First Amendment theories support the constitutional protection of a physician's right to ask a patient whether he or she owns firearms. However, in order for a theory to extend legal and constitutional protections for speech, courts must bridge the gap between First Amendment theory and doctrine. Professor Post, in his discussion of the link between theory and doctrine, writes that "the purpose of doctrine is to institutionalize constitutional objectives."[342] But while Post argues that the Court's reliance on multiple theories creates doctrinal conflicts, Rodney Smolla believes that "[t]here is no logical reason . . . why the preferred position of freedom of speech might not be buttressed by multiple rationales."[343] And that has been the approach of this part of the article. Throughout, it has used a mix of First Amendment theories and a defense of the varied, respective interests of patients and doctors when it comes to defending their constitutionally protected right to discuss guns.

---

340. Dan Baum, *Review – A Gun Lover on Why Our Gun Debate is Off Target*, WALL ST. J., Feb. 16, 2013, at C1.
341. Berg, *supra* note 37, at 236.
342. Post, *supra* note 33, at 160.
343. SMOLLA, *supra* note 289, at 5.

When it comes to protecting speech, the strict scrutiny standard of review places a high hurdle before a government attempting to create restrictions. Specifically, "the burden of proof," as Professor Catherine Fisk explains, "is on the government to prove: (a) a compelling interest in regulating the speech, and (b) that all less restrictive alternatives 'will be ineffective to achieve its goals.'"[344] As mentioned earlier, courts typically apply this standard when dealing with content-based restrictions.[345] Judge Cooke argued in her permanent injunction that the Florida law did, indeed, constitute a content-based restriction by specifically prohibiting speech related to firearms.[346]

Given the nature of doctor-patient speech in the context of this case, the Eleventh Circuit Court of Appeals now should apply the highest standard of review possible to the Florida law. Speech among doctors and patients regarding firearm safety serves vital functions in a self-governing society. Protecting such doctor-patient speech leads to: informed decision-making about crucial public issues; protection of patients' rights to receive information and advice about their health and safety; respect of patients' dignity and their self-fulfillment as humans when they can make decisions based on what they hear and learn; and the ability of doctors to fully perform their Hippocratic duties by advising parents about the best means to protect themselves and their loved ones from harm.

Finally, protecting this type of doctor-patient speech dignifies and fulfills physicians because they can exchange ideas and discuss safety information that potentially promote the wellbeing of their patients and lead to the discovery of shared truths with those they serve. Simply put, free speech is the very foundation of effective doctor-patient exchanges, and any law violating their First Amendment rights should be subjected to and rejected by the strictest standards of judicial scrutiny. While Judge Cooke equivocated in her 2012 *Wollschlaeger* opinion about the proper standard of review, the Eleventh Circuit now should adopt strict scrutiny.

---

344. Catherine L. Fisk, *Union Lawyers and Employment Law*, 23 BERKELEY J. EMP. & LAB. L. 57, 90 (2002).

345. *See supra* note 41 and accompanying text

346. *See supra* note 146–148 and accompanying text.

CONCLUSION

Amber Ullman likely didn't intend to instigate a constitutional conflict when she declined to answer a pediatrician's gun-ownership questions in July 2010. Regardless, her rebuffment of the doctor led, in no small part, to an ongoing federal-court battle ostensibly pitting the First and Second Amendments against each other.

This Article has argued, however, that Florida's Firearm Owners' Privacy Act in no way enhances, let alone protects, the right to bear arms. Instead, the Act creates a content-based speech regulation that abridges the right of doctors to practice potentially life-saving preventive medicine by counseling patients about gun safety.

At the same time, the Act deprives patients who might want to discuss firearm safety of that opportunity—the right to receive speech—because it is predicated on the notion that doctors should default to silence on the topic. Florida, however, contends the Act is merely hortatory and allows physicians to discuss guns with their patients if the subject meets an ambiguous standard of good-faith relevance. Cynically viewed, Florida jettisoned a politically verboten topic from doctor-patient discourse.

Despite such problems, the Florida law now provides a propitious opportunity for the Eleventh Circuit to resolve a question the U.S. Supreme Court has left unsettled: *What standard of scrutiny should be applied to measure the constitutional validity of statutes restricting the speech of physicians within the context of doctor-patient relationships?* Contradictory judicial decisions and conflicting theories complicate a defense of professional/physician speech under the strict scrutiny standard, especially given that the Supreme Court has suggested, at least in the context of abortion-related cases, that intermediate scrutiny is appropriate.

Using several key First Amendment theories of free speech, this Article contends that the Eleventh Circuit should adopt strict scrutiny. The dispute in *Wollschlaeger* involves pure speech, not a medical procedure or drug prescription. The Eleventh Circuit, of course, could dodge the entire First Amendment issue by holding that the Act is merely hortatory and/or that it regulates only medical conduct, not speech.

The Eleventh Circuit's forthcoming ruling, although only binding on the states within the circuit, likely will influence lawmakers in other gun-friendly states. While Florida is the only state thus far to adopt a statute regulating physicians' gun-ownership discussions with patients, "[s]ix other states — Alabama, Minnesota, North Carolina, Oklahoma, Tennessee and West Virginia — have considered similar legislation in recent years."[347]

Significantly, in early 2013 lawmakers in both Kansas[348] and Missouri[349] proposed bills affecting information about patients' gun ownership that doctors can record in medical records. Ironically, the Florida legislature in 2013 considered a measure to *repeal* the speech-related provisions of the Firearm Owners' Privacy Act—even as the state appeals to the Eleventh Circuit to salvage the statute.[350]

Threats to physicians' speech regarding firearms also exist at the federal level. To the surprise of the Obama administration,[351] a section of the controversial Affordable Care Act restricts the ability of doctors to pose gun-related questions of patients.[352] The provision went largely

---

347. Michelle Andrews, *Medical Questions About Gun Ownership Come Under Scrutiny*, KAISER HEALTH NEWS (Nov. 26, 2012), http://www.kaiserhealthnews.org/Features/Insuring-Your-Health/2012/112712-Michelle-Andrews-on-gun-ownership.aspx.

348. Andy Marso, *Committee Passes Gun Bill Without Doctor Provision*, TOPEKA CAPITAL-J., Feb. 27, 2013, available on NewsBank database.

349. *See* Elizabeth Crisp, *Statehouse Buzz: Gun Proposals Spur Interest in Missouri Legislature*, ST. LOUIS POST-DISPATCH (Feb. 15, 2013), http://www.stltoday.com/news/local/govt-and-politics/elizabeth-crisp/gun-proposals-spur-interest-in-missouri-legislature/article_5d04e3c8-5d2d-58c1-8d81-7a781c23cac1.html.

350. *See* H.B. 4017, 2013 Reg. Sess. (Fla. 2013), *available at* http://www.myfloridahouse.gov/Sections/Bills/billsdetail.aspx?BillId=49495&.
(proposing to repeal provisions relating to medical privacy concerning firearms and prohibited acts by health care practitioners, health care facilities and insurers related to the collection and use of information about patients' ownership of firearms but failing in committee).

351. Peter Wallsten & Tom Hamburger, *In Health-Care Law, A Victory for NRA*, WASH. POST, Dec. 31, 2012, at A1.

352. *Read the Law* at 2037–39, Affordable Care Act: The Patient Protection and Affordable Care Act (PPACA), Pub. L. 111-148, 124 Stat. 119 (2010) (to be codified as amended in scattered sections of 21, 25, 26, 29, and 42 U.S.C.).

unnoticed until the December 2012 shooting in Newtown, Conn.[353] Following a strong appeal against the provision[354] by medical and legal organizations,[355] President Obama signed a January 2013 executive action declaring that no part of the health care reform law should be interpreted as forbidding doctors from discussing guns with patients.[356]

It is time for courts such as the Eleventh Circuit in *Wollschlaeger* to finally resolve that any restriction on physician speech not related to a medical procedure must be measured against the strict scrutiny standard of review. Both the right to speak and the right to receive speech lie in the balance, as do the health and safety of patients.

---

353. Wallsten & Hamburger, *supra* note 351, at A1.

354. *Id.*

355. Letter from American Academy of Pediatrics et al. to Rebecca Zimmerman, Centers for Medicare & Medicaid Services (Dec. 27, 2012), *available at* http://www.washingtonpost.com/r/2010-2019/WashingtonPost/2012 /12/30 /National- Politics/Graphics/Obamacareletter.pdf.

356. *See* WHITE HOUSE, NOW IS THE TIME: THE PRESIDENT'S PLAN TO PROTECT OUR CHILDREN AND OUR COMMUNITIES BY REDUCING GUN VIOLENCE 9 (2013) *available at* http://www.whitehouse.gov/sites/default/files/docs/wh_now_is_the _time_full.pdf ( "The Administration will issue guidance clarifying that the Affordable Care Act does not prohibit or otherwise regulate communication between doctors and patients, including about firearms.").