

ROPES & GRAY LLP
ONE METRO CENTER
700 12ᵀᴴ STREET, NW, SUITE 900
WASHINGTON, DC 20005-3948
WWW.ROPESGRAY.COM

June 20, 2014

Douglas H. Hallward-Driemeier
T +1 202 508 4776
F +1 202 383 8354
douglas.hallward-driemeier@ropesgray.com

Mr. John Ley, Clerk
United States Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re:    No. 12-14009, *Wollschlaeger v. Governor, State of Florida*

Dear Mr. Ley:

Under Rule 28(j), we call the Court's attention to *Susan B. Anthony List v. Driehaus*, No. 13-193 (U.S. June 16, 2014) ("*SBA*"), attached.

In *SBA*, the Supreme Court unanimously upheld, in circumstances like these, plaintiffs' standing to bring a pre-enforcement challenge to Ohio's law proscribing false statements in campaign advertisements. The Court reiterated that a plaintiff need only show a "credible threat of enforcement," where the challenged statute threatens to chill protected speech. *Id.* at 11. The Court held that it was sufficient that plaintiffs' speech was "'arguably affected with a constitutional interest'" and "'*arguably* proscribed' by the law," *id.* at 11, 12 (emphasis added), even though plaintiffs maintained their speech would *not* violate the statute, *id.* at 13. Similarly here, though Appellees believe questions regarding gun ownership as part of preventive medicine *are* relevant to patient health, even without an individualized basis, it is at least "arguable," especially given the circumstances surrounding enactment of the Firearm Owners' Privacy Act ("FOPA") at issue in this appeal, whether such generalized concerns would protect them under the statute's safe harbor.

Finally, in holding that the threat of enforcement was "not 'chimerical'" in *SBA*, the Court stressed that Ohio's law, like FOPA, allowed private individuals, unconstrained by ethical or other limits, to initiate complaints – thus increasing the likelihood of self-censorship by those who feared having to defend against even meritless administrative proceedings. *Id.* at 14. Moreover, as in *SBA*, enforcement of FOPA carries serious penalties beyond an administrative rebuke, including loss of one's professional license. *Id.* at 16. And, as in *SBA*, the Board here showed its willingness to act on such private complaints, taking votes and issuing guidance immediately after FOPA's enactment informing doctors that FOPA was enforceable through Board disciplinary proceedings. *See* Appellees' Br. 22-27.

Here, as in *SBA*, "denying prompt judicial review would impose a substantial hardship on [Appellees], forcing them to choose between refraining from [protected] speech on the one hand, or

engaging in that speech and risking costly [Board] proceedings" and steep penalties – including loss of their medical licenses – on the other. *SBA* at 18.

Respectfully submitted,

Douglas H. Hallward-Driemeier /mo

Douglas H. Hallward-Driemeier
Ropes & Gray LLP
One Metro Center
700 12th St NW Suite 900
Washington, DC 20005
douglas.hallward-driemeier@ropesgray.com
*Counsel for Appellees*

Enclosure

cc: Allen C. Winsor
    Pam Bondi
    Jason Vail
    Office of the Attorney General
    PL-01, The Capital
    Tallahassee, FL 32399

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SUSAN B. ANTHONY LIST ET AL. *v.* DRIEHAUS ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 13–193. Argued April 22, 2014—Decided June 16, 2014

Respondent Driehaus, a former Congressman, filed a complaint with the Ohio Elections Commission alleging that petitioner Susan B. Anthony List (SBA) violated an Ohio law that criminalizes certain false statements made during the course of a political campaign. Specifically, Driehaus alleged that SBA violated the law when it stated that his vote for the Patient Protection and Affordable Care Act (ACA) was a vote in favor of "taxpayer funded abortion." After Driehaus lost his re-election bid, the complaint was dismissed, but SBA continued to pursue a separate suit in Federal District Court challenging the law on First Amendment grounds. Petitioner Coalition Opposed to Additional Spending and Taxes (COAST) also filed a First Amendment challenge to the Ohio law, alleging that it had planned to disseminate materials presenting a similar message but refrained due to the proceedings against SBA. The District Court consolidated the two lawsuits and dismissed them as nonjusticiable, concluding that neither suit presented a sufficiently concrete injury for purposes of standing or ripeness. The Sixth Circuit affirmed on ripeness grounds.

*Held*: Petitioners have alleged a sufficiently imminent injury for Article III purposes. Pp. 7–18.

(a) To establish Article III standing, a plaintiff must show, *inter alia*, an "injury in fact," which must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560. When challenging a law prior to its enforcement, a plaintiff satisfies the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution

thereunder." *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298. Pp. 7–11.

(b) Petitioners have alleged a credible threat of enforcement of the Ohio law. Pp. 11–17.

(1) Petitioners have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest" by pleading specific statements they intend to make in future election cycles. Pp. 11–12.

(2) Petitioners' intended future conduct is also "arguably . . . proscribed by [the] statute." The Ohio false statement statute sweeps broadly, and a panel of the Ohio Elections Commission already found probable cause to believe that SBA violated the law when it made statements similar to those petitioners plan to make in the future. *Golden* v. *Zwickler*, 394 U. S. 103, is distinguishable; the threat of prosecution under an electoral leafletting ban in that case was wholly conjectural because the plaintiff's "sole concern" related to a former Congressman who was unlikely to run for office again. Here, by contrast, petitioners' speech focuses on the broader issue of support for the ACA, not on the voting record of a single candidate. Nor does SBA's insistence that its previous statements were true render its fears of enforcement misplaced. After all, that insistence did not prevent the Commission from finding probable cause for a violation the first time. Pp. 12–13.

(3) Finally, the threat of future enforcement is substantial. There is a history of past enforcement against petitioners. Past enforcement against the same conduct is good evidence that the threat of enforcement is not "'chimerical.'" *Steffel* v. *Thompson*, 415 U. S. 452, 459. The credibility of that threat is bolstered by the fact that a complaint may be filed with the State Commission by "any person," Ohio Rev. Code Ann. §3517.153(A), not just a prosecutor or agency.

The threatened Commission proceedings are of particular concern because of the burden they impose on electoral speech. Moreover, the target of a complaint may be forced to divert significant time and resources to hire legal counsel and respond to discovery requests in the crucial days before an election. But this Court need not decide whether the threat of Commission proceedings standing alone is sufficient; here, those proceedings are backed by the additional threat of criminal prosecution. Pp. 14–17.

(c) The Sixth Circuit separately considered two other "prudential factors": "fitness" and "hardship." This Court need not resolve the continuing vitality of the prudential ripeness doctrine in this case because those factors are easily satisfied here. See *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. ___. Pp. 17–18.

525 Fed. Appx. 415, reversed and remanded.

Thomas, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

――――――
No. 13–193
――――――

## SUSAN B. ANTHONY LIST, ET AL., PETITIONERS *v.* STEVEN DRIEHAUS ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 16, 2014]

JUSTICE THOMAS delivered the opinion of the Court.

Petitioners in this case seek to challenge an Ohio statute that prohibits certain "false statements" during the course of a political campaign. The question in this case is whether their preenforcement challenge to that law is justiciable—and in particular, whether they have alleged a sufficiently imminent injury for the purposes of Article III. We conclude that they have.

I

The Ohio statute at issue prohibits certain "false statement[s]" "during the course of any campaign for nomination or election to public office or office of a political party." Ohio Rev. Code Ann. §3517.21(B) (Lexis 2013). As relevant here, the statute makes it a crime for any person to "[m]ake a false statement concerning the voting record of a candidate or public official," §3517.21(B)(9), or to "[p]ost, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether

it was false or not," §3517.21(B)(10).[1]

"[A]ny person" acting on personal knowledge may file a complaint with the Ohio Elections Commission (or Commission) alleging a violation of the false statement statute. §3517.153(A) (Lexis Supp. 2014). If filed within 60 days of a primary election or 90 days of a general election, the complaint is referred to a panel of at least three Commission members. §§3517.156(A), (B)(1) (Lexis 2013). The panel must then hold an expedited hearing, generally within two business days, §3517.156(B)(1), to determine whether there is probable cause to believe the alleged violation occurred, §3517.156(C). Upon a finding of probable cause, the full Commission must, within 10 days, hold a hearing on the complaint. §3517.156(C)(2); see also Ohio Admin. Code §3517–1–10(E) (2008).

The statute authorizes the full Commission to subpoena witnesses and compel production of documents. Ohio Rev. Code Ann. §3517.153(B) (Lexis Supp. 2014). At the full hearing, the parties may make opening and closing statements and present evidence. Ohio Admin. Code §§3517–1–11(B)(2)(c), (d), (g). If the Commission determines by "clear and convincing evidence" that a party has violated

––––––––––

[1] Section 3517.21(B) provides in relevant part:

"No person, during the course of any campaign for nomination or election to public office or office of a political party, by means of campaign materials, including sample ballots, an advertisement on radio or television or in a newspaper or periodical, a public speech, press release, or otherwise, shall knowingly and with intent to affect the outcome of such campaign do any of the following:

.          .          .          .          .

"(9) Make a false statement concerning the voting record of a candidate or public official;

"(10) Post, publish, circulate, distribute, or otherwise disseminate a false statement concerning a candidate, either knowing the same to be false or with reckless disregard of whether it was false or not, if the statement is designed to promote the election, nomination, or defeat of the candidate."

the false statement law, the Commission "shall" refer the matter to the relevant county prosecutor. Ohio Rev. Code Ann. §§3517.155(D)(1)–(2) (Lexis Supp. 2014). Alternatively, the Commission's regulations state that it may simply issue a reprimand. See Ohio Admin. Code §3517–1–14(D). Violation of the false statement statute is a first-degree misdemeanor punishable by up to six months of imprisonment, a fine up to $5,000, or both. Ohio Rev. Code Ann. §§3599.40 (Lexis 2013), 3517.992(V) (Lexis Supp. 2014). A second conviction under the false statement statute is a fourth-degree felony that carries a mandatory penalty of disfranchisement. §3599.39.

## II

Petitioner Susan B. Anthony List (SBA) is a "pro-life advocacy organization." 525 Fed. Appx. 415, 416 (CA6 2013). During the 2010 election cycle, SBA publicly criticized various Members of Congress who voted for the Patient Protection and Affordable Care Act (ACA). In particular, it issued a press release announcing its plan to "educat[e] voters that their representative voted for a health care bill that includes taxpayer-funded abortion." App. 49–50. The press release listed then-Congressman Steve Driehaus, a respondent here, who voted for the ACA. SBA also sought to display a billboard in Driehaus' district condemning that vote. The planned billboard would have read: "Shame on Steve Driehaus! Driehaus voted FOR taxpayer-funded abortion." *Id.,* at 37. The advertising company that owned the billboard space refused to display that message, however, after Driehaus' counsel threatened legal action.

On October 4, 2010, Driehaus filed a complaint with the Ohio Elections Commission alleging, as relevant here, that SBA had violated §§3517.21(B)(9) and (10) by falsely

stating that he had voted for "taxpayer-funded abortion."[2] Because Driehaus filed his complaint 29 days before the general election, a Commission panel held an expedited hearing. On October 14, 2010, the panel voted 2 to 1 to find probable cause that a violation had been committed. The full Commission set a hearing date for 10 business days later, and the parties commenced discovery. Driehaus noticed depositions of three SBA employees as well as individuals affiliated with similar advocacy groups. He also issued discovery requests for all evidence that SBA would rely on at the Commission hearing, as well as SBA's communications with allied organizations, political party committees, and Members of Congress and their staffs.

On October 18, 2010—after the panel's probable-cause determination, but before the scheduled Commission hearing—SBA filed suit in Federal District Court, seeking declaratory and injunctive relief on the ground that §§3517.21(B)(9) and (10) violate the First and Fourteenth Amendments of the United States Constitution. The District Court stayed the action under *Younger* v. *Harris*, 401 U. S. 37 (1971), pending completion of the Commission proceedings. The Sixth Circuit denied SBA's motion for an injunction pending appeal. Driehaus and SBA eventually agreed to postpone the full Commission hearing until after the election.

When Driehaus lost the election in November 2010, he moved to withdraw his complaint against SBA. The Commission granted the motion with SBA's consent. Once the Commission proceedings were terminated, the District Court lifted the stay and SBA amended its complaint. As

────────────

[2] The dispute about the falsity of SBA's speech concerns two different provisions of the ACA: (1) the subsidy to assist lower income individuals in paying insurance premiums, and (2) the direct appropriation of federal money for certain health programs such as community health centers. See Brief for Petitioners 4–5.

relevant here, the amended complaint alleged that Ohio Rev. Code Ann. §§3517.21(B)(9) and (10) are unconstitutional both facially and as applied. Specifically, the complaint alleged that SBA's speech about Driehaus had been chilled; that SBA "intends to engage in substantially similar activity in the future"; and that it "face[d] the prospect of its speech and associational rights again being chilled and burdened," because "[a]ny complainant can hale [it] before the [Commission], forcing it to expend time and resources defending itself." App. 121–122.

The District Court consolidated SBA's suit with a separate suit brought by petitioner Coalition Opposed to Additional Spending and Taxes (COAST), an advocacy organization that also alleged that the same Ohio false statement provisions are unconstitutional both facially and as applied.[3] According to its amended complaint, COAST intended to disseminate a mass e-mail and other materials criticizing Driehaus' vote for the ACA as a vote "to fund abortions with tax dollars," but refrained from doing so because of the Commission proceedings against SBA. *Id.,* at 146, 148, 162. COAST further alleged that it "desires to make the same or similar statements about other federal candidates who voted for" the ACA, but that fear "of finding itself subject to the same fate" as SBA has deterred it from doing so. *Id.,* at 149, 157.[4]

_____

[3] Petitioners also challenged a related "disclaimer provision," App. 126–127, 156–157, under Ohio Rev. Code Ann. §3517.20, and COAST raised pre-emption and due process claims. Reply Brief 21, n. 7. Petitioners do not pursue their "disclaimer," pre-emption, or due process claims before us. *Ibid.* We also need not address SBA's separate challenge to the Commission's investigatory procedures; petitioners have conceded that the procedures claim stands or falls with the substantive prohibition on false statements. *Ibid.;* see Tr. of Oral Arg. 19. Finally, the parties agree that petitioners' as-applied claims "are better read as facial objections to Ohio's law." Reply Brief 19. Accordingly, we do not separately address the as-applied claims.

[4] SBA named Driehaus, the Commission's members and its staff at-

The District Court dismissed both suits as non-justiciable, concluding that neither suit presented a sufficiently concrete injury for purposes of standing or ripeness. The Sixth Circuit affirmed on ripeness grounds. 525 Fed. Appx. 415. The Court of Appeals analyzed three factors to assess whether the case was ripe for review: (1) the likelihood that the alleged harm would come to pass; (2) whether the factual record was sufficiently developed; and (3) the hardship to the parties if judicial relief were denied.

Regarding the first factor, the Sixth Circuit concluded that SBA's prior injuries—the probable-cause determination and the billboard rejection—"do not help it show an imminent threat of *future* prosecution," particularly where "the Commission never found that SBA . . . violated Ohio's false-statement law." *Id.*, at 420. The court further reasoned that it was speculative whether any person would file a complaint with the Commission in the future, in part because Driehaus took a 2-year assignment with the Peace Corps in Africa after losing the election. Finally, the court noted that SBA has not alleged that "it plans to lie or recklessly disregard the veracity of its speech" in the future, but rather maintains that the statements it intends to make are factually true. *Id.*, at 422.

As for the remaining factors, the court concluded that the factual record was insufficiently developed with respect to the content of SBA's future speech, and that withholding judicial relief would not result in undue hardship because, in the time period leading up to the 2010 election, SBA continued to communicate its message even after Commission proceedings were initiated. The Sixth Circuit

---

torney (in their official capacities), and the Ohio Secretary of State (in her official capacity) as defendants. COAST named the Commission, the Commission's members and its staff attorney (in their official capacities), and the Ohio Secretary of State (in her official capacity) as defendants. All named defendants are respondents here.

therefore determined that SBA's suit was not ripe for review, and that its analysis as to SBA compelled the same conclusion with respect to COAST.

We granted certiorari, 571 U. S. ___ (2014), and now reverse.

## III

### A

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U. S. Const., Art. III, §2. The doctrine of standing gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process."[5] *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560 (1992). "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper* v. *Amnesty Int'l USA*, 568 U. S. ___, ___, (2013) (slip op., at 9). To establish Article III standing, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision." *Lujan*, *supra*, at 560–561 (internal quotation marks omitted).

This case concerns the injury-in-fact requirement, which helps to ensure that the plaintiff has a "personal stake in the outcome of the controversy." *Warth* v. *Seldin*, 422

————————

[5] The doctrines of standing and ripeness "originate" from the same Article III limitation. *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 335 (2006). As the parties acknowledge, the Article III standing and ripeness issues in this case "boil down to the same question." *Med-Immune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 128, n. 8 (2007); see Brief for Petitioners 28; Brief for Respondents 22. Consistent with our practice in cases like *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 392 (1988), and *Babbitt* v. *Farm Workers,* 442 U. S. 289, 299, n. 11 (1979), we use the term "standing" in this opinion.

U. S. 490, 498 (1975) (internal quotation marks omitted). An injury sufficient to satisfy Article III must be "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan, supra,* at 560 (some internal question marks omitted). An allegation of future injury may suffice if the threatened injury is "certainly impending," or there is a "'substantial risk' that the harm will occur." *Clapper,* 568 U. S., at ___, ___, n. 5 (slip op., at 10, 15, n. 5) (emphasis deleted and internal quotation marks omitted).

"'The party invoking federal jurisdiction bears the burden of establishing' standing." *Id.,* at ___ (slip op., at 12). "[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan, supra,* at 561.

## B

One recurring issue in our cases is determining when the threatened enforcement of a law creates an Article III injury. When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law. See *Steffel* v. *Thompson,* 415 U. S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights"); see also *MedImmune, Inc.* v. *Genentech, Inc.,* 549 U. S. 118, 128–129 (2007) ("[W]here threatened action by *government* is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"). Instead, we have permitted pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent. Specifically, we have held that a plaintiff satisfies the injury-in-fact

requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt* v. *Farm Workers,* 442 U. S. 289, 298 (1979). Several of our cases illustrate the circumstances under which plaintiffs may bring a preenforcement challenge consistent with Article III.

In *Steffel*, for example, police officers threatened to arrest petitioner and his companion for distributing handbills protesting the Vietnam War. Petitioner left to avoid arrest; his companion remained and was arrested and charged with criminal trespass. Petitioner sought a declaratory judgment that the trespass statute was unconstitutional as applied to him.

We determined that petitioner had alleged a credible threat of enforcement: He had been warned to stop handbilling and threatened with prosecution if he disobeyed; he stated his desire to continue handbilling (an activity he claimed was constitutionally protected); and his companion's prosecution showed that his "concern with arrest" was not "'chimerical.'" 415 U. S., at 459. Under those circumstances, we said, "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Ibid.*

In *Babbitt*, we considered a preenforcement challenge to a statute that made it an unfair labor practice to encourage consumers to boycott an "agricultural product . . . by the use of dishonest, untruthful and deceptive publicity.'" 442 U. S., at 301. The plaintiffs contended that the law "unconstitutionally penalize[d] inaccuracies inadvertently uttered in the course of consumer appeals." *Ibid.*

Building on *Steffel*, we explained that a plaintiff could bring a preenforcement suit when he "has alleged an intention to engage in a course of conduct arguably af-

fected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbit, supra,* at 298. We found those circumstances present in *Babbitt.* In that case, the law "on its face proscribe[d] dishonest, untruthful, and deceptive publicity." 442 U. S., at 302. The plaintiffs had "actively engaged in consumer publicity campaigns in the past" and alleged "an intention to continue" those campaigns in the future. *Id.,* at 301. And although they did not "plan to propagate untruths," they argued that "'erroneous statement is inevitable in free debate.'" *Ibid.* We concluded that the plaintiffs' fear of prosecution was not "imaginary or wholly speculative," and that their challenge to the consumer publicity provision presented an Article III case or controversy. *Id.,* at 302.

Two other cases bear mention. In *Virginia* v. *American Booksellers Assn. Inc.,* 484 U. S. 383 (1988), we held that booksellers could seek preenforcement review of a law making it a crime to "'knowingly display for commercial purpose'" material that is "'harmful to juveniles'" as defined by the statute. *Id.,* at 386. At trial, the booksellers introduced 16 books they believed were covered by the statute and testified that costly compliance measures would be necessary to avoid prosecution for displaying such books. Just as in *Babbitt* and *Steffel,* we determined that the "pre-enforcement nature" of the suit was not "troubl[ing]" because the plaintiffs had "alleged an actual and well-founded fear that the law will be enforced against them." 484 U. S., at 393.

Finally, in *Holder* v. *Humanitarian Law Project,* 561 U. S. 1 (2010), we considered a preenforcement challenge to a law that criminalized "'knowingly provid[ing] material support or resources to a foreign terrorist organization.'" *Id.,* at 8. The plaintiffs claimed that they had provided support to groups designated as terrorist organizations prior to the law's enactment and would provide

similar support in the future. The Government had charged 150 persons with violating the law and declined to disavow prosecution if the plaintiffs resumed their support of the designated organizations. We held that the claims were justiciable: The plaintiffs faced a "'credible threat'" of enforcement and "'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Id.,* at 15.

## IV

Here, SBA and COAST contend that the threat of enforcement of the false statement statute amounts to an Article III injury in fact. We agree: Petitioners have alleged a credible threat of enforcement. See *Babbitt,* 442 U. S., at 298.

## A

First, petitioners have alleged "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Ibid.* Both petitioners have pleaded specific statements they intend to make in future election cycles. SBA has already stated that representatives who voted for the ACA supported "taxpayer-funded abortion," and it has alleged an "inten[t] to engage in substantially similar activity in the future." App. 49–50, 122. See also *Humanitarian Law Project, supra,* at 15–16 (observing that plaintiffs had previously provided support to groups designated as terrorist organizations and alleged they "would provide similar support [to the same terrorist organizations] again if the statute's allegedly unconstitutional bar were lifted"). COAST has alleged that it previously intended to disseminate materials criticizing a vote for the ACA as a vote "to fund abortions with tax dollars," and that it "desires to make the same or similar statements about other federal candidates who voted for [the ACA]." App. 146, 149, 162. Because petitioners' intended future conduct concerns

political speech, it is certainly "affected with a constitutional interest." *Babbitt, supra,* at 298; see also *Monitor Patriot Co.* v. *Roy,* 401 U. S. 265, 272 (1971) ("[T]he constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office").

## B

Next, petitioners' intended future conduct is "arguably. . . proscribed by [the] statute" they wish to challenge. *Babbitt, supra,* at 298. The Ohio false statement law sweeps broadly, see *supra,* at 1–2, and n. 1., and covers the subject matter of petitioners' intended speech. Both SBA and COAST have alleged an intent to "[m]ake" statements "concerning the voting record of a candidate or public official," §3517.21(B)(9), and to "disseminate" statements "concerning a candidate . . . to promote the election, nomination, or defeat of the candidate," §3517.21(B)(10). And, a Commission panel here already found probable cause to believe that SBA violated the statute when it stated that Driehaus had supported "taxpayer-funded abortion"—the same sort of statement petitioners plan to disseminate in the future. Under these circumstances, we have no difficulty concluding that petitioners' intended speech is "arguably proscribed" by the law.

Respondents incorrectly rely on *Golden* v. *Zwickler*, 394 U. S. 103 (1969). In that case, the plaintiff had previously distributed anonymous leaflets criticizing a particular Congressman who had since left office. *Id.,* at 104–106, and n. 2. The Court dismissed the plaintiff's challenge to the electoral leafletting ban as nonjusticiable because his "*sole concern* was literature relating to the Congressman and his record," and "it was most unlikely that the Congressman would again be a candidate." *Id.,* at 109 (emphasis added). Under those circumstances, any threat of

future prosecution was "wholly conjectural." *Ibid.*

Here, by contrast, petitioners' speech focuses on the broader issue of support for the ACA, not on the voting record of a single candidate. See Reply Brief 4–5 (identifying other elected officials who plan to seek reelection as potential objects of SBA's criticisms). Because petitioners' alleged future speech is not directed exclusively at Driehaus, it does not matter whether he "may run for office again." Brief for Respondents 33 (internal quotation marks omitted). As long as petitioners continue to engage in comparable electoral speech regarding support for the ACA, that speech will remain arguably proscribed by Ohio's false statement statute.

Respondents, echoing the Sixth Circuit, contend that SBA's fears of enforcement are misplaced because SBA has not said it "'plans to lie or recklessly disregard the veracity of its speech.'" *Id.,* at 15 (quoting 525 Fed. Appx., at 422). The Sixth Circuit reasoned that because SBA "can only be liable for making a statement 'knowing' it is false," SBA's insistence that its speech is factually true "makes the possibility of prosecution for uttering such statements exceedingly slim." *Id.,* at 422.

The Sixth Circuit misses the point. SBA's insistence that the allegations in its press release were true did not prevent the Commission panel from finding probable cause to believe that SBA had violated the law the first time around. And, there is every reason to think that similar speech in the future will result in similar proceedings, notwithstanding SBA's belief in the truth of its allegations. Nothing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law. See, *e.g., Babbitt,* 442 U. S*.,* at 301 (case was justiciable even though plaintiffs disavowed any intent to "propagate untruths").

## C

Finally, the threat of future enforcement of the false statement statute is substantial. Most obviously, there is a history of past enforcement here: SBA was the subject of a complaint in a recent election cycle. We have observed that past enforcement against the same conduct is good evidence that the threat of enforcement is not "'chimerical.'" *Steffel*, 415 U. S., at 459; cf. *Clapper*, 568 U. S., at ___ (slip op., at 12) (plaintiffs' theory of standing was "substantially undermine[d]" by their "fail[ure] to offer any evidence that their communications ha[d] been monitored" under the challenged statute). Here, the threat is even more substantial given that the Commission panel actually found probable cause to believe that SBA's speech violated the false statement statute. Indeed future complainants may well "invoke the prior probable-cause finding to prove that SBA *knowingly* lied." Brief for Petitioners 32.

The credibility of that threat is bolstered by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency. Instead, the false statement statute allows "any person" with knowledge of the purported violation to file a complaint. §3517.153(A). Because the universe of potential complainants is not restricted to state officials who are constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents. See Brief for Michael DeWine, Attorney General of Ohio, as *Amicus Curiae* 8 (hereinafter DeWine Brief); see also *id.*, at 6 (noting that "the Commission has no system for weeding out frivolous complaints"). And petitioners, who intend to criticize candidates for political office, are easy targets.

Finally, Commission proceedings are not a rare occurrence. Petitioners inform us that the Commission "'handles about 20 to 80 false statement complaints per year,'"

Brief for Petitioners 46, and respondents do not deny that the Commission frequently fields complaints alleging violations of the false statement statute. Cf. *Humanitarian Law Project*, 561 U. S., at 16 (noting that there had been numerous prior prosecutions under the challenged statute). Moreover, respondents have not disavowed enforcement if petitioners make similar statements in the future. See Tr. of Oral Arg. 29–30; see also *Humanitarian Law Project*, *supra,* at 16 ("The Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do"). In fact, the specter of enforcement is so substantial that the owner of the billboard refused to display SBA's message after receiving a letter threatening Commission proceedings. On these facts, the prospect of future enforcement is far from "imaginary or speculative." *Babbitt*, *supra*, at 298.

We take the threatened Commission proceedings into account because administrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review. See *Ohio Civil Rights Comm'n* v. *Dayton Christian Schools, Inc.*, 477 U. S. 619, 625–626, n. 1 (1986) ("If a reasonable threat of prosecution creates a ripe controversy, we fail to see how the actual filing of the administrative action threatening sanctions in this case does not"). The burdens that Commission proceedings can impose on electoral speech are of particular concern here. As the Ohio Attorney General himself notes, the "practical effect" of the Ohio false statement scheme is "to permit a private complainant . . . to gain a campaign advantage without ever having to prove the falsity of a statement." DeWine Brief 7. "[C]omplainants may time their submissions to achieve maximum disruption of their political opponents while calculating that an ultimate decision on the merits will be deferred until after the relevant election." *Id.*, at 14–15. Moreover, the target of a false statement complaint may be forced to divert significant time

and resources to hire legal counsel and respond to discovery requests in the crucial days leading up to an election. And where, as here, a Commission panel issues a preelection probable-cause finding, "such a determination itself may be viewed [by the electorate] as a sanction by the State." *Id.*, at 13.

Although the threat of Commission proceedings is a substantial one, we need not decide whether that threat standing alone gives rise to an Article III injury. The burdensome Commission proceedings here are backed by the additional threat of criminal prosecution. We conclude that the combination of those two threats suffices to create an Article III injury under the circumstances of this case. See *Babbitt, supra,* at 302, n. 13 (In addition to the threat of criminal sanctions, "the prospect of issuance of an administrative cease-and-desist order or a court-ordered injunction against such prohibited conduct provides substantial additional support for the conclusion that appellees' challenge . . . is justiciable" (citations omitted)).

That conclusion holds true as to both SBA and COAST. Respondents, relying on *Younger* v. *Harris,* 401 U. S. 37 (1971), appear to suggest that COAST lacks standing because it refrained from actually disseminating its planned speech in order to avoid Commission proceedings of its own. See Brief for Respondents 26–27, 34. In *Younger*, the plaintiff had been indicted for distributing leaflets in violation of the California Criminal Syndicalism Act. When he challenged the constitutionality of the law in federal court, several other plaintiffs intervened, arguing that their own speech was inhibited by Harris' prosecution. The Court concluded that only the plaintiff had standing because the intervenors "d[id] not claim that they ha[d] ever been threatened with prosecution, that a prosecution [wa]s likely, or even that a prosecution [wa]s remotely possible." 401 U. S., at 42.

That is not this case. Unlike the intervenors in *Younger*,

COAST has alleged an intent to engage in the same speech that was the subject of a prior enforcement proceeding. Also unlike the intervenors in *Younger*, who had never been threatened with prosecution, COAST has been the subject of Commission proceedings in the past. See, *e.g., COAST Candidates PAC* v. *Ohio Elections Comm'n*, 543 Fed. Appx. 490 (CA6 2013). COAST is far more akin to the plaintiff in *Steffel*, who was not arrested alongside his handbilling companion but was nevertheless threatened with prosecution for similar speech. 415 U. S., at 459.

In sum, we find that both SBA and COAST have alleged a credible threat of enforcement.

## V

In concluding that petitioners' claims were not justiciable, the Sixth Circuit separately considered two other factors: whether the factual record was sufficiently developed, and whether hardship to the parties would result if judicial relief is denied at this stage in the proceedings. 525 Fed. Appx., at 419. Respondents contend that these "prudential ripeness" factors confirm that the claims at issue are nonjusticiable. Brief for Respondents 17. But we have already concluded that petitioners have alleged a sufficient Article III injury. To the extent respondents would have us deem petitioners' claims nonjusticiable "on grounds that are 'prudential,' rather than constitutional," "[t]hat request is in some tension with our recent reaffirmation of the principle that 'a federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'" *Lexmark Int'l, Inc.* v. *Static Control Components, Inc.*, 572 U. S. ___, ___ (2014) (slip op., at 6) (quoting *Sprint Communications, Inc.* v. *Jacobs*, 571 U. S. ___, ___ (2013) (slip op., at 6); some internal quotation marks omitted).

In any event, we need not resolve the continuing vitality

of the prudential ripeness doctrine in this case because the "fitness" and "hardship" factors are easily satisfied here. First, petitioners' challenge to the Ohio false statement statute presents an issue that is "purely legal, and will not be clarified by further factual development." *Thomas* v. *Union Carbide Agricultural Products Co.*, 473 U. S. 568, 581 (1985). And denying prompt judicial review would impose a substantial hardship on petitioners, forcing them to choose between refraining from core political speech on the one hand, or engaging in that speech and risking costly Commission proceedings and criminal prosecution on the other.

\*        \*        \*

Petitioners in this case have demonstrated an injury in fact sufficient for Article III standing. We accordingly reverse the judgment of the United States Court of Appeals for the Sixth Circuit and remand the case for further proceedings consistent with this opinion, including a determination whether the remaining Article III standing requirements are met.

*It is so ordered.*