

ROPES & GRAY LLP
PRUDENTIAL TOWER
800 BOYLSTON STREET
BOSTON, MA 02199-3600
WWW.ROPESGRAY.COM

September 15, 2014

Douglas H. Hallward-Driemeier
T +1 202 508 4776
F +1 202 383 8354
douglas.hallward-driemeier@ropesgray.com

Mr. John Ley, Clerk
United States Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re:     No. 12-14009, *Wollschlaeger v. Governor, State of Florida*

Dear Mr. Ley:

Pursuant to F.R.A.P. 28(j), we call the Court's attention to *King v. Governor of State of New Jersey*, No. 13-4429 (3d Cir. Sept. 11, 2014) (attached), in which the Third Circuit held that licensed counselors' verbal communications during Sexual Orientation Change Efforts counseling are protected by the First Amendment as professional speech, warranting at least intermediate scrutiny.

*King* first held that "speech is speech," and that "the function of [professional] speech does not render it 'conduct' that is wholly outside the scope of the First Amendment." *Id.* at 28–29, 39; *id.* at 24–26 (discussing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010)). Professional speech involving "personalized services to a client based on the professional's expert knowledge and judgment" *is* entitled to First Amendment protection. *Id.* at 34, 37–39.

*King* specifically disagreed with the panel majority's conclusion in this case that "regulations of professional speech are subject to a more deferential standard of review or, possibly, no review at all." *Id.* at 45. According to *King*, regulation of professional speech, like commercial speech, is subject to intermediate scrutiny. Both "serve[] as an important channel for the communication of information that might otherwise never reach the public." *Id.* at 42. And, "anything less than intermediate scrutiny would [not] adequately protect the First Amendment interests inherent in professional speech." *Id.* at 47. As the district court held, and as Judge Wilson further demonstrated in his dissent, Florida's Firearm Owners Privacy Act ("FOPA") cannot withstand even intermediate scrutiny. The fundamental disagreement between the analysis in *King* and that of the panel majority further supports the need for *en banc* review.

Moreover, *King* held that content-based regulation of professional speech for purposes other than "protecting [the State's] citizens from ineffective or harmful professional services" is subject to *strict* scrutiny. *Id.* at 44 (citing *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)). Because it was not designed for this purpose, FOPA would be subject to strict scrutiny under *King*'s analysis.

We request that you please circulate a copy of the opinion and this letter to the full court.

Respectfully submitted,

Douglas H. Hallward-Driemeier
Ropes & Gray LLP
One Metro Center
700 12th St NW Suite 900
Washington, DC 20005
douglas.hallward-driemeier@ropesgray.com
*Counsel for Petitioners*

Enclosure

cc: Allen C. Winsor
    Pam Bondi
    Jason Vail
    Office of the Attorney General
    PL-01, The Capital
    Tallahassee, FL 32399

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4429
_____

TARA KING, ED. D. INDIVIDUALLY AND ON
BEHALF OF HER PATIENTS;
RONALD NEWMAN, PH. D., INDIVIDUALLY AND
ON BEHALF OF HIS PATIENTS;
NATIONAL ASSOCIATION FOR RESEARCH AND
THERAPY OF HOMOSEXUALITY, (NARTH);
AMERICAN ASSOCIATION OF CHRISTIAN
COUNSELORS,

                Appellants

v.

GOVERNOR OF THE STATE OF NEW JERSEY;
ERIC T. KANEFSKY,
DIRECTOR OF THE NEW JERSEY DEPARTMENT
OF LAW AND PUBLIC SAFETY:
DIVISION OF CONSUMER AFFAIRS, IN HIS
OFFICIAL CAPACITY;
MILAGROS COLLAZO, EXECUTIVE DIRECTOR OF
THE NEW JERSEY BOARD OF MARRIAGE

1

AND FAMILY THERAPY EXAMINERS,
IN HER OFFICIAL CAPACITY;
J. MICHAEL WALKER, EXECUTIVE DIRECTOR OF
THE NEW JERSEY BOARD
OF PSYCHOLOGICAL EXAMINERS,
IN HIS OFFICIAL CAPACITY;
PAUL JORDAN,
PRESIDENT OF THE NEW JERSEY STATE
BOARD OF MEDICAL EXAMINERS,
IN HIS OFFICIAL CAPACITY


GARDEN STATE EQUALITY (Intervenor in D.C.)
_____


On Appeal from the United States District Court
for the District of New Jersey
District Court No. 13-cv-05038
District Judge: The Honorable Freda L. Wolfson

Argued July 9, 2014

Before: SMITH, VANASKIE, and SLOVITER,
*Circuit Judges*

(Filed: September 11, 2014)

Mary E. McAlister, Esq.
Daniel J. Schmid, Esq.

Liberty Counsel
P.O. Box 11108
Lynchburg, VA 24506

Anita L. Staver, Esq.
Mathew D. Staver [ARGUED]
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854

Demetrios K. Stratis, Esq.
10-04 River Road
Fairlawn, NJ 07410
    *Counsel for Appellants*

Robert T. Lougy, Esq.
Eric S. Pasternack, Esq.
Susan M. Scott [ARGUED]
Office of Attorney General of New Jersey
P.O. Box 112
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
    *Counsel for Appellee*

Shireen A. Barday, Esq.
David S. Flugman, Esq. [ARGUED]

Frank M. Holozubiec, Esq.
Andrew C. Orr
Kirkland & Ellis
601 Lexington Avenue
New York, NY  10022

Andrew Bayer, Esq.
Gluck Walrath
2nd Floor
428 River View Plaza
Trenton, NJ  08611

Shannon P. Minter, Esq.
Christopher F. Stoll, Esq.
Amy Whelan, Esq.
National Center for Lesbian Rights
870 Market Street
Suite 370
San Francisco, CA  94102
  *Counsel for Intervenor Appellee*

Mordechai Biser, Esq.
Agudath Israel of America
42 Broadway
14th Floor
New York, NY  10004

Ronald D. Coleman, Esq.
Goetz Fitzpatrick, Esq.

1 Penn Plaza
Suite 3100
New York, NY  10119

Jonathan C. Dalton, Esq.
Alliance Defending Freedom
15100 North 90th Street
Scottsdale, AZ  85260
        *Amicus Appellant*

Kristy K. Marino, Esq.
Eileen R. Ridley, Esq.
Foley & Lardner
555 California Street
Suite 1700
San Francisco, CA   94104

Suman Chakraborty, Esq.
Squire Patton Boggs LLP
1185 Avenue of the Americas
30th Floor
New York, NY   10036

Curtis C. Cutting, Esq.
Horvitz & Levy
15760 Ventura Boulevard
18th Floor
Encino, CA  91436

Hayley J. Gorrenberg, Esq.
Lambda Legal Defense & Education Fund, Inc.
120 Wall Street
19th Floor
New York, NY 10005

Lisa A. Linsky, Esq.
McDermott, Will & Emery
340 Madison Avenue
New York, NY 10173

Sandford J. Rosen, Esq.
Rosen, Bien & Galvan
315 Montgomery Street
10th Floor
San Francisco, CA 94104

Tanya E. Kalivas, Esq.
Arnold & Porter
399 Park Avenue
34th Floor
New York, NY 10022

Emily B. Goldberg, Esq.
McCarter & English
100 Mulberry Street
Four Gateway Center, 14th Floor
Newark, NJ 07102
        *Amicus Appellee*

---

OPINION

---

SMITH, *Circuit Judge.*

A recently enacted statute in New Jersey prohibits licensed counselors from engaging in "sexual orientation change efforts"[1] with a client under the age of 18. Individuals and organizations that seek to provide such counseling filed suit in the United States District Court for the District of New Jersey, challenging this law as a violation of their First Amendment rights to free speech and free exercise of religion. Plaintiffs also asserted claims on behalf of their minor clients under the First and Fourteenth Amendments. The District Court rejected Plaintiffs' First Amendment claims and held that they lacked standing to bring claims on behalf of their minor clients. Although we disagree with parts of the District Court's analysis, we will affirm.

---

[1]    The term "sexual orientation change efforts" is defined as "the practice of seeking to change a person's sexual orientation, including . . . efforts . . . to reduce or eliminate sexual or romantic attractions or feelings toward a person of the same gender." N.J. Stat. Ann. § 45:1-55.

## I.

## A.

Plaintiffs are individuals and organizations that provide licensed counseling to minor clients seeking to reduce or eliminate same-sex attractions ("SSA"). Dr. Tara King and Dr. Ronald Newman are New Jersey licensed counselors and founders of Christian counseling centers that offer counseling on a variety of issues, including sexual orientation change, from a religious perspective. The National Association for Research and Therapy of Homosexuality ("NARTH") and the American Association of Christian Counselors are organizations whose members provide similar licensed counseling in New Jersey.

Plaintiffs describe sexual orientation change efforts ("SOCE") counseling as "talk therapy" that is administered solely through verbal communication. SOCE counselors may begin a session by inquiring into potential "root causes" of homosexual behavior, such as childhood sexual trauma or other developmental issues, such as a distant relationship with the same-sex parent. A counselor might then attempt to effect sexual orientation change by discussing "traditional, gender-appropriate behaviors and characteristics" and how the client can foster and develop these behaviors and characteristics. Many counselors, including Plaintiffs, approach

counseling from a "Biblical perspective" and may also
integrate Biblical teachings into their sessions.[2]

On August 19, 2013, Governor Christopher J.
Christie signed Assembly Bill A3371 ("A3371") into
law.[3] A3371 provides:

> a. A person who is licensed to provide
> professional counseling . . . shall not engage
> in sexual orientation change efforts with a
> person under 18 years of age.

> b. As used in this section, "sexual
> orientation change efforts" means the
> practice of seeking to change a person's
> sexual orientation, including, but not limited
> to, efforts to change behaviors, gender
> identity, or gender expressions, or to reduce
> or eliminate sexual or romantic attractions or
> feelings toward a person of the same gender;
> except that sexual orientation change efforts

---

[2]     As the District Court observed, Plaintiffs provide very
few details of precisely what transpires during SOCE
counseling sessions. The foregoing is the sum total of
Plaintiffs' descriptions, which they compiled in response to
the District Court's inquiries at the October 1, 2013, hearing.
J.A. 556–57.

[3]     Assembly Bill A3371 is now codified at N.J. Stat.
Ann. §§ 45:1-54, 55. Because the parties still refer to the law
as A3371, we do so in this Opinion as well.

shall not include counseling for a person seeking to transition from one gender to another, or counseling that:

> (1) provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and

> (2) does not seek to change sexual orientation.

N.J. Stat. Ann. § 45:1-55. Though A3371 does not itself impose any penalties, a licensed counselor who engages in the prohibited "sexual orientation change efforts" may be exposed to professional discipline by the appropriate licensing board. *See* N.J. Stat. Ann. § 45:1-21.

A3371 is accompanied by numerous legislative findings regarding the impact of SOCE counseling on clients seeking sexual orientation change. N.J. Stat. Ann. § 45:1-54. The New Jersey legislature found that "being lesbian, gay, or bisexual is not a disease, disorder, illness, deficiency, or shortcoming" and that "major professional associations of mental health practitioners and researchers in the United States have recognized this fact

10

for nearly 40 years." *Id.* The legislature also cited reports, articles, resolutions, and position statements from reputable mental health organizations opposing therapeutic intervention designed to alter sexual orientation. Many of these sources emphasized that such efforts are ineffective and/or carry a significant risk of harm. According to the legislature, for example, a 2009 report issued by the American Psychological Association ("APA Report") concluded:

> [S]exual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people, including confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, increased self-hatred, hostility and blame toward parents, feelings of anger and betrayal, loss of friends and potential romantic partners, problems in sexual and emotional intimacy, sexual dysfunction, high-risk sexual behaviors, a feeling of being dehumanized and untrue to self, a loss of faith, and a sense of having wasted time and resources.

*Id.*

Finally, the legislature declared that "New Jersey

has a compelling interest in protecting the physical and psychological well-being of minors, including lesbian, gay, bisexual, and transgender youth, and in protecting its minors against exposure to serious harms caused by sexual orientation change efforts." *Id.*

## B.

On August 22, 2013, Plaintiffs filed a complaint against various New Jersey executive officials ("State Defendants")[4] in the United States District Court for the District of New Jersey, alleging that A3371 violated their rights to free speech and free exercise of religion under the First and Fourteenth Amendments. The complaint also alleged constitutional claims on behalf of Plaintiffs' minor clients and their parents. Specifically, Plaintiffs claimed that A3371 violated the minor clients' First and Fourteenth Amendment rights to free speech and free exercise of religion and the parents' Fourteenth

---

[4] These State Defendants include Christopher J. Christie, Governor; Eric T. Kanefsky, Director of the New Jersey Department of Law and Public Safety: Division of Consumer Affairs; Milagros Collazo, Executive Director of the New Jersey Board of Marriage and Family Therapy Examiners; J. Michael Walker, Executive Director of the New Jersey Board of Psychological Examiners; and Paul Jordan, President of the New Jersey State Board of Medical Examiners. Plaintiffs filed suit against each official in his or her official capacity.

Amendment right to substantive due process.[5]

The following day, Plaintiffs moved for a Temporary Restraining Order and/or Preliminary Injunction to prevent enforcement of A3371. During a telephone conference with the parties, the District Court denied Plaintiffs' motion for preliminary relief and, at Plaintiffs' request, converted this motion into a motion for summary judgment. On September 6, 2013, Garden State Equality ("Garden State"), a New Jersey civil rights organization that advocates for lesbian, gay, bisexual, and transgender equality, filed a motion to intervene as a defendant. On September 13, 2013, State Defendants and Garden State filed cross-motions for summary judgment. The District Court heard argument on all of these motions on October 1, 2013, and issued a final ruling in an order dated November 8, 2013.

The District Court first considered whether Garden State was required to demonstrate Article III standing to participate in the lawsuit as an intervening party.[6] The

---

[5]    The complaint also alleged various claims under the constitution of New Jersey. Plaintiffs abandoned these claims in the District Court.

[6]    Article III standing requires (1) an injury in fact, (2) that is causally related to the alleged conduct of the defendant, and (3) that is redressable by judicial action. *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Court acknowledged that this was an open question in the Third Circuit, and adopted the view held by a majority of our sister circuits that an intervenor need not have Article III standing to participate. The Court then held that Garden State fulfilled the requirements for permissive intervention pursuant to Federal Rule of Civil Procedure 24(b), reasoning that Garden State's motion was timely, it shared a common legal defense with State Defendants, and its participation would not unduly prejudice the adjudication of Plaintiffs' rights. Accordingly, the Court granted Garden State's motion to intervene.

The District Court then considered whether Plaintiffs possessed standing to pursue claims on behalf of their minor clients and their parents. It reasoned first that "Plaintiffs' ability to bring third-party claims hinges on whether they suffered any constitutional wrongs by the passage of A3371." J.A. 24. It then held that because, as it would explain later in its opinion, A3371 did not violate Plaintiffs' constitutional rights, Plaintiffs did not suffer an "injury in fact" sufficient to confer third-party standing. The Court also held that Plaintiffs failed to demonstrate that these third parties were sufficiently hindered in their ability to protect their own interests. Accordingly, the Court granted summary judgment for Defendants on Plaintiffs' third-party claims.

The District Court then considered whether A3371 violated Plaintiffs' right to free speech. Relying heavily on the Ninth Circuit's decision upholding a similar

statute in *Pickup v. Brown*, 728 F.3d 1042 (9th Cir. 2013),[7] the Court concluded that A3371 regulates conduct, not speech. The Court also determined that A3371 does not have an "incidental effect" on speech sufficient to trigger a lower level of scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968). Having determined that A3371 regulates neither speech nor expressive conduct, the District Court rejected Plaintiffs' free speech challenge.[8] The District Court also concluded

---

[7]   After the District Court issued its opinion, the Ninth Circuit denied a petition for rehearing en banc in *Pickup* and, in the process, amended its opinion to include, *inter alia*, a discussion of *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). *Compare Pickup*, 728 F.3d 1042 *with Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2013) *cert denied*, 134 S. Ct. 2871 (2014) and *cert denied*, 134 S. Ct. 2881 (2014). We will discuss *Pickup* and *Humanitarian Law Project* in more detail *infra*.

[8]   After concluding that A3371 regulates neither speech nor expressive conduct, the District Court went on to subject the statute to rational basis review. In a footnote, it explained that it had, by this point, "rejected Plaintiff's First Amendment free speech challenge," but that it was applying rational basis review to determine "whether there [was] any substantive due process violation." J.A. 48 n.26. This explanation is puzzling, however, given that Plaintiffs alleged a substantive due process claim only on behalf of their minor patients' parents, and the District Court's rejection of these third-party claims on standing grounds rendered any further analysis unnecessary.

that A3371 is not unconstitutionally vague or overbroad.

The District Court next rejected Plaintiffs' free exercise claim. It was not convinced by Plaintiffs' arguments that A3371 engaged in impermissible gerrymandering, and concluded instead that A3371 was a neutral law of general applicability subject only to rational basis review. The District Court then held that A3371 is rationally related to New Jersey's legitimate interest in protecting its minors from harm and, accordingly, granted Defendants' motions for summary judgment on Plaintiffs' free exercise claim. This timely appeal followed.

II.

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

We review a district court's legal conclusions de novo and ordinarily review its factual findings for clear error. *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 295 (3d Cir. 2011). Because this case implicates the First Amendment, however, we are obligated to "make an independent examination of the whole record" to "make sure that the trial court's judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (internal quotation marks and citations omitted).

## III.

We first turn to the issue of whether A3371, as applied to the SOCE counseling Plaintiffs seek to provide, violates Plaintiffs' First Amendment right to free speech. The District Court held that it does not, reasoning that SOCE counseling is "conduct" that receives no protection under the First Amendment. We disagree, and hold that the verbal communication that occurs during SOCE counseling is speech that enjoys some degree of protection under the First Amendment. Because Plaintiffs are speaking as state-licensed professionals within the confines of a professional relationship, however, this level of protection is diminished. Accordingly, A3371 survives Plaintiffs' free speech challenge if it directly advances the State's substantial interest in protecting its citizens from harmful or ineffective professional practices and is not more extensive than necessary to serve that interest. We hold that A3371 meets these requirements.

## A.

With respect to Plaintiffs' free speech challenge, the preliminary issue we must address is whether A3371 has restricted Plaintiffs' speech or, as the District Court held, merely regulated their conduct. The parties agree that modern-day SOCE therapy, and that practiced by Plaintiffs in this case, is "talk therapy" that is

administered wholly through verbal communication.[9] Though verbal communication is the quintessential form of "speech" as that term is commonly understood, Defendants argue that these particular communications are "conduct" and not "speech" for purposes of the First Amendment because they are merely the "tool" employed by therapists to administer treatment. Thus, the question we confront is whether verbal communications become "conduct" when they are used as a vehicle for mental health treatment.

We hold that these communications are "speech" for purposes of the First Amendment. Defendants have not directed us to any authority from the Supreme Court or this circuit that have characterized verbal or written communications as "conduct" based on the function these communications serve. Indeed, the Supreme Court rejected this very proposition in *Holder v. Humanitarian*

---

[9] Prior forms of SOCE therapy included non-verbal "aversion treatments, such as inducing nausea, vomiting, or paralysis, providing electric shocks; or having the individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts." J.A. 306 (APA Report). Plaintiffs condemn these techniques as "unethical methods of treatment that have not been used by any ethical and licensed mental health professional in decades" and believe "professionals who engage in such techniques should have their licenses revoked." J.A. 171 (Decl. of Dr. Tara King).

*Law Project*, 561 U.S. 1 (2010). In that case, plaintiffs claimed that a federal statute prohibiting the provision of "material support" to designated terrorist organizations violated their free speech rights by preventing them from providing legal training and advice to the Partiya Karkeran Kurdistan ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). *Id.* at 10–11. Defendants responded that the "material support" statute should not be subjected to strict scrutiny because it is directed toward conduct and not speech. *Id.* at 26–28.

The Supreme Court, however, expressly rejected the argument that "the only thing actually at issue in [the] litigation [was] conduct." *Id.* at 27. It concluded that while the material support statute ordinarily banned conduct, the activity it prohibited in the particular case before it—the provision of legal training and advice—was speech. *Id.* at 28. It reached this conclusion based on the straightforward observation that plaintiffs' proposed activity consisted of "communicating a message." *Id.* In concluding further that this statute regulated speech on the basis of content, the Court's reasoning was again simple and intuitive: "Plaintiffs want to speak to the PKK and the LTTE, and whether they may do so under § 2339B depends on what they say." *Id*. at 27. Notably, what the Supreme Court did *not* do was reclassify this

communication as "conduct" based on the nature or function of what was communicated.[10]

Given that the Supreme Court had no difficulty characterizing legal counseling as "speech," we see no reason here to reach the counter-intuitive conclusion that the verbal communications that occur during SOCE counseling are "conduct." Defendants' citation to *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949), does not alter our conclusion. There, members of the Ice and Coal Drivers and Handlers Local Union No. 953 were enjoined under a state antitrade restraint statute from picketing in front of an ice company in an effort to convince it to discontinue ice sales to non-union buyers. 336 U.S. at 492–494. The Supreme Court rejected the union workers' free speech claim, reasoning that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 502 (citations omitted). This passage, which is now over 60 years old, has been the subject of much confusion. *See* Eugene Volokh, *Speech as*

---

[10] Further, a plurality of the Supreme Court in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992), acknowledged that a Pennsylvania law requiring physicians to provide information to patients prior to performing abortions regulated *speech* rather than merely "treatment" or "conduct."

*Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1314–22 (2005) (discussing eight distinct interpretations of *Giboney*'s "course of conduct" language). Yet whatever may be *Giboney*'s meaning or scope, *Humanitarian Law Project* makes clear that verbal or written communications, even those that function as vehicles for delivering professional services, are "speech" for purposes of the First Amendment. 561 U.S. at 27–28.

In reaching a contrary conclusion, the District Court relied heavily on the Ninth Circuit's recent decision in *Pickup*. *Pickup* involved a constitutional challenge to Senate Bill 1172 ("SB 1172"), which, like A3371, prohibits state-licensed mental health providers from engaging in "sexual orientation change efforts" with clients under 18 years of age. 740 F.3d at 1221. As here, SOCE counselors argued that SB 1172 violated their First Amendment rights to free speech and free exercise.[11]

The Ninth Circuit disagreed. *Pickup* explained that "the First Amendment rights of professionals, such as doctors and mental health providers" exist on a "continuum." *Id*. at 1227. On this "continuum," First Amendment protection is greatest "where a professional

---

[11]    Unlike the present case, plaintiffs in *Pickup* included minor patients and their parents.

is engaged in a public dialogue." *Id*. At the midpoint of this continuum, which *Pickup* described as speech "within the confines of the professional relationship," First Amendment protection is "somewhat diminished." *Id.* at 1228. At the other end of this continuum is "the regulation of professional *conduct*, where the state's power is great, even though such regulation may have an incidental effect on speech." *Id.* at 1229 (citing *Lowe v. S.E.C.*, 472 U.S. 181, 232 (1985) (White, J., concurring in the result)) (emphasis in original).

*Pickup* concluded that because SB 1172 "regulates conduct," it fell within this third category on the continuum. *Id.* It reasoned that "[b]ecause SB 1172 regulates only treatment, while leaving mental health providers free to discuss and recommend, or recommend against, SOCE, . . . any effect it may have on free speech interests is merely incidental. Therefore, we hold that SB 1172 is subject to only rational basis review and must be upheld if it bears a rational relationship to a legitimate state interest." *Id.* at 1231 (citing *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884, 967–68 (1992) (plurality opinion)).[12] The Ninth Circuit

---

[12] It is not entirely clear why, or on what authority, the original *Pickup* opinion concluded that rational basis is the proper standard of review for a regulation of professional conduct that has an incidental effect on professional speech. The original opinion in *Pickup* accompanied this conclusion with a quote from *National Association for the Advancement*

concluded that "SB 1172 is rationally related to the legitimate government interest of protecting the well-being of minors" and, accordingly, rejected the plaintiffs' free speech claim. *Id.* at 1232.

The Ninth Circuit's denial of a petition for rehearing en banc drew a spirited dissent from Judge O'Scannlain. Joined by two other Ninth Circuit judges, he criticized the *Pickup* majority for merely "labeling" disfavored speech as "conduct" and thereby "insulat[ing] [SB 1172] from First Amendment scrutiny." 740 F.3d at

---

*of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) ("*NAAP*"). 728 F.3d at 1056. The quoted passage from *NAAP*, however, refers to the proper standard for reviewing an *equal protection* challenge to a law that discriminates against a non-suspect class—it did not, in any way, establish that rational basis is the proper standard for reviewing a *free speech* challenge to a law that regulates professional conduct. *See* 228 F.3d at 1049. When the Ninth Circuit amended *Pickup* following the denial of the petition for rehearing en banc, the panel substituted the citation to *NAAP* with one to *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884, 967–68 (1992), in which, according to the Ninth Circuit, "a plurality of three justices, plus four additional justices concurring in part and dissenting in part, applied a reasonableness standard to the regulation of medicine where speech may be implicated incidentally." *Pickup*, 740 F.3d at 1231. We will discuss *infra* the proper standard of review for regulation of professional speech, as well as the relevance of *Casey* to this analysis.

1215 (O'Scannlain, J., dissenting from denial of rehearing en banc). Judge O'Scannlain further explained:

> The panel provides no principled doctrinal basis for its dichotomy: by what criteria do we distinguish between utterances that are truly "speech," on the one hand, and those that are, on the other hand, somehow "treatment" or "conduct"? The panel, contrary to common sense and without legal authority, simply asserts that some spoken words—those prohibited by SB 1172—are not speech.

*Id.* at 1215–16.

Judge O'Scannlain's dissent also relied heavily upon *Humanitarian Law Project*. Judge O'Scannlain argued that *Humanitarian Law Project* "flatly refused to countenance the government's purported distinction between 'conduct' and 'speech' for constitutional purposes when the activity at issue consisted of talking and writing." *Id*. at 1216. He explained that *Humanitarian Law Project* stood for the proposition that "the government's *ipse dixit* cannot transform 'speech' into 'conduct' that it may more freely regulate." *Id.*[13]

---

[13] The amended *Pickup* opinion acknowledges that *Humanitarian Law Project* found activity to be "speech" when it "consist[ed] of *communicating a message*," but

While *Pickup* acknowledged that SB 1172 *may* have at least an "incidental effect" on speech and subjected the statute to rational basis review,[14] here the District Court went one step further when it concluded that SOCE counseling is pure, non-expressive conduct that falls wholly outside the protection of the First Amendment. The District Court's primary rationale for

_____

contends that "SB 1172 does not prohibit Plaintiffs from 'communicating a message'" because "[i]t is a state regulation governing the conduct of state-licensed professionals, and it does not pertain to communication in the public sphere." *Id*. at 1230 (quoting *Humanitarian Law Project*, 561 U.S. at 28) (emphasis added by *Pickup*). We are not persuaded. *Humanitarian Law Project* concluded that the "material support" statute regulated speech despite explicitly acknowledging that it did not stifle communication in the public sphere. 561 U.S. at 25–26 ("Under the material-support statute, plaintiffs may say anything they wish on any topic. They may speak and write freely about the PKK and LTTE, the governments of Turkey and Sri Lanka, human rights, and international law. They may advocate before the United Nations.").

[14] Judge O'Scannlain's dissent in *Pickup* accuses the majority of "entirely exempt[ing] [SB 1172] from the First Amendment." 740 F.3d at 1215 (O'Scannlain, dissenting from denial of rehearing en banc). We do not believe the Ninth Circuit went that far. As we have explained, the Ninth Circuit acknowledged that SB 1172 "may" have an "incidental effect" on speech, and thus applied rational basis review; it did not exempt SB 1172 from any review at all.

this conclusion was that "the *core characteristic* of counseling is not that it may be carried out through talking, but rather that the counselor applies methods and procedures in a therapeutic manner." J.A. 35 (emphasis added). The District Court derived this reasoning in part from *Pickup*, in which the Ninth Circuit observed that the "key component of psychoanalysis is the treatment of emotional suffering and depression, *not* speech." 740 F.3d at 1226 (quoting *National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1054 (9th Cir. 2000)). On this basis, the District Court concluded that "the line of demarcation between conduct and speech is whether the counselor is attempting to communicate information or a particular viewpoint to the client or whether the counselor is attempting to apply methods, practices, and procedures to bring about a change in the client—the former is speech and the latter is conduct." J.A. 39.

As we have explained, the argument that verbal communications become "conduct" when they are used to deliver professional services was rejected by *Humanitarian Law Project*. Further, the enterprise of labeling certain verbal or written communications "speech" and others "conduct" is unprincipled and susceptible to manipulation. Notably, the *Pickup* majority, in the course of establishing a "continuum" of protection for professional speech, never explained exactly *how* a court was to determine whether a statute

26

regulated "speech" or "conduct." *See Pickup*, 740 F.3d at
1215–16 (O'Scannlain, J., dissenting from denial of
rehearing en banc) ("[B]y what criteria do we distinguish
between utterances that are truly 'speech,' on the one
hand, and those that are, on the other hand, somehow
'treatment' or 'conduct'?"). And the District Court's
analysis fares no better; even a cursory inspection of the
line it establishes between utterances that "communicate
information or a particular viewpoint" and those that seek
"to apply methods, practices, and procedures" reveals the
illusory nature of such a dichotomy.

For instance, consider a sophomore psychology
major who tells a fellow student that he can reduce same-
sex attractions by avoiding effeminate behaviors and
developing a closer relationship with his father. Surely
this advice is not "conduct" merely because it seeks to
apply "principles" the sophomore recently learned in a
behavioral psychology course. Yet it would be strange
indeed to conclude that the same words, spoken with the
same intent, somehow become "conduct" when the
speaker is a licensed counselor. That the counselor is
speaking as a licensed professional may affect the level
of First Amendment protection her speech enjoys, but
this fact does not transmogrify her words into "conduct."
As another example, a law student who tries to convince
her friend to change his political orientation is assuredly
"speaking" for purposes of the First Amendment, even if
she uses particular rhetorical "methods" in the process.

To classify some communications as "speech" and others as "conduct" is to engage in nothing more than a "labeling game." *Pickup*, 740 F.3d at 1218 (O'Scannlain, J., dissenting from denial of rehearing en banc).

Lastly, the District Court's classification of counseling as "conduct" was largely motivated by its reluctance to imbue certain professions—*i.e.*, clinical psychology and psychiatry—with "special First Amendment protection merely because they use the spoken word as therapy." J.A. 38. According to the District Court, the "fundamental problem" with characterizing SOCE counseling as "speech" is that "it would mean that *any* regulation of professional counseling necessarily implicates fundamental First Amendment speech rights." *Id.* at 39. This result, reasoned the District Court, would "run[] counter to the longstanding principle that a state generally may enact laws rationally regulating professionals, including those providing medicine and mental health services." *Id.* (citations omitted).

As we will explain, the District Court's concern is not without merit, but it speaks to whether SOCE counseling falls within a lesser protected or unprotected category of speech—not whether these verbal communications are somehow "conduct." Simply put, speech is speech, and it must be analyzed as such for purposes of the First Amendment. Certain categories of speech receive lesser protection, *see, e.g., Ohralik v.*

*Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978), or even no protection at all, *see, e.g., Roth v. United States*, 354 U.S. 476, 483 (1957). But these categories are deeply rooted in history, and the Supreme Court has repeatedly cautioned against exercising "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Alvarez*, 132 S. Ct. 2537 (2012) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). By labeling certain communications as "conduct," thereby assuring that they receive no First Amendment protection at all, the District Court has effectively done just that.

Thus, we conclude that the verbal communications that occur during SOCE counseling are not "conduct," but rather "speech" for purposes of the First Amendment. We now turn to the issue of whether such speech falls within a historically delineated category of lesser protected or unprotected expression.

## B.

The District Court's focus on whether SOCE counseling is "speech" or "conduct" obscured the important constitutional inquiry at the heart of this case: the level of First Amendment protection afforded to speech that occurs as part of the practice of a licensed profession. In addressing this question, we first turn to whether such speech is fully protected by the First Amendment. We conclude that it is not.

The authority of the States to regulate the practice of certain professions is deeply rooted in our nation's jurisprudence. Over 100 years ago, the Supreme Court deemed it "too well settled to require discussion" that "the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health." *Watson v. State of Maryland*, 218 U.S. 173, 176 (1910). *See also Dent v. West Virginia*, 129 U.S. 114, 122 (1889) ("[I]t has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely."). The Court has recognized that States have "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). *See also Ohralik*, 436 U.S. at 460 ("[T]he State bears a special responsibility for maintaining standards among members of the licensed professions."). The exercise of this authority is necessary to "shield[] the public against the untrustworthy, the incompetent, or the irresponsible." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

When a professional regulation restricts what a professional can and cannot say, however, it creates a "collision between the power of government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech and of the

press guaranteed by the First Amendment." *Lowe v. S.E.C.*, 472 U.S. 181, 228 (1985) (White, J., concurring in the result). Justice Jackson first explored this area of "two well-established, but at times overlapping, constitutional principles" in *Thomas* 323 U.S. at 544–48 (1945) (Jackson, J., concurring). There, he explained:

> A state may forbid one without its license to practice law as a vocation, but I think it could not stop an unlicensed person from making a speech about the rights of man or the rights of labor . . . . Likewise, the state may prohibit the pursuit of medicine as an occupation without its license but I do not think it could make it a crime publicly or privately to speak urging persons to follow or reject any school of medical thought. So the state to an extent not necessary now to determine may regulate one who makes a business or a livelihood of soliciting funds or memberships for unions. But I do not think it can prohibit one, even if he is a salaried labor leader, from making an address to a public meeting of workmen, telling them their rights as he sees them and urging them to unite in general or to join a specific union.

*Id.* at 544–45. Ultimately, Justice Jackson concluded that the speech at issue—which encouraged a large group of

Texas workers to join a specific labor union—"f[ell] in the category of a public speech, rather than that of practicing a vocation as solicitor" and was therefore fully protected by the First Amendment. *See id.* at 548.

Justice White expounded upon Justice Jackson's analysis in *Lowe*. He and two other justices agreed that "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech" but also recognized that "[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press." 472 U.S. at 228, 230 (White, J., concurring in the result). Building on Justice Jackson's concurrence, Justice White defined the contours of First Amendment protection in the realm of professional speech:

> One who takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession. Just as offer and acceptance are communications incidental to the regulable transaction called a contract, the professional's speech is incidental to the conduct of the profession. . . . Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising

judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press."

*Id.* at 232.

The Supreme Court addressed the issue of professional speech most recently in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) (plurality opinion). Though the bulk of the plurality's opinion was devoted to a substantive due process claim, it addressed the plaintiffs' First Amendment claim briefly in the following paragraph:

All that is left of petitioners' argument is an asserted First Amendment right of a physician not to provide information about the risks of abortion, and childbirth, in a manner mandated by the State. To be sure, the physician's First Amendment rights not to speak are implicated, *see Wooley v. Maynard,* 430 U.S. 705 (1977), but only as part of the practice of medicine, subject to

reasonable licensing and regulation by the State, *cf. Whalen v. Roe,* 429 U.S. 589, 603 (1977). We see no constitutional infirmity in the requirement that the physician provide the information mandated by the State here.

*Id.* at 884.

A trio of recent federal appellate decisions has read these opinions to establish special rules for the regulation of speech that occurs pursuant to the practice of a licensed profession. *See Wollschlaeger v. Florida*, No. 12-cv-14009, 2014 WL 3695296, at *13–21 (11th Cir. July 25, 2014); *Pickup*, 740 F.3d at 1227–29; *Moore-King v. County of Chesterfield, Va*., 708 F.3d 560, 568–70 (4th Cir. 2013). In *Moore-King*, for example, the Fourth Circuit drew heavily from the concurrences in *Thomas* and *Lowe* in holding that "professional speech" does not receive full protection under the First Amendment. 708 F.3d at 568–70. Consistent with Justice White's concurrence in *Lowe*, *Moore-King* explained that "the relevant inquiry to determine whether to apply the professional speech doctrine is whether the speaker is providing personalized advice in a private setting to a paying client or instead engages in public discussion and commentary." *Id.* at 569. It then concluded that plaintiff's speech, which consisted of "spiritual counseling" that involved "a personalized reading for a paying client," was "professional speech" which the state could regulate

without triggering strict scrutiny under the First Amendment. *Id.*

The Ninth Circuit also embraced the idea of professional speech in *Pickup*. Although the District Court focused primarily on *Pickup*'s discussion of whether SOCE counseling is "speech" or "conduct," the Ninth Circuit also relied heavily on the constitutional principle that a licensed professional's speech is not afforded the full scope of First Amendment protection when it occurs as part of the practice of a profession. *See* 740 F.3d at 1227–29. In recognizing a "continuum" of First Amendment protection for licensed professionals, *Pickup* relied heavily on Justice White's concurrence in *Lowe* and the plurality opinion in *Casey*. *Id.* As discussed *supra*, *Pickup* held that First Amendment protection is "at its greatest" when a professional is "engaged in a public dialogue," *id.* at 1227 (citing *Lowe*, 472 U.S. at 232 (White, J., concurring in the result)); "somewhat diminished" when the professional is speaking "within the confines of a professional relationship," *id.* at 1228 (citing *Casey*, 505 U.S. at 884 (plurality opinion)); and at its lowest when "the regulation [is] of professional *conduct* . . . even though such regulation may have an incidental effect on speech," *id.* at 1229 (citing *Lowe*, 472 U.S. at 232 (White, J., concurring in the result)).

Most recently, the Eleventh Circuit also recognized that professional speech is not fully protected under the First Amendment. *Wollschlaeger*, 2014 WL

3695296. While the Eleventh Circuit would afford "speech to the public by attorneys on public issues" with "the strongest protection our Constitution has to offer," it held that the full scope of First Amendment protection did not apply to a physician speaking "only as part of the practice of medicine, subject to reasonable licensing and regulation by the State." *Id.* at *14 (quoting *Casey*, 505 U.S. at 884 (plurality opinion)). Similar to *Moore-King*, *Wollschlaeger* explained that "the key to distinguishing between occupational regulation and abridgment of First Amendment liberties is in finding a personal nexus between professional and client." *Id.* (internal quotation marks and citations omitted).

We find the reasoning in these cases to be informative. Licensed professionals, through their education and training, have access to a corpus of specialized knowledge that their clients usually do not. Indeed, the value of the professional's services stems largely from her ability to apply this specialized knowledge to a client's individual circumstances. Thus, clients ordinarily have no choice but to place their trust in these professionals, and, by extension, in the State that licenses them. *See, e.g., Virginia State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 768 (1976) ("[H]igh professional standards, to a substantial extent, are guaranteed by the close regulation to which pharmacists in Virginia are subject."). It is the State's imprimatur and the regulatory oversight that

accompanies it that provide clients with the confidence they require to put their health or their livelihood in the hands of those who utilize knowledge and methods with which the clients ordinarily have little or no familiarity.

This regulatory authority is particularly important when applied to professions related to mental and physical health. *See Watson*, 218 U.S. at 176 ("[T]he police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). The practice of most professions, mental health professions in particular, will inevitably involve communication between the professional and her client—this is, of course, how professionals and clients interact. To handcuff the State's ability to regulate a profession whenever speech is involved would therefore unduly undermine its authority to protect its citizens from harm. *See* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 950 (2007) ("The practice of medicine, like all human behavior, transpires through the medium of speech. In regulating the practice, therefore, the state must necessarily also regulate professional speech.").

Thus, we conclude that a licensed professional does not enjoy the full protection of the First Amendment when speaking as part of the practice of her profession. Like the Fourth and Eleventh Circuits, we believe a professional's speech warrants lesser protection only

when it is used to provide personalized services to a client based on the professional's expert knowledge and judgment. *See Wollschlaeger*, 2014 WL 3695296, at \*14; *Moore-King*, 708 F.3d at 569. By contrast, when a professional is speaking to the public at large or offering her personal opinion to a client, her speech remains entitled to the full scope of protection afforded by the First Amendment.[15]

---

[15] While we embrace *Pickup*'s conclusion that First Amendment protection differs in the context of professional speech, we decline to adopt its three categories of protection. It is indisputable that a professional "engaged in a public dialogue" receives robust protection under the First Amendment. *Pickup*, 740 F.3d at 1227. But we find that the other two points on *Pickup*'s "continuum" are usually conflated; a regulation of "professional conduct" will in many cases "incidentally" affect speech that occurs "within the confines of a professional relationship." *Id.* at 1228–29. SB1172 is a prime example: even if, as the *Pickup* panel reasoned, it only "incidentally" affects speech, the speech that it incidentally affects surely occurs within the confines of the counseling relationship. In fact, *Pickup* itself conflated these two categories when applying its "continuum" to SB1172. Though it held that SB1172 implicated the least protected category, *Pickup* subjected the statute to the level of scrutiny of its midpoint category—*i.e.*, *Casey*'s rational basis test. *See id.* at 1228–29. Thus, we refuse to adopt *Pickup*'s distinction between speech that occurs within the confines of a

With these principles in mind, it is clear to us that speech occurring as part of SOCE counseling is professional speech. SOCE counselors provide specialized services to individual clients in the form of psychological practices and procedures designed to effect a change in the clients' thought patterns and behaviors. Importantly, A3371 does not prevent these counselors from engaging in a public dialogue on homosexuality or sexual orientation change—it prohibits only a professional practice that is, in this instance, carried out through verbal communication. While the function of this speech does not render it "conduct" that is wholly outside the scope of the First Amendment, it does place it within a recognized category of speech that is not entitled to the full protection of the First Amendment.

## C.

That we have classified Plaintiffs' speech as professional speech does not end our inquiry. While the cases above make clear that such speech is not fully protected under the First Amendment, the question remains whether this category receives some lesser degree of protection or no protection at all. We hold that professional speech receives diminished protection, and, accordingly, that prohibitions of professional speech are constitutional only if they directly advance the State's

professional relationship and that which is only incidentally affected by a regulation of professional conduct.

interest in protecting its citizens from harmful or ineffective professional practices and are no more extensive than necessary to serve that interest.

In explaining why this level of protection is appropriate, we find it helpful to compare professional speech to commercial speech. For over 35 years, the Supreme Court has recognized that commercial speech— truthful, non-misleading speech that proposes a legal economic transaction—enjoys diminished protection under the First Amendment. *See Ohralik*, 436 U.S. at 454–59.[16] Though such speech was at one time considered outside the scope of the First Amendment altogether, *see Valentine v. Chrestensen*, 316 U.S. 52, 54 (1942), the Supreme Court reversed course in *Bigelow v. Virginia*, 421 U.S. 809, 818–26 (1975), and recognized that commercial speech enjoys some degree of protection. The Court has since explained that commercial speech has value under the First Amendment because it facilitates the "free flow of commercial information," in which both the intended recipients and society at large have a strong interest. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763–64 (1976) ("*Virginia*

---

[16] Advertisements that are false or misleading have never been recognized as protected by the First Amendment. *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976). Nor have advertisements proposing illegal transactions. *See id.* at 772.

*Pharmacy*"); *see also Central Hudson Gas & Elec. Corp. v. Public Serv. Comm. of New York*, 447 U.S. 557, 561–62 (1980) (explaining that commercial speech "assists consumers and furthers the societal interest in the fullest possible dissemination of information"). In fact, the Court has recognized that a consumer's interest in this information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Virginia Pharmacy*, 425 U.S. at 763.

Despite recognizing the value of commercial speech, the Court has "not discarded the 'common-sense' distinction" between commercial speech and other areas of protected expression. *Ohralik*, 436 U.S. at 455–56 (quoting *Virginia Pharmacy*, 425 U.S. at 771 n.24). Instead, the Court has repeatedly emphasized that commercial speech enjoys only diminished protection because it "occurs in an area traditionally subject to government regulation." *Central Hudson*, 447 U.S. at 562 (quoting *Ohralik*, 436 U.S. at 455–56). Because commercial speech is "linked inextricably with the commercial arrangement it proposes, . . . the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself." *Edenfield v. Fane*, 507 U.S.761, 767 (1993) (internal quotation marks and citations omitted). Accordingly, a prohibition of commercial speech is permissible when it "directly advances" a "substantial" government interest and is "not more extensive than is necessary to serve that

interest." *Central Hudson*, 447 U.S. at 566. The Supreme Court later dubbed this standard of review "intermediate scrutiny." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623–24 (1995) (internal quotation marks and citation omitted).

We believe that commercial and professional speech share important qualities and, thus, that intermediate scrutiny is the appropriate standard of review for prohibitions aimed at either category. Like commercial speech, professional speech is valuable to listeners and, by extension, to society as a whole because of the "informational function" it serves. *Central Hudson*, 447 U.S. at 563. As previously discussed, professionals have access to a body of specialized knowledge to which laypersons have little or no exposure. Although this information may reach non-professionals through other means, such as journal articles or public speeches, it will often be communicated to them directly by a licensed professional during the course of a professional relationship. Thus, professional speech, like commercial speech, serves as an important channel for the communication of information that might otherwise never reach the public. *See* Post, *supra*, at 977; *see also Central Hudson*, 447 U.S. at 561–62 (describing

"the societal interest in the fullest possible dissemination of information").[17]

Additionally, like commercial speech, professional speech also "occurs in an area traditionally subject to government regulation." *Central Hudson*, 447 U.S. at 562 (quoting *Ohralik*, 436 U.S. at 455–56). As we have previously explained, States have traditionally enjoyed broad authority to regulate professions as a means of protecting the public from harmful or ineffective professional services. Accordingly, as with commercial speech, it is difficult to ignore the "common-sense" differences between professional speech and other forms of protected communication. *Ohralik*, 436 U.S. at 455–56 (quoting *Virginia Pharmacy*, 425 U.S. at 771 n.24).

Given these striking similarities, we conclude that professional speech should receive the same level of First Amendment protection as that afforded commercial speech. Thus, we hold that a prohibition of professional

---

[17]    We also recognize that professional speech can often serve an expressive function insofar as a professional's personal beliefs—including deeply-held political or religious beliefs—are infused in the practice of a profession. SOCE counselors, for example, provide counseling not merely for remuneration but as a means of putting important beliefs and values into practice. This expressive value is further reason to afford professional speech some level of protection under the First Amendment.

speech is permissible only if it "directly advances" the State's "substantial" interest in protecting clients from ineffective or harmful professional services, and is "not more extensive than necessary to serve that interest." *Central Hudson*, 447 U.S. at 566.

In so holding, we emphasize that a regulation of professional speech is spared from more demanding scrutiny only when the regulation was, as here, enacted pursuant to the State's interest in protecting its citizens from ineffective or harmful professional services. Because the State's regulatory authority over licensed professionals stems from its duty to protect the clients of these professionals, a state law may be subject to strict scrutiny if designed to advance an interest unrelated to client protection. Thus, a law designed to combat terrorism is not a professional regulation, and, accordingly, may be subject to strict scrutiny. *See Humanitarian Law Project*, 561 U.S. at 25–28. Similarly, a law that is not intended to protect a professional's clients, but to insulate certain laws from constitutional challenge, is more than just a regulation of professional speech and, accordingly, intermediate scrutiny is not the proper standard of review. *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 540–49 (2001).[18]

---

[18]    Like *Humanitarian Law Project*, *Velazquez* concerned federal legislation which could not have been passed pursuant to the State's police power. *Velazquez*, 531 U.S. at 536.

We recognize that our sister circuits have concluded that regulations of professional speech are subject to a more deferential standard of review or, possibly, no review at all. *See Pickup*, 740 F.3d at 1231; *Wollschlaeger*, 2014 WL 3695296, at \*13–14; *Moore-King*, 708 F.3d at 567–70. *Pickup*, for example, cited *Casey*, 505 U.S. at 884, 967–68 (plurality opinion), as support for its decision to apply rational basis review to a similar statute. *Pickup*, 740 F.3d at 1231.[19]

---

[19]    *Pickup* is the only court to explicitly apply rational basis review to a regulation of professional speech. 740 F.3d at 1231. *Wollschlaeger* and *Moore-King*, by contrast, do not explicitly identify the level of scrutiny they apply, if they apply one at all. In *Wollschlaeger*, the majority held that "a statute that governs the practice of an occupation is not unconstitutional as an abridgment of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." 2014 WL 3695296, at \*13 (internal quotation marks and citation omitted); *see also id.* at \*15 (noting that generally applicable licensing regimes "do[] not implicate constitutionally protected activity under the First Amendment") (internal quotation marks and citations omitted). *But see id.* at \*41 (Wilson, J., dissenting) (interpreting the majority opinion to apply rational basis review). Similarly, in *Moore-King*, the majority held that "[u]nder the professional speech doctrine, the government can license and regulate those who would provide services to their clients for compensation without running afoul of the First Amendment." 708 F.3d at 569. *But*

45

To the extent *Casey* suggested rational basis review, we do not believe such a standard governs here. While the plurality opinion noted in passing that speech, when part of the practice of medicine, is "subject to *reasonable* licensing and regulation by the State," 505 U.S. at 884 (emphasis added), the regulation it addressed fell within a special category of laws that compel disclosure of truthful factual information, *id.* at 881. In the context of commercial speech, the Supreme Court has treated compelled disclosures of truthful factual information differently than prohibitions of speech, subjecting the former to rational basis review and the latter to intermediate scrutiny. *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 650–51 (1985) (outlining the "material differences between disclosure requirements and outright prohibitions on speech" and subjecting a disclosure requirement to rational basis review). Thus, to the extent *Casey* applied rational basis review, this facet of the opinion is inapplicable to the present case because the law at issue is a prohibition of speech, not a compulsion of truthful factual information. *See Wollschlaeger*, 2014 WL 3695296, at *38 (Wilson, J., dissenting) (reasoning that "[e]ven if *Casey* applied something less than

---

*see id.* at 570 (refusing to "afford the government carte blanche in crafting or implementing [occupational] regulations" and refraining from "delineat[ing] the precise boundaries of permissible occupational regulation under the professional speech doctrine").

intermediate scrutiny," *Zauderer* establishes that a more stringent standard of review should apply to restrictions on professional speech.).

Additionally, we have serious doubts that anything less than intermediate scrutiny would adequately protect the First Amendment interests inherent in professional speech. Without sufficient judicial oversight, legislatures could too easily suppress disfavored ideas under the guise of professional regulation. *See Pickup*, 740 F.3d at 1215 (O'Scannlain, J., dissenting from denial of rehearing en banc). This possibility is particularly disturbing when the suppressed ideas concern specialized knowledge that is unlikely to reach the general public through channels other than the professional-client relationship. Intermediate scrutiny is necessary to ensure that State legislatures are regulating professional speech to prohibit the provision of harmful or ineffective professional services, not to inhibit politically-disfavored messages.

Lastly, we reject Plaintiffs' argument that A3371 should be subject to strict scrutiny because it discriminates on the basis of content and viewpoint. First, although we agree with Plaintiffs that A3371 discriminates on the basis of content,[20] it does so in a way

---

[20]    We have little doubt in this conclusion. A3371, on its face, prohibits licensed counselors from speaking words with a particular content; *i.e.* words that "seek[] to change a

that does not trigger strict scrutiny. Ordinarily, content-based regulations are highly disfavored and subjected to strict scrutiny. *See Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011). And this is generally true even when the law in question regulates unprotected or lesser protected speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 381–86 (1992). Nonetheless, within these unprotected or lesser protected categories of speech, the Supreme Court has held that a statute does *not* trigger strict scrutiny "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *Id.* at 388. By way of illustration, the Court explained:

> [A] State may choose to regulate price advertising in one industry but not in others, because the risk of fraud (one of the characteristics of commercial speech that justifies depriving it of full First Amendment protection) is in its view greater there. But a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion.

*Id.* at 388–89 (internal citations omitted).

---

person's sexual orientation." N.J. Stat Ann. § 45:1-55. Thus, as in *Humanitarian Law Project*, "Plaintiffs want to speak to [minor clients], and whether they may do so under [A3371] depends on what they say." 561 U.S. at 27.

A3371 fits comfortably within this category of permissible content discrimination. As with the content-based regulations identified by *R.A.V.* as permissible, "the basis for [A3371's] content discrimination consists entirely of the very reason" professional speech is a category of lesser-protected speech. *Id.* at 388. The New Jersey legislature has targeted SOCE counseling for prohibition because it was presented with evidence that this particular form of counseling is ineffective and potentially harmful to clients. Thus, the reason professional speech receives diminished protection under the First Amendment—*i.e.*, because of the State's longstanding authority to protect its citizens from ineffective or harmful professional practices—is precisely the reason New Jersey targeted SOCE counseling with A3371. Therefore, we conclude that A3371 does not trigger strict scrutiny by discriminating on the basis of content in an impermissible manner.

Nor do we agree that A3371 triggers strict scrutiny because it discriminates on the basis of viewpoint. Plaintiffs argue that A3371 prohibits them from expressing the viewpoint "that [same sex attractions] can be reduced or eliminated to the benefit of the client." Appellant's Br. 26. That is a misreading of the statute. A3371 allows Plaintiffs to express this viewpoint, in the form of their personal opinion, to anyone they please, including their minor clients. What A3371 prevents Plaintiffs from doing is expressing this viewpoint in a

very specific way—by actually rendering the professional services that they believe to be effective and beneficial. Arguably, any time a professional engages in a particular professional practice she is implicitly communicating the viewpoint that such practice is effective and beneficial. The prohibition of this method of communicating a particular viewpoint, however, is not the type of viewpoint discrimination with which the First Amendment is concerned. If it were, State legislatures could never ban a particular professional practice without triggering strict scrutiny. Thus, a statute banning licensed psychotherapists from administering treatments based on phrenology would be subject to strict scrutiny because it prevents these therapists from expressing their belief in phrenology by putting it into practice. Such a rule would unduly undermine the State's authority to regulate the practice of licensed professions.

Accordingly, we believe intermediate scrutiny is the applicable standard of review in this case. We must uphold A3371 if it "directly advances" the government's interest in protecting clients from ineffective and/or harmful professional services, and is "not more extensive than necessary to serve that interest." *See Central Hudson*, 447 U.S. at 566. Those are the questions we next address.

## D.

Our analysis begins with an evaluation of New Jersey's interest in the passage of A3371. As we have previously explained, the State's interest in protecting its citizens from harmful professional practices is unquestionably substantial. *See Goldfarb*, 421 U.S. at 792; *Watson*, 218 U.S. at 176. Here, New Jersey's stated interest is even stronger because A3371 seeks to protect minor clients—a population that is especially vulnerable to such practices. *See* Supplemental App. 85 (Declaration of Douglas C. Haldeman, Ph.D.) (explaining that adolescent and teenage clients are "much more vulnerable to the potentially traumatic effects of SOCE" because their "pre-frontal cort[ices] [are] still developing and changing rapidly").

Our next task, then, is to determine whether A3371 directly advances this interest by prohibiting a professional practice that poses serious health risks to minors. To survive heightened scrutiny, the State must establish that the harms it believes SOCE counseling presents are "real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (plurality opinion) ("*Turner I*") (citations omitted). *See also Pitt News v. Pappert*, 379 F.3d 96, 107 (3d Cir. 2004) (explaining that legislatures cannot meet this burden by relying on "mere speculation or conjecture") (quoting *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1992)). Even when applying intermediate

scrutiny, however, we do not review a legislature's empirical judgment *de novo*—our task is merely to determine whether the legislature has "drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc., v. F.C.C.*, 520 U.S. 180, 195 (1997) ("*Turner II*") (internal quotation marks and citation omitted). Further, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000).

We conclude that New Jersey has satisfied this burden. The legislative record demonstrates that over the last few decades a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of SOCE, expressing serious concerns about its potential to inflict harm. Among others, the American Psychological Association, the American Psychiatric Association, and the Pan American Health Organization have warned of the "great" or "serious" health risks accompanying SOCE counseling, including depression, anxiety, self-destructive behavior, and suicidality. N.J. Stat. Ann. § 45:1-54 (collecting additional position statements and articles from the American Academy of Pediatrics, the American Psychoanalytic Association, and the American Academy of Child and Adolescent Psychiatry warning of the health risks posed by SOCE counseling). Many such

organizations have also concluded that there is no credible evidence that SOCE counseling is effective. *See id*.

We conclude that this evidence is substantial. Legislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject. Such evidence is a far cry from the "mere speculation or conjecture" our cases have held to be insufficient. *Pitt News*, 379 F.3d at 107 (internal quotation marks and citations omitted).

Plaintiffs do not dispute the views of the professional community at large concerning the efficacy and potential harmfulness of SOCE counseling. Instead, they fault the legislature for passing A3371 without first obtaining conclusive empirical evidence regarding the effect of SOCE counseling on minors. To be sure, the APA Report suggests that the bulk of empirical evidence regarding the efficacy or harmfulness of SOCE counseling currently falls short of the demanding standards imposed by the scientific community. *See* J.A. 327 (noting the "limited amount of methodologically sound research" on SOCE counseling); *id.* at 367 (noting that "[t]he few early research investigations that were conducted with scientific rigor raise concerns about the safety of SOCE" but refusing "to make a definitive

statement about whether recent SOCE is safe or harmful and for whom" due to a lack of "scientifically rigorous studies" of these practices).[21]

Yet a state legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000) ("This is not to suggest that a 10,000-page record must be compiled in every case or that the Government must delay in acting to address a real problem; but the Government must present more than anecdote and suspicion."). This is particularly true when a legislature's empirical judgment is highly plausible, as we conclude New Jersey's judgment is in this case. *See Nixon*, 528 U.S. at 391. It is not too far a leap in logic to conclude that a minor client might suffer psychological harm if repeatedly told by an authority figure that her sexual orientation—a fundamental aspect of her identity—is an undesirable condition. Further, if SOCE counseling is ineffective—which, as we have explained, is supported by substantial evidence—it would not be unreasonable for a legislative body to conclude that a minor would blame herself if her counselor's efforts

---

[21] It is worth noting that although the APA Report was uncomfortable making a "definitive" statement about the effects of SOCE, it did ultimately observe that there was at least "some evidence to indicate that individuals experienced harm from SOCE." J.A. 287, 367.

failed. Given the substantial evidence with which New Jersey was presented, we cannot say that these fears are unreasonable. We therefore conclude that A3371 "directly advances" New Jersey's stated interest in protecting minor citizens from harmful professional practices.

Lastly, we must determine whether A3371 is more extensive than necessary to protect this interest. To survive this prong of intermediate scrutiny, New Jersey "is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest." *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (citing *Board of Tr. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)).[22] Thus, New Jersey must establish "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (quoting *Fox*, 492 U.S. at 480); *see also Heffner v. Murphy*, 745 F.3d 56, 92–93 (3d Cir. 2014) (upholding regulation of commercial speech while acknowledging that the fit between the statute and its interests was "imperfect").

---

[22]    As explained in *Fox*, the word "necessary," in the context of intermediate scrutiny, does not "translate into [a] 'least-restrictive-means' test" but instead has a "more flexible meaning." 492 U.S. at 476–77.

Plaintiffs argue that A3371's ban is overly burdensome, and that New Jersey's objectives could be accomplished in a less restrictive manner via a requirement that minor clients give their informed consent before undergoing SOCE counseling. We are not convinced, however, that an informed consent requirement would adequately serve New Jersey's interests. Minors constitute an "especially vulnerable population," *see* J.A. 405 (APA Report, Appendix A), and may feel pressured to receive SOCE counseling by their families and their communities despite their fear of being harmed, *see* J.A. 301 (APA Report) (explaining that "hostile social and family attitudes" are among the reasons minors seek SOCE counseling). Thus, even if SOCE counseling were helpful in a small minority of cases—and the legislature, based on the body of evidence before it, was entitled to reach a contrary conclusion—an informed consent requirement could not adequately ensure that only those minors that could benefit would agree to move forward. As Plaintiffs have offered no other suggestion as to how the New Jersey legislature could achieve its interests in a less restrictive manner, we conclude that A3371 is sufficiently tailored to survive intermediate scrutiny.

Accordingly, we conclude that A3371 is a permissible prohibition of professional speech.

F.

Lastly, Plaintiffs argue that A3371 is unconstitutionally vague and overbroad. We disagree.

The Supreme Court has held that "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432 (1963) (citations omitted). "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Id.* at 433 (citation omitted). Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (citations omitted). "[B]ecause we are condemned to the use of words, we can never expect mathematical certainty from our language." *Hill v. Colorado*, 530 U.S. 730, 733 (2000) (internal quotation marks and citation omitted). Thus, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Id.* (internal quotation marks and citation omitted).

Plaintiffs argue that A3371 is unconstitutional on its face because the term "sexual orientation change

efforts" is impermissibly vague.[23] We disagree. Under A3371, this term is defined as:

> [T]he practice of seeking to change a person's sexual orientation, including, but not limited to, efforts to change behaviors, gender identity, or gender expressions, or to reduce or eliminate sexual or romantic attractions or feelings toward a person of the same gender; except that sexual orientation change efforts shall not include counseling for a person seeking to transition from one gender to another, or counseling that:
>
> > (1) provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices; and
> >
> > (2) does not seek to change sexual orientation.

---

[23]    In the District Court, Plaintiffs also argued that the phrase "sexual orientation" is unconstitutionally vague. They do not pursue this argument on appeal.

N.J. Stat. Ann. § 45:1-55. While this statutory definition may not provide "perfect clarity," *Hill*, 530 U.S. at 733 (quotation marks and citation omitted), its list of illustrative examples provides boundaries that are sufficiently clear to pass constitutional muster. Further, counseling designed to change a client's sexual orientation is recognized as a discrete practice within the profession. Such counseling is sometimes referred to as "reparative" or "conversion" therapy and has been the specific target of public statements by recognized professional organizations. *See* N.J. Stat. Ann. § 45:1-54 (quoting statements from the American Psychiatric Association, the National Association of Social Workers, the American Counseling Association Governing Council, and the Pan American Health Organization referring to this practice). Plaintiffs themselves claim familiarity with this form of counseling and acknowledge that many counselors "specialize" in such practices. *See, e.g.*, J.A. 168 (Decl. of Dr. Tara King) (explaining that Dr. King provides "sexual orientation change efforts ('SOCE') counseling"); J.A. 177 (Decl. of Dr. Ronald Newman) (explaining that "part of [Dr. Newman's] practice involves what is often called sexual orientation change efforts ('SOCE') counseling"); J.A. 182 (Decl. of David Pruden, on behalf of NARTH) (explaining that "NARTH provides various presentations across the country hosted by mental health professionals who specialize in what is referred to in A3371 as sexual orientation change efforts ('SOCE') counseling"). To

those in the field of professional counseling, the meaning of this term is sufficiently definite "in the vast majority of its intended applications." *Hill*, 530 U.S. at 733 (quotation marks and citation omitted). Thus, we reject Plaintiffs' argument that A3371 is unconstitutionally vague.

As to overbreadth, a statute that impinges upon First Amendment freedoms is impermissibly overbroad if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008)). Plaintiffs' only argument on this front is that A3371 prohibits SOCE counseling even when, in Plaintiffs' view, such counseling would be especially beneficial. *See* Appellant's Br. 47 (arguing that A3371 prevents a minor from receiving SOCE counseling even if the cause of their same-sex attractions was sexual abuse). This argument, however, is nothing more than a disagreement with New Jersey's empirical judgments regarding the effect of SOCE counseling on minors. As we have already concluded, New Jersey's reasons for banning SOCE counseling were sufficiently supported by the legislative record. Thus, we hold that A3371 is not unconstitutionally overbroad.

## IV.

Plaintiffs' second constitutional claim is that A3371 violates their First Amendment right to the free exercise of religion. For the reasons that follow, we conclude that this claim also lacks merit.

Under the Religion Clauses of the First Amendment, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The right to freely exercise one's religion, however, is not absolute. *McTernan v. City of York*, 577 F.3d 521, 532 (3d Cir. 2009). If a law is "neutral" and "generally applicable," it will withstand a free exercise challenge so long as it is "rationally related to a legitimate government objective." *Brown v. City of Pittsburgh*, 586 F.3d 263, 284 (3d Cir. 2009) (citation omitted). This is so even if the law "has the incidental effect of burdening a particular religious practice" or group. *Id.* at 284 (quoting *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993)).

The issue before us, then, is whether A3371 is "neutral" and "generally applicable." "A law is 'neutral' if it does not target religiously motivated conduct either on its face or as applied in practice." *Blackhawk v. Pennsylvania.*, 381 F.3d 202, 209 (3d Cir. 2004) (citing *Lukumi*, 508 U.S. at 533–40; *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 167 (3d Cir. 2002)).

"A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Id.* at 209 (citations omitted).

As a preliminary matter, A3371 makes no explicit reference to any religion or religious beliefs, and is therefore neutral on its face. *See Lukumi*, 508 U.S. at 533–34. Nevertheless, Plaintiffs argue that A3371 covertly targets their religion by prohibiting counseling that is generally religious in nature while permitting other forms of counseling that are equally harmful to minors. Specifically, Plaintiffs contend that A3371 operates as an impermissible "religious gerrymander"[24] because it provides "individualized exemptions" for counseling:

> (1) for minors seeking to transition from one gender to another, (2) for minors struggling with or confused about heterosexual

---

[24] A "religious gerrymander" occurs when the boundaries of statutory coverage are "artfully drawn" to target or exclude religiously-motivated activity. *American Family Ass'n, Inc. v. F.C.C.*, 365 F.3d 1156, 1170 (D.C. Cir. 2004); *see also Lukumi*, 508 U.S. at 535 (describing a "religious gerrymander" as "an impermissible attempt to target petitioners and their religious practices").

attractions, behaviors, or identity, (3) that facilitates exploration and development of same-sex attractions, behaviors, or identity, (4) for individuals over the age of 18, and (5) provided by unlicensed counselors.

Appellant's Br. 51.

None of these five "exemptions," however, demonstrate that A3371 covertly targets religiously motivated conduct. Plaintiffs' first and third "exemptions" are not compelling because nothing in the record suggests that these forms of counseling are equally harmful to minors. Plaintiffs' second "exemption," which implies that A3371 would permit heterosexual-to-homosexual change efforts, misinterprets the statute; A3371 prohibits *all* "sexual orientation change efforts" regardless of the direction of the desired change. *See* N.J. Stat. Ann. § 45:1-55 (defining "sexual orientation change efforts" as "including, *but not limited to*," efforts to eliminate same sex attractions) (emphasis added). Lastly, Plaintiffs' fourth and fifth "exemptions" are simply irrelevant because they have nothing to do with religion. Plaintiffs fail to explain how A3371's focus on the professional status of the counselor or the

age of the client belies a concealed intention to suppress a particular religious belief.[25]

Accordingly, we conclude that A3371 is neutral and generally applicable, and therefore triggers only rational basis review. In so doing, we reject Plaintiffs' argument that even if A3371 were neutral and generally applicable, it should be subject to strict scrutiny under a "hybrid rights" theory. Specifically, Plaintiffs contend that because A3371 "burdens" both their free exercise and free speech rights, they have presented a "hybrid rights" claim that triggers heightened scrutiny. We have previously refused to endorse such a theory, *McTernan v.*

---

[25] Plaintiffs also argue that A3371's neutrality is undermined by a statement made by one of the members of the Task Force that authored the 2009 APA Report. According to Plaintiffs, this researcher claimed that the APA Task Force was unwilling to "take into account what are fundamentally negative religious perceptions of homosexuality—they don't fit into our world view." Appellant's Br. 52. Plaintiffs fail to explain, however, how this statement reflects the New Jersey legislature's motives in passing A3371. This statement was made by one of several members of the APA Task Force, which produced only one of the many pieces of evidence on which the legislature relied when passing A3371. It by no means establishes that New Jersey was secretly motivated by religious animus, as opposed to their stated objective of protecting minor citizens from harm.

*City of York, Pa.*, 564 F.3d 636, 647 n.5 (3d Cir. 2009), and we refuse to do so today. *See also Combs v. Homer-Center Sch. Dist.*, 540 F.3d 231, 247 (3d Cir. 2008) ("Until the Supreme Court provides direction, we believe the hybrid-rights theory to be dicta."). Because we have already concluded that A3371 survives intermediate scrutiny, it follows *ipso facto* that this law is rationally related to a legitimate government interest. Therefore, we will affirm the District Court's dismissal of this claim.

## V.

Plaintiffs also argue that the District Court erred by concluding that they lacked standing to bring claims on behalf of their minor clients.[26] This argument is also without merit.

"It is a well-established tenet of standing that 'a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002) (quoting *Powers v. Ohio*, 499 U.S. 400, 410 (1991)). "Yet the prohibition is not invariable and our jurisprudence recognizes third-party standing under certain circumstances." *Id.* (citations

---

[26] Although Plaintiffs' complaint alleged claims on behalf of their patients' parents, Plaintiffs do not pursue these claims on appeal.

omitted). To establish third-party standing, a litigant must demonstrate that (1) she has suffered an "injury in fact" that provides her with a "sufficiently concrete interest in the outcome of the issue in dispute"; (2) she has a "close relation to the third party"; and (3) there exists "some hindrance to the third party's ability to protect his or her own interests." *Powers*, 499 U.S. at 411 (internal quotation marks and citations omitted). In the present case, the parties agree that licensed counselors have a sufficiently "close relationship" to their clients, *see Pennsylvania Psychiatric Soc'y*, 280 F.3d at 289–90, but dispute whether Plaintiffs have suffered a sufficient "injury in fact" and whether Plaintiffs' clients are sufficiently "hindered" in their ability to bring suit themselves. We will address these two elements in turn.

Plaintiffs argue that the District Court erred by holding that they did not suffer an "injury in fact." We agree. The District Court reasoned that "Plaintiffs' ability to bring third-party claims hinges on whether they suffered any constitutional wrongs by the passage of A3371." J.A. 24. We have never held, however, that a plaintiff must possess a successful constitutional claim in order to establish an "injury in fact" sufficient to confer third-party standing. In *Craig v. Boren*, 429 U.S. 190, 191–97 (1976), for example, the Supreme Court granted third-party standing to a vendor who did not even allege a violation of her own constitutional rights—she merely alleged that the law at issue, in violating the rights of her

customers, resulted in a reduction in her sales. Here, Plaintiffs are similarly injured by A3371 in that they are forced to either sacrifice a portion of their client base or disobey the law and risk the loss of their licenses. Thus, we conclude that Plaintiffs have a "sufficiently concrete interest" in this dispute regardless of whether A3371 violates their constitutional rights.

We agree with Defendants, however, that Plaintiffs have failed to establish that their clients are "hindered" in their ability to bring suit themselves. The only evidence Plaintiffs provide on this issue is Dr. Newman's assertion that "[n]either of [his] clients wants others to even know they are in therapy."[27] J.A. 448 (Decl. of Ronald Newman, Ph.D.). While a fear of social stigma can in some circumstances constitute a substantial obstacle to filing suit, *see Pennsylvania Psychiatric Soc'y*, 280 F.3d at 290, Plaintiffs' evidence does not sufficiently establish the presence of such fear here. Further, we note that minor clients have been able to file suit pseudonymously in both *Pickup* and *Doe v. Christie*, 2014 WL 3765310 (D.N.J. July 31, 2014). While we disagree with the District Court that the presence of such lawsuits is

---

[27] Further, Dr. Newman made this assertion as a justification for not asking his patients to testify in open court, not as a reason these patients would be unwilling to file suit under a pseudonym. J.A. 448 (Decl. of Ronald Newman, Ph.D.).

dispositive,[28] the fact that minor clients have previously filed suit bolsters our conclusion that they are not sufficiently hindered in their ability to protect their own interests. Accordingly, we hold that Plaintiffs lack standing to pursue claims on behalf of their minor clients.

## VI.

Plaintiffs also argue that the District Court erred by allowing Garden State to intervene. They advance two arguments on this point: first, that the District Court erroneously concluded that Garden State was not required to possess Article III standing; and second, that the District Court abused its discretion by permitting Garden State to intervene under Federal Rule of Civil Procedure 24(b). For the reasons that follow, we reject both arguments.

---

[28] The District Court reasoned that "since these litigants are bringing their own action against Defendants, there can be no serious argument that these third parties are facing obstacles that would prevent them from pursuing their own claims." J.A. 22. As we have explained, however, "a party need not face insurmountable hurdles to warrant third-party standing." *Pennsylvania Psychiatric Soc'y*, 280 F.3d at 290 (citation omitted). Thus, the fact that a few patients have been able to overcome certain obstacles does not necessarily preclude a determination that these obstacles are a "hindrance" sufficient to justify third-party standing.

## A.

"Article III of the Constitution limits the power of federal courts to deciding 'cases' and 'controversies.' This requirement ensures the presence of the 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Diamond v. Charles*, 476 U.S. 54, 61–62 (1986) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In order to ensure that such a "case" or "controversy" is present, the Supreme Court has consistently required prospective plaintiffs to establish Article III standing in order to pursue a lawsuit in federal court. *See, e.g.*, *id.* at 62. Prospective plaintiffs must therefore allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013) (quotation marks and citation omitted).

Whether prospective *intervenors* must establish Article III standing, however, is an open question in the Third Circuit. *See American Auto. Ins. Co. v. Murray*, 658 F.3d 311, 318 n.4 (3d Cir. 2011) ("[W]e need not today resolve the issue of whether a party seeking to intervene must have Article III standing."). As the District Court acknowledged, our sister circuits are divided on this question. The majority have held that an intervenor is not required to possess Article III standing

to participate. *See San Juan Cnty. v. United States*, 503 F.3d 1163, 1171–72 (10th Cir. 2007) (en banc); *Ruiz v. Estelle*, 161 F.3d 814, 830–33 (5th Cir. 1998); *Associated Builders & Contractors v. Perry*, 16 F.3d 688, 690 (6th Cir. 1994); *Yniguez v. Arizona*, 939 F.2d 727, 731 (9th Cir. 1991); *Chiles v. Thornburgh*, 865 F.2d 1197, 1213 (11th Cir. 1989); and *United States Postal Serv. v. Brennan*, 579 F.2d 188, 190 (2d Cir. 1978). The Eighth and D.C. Circuits have reached a contrary conclusion. *See Mausolf v. Babbitt*, 85 F.3d 1295, 1300 (8th Cir. 1996); *Southern Christian Leadership Conference v. Kelley*, 747 F.2d 777, 779 (D.C. Cir. 1984).[29]

---

[29] The District Court cited *United States v. 36.96 Acres of Land*, 754 F.2d 855 (7th Cir. 1985), as falling on this side of the split as well. While *36.96 Acres* held that a party seeking intervention as of right must demonstrate an interest that is "greater than the interest sufficient to satisfy the standing requirement," *id.* at 859, it is unclear whether the Seventh Circuit concluded that this greater interest was required by Article III of the Constitution or merely by the then-existing version of Rule 24(a). *See Ruiz*, 161 F.3d at 831 (explaining that "of the cases cited in *Diamond*"—including *36.96 Acres*—"only *Kelly* maintains that Article III (and not just Rule 24(a)(2) & 24(b)(2)) requires intervenors to possess standing."). To the extent *36.96* held that a greater interest was constitutionally required, it provided no reasoning for that conclusion and thus carries no persuasive weight.

We find the majority's view more persuasive. If the plaintiff that initiated the lawsuit in question has Article III standing, a "case" or "controversy" exists regardless of whether a subsequent intervenor has such standing. *See Ruiz*, 161 F.3d at 832 ("Once a valid Article III case-or-controversy is present, the court's jurisdiction vests. The presence of additional parties, although they alone could independently not satisfy Article III's requirements, does not of itself destroy jurisdiction already established."); *Chiles*, 865 F.2d at 1212 ("Intervention under Rule 24 presumes that there is a justiciable case into which an individual wants to intervene.").

Further, while the Supreme Court has never explicitly concluded that intervenors need not possess Article III standing, this conclusion is implicit in several decisions in which it has questioned whether a particular intervenor has Article III standing but nonetheless refrained from resolving the issue. *See, e.g.*, *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 233 (2003) ("It is clear, however, that the [named defendant] has standing, and therefore we need not address the standing of the intervenor-defendants . . . ."), *overruled on other grounds by Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 66 (1997) (expressing "grave doubts" about whether intervenors possessed Article III standing but concluding that it "need not definitively

resolve the issue"). As the Tenth Circuit reasoned in *San Juan Cnty.*, the Supreme Court could not have avoided these questions if intervenors were required to have standing under Article III "because the Court could not simply ignore whether the requirements of Article III had been satisfied." 503 F.3d at 1172. *See also id.* ("Standing implicates a court's jurisdiction, and requires a court itself to raise and address standing before reaching the merits of the case before it.") (quotation marks and citations omitted).

Accordingly, we conclude that the District Court did not err by determining that Garden State need not demonstrate Article III standing in order to intervene.

## B.

Plaintiffs also argue that the District Court abused its discretion by permitting Garden State to intervene under Federal Rule of Civil Procedure 24(b). This argument lacks merit as well.

Rule 24(b) provides that "[o]n timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). In exercising its discretion, a district court "must consider whether the intervention will unduly

delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). We have previously noted that a district court's ruling on a motion for permissive intervention is a "highly discretionary decision" into which we are "reluctant to intrude." *Brody By and Through Sugzdinis v. Spang*, 957 F.2d 1108, 1115 (3d Cir. 1992).

We see no reason to disturb the District Court's decision in this case. Garden State's motion was timely, as it was filed a mere 14 days after the complaint. Garden State and New Jersey also share the common legal position that A3371 does not violate Plaintiffs' First Amendment rights. Lastly, Plaintiffs' argument that they are unduly prejudiced by having to respond to "superfluous arguments" is not convincing. Accordingly, we conclude that the District Court did not abuse its discretion by permitting Garden State to intervene.

## VII.

Although we reject the District Court's conclusion that A3371 prohibits only "conduct" that is wholly unprotected by the First Amendment, we uphold the statute as a regulation of professional speech that passes intermediate scrutiny. We agree with the District Court that A3371 does not violate Plaintiffs' right to free exercise of religion, as it is a neutral and generally applicable law that is rationally related to a legitimate

government interest. We further agree that Plaintiffs lack standing to bring claims on behalf of their minor clients, and conclude that the District Court did not abuse its discretion by permitting Garden State to intervene. Accordingly, we will affirm the judgment of the District Court.