[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14009
_____

D.C. Docket No. 1:11-cv-22026-MGC

DR. BERND WOLLSCHLAEGER,
DR. JUDITH SCHAECHTER,
DR. TOMMY SCHECHTMAN,
AMERICAN ACADEMY OF PEDIATRICS, FLORIDA CHAPTER,
AMERICAN ACADEMY OF FAMILY PHYSICIANS, FLORIDA CHAPTER,
AMERICAN COLLEGE OF PHYSICIANS, FLORIDA CHAPTER, INC.,
ROLAND GUTIERREZ,
STANLEY SACK,
SHANNON FOX-LEVINE,

Plaintiffs - Appellees,

versus

GOVERNOR OF THE STATE OF FLORIDA,
SECRETARY, STATE OF FLORIDA,
SURGEON GENERAL OF THE STATE OF FLORIDA,
SECRETARY, HEALTH CARE ADMINISTRATION OF THE STATE OF

FLORIDA,
DIVISION DIRECTOR, FLORIDA DEPARTMENT OF HEALTH,
Division of Medical Quality Assurance,
GEORGE THOMAS,
JASON ROSENBERG,
ZACHARIAH P. ZACHARIAH,
ELISABETH TUCKER,
TRINA ESPINOLA,
MERLE STRINGER,
JAMES ORR,
GARY WINCHESTER,
NABIL EL SANADI,
ROBERT NUSS,
ONELIA LAGE,
FRED BEARISON,
DONALD MULLINS,
BRIGETTE RIVERA GOERSCH,
BRADLEY LEVINE,

                                                    Defendants - Appellants.


BROWARD COUNTY MEDICAL ASSOCIATION,
BROWARD COUNTY PEDIATRIC SOCIETY,
PALM BEACH COUNTY MEDICAL SOCIETY,
FLORIDA PUBLIC HEALTH ASSOCIATION,
UNIVERSITY OF MIAMI SCHOOL OF LAW AND YOUTH CLINIC,
CHILDREN'S HEALTHCARE IS A LEGAL DUTY, INC.,
EARLY CHILDHOOD INITIATIVE FOUNDATION,
AMERICAN ACADEMY OF PEDIATRICS,
AMERICAN ACADEMY Of CHILD AND ADOLESCENT PSYCHIATRY,
AMERICAN ACADEMY OF FAMILY PHYSICIANS,
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS,
AMERICAN COLLEGE OF SURGEONS,
AMERICAN COLLEGE OF PREVENTIVE MEDICINE,
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGIST,
AMERICAN CONGRESS OF OBSTETRICIANS AND GYNECOLOGISTS,
AMERICAN PSYCHIATRIC ASSOCIATION,
CENTER FOR CONSTITUTIONAL JURISPRUDENCE,
DOCTORS FOR RESPONSIBLE GUN OWNERSHIP,

NATIONAL RIFLE ASSOCIATION OF AMERICA,
AMERICAN MEDICAL ASSOCIATION,
ACLU FOUNDATION OF FLORIDA,
ALACHUA COUNTY MEDICAL SOCIETY,
AMERICAN PUBLIC HEALTH ASSOCIATION,
AMERICAN ASSOCIATION OF SUICIDOLOGY,
SUICIDE AWARENESS VOICES OF EDUCATION,
LAW CENTER TO PREVENT GUN VIOLENCE,

Amicus Curiae.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 28, 2015)

**ON PETITION FOR REHEARING**

Before TJOFLAT and WILSON, Circuit Judges, and COOGLER,[*] District Judge.

TJOFLAT, Circuit Judge:

We *sua sponte* vacate and reconsider our original opinion in this matter,

reported at 760 F.3d 1195. We substitute in its place the following opinion.

The Governor of the State of Florida, other Florida officials, and members of

the Board of Medicine of the Florida Department of Health (collectively, the

"State"), appeal from the District Court's grant of summary judgment and an

_____

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

injection in favor of a group of physicians and physician advocacy groups (collectively, "Plaintiffs") enjoining enforcement of Florida's Firearm Owners Privacy Act[1] (the "Act") on First and Fourteenth Amendment grounds.

Society has traditionally accorded physicians a high degree of deference due to factors such as their superior knowledge, education, and "symbolic role as conquerors of disease and death."  Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 226 (1994).  This deference reaches its apex in the examination room.  When a patient enters a physician's examination room, the patient is in a position of relative powerlessness.  The patient must place his or her trust in the physician's guidance and submit to the physician's authority.

With this authority comes responsibility.  To protect patients, society has long imposed upon physicians certain duties and restrictions that operate to define the boundaries of good medical care.  In keeping with this tradition, the State passed the Act.

The Act seeks to protect patient privacy by restricting irrelevant inquiry and record-keeping by physicians on the sensitive issue of firearm ownership.  The Act does not prevent physicians from speaking with patients about firearms generally.

---

[1] 2011 Fla. Laws 112 (codified at Fla. Stat. §§ 381.026, 456.072, 790.338).

Nor does it prohibit specific inquiry or record-keeping about a patient's firearm-ownership status when the physician determines in good faith, based on the circumstances of that patient's case, that such information is relevant to the patient's medical care or safety, or the safety of others.

Rather, the Act codifies the commonsense conclusion that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient's care—especially not when that inquiry or record-keeping constitutes such a substantial intrusion upon patient privacy. Given this understanding of the Act, and in light of the longstanding authority of States to define the boundaries of good medical practice, we hold that the Act is, on its face, a permissible restriction of physician speech. Plaintiffs remain free—as they have always been—to assert their First Amendment rights as an affirmative defense in any actions brought against them. But we will not, by striking down the Act, effectively hand Plaintiffs a declaration that such a defense will be successful.

Accordingly, we reverse the District Court's grant of summary judgment in favor of Plaintiffs, and vacate the injunction against enforcement of the Act.

## I.

On June 2, 2011, Florida Governor Rick Scott signed the Act into law. The Act created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms; prohibitions; penalties; exceptions," and amended the Florida Patient's Bill of

Rights and Responsibilities, Fla. Stat. § 381.026, to include several of the same

provisions. The Act also amended Fla. Stat. § 456.072, entitled "Grounds for

discipline; penalties; enforcement," to provide for disciplinary measures for

violation of the Act. The Florida legislature passed the Act in response to

complaints from constituents that medical personnel were asking unwelcome

questions regarding firearm ownership, and that constituents faced harassment or

discrimination on account of their refusal to answer such questions or simply due

to their status as firearm owners.[2]

---

[2] For example, in a widely publicized incident that took place in Ocala, a pediatrician, during a routine visit, asked a patient's mother whether she kept any firearms in her home. Because she felt that the question constituted an invasion of her privacy, the mother refused to answer. The pediatrician then terminated their relationship and advised the mother that she had thirty days to find a new doctor. Fla. H.R. Comm. on Health & Human Servs., H.B. 155 (2011) Staff Analysis 2 (Apr. 7, 2011). *See also* Fred Hiers, *Family and pediatrician tangle over gun question*, Ocala StarBanner, July 24, 2010, http://www.ocala.com/article/20100724/articles/7241001.

In another incident, physicians refused to provide medical care to a nine-year-old "because they wanted to know if [the child's family] had a firearm in their home." Audio CD: Regular Session Senate Floor Debate on HB 155, held by the Florida Senate (Apr. 27–28, 2011) at 26:32 (remarks of Sen. Evers) (on file with Florida Senate Office of the Secretary). In another example, a legislator stated that, during an appointment with his daughter, a pediatrician asked that the legislator remove his gun from his home. Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida House of Representatives (Apr. 26, 2011) at 26:20 (remarks of Rep. Artiles) (on file with Florida House of Representatives Office of the Clerk). Another legislator reported a complaint from a constituent that a health care provider falsely told him that disclosing firearm ownership was a Medicaid requirement. *Id.* at 13:40 (remarks of Rep. Brodeur). That legislator also relayed a complaint about a mother who was separated from her children while medical staff asked the children whether the mother owned firearms. *Id.*

Further incidents are recounted in a Joint Statement of Undisputed Facts filed by the parties in the District Court below. *Wollschlaeger v. Farmer*, No. 1:11-CV-22026 (S.D. Fla. Nov. 11, 2011), Doc. 87.

The Act provides, in relevant part, that licensed health care practitioners and facilities (i) "may not intentionally enter" information concerning a patient's ownership of firearms into the patient's medical record that the practitioner knows is "not relevant to the patient's medical care or safety, or the safety of others," § 790.338(1); (ii) "shall respect a patient's right to privacy and should refrain" from inquiring as to whether a patient or his or her family owns firearms, unless the practitioner or facility believes in good faith that the "information is relevant to the patient's medical care or safety, or the safety of others," § 790.338(2); (iii) "may not discriminate" against a patient on the basis of firearm ownership, § 790.338(5); and (iv) "should refrain from unnecessarily harassing a patient about firearm ownership," § 790.338(6).[3]

---

[3] The full text of the challenged provisions is as follows:

(1) A health care practitioner licensed under chapter 456 [of the Florida Statutes] or a health care facility licensed under chapter 395 [of the Florida Statutes] may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.

(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry. . . .

Violation of any of the provisions of the Act constitutes grounds for disciplinary action under § 456.072(2). Fla. Stat. § 456.072(1)(nn). Furthermore, "[v]iolations of the provisions of subsections (1)–(4) constitute grounds for disciplinary action under [Fla. Stat. §§] 456.072(2) and 395.1055." Fla. Stat. § 790.338(8). Thus, if the Board of Medicine of the Florida Department of Health (the "Board") finds that a physician has violated the Act, the physician faces disciplinary measures including fines, restriction of practice, return of fees, probation, and suspension or revocation of his or her medical license. Fla. Stat. § 456.072(2). An investigation culminating in disciplinary action may be initiated against a physician by the Department of Health or may be triggered by a citizen's complaint. Fla. Stat. § 456.073. The minutes of a June 2, 2011, meeting of the

---

> (5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.
>
> (6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination. . . .

Fla. Stat. § 790.338.

The Act also contains related provisions concerning emergency medical personnel and insurance companies, affirming the right of patients to decline to answer physician questions, and affirming that the Act does not alter existing law regarding a physician's authorization to choose patients. § 790.338(3), (4), (7). Plaintiffs do not appear to challenge these provisions, and, as the District Court held, because these provisions do not apply to physicians or do not regulate any conduct by physicians, Plaintiffs lack standing to challenge them.

Rules/Legislative Committee of the Board indicate that the Board is prepared to initiate disciplinary proceedings against a physician who violates the Act, stating that "the Committee [has] determined [that] violation of [the Act] falls under failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply." Fla. Bd. of Medicine Rules/Legislative Comm., Meeting Report, at 3 (Jun. 2, 2011), *available at* http://ww10.doh.state.fl.us/pub/medicine/Agenda_Info/Public_Information/Public_Minutes/2011/Committees/R-L/060211_Minutes.pdf.

On June 6, 2011, four days after Governor Scott signed the Act into law, Plaintiffs filed a 42 U.S.C. § 1983 action against the State in the United States District Court for the Southern District of Florida, alleging that the inquiry, record-keeping, discrimination, and harassment provisions of the Act facially violate the First and Fourteenth Amendments of the United States Constitution, and seeking declaratory and injunctive relief. Plaintiffs contended that the Act imposes an unconstitutional, content-based restriction on speech, is overbroad, and is unconstitutionally vague.

On September 14, 2011, finding that Plaintiffs were likely to succeed on the merits, the District Court preliminarily enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act, together

with the provisions providing for discipline of physicians who violate the Act. *Wollschlaeger v. Farmer*, 814 F. Supp. 2d 1367, 1384 (S.D. Fla. 2011).

On June 2, 2012, the District Court permanently enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act— together with the related disciplinary provisions—holding, on cross motions for summary judgment, that all four provisions facially violated the First Amendment, and that the inquiry, record-keeping, and harassment provisions of the Act were void for vagueness. *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1267–69 (S.D. Fla. 2012).

The District Court found that Plaintiffs had standing to sue because Plaintiffs were engaging in self-censorship to avoid potential disciplinary action, which constituted a cognizable injury-in-fact that was fairly traceable to the Act and redressable by injunction. *Id.* at 1258–59. The District Court also held that Plaintiffs' claims were ripe, finding that delayed review would "cause hardship to Plaintiffs, who would continue to engage in self-censorship," and that further factual development of the issues was unnecessary. *Id.* at 1259.

Turning to the merits, the District Court found that the Act imposed a content-based restriction on physicians' speech on the subject of firearms. *Id.* at 1261. The District Court rejected the State's argument that the Act "constitute[s] a permissible regulation of professional speech or occupational conduct that imposed

a mere incidental burden on speech." *Id.* at 1262. The District Court noted that, unlike the provisions of the Act, "[s]uch regulations govern the access or practice of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession." *Id.*

The District Court then assessed the State's asserted interests in passing the Act. The District Court acknowledged that the State has an interest in protecting its citizens' Second Amendment right to keep and bear arms, but found that such a right is "irrelevant" to the Act and therefore is not "a legitimate or compelling interest for it." *Id.* at 1264. The District Court found that, because the State acted on the basis of purely anecdotal information and provided no evidence that discrimination or harassment based on firearm ownership is pervasive, the State does not have a legitimate or compelling interest in protecting its citizens "from barriers to the receipt of medical care arising from [such] discrimination or harassment." *Id.* (quotation marks omitted). However, the District Court found that Florida has legitimate—but perhaps not compelling—interests "in protecting patients' privacy regarding their firearm ownership or use" and in the regulation of professions. *Id.* at 1265.

Balancing physicians' free speech rights against the State's legitimate interests in protecting patient privacy and regulating the professions, the District Court held that—regardless of whether strict scrutiny or some lesser standard

applied—the inquiry, record-keeping, discrimination, and harassment provisions of the Act could not pass constitutional muster. *Id.* at 1265–67. The District Court found that the State had failed to provide any evidence that the confidentiality of information regarding patients' firearm ownership was at risk, noting that a patient may simply decline to provide such information, and that state and federal laws pertaining to the confidentiality of medical records provide adequate protection to patients. *Id.* at 1267. With regard to the regulation of professions, the District Court found that the Act lacked "narrow specificity," *id.* at 1266 (quotation marks omitted), because the Act directly targets speech rather than merely imposing an incidental burden on speech. *Id.* at 1266–67. For similar reasons, the District Court further found that the Act is not the least restrictive means of achieving the State's interests. *Id.* at 1267. Thus, the District Court held that the "balance of interests tip significantly in favor of safeguarding practitioners' ability to speak freely to their patients." *Id.* at 1267.

The District Court also held that the inquiry, record-keeping, and harassment provisions of the Act were unconstitutionally vague. *Id.* at 1267–69. With regard to the inquiry and record-keeping provisions, the District Court found that the "relevance standard" failed to provide sufficient guidance as to what conduct the Act prohibits. *Id.* at 1268. With regard to the harassment provision, the District Court noted that the term "harass" has an ordinary meaning that is readily clear,

*id.*, but "[w]hat constitutes 'unnecessary harassment' is left to anyone's guess," *id.* at 1269. The District Court noted that it did not need to address Plaintiffs' argument that the Act is overbroad because doing so would not change the outcome. *Id.* at 1270 n.7.

Thus, the District Court—finding the remaining provisions of the Act severable—granted Plaintiffs' motion for summary judgment, and granted in part and denied in part the State's motion for summary judgment.[4] *Id.* at 1270. Accordingly, the District Court permanently enjoined the State from enforcing the record-keeping, inquiry, harassment, and discrimination provisions of the Act, § 790.338(1), (2), (5), (6), and from enforcing § 790.338(8), to the extent that it provided that violations of § 790.338(1) and (2) constitute grounds for disciplinary action, and § 456.072(1)(nn), to the extent that it provided that violations of § 790.338(1), (2), (5) and (6) constitute grounds for disciplinary action. *Id.*

On July 30, 2012, the State timely appealed the District Court's judgment. We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1291.

---

[4] The District Court granted the State's motion for summary judgment with respect to the provisions of the Act that neither apply to practitioners nor regulate any conduct by physicians, § 790.338(3), (4), (7), finding that Plaintiffs lacked standing to challenge these provisions. *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1258 (S.D. Fla. 2012).

## II.

We review a district court's grant of summary judgment *de novo*. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). "Summary judgment is appropriate when 'there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Id.* (alteration in original) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quotation marks omitted).

We review a district court's legal determinations *de novo* and ordinarily review its factual findings for clear error. In the context of the First Amendment, however, we conduct an independent examination of the whole record, subjecting the District Court's findings of 'constitutional facts'—those facts "that involve the reasons the [defendant] took the challenged action"—to *de novo* review. *ACLU of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1206 (11th Cir. 2009). We also review *de novo* questions concerning our subject matter jurisdiction, such as standing and ripeness. *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006).

## III.

We begin by taking up the issue of justiciability. The District Court found that Plaintiffs had standing to sue because they were engaging in self-censorship,

which constituted a cognizable injury-in-fact fairly traceable to the Act and redressable by injunction. 880 F. Supp. 2d at 1258–59. The State contends that this was error, because the Act does not prohibit physicians from asking patients about firearm ownership, providing firearm safety counseling, or recording information concerning patients' firearm ownership. The State argues that physicians may engage in such conduct when it is relevant to patients' care, and even when not relevant, the Act merely suggests that physicians "should refrain" from inquiring as to firearm ownership. Fla. Stat. § 790.338(2). Such hortatory language, the State argues, does not constitute a mandate that physicians must not inquire. Thus, the State argues, because the Act does not in fact actually prohibit the conduct Plaintiffs wish to engage in, Plaintiffs lack standing to challenge the Act because they have not demonstrated injury-in-fact. Moreover, the State argues, we have an obligation to read the Act as a mere recommendation that physicians refrain from irrelevant inquiry and record-keeping about firearms, in order to construe the Act as valid.

We find that the District Court properly held that Plaintiffs' claims are justiciable. In order to have standing, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. FEC*, 554 U.S. 724, 733, 128 S. Ct. 2759, 2768, 171 L. Ed. 2d 737 (2008).

However, "[s]tanding is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  *Id.* at 734, 128 S. Ct. at 2769 (citations omitted) (quotation marks omitted).

At the outset, we note that Plaintiffs' First Amendment challenge to the Act may be viewed as the functional equivalent of a First Amendment argument raised as an affirmative defense in a hypothetical case brought against a physician for asking irrelevant questions about firearms contrary to good medical practice.  A physician could raise such a defense in a disciplinary proceeding brought under the Act for such conduct, or, for that matter, in a malpractice action brought in court for such conduct.  For example, a patient could file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about firearm ownership—just as a patient could potentially file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about any other topic.  The physician could choose to admit to the purportedly harassing speech and plead the First Amendment as an affirmative defense, in effect contending that the court's rejection of the affirmative defense would constitute state action in violation of the Constitution.  Indeed, leaving aside the Act, a physician facing malpractice liability for a wide swath of professional activity involving speech could theoretically raise a First Amendment defense.

In mounting a facial challenge to the Act, however, Plaintiffs sought a First Amendment defense to any action brought against a physician based on speech targeted by the Act. The State contends that the only proper vehicle for Plaintiffs' First Amendment defense is a live proceeding brought under the Act. In other words, in arguing that Plaintiffs' facial challenge is not justiciable, the State is saying that Plaintiffs must wait until they have been subjected to discipline pursuant to the Act.

Crucial to resolving the standing question is the nature of Plaintiffs' claims. "Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citing *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991)).

Plaintiffs' sole alleged injury is self-censorship, which may be a cognizable injury-in-fact for standing purposes. *See id.* ("[I]t is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001))).

To establish a cognizable self-censorship injury for the purposes of a First Amendment claim, a plaintiff "must show that, as a result of his desired

expression, (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." *Id.* at 1260 (internal quotation marks omitted). If a plaintiff proceeds under the credible-threat-of-prosecution prong, he must demonstrate: "[F]irst, that he seriously wishes to engage in expression that is at least arguably forbidden by the pertinent law, and second, that there is at least some minimal probability that the challenged rules will be enforced if violated." *Id.* (emphasis omitted) (citations omitted) (quotation marks omitted). "If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Id.* at 1257.

Plaintiffs explain that, as part of the practice of preventative care, some physicians routinely ask patients whether they own firearms—either verbally or via a screening questionnaire—and provide firearm safety counseling, as part of a larger battery of questions and counseling regarding health and safety risks (including, for example, poisonous chemicals in the home, alcohol, tobacco, and swimming pools). After passage of the Act, Plaintiffs have curtailed or eliminated this practice for fear of facing discipline.[5]

_____

[5] Plaintiffs' Complaint lays out the specifics of individual physicians' practices regarding firearm inquiries and safety counseling. For example, prior to passage of the Act, Dr. Wollschlaeger asked his patients to complete a questionnaire that included questions regarding firearm ownership, and routinely orally asked patients whether they owned firearms if other risk

Plaintiffs have established that they wish to engage in conduct that is at least arguably forbidden by the Act. In their practice of preventative medicine, Plaintiffs wish to ask questions and record information regarding firearms as a matter of routine—without making a particularized determination of relevance— which implies that some such inquiry and recordation will not be relevant to the health and safety of patients or others and thus would be prohibited by the Act. The Act was recently enacted, and the State is defending it, so we may infer that

---

factors were present—such as when patients had children in the home, were suffering from addiction, depression, or suicidal ideation, had an unstable family environment, or were involved in a domestic-violence situation—to provide firearm safety counseling tailored to the patient's circumstances. After passage of the Act, Dr. Wollschlaeger has removed the firearms-related questions from his questionnaire and no longer orally asks questions regarding firearm ownership or discusses firearms as part of his standard preventative counseling.

The other physicians who are party to this suit have limited their practice of asking questions and providing counseling about firearm safety, but still do so to varying degrees. For example, prior to passage of the Act, Dr. Schaechter and Dr. Schectman routinely asked their patients questions regarding firearm ownership and entered related information into their medical records. They have continued this practice even after passage of the Act because they believe in good faith that such questions and information are relevant to their patients' care. However, they now refrain from asking follow-up questions when patients or their parents seem upset by the initial screening question, when, prior to passage of the Act, they would not have refrained. Similarly, Dr. Gutierrez continues to use a patient questionnaire that includes a question about firearm ownership, but has resolved to refrain from asking any follow-up questions should a patient initially appear disinclined to discuss the topic. Dr. Sack has ended his previous practice of beginning his firearm safety counseling by asking patients whether they have a firearm in the house. However, he has continued to provide firearm safety counseling, framing it in hypothetical terms not tailored to his patients' individual circumstances. Dr. Fox-Levine has, since passage of the Act, removed questions regarding firearm ownership from her intake questionnaire, but continues to advise some patients about firearm safety, framing her advice in hypothetical terms.

there is at least some probability that the Act will be enforced if violated.[6] Thus, Plaintiffs have established a cognizable self-censorship injury for their First Amendment claims.[7]

Similarly, to establish a cognizable self-censorship injury for the purposes of a vagueness claim, a plaintiff must show that: "(1) he seriously wishes to [speak]; (2) such [speech] would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Id.* at 1254 (emphasis omitted) (footnote omitted) (citations omitted). Notably, "it is the existence, not the imposition, of standardless requirements that causes [the] injury." *Id.* (alteration in original) (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006)).

For the reasons discussed above, Plaintiffs have met the first and third prongs. With regard to the second prong, Plaintiffs argue that it is unclear whether

---

[6] We note that the Act does not provide for criminal penalties, but only disciplinary action by the Board. Nevertheless, for standing purposes, the threat of disciplinary action may be sufficient. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1248, 1260 (11th Cir. 2010) (finding an attorney had standing to challenge the state bar's attorney advertising rules when the consequence for noncompliance was disciplinary action, such as disbarment).

[7] We acknowledge that the harassment and discrimination provisions of the Act in particular, § 790.338(5) and (6), prohibit conduct that may involve little to no speech. Nevertheless, Plaintiffs claim self-censorship as a result of all four challenged provisions of the Act. As all four challenged provisions regulate conduct that arguably involves speech, this is sufficient for standing purposes. We need not, of course, evaluate the merits of these claims at the standing stage.

routine inquiries and record-keeping regarding firearms, made as part of the practice of preventative medicine and not based on patients' particularized circumstances, qualify as "relevant" to health and safety, and that the law does not define the terms "unnecessarily harassing" or "discriminate," leaving physicians without guidance as to what conduct the Act prohibits and when physicians may be subject to discipline for conduct patients may unpredictably deem objectionable. Without determining, at this stage, the ultimate merits of Plaintiffs' argument, we accept that the language Plaintiffs point to is at least arguably vague. Thus, Plaintiffs have established a cognizable self-censorship injury for their vagueness claim.

Plaintiffs claim that they curtailed their firearms inquiry and counseling practices due to the Act, and that they would resume those practices but for the Act. Thus, Plaintiffs' self-censorship injury is fairly traceable to passage of the Act, and redressable by injunction. Accordingly, Plaintiffs have standing.

The State argues that Plaintiffs lack standing with regard to the inquiry provision of the Act because the provision in fact prohibits nothing at all. Thus, the State claims, Plaintiffs' fear that they will face discipline is not objectively reasonable. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) ("A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that

fear is objectively reasonable.").  Under the State's proposed construction, the Act

merely recommends that physicians "should refrain" from asking questions about

firearms unless relevant, and that such hortatory language does not constitute a bar

on speech.  The State points out that the Executive Director of the Board stated in a

letter—posted to the Board's website shortly after Plaintiffs filed suit—that the

Board does not interpret the inquiry provision as a prohibition, but rather as a

recommendation (contradicting a letter the Executive Director had previously

mailed to Florida physicians stating the opposite).  Accordingly, the State

contends, there is no credible threat of enforcement with regard to the inquiry

provision.

We disagree.  Laws—such as the Act—that provide for disciplinary action

in case of violation should generally not be interpreted as hortatory.  *Compare

Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1377 (Fed. Cir. 2002) ("In

the absence of any consequences for noncompliance, [a law's] timing provisions

are at best precatory rather than mandatory."), *with Kittay v. Kornstein*, 230 F.3d

531, 538 n.3 (2d Cir. 2000) (noting that attorney disciplinary rules "are mandatory

in character" because they "state the minimum level of conduct below which no

lawyer can fall without being subject to disciplinary action" (quotation marks

omitted)), *and Edwards v. Born, Inc.*, 792 F.2d 387, 391–92 (3d Cir. 1986) (noting

that attorney disciplinary rules "are mandatory" because attorneys are subject to

discipline for violating them).  Thus, despite the Board's position—insofar as the

Executive Director's letters represent it—that the inquiry provision constitutes a

recommendation rather than a mandate, the fact that the Act provides for

disciplinary action against Plaintiffs in case of a violation provides evidence that

Plaintiffs' fear that they may face discipline is objectively reasonable for standing

purposes.  Notably, this is not a generalized fear of disciplinary action, but rather a

specific apprehension by a specific group—physicians—whose conduct the Act

targets.  *But cf. Clapper v. Amnesty Int'l USA*, 568 U.S. ___, 133 S. Ct. 1138,

1143, 185 L. Ed. 2d 264 (2013) (holding that attorneys and various human rights,

labor, legal, and media organizations cannot "manufacture standing" to challenge a

provision of the Foreign Intelligence Surveillance Act of 1978 "by choosing to

make expenditures based on hypothetical future harm" where plaintiffs merely

speculate that the government will target their communications, and so the costs

they incurred were a product of their generalized fear of surveillance).

Moreover, we note that the Board has not been consistent in its position that

the inquiry provision is hortatory, as indicated by the Executive Director's first

letter stating the contrary.  The State is also inconsistent in its interpretation of the

"should refrain" language in its briefs.  For instance, it repeatedly characterizes

identical language in the harassment provision of the Act as a mandatory

prohibition against unnecessary harassment.  State's Br. at 1, 6, 18, 27, 35 n.8, 39.

It also describes the inquiry provision itself as "proscrib[ing] . . . inquiries," *id.* at 11, and "prohibit[ing] conduct," *id.* at 39.  *Cf. Wilson*, 132 F.3d at 1428–29 (holding that disbarred attorneys lacked standing to challenge State Bar rules that limit the ways in which disbarred attorneys can represent themselves to the public or have contact with clients where "the State Bar ha[d] repeatedly and consistently taken the position that the [challenged rules] ha[d] no application to the types of scenarios the disbarred attorneys have posed").

Neither is it controlling that, as the State contends, the Florida Supreme Court interpreted the term "should" as hortatory in reviewing Florida's Code of Judicial Conduct.  *See In re Code of Judicial Conduct*, 643 So. 2d 1037, 1041 (Fla. 1994).  Such interpretation is irrelevant to determining what effect the Florida legislature intended to give language in the Act.  Thus, Plaintiffs' fear that they may face discipline under the inquiry provision is objectively reasonable.[8]

---

[8] We do not accept Plaintiffs' argument that construing the inquiry provision's "should refrain" language as hortatory would render meaningless the portion of the provision allowing physicians to nevertheless make firearm inquiries when doing so would be relevant to care and safety.  *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566, 173 L. Ed. 2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotation marks omitted)).  Even if we were to construe the inquiry provision as a mere recommendation that physicians refrain from inquiring about firearms, it is perfectly reasonable that the legislature may wish to withdraw this recommendation should the inquiry be relevant in a given case.  Nevertheless, we find that the inquiry clause is not a mere recommendation, and our rejection of Plaintiffs' argument does not alter the result of our standing inquiry.

The State also argues that Plaintiffs lack standing with regard to the record-keeping provision of the Act because it only proscribes the entry of firearm information that is not relevant to medical care or safety, and Plaintiffs claim no injury arising from a wish to record irrelevant information. However, Plaintiffs claim an injury to their practice of preventative medicine arising from not being free to record the firearm information of every patient as a matter of course. Some—perhaps the majority—of these records will therefore be irrelevant to the care and safety of patients and others. Thus, the State's argument is unavailing: Plaintiffs claim an injury arising, in part, from a desire to record irrelevant information.

Accordingly, we find that the District Court properly held that Plaintiffs have standing to challenge the Act. We also find that the District Court properly held that Plaintiffs' claims are ripe for adjudication.[9]

## IV.

Now for the merits of Plaintiffs' claims. Plaintiffs' facial attacks on the Act arise under two separate provisions of the Constitution. First, they contend that § 790.338(1), (2), (5), (6)—the record-keeping, inquiry, discrimination, and

---

[9] The State does not renew on appeal its argument that Plaintiffs' claims are not ripe. Thus, we will not address the issue in detail.

harassment provisions of the Act[10]—impermissibly trench upon their rights under the First Amendment.  In their view, the Act is a content-based restriction on speech and as such, is subject to—and fails—strict scrutiny.  Plaintiffs also assert that the Act is overbroad; that is, they claim that even if the Act's regulation of speech is constitutional in a limited number of situations, it nonetheless proscribes a substantial amount of legitimate speech, and must fall.  Second, Plaintiffs argue that the Act violates their rights under the Due Process Clause of the Fourteenth Amendment, in that the Act's terms are so vague that they fail to put a person of ordinary intelligence on notice as to what the Act prohibits.

We will begin with the latter contention and then move to the First Amendment challenges.  *See Borgner v. Brooks*, 284 F.3d 1204, 1208 (11th Cir. 2002) ("Before analyzing [the challenged state statute] under the [appropriate level of First Amendment scrutiny], we must first determine whether the statute, taken as a whole, is clear as far as what is required and what is prohibited.").

A.

Under "[t]he void-for-vagueness doctrine[,] . . . 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common

---

[10] Plaintiffs' challenge is limited to these four provisions.  Accordingly, unless context demands otherwise, future references to the Act should be understood to refer only to these provisions.

intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (third alteration in original) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629, 104 S. Ct. 3244, 3256, 82 L. Ed. 2d 462 (1984)).  Thus, a statute is unconstitutionally vague if "it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03, 86 S. Ct. 518, 520–21, 15 L. Ed. 2d 447 (1966).

The Supreme Court has explained that "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432, 83 S. Ct. 328, 337, 9 L. Ed. 2d 405 (1963).  Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct. 2746, 2755, 105 L. Ed. 2d 661 (1989) (citation omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 2300, 33 L. Ed. 2d 222 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language.").  As such, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado*,

530 U.S. 703, 733, 120 S. Ct. 2480, 2498, 147 L. Ed. 2d 597 (2000) (citation omitted) (quotation marks omitted).

We begin by setting forth our understanding of the meaning of each of the challenged provisions, after which we address Plaintiffs' specific contentions. *See Broadrick v. Oklahoma*, 413 U.S. 601, 617 n.16, 93 S. Ct. 2908, 2919, 37 L. Ed. 2d 830 (1973) ("[A] federal court must determine what a state statute means before it can judge its facial constitutionality."). We do so in light of the familiar principle that where a statute is "readily susceptible to a narrowing construction that avoids constitutional infirmities," we must uphold it. *See Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1326 (11th Cir. 2001).

## 1.

The record-keeping provision prohibits physicians from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record if the [physician] knows that such information is not relevant to the patient's medical care or safety, or the safety of others." Fla. Stat. § 790.338(1). We note three salient points with regard to this provision. First, the substantive prohibition contained in the first clause—that a physician may not "intentionally enter any disclosed information concerning firearm ownership," *id.*—is conditioned on a relevancy requirement in the second clause. *See* New Oxford American Dictionary 865 (3d ed. 2010), *available at*

http://www.oxforddictionaries.com/definition/american_english/if (defining "if," in the first sense, as a conjunction which "introduc[es] a conditional clause").  The substantive prohibition applies only when the condition in the second clause is met—i.e., when a physician knows that information concerning firearm ownership is not relevant to the patient's medical care or safety, or the safety of others.  Logically, when a physician does *not* know that information concerning firearm ownership is irrelevant to the patient's medical care or safety, or the safety of others, the prohibition does *not* apply.

Second, and relatedly, the statute is written to require a high degree of certainty as to non-relevance on the part of the physician before the prohibition takes effect.  By its terms, the provision only prohibits physicians from entering information concerning firearm ownership when the physician has knowledge of irrelevance.  Any mental state regarding irrelevance that does not rise to the level of knowledge would not trigger the prohibition.

Finally, of course, if the prohibition applies *only* when a physician *knows* the information to be irrelevant, then the critical issue is the meaning of the relevancy requirement.  Plaintiffs argue that the provision is vague because it does not provide them with sufficient notice as to when record-keeping regarding firearms is relevant to medical care or safety.  Plaintiffs note that the Act does not specify whether a physician must make a particularized finding of relevance for each

patient or whether a physician's general belief that firearms are always relevant will suffice. They also argue that the Act does not specify if a physician must believe that firearm information is relevant at the time of inquiry and record-keeping, or if a good-faith belief that the information may later become relevant (such as in the practice of preventative medicine) satisfies the requirements of the Act. Plaintiffs contend that, because a reading that information about firearms is always relevant would render the Act meaningless, physicians reasonably fear that the Act requires some higher, unspecified level of relevance.

We find that recourse to plain meaning resolves the issue. *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1247 (11th Cir. 2005) (en banc) ("The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language unless it is ambiguous."). "Relevant" means "[r]elated to the matter at hand; to the point; pertinent." American Heritage Dictionary of the English Language 1098 (William Morris ed., 1969). We agree that the Act's relevancy requirement does not have a neat, one-size-fits-all definition; rather, relevancy is necessarily determined on a case-by-case basis. That is, whether information is related to the matter at hand depends entirely on the specifics of the matter at hand. A reading that information about firearm ownership is relevant in every case would, indeed, render the record-keeping provision superfluous, but this problem is easily avoided by adhering to a plain-meaning construction of relevancy

as an ad hoc determination, requiring a physician to base his or her calculation as to the relevancy of a patient's firearms-ownership status on particularized information about the patient.  By employing a flexible relevancy standard, the Act provides physicians with the freedom to record information regarding firearm ownership whenever doing so would be part of the practice of good medicine.

Taking these three points together, we think the record-keeping provision stands for the simple proposition that a physician may not record a patient's firearm-ownership status unless the physician believes that—because of some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies—the patient's firearm-ownership status pertains to the patient's medical care or safety, or the safety of others.  The record-keeping provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

## 2.

The inquiry provision is phrased slightly differently, but we think it is substantially similar to the record-keeping provision in terms of its practical effect. This provision directs physicians to

> refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient.  Notwithstanding this provision, a [physician] . . . that in good faith believes that this information is relevant to the patient's medical

31

> care or safety, or the safety of others, may make such a verbal or
> written inquiry.

Fla. Stat. § 790.338(2).

Here again, the substantive prohibition is qualified by a relevancy requirement, effectively providing that physicians may inquire whenever they believe in good faith that firearm ownership information is relevant to medical care or safety. Again, the provision sets a high bar as to the mental state necessary to trigger the prohibition: a physician must lack any good-faith belief as to the relevancy of the information. The provision does not require physicians to have *knowledge* of relevance before speaking, but only a good-faith *belief* as to relevance. Although this is phrased differently than the record-keeping provision's relevancy requirement, we think the two provisions form two sides of the same coin. The prohibitions apply when a physician knows the information to be *irrelevant* and do not apply if the physician has a good-faith belief that the information *is relevant*.

And, as with the record-keeping provision, the relevancy clause is also key here. Plaintiffs again assert that the term "relevant" is vague, but as we observed above, in context, this requirement simply means that a physician should base his or her calculation as to the relevancy of a patient's ownership of firearms on particularized information about the patient. Thus, a physician may make inquiries as to the firearms-ownership status of any or all patients, so long as he or she does

so with the good-faith belief—based on the specifics of the patient's case—that the inquiry is relevant to the patient's medical care or safety, or the safety of others. If, for example, the physician seeks firearm information to suit a personal agenda unrelated to medical care or safety, he or she would not be making a "good-faith" inquiry, and so the Act plainly directs him to refrain from inquiring.

Accordingly, we conclude that the inquiry provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

## 3.

Finally,[11] the harassment provision also contains the same basic elements as the first two provisions, albeit with a few modifications. The harassment provision directs physicians to "refrain from unnecessarily harassing a patient about firearm ownership during an examination." Fla. Stat. § 790.338(6). Like the record-keeping and inquiry provisions, the harassment provision does not impose a flat ban on the speech at issue, but rather qualifies its ban—here, with a necessity requirement. Under the terms of the statute, physicians are only prohibited from harassing patients about firearm ownership when such harassment is unnecessary.

---

[11] Plaintiffs have not cross-appealed the District Court's holding that the discrimination provision, § 790.338(5), is not void for vagueness. As a result, we need not address their argument that what constitutes "discrimination" under the provision is unclear.

One way in which the harassment provision differs from the previous two provisions, however, is with regard to the mental-state standard that triggers the substantive prohibition. Instead of imposing a high bar before *prohibiting* the speech—requiring knowledge of irrelevance or the absence of a good-faith belief of relevance—the harassment provision flips this formula, imposing a relatively high bar before *permitting* the speech. Harassment about firearm ownership is only permitted when necessary. We are not troubled by this inversion, however, because although, as we discuss below, we can imagine scenarios in which "harassment" might be warranted, even advisable, we think that in the majority of cases, it will not be. Imposing a more rigorous standard before permitting record-keeping or inquiry might present a more difficult question, but we do not think it inappropriate as a prerequisite to permitting "harassing."

Finally, we think that the necessity requirement, like the record-keeping and inquiry provisions, when read in the context of the provision and the Act as a whole, also has the effect of requiring a particularized determination by the physician as to relevance. *See Young v. Progressive Se. Ins. Co.*, 753 So. 2d 80, 84 (Fla. 2000) ("[A]ll parts of a statute must be read *together* in order to achieve a consistent whole," and "'[w]here possible, courts must give effect to *all* statutory provisions and construe related statutory provisions in harmony with one another'"), *cited with approval in Borgner*, 284 F.3d at 1208.

Two points inform this conclusion.  First, the harassment provision contains an explicit temporal limitation: unnecessary harassment is prohibited "during an examination."  Fla. Stat. § 790.338(6).  Since the purpose of a medical examination is the provision of medical care, it seems logical to assume that *if* any harassment is permissible within that context, it must be related to the purpose of the medical examination.  Second, the relevancy requirements present in both the record-keeping and inquiry provisions illuminate the meaning of the necessity requirement in the harassment provision.  These requirements manifestly turn on a particularized determination by the physician as to the relevancy of the speech to the medical care or safety of the patient, or the safety of others.  While that link is not made explicit in connection with the necessity requirement, the clear implication, given this pattern, is that the necessity requirement is directed to the same object: the medical care or safety of the patient, or the safety of others.

Plaintiffs express concern that the relevancy determination will hinge solely on a particular patient's subjective understanding of what constitutes "unnecessary harassment," and that as a result, they may be subjected to liability or discipline on an arbitrary basis.  Were this indeed the case, the provision would likely be invalid.  *See Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (holding a statute providing for administrative action against physicians who engage in speech that "the patient believes to be a recommendation of marijuana" lacks the requisite

narrow specificity under the First Amendment); *see also Thomas v. Collins*, 323 U.S. 516, 535, 65 S. Ct. 315, 325, 89 L. Ed. 430 (1945) (striking on First Amendment grounds a statute criminalizing solicitation of membership for certain unions without state license because the statute did not distinguish between solicitation and advocacy, and so "put[] the speaker . . . wholly at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning").

Again, we find the plain meaning of the term sufficient to dispel these fears. "Harass" means "[t]o disturb or irritate persistently." American Heritage Dictionary of the English Language 600 (William Morris ed. 1969). When read in the context of the Act as a whole, the harassment provision communicates that physicians should not disparage firearm-owning patients, and should not persist in attempting to speak to the patient about firearm ownership when the subject is not relevant to medical care or safety. Like the other provisions of the Act, the harassment provision targets physicians who wish to pursue an agenda unrelated to medical care or safety.

Although the District Court found the modifier "unnecessarily" to be problematic, we disagree. The modifier in fact allows physicians the freedom to challenge—i.e., "harass"— patients regarding firearms when, under the particularized circumstances of the patient's case, doing so is necessary for health

or safety reasons, even if the patient might find the physician's advice unwelcome. For example, if a patient is suicidal, a physician may wish to attempt to persuade the patient to remove firearms from the patient's home, even if the patient initially objects.  So even if the patient considers the physician's health and safety advice related to firearms to be harassing, the inclusion of the modifier "unnecessarily" leaves room for physicians to deliver such advice when necessary to medical care or safety, consistent with the Act's other provisions.  The harassment provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

As a final point, we note that patients by themselves cannot subject physicians to discipline.  Patients may file a complaint which triggers an investigation by the Board, or they may bring a malpractice action, but so long as a physician is operating in good faith within the boundaries of good medical practice, and is providing only firearm safety advice which is relevant and necessary, he or she need not fear discipline at the hands of the Board or a money judgment in a court of law.

4.

To summarize, we read the Act to prohibit record-keeping about firearm ownership only when the physician knows such information to be irrelevant to the patient's medical care or safety, or the safety of others; inquiry about firearm

ownership only when the physician lacks a good-faith belief that the information is relevant to the patient's medical care or safety, or the safety of others; and harassment about firearm ownership only when the physician does not believe it necessary to the patient's medical care or safety, or the safety of others.

Having determined that the record-keeping, inquiry, and harassment provisions are of sufficient clarity to conform to the requirements of due process, we hold that the District Court erred in finding them void for vagueness.

## B.

We turn now to the first of Plaintiffs' First Amendment challenges. We need only proceed to apply First Amendment scrutiny to the Act if it regulates activity that falls within the ambit of the First Amendment's protections. Therefore, we begin our analysis by resolving a necessary preliminary issue: whether any of the challenged provisions implicate a significant amount of "speech" as that term is understood in the context of First Amendment law.

## 1.

Under the First and Fourteenth Amendments, States are prohibited from "mak[ing] [any] law . . . abridging the freedom of speech." U.S. Const. amend. I.[12]

---

[12] The First Amendment's prohibition is applied against the States through the Fourteenth Amendment's Due Process Clause. *Schneider v. New Jersey*, 308 U.S. 147, 160, 60 S. Ct. 146, 150, 84 L. Ed. 155 (1939); *see also Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940).

"The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539, 105 L. Ed. 2d 342 (1989). Conduct may also be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 2730, 41 L. Ed. 2d 842 (1974). To determine whether particular conduct implicates the protections of the First Amendment, we look to whether it is "inten[ded] to convey a particularized message," and whether, under the circumstances, it is highly likely "that the message would be understood by [observers]." *Johnson*, 491 U.S. at 404, 109 S. Ct. at 2539 (quoting *Spence*, 418 U.S. at 410–11, 94 S. Ct. at 2730).

It would seem under this definition— indeed, under almost any measure— that asking questions and writing down answers constitute protected expression under the First Amendment. However, the State argues that the Act escapes First Amendment scrutiny because it is directed toward conduct—the practice of medicine. While seemingly conceding (as it must) that asking questions and writing down answers would receive First Amendment protection if it occurred between strangers on a street corner, the State asserts that because the activity is conducted by a physician as part of the practice of the medical profession, and because the medical profession has long been subject to close regulation by the

State, the fact that the law restricts oral and written communication is of no consequence whatever.

The State finds support for this proposition in *Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011). In that case, we said that "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Id.* at 1191 (quoting *Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988)). That is true so far as it goes, but the State's proffered interpretation begs the question we must answer here. An inhibition of professionals' freedom of speech does not violate the First Amendment "*so long as*" it is "merely the incidental effect of . . . an otherwise legitimate regulation." *Id.* (emphasis added). The State's analysis proceeds at such a high level of generality that *all* laws regulating the practice of a profession would necessarily impose only incidental burdens on speech, and so would always pass muster under the First Amendment. This cannot be the case.

The State also cites Justice White's concurring opinion in *Lowe v. SEC*, 472 U.S. 181, 211–36, 105 S. Ct. 2557, 2573–86, 86 L. Ed. 2d 130 (1985), but we do not find anything in that opinion that would countenance the idea that the entire category of professional regulation touches only on conduct, and thus lies beyond the reach of the First Amendment. Indeed, Justice White recognized that "[a]t

some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment." *Id.* at 230, 105 S. Ct. at 2583; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S. Ct. 2705, 2724, 177 L. Ed. 2d 355 (2010) (explaining that when "the conduct triggering coverage under [a] statute consists of communicating a message . . . we must [apply] a more demanding standard" of scrutiny than that applied to regulations of noncommunicative conduct (second modification in original)); *Miller v. Stuart*, 117 F.3d 1376, 1382 (11th Cir. 1997) (holding that a state may not insulate a regulation of commercial speech from First Amendment review simply by classifying the speech as part of the profession of accountancy); *King v. Governor of N.J.*, 767 F.3d 216, 228–29 (3d Cir. 2014) (rejecting the argument that verbal communications become "conduct" when they are used to deliver professional services), *cert. denied* 575 U.S. ___, ___ S. Ct. ___, 2015 WL 1959131 (May 4, 2015).

Our task, then, is to determine whether any provision of the Act crosses the boundary between a law regulating professional *conduct* with an incidental effect on speech, and a law regulating protected *speech*, which "must survive the level of scrutiny demanded by the First Amendment." *Lowe*, 472 U.S. at 230, 105 S. Ct. at 2583 (White, J., concurring).

The record-keeping provision of the Act, § 790.338(1), prohibits physicians from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record" under certain circumstances. This provision clearly targets activity—making an entry in a medical record—that is intended to convey a particular message—information about firearm ownership. And, (legibility aside) we think that under the circumstances it is highly likely that the expressive content contained in these entries would be understood by those viewing them. Therefore, we hold that the record-keeping provision regulates speech, and as such, must survive some level of First Amendment scrutiny.

The inquiry provision of the Act, § 790.338(2), requires physicians to "refrain from making a written inquiry or asking questions concerning the ownership of a firearm . . . ." On its face, this provision also inhibits protected speech—inquiring about firearm ownership. It too must survive some level of First Amendment scrutiny.

The discrimination provision of the Act, § 790.338(5), if not a horse of a different color, is at least a different shade steed. This provision prohibits "discriminat[ion] against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition." *Id.* Unlike the first two provisions considered, the discrimination provision does not facially implicate a substantial amount of protected speech. Of course, it is possible to

discriminate via speech, by hanging a sign on the examination room wall proclaiming "Gun Owners Not Welcome Here," for example. But this does not transform antidiscrimination laws into restrictions on speech. *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62, 126 S. Ct. 1297, 1308, 164 L. Ed. 2d 156 (2006) ("Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."); *accord Wisconsin v. Mitchell*, 508 U.S. 476, 487–88, 113 S. Ct. 2194, 2201, 124 L. Ed. 2d 436 (1993) (compiling cases upholding state and federal antidiscrimination laws against First Amendment challenge). The provision does not single out speech, or target speech that carries a specific message; rather "the focal point of its prohibition [is] the act of discriminating against individuals in the provision of [medical treatment] on the proscribed ground[]." *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572, 115 S. Ct. 2338, 2347, 132 L. Ed. 2d 487 (1995). Especially in light of the facial nature of Plaintiffs' challenge—we hold that the discrimination provision is a regulation of conduct with only an incidental effect on speech. As such, it does not implicate, let alone offend, the First Amendment.

The harassment provision of the Act, § 790.338(6), requires physicians to "refrain from unnecessarily harassing a patient about firearm ownership . . . ." Plaintiffs point us to *Saxe v. State Coll. Area Sch. Dist.*, which stands for the proposition that "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause." 240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.) Of course, "non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause," but the First Amendment also "protects a wide variety of speech that listeners may consider deeply offensive . . . ." *Id.* at 206; *see, e.g., Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969).

A natural reading of the provision would seem to indicate that it is primarily concerned with verbal harassment, since it defines a subject about which unnecessary harassment is prohibited. It is difficult to imagine how one would physically "harass[] a patient *about* firearm ownership." *See* Fla. Stat. § 790.338(6) (emphasis added). However, even assuming that there are some situations in which the provision could be applied without involving speech, we think that on balance, the provision substantially regulates speech and so must survive some level of First Amendment scrutiny.[13]

_____

[13] We note that Plaintiffs bring two types of facial First Amendment challenges to this provision: a traditional facial challenge, which can succeed only if "no set of circumstances

44

In sum, we conclude that while the discrimination provision is a regulation of professional conduct with merely an incidental effect on speech, and thus does not implicate the First Amendment, the record-keeping, inquiry, and harassment provisions *do* regulate a significant amount of protected speech. Accordingly, we must proceed to determine what level of scrutiny the First Amendment demands of these provisions. *See Lowe*, 472 U.S. at 230, 105 S. Ct. at 2583 (White, J., concurring).

## 2.

Before we answer that question, however, we think it may be helpful to survey the landscape of professional speech. Two concepts orient our discussion: profession and relationship. A physician is not only a member of the medical profession; he or she is also a fiduciary member of various physician-patient relationships. *See, e.g.,* 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers*

---

exists under which the Act would be valid," *Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 1877, 188 L. Ed. 2d 912 (2014) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)), and an overbreadth challenge, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quotation marks omitted).

If there are some plainly legitimate applications of the harassment provision, such as to physical harassment, that would seem to doom the first of Plaintiffs' facial First Amendment challenges. This is not necessarily dispositive, however, because a substantial number of its applications may still be found to be unconstitutional in an overbreadth analysis.

§ 141 (2012); *Mangoni v. Temkin*, 679 So. 2d 1286, 1288 (Fla. Dist. Ct. App. 1996). By exploring the distinct interests that drive and restrain government regulation in both areas, we can derive a framework by which to evaluate laws regulating professional speech.

We start with the commonsense observation that "[t]here is a difference, for First Amendment purposes, between . . . professionals' speech to the public at large versus their direct, personalized speech with clients." *Locke*, 634 F.3d at 1191; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634, 115 S. Ct. 2371, 2381, 132 L. Ed. 2d 541 (1995) ("Speech by professionals obviously has many dimensions."). While a professional may speak on a variety of topics in a variety of contexts, only some of this speech falls under the category of "professional speech." Consider two hypothetical scenarios. In the first, a physician meets with a patient in an examination room and explains the risks of a particular surgical procedure. This conversation is easily classified as professional speech. In the second scenario, the same physician speaks to a crowd at a rally, extolling the merits of a particular political candidate. It seems equally clear that while this speech is also uttered by a professional, it is not "professional speech."

Phrased in terms of principles, we think it is safe to say that speech uttered by a professional in furtherance of his or her profession and within the confines of a professional-client relationship falls within any reasonable definition of

professional speech.  *See King*, 767 F.3d at 232 (defining professional speech as speech that "is used to provide personalized services to a client based on the professional's expert knowledge and judgment"); *Moore-King v. Cty. of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013) (finding "the relevant inquiry to determine whether to apply the professional speech doctrine" to be "whether the speaker is providing personalized advice in a private setting to a paying client"); *see also* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech,* 2007 U. Ill. L. Rev. 939, 949 ("[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regula[ble] . . . .").

At the other end of the spectrum, speech uttered by a professional that is irrelative to the practice of his or her profession and outside a particular professional-client relationship likely falls beyond the purview of professional speech.[14]  *See Lowe,* 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring) ("Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government

---

[14] This does not mean that the speech cannot be regulated, but rather that such speech is, for most purposes, indistinguishable from speech by the average citizen.  Therefore, any government regulation of such speech would generally be subject to a conventional First Amendment analysis.  *See Pickup v. Brown*, 740 F.3d 1208, 1227–28 (9th Cir. 2013).

regulation . . . becomes regulation of speaking or publishing as such, subject to the First Amendment's command that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'"); *cf. Sedivy v. State ex rel. Stenberg*, 567 N.W. 2d 784, 793 (Neb. Ct. App. 1997) (suggesting in dicta that the First Amendment would bar the State from revoking a veterinarian's license solely because he expressed disagreement with government tax policies).

The difference between the first and second scenarios posed above turns on two factors: the professional effectivity of the speech—whether the physician is speaking in furtherance of the practice of medicine or not, and the relational context of the speech—whether the physician is speaking within a fiduciary relationship or not. Taken together, these factors account for the universe of speech uttered by a professional, dividing it into four categories. First, a physician may speak to the public, in furtherance of the practice of medicine. Second, a physician may speak to a client, in furtherance of the practice of medicine. Third, a physician may speak to a client, on a matter irrelative to the practice of medicine.

Finally, a physician may speak to the public, on a matter irrelative to the practice of medicine.[15]

To illustrate, the physician's speech in the first scenario above, to a patient about the risks of surgery, would fall in the second category: speech that furthers the practice of the physician's profession and occurs within the confines of a physician-patient relationship. The physician's speech to the crowd about a political candidate would fall in the fourth category: speech that is unrelated to the practice of the physician's profession and occurs in the absence of any special relationship.

_____

[15] It may be helpful to think about these four categories in the form of a grid, like so:



Speech between these two extremes can be located as well. Promotional or advertising speech by a physician to the public would fall within the first category: speech to the public for the purpose of furthering the physician's practice. Giving general health advice to the public on a television talk show or in a newspaper column would also be in this category. *See, e.g., Bailey v. Huggins Diagnostic & Rehab. Ctr., Inc.*, 952 P.2d 768, 773 (Colo. App. 1997) (disallowing on First Amendment grounds a negligent misrepresentation claim against a dentist for publicly suggesting that mercury amalgam fillings are harmful and should be removed).

Conversely, conversation by a physician with a patient about their mutual love of golf would fall in the third category: speech unrelated to the practice of medicine but within the confines of a physician-patient relationship. A more sinister example of speech within this category is harassing or intimidating speech by a physician to a patient. *See, e.g., In re Suspension or Revocation of License of Singh*, No. A-2181-06T2, 2007 WL 1753567, at *1 (N.J. Super. Ct. App. Div. June 20, 2007) (affirming revocation of a physician's license in part for repeatedly pressuring elderly patient to conceal the physician's attempt to solicit a loan from her).

The utility of this two-dimensional model of professional speech comes to the fore when we attempt to identify the various governmental, societal, and

individual interests that shape regulations of speech by professionals. The combination of salient interests present when a physician speaks in furtherance of his profession is related to, but distinct from, the interests at play when a physician speaks as a fiduciary.

When government regulation of speech uttered by a professional is analyzed through the lens of the professional effectivity of the speech—whether it furthers or is unrelated to the practice of a profession—the relevant interests are the government's interest in regulating the profession for the protection of the public and the professional's interest in speaking freely. Both interests vary depending on whether the speech effects the practice of a profession. The government's interest is strongest when a professional speaks in furtherance of his profession and weakest when a professional speaks irrelative to his profession. The professional's interest, conversely, is strongest when he speaks on matters unrelated to his profession and weakest when he speaks in furtherance of his profession.

When regulations of speech uttered by a professional are analyzed in terms of the audience—whether the speech occurs within the confines of a relationship of trust and confidence or not—the relevant interests are slightly different. Within a fiduciary or quasi-fiduciary relationship, the government has a strong interest in policing the boundaries of the relationship to protect the weaker party from exploitation. This interest does not derive solely from some general principle that

the government is obligated to protect the weak from predation by the strong; rather, the government's interest is in ensuring that the societally beneficial function of these relationships—agent-principal, attorney-client, physician-patient, etc.—is not nullified due to exploitation by the fiduciary.  Outside the confines of such relationships, the government's interest in protecting the listener wanes, and instead the interest of the physician's audience in obtaining information reaches its zenith.

Once this two-dimensional interplay of interests is set forth, our intuitive conclusions about whether certain kinds of speech by physicians constitute professional speech, and the proportionate latitude with which a state may regulate such speech, make sense.  When a physician speaks to a patient in furtherance of the practice of medicine, not one, but two substantial state interests are implicated: regulation of the profession for the protection of the public, and regulation of the relationship for the protection of the patient and the benefit of society.  Conversely, when a physician speaks to the public on a matter irrelative to the practice of medicine, neither state interest adheres with any special force; instead, the countervailing interests—the physician's interest in speaking freely and society's interest in listening freely—come to the fore.

Another benefit of our two-dimensional framework is that it aligns with and illuminates the limited guidance the Supreme Court has provided on the subject of

professional speech. Take, for example, promotional speech by professionals. Under our analysis, regulations of this type of speech fall in the first category, where the two primary interests at play are the state's interest in protecting the public by regulating the profession, and society's interest in the free flow of information. Notably, these are precisely the interests the Supreme Court has found relevant to analyzing regulations of professional advertising. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 764, 766–68, 96 S. Ct. 1817, 1827, 1828–29, 48 L. Ed. 2d 346 (1976) (characterizing the countervailing interests as society's "strong interest in the free flow of commercial information," and the state's "strong interest" in protecting the public by maintaining "high professional standards"); *accord Bates v. State Bar of Ariz.*, 433 U.S. 350, 364–79, 97 S. Ct. 2691, 2699–707, 53 L. Ed. 2d 810 (1977); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 454–460, 98 S. Ct. 1912, 1918–20, 56 L. Ed. 2d 444 (1978).

The Supreme Court has also addressed, in passing, another category of speech by a professional—a regulation compelling physicians to discuss certain information with their patients about the risks of abortion and childbirth. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 2824, 120 L. Ed. 2d 674 (1992) (joint opinion). Under our framework, this type of regulation falls at the intersection of two substantial governmental interests: regulation of the

profession for the protection of the public, and regulation of the fiduciary relationship for the protection of the patient and the benefit of society. When one understands that both of the primary interests at play in this category cut in favor of government regulation, the Supreme Court's succinct conclusion that the regulation implicated "the physician[s'] First Amendment rights" but survived scrutiny as a "reasonable" regulation of the practice of medicine makes more sense. *Id.*

While the Court's brief treatment in *Casey* does not provide much insight into how to analyze regulations of professional speech, or why the statute at issue survived First Amendment scrutiny,[16] the holding is helpful insofar as it is consistent with our conclusion that speech by a professional is best understood by evaluating it along two dimensions – whether it is uttered in furtherance of a profession and whether it occurs within a professional-client relationship.

---

[16] As at least one commentator has noted, *Wooley v. Maynard*, 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977), and *Whalen v. Roe*, 429 U.S. 589, 97 S. Ct. 869, 51 L. Ed. 2d 64 (1977), the two cases the Court cited as support for its holding, point in opposite directions on the issue of the appropriate level of scrutiny. Daniel Halberstam, *Commercial Speech, Professional Speech, and the Constitutional Status of Social Institutions,* 147 U. Pa. L. Rev. 771, 773–74 (1999). The reference to *Wooley* would seem to indicate that heightened scrutiny is appropriate, given that the Court in *Wooley* struck down a regulation of speech because it was not narrowly tailored to a "sufficiently compelling" government interest. *See* 430 U.S. at 716–717, 97 S. Ct. at 1436. On the other hand, the passage cited from *Whalen* suggests that States' authority to regulate the practice of medicine is subject only to basic due process considerations. *See* 429 U.S. at 603, 97 S. Ct. at 878. "To fuse these two models in a shorthand formulation provides little indication of how to resolve any professional's First Amendment claim other than the precise one at issue in *Casey*." Halberstam, *supra*, at 774.

We need not mark out today the full metes and bounds of professional speech.  It is sufficient to observe that speech by a physician that is uttered in furtherance of the practice of medicine and within the confines of a fiduciary relationship falls squarely within this category.  As this is what the Act seeks to regulate, we conclude that it is a regulation of professional speech.[17]

With these principles in mind, we are now prepared to address the issue of the appropriate level of First Amendment scrutiny with which to evaluate the Act.

3.

All regulations of speech are not created equal in the eyes of the First Amendment.  Laws regulating speech "receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it."  *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014), *cert. denied*, 576 U.S.

---

[17] There can be no argument that Plaintiffs view inquiries about firearm ownership as a matter of preventative care—i.e., in furtherance of the practice of medicine—or that they wish to raise these issues with their patients—i.e., within the context of a fiduciary relationship.  *See* Plaintiffs' Br. 3–4.  Indeed, stripped to its essentials, Plaintiffs' theory of the case appears to be that the Act prohibits them from speaking to their patients in furtherance of the practice of medicine, but that the State's objective in passing the Act was to prohibit them from speaking on a matter irrelative to the practice of medicine, and that it will seek to punish them for doing so.

We do not understand Plaintiffs to argue that they have a First Amendment right to speak to their patients within the examination room on matters irrelative to the practice of medicine. So, because we find that the Act was tailored so as to permit inquiry about firearms in all circumstances in which the physician believes in good faith that such information is relevant to the health or safety of any individual, *see supra* part IV.A.2, we need not—indeed, we cannot—address the propriety of applying the Act to prohibit physicians from discussing matters irrelative to their patients' health or safety.  Because Plaintiffs concede that the Act regulates speech uttered in furtherance of the practice of medicine, we proceed to analyze it as such.

___, ___ S. Ct. ___, 2015 WL 1331672 (June 15, 2015). Some statutory restraints on speech—most laws that restrict speech based on its content or viewpoint, for example—receive the "most exacting scrutiny," *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 642, 114 S. Ct. 2445, 2459, 129 L. Ed. 2d 497 (1994), while others typically receive a less rigorous level of review, *e.g., Ward*, 491 U.S. 781, 109 S. Ct. 2746 (content-neutral regulations of the time, place, or manner of speech); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980) (regulations of commercial speech); *United States v. O'Brien*, 391 U.S. 367, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968) (regulations of noncommunicative conduct).

a.

As noted, the Supreme Court has yet to clarify the precise level of scrutiny with which to review government restrictions of professional speech. To bridge this gap, we must proceed via inference from the known to the unknown. The first piece of information we have is the level of scrutiny due government regulations of speech by a professional on a matter irrelative to the practice of his profession and outside any particular relationship (in the fourth category above). In almost every instance, when a professional speaks in this context, his status as a professional is entirely incidental to his speech. When this is true, the government generally may not treat professional speakers differently than nonprofessional speakers. *See*

*Pickup v. Brown*, 740 F.3d 1208, 1227–28 (9th Cir. 2013) ("[O]utside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment."); *see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n,* 429 U.S. 167, 176, 97 S. Ct. 421, 426, 50 L. Ed. 2d 376 (1976) ("[The government] may not . . . discriminate between speakers on the basis of their employment . . . ."); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will County, Ill.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968) ("[T]eachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest . . . .").

Because the State's interest in imposing content-based restrictions on speech is at low ebb when a professional speaks to the public irrelative to the practice of his profession, the State is required to justify any such regulation by demonstrating that it is "the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005). This test is known as strict scrutiny. *Id.* So, for example, a law that prohibited physicians from discussing the subject of firearms with the public generally would assuredly be classified as a content-based restriction on speech,

subject to strict scrutiny.  Absent a showing that the law was necessary to further a compelling government interest, it would fall.

Another parcel of *terra cognita* is the level of scrutiny with which to evaluate regulations of speech by a professional to the public in promotion of his or her profession (in the first category above).  The Supreme Court has noted that this type of speech "occurs in an area traditionally subject to government regulation," and has therefore concluded that it warrants a lower level of protection under the First Amendment.  *Ohralik*, 436 U.S. at 456, 98 S. Ct. at 1918.  Correspondingly, the Court has set a lower bar by which to measure State regulation of such speech—intermediate, rather than strict scrutiny.  *Fla. Bar*, 515 U.S. at 623, 115 S. Ct. at 2375.  To survive this level of review, the State "must assert a substantial interest in support of its regulation" and demonstrate that the restriction "directly and materially advances" that interest without sweeping more widely than necessary.  *Id.* at 624, 115 S. Ct. at 2376 (citing *Cent. Hudson*, 447 U.S. at 566, 100 S. Ct.at 2351).

The Court's holdings in this area follow a clear trend.  When the State seeks to impose content-based restrictions on speech in a context in which its regulatory interests are diminished, such as when a professional speaks to the public in a nonprofessional capacity, courts apply the most exacting scrutiny.  When the State seeks to regulate speech by professionals in a context in which the State's interest

in regulating for the protection of the public is more deeply rooted, a lesser level of scrutiny applies.

We think that the restriction at issue here fits cleanly within the latter category, because both of the State interests implicated by the Act have deep regulatory roots. First, Courts have long recognized the authority—duty, even—of States to regulate the practice of professions to "shield[] the public against the untrustworthy, the incompetent, or the irresponsible." *Thomas*, 323 U.S. at 545, 65 S. Ct. at 329 (Jackson, J., concurring). *See, e.g., Goldfarb v. Va. State Bar*, 421 U.S. 773, 792, 95 S. Ct. 2004, 2016, 44 L. Ed. 2d 572 (1975) ("We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions."); *Watson v. Maryland*, 218 U.S. 173, 176, 30 S. Ct. 644, 646, 54 L. Ed. 987 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."). [18]

---

[18] Pursuant to that authority, States commonly enact laws touching on what professionals may say. Florida, for example, has quite a few regulations implicating speech by physicians. *See, e.g.*, Fla. Stat. § 381.026 (requiring physicians to communicate various information to patients on request, including: the physician's "name, function, and qualifications"; information

Moreover, the authority of the State to regulate relationships of a fiduciary

character via the common law is, if anything, a more venerable proposition than

---

concerning the patient's "diagnosis, planned course of treatment, alternatives, risks, and prognosis"; various financial information; and a written "statement of patient rights and responsibilities"); *id.* § 381.986 (requiring physicians who prescribe low-THC cannabis to provide information to patients about the potential risks and side effects of, alternatives to, and effectiveness of the treatment, as well as imposing various recording and reporting requirements); *id.* § 456.41 (requiring physicians offering complementary or alternative health care treatments to communicate to the patient, orally or in writing, "the nature, benefits, and risks of the treatment," as well as "the practitioner's education, experience, and credentials in the field," and to indicate the provision of such information in the patient's medical records); *id.* § 458.324 (requiring physicians treating patients diagnosed with or at a high risk for breast cancer to provide various information about treatment alternatives to the patient and document the provision of such information in the patient's medical records); *id.* § 458.325 (requiring physicians, prior to administering electroconvulsive or psychosurgical procedures to a patient, to disclose information regarding the procedure); *id.* § 458.331 (listing various grounds for disciplinary action, including "the use of fraud, intimidation, undue influence, or a form of overreaching or vexatious conduct" to solicit patients; "failing to keep legible . . . medical records" that identify responsible physicians "by name and professional title" and that include sufficient information to "justify the course of treatment of the patient"; and "failing . . . to provide patients with information about their patient rights and how to file a patient complaint"); Fla. Admin. Code R. 64B8-9.007 (requiring surgeons to "verbally confirm the patient's identification, the intended procedure and the correct surgical/procedure site" before operating, and to document such confirmation in the patient's medical records ); *id.* R. 64B8-9.008 (proscribing all "verbal behavior" between a physician and a patient that could "reasonably be interpreted as romantic involvement with [the] patient"); *id.* R. 64B8-9.013 (mandating detailed information physicians must record prior to and during the course of prescribing controlled substances for a patient; requiring physicians to use a "written treatment plan" with specific content; requiring physicians to "discuss the risks and benefits of the use of controlled substances with the patient"); *id.* R. 64B8-9.0141 (prohibiting physicians from "provid[ing] treatment recommendations . . . via electronic or other means" unless the physician completes a "documented patient evaluation," discusses "treatment options and the risks and benefits of treatment" with the patient, and "[m]aint[ains] . . . contemporaneous medical records"); *id.* R. 64B8-11.001 (imposing various restrictions on physician advertising); *id.* R. 64B8-11.002 (prohibiting licensed physicians from representing in their promotional communications that they "are HIV negative or free from AIDS," or implying or stating "that any other licensee is or may be a greater risk to patients due to a failure or refusal to provide similar advertising or notice"); *id.* R. 64B8-11.003 (requiring licensed physicians to identify themselves as such to their patients).

the principle that the State possesses regulatory authority over professions. *See, e.g., Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 588–89, 23 L. Ed. 328 (1875) ("That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings . . . with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."); *see also* 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 218, at 235–36 (13th ed. 1886) ("In . . . cases [in which there is a fiduciary relation between the parties,] the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost degree of good faith . . . in all transactions between the parties. If there is any misrepresentation, or any concealment of a material fact, or any just suspicion of artifice or undue influence, Courts of Equity will interpose . . . ."); *see generally* Tamar Frankel, *Fiduciary Law*, 79–99 (2011) (tracing the roots of government regulation of fiduciary relations back to Hammurabi).

Indeed, one could make the case that when enacting laws governing the type of quintessential professional speech with which we are concerned here, the State has even more regulatory leeway than when regulating promotional speech by professionals, given the fiduciary context within which the former occurs.

However, we need not determine conclusively whether a lesser form of scrutiny ever applies to regulations of professional speech, because in this case the outcome is the same whether a heightened intermediate scrutiny standard or some lesser level of judicial scrutiny is applied. *Cf. Sorrell v. IMS Health Inc.*, ___ U.S. ___, ___, 131 S. Ct. 2653, 2667, 180 L. Ed. 2d 544 (2011) (finding it unnecessary to decide the precise level of scrutiny with which to evaluate speech restriction when the result was the same under either of the two possible standards).

b.

Plaintiffs contend that strict scrutiny is required for several reasons. First, they argue that the Act must satisfy strict scrutiny because it is a content-based restriction on speech—i.e., it restricts physicians from speaking about a certain topic: their patients' status as firearm owners. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305 (1992) ("Content-based regulations are presumptively invalid.") We readily agree that the Act regulates speech on the basis of its content—"Plaintiffs want to speak to [their patients], and whether they may do so under [the Act] depends on what they say." *See Holder*, 561 U.S. at 27, 130 S. Ct. at 2723–24. But this does not seal the Act's fate.

As explained in *R.A.V.*, the Constitution suffers content-based restrictions within certain limited categories of speech that society has determined do not merit full First Amendment protection. *See* 505 U.S. 377 at 382–83, 112 S. Ct. at 2542–

43.  Such regulations "may [not] be made the vehicles for content discrimination unrelated to their distinctly [regulable] conduct," *id.* at 383–84, 112 S. Ct. at 2543, but intra-category content discrimination *is* permissible when the basis for it is the very reason the entire category of speech at issue receives less-than-full protection under the First Amendment, *see id.* at 388, 112 S. Ct. at 2545.[19]  Thus "[a] State might choose to prohibit only that obscenity which is the most patently offensive *in its prurience* . . . [b]ut it may not prohibit . . . only that obscenity which includes offensive *political* messages."  *Id.* at 388, 112 S. Ct. at 2546.

This is the case with the Act.  The State made the commonsense determination that inquiry about firearm ownership, a topic which many of its citizens find highly private, falls outside the bounds of good medical care to the extent the physician knows such inquiry to be entirely irrelevant to the medical care or safety of a patient or any person.  This accords neatly with the rationale for affording diminished protection to the entire category of professional speech—i.e.,

---

[19] In *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305 (1992), the Supreme Court explicitly addressed only those categories of speech that have so little value that they may be completely proscribed, such as obscenity, defamation, and fighting words.  *See id.* at 382–84, 112 S. Ct. at 2543.  We can think of no reason why the Court's reasoning in *R.A.V.* should not extend, perforce, beyond wholly proscribable categories of speech to those categories which, although they may not be of so little value as to warrant flat bans, have traditionally been deemed to merit a diminished level of First Amendment protection, such as commercial speech, or professional speech.  *King v. Governor of N.J.*, 767 F.3d 216, 236–37 (3d Cir. 2014).  Indeed, the Court indicated as much when it used several commercial speech cases to illustrate how the doctrine worked in practice.  *See R.A.V.*, 505 U.S. at 388–89, 112 S. Ct. at 2546.  We therefore proceed with this understanding.

the State's interest in regulating the profession to ensure that its citizens receive safe and effective care.[20]

Plaintiffs also suggest that the Act should trigger strict scrutiny because it is a speaker-based regulation of speech. To the extent that Plaintiffs seriously contend that this is an independent ground for strict scrutiny, Plaintiffs betray a fundamental misunderstanding of the doctrine of professional speech. It simply is not the case that every regulation of speech by professionals—all of which are, by definition, speaker-based—is presumptively unconstitutional. The Supreme Court has never framed its analysis in this way when scrutinizing regulations of speech by professionals. *See, e.g., Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 366–68, 122 S. Ct. 1497, 1503–04, 152 L. Ed. 2d 563 (2002) (reviewing law restricting speech by licensed pharmacists and physicians); *Fla. Bar*, 515 U.S. at 622–24, 115 S. Ct. at 2375–76 (reviewing law restricting speech by lawyers); *Edenfield v. Fane,* 507 U.S. 761, 765–67, 113 S. Ct. 1792, 1797–98, 123 L. Ed. 2d 543 (1993)

---

[20] It may be contended that the basis for the State's restriction is political rather than medical in nature, and that as a result, the Act does not fall within *R.A.V.*'s exception. This argument might have legs if the Act had simply prohibited all discussion of firearms by physicians, or if it had restricted such speech on the basis of a particular viewpoint. Instead, the Act affords physicians wide latitude to speak about firearms—to inquire, to record, even, in some instances, to harass—right up to the point where the physician knows, or no longer believes in good faith, that such speech is relevant to anyone's medical care or safety. *See supra* part IV.A. We think that by defining the boundaries of permissible speech in terms of medical necessity, the State evinced scrupulous heed of the distinction between an impermissible regulation of speech on the basis of content unrelated to the category in which it falls, and an appropriate regulation of speech on a basis that is consistent with the reasons the entire category may be regulated.

(reviewing law restricting speech by accountants); *Casey*, 505 U.S. at 884, 112 S. Ct. at 2824 (reviewing law compelling speech by physicians) (joint opinion); *Friedman v. Rogers*, 440 U.S. 1, 8–14, 99 S. Ct. 887, 893–98, 59 L. Ed. 2d 100 (1979) (reviewing law restricting speech by optometrists).

The reason why restrictions on speech by professionals generally do not offend the Constitution despite the fact that they discriminate on the basis of the speaker's identity is essentially the same reason that restrictions on the basis of the content of the speech are permissible in this area. *See R.A.V.*, 505 U.S. at 383, 112 S. Ct. at 2543. The basis for such restrictions is the very reason that the entire class of speech gets diminished First Amendment protection. The State cannot effectively pursue its interest in regulating professions if it may not draw laws by reference to professional status.[21]

Finally, although Plaintiffs sprinkle fleeting references to viewpoint discrimination throughout their brief, we do not take them seriously to contend that

---

[21] As the Supreme Court noted in *R.A.V.*, however, this does not give the State free rein to turn regulations of professional speech into "vehicles for content discrimination unrelated to their distinctly [regulable] content." 505 U.S. at 383–84, 112 S. Ct. at 2543. We think there exists a nexus requirement in the area of speaker-based restrictions analogous to that present in the area of content-based restrictions. Thus, while a State would be free to restrict the speech of all physicians, or even of certain sub-categories of physicians, provided its rationale was consistent with "the very reason the entire category of speech at issue" receives less than full protection under the First Amendment, it could not, consistent with the First Amendment, impose a restriction on the speech of all physicians who are registered Democrats, because such a restriction would be entirely unrelated to the interest justifying greater regulatory leeway in this area—that of ensuring that medical professionals provide safe and effective medical care. *See id.* at 388, 112 S. Ct. at 2545.

the Act "targets . . . particular views taken by speakers on a subject," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2516, 132 L. Ed. 2d 700 (1995), and for good reason. The Act plainly makes no distinction between speech favoring firearm ownership and speech disfavoring firearm ownership. The target of the Act's restriction is speech of *any* viewpoint on the subject of firearm ownership that the physician knows to be completely irrelevant to the health and welfare of the patient or any other person.

c.

Accordingly, we will proceed under the rubric of intermediate scrutiny. Under this standard, we must uphold the Act if it "directly advances" a "substantial" State interest, and "is not more extensive than is necessary to serve that interest." *See Cent. Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351.

In doing so, we find ourselves in good company. Three of our sister circuits have either applied intermediate scrutiny or strongly suggested that some intermediate level of review was appropriate when assessing regulations of professional speech. *See Stuart,* 774 F.3d at 248 (4th Cir. 2014) (applying intermediate scrutiny to strike down regulation of physicians' speech); *King*, 767 F.3d at 235 (3rd Cir. 2014) (concluding that intermediate scrutiny was the appropriate standard by which to evaluate restrictions on professional speech); *Pickup*, 740 F.3d at 1227–28, 1231 (9th Cir. 2013) (situating speech by

professionals that occurs within the confines of a professional relationship at the midpoint on a continuum between speech by a professional to the public, which receives "robust protection under the First Amendment," and speech by a professional which is "merely incidental" to the conduct of a profession, and "subject to only rational basis review").

4.

When conducting an intermediate scrutiny analysis, we look first to the substantiality of the State's interest. *See Fla. Bar*, 515 U.S. at 624, 115 S. Ct. at 2376. We may not propose hypothetical governmental interests, as in a rational basis analysis; rather we must look to "the precise interests put forward by the State . . . ." *Id.* (quotation marks omitted).

Here, the State asserts that the Act serves several substantial interests, including safeguarding the privacy of patients and their families, facilitating access to medical care, and preventing discrimination and harassment.[22] These interests "obviously factor[] into" the State's "paramount . . . objective," *Fla. Bar*, 515 U.S. at 624, 115 S. Ct. at 2376, in the area of professional regulation—preserving its citizens from harmful or ineffective professional practices, *see* Fla. Stat.

---

[22] Because we ultimately conclude that the State's proffered interest in patient privacy is substantial, we find further discussion of the State's alternative interests unnecessary. *See Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 624 n. 1, 115 S. Ct. 2371, 2376, 132 L. Ed. 2d 541 (1995) (noting that the State need not "point to more than one interest in support of its . . . restriction; a single substantial interest is sufficient to satisfy *Central Hudson*'s first prong").

§ 456.003(2) (stating the Florida legislature's belief that "the preservation of the health, safety, and welfare of the public" is the only permissible objective of regulations of the health professions).  Citing the "social, political, and moral controversy" surrounding firearm ownership in some circles, the State argues that inquiry about the subject is perceived by many to be highly intrusive.  State's Br. 33 (quoting *Johnson v. Bryco Arms*, 224 F.R.D. 536, 543 (E.D.N.Y. 2004)).  In response to concerns expressed by constituents, the State asserts, the legislature enacted the Act to shield patient privacy by limiting the solicitation of information about firearm ownership whenever it is unnecessary to anyone's medical care or safety.[23]  *Id.*

As noted above, the Supreme Court has deemed the State's interest in regulating the practice of professions for the protection of the public not merely

---

[23] Some of the complaints received by the Florida legislature prior to the passage of the Act reflect constituents' concerns that their firearm-ownership status, once entered into their medical record, may be disclosed to third parties.  Plaintiffs contend that this is an irrational fear, and that existing law provides sufficient safeguards for patient privacy.  *See* infra part IV.A.4, at 72.

We need not speculate as to the reasons patients might be uncomfortable disclosing their firearm-ownership status to their physicians, but we note that a patient might wish to keep any number of subjects private when discussion of those subjects is not relevant to his or her medical care.  For example, a patient may not wish to disclose his or her religious or political affiliations, sexual preferences, or bank account balance to a physician.  The Act merely circumscribes the unnecessary collection of patient information on one of many sensitive subjects.  It does so as a means of protecting a patient's ability to receive effective medical treatment without compromising the patient's privacy with regard to matters unrelated to their medical care or safety, or the safety of others.

substantial, but "compelling." *Goldfarb*, 421 U.S. at 792, 95 S. Ct. at 2016. Furthermore, the Supreme Court has also held that "the protection of potential clients' privacy is a substantial state interest." *Fla. Bar*, 515 U.S. at 625, 115 S. Ct. at 2376 (quoting *Edenfield*, 507 U.S. at 769, 113 S. Ct. at 1799). Although the Act was presumably motivated primarily by the privacy concerns of physicians' existing patients, as opposed to potential patients, we see no material difference in the substantiality of the privacy interests at issue. We conclude that protecting the public by regulating the medical profession so as to safeguard patient privacy is a substantial state interest. *Cf. Falanga v. State Bar of Ga.*, 150 F.3d 1333, 1344 (11th Cir. 1998) ("Unquestionably, the interests that the State . . . asserted are substantial, namely, protecting the public from vexatious conduct [by attorneys] . . . [and] preventing invasions of privacy . . . .").

We move to the second step of the intermediate scrutiny analysis: whether the Act directly advances the State's substantial interest. To carry its burden here, the State must establish that the harms that the Act seeks to prevent "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664, 114 S. Ct. at 2470 (plurality opinion). While the State may not rely on "mere speculation or conjecture," *Edenfield*, 507 U.S. at 770, 113 S. Ct. at 1800, it is not required "to present 'empirical data . . . accompanied by a surfeit of background information'" to

justify its restriction. *Falanga*, 150 F.3d at 1340 (quoting *Fla. Bar*, 515 U.S. at 628, 115 S. Ct. at 2378). "Rather, the State['s] . . . case may rest 'solely on history, consensus, and simple common sense[.]'" *Id.* (second alteration in original) (quoting *Fla. Bar*, 515 U.S. at 628, 115 S. Ct. at 2378). Further, "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391, 120 S. Ct. 897, 906, 145 L. Ed. 2d 886 (2000).

We conclude that the State has met its burden of proof under this step of the analysis. As an initial matter, the record contains a number of anecdotes and references to constituent complaints regarding unwelcome questioning about firearm ownership from physicians. *See supra* note 2. Both the Supreme Court and this Court have noted that anecdotal evidence may support a conclusion that the challenged regulation directly and materially serves the State's substantial interest. *See Fla. Bar*, 515 U.S. at 627, 115 S. Ct. at 2377 (describing the extensive anecdotal record presented by the State); *Falanga*, 150 F.3d at 1340 (noting anecdotal evidence of complaints by the public).

More importantly, however, given what the Act actually prohibits—record-keeping about firearm ownership only when the physician knows such information to be irrelevant, *see supra* part IV.A.1, inquiry about firearm ownership only when

the physician lacks a good-faith belief that the information is relevant, *see supra* part IV.A.2, and harassment about firearm ownership only when the physician does not believe it necessary, *see supra* part IV.A.3—we think that "simple common sense" furnishes ample support for the legislature's decision. The State need not point to peer-reviewed studies or conduct extensive surveys to establish that proscribing highly intrusive speech that physicians themselves do not believe to be relevant or necessary directly advances the State's interest in protecting its citizens from harmful or ineffective professional practices and safeguarding their privacy. This is particularly true given the facial plausibility of the legislature's conclusion. *See Nixon*, 528 U.S. at 391, 120 S. Ct. at 906.

Plaintiffs dispute this commonsense conclusion by arguing that existing federal and state laws sufficiently protect patient privacy.[24] As an initial matter, we note that these laws protect information *after* it has been disclosed to physicians; they do nothing to protect information from initial disclosure *to* physicians and their staff. More to the point, if the physician has no need for the information in the first place, then whether that information will be kept in

---

[24] Under regulations promulgated pursuant to the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, covered health care providers may not disclose patient health information except to an enumerated list of entities. 45 C.F.R. § 164.502. Florida law also provides that a patient's medical records must be kept confidential and enumerates only limited circumstances in which a health care provider may share patient records with a third party. Fla. Stat. § 456.057(7)(a).

confidence is irrelevant. The principal harm targeted by the Act is the collection of information regarding, and harassment about, firearm ownership when that information is irrelevant to or unnecessary for the provision of medical care.

Plaintiffs further contend that because firearm ownership is heavily regulated, and individuals who wish to own a firearm must provide considerable personal information to the State, *see* Fla. Stat. § 790.065 (requiring prospective firearm buyers to submit a wide range of personal information and undergo a background check), patients should have no qualms about revealing their status as firearm owners to physicians, and thus the Act does not further patient privacy. Again, we find this argument to be inapposite. The fact that the State may possess information about resident firearm owners is utterly immaterial to whether or not physicians should have access to such information.[25] Moreover, here again, Plaintiffs mistake the actual working of the Act. The purpose of the Act, as we read it, is not to protect patient privacy by shielding patients from any and all discussion about firearms with their physicians; the Act merely requires physicians to refrain from broaching a concededly sensitive topic when they lack any good-faith belief that such information is relevant to the medical care or safety of their

---

[25] Unlike in the Fourth Amendment, there is no "third-party exposure" exception that somehow mitigates the State's interest in protecting the privacy of its citizens. *Cf. Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S. Ct. 2577, 2582, 61 L. Ed. 2d 220 (1979) (explaining that for the purposes of the Fourth Amendment, "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties").

patients or others.  Pointing to circumstances that allegedly diminish patients'

privacy *per se* is off-base.

Given the highly disparate power balance of the physician-patient

relationship,[26] we find it to be clear that extracting private information from a

patient, knowing such information to be irrelevant to the provision of medical care,

is a real harm.  In these circumstances, it is a matter of common sense that

restricting unnecessary inquiry eliciting such information directly advances the

---

[26] One scholar has summarized the power dynamics of the physician-patient relationship thusly:

[R]esearch shows [that] the purpose and structure of the doctor-patient relationship vest physicians with immense authority and power in the eyes of patients.  Physicians' authority derives from their superior knowledge and education, their prestigious social and economic status, and the "charismatic authority" that derives from their symbolic role as conquerors of disease and death. . . .  The confluence of these factors leads to an institutionalization of physicians' "professional dominance" within the structure of doctor-patient interaction that in itself legitimizes physician expressions.

In the face of this dominance, patients suspend their critical faculties and defer to physicians' opinions.  Patients' disempowered position stems from a number of factors, including lack of medical knowledge, the anxiety that accompanies illness, and the need to believe that physicians have the power and competence needed to cure them.

. . . .

These structural inequities also counteract patients' ability to question physicians and redirect the course of a conversation, even if patients have an acute desire to acquire information. Moreover, socio-economic differences between doctor and patient, particularly differences of race, class, gender, or age, further impede communication.

Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 225–28 (1994) (footnotes omitted).

State's substantial interest in regulating the medical profession to prevent harmful or ineffective medical care and safeguard patient privacy.

Under the third and final step of the intermediate scrutiny analysis, we must determine whether the Act is more extensive than necessary to serve this interest. The State "must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188, 119 S. Ct. 1923, 1932, 144 L. Ed. 2d 161 (1999) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 3035, 106 L. Ed. 2d 388 (1989)).

Frankly, we read the Act to be precisely tailored to the State's legitimate interests. The State has not made a sweeping *ex ante* judgment that all conversation and record-keeping about firearm ownership is inappropriate. The Act does not even represent a legislative conclusion that a subset of physician speech is categorically inappropriate. Instead, the Act's prohibitions are directly and entirely coupled to physicians' *own* good-faith judgments about whether such inquiry or record-keeping is medically appropriate in the circumstances of the particular patient's case. *See supra* part IV.A. If, as we have concluded, the State has a substantial interest in regulating the medical profession to prevent ineffective

medical care, in this instance by protecting patients from unnecessary breaches of privacy, what narrower way to advance this interest than by impressing upon physicians the necessity that any inquiry or record-keeping about firearm ownership be the result of a genuine, subjective determination based on medical need? The Act does not falter on this ground.

Accordingly, we hold that the District Court erred by concluding that the Act violates the First Amendment. The Act withstands intermediate scrutiny as a permissible restriction of professional speech.

5.

Finally, we address the second of Plaintiffs' First Amendment challenges: overbreadth. A statute is "overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quotation marks omitted). "The overbreadth doctrine is 'strong medicine' that generally should be administered 'only as a last resort.'" *Locke*, 634 F.3d at 1192 (quoting *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 1838, 170 L. Ed. 2d 650 (2008)).

We reject this challenge for the same reasons that we rejected Plaintiffs' conventional facial free speech challenge. The Act does not prohibit a substantial amount of protected speech because, even accepting that the Act "regulates and

restricts every practitioner's speech on the subject of firearms," it only burdens speech that, as judged by the physician in good faith, lacks a sufficient nexus to the medical care or safety of a particular patient. As the State may validly legislate to ensure "the practice of professions within their boundaries," *Goldfarb*, 421 U.S. at 792, 95 S. Ct. at 2016, and as no one argues that concededly irrelevant speech lies within the scope of good medical practice, we hold that the Act is not overbroad.

## C.

Concluding, we think it appropriate to make two points. First, although we hold today that the Act does not facially conflict with the requirements of the Constitution, we do not, by that holding, foreclose as-applied challenges. Plaintiffs remain free to assert the First Amendment as an affirmative defense in any proceeding brought against them based upon speech made in the course of treatment that allegedly fell outside the bounds of good medical care. By rejecting Plaintiffs' facial challenge to the Act, we are simply refusing to provide Plaintiffs with a declaration that such a defense will be successful.

Second, our decision should not be read as a pronouncement on the Act's "wisdom, need, [or] propriety." *Griswold v. Connecticut*, 381 U.S. 479, 482, 85 S. Ct. 1678, 1680, 14 L. Ed. 2d 510 (1965). That is not our job. Our responsibility, simply and supremely, is "to decide cases agreeably to the Constitution and laws of the United States." *Id.* at 530, 85 S. Ct. at 1707 (Stewart, J., dissenting) (quotation

marks omitted).  Having concluded that the Act does not offend either the First or the Fourteenth Amendments of the Constitution, we must uphold it.

V.

Accordingly, we REVERSE the District Court's grant of summary judgment in favor of Plaintiffs, and VACATE the injunction against enforcement of the Act.

SO ORDERED.

WILSON, Circuit Judge, dissenting:

The Majority has vacated its original opinion and replaced it with one that, unlike the original opinion, subjects Florida's Firearm Owners' Privacy Act (Act) to First Amendment scrutiny. While this is an encouraging development, the Majority believes the Act survives intermediate scrutiny. It does not. For this reason, I continue to dissent.

## I.

Numerous medical organizations, including the American Medical Association (AMA), view firearm related deaths and injuries as a serious public health problem with particularly pernicious effects on children. These organizations believe that this public health problem can be alleviated by providing people, particularly children and their parents, with information about firearm safety.[1] Accordingly, the AMA has, among other things, adopted a policy encouraging "members to inquire as to the presence of household firearms as a part of childproofing the home." Prevention of Firearm Accidents in Children, AMA Policy H-145.990. From the AMA's perspective, this inquiry could not be more

---

[1] *See* Christine S. Moyer, "Public Health Approach: Physicians Aim to Prevent Gun Violence," *American Medical News*, Sept. 10, 2012, *available at* http://www.amednews.com. *American Medical News* is published by the AMA. Moyer's article describes efforts in the medical community to reduce firearm related injuries by using preventive care methods that have been used to address other public health problems such as motor vehicle accidents, smoking, and the spread of diseases.

vital, as the policies are specifically designed to "reduce pediatric firearm morbidity and mortality." *Id.*

Consistent with their beliefs about how best to address this public health problem, a number of Florida doctors, including plaintiffs, followed the AMA's advice. They routinely spoke with patients about firearms, asking patients if firearms were present in the home in order to specifically tailor follow-up safety information. There is no doubt that many doctors genuinely believe that these conversations can help protect their patients and the public. Indeed, some doctors believed these conversations to be so important that they were willing to lose the business of patients who refused to engage.

In response to complaints by patients who found doctors' questioning and counseling on the subject of firearms to be irritating, offensive, and overly political, Florida passed the Act. Simply put, the Act is a gag order that prevents doctors from even asking the first question in a conversation about firearms. The Act prohibits or significantly chills doctors from expressing their views and providing information to patients about one topic and one topic only, firearms.

Regardless of whether we agree with the message conveyed by doctors to patients about firearms, I think it is perfectly clear that doctors have a First Amendment right to convey that message. This Act significantly infringes upon

that right, and it is therefore subject, at the very least, to intermediate scrutiny. Subject to this level of scrutiny, the Act cannot pass constitutional muster.

The State's asserted interests in protecting the rights of firearm owners, including their privacy rights, their rights to be free from harassment and discrimination, and their ability to access medical care, are incredibly important. Were the Act necessary to protect those rights, I believe the Act might survive an intermediate scrutiny challenge. But the State has offered no evidence to show that those rights are under threat, nor is there evidence in the record suggesting that the Act will either directly or materially advance those interests.

Further, those interests must be weighed against doctors' rights to convey their chosen message about firearm safety and to play their chosen role in addressing what they view to be a public health crisis. If there is disagreement in the medical community with the plaintiffs' view that providing patients with information about firearm safety is good for public health, it is certainly not presented in the record before us.[2] Indeed, the record and common sense lead

---

[2] At its annual meeting in August of 2012, the American Bar Association (ABA) adopted Resolution 111,

> oppos[ing] governmental actions and policies that limit the rights of physicians and other health care providers to inquire of their patients whether they possess guns and how they are secured in the home or to counsel their patients about the dangers of guns in the home and safe practices to avoid those dangers.

Citing the AMA policy quoted above, the ABA specifically recognized that

inexorably to the conclusion that children will suffer fewer firearm related injuries if they—and their parents—know more about firearm safety. But now they will know less. As a result of the Act, there is no doubt that many doctors in Florida will significantly curtail, if not altogether cease, discussions with patients about firearms and firearm safety.

Thus, while the Act does not advance the State's asserted interests, the Act does significantly limit doctors' ability to speak to their patients in ways that they believe will protect the public and save lives. The poor fit between what the Act actually does and the interests it purportedly serves belies Florida's true purpose in passing this Act: silencing doctors' disfavored message about firearm safety. This, the State cannot do.

The district court properly invalidated the Act as a content-, speaker-, and viewpoint-based restriction that "chills practitioners' speech in a way that impairs the provision of medical care and may ultimately harm the patient." *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1267 (S.D. Fla., 2012). The Majority reverses and holds that the Act survives intermediate scrutiny under the First Amendment.

---

[p]reventive care through safety counseling is a pillar of modern medicine, and is vitally important to the health and welfare of patients. It is also the ethical and legal responsibility of physicians. Failure to fulfill these duties results in a breach of the objective standard of care owed to patients. . . . Firearms in the home are another known risk factor that doctors may choose to discuss with their patients or the parents of young patients.

Supreme Court and Eleventh Circuit precedent, however, supports the conclusion that the Act cannot survive intermediate scrutiny.

## II.

The Act contains four provisions at issue in this appeal. (1) The "record keeping provision" states that doctors cannot record firearm-related information in medical files that they "know" not to be "relevant." Fla. Stat. § 790.338(1). (2) The "inquiry provision" states that doctors "shall respect a patient's right to privacy and should refrain" from asking patients about firearm ownership, unless the doctor believes in good faith that the information is medically relevant. Fla. Stat. § 790.338(2). (3) The "discrimination provision" states that practitioners "may not discriminate" against patients on the basis of firearm ownership. Fla. Stat. § 790.338(5). (4) Finally, the "harassment provision" states that practitioners "shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing" patients about firearm ownership. Fla. Stat. § 790.338(6).

This Act was passed in response to constituent complaints about the manner and extent to which doctors were discussing firearm ownership with patients. Specifically, as the State explains:

> [A]ctual discrimination experienced by gun owners in Florida directly motivated the Legislature to pass the Act. Among other things, the Legislature heard that: a woman was given 30 days to find a new physician after she refused to answer questions about firearms in her

home; a patient was asked by a physician to remove firearms from his home; a facility separated a mother from her children while interrogating them about firearms; a physician refused to care for a nine-year-old boy because he wanted to know about firearms in the home; citizens were falsely told that Medicaid required them to disclose their firearm ownership and would not pay if they refused to answer; a doctor refused to examine a child when the mother refused to answer firearms questions; and a facility billed for services not delivered after a family refused to answer questions about their firearms.

These experiences show that the Legislature's action in passing the Act overwhelmingly was based on real concerns about protecting constituent privacy and preventing discrimination and harassment during doctor's visits.

A Florida legislator's own experience was similar: "After answering a pediatrician's question about gun ownership, the pediatrician asked that [the legislator] remove the gun from his home. To the legislator, the doctor's conduct constituted 'a political . . . attack on the constitutional right to own a . . . firearm.'" A National Rifle Association representative also complained that questioning patients about gun ownership "to satisfy a political agenda needs to stop." The State asserts that these are examples of what the Act was designed to stop.

Tellingly, the State attempts on appeal to narrow the scope of the Act— though it does so inconsistently. In any event, the Supreme Court has explained that a law restricting speech may be rendered unconstitutional based on "the inevitable effect of [the] statute on its face . . . [or its] stated purposes." *Sorrell v. IMS Health Inc.*, __ U.S. __, 131 S. Ct. 2653, 2663 (2011) (internal quotation

marks omitted).  Therefore, in assessing the constitutionality of the Act, we cannot ignore that this Act will inevitably silence doctors on the topic of firearms in all but the rarest of circumstances.  Doctors risk losing their licenses if they are found to have violated the Act, so they cannot safely assume that the State will only advance the narrow reading of the Act it suggests here.

In a revealing portion of its brief, the State asserts that the "Act *proscribes* only inquiries within the doctor-patient relationship and recordkeeping about firearms that is not relevant to medical and safety concerns."[3]  At this point, difficulties arise because Appellees and the State have different definitions of "relevant."  Many doctors and medical organizations assert that it is always relevant to ask about—and thus, to record—firearm-ownership information.  As discussed, the AMA, as well as the American Academy of Pediatrics, its Florida chapter, the American Academy of Family Physicians, its Florida chapter, the

_____

[3] Here is one of the State's contradictions.  Elsewhere in its briefing, the State asserts that the inquiry provision is not, as it just stated, a proscription but is instead merely advisory.  From a doctor's perspective, however, the Act must be treated as mandatory.  Indeed, the Executive Director of the body responsible for enforcing the Act, the Board of Medicine of the Florida Department of Health (Board), mailed a letter to physicians stating that the inquiry provision was mandatory.  But in a change of course, the Board posted to its website shortly after Appellees filed suit that, in fact, the provision was only advisory.  The State's argument that the provision is only advisory is not a bad one, because unlike other provisions which use the clearly mandatory word "shall," the inquiry provision uses the ambiguous word "should."  But it would be extremely risky for doctors to rely on this interpretation, given that the timing of the Board's change in course suggests that it may only have been part of the State's litigation strategy.  There are no assurances that, once this litigation ends, the Board will not revert back to its broader interpretation.  Further, the State interprets the same word ("should") to be mandatory in the context of interpreting the harassment provision—though the State vacillates on this interpretation, as well.

American College of Physicians, and its Florida chapter all recommend providing counseling and guidance on a variety of injury-prevention topics including firearm safety. Doctors thus quite legitimately insist that asking firearm-related questions as a matter of course and recording the information in medical files is good for their patients' health and for the public's safety.

As the incidents discussed in the legislative history suggest, however, the Act was apparently designed to prohibit doctors from routinely asking about firearm ownership on prescreening, informational forms. Appellees rightly suspect, despite the State's present assurance to the contrary, that the standard of relevance contemplated by the Act is higher than the Appellees' own standard. Consequently, for purposes of assessing the Act's constitutionality, I assume that many doctors, absent some particularized fact or circumstance indicating that firearm ownership is particularly relevant,[4] will stop asking about and recording this information.[5]

---

[4] And how will physicians be able to make the relevance determination without inquiring? I will return to this issue in the coming discussion.

[5] It appears that the Act determines as a matter of State law that firearm ownership is not medically relevant in all cases for preventive medicine purposes. Elsewhere in its briefing, however, the State emphasized that the Act specifically allows doctors to ask about firearms whenever they believe "in good faith" that the information is relevant and to record such information unless they "know" it to be irrelevant. From this, the State concludes that "the Legislature enabled physicians to make these inquiries *of any or all patients*" if the doctor holds a different view of medical relevance than the State. This interpretation, of course, would *allow* the inquiries detailed in the legislative history; precisely the same inquiries the State previously

The Act also prohibits "discrimination" on the basis of gun ownership. One might reasonably expect, based on the incidents that prompted passage of the Act, that this provision bars doctors from declining to treat a patient who refuses to answer questions regarding firearm ownership. The Act explicitly affords doctors the continued right to refuse to treat such patients, however, *see* Fla. Stat. § 790.338(4), so the Legislature apparently intended to prevent other forms of discrimination when it passed the Act. The State asserts that "actual *discrimination* experienced by gun owners in Florida directly motivated the Legislature to pass the Act." This statement is followed by the list of incidents contained in the legislative history. As noted above, the State also explained that the Act was passed in response to questioning about gun ownership and follow-up recommendations to make such ownership safer, including recommendations to remove guns from the home entirely. These discussions, which some constituents and legislators perceive to be a political attack, could be viewed as discriminatory. Based on their status as gun owners, some patients are subjected to uncomfortable conversations about firearms, while others are not. Because the State explicitly

stated that the Act was designed to prevent. Given this uncertainty, doctors who wish to ask about firearm ownership in all cases would be taking a significant risk if they continued to do so.

A bit more is said on this point in Part IV, *infra*, in relation to my brief discussion on vagueness.

acknowledges that the legislative history provides examples of what constitutes discrimination, doctors reasonably fear punishment for discrimination under the Act for speaking as the doctors did in the above-cited incidents. Accordingly, the discrimination provision, like the record keeping and inquiry provisions, will cause doctors not to ask about or make recommendations regarding firearm ownership, particularly if patients are initially resistant to information on this topic.[6]

The harassment provision chills doctors' speech even further. The State explains that "the Legislature enabled physicians to make [firearm ownership] inquiries of *any or all patients*, provided they do so with the belief that the inquiry is relevant to the patient's care. Logically then, if a physician seeks firearms information to suit only a political agenda unrelated to the patient's well-being, . . . he *may be unnecessarily harassing his patient . . . .*" As Appellees' brief explains, consistent with AMA policy, many doctors believe that asking about firearm ownership is related to the patient's well-being in all cases, which is why questions

---

[6] Given the overall purpose of the Act and the Act's legislative history—considered in light of the State's assertions that that legislative history is illustrative of what constitutes "discrimination"—we must view the harassment and discrimination provisions as designed to reinforce the inquiry and record keeping provisions. Moreover, the fact that the Act explicitly allows the primary form of discrimination that actually occurred—that is, doctors turning away patients who refused to answer questions about firearms—belies the notion that the discrimination provision is meant to address *actual* discrimination experienced by firearm owners. It may indeed prohibit some of the discriminatory conduct that the State speculates *might* occur, and it would not create a constitutional problem if that is all it did. In this context, however, it is difficult to see the discrimination provision as anything other than reinforcement of the other provisions prohibiting doctors from saying and writing certain things.

about firearm ownership were asked by many doctors before the passage of this Act.  As the legislative history makes clear, however, these routine inquiries and the follow-up conversations they prompted were deemed by constituents and legislators to be part of an anti-firearm political agenda which the State defines in its briefing as unnecessary harassment.

Most of the incidents discussed in the legislative history appear to involve nothing more than a disagreement between the doctor, who perceived the gun-related information to be relevant to the patient's well-being, and the patient, who perceived the information to be part of an unwelcome political attack.  The harassment provision of the Act suggests that the State has taken the patients' side in this disagreement.  There is nothing to suggest that the doctors' inquiries or messages regarding firearms were not genuinely believed to be in the patients' best medical interest when given.  But there is evidence in the legislative history to suggest that the harassment provision is designed to prevent these conversations from taking place in the future.  That is certainly the result it will achieve.  Doctors will largely cease inquiring into and counselling on the topic of firearms, lest they be accused of crossing the line between providing life-saving preventive medical information and promoting an anti-firearm political agenda.[7]

---

[7] In its initial brief, the State asserted (most, though not all of the time) that the word "should" in the inquiry provision rendered the provision purely advisory.  Regarding the

Under this Act, then, one group of speakers, medical professionals, is prohibited or at least chilled from engaging in a great deal of speech about one topic, firearms. Doctors cannot ask routine questions about firearm ownership of all incoming patients as they did before, despite the fact that a host of medical associations suggest that they should. Doctors cannot record information about their patients' firearm ownership in highly-confidential medical files, even though the information may later prove essential to the doctor in a medical malpractice suit or to the patient in an emergency situation. Doctors also cannot provide firearm safety information and advice without running the risk of facing discipline if their medical efforts are construed to be part of a political agenda. Though the State offers reasons to believe that the Act might not be interpreted to prohibit all of these things, at various points in its briefing, the State accepts that these forms of speech are the intended targets of this Act. Under a reasonable interpretation of

---

harassment provision, which included the exact same word, "should," the State asserted that the provision "*prohibit[s]* facilities and practitioners from . . . unnecessarily harassing patients who own guns." The same word used in the same statute rendered one provision advisory but the other mandatory. In an effort to correct this contradiction, the State asserted in its Reply Brief that "the Legislature provided physicians with the freedom to . . . unnecessarily harass patients about firearms, while . . . *suggesting* that they not broach these areas." If the State cannot even decide from one brief to the next whether the Act prohibits or merely advises against unnecessarily harassing patients, doctors certainly cannot rely on the State's self-contradictory assurances that they will not seek to punish doctors under the harassment provision for speaking in ways that some constituents deem to be political. As Judge Tjoflat recognized at oral argument, these rules will simply cause doctors to "steer clear."

the Act, then, doctors are potentially subject to discipline for talking about firearms with their patients in all but a few narrow circumstances.

One final observation is in order regarding the Act's interpretation. The State deemed the district court's decision to treat the inquiry and harassment provisions as mandatory rather than advisory as an intentional "effort to render the Act unconstitutional." The Majority, however, accepts the district court's interpretation that the inquiry and harassment provisions are mandatory. Thus, despite accepting an interpretation of the Act that even the State suggests would "render the Act unconstitutional," the Majority strikingly holds that the Act survives First Amendment scrutiny. In other words, the Majority has gone further in limiting speech rights than the State argued it should or could.

### III.

The Act proscribes speech about one topic (firearms) by one group of speakers (medical professionals). As such, the Act must be subjected to at least intermediate scrutiny, a standard it fails to satisfy. Accordingly, I conclude that the Act is unconstitutional.

### A.

Recently, in *Sorrell*, the Court invalidated a "statute [that] disfavors marketing, that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers." 131 S. Ct. at

2663.  Here, the Act directly prohibits firearm related inquiries and record keeping, as well as persistent discussions on the topic,[8] "that is, speech with a particular content.  More than that, the statute disfavors specific speakers, namely," doctors.  *See id.*  Thus, "[t]he law on its face burdens disfavored speech by disfavored speakers, [and] [i]t follows that heightened judicial scrutiny is warranted."  *Id.* at 2663–64.  Indeed, "[t]he First Amendment requires heightened scrutiny *whenever* the government creates a regulation of speech because of disagreement with the message it conveys."  *Id.* at 2664 (emphasis added) (internal quotation marks omitted).

The speech restricted here is part of a tradition of exceptional protection, and it certainly is not within an area traditionally subject to "proscription."  The Court has explicitly recognized the importance of a free flow of information between doctor and patient, which this Act explicitly and directly limits.  "[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."  *Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 913 (1980).  Relatedly, a "consumer's concern for the free flow of . . . speech . . . has great relevance in the

---

[8] The Majority defines "to harass" as "[t]o disturb or irritate persistently."  Maj. Op. at 36.  Many firearm owners—as evidenced by the legislative history—are irritated by virtually all discussions with their doctors about firearms.  Thus, doctors "harass" their patients by persistently discussing firearms.

fields of medicine and public health, where information can save lives." *Sorrell*, 131 S. Ct. at 2664 (internal quotation marks omitted).

And even if we assume that only speech which the State defines as medically irrelevant will be proscribed, Justice White's concurrence in *Lowe v. S.E.C.* explains that while "the [S]tate may prohibit the pursuit of medicine as an occupation without its license, . . . I do not think it could make it a crime publicly *or privately* to speak urging persons to follow or reject any school of medical thought." 472 U.S. 181, 231, 105 S. Ct. 2557, 2584 (1985) (White, J., concurring) (emphasis added) (internal quotation marks omitted). Under the Act, doctors run the serious risk of being disciplined for harassing patients by pushing a "political agenda" if they speak (too forcefully or persistently) to their patients about schools of medical thought which deem firearm ownership relevant.

There exists a second reason why the speech being silenced here deserves protection under the First Amendment. Greater protections are afforded to speech dealing with matters of public concern, which include "any matter of political, social, or other concern to the community." *Snyder v. Phelps*, __ U.S. __, 131 S. Ct. 1207, 1216 (2011) (internal quotation marks omitted). Firearm safety qualifies as a public concern under that standard. So, too, does state regulation of health care. Under the Act, speech by Florida doctors to their patients regarding the former is almost entirely prohibited, and speech about the latter, as it relates to the

Act itself, is significantly chilled lest a doctor's complaint about the Act be perceived as harassing, anti-gun politicking.  Further, under the Majority's holding, speech about the latter could be eliminated entirely from the doctor-patient relationship.[9]

Further still, "the law's express purpose and practical effect are to diminish the effectiveness" of firearm safety messages delivered by doctors.  *Sorrell*, 131 S. Ct. at 2663 (explaining that "the inevitable effect of a statute on its face" and "a statute's stated purposes" may be considered for purposes of evaluating constitutionality (internal quotation marks omitted)).  Doctors asked patients about firearms in order to give specifically tailored—and thus more effective—firearm safety information.  Indeed, amicus curiae supporting the State's legislation

---

[9] *Snyder* also explains that "whether speech is of public or private concern requires us to examine the content, form, and context of that speech."  131 S. Ct. at 1216 (internal quotation marks omitted).  The content of the speech prohibited by the Act certainly concerns the public, as the speech prohibited by this Act has been recognized by the AMA to be part of an effort to address a public health problem.  The form and context perhaps cut in the opposite direction, but not necessarily.  When a doctor speaks in private to her patients about a topic like firearm safety during the course of an examination, the message may have a fairly significant impact on the patients' views about guns because doctors are trusted, knowledgeable, and presumably genuinely interested in the health consequences of firearms rather than the political consequences of them.  To many listeners, even those well-attuned to Second Amendment political debates, a doctor's advice could offer a new, perhaps previously unconsidered perspective that may well change public views as well as personal practices.  The State was no doubt aware of the great influence doctors' knowledge and information sharing might have on the public firearm debate, and because the State disagreed with the doctors' powerful message, it silenced them.

On topics concerning public health, doctors' ability to inform their patients one-on-one about the consequences of legislation seems even more clearly to be a matter of public concern, even though the speech is conveyed in private.

explain that the Act is necessary because a "doctor's questions can interfere with patients' exercise of the right [to bear arms] by putting patients in a hesitant position where *they question their ownership of firearms* because of physician disapproval." That statement is staggering. It suggests that the perceived problem with doctors' truthful, non-misleading message regarding firearm safety was that it was working, so the message was silenced. That is classic viewpoint discrimination.

Despite the State's contention that pro-gun doctors are silenced on the topic just as surely as anti-gun doctors, the Act's legislative history erases any doubt as to which viewpoint the State sought to silence. As discussed, the legislative history confirms that the purpose of the Act was to silence firearm-safety messages that were perceived as "political attacks" and as part of a "political agenda" *against* firearm ownership. Moreover, the State's argument that the Act is meant to protect the rights of firearm owners—in conjunction with the argument's neglect of the rights of non-owners—further evidences which side the State is taking in this fight. Thus, "[i]n its practical operation, [Florida's] law goes even beyond mere content discrimination, to actual viewpoint discrimination." *Id.* (internal quotation marks omitted). "It follows that heightened judicial scrutiny is warranted." *Id.* at 2664.

The Supreme Court has recognized that "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v.*

*Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818, 120 S. Ct. 1878, 1889 (2000).

Content-based statutes, therefore, "are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992).  Based on the foregoing, the only choice I believe we have to make is one between strict and intermediate First Amendment scrutiny.  As Part IV below shows, the Act is unconstitutional under either standard so deciding between the two is unnecessary.

## B.

The Majority is now persuaded that the Act is subject to some level of scrutiny under the First Amendment.  It is the analysis that follows where we part ways, as the Majority leaves open the possibility of a more deferential approach to restrictions of speech within the boundaries of a professional relationship.

## 1.

The Majority's analysis creates a two-dimensional, four-category framework for assessing the scrutiny applicable to speech by professionals and assigns varying levels of scrutiny accordingly.  To the extent that framework acknowledges that professionals speaking outside the confines of a professional relationship on matters unrelated to the profession are entitled to the same First Amendment protection as non-professionals are, I agree with that conclusion.  There is no reason to think that the State's authority to regulate a profession extends to the entirety of a professional's existence.  In addition, the Majority's conclusion that

laws restricting speech by professionals furthering the profession outside a professional relationship, including commercial speech, must be subjected to First Amendment scrutiny is well-settled. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 111 S. Ct. 2720 (1991); *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 620, 623–24, 115 S. Ct. 2371, 2374, 2375–76 (1995).

The Majority then goes on to divide, within the context of a direct, professional relationship, speech furthering the practice of the profession from that irrelative to the profession; the Majority concludes that the Act regulates the former category. According to the Majority, in this context, the governmental regulatory interest peaks, while the citizen's interest in giving and receiving information reaches its nadir. Thus, while the Majority leaves the question open, it declares that this category of speech may actually be subject to a level of scrutiny more deferential than intermediate scrutiny.

This novel framework and the significance that the Majority attaches to it are problematic. It diminishes the First Amendment protection afforded to professionals by permitting the State to silence professionals on whatever topic the State sees fit. That is not what the Constitution commands. Our precedent instructs that intermediate scrutiny should apply, and we relax this standard for restrictions on a professional's speech only where certain characteristics so justify.

Justice White's concurrence in *Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring), and *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) stand for the proposition that a law regulating professional conduct that burdens speech may evade First Amendment scrutiny only when: (1) the law is a licensing scheme regulating entry into a profession; (2) the impact on speech (an impact felt only by unlicensed, would-be practitioners) is incidental to a broader State goal (ensuring the quality of the State's professionals); (3) the burden on speech is content-neutral; and (4) the prohibition on unlicensed individuals' speech does not extend beyond the confines of a one-on-one professional-client relationship. Only the fourth condition is present here. Thus these cases are readily distinguishable.

Some laws burdening speech evade First Amendment scrutiny where the burdens occur within a professional setting. *See Locke*, 634 F.3d at 1191 ("'If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it *cannot be said to have enacted a limitation on freedom of speech . . . subject to First Amendment scrutiny*.'") (alteration in original) (emphasis added) (quoting *Lowe*, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring))). Where this rule applies, the law is subject only to rational basis review. *Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (requiring only that the regulation "have a rational connection with the applicant's fitness or capacity to practice the profession" (internal quotation marks omitted)).

But this rule does not apply here, because, while there is one similarity between the regulations at issue in those cases and the Act here, there are several critical differences.

The similarity is that *Lowe*, *Locke*, and this case all consider speech that occurs within the confines of a one-on-one professional relationship. In *Lowe*, the defendant was accused of providing investment advice without a license, in violation of federal law. *Id.* at 227, 105 S. Ct. at 2582. Justice White considered the First Amendment implications of the fact that the investment "advice" was published broadly, suggesting that Lowe might not be engaged in the practice of investment advising at all. *Id.* Ultimately, Justice White concluded that the First Amendment protected Lowe's right to convey this investment-related information for a profit, even if he had no license. *Id.* at 233, 105 S. Ct. at 2584–85. In discussing the First Amendment implications of licensing schemes generally, Justice White concluded that a professional who "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." *Id.* at 232, 105 S. Ct. at 2584. On the other hand,

> [w]here the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as

> legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment[] . . . .

*Id.* Justice White concluded that because the defendant's activities fell into the latter category, the First Amendment applied.

Thus, *Lowe* established only that the existence of a professional relationship is a *necessary* condition if a law burdening speech is to evade First Amendment scrutiny. Nothing in *Lowe* implied that such a condition was *sufficient* to support this conclusion. In fact, *Lowe* suggests three more conditions, all of which have been present in subsequent cases applying *Lowe*'s rule, and none of which are present here.[10]

In addition to the above condition, *Lowe* also contemplated that speech would be burdened without First Amendment scrutiny only if the burden was a consequence of a professional licensing scheme. *Id.* at 229, 105 S. Ct. at 2583 (discussing "the principle that the government may restrict entry into professions and vocations through *licensing schemes*" (emphasis added)). And there is a third condition, which recognizes that the government's ability to burden speech through a licensing scheme without implicating the First Amendment "has never been extended to encompass the licensing of speech per se or of the press." *Id.* at 229–

---

[10] There is one exception from the Ninth Circuit, which is readily distinguishable from the instant case, as will be discussed below.

30, 105 S. Ct. at 2583.  This reasoning has developed into a rule that "any inhibition [must be] merely the *incidental effect* of observing an otherwise legitimate regulation."  *Locke*, 634 F.3d at 1191 (emphasis added) (internal quotation marks omitted).  In cases contemplating *Lowe* (and subsequently, *Locke*), the State's regulation was not directed at speech but instead at improving the overall quality of a profession, broadly speaking, by ensuring that only qualified individuals practice the profession.  *See, e.g.*, *id.* (relying on *Lowe* to uphold a statute restricting the practice of interior design to licensed professionals); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (relying on Justice White's reasoning in *Lowe* to uphold a statute restricting the use of certain terms in the work product of unlicensed accountants).

A fourth and final condition that is implicit in the rule contemplated in *Lowe* is content-neutrality—at least to a far greater extent than is present here.  To be sure, the SEC's prohibition applied only to the topic of investment advising, but within that field, it did not differentiate.  It was not as if unlicensed advisers were left free to recommend investment products the government preferred—such as government bonds—but restricted from recommending anything else.  Similarly, in *Locke*, unlicensed designers were not left free to recommend design techniques the government might prefer—such as energy saving, "green" designs—but restricted

from recommending anything else.  In this way, at least, the burden on speech in cases like *Lowe* is content-neutral.[11]

Further, First Amendment scrutiny is not eliminated simply because burdened speech occurs in the course of conducting one's business as a professional.  Even in cases involving speech that is spoken only in pursuit of one's profession, the Court has applied intermediate First Amendment scrutiny. *See Sorrell*, 131 S. Ct. at 2667–71 (applying intermediate First Amendment scrutiny to a law prohibiting pharmacies from selling records of doctors'

---

[11] Contrary to the Majority's assertion, the *R.A.V.* principle—that content discrimination is permissible where the basis for that discrimination is a reason the speech receives lesser protection "should . . . extend . . . beyond wholly proscribable categories of speech to those categories which . . . have traditionally been deemed to merit a diminished level of First Amendment protection, such as . . . professional speech"—is inapposite. *See* Maj. Op. at 63 n.19.  That principle contemplates, for example, banning only obscenity excessive in its prurience or price advertising exclusively in an industry especially prone to fraud; prurience and fraud are bases for withholding full First Amendment protection from obscenity and commercial speech, respectively. *See R.A.V.*, 505 U.S. at 388–89, 112 S. Ct. at 2545–46.  On the other hand, a state could not ban obscenity or commercial speech only if it contained a particular political message. *See id.*

The Act clearly relates more closely to the political speech ban.  Besides the obvious—that it restricts speech on a topic that is, at least currently, substantially politically charged—the State's purported interests do not relate to any reasons for limiting First Amendment protection applicable to professional speech.  First, nothing about the State's authority to regulate professions has anything to do with protecting Second Amendment rights, as physicians are in no better position to violate those rights than any other citizen, a point I discuss more robustly herein.  Second, while privacy may well be an interest that supports a potential limitation on protection afforded to professional speech, that would warrant a restriction that applies to a wide range of matters about which doctors currently may freely inquire, not one that applies to firearm ownership only.  Finally, there is no evidence that firearm owners have encountered barriers to the receipt of healthcare, discrimination, or harassment, another point I will address; in other words, a restriction on content related to guns is unrelated to the State's regulation of the profession because there is nothing to suggest that it furthers that interest.

prescribing patterns to pharmaceutical salespeople); *Went For It*, 515 U.S. at 620, 623–24, 115 S. Ct. at 2374, 2375–76 (subjecting a regulation prohibiting lawyers from engaging in certain forms of direct advertising to intermediate First Amendment scrutiny); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010) (recognizing that when "conduct triggering coverage under the statute consists of communicating a message," First Amendment scrutiny still applies).[12]

In *Locke*, all four conditions were satisfied. The challenged provision was a content-neutral professional licensing scheme applicable to interior designers that incidentally burdened the speech of unlicensed designers by prohibiting them from giving one-on-one design advice. 634 F.3d at 1191. The four conditions from *Lowe* were met, and First Amendment scrutiny was not applied. *See also Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring) (recognizing that First Amendment scrutiny does not apply to "[r]egulations *on entry into a profession*" (emphasis added)).

---

[12] Even if speech may fairly be characterized as conduct, a regulation which targets conduct that consists almost entirely of speech is not immune from First Amendment scrutiny. To be sure, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was *in part* initiated, evidenced, or carried out by means of language . . . ." *Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring) (emphasis added) (internal quotation marks omitted). If conduct is primarily carried out by language, however, it becomes difficult to claim that a regulation of that conduct creates merely an incidental burden on speech. The speech then seems to fall under the rubric of commercial speech, subject to intermediate scrutiny. *See, e.g., Sorrell*, 131 S. Ct. at 2667–68.

The Act is not a licensing scheme, rendering *Locke* and *Lowe* inapposite, and the differences do not stop there. The Act's purpose is not to regulate the profession of medicine as a whole but rather to regulate one, narrow aspect of professional speech. Further, the Act does not incidentally burden speech as a consequence of the State's pursuit of improving the overall quality of the profession as a whole. Instead, the Act directly targets speech per se by licensed professionals, not just speech incidental to the practice of a profession by the unlicensed.[13] The Act prohibits inquiries, record keeping, and unnecessarily harassing and discriminatory expression—which may consist of nothing more than recommendations to store firearms more safely or to remove them from homes with children if those recommendations are taken to be "political attacks"—on one topic, firearm ownership and safety. This of course renders the Act content-based rather than content-neutral, distinguishing this case even further from *Locke*.

---

[13] Indeed, considering exactly what the inquiry provision purports to do shows how far removed the Act is from the scenario contemplated in *Lowe*. The inquiry provision prohibits doctors from asking irrelevant questions about firearms. For example, if a doctor and his patient have gotten to know each other over the years, the doctor may ask the patient whether he owns a firearm in order to see if the patient might like to go hunting. That inquiry is plainly irrelevant to the patient's care, so it is an obvious example of what the inquiry provision prohibits. *Lowe* directly states that such inquiries are speech, not professional conduct: "Where . . . a speaker does not purport to be exercising judgment on behalf of any particular individual," as would obviously be the case when a doctor is asking his patient if he owns a firearm because he wants to arrange a hunting trip, "government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment[]." 472 U.S. at 232, 105 S. Ct. at 2584. Thus, *Lowe* directly states that the inquiries prohibited by the Act are not legitimate regulations of professional conduct but are instead direct regulations of speech.

*Lowe*'s rationale has wisely not been extended beyond these parameters. *Lowe* articulated reasons for *limiting* government intrusion into free expression. It recognized only that a very narrow category of speech—speech by unlicensed professionals engaging in the one-on-one practice of a profession for which they are unqualified—could be incidentally burdened as a consequence of licensing an entire profession. The holding of *Lowe* and the purpose of Justice White's concurrence was to narrow that category, and thus to expand the free speech rights even of unlicensed professionals. By saying that unlicensed professionals' free speech rights expanded, *Lowe* was not implying that licensed professionals' free speech rights narrowed. The Supreme Court has explicitly warned against reading First Amendment case law in this way: "A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." *United States v. Alvarez*, __ U.S. __, 132 S. Ct. 2537, 2545 (2012) (plurality opinion).

*Lowe*'s rationale further supports the conclusion that licensed professionals enjoy First Amendment rights even when they are speaking within the confines of a professional relationship. Justice White explained that

> a State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar. . . .
> . . . .
>        . . . Clients trust in investment advisers, if not for the protection of life and liberty, at least for the safekeeping and accumulation of property. Bad investment advice may . . . lead to ruinous losses for the client. To protect investors, the Government . . . may require that

investment advisers, like lawyers, evince the qualities of truth-speaking, honor, discretion, and fiduciary responsibility.

472 U.S. at 229, 105 S. Ct. at 2582–83 (White, J., concurring) (internal quotation marks omitted). Licensed professionals thus occupied a venerated position in *Lowe*, as these professionals perform functions in society that cannot be trusted to just anyone. And it was only because of this compelling rationale that the unqualified could be silenced at all. Far from venerating professionals who deliver what *Lowe* recognized to be critical advice, the Act here prohibits licensed medical professionals from exercising their judgment, making inquiries, and engaging in the kind of persistent counseling that they believe will improve the well-being of their patients.

Despite this precedent, the Majority maintains that some lesser level of scrutiny may apply to speech by professionals within the confines of a professional relationship. Instead of recognizing that licensed professionals' speech is particularly valuable, the State's decision to silence certain speech is approved by the Majority precisely because the speakers are so qualified. The State could not rely on the Majority's rationale to, for example, silence non-professionals, who are unqualified to give firearm safety advice, from making inquiries in private about firearm ownership, even though silencing that type of speaker is what *Lowe* envisioned. Instead, the Majority's rationale would allow the State to silence any and all professionals who *are* qualified to give such advice because their speech,

when spoken in a private, professional setting is converted from protected private speech to virtually unprotected professional conduct. This turns *Lowe* on its head.

As amicus favoring the Act seemed to admit, doctors were silenced because their speech was causing patients to question whether the safety concerns associated with firearm ownership outweighed the benefits. The Court has very recently rejected this as an appropriate rationale for silencing speech: "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 131 S. Ct. at 2671. It is thus clear that *Lowe* is distinguishable both factually and based on its rationale. We should not set aside a compelling body of case law that consistently applies First Amendment scrutiny to content-based restrictions based on an extension of an inapplicable line of cases.

**2.**

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791 (1992), reaffirms that intermediate scrutiny is appropriate here. The regulation in *Casey* compelled doctors to advise women seeking abortions about various health consequences and alternatives. *Id.* at 884, 112 S. Ct. at 2824 (plurality opinion). The personal nexus between professional and client that exists here and that existed in *Locke* was also present in *Casey*. Unlike *Locke*, however, *Casey* involved a regulation targeted at speech about a specific topic within the medical profession rather than a general regulation restricting entry to the

profession as a whole. *Casey* is thus more analogous to this case and helpful in identifying the applicable level of scrutiny, though it is worth noting that the relevant First Amendment discussion consisted only of three sentences in a three-member opinion that did not speak for the Court.[14] Therefore, *Casey*'s statement—that "First Amendment rights . . . [were] implicated"—instructs that the Act is subject to First Amendment scrutiny. *See* 505 U.S. at 884, 112 S. Ct. at 2824. The fact that *Casey* upheld the provision at issue there does not mean that the provision was not subject to *any* First Amendment scrutiny. That Justice O'Connor's opinion in *Casey* did not apply Justice White's framework from *Lowe* is not an insignificant detail that can be cast aside. *Casey* did not apply Justice White's framework because Justice White's framework was inapplicable. That is why Justice White in *Lowe* and Justice O'Connor in *Casey* reached opposite conclusions about whether the First Amendment was implicated, and that is why the two opinions cannot be treated as if they applied the same level of scrutiny.

Thus, it is clear that unlike *Locke*, the regulation in *Casey* was subjected to some level of First Amendment scrutiny. Given the brevity of *Casey*'s First Amendment discussion, identifying what level of scrutiny was applied is difficult.

---

[14] Justice O'Connor's opinion constituted the judgment of the Court as to Parts I, II, III, V-A, V-C, and VI only. The First Amendment discussion falls in Part V-B, and Justice O'Connor was joined only by Justices Kennedy and Souter in this Part.

*Casey* noted only that, although the First Amendment applied, the speech was "subject to reasonable licensing and regulation" because it was "part of the practice of medicine." 505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion). It is clear from this statement that strict scrutiny was not applied. *See, e.g.*, *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 575 (5th Cir. 2012) ("The plurality response to the compelled speech claim is clearly not a strict scrutiny analysis."). The Fourth and Ninth Circuits havecharacterized *Casey* as applying "intermediate scrutiny." *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539, 554 (4th Cir. 2012), *vacated on reh'g en banc on other grounds*, 721 F.3d 264 (4th Cir. 2013); *see also Pickup v. Brown*, 740 F.3d 1208, 1228 (9th Cir. 2013) (placing *Casey* at the midpoint on the continuum of First Amendment protections). Other Circuits have not definitively answered the question.

Although *Casey* did not explicitly state that intermediate scrutiny applied, I believe the Fourth and Ninth Circuits are correct. Immediately before addressing the First Amendment issue, the Court in *Casey* recognized that the State had "a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth." 505 U.S. at 882, 112 S. Ct. at 2823 (plurality opinion). The requirement also advanced the "legitimate goal" of ensuring that women do not unwittingly suffer "devastating psychological

consequences" of less-than-fully-informed decision making and "protecting the life of the unborn." *Id.* at 882, 884, 112 S. Ct. at 2823–24. To advance these goals, the Court found "legislation *aimed at* ensuring a decision that is mature and informed" to be constitutional. *Id.* at 883, 112 S. Ct. at 2824 (emphasis added). Further, the Court discussed the ways in which the speech requirement was narrowly drawn: it was limited to "truthful and not misleading" information, and "the statute [did] not prevent the physician from exercising his or her medical judgment" not to provide the information in certain situations. *Id.* at 882, 884, 112 S. Ct. at 2823–24.

This analysis mirrors an intermediate scrutiny analysis and shows that the law in question passes constitutional muster under that standard. *See Sorrell*, 131 S. Ct. at 2667–68 (explaining that to survive intermediate scrutiny, "the State must show at least that the statute [1] directly advances [2] a substantial governmental interest and [3] that the measure is drawn to achieve that interest" (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S. Ct. 2453 (1980))). I therefore believe that *Casey* applied something akin to intermediate First Amendment scrutiny.

Even if the Majority is correct that *Casey* applied something less than intermediate scrutiny, *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 105 S. Ct. 2265 (1985), confirms that intermediate scrutiny applies here. In *Zauderer*, the Court applied a "reasonable relation"

standard of First Amendment review, similar—in wording, though not necessarily in form—to the one applied in *Casey*. *Id.* at 651, 105 S. Ct. at 2282 (holding that although the First Amendment was implicated, the regulation compelling disclosure of certain information in advertisements was constitutional as long as it was "reasonably related to the State's interest"). *Zauderer* explained that the reasonableness standard applied there was less rigorous than intermediate scrutiny, *see id.* at 651 n.14, 105 S. Ct. at 2282 n.14, but the case highlights a distinction that proves intermediate scrutiny applies here, even if it did not in *Casey*. *Zauderer* recognized that a *restriction* on advertising would be subject to intermediate First Amendment scrutiny under the test applied in *Sorrell* and *Central Hudson*. *Id.* at 644, 105 S. Ct. at 2278. "Reasonableness" scrutiny applied only where the provision at issue *compelled* truthful speech but did not prohibit speech in any way. *Id.* at 651, 105 S. Ct. at 2281–82. Thus, when speech is *prohibited* rather than compelled, reasonableness-scrutiny is ratcheted up to intermediate scrutiny. *Casey* involved a provision compelling speech, while this case involves a prohibition on speech, so even if reasonableness scrutiny was applied in *Casey*, scrutiny should be ratcheted up to the intermediate level here.[15] This again

---

[15] The significance of compelling speech as opposed to restricting it can be observed in *Casey* itself. It is difficult to imagine that a statute *prohibiting* a doctor from providing truthful, non-misleading information concerning the risks of abortion and abortion alternatives would survive a First Amendment challenge.

confirms that a content-based restriction like the Act here will always receive at least intermediate scrutiny.

Thus, while *Casey* is, as the Majority notes, "consistent with" the Majority's two-dimensional framework, *Casey* does not necessarily support that framework; correlation does not imply causation. On the contrary, the weight of binding precedent and persuasive authority suggests that neither *Casey* nor any other case suggests that anything less demanding than intermediate scrutiny applies here.

**3.**

Two cases from the Ninth Circuit support this conclusion as well. In *Conant v. Walters*, the court invalidated a federal regulation prohibiting doctors from recommending the use of medical marijuana after applying heightened First Amendment scrutiny. 309 F.3d 629, 632 (9th Cir. 2002). Despite taking place within the confines of a doctor-patient relationship, the regulation was analyzed as a classic content-, speaker-, and viewpoint-based restriction. *Id.* at 637, 639. By contrast, in *Pickup v. Brown*, the court held that a California law prohibiting mental health professionals from offering sexual orientation change efforts (SOCE) therapy to minors was immune from First Amendment scrutiny, even though the therapy itself was carried out through words. 740 F.3d at 1225.

Distinguishing *Conant*, the court drew lines between a professional's public speech, *id.* at 1227, a professional's speech "within the confines of a professional

relationship," *id.* at 1228 (citing *Casey* as an example of such speech, and noting that the burdened speech in that case fell on the *midpoint* of the continuum where First Amendment protections are diminished but not eliminated), and a professional's conduct which is carried out through speech, *id.* at 1229. The regulation in *Conant*, which prohibited doctors from *recommending* medical marijuana, burdened speech that was entitled, at the very least, to intermediate First Amendment protections. *Id.* at 1226–27. At the same time, *Conant* recognized that any speech burdened as a result of the law's ban on prescribing medical marijuana fell into the third, unprotected category, *id.* at 1226, because the ban targets professional conduct (i.e., giving patients drugs) and only incidentally burdens speech (i.e., writing the name of a drug on a prescription pad).

Similarly, the court in *Pickup* concluded that SOCE therapy, though carried out in verbal form, was indistinguishable from prescribing a drug or performing a surgery. In other words, the burdened speech was exclusively the functional equivalent of the treatment itself. Therefore, banning SOCE therapy was no different than outlawing certain drugs, and the burden on speech (i.e., the ban on speaking words that constitute SOCE therapy) was incidental and necessary to the ban on the disfavored medical conduct (i.e., performing the therapy). *Id.* at 1230. *Pickup* recognized that the law at issue went no further in banning speech than necessary to regulate the proscribed medical conduct. Doctors' right to "express

their views to anyone, including minor patients and their parents, about any subject, including SOCE," was explicitly protected by the act in question. *Id.* at 1230.

The regulations here, like the regulations in *Casey* and *Conant*, burden speech that fits, at the very least, into the intermediate category where First Amendment protections apply. When the Ninth Circuit expanded *Lowe*'s reasoning in *Pickup*, it was very careful to narrowly circumscribe the category of speech that was left unprotected. Only speech that is the functional equivalent of performing a surgery or prescribing a drug can be burdened without scrutiny under *Pickup*. It is well worth noting that the speech burdened in *Casey* received intermediate scrutiny even though the speech was exclusively intended to fully inform patients about a medical procedure. Thus, even if speech that is the functional equivalent of medical treatment can be regulated without scrutiny, speech that is directly related to medical treatment does not fit within that category under *Pickup*.

Here, in stark contrast to *Pickup* where all of the burdened speech was the functional equivalent of providing a drug, none of the speech burdened by the Act fits in that category. Asking irrelevant questions about firearm ownership, recording the answers, or harassing a patient based on firearm ownership—by persistently and irritatingly discussing the subject—is nothing like giving a patient

a drug or performing SOCE therapy.  Further, some, though by no means all, of the speech burdened by the Act is similar to the speech burdened by the regulation in *Casey*.  To the extent that the Act burdens speech designed to inform patients about the dangers of firearms or speech designed to inform patients of safer ways to own firearms, the speech is much like the speech in *Casey*.  Accordingly, such speech should be given intermediate protections.  Strengthening this conclusion is the fact that, while the law in *Casey exclusively* concerned speech necessary to fully inform patients about a medical procedure, the Act here also burdens speech that is unrelated to this purpose.  The Act bans irrelevant questioning and irritating politicking on the subject of firearm ownership, which by definition has nothing whatsoever to do with medical treatment or a medical procedure and is in no way designed to inform patients about anything of medical relevance.

Because the Act burdens such a broad swath of physician speech on the topic of firearms—including speech that by definition has nothing to do with medical treatment—*Conant*, which applied heightened scrutiny, is directly applicable.  Doctors have a First Amendment right to ask questions about firearms and to discuss, even persistently, the pros and cons of firearm ownership with their patients just as surely as they have the right to discuss the pros and cons of medical marijuana.  Such communication cannot be labelled unprotected conduct simply because it takes place within the confines of a professional relationship.  *Pickup*

does nothing to undermine this principle and in fact reaffirms it, 740 F.3d at 1228, though I make no comment on whether *Pickup* was correctly decided.[16]

**4.**

When a doctor asks his patient obviously irrelevant questions, the doctor "does not purport to be exercising judgment on behalf of any particular individual," so *Lowe* says that "government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking . . . as such, subject to the First Amendment[]." 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring).

Further, as discussed above, the only case that extends *Lowe* beyond the licensing context, *Pickup*, also set a limiting principle. Irrelevant questioning by doctors about firearms (for purposes of arranging a hunting trip or going on a political rant) is clearly not the functional equivalent of providing care, which was the only context in which *Pickup* extended *Lowe*'s rule. 740 F.3d at 1225. Asking

---

[16] The Ninth Circuit's decision not to take the case en banc drew a spirited dissent, which stated that "[b]y labeling . . . speech as 'conduct,' the panel's opinion has entirely exempted such regulation from the First Amendment. In so doing, the panel . . . insulates from First Amendment scrutiny California's prohibition—in the guise of a professional regulation—of politically unpopular expression." 740 F.3d at 1215 (O'Scannlain, J., dissenting from the denial of rehearing en banc). I share the concern that the difference between the intermediate category (speech within the professional relationship that is related to medical conduct but is not itself conduct) and the unprotected category (conduct within the professional relationship that is carried out through speech) may prove to be illusory. If the court in *Pickup* erred, it did so by putting too much speech into the unprotected category. *Cf. Humanitarian Law Project*, 561 U.S. at 28, 130 S. Ct. at 2724 (applying First Amendment scrutiny where "conduct triggering coverage under the statute consists of communicating a message").

someone whether they engage in a practice ("Do you smoke?") is far less like medical conduct than discussing the dangers of engaging in the practice ("Smoking causes lung cancer, so you should use X, Y, or Z method to stop."). It is even more obvious than asking someone an irrelevant question ("Do you own a gun? If so, we should go hunting.") is far less like medical conduct than discussing firearm safety ("You should store your firearm and ammunition in separate, locked safes and use a trigger lock."). Thus it is simply inaccurate to characterize the Act as a regulation on medical conduct rather than a regulation on speech.

The Act is unlike other State laws that only *incidentally* burden speech; it *directly* bans questioning. How can it possibly be argued that a law telling doctors, "Do not ask irrelevant questions about guns," only *incidentally* burdens the right to ask irrelevant questions about guns? The burden could not be more direct. By contrast, a medical malpractice regime that holds a doctor liable when his unreasonable treatment causes a patient harm has only incidental burdens on speech. Under that regime, liability attaches for prescribing the wrong drug, directly burdening the bad practice of giving patients harmful drugs and *incidentally* burdening the right to write the name of the drug on a prescription pad. Liability also attaches for failing to properly diagnose a disease, burdening the bad practice of failing to identify a health problem and *incidentally* burdening the right to remain silent about a medical problem or tell a patient he has a clean bill of

health when he does not.  *Pickup* was justified on the same basis.  SOCE therapy is analogous to prescribing a harmful drug.  Liability could attach for providing SOCE therapy because the therapy had the chance to harm minors psychologically.

As *Pickup* and *Lowe* recognized, however, even if quack medicine (or what the State deems to be quack medicine) can be prohibited without scrutiny, doctors cannot be prohibited from talking to their patients about quack medicine.  *See* 472 U.S. at 231, 105 S. Ct. at 2584 (White, J., concurring) ("I do not think [the State] could make it a crime . . . privately to speak urging persons to follow or reject any school of medical thought." (internal quotation marks omitted)); 740 F.3d at 1228 (holding only that "[a] doctor may not counsel a patient *to rely* on quack medicine" but recognizing that a doctor may talk to patients about quack medicine such as SOCE (emphasis added) (internal quotation marks omitted)).  I believe that a doctor's First Amendment challenge would prevail if a doctor faced liability for speaking about but not performing or inducing reliance upon quack medicine, because such a burden on speech would be direct, not incidental to the State's goal of preventing bad medical care.

Applying this rationale here, had the State drafted a law stating that it is bad medicine to counsel patients on firearm safety and that, accordingly, doctors may not, as part of the practice of preventive medicine, counsel patients on firearm safety, we might be dealing with a regulation like malpractice laws and like the law

in *Pickup*.  Further, had the State drafted such a law, then the opening question in a firearm safety counseling session—a session that is prohibited as bad medicine under this hypothetical—would likely also be prohibited.  In that case, the ban on the question might truly be *incidental* to the overall ban on (what the State deems) bad medical practice.  I have expressed my doubts as to whether such a ban would evade First Amendment scrutiny, but that ban would be more likely to do so than the Act.

By contrast, the Act allows firearm counseling to continue, so it is not directly regulating medical conduct or declaring a certain form of treatment bad medicine.  At the same time, the Act directly bans asking irrelevant questioning about firearms—even, indeed especially, those questions having nothing to do with medical conduct.  The Act thus *directly* targets questioning and only *incidentally* advances whatever medical interests might be served by a law eliminating irrelevant questions about firearms from the doctor's office.  The burden on speech is direct.  The benefit to medical care is, at best, incidental and indirect.  The Supreme Court has explicitly recognized that States cannot advance their interests in this way.  *See Sorrell*, 131 S. Ct. at 2670 (recognizing that the First Amendment prohibits laws where "[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers").

## IV.

The foregoing leads to the conclusion that nothing less than intermediate First Amendment scrutiny applies. For the Act to survive, "First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction . . . directly and materially advances that interest; and third, the regulation must be narrowly drawn." *Went For It*, 515 U.S. at 624, 115 S. Ct. at 2376 (internal quotation marks omitted); *see also Sorrell*, 131 S. Ct. at 2667–68; *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351. "[Intermediate scrutiny] standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell*, 131 S. Ct. at 2668.

Under the first prong of this analysis, we may not "supplant the precise interests put forward by the State with other suppositions." *Went For It*, 515 U.S. at 624, 115 S. Ct. at 2376 (internal quotation marks omitted). Intermediate scrutiny's second prong "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 626, 115 S. Ct. at 2377 (internal quotation marks omitted).

The Court has not clearly established the evidentiary requirements necessary to survive the second prong of intermediate scrutiny, but *Went For It* explains that

if the State presents "no studies," and "the record [does] not disclose any anecdotal evidence . . . [but instead] tended to contradict, rather than strengthen" the State's argument, then the evidence is insufficient. *Id.* *Sorrell* clarifies that "a few" anecdotal stories are not necessarily sufficient to establish that the harm posed to the State's interest is real. *See* 131 S. Ct. at 2669.

Finally, under the third prong of intermediate scrutiny, we do not apply the least restrictive means test, at the one extreme, or rational basis review, at the other. *Went For It*, 515 U.S. at 632, 115 S. Ct. at 2380. Instead we look for a narrowly tailored fit between the State's chosen means and its asserted ends, though the Act need not be a perfect fit. *Id.* *Sorrell* also clarifies that if a regulation burdening speech is under-inclusive, addressing but one area of a larger problem, this is evidence that the justification may be insufficient to sustain the law under intermediate scrutiny. 131 S. Ct. at 2668.

The State asserts the following interests: (1) securing and improving healthcare, particularly for firearm owners; (2) protecting firearm owners' privacy rights; (3) protecting Second Amendment rights; and (4) preventing discrimination against and harassment of firearm owners. I assume that each of the State's asserted interests is substantial but ultimately conclude that all four relevant provisions of the Act fail under the second and third prongs of this analysis because, while the interests are substantial, the interests are either not under threat

by activities proscribed by the Act, or the Act at most indirectly and marginally advances them.

## A.

The record suggests that the Act will make healthcare in Florida worse, not better. That is not my opinion. It is the opinion of many leading medical associations, including the AMA. If there is significant disagreement with this opinion in the medical community, the State did not mention it. There is simply no evidence showing that inquires about firearms during medical examinations negatively affected medical care or the health and well-being of patients.

The available evidence does establish two things: first, the healthcare of everyone who is happy to answer their doctors' inquiries about firearms may suffer as a result of the Act; second, the First Amendment rights of everyone who welcomes their doctors' inquiries and information on firearms have been infringed. As to the first point, the medical community thinks doctors ought to be free to ask about firearms in order to provide patients with potentially life-saving information, but because of this law, they will not do so. A vivid imagination is not required to think of the innumerable adverse health consequences that go along with unsafe firearm ownership, but those health consequences are now more likely to befall people who would have welcomed a doctor's inquiry into firearms ownership.

As to the second point, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both . . . . [F]reedom of speech necessarily protects the right to receive." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57, 96 S. Ct. 1817, 1823 (1976) (internal quotation marks omitted). The right to receive is burdened here, and by cutting off even the opening question in the firearm conversation, the Act virtually eliminates that right altogether. It is anathema to the First Amendment to treat truthful, non-misleading information the same way we would treat a dangerous drug. "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell*, 131 S. Ct. at 2671 (internal quotation marks omitted).

This Act does not even give patients the option to consent to the doctors' questioning on firearms. In *Sorrell*, the Court explained that "private decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge." *Id.* at 2669. Here, because there is no mechanism for patients to consent, private decisionmaking between doctors and patients on the topic of firearms has been drastically reduced. Governmental partiality favoring firearm ownership predominates, and messages against firearm

ownership are drastically limited if not entirely prevented from reaching people who want to hear them.

Considering only the healthcare of firearm owners, there is no evidence that the quality of their care diminished when doctors found out they owned guns. There is also no evidence that their ownership status was improperly disclosed. Indeed firearm owners are the ones most likely to benefit from the information provided by doctors on this subject, and there is evidence suggesting that many firearm-owning patients appreciated the information. As in *Sorrell*, "The defect in [the] law is made clear by the fact that many listeners find [the information] instructive." *Id.* at 2671.

The only people who arguably stand to benefit medically from the Act are those who voluntarily choose not to answer their doctors' questions about firearms. Without the Act, doctors are free to ask firearm-related questions, and people who refuse to answer such questions may be denied care as a result. With the Act, people who refuse to answer questions may still be denied care, *see* Fla. Stat. § 790.338(4), but firearm-related questions will be asked very rarely, giving doctors fewer occasions to find out that patients would be non-cooperative and thus fewer occasions to deny care on this basis. That is a potential benefit, but it is a slight one with great costs. Therefore, the burden on speech does not meet the standards of proportionality discussed in *Sorrell*.

It is important to recall that there is no evidence suggesting that firearm owners were denied care *because* they were firearm owners. The only patients who were denied care were those who refused to answer a doctor's questions, and thus, the doctor did not even know whether the patient was a firearm owner. Doctors understand that they cannot do their jobs—and risk medical malpractice liability—if they fail to inquire broadly. Patients who resist inquiries make doctors' jobs more difficult and present doctors with risks that compliant patients do not. Doctors thus have a significant interest in speaking freely, making inquiries, and recording patients' answers.

Of course, if patients wish not to answer, they are free not to. Ordinarily, those who wish not to answer questions receive "ample protection from [their] unquestioned right to refuse to engage." *Sorrell*, 131 S. Ct. at 2670 (internal quotation marks omitted). These patients may freely choose another doctor whose questioning comports with the patients' sensibilities, and there is no evidence in the record suggesting that any non-compliant patients who were turned away could not find other doctors.

To justify forcing doctors to relinquish their freedom to ask questions solely as a means to protect patients' freedom not to answer questions, the State would have to show that patients faced a dilemma of sorts and that refusing to answer was not a sufficient solution. Beyond failing to offer evidence that patients were

unable to find other doctors, the State has offered no evidence to suggest that patients would have sacrificed anything by answering the doctors' questions. There is no evidence that the information obtained through these inquiries was misused. It has not been disclosed, and care did not diminish for those who answered. Thus, patients appear from the record to face a perfectly free choice when presented with a doctor's questions about firearms: they may find a new doctor or answer the question (which has no adverse consequences and, if anything, may lead to a lifesaving conversation). These are not bad options, and are far better options than those available to the grieving father whose son's funeral draws harassing, vile protests. *See Snyder*, 131 S. Ct. at 1213. If the First Amendment protects funeral protests, the "benign and, many would say, beneficial" inquiries and conversations about firearms that are burdened by the Act are "also entitled to the protection of the First Amendment." *Sorrell*, 131 S. Ct. at 2670.

Further, there is no evidence that the options faced by patients who refused to answer questions about firearms were any worse than the options faced by those who refused to answer any other private, potentially irrelevant question. That the right to refuse to answer questions about firearms garners special protection belies the State's preference—a preference not designed to ensure that patients who wish to protect their privacy will have access to medical care but instead designed to

protect a pro-firearm message the State prefers. *See id.* at 2668 (explaining that a State's failure to address a wider problem through a "coherent policy" addressing the problem as a whole is evidence that the asserted interest cannot justify the burden placed on speech (internal quotation marks omitted)).

Finally, one amicus curiae favoring the Act suggests that the Act will improve healthcare by improving the doctor-patient relationship. The argument, as far as I can tell, goes as follows: previously, firearm owners were unwilling to share firearm-ownership information with their doctors because they feared— without any evidence to validate this fear—that doctors might be gathering this information for nefarious purposes. Once doctors had the information, patients feared that doctors would, in violation of ethical principles and several laws, pass the information to government bureaucrats.

Now, however, because doctors are told not to ask irrelevant questions about firearms, patients can rest assured that if doctors ask about firearms, it is relevant, so patients know it is in their best interest to answer the question. Of course, there are no additional protections prohibiting the doctor from disclosing this information, so the original fear remains in full force. But firearm owners also know that the health consequences of not answering are probably more serious now, because the question is more relevant. Thus, the calculus changes slightly:

answering, while potentially detrimental to privacy rights, becomes more appealing because not doing so is more likely to be detrimental to healthcare.

This argument accepts the premise that conveying information about a patient's firearm ownership to her physician is potentially beneficial to the patient's health. The argument also accepts the premise that, because this information is potentially vital to effective healthcare, it is important that the flow of information between doctor and patient be unobstructed. Thus, the amicus curiae reasons, the Act improves healthcare because it removes a potential obstruction—suspicion that the privacy consequences of disclosing firearm ownership outweighs the health benefits—that was blocking the free flow of information between doctor and patient on the subject of firearms. If this was the Legislature's goal, its chosen means are poorly suited to the task. In order to *remove* an obstruction to the flow of information, the State eliminated the flow altogether. This simply does not withstand intermediate scrutiny.

Even if we accept the unlikely premise that firearm owners who were unwilling to disclose firearm ownership information to their doctors before this Act was passed will be willing to do so now, there is no doubt that this law will cause doctors to know *less*, not *more*, about their patients' firearm ownership status. As the amicus curiae suggests, this information is potentially important to patients' well-being. Much of that lost information will include information of initially

questionable relevance that, only after it is too late, will prove to be critical. That is bad for people's health. The State falls far short of showing that the Act directly and materially advances healthcare for anyone. At most, "[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell*, 131 S. Ct. at 2670. Such efforts do not survive intermediate scrutiny.

## B.

The State next asserts an interest in promoting the privacy of firearm owners. It may be assumed that firearm owners "have an interest in keeping their [ownership status] confidential. But [the Act] is not drawn to serve that interest." *Id.* at 2668. Indeed, it is entirely unnecessary to serve that interest.

This argument launches from a premise that fundamentally misunderstands one of the primary purposes of keeping medical information confidential. The *best* way to ensure that confidential information is not divulged through our doctors is to avoid sharing any information with doctors at all. But if we took that view, doctors would obviously not be very effective. The information we give them has the potential to save our lives, so we should give it freely, and doctors should ask for it without hesitation.

Given that information-sharing with our doctors has life-saving potential, the medical community and the State have built high walls around the doctor-patient

relationship to ensure that within those walls, there are no secrets.  Therefore, while the State has a strong interest in protecting the confidentiality of medical records, any claim that the Act, which directly burdens speech and *limits* information-sharing, is justified by these concerns is suspect from the outset.  The Act itself causes the very harm confidentiality is designed to prevent: limiting the flow of information from doctor to patient.

In any event, for the State to justify burdening speech in order to further its interest in patient confidentiality, it must show that this Act directly and materially addresses a real concern.  The concern that firearm ownership status, if recorded in medical files, will not remain confidential is entirely speculative and therefore insufficient.  *Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377.

The record reflects no incidents of firearm-ownership information from medical records being disclosed to outside parties, and there are a variety of measures in place to ensure that such incidents will never occur.  In addition to ethical principles, the confidentiality of medical records is secured by state and federal laws discussed by the Majority, Maj. Op. at 71, n.24.  It was also suggested at oral argument that, as a result of the Affordable Care Act and the digitization of medical records, government bureaucrats may somehow gain access to medical records, providing the government with information on firearm ownership.  To the extent that such information is not already available from other sources, the

Affordable Care Act explicitly prohibits the information from being gathered through medical records: "None of the authorities provided to the Secretary under the [Affordable Care Act] . . . shall be construed to authorize or may be used for the collection of any information relating to (A) the lawful ownership or possession of a firearm or ammunition; (B) the lawful use of a firearm or ammunition; or (C) the lawful storage of a firearm or ammunition." 42 U.S.C. § 300gg-17(c)(2). Patients also may refrain from disclosing their firearm ownership status, which, as discussed above, has not proven to be detrimental to anyone's care except in ways that befall all uncooperative patients, not just those who refuse to answer questions about firearms.

Given that the confidentiality of medical records is closely guarded already, the need to further ensure privacy to prevent misuse cannot justify the burden placed on doctors' speech by the Act: "The choice between the dangers of suppressing information, and the dangers of its misuse if it is freely available is one that the First Amendment makes for us." *Sorrell*, 131 S. Ct. at 2671 (internal quotation marks omitted).

The State also suggests that, even if information is kept confidential from the outside world, patients may still incur adverse consequences and a loss of privacy if other medical professionals are able to determine firearm ownership status from medical records. Again, the harm addressed here is entirely speculative. Those

doctors and medical personnel are bound by the same confidentiality restrictions just discussed. And there is no evidence to validate the State's fear that patients whose firearm ownership is recorded in their medical files will receive worse care from subsequent doctors as a result of this information. Fear of this type is purely speculative and cannot satisfy the State's burden under intermediate scrutiny.[17] *See Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377. As the Court has explained, "[p]rivacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers." *Sorrell*, 131 S. Ct. at 2672.

Finally, the Majority relies on patients' interest in protecting private information, including status as a firearm owner, from their own physicians. *See* Maj. Op. at 68 n.23, 71. If the State merely wants to reserve for patients the right to decide whether to disclose firearm ownership, the Act is a poor fit. It does not

---

[17] Given that the State is only speculating that irrelevant notations in patients' medical files will cause them to receive worse care from subsequent doctors, it seems equally if not more plausible to think that subsequent doctors would provide worse care based on a documented history of a patient's recalcitrance, tardiness, failure to pay bills on time, or frequent follow-up calls. Yet doctors remain free to make these—and any other—medically irrelevant notations in patients' records, even though the consequences would seem to be just as severe as the concerns the Act purportedly addresses. When a statute is so under-inclusive, it belies the fact that the statute has another purpose. As the Court explained in *Sorrell*, "[p]erhaps the State could have addressed . . . confidentiality through a more coherent policy. . . . A statute of that type would present quite a different case than the one presented here. But the State did not enact a statute with that purpose or design." 131 S. Ct. at 2668. Instead, the State enacted a viewpoint-based restriction on speech just like the one invalidated in *Sorrell* with at most incidental privacy benefits. *See id.* at 2669 ("To obtain the limited privacy [provided for] by [the Act, patients] are forced to acquiesce in the State's goal of burdening disfavored speech by disfavored speakers.").

allow individual patients to decide that their firearm ownership status is none of their doctors' business. Instead, the patient never has the chance to make the decision because the doctor is unable to broach the subject.[18] A better tailored provision would allow physicians to inquire and simply require them to respect their patients' decision to decline to answer. But the Act does the opposite. It allows doctors to refuse to see patients who decline to answer. *See* Fla. Stat. § 790.338(4). Therefore, with this particular privacy interest in mind, the Act plainly is more extensive than necessary to serve patients' interest in keeping the information from their doctors and fails under the third prong of intermediate scrutiny.

## C.

---

[18] In the absence of signs, symptoms, or complaints of an illness or condition, it is difficult to imagine how a physician would reach the conclusion that a particular question or questions would be "relevant to the patient's medical care or safety, or the safety of others." And in some cases, it is vital to the health of patients generally that physicians inquire regarding certain matters without any particularized relevance determination, so that conditions and warning signs can be caught before developing into more serious, life-threatening matters. For example, as a matter of course, a doctor may ask a patient about his diet and exercise habits in order to assess the patient's risk of heart disease, without any indication that the patient is suffering from heart disease. If a doctor waits until a patient's poor heart health makes itself known—for example, when the patient suffers a heart attack—it may be too late.

In the same way, if a physician waits until the risk of gun ownership manifests itself in a suicide, homicide, or accidental shooting, the physician will have missed the opportunity to prevent such an adverse potential consequence of gun ownership. Yet this is precisely the situation the Act forces upon not just physicians but also their patients, who will, more directly and forcefully, feel the consequences of the Act's "wait until something bad happens" mandate.

The State next asserts that the Act protects Second Amendment rights. There is no doubt that the right to keep and bear arms is guaranteed by the Second Amendment and that the State has an interest in protecting that right. It is unclear, however, what threat doctors pose to Second Amendment rights. Doctors do not have the ability to seize patients' weapons nor is there any evidence that they have ever tried to do so. Doctors are also not agents of the government, so to the extent that doctors send a one-sided message that firearm ownership causes more harm than good, that message does not convey government disapproval that might raise Second Amendment concerns. Like any other group of private citizens, doctors are free to express their views on firearm ownership, and the ordinary expectation is that a person's rights to be free from unwanted speech are amply protected by the "unquestioned right to refuse to engage in conversation." *Sorrell*, 131 S. Ct. at 2670.

While it is true that within the confines of a doctor's office, doctors can persuade us to do things we would not do for other private citizens, it is also true that as soon as we leave, that power diminishes drastically. If a doctor recommends that I remove a firearm from my home, I am perfectly free to ignore him when I get home. If I take his advice, however, I cannot complain that my *right* to own a gun was infringed upon any more than a patient who quits smoking after his doctor told him to do so can complain that his doctor violated his right to

smoke.  The Second Amendment does not include a right to be free from private persuasion.  The State's Second Amendment argument is essentially "that the force of [doctors'] speech can justify the government's attempts to stifle it.  Indeed the State defends the law by insisting that [doctors] ha[ve] a strong influence . . . . This reasoning is incompatible with the First Amendment."  *Id.* at 2671.

The State clearly has *not* expressed a general interest in preventing doctors from "infringing on patients' rights" by giving advice not to exercise certain rights in certain ways.  The State has not expressed this general interest even though doctors routinely ask about a range of things other than firearms which are not immediately relevant to our care and which may implicate our rights.  This is almost certainly because the State *approves* of doctors asking about these other topics.  As for guns, however, the State disagrees with doctors that questioning patients about firearms is relevant to medical care, and it disapproves of persistent discussion on the topic that might passionately convey an anti-firearm message. So the State silenced that message and that message alone, under a guise of protecting rights.  It is clear that "[t]he State's interest in burdening the speech of [doctors] turns on nothing more than a difference of opinion."  *Id.* at 2672.  Such differences of opinion cannot be regulated out of existence.

For the right to bear arms to be under serious threat from doctors—a threat sufficient to justify a State response that intrudes on doctors' rights to speak—

doctors must be doing more than simply persuading firearm owners to voluntarily relinquish their arms.  They must be doing more than what one amicus curiae favoring the Act claims doctors are doing, which is "*question[ing]* [patients and thereby] interfer[ing] with patients' exercise of the right [to bear arms] by putting patients in a hesitant position where they question their ownership of firearms because of physician disapproval."  Indeed much of what good doctors do is question patients about certain behavior thereby expressing disapproval of the behavior (psychologists ask us why we say certain things to people we are having difficulties with; cardiologists ask us if we routinely eat unhealthy foods; internists ask us if we get enough sleep, drink too much soda and not enough water, and whether we engage in unsafe sexual practices), and (hopefully) causing us to question whether we should continue to engage in that harmful behavior.  No one disputes that it is anyone's *right* to engage in any of the aforementioned activities, and there is absolutely no evidence that doctors are intruding on firearm owners' rights any more than doctors are intruding on any of the above-mentioned rights. That we have a right to do something does not mean we have a right to be free from questioning about that right or from suggestions of other people—people we voluntarily went to see for advice on how to live healthy lives—who may tell us that exercising a particular right in a particular way is a bad idea.

As for other potentially more compelling means of persuasion a doctor could use, such as refusing treatment or providing worse treatment unless patients give up their arms, there is absolutely no evidence that such means are being used. Such speculative fears are insufficient to justify a regulation that is subject to intermediate scrutiny. *Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377.

Perhaps one could respond, as noted above, that preventing doctors from asking firearm-related questions in most situations will ensure that fewer people are put in a position of being turned away for failing to answer such questions. But the right to bear arms does not include a right not to be asked a question about whether one bears arms. "Personal privacy even in one's own home receives 'ample protection' from the 'resident's unquestioned right to refuse to engage in conversation with unwelcome visitors.' *Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 168, 122 S. Ct. 2080 . . . (2002). A physician's office is no more private and is entitled to no greater protection." *Sorrell*, 131 S. Ct. 2670 (second citation omitted). This statement was rendered with regard to doctors in *their own* offices. If they do not have a right to be free from unwelcomed visitors in their own offices, patients who voluntarily chose to visit doctors certainly do not have greater protections from questioning by the doctors themselves. That is particularly true when, as already explained, the answer to any question about firearms will not lead to adverse consequences.

With regard to the State's asserted Second Amendment justification, like its medical justification, "[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers . . . . But the fear that people would make bad decisions [such as relinquishing their firearms] if given truthful information cannot justify content-based burdens on speech." *Id.* at 2670–71 (internal quotation marks omitted). The fact that a doctor's message on firearm safety may be incompatible with the State's desire to protect firearm owners from uncomfortable questioning or counseling on firearm safety does not implicate Second Amendment concerns and belies the State's desire simply to silence a message with which it disagrees.

### D.

The State finally asserts that the Act is designed to prevent harassment and discrimination against firearm owners. The State provides very little evidence—no more than a few anecdotes—to support its contention that patients are being discriminated against and harassed on the basis of firearm ownership. It is doubtful whether such evidence is sufficient to establish that the Act will advance an interest in a "direct and material way." *Went For It*, 515 U.S. at 625, 115 S. Ct. at 2377 (internal quotation marks omitted). A "governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are

*real* and that its restriction will in fact alleviate them to a material degree." *Id.* at

626, 115 S. Ct. at 2377 (internal quotation marks omitted).

Regarding harassment in particular, the chill that the harassment provision

puts on doctors' protected speech is significant, and the benefit of the provision is

minimal given how innocuous the "harassment" that allegedly takes place seems to

be. As discussed in Part I, a doctor's simple recommendation to remove firearms

from a home where children were present was one of the incidents that prompted

passage of this Act and that presumably would constitute "harassment."[19] Even if

doctors might not ultimately be disciplined for such behavior, this Act will

certainly cause many of them not to engage in it.

Were the evidence of harassment against firearm owners greater, and had the

legislative history not explicitly stated that the Act was needed to prohibit doctors

from advising patients to relinquish firearms in pursuit of a political agenda—that

is, were it not apparent that the State's goal was to eliminate unpopular speech

rather than harassment—the constitutionality of the harassment provision may well

be different. But that is not the case before us. Confronted with nearly identical

---

[19] Again, the Majority defines "to harass" as "[t]o disturb or irritate persistently." I am
certain that most smokers are "harassed" by their doctors about smoking under this definition. If
doctors apply the same persistence to firearm safety recommendations—including removing
firearms from homes with children—as they do to smoking cessation recommendations, they are,
according to the Majority, harassing their patients and therefore subject to discipline. One would
think that doctors ought to persist in encouraging their patients to do what the doctors genuinely
believe is best for their patients' health and well-being.

anecdotal evidence of harassment in *Sorrell*, the Supreme Court stated: "[A] few have reported that they felt coerced and harassed. . . . It is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' . . . can sustain a broad content-based rule like" the Act. 131 S. Ct. at 2669. The same is true here, and the harassment provision cannot withstand intermediate scrutiny as a result. Indeed, "[m]any are those who must endure speech they do not like, but that is a necessary cost of freedom." *Id.*

The discrimination provision presents a closer question. To begin with, unlike the inquiry, recording, and harassment provisions, speech is less directly targeted by this provision of the Act. A doctor could inquire into and record information about firearms with little fear of facing a discrimination charge simply for doing those things. That does not mean, however, that if the discrimination provision remained, no speech would be prohibited or chilled.

While less obviously so, a doctor who presses a patient on the issue of firearm ownership, engages in tough questioning on the subject, and recommends repeatedly that a patient remove firearms from his home could be seen as discriminating against that patient. We would typically think of such behavior more as harassment than as discrimination, but the Act itself does not define

either.[20]  A patient who is subjected to relatively harsh, tough-love treatment from a doctor could easily believe he is being discriminated against because he owns a firearm—other patients who do not own firearms are not being persistently lectured by their doctors, but patients who do own firearms are being scolded precisely because they own firearms.  That, it seems to me, could be discrimination prohibited by the Act.

Further, even if the other three provisions of the Act are struck down, doctors' inquiries will be chilled as a result of the discrimination provision. Inquiries constitute strong evidence of discriminatory motive, *see, e.g.*, *Barbano v. Madison Cnty.*, 922 F.2d 139, 141–46 (2d Cir. 1990), and doctors will rightly fear that if they ask about firearms and patients subsequently complain about any aspect of their treatment, the doctors' initial inquiries will be used as ammunition against them to support discrimination claims.  Even standing alone, the discrimination provision thus prohibits and significantly chills firearms related speech by doctors, though it probably has a lesser effect on speech than the Act's other provisions.

---

[20] In a case confronting a somewhat similar issue, then Circuit Judge Alito used the term "discriminatory harassment" to describe federal prohibitions.  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).  Even if the harassment provision is invalidated, then, it seems that the same speech which constitutes harassment might constitute "discriminatory harassment" and thus be proscribed by the discrimination provision.  Further, as noted *supra* in Part I, the legislative history cited by the State was said to contain examples of "actual discrimination" faced by firearm owners.  Those examples almost exclusively involved speech.

Accordingly, I reject the State's assertion that the discrimination provision evades First Amendment scrutiny as a regulation of discriminatory conduct, not speech. To be sure, the Supreme Court has explained that anti-discrimination provisions designed to address discriminatory conduct "do not, *as a general matter*, violate the First or Fourteenth Amendments." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571–72, 115 S. Ct. 2338, 2346 (1995) (emphasis added). But this is not a typical anti-discrimination law or a typical case, because unlike the statute before the Court in *Hurley*, the Act here is "unusual in an[] obvious way, since it does . . . , on its face, target speech . . . on the basis of its content." *Id.* at 572, 115 S. Ct. at 2347.

The State offered almost no evidence of conduct-based discrimination. Indeed, the only actual examples of adverse conduct cited by the State befell people who refused to disclose firearm status, not people who were known firearm owners. There was an incident involving billing for services allegedly not rendered, but that involved a patient who was turned away for refusing to answer questions. And other patients were declined for service, which constitutes discriminatory conduct, not speech, but they were declined for service because, again, they refused to answer questions, not because they were known firearm owners. Thus, there is evidence that people are being discriminated against for

refusing to answer their doctors' questions, but there is no evidence that patients are being discriminated against because they own firearms.[21]

The State simply cannot support its assertion that the Act is a means of preventing that type of discrimination against firearm owners because those examples do not constitute discrimination against firearm owners.  And even if they did, the Act expressly allows doctors to turn away patients who refuse to answer questions, *see* Fla. Stat. § 790.338(4), so it cannot be justified as an effort to eliminate that form of discrimination, either.  Further, the Act is unnecessary to protect patients from being billed for services not rendered, as other remedies surely exist to resolve that problem.  As for the State's list of other examples of discriminatory conduct that *might* occur on the basis of firearm ownership (denial of referrals, longer wait times, and cancelled appointments, to name a few), the State has presented no evidence that any of these forms of discrimination against firearm owners have ever occurred.

Thus, while it is clear that speech will be burdened as a result of this provision, it is unclear that any discriminatory conduct will be eliminated.  As *Went For It* explains, a statute cannot survive intermediate scrutiny on the

---

[21] There is no evidence in the record one way or the other on this point, but I suspect that doctors would turn patients away for refusing to answer questions on any topic.  Indeed, if doctors continued to treat patients who refused to answer questions, doctors would seemingly be exposed to significant malpractice liability as a result.

assumption that it will solve an entirely speculative problem. *See* 515 U.S. at 626,

115 S. Ct. at 2377. This also proves that, unlike in *Hurley*, where a discrimination

provision was found not to implicate the First Amendment, here the "focal point of

[the] prohibition [is not] on the *act* of discriminating against individuals in the

provision of publicly available . . . services." 515 U.S. at 572, 115 S. Ct. at 2347

(emphasis added). The legislative history makes clear that the Act was intended

primarily to prohibit speech, though I recognize that it may prohibit some

discriminatory conduct if that type of conduct ever occurs in the future. Given

these facts, the First Amendment applies even to anti-discrimination laws. *See,*

*e.g.*, *Saxe*, 240 F.3d at 206–07 ("'Where pure expression is involved,' anti-

discrimination law 'steers into the territory of the First Amendment.' *DeAngelis v.*

*El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). This is

especially true because, as the Fifth Circuit has noted, when anti-discrimination

laws are 'applied to . . . harassment claims founded solely on verbal insults,

pictorial or literary matter, the statute[s] impose[] content-based, viewpoint-

discriminatory restrictions on speech.' *DeAngelis*, 51 F.3d at 596–97." (alterations

in original)).

Therefore, the discrimination provision is also subject to intermediate

scrutiny, and the State has failed to show that this provision addresses a real harm

or advances a State interest in a direct, material way. *See Went For It*, 515 U.S. at

626, 115 S. Ct. at 2377.  The Act is instead directed at silencing doctors who advance an anti-firearm—not an anti-firearm *owner*—viewpoint with which the State disagrees.  This it cannot do.  *See Sorrell*, 131 S. Ct. at 2668 ("[Intermediate scrutiny standards] ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.").

## V.

I also believe the Act to be void for vagueness.  At the outset, because this "law interferes with the right of free speech . . . , a more stringent vagueness test should apply."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1193–94 (1982); *see also Reno v. ACLU*, 521 U.S. 844, 871–72, 117 S. Ct. 2329, 2344 (1997) (explaining that the "vagueness of [a speech-related] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").

Under this standard, based on the Majority's own interpretation of the Act, the Act is vague as to one of the most common firearms-related practices doctors actually engage in—namely, the practice of asking patients about firearm ownership in questionnaires that are given as a matter of course before the doctor and patient ever meet.  Many doctors claim that such inquiries are always potentially relevant and that making them is part of the practice of good medicine.

Consequently, doctors need to know if they can continue to ask patients about firearm ownership as a matter of course by using intake questionnaires.

Because the inquiry provision is written "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, [it] violates the first essential of due process of law." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (internal quotation marks omitted). One might think that when doctors ask questions about firearm ownership as a matter of course, they do not "know" the questions to be irrelevant, nor is the record (the questionnaire itself is a record) kept in the absence of a "good faith" belief that the record is relevant. Some might conclude from this that doctors are free to continue asking all patients about firearm ownership as they did before the Act's passage. On the other hand, the legislative history suggests that such questioning, absent patient-specific information, is exactly the type of speech the Act was designed to prohibit.

Further highlighting the Act's vagueness, the State is not even clear on whether the inquiry provision is advisory or mandatory. Initially, the Board responsible for enforcing the Act informed doctors that it was mandatory. Then, the Board changed course and stated that it was advisory. Similarly, as discussed in Part II, the State's characterization of the inquiry provision is internally

contradictory, describing it at times as advisory and at times as a proscription. Again, people of common intelligence are left guessing what the Act prohibits.

Not surprisingly, plaintiffs have responded to this Act in a variety of ways, further confirming that people of common intelligence do not know what the Act prohibits. *See* Maj. Op. at 18 n.5. Some doctors have continued making inquiries about firearm ownership as a matter of course because they believe the Act allows them to do so. Others have stopped this questioning—even though they believe, consistent with AMA policy, that the inquiries are good for patients—because they believe the Act requires them to do so. Plaintiffs possess at least common intelligence, and they, too, are left guessing.

Compounding this problem, the State suggests that doctors can and should continue to counsel patients on firearm safety. So if it is good to give patients firearm safety instructions, how can it possibly be bad to ask questions of patients in order to specifically tailor those instructions? That, it seems to me, suggests that asking about firearm ownership is indeed always relevant. Assuming the Act is mandatory, however, I must confess that I myself am left guessing what the inquiry provision prohibits.

Relatedly, the prohibition on routine inquiry—assuming there is such a prohibition—leaves physicians in a hopeless bind. If a doctor is to reach the good faith conclusion that firearm safety is relevant to a particular patient, he must first

inquire of that patient whether the patient or a family member keeps a firearm in the home or some other place where the patient may access it. But the doctor cannot do that without his good faith belief as to relevance. How can the Act require an individualized assessment that the Act itself renders impossible? If a doctor may not inquire on the subject, what then would allow a doctor to conclude that a firearms discussion was relevant? A patient volunteering that he keeps a gun at home would likely meet the standard, though this strikes me as likely to be a rare occurrence. What else? Would the patient's wearing a T-shirt emblazoned with the National Rifle Association's logo be sufficient? Such a circular prohibition does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and certainly will "lead citizens to steer far wider of the unlawful zone." *See Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S. Ct. 2294, 2298–99 (1972). The inquiry provision, then, is unconstitutionally vague.

The harassment provision, which bans only unnecessary harassment, also leaves people of common intelligence guessing about how far doctors may go in counseling patients on firearm safety. Intuitively, when doctors are initially met with resistance from patients on a medically important subject, doctors should persist for the good of the patient. For example, if a doctor knows a patient smokes and advises him of the dangers of doing so, a patient may become irritated. While the doctor should perhaps take a different approach to his counseling, he

147

certainly should not simply cease the counseling because the patient is irritated. Indeed, the doctor will likely have to be more persistent and irritating with this smoker than with the smoker who responds favorably to the doctor's initial counseling, signaling that the doctor's message has been received.

One might think that the same is true of firearm owners. If a doctor's initial counseling is well-received by the patient, the doctor knows that the message has been received, so he need not broach the subject again. But if a doctor's initial counseling is met with resistance, intuition suggests that this patient may be—like the smoker resistant to counseling on the subject—the one most in need of further counseling. Here, the Act creates uncertainty. If the doctor persists, he is no doubt harassing the patient. The question is, however, is that harassment necessary?

Of course, the doctor does not know with any great precision because he cannot ask about firearm ownership, compounding the problem further. Medical intuition perhaps tells the doctor that persistence is necessary, but the doctor is left with no guidance on whether this intuition is sufficient to render persistence (i.e., harassment) necessary for purposes of the Act. Legislative history would suggest that this is exactly the point at which doctors are supposed to stop, but it simply is not clear from the Act what doctors may be punished for doing. The Majority's suggestion that doctors may engage in brief, generalized discussions does no good because the doctor may know, from the patient's reaction, that the initial

discussion did no good whatsoever.  The Majority's further suggestion that, in some cases, a doctor may conclude based on a patient's particular circumstances that the need to persist will be clear, also offers doctors no guidance on how to proceed in the vast majority of cases, where the need to persist will not be obvious.[22]  Yet again, people of common intelligence are left guessing.

Again, the uncertainty is compounded by the fact that the State claims firearm safety counseling is often, if not always, good for patients.  If that counseling is good for patients, then it makes no sense to limit that counseling to the distribution of a pamphlet and a generic discussion that is likely to have little to no impact.  Instead, if the counseling is good, common sense tells doctors that they ought to persist in that counseling, even past the point of irritation.  It is anyone's guess whether doctors may continue doing so after today's holding, or whether they will instead lose their licenses to practice medicine.

The people who put forward these contradictory and at times internally inconsistent interpretations of the Act possess common, if not exceptional intelligence.  If they are left guessing about what the Act prohibits, that all but proves that the Act is vague.  Sadly, I suspect that some of the practices doctors

---

[22] Normally, a doctor would be able to make the determination simply by asking a patient whether he owns a firearm.  Thanks to the inquiry provision, that is no longer an option.

have continued to engage in despite the Act will probably subject these well-intentioned doctors to discipline, but like them, I simply do not know.

Exacerbating the situation is the prospect of malpractice liability. If firearm safety counseling—whether brief of extended—is capable of reducing the prospect of accidental firearm related injuries, as the AMA believes it is, then to avoid liability, doctors should provide firearm safety counseling. If that counseling is too brief or too generic—because a pediatrician sought to comply with the inquiry and harassment provisions of the Act—but it can be proven that more persistent, specifically tailored counseling would have prevented a child who found her father's loaded, unlocked firearm from accidentally shooting herself, I suspect a jury may well find the doctor liable. And regardless of whether malpractice liability attaches, I feel for that doctor who will have the death of a child on her conscience for the rest of her life.

Doctors' jobs are hard enough when the State does not enact laws that force them to think twice about asking questions and providing information that may save lives. Given how vague this Act is, thinking twice will not be nearly enough for doctors to figure out what to do to protect their patients, on the one hand, and to comply with the Act, on the other.

**VI.**

The Act silences a great deal of speech by one group of speakers on one topic. Precedent therefore directs us to subject the Act to at least intermediate scrutiny, under which it fails.

This law is not designed to prevent irrelevant speech from harming the doctor-patient relationship, because it allows irrelevant speech within that relationship to continue much as it did before. Far from stopping irrelevant speech in a doctor's office, the Act instead allows virtually all irrelevant speech to continue while stopping virtually all speech—relevant and irrelevant alike—about a single topic: firearms. This law is not designed to improve healthcare because, as far as the medical community is concerned, this law will make healthcare worse. This law is not designed to protect privacy because privacy of the information at issue is already secured. This law is not designed to protect Second Amendment rights because doctors have no authority—and have not used their private positions of power—to compel firearm owners to relinquish their weapons. This law is instead designed to stop a perceived political agenda, and it is difficult to conceive of any law designed for that purpose that could withstand First Amendment scrutiny.

Even if—perhaps particularly if—doctors were actually waging a political campaign rather than merely being perceived as doing so, the First Amendment would protect them from laws like the Act. What is more troubling is that there is

no evidence that doctors are actually pursuing a political agenda with patients. Doctors are not *prohibiting* patients from exercising the right to bear arms; they are, perhaps, *convincing* patients not to do so—or to do so more safely. This is precisely the type of speech the First Amendment is designed to protect. Because the Act prohibits doctors from even asking the first question in this conversation, the Act is unconstitutional. Accordingly, the district court's decision should be affirmed, and I therefore respectfully dissent.