No. 12-14009

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

DR. BERND WOLLSCHLAEGER, *et al.*,
*Plaintiffs-Appellees,*
*v.*
GOVERNOR OF THE STATE OF FLORIDA, *et al.*,
*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of Florida

BRIEF *AMICUS CURIAE* OF MOMS DEMAND ACTION FOR GUN
SENSE IN AMERICA IN SUPPORT OF PETITION FOR REHEARING
*EN BANC*

J. Adam Skaggs
MOMS DEMAND ACTION FOR GUN
SENSE IN AMERICA
P.O. Box 4184
New York, NY 10163
(646) 324-8201

Gregory A. Castanias
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Peter C. Canfield
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
(404) 521-3939

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
_____

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Moms Demand Action for Gun Sense in America discloses it is a part of a non-profit organization, Everytown for Gun Safety, which has no parent corporations and issues no stock. Accordingly, no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 26.1-1, in addition to the parties and entities identified in the Certificate of Interested Persons in the Petition for Rehearing *En Banc*, Moms Demand Action for Gun Sense in America submits that the following persons and entities have an interest in the outcome of this matter:

*Amicus Curiae*:

Moms Demand Action for Gun Sense in America

Everytown for Gun Safety Action Fund

Everytown for Gun Safety Support Fund

Counsel for *Amicus Curiae*:

JONES DAY,

Peter C. Canfield

Gregory A. Castanias

Charlotte H. Taylor

MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA,

J. Adam Skaggs

Dated: August 28, 2015      /s/ Gregory A. Castanias
                                         Counsel for *Amicus Curiae*

# RULE 35 CERTIFICATION

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves a question of exceptional importance: whether the State of Florida may, consistent with the First Amendment, forbid physicians from providing truthful information to patients—and, concomitantly, whether it may forbid patients from receiving such truthful information—regarding firearm safety and storage.

I further express a belief, based on a reasoned and studied professional judgment, that this appeal merits *en banc* rehearing for the same reasons of importance and decisional conflict set forth in the Petition for Rehearing *En Banc* at pages vii-viii.

Dated: August 28, 2015

Respectfully submitted,

/s/ Gregory A. Castanias
Gregory A. Castanias
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001-2113
(202) 879-3939

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................... i

RULE 35 CERTIFICATION ............................................................................ ii

TABLE OF AUTHORITIES ............................................................................ v

INTEREST OF THE *AMICUS CURIAE* .......................................................... 1

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE FACTS ........................................................................ 1

ARGUMENT AND AUTHORITIES ................................................................ 1

I.     THE ACT SUBJECTS DOCTORS WHO PROVIDE INFORMATION TO PATIENTS ON ONE PARTICULAR SUBJECT—GUN OWNERSHIP AND SAFETY—TO DISCIPLINARY ACTION. ...................................................................... 3

II.    THE DOCTOR-PATIENT RELATIONSHIP IS A CRUCIAL AVENUE FOR PROVIDING HEALTH AND SAFETY INFORMATION TO PARENTS, INCLUDING INFORMATION ABOUT FIREARM SAFETY. ............................................................... 4

       A.     In General, Doctor-Patient Communications Play An Important Role In The Marketplace Of Ideas. ................................. 4

       B.     Parents In Particular Reply On Their Doctors For Accurate Health And Safety Information About Raising Their Children. .............. 6

       C.     Studies Show That Doctor-Patient Communications About Firearm Safety Lead To Better Firearm Storage Practices. ................. 6

III.   THE ACT VIOLATES PATIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION ABOUT FIREARM SAFETY. ................. 8

       A.     The Act Is A Content-Based Restriction That Will Chill A Significant Amount Of Protected Speech And, In Turn, Deprive Many Patients Of Important Information About Firearm Safety. ........... 8

       B.     The First Amendment Protects Individuals' Right To Receive Information, And This Right Does Not Disappear Within The Context Of The Doctor-Patient Relationship ......................... 10

C.    The Act Violates The First Amendment Because It Prevents *Willing* Listeners From Receiving Information In Order To Protect A Minority of *Unwilling* Listeners ................................................... 12

CONCLUSION ........................................................................................................ 15

CERTIFICATE OF SERVICE ..........................................................................................

# TABLE OF AUTHORITIES

**Page(s)**

**C**ASES

Bd. of Educ. v. Pico ex rel. Pico,
457 U.S. 853 (1982) ................................................................. 10

Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,
447 U.S. 557 (1980) ............................................................. 12, 14

Conant v. Walters,
309 F.3d 629 (9th Cir. 2002) ..................................................... 5

Erznoznik v. City of Jacksonville,
422 U.S. 205 (1975) ................................................................. 12

Greater New Orleans Broad. Ass'n v. United States,
527 U.S. 173 (1999) ................................................................. 13

King v. Governor of the State of New Jersey,
767 F.3d 216 (3d Cir. 2014) ..................................................... 5, 6

Lorillard Tobacco Co. v. Reilly,
533 U.S. 525 (2001) ............................................................. 10, 14

Martin v. City of Struthers,
319 U.S. 141 (1943) ........................................................... 10, 14, 15

Police Dep't of City of Chicago v. Mosley,
408 U.S. 92 (1972) ................................................................. 8

Procunier v. Martinez,
416 U.S. 396 (1974) ................................................................. 11

Reed v. Town of Gilbert,
135 S. Ct. 2218 (2015) ..................................................... 3, 12, 14, 15

*Reno v. ACLU,*
   521 U.S. 844 (1997) ............................................................. 14, 15

*Sorrell v. IMS Health Inc.,*
   131 S. Ct. 2653 (2011) ........................................................ 11, 13

*Stanley v. Georgia,*
   394 U.S. 557 (1969) ................................................................. 10

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,*
   425 U.S. 748 (1976) ................................................................. 10

## STATUTES

Fla. Stat. Ann. § 790.338(1) ......................................................... 4

Fla. Stat. Ann. § 790.338(2) ................................................... 4, 8, 9

Fla. Stat. Ann. § 790.338(4) ......................................................... 4

Fla. Stat. Ann. § 790.338(5) .................................................... 4, 10

Fla. Stat. Ann. § 790.338(6) ..................................................... 4, 9

Fla. Stat. Ann. § 790.338(8) ......................................................... 4

## OTHER AUTHORITIES

Teresa Albright & Sandra Burge, *Improving Firearm Storage Habits: Impact of Brief Office Counseling by Family Physician*, 16 J. Am. Bd. of Family Practice 40 (2003) ................................................................ 7, 14

American Academy of Pediatrics, *Firearms Safety, available at* http://bit.ly/1hG8WYV ................................................................ 7

Shari L. Barkin et al., *Is Office-Based Counseling About Media Use, Timeouts, and Firearm Storage Effective?* 122 Pediatrics 15 (2008) ....................... 7

R.Butkus & A.Weissman, *Internists' Attitudes Toward Prevention of Firearm Injury*, 160 Annals of Internal Medicine 821 (2014) ........................... 8

Tamera Coyne-Beasley et al., *"Love Our Kids, Lock Your Guns," A Community-Based Firearm Safety Counseling and Gun Lock Distribution Program*, 155 Archives of Pediatric & Adolescent Medicine 659 (2001) ................... 7

*Everytown Poll Memo: Gun Storage and Child Access Prevention*, June 23, 2014, *available at* http://every.tw/1UdgJt4 ........................................................... 15

Fed. R. App. P. 29(c)(5) ............................................................................ 1

Fed. R. App. P. 35(a)(2) ............................................................................ 2

Lawrence O. Gostin, *Public Health Law: Power, Duty, Restraint* (2d ed. 2008) ........................................................................................... 5

Alexis Macias, *When States Practice Medicine: Physician Gag Laws*, Bulletin of the Am. Coll. of Surgeons, Feb. 1, 2012 ...................................................... 7

Moms Demand Action & Everytown for Gun Safety, *Innocents Lost: A Year of Unintentional Gun Deaths* (2014) ......................................................... 7

## INTEREST OF THE *AMICUS CURIAE*[1]

As set forth in the accompanying motion for leave to file this *amicus* brief, Moms Demand Action for Gun Sense in America ("Moms Demand Action") is a grassroots movement of American mothers fighting for public safety measures that respect the Second Amendment and protect people from gun violence. A part of Everytown for Gun Safety, Moms Demand Action promotes firearm safety nationwide and believes that doctors—in particular, pediatricians—play an indispensable role in promoting responsible gun ownership and storage because they are often parents' primary source of information about children and gun safety.

## STATEMENT OF THE ISSUES

Whether the State can, consistent with the First Amendment, place content-based restrictions on doctor-patient communications that restrict the flow of truthful information from doctor to patient.

## STATEMENT OF THE FACTS

*Amicus* adopts the statement of facts set forth in Judge Wilson's dissenting opinion (Op. 78-90) and adopted by petitioners here (Pet. 4).

## ARGUMENT AND AUTHORITIES

Petitioners have shown, persuasively, that Florida's "Firearm Owners Privacy

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amicus curiae* and its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

Act" (variously, "FOPA" or "the Act") is an improper content-based restriction on physicians' speech that impedes doctors' ability to counsel their patients in ways that diverge from the State of Florida's preferred political stance. Petitioners have further shown, in detail, how the fractured panel opinion, in upholding the Act against constitutional challenges, "breaks with settled Supreme Court precedent and silences critical communication between doctors and patients." Pet. 1.

*Amicus* submits this brief to underscore the "question of exceptional importance," Fed. R. App. P. 35(a)(2), presented by this case: May a state restrict the transmission of literally lifesaving information within the marketplace for ideas? By restricting doctors' speech regarding gun safety, FOPA infringes doctors' First Amendment right to speak. *Amicus* submits this brief to demonstrate that FOPA also infringes patients' right to hear that speech.

The doctor-patient relationship is a critical means of conveying accurate, unbiased public health information in a marketplace crowded with behavioral messages. Parents rely on their pediatricians for medically sound advice for raising healthy, safe children. In particular, studies show that when doctors make routine inquiries about firearm ownership and follow up with brief, one-time counseling about storage practices, families improve the safety of their gun storage practices.

Florida, however, has enacted a content-discriminatory law that will chill doctor-patient communications about firearm safety. This law violates patients' long-recognized First Amendment right to receive information. Doctor-patient

communications play a crucial role in disseminating valuable information, thus meriting First Amendment protection. The Supreme Court has repeatedly held that speech by professionals receives First Amendment protection, and petitioners amply demonstrate that the viewpoint-discriminatory approach of FOPA must satisfy strict scrutiny. Pet. 6-9; *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). And, even in cases where a *speaker* may be entitled to lesser First Amendment protection, such as "intermediate scrutiny," the regulation must still be narrowly tailored so that *listeners'* First Amendment rights to receive that information are not abridged.

Moreover, even if intermediate scrutiny applied, the Act would fail it; the panel majority's intermediate-scrutiny analysis was insufficiently sensitive to both speakers' and listeners' rights. As the Supreme Court has repeatedly held, the government cannot deprive the public of the opportunity to receive communications to protect the sensibilities of a minority of listeners. *En banc* rehearing should be granted.

## I. THE ACT SUBJECTS DOCTORS WHO PROVIDE INFORMATION TO PATIENTS ON ONE PARTICULAR SUBJECT—GUN OWNERSHIP AND SAFETY—TO DISCIPLINARY ACTION.

Florida passed FOPA in 2011, in response to a handful of complaints to legislators by patients who had been asked about firearm ownership by their physicians. Op. at 5-6 & n.2. The Act places a number of sweeping restrictions on doctor-patient communications and related activities. Most salient here, it provides that doctors "should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family

member of the patient, or the presence of a firearm in a private home," unless the doctor "in good faith believes that this information is relevant to the patient's medical care or safety." Fla. Stat. Ann. § 790.338(2). The Act also restricts information about firearm ownership being entered into patients' medical records, *id.* § 790.338(1), and provides that doctors may not discriminate against or "unnecessarily harass" patients on the basis of firearm ownership, *id.* § 790.338(5)-(6). (Doctors may still "choose [their] patients." *Id.* § 790.338(4).) A violation of the Act subjects a doctor to disciplinary action. *Id.* § 790.338(8).

## II. THE DOCTOR-PATIENT RELATIONSHIP IS A CRUCIAL AVENUE FOR PROVIDING HEALTH AND SAFETY INFORMATION TO PARENTS, INCLUDING INFORMATION ABOUT FIREARM SAFETY.

The Act places an unconstitutional burden on doctor-patient communications—a vital means of transmitting accurate, research-based information about child health and safety to parents.

### A. In General, Doctor-Patient Communications Play An Important Role In The Marketplace Of Ideas.

Patients rely on their doctors for information and advice that will allow them to make optimal decisions about medical treatment and their lifestyles in general. In a marketplace of ideas saturated with commercial advertising and other messages aimed at influencing behavior, there is a pressing need for accurate and unbiased health information. To quote a leading health-law scholar, "[t]he population must at least be aware of the health consequences of risk behaviors to make informed decisions."

Lawrence O. Gostin, *Public Health Law: Power, Duty, Restraint* 333 (2d ed. 2008). "The citizenry is bombarded with behavioral messages that affect its health—by the media and entertainment, trade associations and corporations, religious and civic organizations, and family and peers. Public health officials strive to be heard above the din of conflicting and confusing communications." *Id.*

Doctor-patient communications are often patients' sole source of reliable health information: "[P]rofessionals have access to a body of specialized knowledge to which laypersons have little or no exposure. . . . [T]his information . . . will often be communicated to [citizens] directly by a licensed professional during the course of a professional relationship. Thus, professional speech . . . serves as an important channel for the communication of information that might otherwise never reach the public." *King v. Governor of the State of New Jersey*, 767 F.3d 216, 234 (3d Cir. 2014). *See also Conant v. Walters*, 309 F.3d 629, 644 (9th Cir. 2002) (Kozinski, J., concurring).

This information is no less essential simply because it may at times provoke patient discomfort; indeed, it could well be said that the most important information that doctors dispense is the least welcome. Doctors frequently counsel patients that they should lose weight, eat less, or exercise more, and often tell patients that habits they find pleasurable, such as smoking, drinking excessive alcohol, or eating rich foods, are unhealthy. They also must frequently ask questions that touch on extremely private, sensitive subjects such as sexual behavior and domestic abuse. But doctors are guided in their actions by the medical community's consensus about

appropriate care. Patients listen to their doctors with the expectation that doctors will tell them what is good for them, not just what patients want to hear.

**B.** **Parents In Particular Rely On Their Doctors For Accurate Health And Safety Information About Raising Their Children.**

Visits to the pediatrician are often parents' primary source of information about how to raise a safe and healthy child. Pediatricians tell new parents what sleeping practices minimize the risk of crib death; what foods babies should eat and avoid; and how to "babyproof" the child's home. As the children grow, these conversations move to topics such as household safety—*e.g.*, using gates at staircases to prevent falls; swimming pool safety; proper storage of dangerous chemicals; and using helmets for bicycle- or skateboard-riding. Storing firearms safely out of reach of curious children is a logical and important part of this dialogue.

Indeed, before children begin attending school, parents have few or no other reliable contacts with public health or medical experts who can bring health and safety issues to their attention. To be sure, friends, relatives, and religious communities can and do provide information and opinions about child-rearing. But doctors are uniquely positioned to provide parents with accurate, empirically based information about child health and safety. *See King*, 767 F.3d at 234. Even after children start school, doctors remain an important source of such information.

**C.** **Studies Show That Doctor-Patient Communications About Firearm Safety Lead To Safer Firearm Storage Practices.**

Several studies show that when doctors inquire about firearm ownership and

provide brief follow-up counseling to gun owners, patients are significantly more likely to follow recommended firearm storage practices. One found that this approach led to a 21.4% increase in safe storage practices among patients who received counseling. Shari L. Barkin et al., *Is Office-Based Counseling About Media Use, Timeouts, and Firearm Storage Effective?*, 122 Pediatrics 15 (2008). Another found that after a single instance of verbal counseling by a family doctor (or counseling coupled with a brochure), families were three times more likely to make a safe change in firearm storage habits than families that received no counseling.[2] And research conducted by *amicus* determined that more than two-thirds of fatal, unintentional shootings of children could be avoided if gun owners stored their firearms responsibly. *See* Moms Demand Action & Everytown for Gun Safety, *Innocents Lost: A Year of Unintentional Gun Deaths* (2014). Thus, the American Academy of Pediatrics holds that inquiries about firearm ownership should be part of routine pediatric care.[3]

---

[2] Teresa Albright & Sandra Burge, *Improving Firearm Storage Habits: Impact of Brief Office Counseling by Family Physician*, 16 J. Am. Bd. of Family Practice 40, 44 (2003). *See also* Tamera Coyne-Beasley et al., *"Love Our Kids, Lock Your Guns," A Community-Based Firearm Safety Counseling and Gun Lock Distribution Program*, 155 Archives of Pediatric & Adolescent Medicine 659, 663 (2001) (concluding that tailored physician counseling can improve rate of safe firearm storage).

[3] *See* American Academy of Pediatrics, *Firearms Safety*, *available at* http://bit.ly/1hG8WYV. The overwhelming majority of the medical community agrees. An American Medical Association resolution defends the right of doctors to discuss firearm safety issues and risks with their patients. *See* Alexis Macias, *When States Practice Medicine: Physician Gag Laws*, Bulletin of the Am. Coll. of Surgeons, Feb. 1, 2012. A 2013 survey found that 85% of internists believed that firearm injury is a public health issue; two-thirds believed that physicians should be able to counsel

Simply put, pediatricians' information about firearm safety—if they are allowed to provide it to parents—will save children's lives.

## III. THE ACT VIOLATES PATIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION ABOUT FIREARM SAFETY.

The First Amendment protects the right to receive information, a right that does not evaporate within the context of the doctor-patient relationship. The Act will chill physicians' speech, and thus prevent parents who would prefer to be informed about firearm safety from receiving that information. It is therefore unconstitutional.

### A. The Act Is A Content-Based Restriction That Will Chill A Significant Amount Of Protected Speech And, In Turn, Deprive Many Patients Of Important Information About Firearm Safety.

The Act is a classic content-based restriction on doctor-patient communications. Op. at 62 (majority); *id.* at 94 (dissent). It provides that doctors "should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition . . . ." Fla. Stat. Ann. § 790.338(2). On its face, the Act distinguishes between inquiries and questions concerning firearm ownership and inquiries and questions on all other topics, and limits only speech pertaining to firearm ownership. This is quintessential content discrimination. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ( "above all else, the First Amendment means that government has no power to restrict expression because of

_____
(continued…)

patients on gun safety. R.Butkus & A.Weissman, *Internists' Attitudes Toward Prevention of Firearm Injury*, 160 Annals of Internal Medicine 821 (2014).

its message, its ideas, its subject matter, or its content").

As the panel dissent explained in detail, the Act will chill communications about "one topic and one topic only"—firearms—between doctors and patients. Op. at 79. The Act bans written and oral inquiries about firearm ownership. Fla. Stat. Ann. § 790.338(2). Although the Act goes on to provide that such inquiries are permissible when "a health care practitioner . . . in good faith believes that this information is relevant to the patient's medical care or safety," *id.*, this will not eliminate the Act's chilling effect: The "good faith" determination can only be made *post hoc*, and cannot provide a clear safe harbor for physician speech that a doctor can rely upon *ex ante*. In consequence, doctors will take the safe course and simply refrain from making routine inquiries on the topic and having follow-up conversations. In turn, a substantial number of gun-owning patients—those who give doctors no specific reason to raise the issue of gun safety—will never receive the counseling and information that their doctors would otherwise have provided.

Similarly, the legislative history shows that the provision banning "unnecessar[y] harass[ment]," Fla. Stat. Ann. § 790.338(6), seeks to minimize doctor-patient conversations about firearm safety—the Act was ostensibly passed in response to a handful of reports of patient discomfort with doctors' inquiries about firearm ownership. *See* Op. at 6 n.2. This in mind, doctors will quite reasonably fear that asking follow-up questions to an initially non-responding patient would be *ex post* deemed "unnecessary harassment" under the Act. A reasonably risk-averse physician

will just avoid the topic entirely—the epitome of a "chilling effect." Finally, the anti-discrimination provision, Fla. Stat. Ann. § 790.338(5), is likely to have a similar chilling effect. *See* Op. at 140-44 (Wilson, J., dissenting).

The Act will thus chill physician speech and prevent patients from receiving information about firearm safety. The First Amendment cannot tolerate such harm.

### B. The First Amendment Protects Individuals' Right To Receive Information, And This Right Does Not Disappear Within The Context Of The Doctor-Patient Relationship.

The First Amendment protects listeners' right to receive information just as much as speakers' right to disseminate it. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 565 (2001) ("[A] speech regulation cannot unduly impinge on . . . the adult listener's opportunity to obtain information."); *Bd. of Educ. v. Pico ex rel. Pico*, 457 U.S. 853, 866-67 (1982) (plurality op.) ("the Constitution protects the right to receive information and ideas" (citation omitted)); *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) ("[T]he protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both."); *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("the Constitution protects the right to receive information and ideas"); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (freedom of speech "embraces the right to distribute literature and necessarily protects the right to receive it" (citation omitted)).

This established First Amendment principle applies to the doctor-patient relationship. As shown above, doctors' communications to patients are an important

means of disseminating valuable public health information.  They therefore merit

constitutional protection.  Indeed, the free flow of information is particularly

important "in the fields of medicine and public health, where information can save

lives."  *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011).

Whatever might be said about limitations on *doctors'* free-speech rights, it would

not follow that *patients'* First Amendment rights may be abridged with impunity.

Indeed, in *Procunier v. Martinez*, 416 U.S. 396 (1974), the Supreme Court specifically

rejected the idea that the diminished First Amendment protection afforded to a

speaker—there, an inmate—similarly negates the First Amendment rights of the

*audience.*  "*Both parties* to the correspondence have an interest in" their communication.

*Id.* at 408 (emphasis added).  The Court therefore "reject[ed] any attempt to justify

censorship of inmate correspondence merely by reference to certain assumptions

about the legal status of prisoners."  *Id.* at 409.  "This line of argument . . . fail[s] to

recognize that the First Amendment liberties of free citizens are implicated in

censorship of prisoner mail," the Court stated, *id.*, before invalidating the regulations

in question, *see id.* at 413-14.  By the same token, concerns that some patients might

feel "uncomfortable" having firearm-safety discussions with their doctor cannot

justify abridging the right of patients willing—indeed, often eager—to receive that

truthful information.  The Court's general governing principle is that "the

Constitution does not permit government to decide which types of otherwise

protected speech are sufficiently offensive to require protection for the unwilling

listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975).

The majority's approach to speech is nothing short of a radical rewriting of the First Amendment, not to mention the basic compact between doctor and patient. Under the majority's approach, sellers of products that might be the subject of future doctor-patient health conversations would be well-advised to lobby for identical "anti-harrassment" legislation, making discussions of butter, tobacco, alcohol, fast-food, sugar, motorcycle helmets, family planning, and so on, all subject to the risk of *ex post* reprisals. The cumulative effect would reduce doctors from trusted advisers to mere merchants of medical services, afraid to tell their patients anything negative lest they risk charges of "harassment."

**C.** **The Act Violates The First Amendment Because It Prevents *Willing* Listeners From Receiving Information In Order To Protect A Minority of *Unwilling* Listeners.**

Where a state law "imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny, 'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 135 S. Ct. at 2231. And even where intermediate scrutiny is appropriate, a similar narrow tailoring is required: The state must show that the Act "directly advances" a "substantial" government interest, and is "not more extensive than is necessary to serve that interest." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980). FOPA is not sufficiently tailored under either test—principally because it violates the longstanding

rule that the government may not restrict speech to protect a minority of listeners when the restriction will prevent the public from receiving the speaker's message.

To start, the validity of the state's justifications is doubtful. The legislature relied on but a few claimed instances of patients' perceived harassment by doctors regarding firearm-ownership discussions. *See* Op. at 6 n.2. The Supreme Court has disapproved of reliance on such anecdotal evidence as sufficient to satisfy even intermediate scrutiny. *See Sorrell,* 131 S. Ct. at 2669 ("It is doubtful that concern for a few physicians who may have felt coerced and harassed by pharmaceutical marketers can sustain a broad content-based rule . . . ." (internal quotation marks omitted)).

Further, the state has not established that the Act actually promotes its asserted interests. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999). The Act does little to further the State's asserted interests of improving healthcare, protecting firearm owners' privacy rights, protecting Second Amendment rights, and preventing discrimination. *See* Op. at 121-44 (Wilson, J., dissenting).

In any event, the Act is not sufficiently tailored to satisfy strict or even intermediate scrutiny. As in *Reed*, where the town's "Sign Code" barred large political signs but left all other kinds of large signs unregulated, here, FOPA fails strict scrutiny because it seeks to prevent patients from being "harassed" by gun-related speech, but

leaves all other potentially "harassing" speech on other topics (diet, exercise, etc.) untouched. 135 S. Ct. at 2227. Even for intermediate scrutiny, the law must be "no[] more extensive than is necessary to serve [the asserted governmental] interest." *Central Hudson*, 447 U.S. at 566. And here, the Supreme Court's decisions have repeatedly held that a regulation of speech fails this tailoring requirement when it restricts the speech available to the general public, including to willing listeners, in order to protect the sensibilities of a minority who might find the speech offensive.[4]

These First Amendment concerns are highly salient here, because most patients would welcome inquiries and information about firearm safety from their doctors. In one study, 70% of gun owners said "no" when asked if they were bothered by inquiries about gun storage and safety by their doctors. Albright & Burge at 44. More generally, data show that citizens overwhelmingly favor responsible gun storage practices; indeed, both gun owners and non-owners strongly support laws requiring

_____

[4] *See, e.g., Martin*, 319 U.S. at 143-44 (striking down ordinance prohibiting door-to-door distribution of leaflets despite claimed justification of "the protection of the householders from annoyance," because it improperly "substitute[d] the judgment of the community for the judgment of the individual householder"); *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (Communications Decency Act failed tailoring requirement because it suppressed "a large amount of speech that adults have a constitutional right to receive and to address to one another," whereas "less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve"); *Lorillard Tobacco*, 533 U.S. at 561-62, 564 (ban on tobacco advertising aimed at children lacked "a reasonable fit between the means" employed and the goal of reducing juvenile tobacco use, because "adults have [an] interest in receiving truthful information about tobacco products," but "[i]n some geographical areas, [the law] would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers").

such practices.  *Everytown Poll Memo: Gun Storage and Child Access Prevention*, June 23, 2014, at 2-3, *available at* http://every.tw/1UdgJt4.  But Florida, ostensibly to stop "harassment" of a few gun owners, has prescribed a law that will chill those discussions from taking place with all patients, including the significant majority who would not object to—or even welcome—those discussions.

It takes little imagination to think of more tailored means for achieving the legislature's ends—most simply, by requiring doctors to cease inquiries about a particular topic when a patient indicates that she does not want to discuss the topic. That would leave it up to the individual patient to decide whether or not to receive firearm safety (or other) information, without blocking willing patients from receiving it.  Where speech bothers some listeners, the remedy is to allow the listeners to decide whether to hear it.  *Martin*, 319 U.S. at 147 ("leaving to each householder the full right to decide whether he will receive strangers as visitors"); *Reno v. ACLU*, 521 U.S. 844, 877 (1997) (instead of penalizing content-providers for making indecent material available on the Internet, a less-speech-restrictive means of protecting children would be to allow each household to control whether particular messages are received).

In sum:  Florida's sweeping, content-based restriction on doctor-patient communications lacks the narrow tailoring required by the First Amendment.

## CONCLUSION

The Court should grant rehearing *en banc*, vacate the panel decision, and affirm the judgment and injunction of the district court.

Dated:  August 28, 2015

Respectfully submitted,


/s/ Gregory A. Castanias
Gregory A. Castanias
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Peter C. Canfield
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
(404) 521-3939

J. Adam Skaggs
MOMS DEMAND ACTION
 FOR GUN SENSE IN AMERICA
P.O. Box 4184
New York, NY 10163
(646) 324-8201


Counsel for *Amicus Curiae*
Moms Demand Action for
Gun Sense in America

# CERTIFICATE OF SERVICE

I hereby certify that, on August 28, 2015, the foregoing Brief of *Amicus Curiae* was served via Electronic Case Filing (ECF) on all counsel of record as indicated below, and that fifteen paper copies were sent to the Clerk of the Court by overnight courier.

Douglas H. Hallward-Driemeier, Esq.
Mariel Goetz, Esq.
Ropes & Gray LLP
700 12th Street, NW, Suite 900
Washington, D.C.  20005

Erin R. Macgowan, Esq.
Ropes & Gray LLP
800 Boylston Street
Boston, MA  02199-3600

Edward M. Mullins, Esq.
Astigarrage Davis Mullins & Grossman, P.A.
701 Brickell Avenue, 16th Floor
Miami, FL  33131-2847

Jonathan E. Lowy, Esq.
Brady Center to Prevent Gun Violence
1225 Eye Street, NW, Suite 1100
Washington, D.C.  2005

Pam Bondi, Esq.
Allen C. Winsor, Esq.
Timothy Osterhaus, Esq.
Jason Vail, Esq.
Diane G. DeWolf, Esq.
Rachel E. Nordby, Esq.
Office of the Attorney General
PL01- The Capitol
Tallahassee, FL  32399-1050

/s/ Gregory A. Castanias
Gregory A. Castanias