

ROPES & GRAY LLP
2099 PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20006-6807
WWW.ROPESGRAY.COM

November 23, 2015

Douglas H. Hallward-Driemeier
T +1 202 508 4776
F +1 202 383 8354
douglas.hallward-driemeier@ropesgray.com

Mr. John Ley, Clerk
United States Court of Appeals, Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

Re:   No. 12-14009, *Wollschlaeger v. Governor, State of Florida* (pet. for rehearing *en banc* filed
      Aug. 18, 2015)

Dear Mr. Ley:

Pursuant to F.R.A.P. 28(j), appellees submit *Dana's Railroad Supply v. Florida*, Case No.
14-14426 (Nov. 4, 2015), which is irreconcilable with the panel opinion in *Wollschlaeger*.

*Dana's Railroad* holds that a Florida law forbidding merchants from imposing a credit card
surcharge fails intermediate First Amendment scrutiny. The opinion stresses several points relevant
to Florida's Firearm Owners Privacy Act ("FOPA"), at issue in *Wollschlaeger*, including: (i)
viewpoint-based discrimination is among "governments' most insidious methods of eliminating
unwelcome opinion" and receives the highest level of judicial scrutiny, *id.* at 22; (ii) courts must
"disregard any potential state interest that would 'keep the public in ignorance' for their own good
because such 'paternalis[m]' is abhorrent to the First Amendment," *id.* at 19-20; (iii) state interests
"formulated too abstractly" – like "consumer protection" in *Dana's Railroad* or "privacy" here –
cannot be "substantial," *id.* at 26; and (iv) "merely wrapping a law in the cloak" of lesser protected
speech – "commercial" in *Dana's Railroad* or "professional" here – "does not immunize it from the
highest form of scrutiny," *id.* at 23.

If laws restricting speech about commercial surcharges are unconstitutional, it follows *a
fortiori* that FOPA, which was enacted for the express purpose of silencing a viewpoint about gun
ownership deemed too "political," must fail. These two decisions, taken together, hold that the state
is barred from regulating a merchant's speech to a customer about a product's price but may restrict
a doctor's speech to a patient about a potentially life-threatening public health issue. If the First
Amendment allows a hierarchy of speech, it is the reverse of that result. *See City of Cincinnati v.
Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (any lesser First Amendment protection for
commercial speech is limited to speech proposing a commercial transaction). The *Dana's Railroad*
majority's attempt to distinguish FOPA as involving an area requiring "greater need for regulatory
flexibility," slip op. at 18, is irrelevant under its own reasoning because FOPA specifically targeted
doctors' speech about firearms because of their perceived viewpoint.

ROPES & GRAY LLP

Please circulate this letter and attachment to the full court, given the pending petition for rehearing *en banc*.

Respectfully submitted,

Douglas H. Hallward-Driemeier
Ropes & Gray LLP
2099 Pennsylvania Ave., N.W.
Washington, DC 20006
douglas.hallward-driemeier@ropesgray.com
*Counsel for Petitioners*

Enclosure

cc: Allen C. Winsor
    Pam Bondi
    Jason Vail
    Office of the Attorney General
    PL-01, The Capital
    Tallahassee, FL 32399

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14426
_____

D.C. Docket No. 4:14-cv-00134-RH-CAS

DANA'S RAILROAD SUPPLY,
DANA JACKSON,
TM JEWELRY LLC,
LEE HARPER,
TALLAHASSEE DISCOUNT FURNITURE,
DUANA PALMER,
COOK'S SPORTLAND,
ERIC COOK,

                                          Plaintiffs - Appellants,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,

                                          Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(November 4, 2015)

Before ED CARNES, Chief Judge, TJOFLAT and SENTELLE,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

Anyone who has ever made a purchase at a gas station, corner store, or shopping mall will not be shocked to learn that swiping a credit card is often more expensive than is paying with cash. What may be shocking to learn is that Florida makes it a second-degree misdemeanor for "[a] sellor or lessor in a sales or lease transaction" to "impose a surcharge on the buyer or lessee for electing to use a credit card," Fla. Stat. § 501.0117(1)–(2), while the State expressly allows "the offering of a discount for the purpose of inducing payment by cash." *Id.* § 501.0117(1). Tautologically speaking, surcharges and discounts are nothing more than two sides of the same coin; a surcharge is simply a "negative" discount, and a discount is a "negative" surcharge. As a result, a merchant who offers the same product at two prices—a lower price for customers paying cash and a higher price for those using credit cards—is allowed to offer a *discount* for cash while a simple slip of the tongue calling the same price difference a *surcharge* runs the risk of being fined and imprisoned.[1]

---

[*] The Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

[1] Violators of Florida's no-surcharge law face the possibility of a $500 fine and sixty days' imprisonment. Fla. Stat. §§ 501.0117, 775.082(4)(b), 775.083(1)(e).

2

The First Amendment prevents staking citizens' liberty on such distinctions in search of a difference. Florida's no-surcharge law directly targets speech to indirectly affect commercial behavior. It does so by discriminating on the basis of the speech's content, the identity of the speaker, and the message being expressed. Because the at-best plausible justifications on which the no-surcharge law rest provide no firm anchor, the law crumbles under any level of heightened First Amendment scrutiny. We, therefore, must strike down § 501.0117 as an unconstitutional abridgment of free speech.

## I.

In 2014, four small businesses filed suit in the Middle District of Florida after receiving cease-and-desist letters from the Florida Attorney General demanding they refrain from certain business practices that, according to the Attorney General, ran afoul of the State's no-surcharge law. Essentially, each of these businesses—which charged lower prices for customers using cash and higher prices for those using credit cards—wishes to express to their customers the price difference as an additional amount for credit-card use rather than a lesser amount for paying in cash.

Dana's Railroad Supply, a family-run hobby shop in Spring Hill, received a cease-and-desist letter on March 15, 2013, after posting a sign indicating that its customers would be subject to a fee for using credit cards to make purchases. TM

Jewelry LLC, a specialty jewelry store in Key West, received its letter on July 26, 2013, for communicating to customers that they faced an additional fee for the use of a credit card.  Tallahassee Discount Furniture, a retailer of discount furniture in Tallahassee, received its letter on July 8, 2013, having previously told customers that they faced a 2 percent surcharge for credit-card payments.  And Cook's Sportland, an outdoor-sporting-goods store in Venice, received its letter on September 20, 2012, after having previously told customers that they faced a credit-card surcharge.  Based on the belief that it is more effective, transparent, and accurate to do so, all four of the businesses wish to call the price difference a credit-card *surcharge* rather than a cash *discount*.

These businesses, plaintiffs below and appellants here, filed their complaint on March 5, 2014, presenting two claims for relief under 42 U.S.C. § 1983.  First, they alleged that Florida's no-surcharge law violates the First Amendment as an unjustified restriction on speech.  Second, they alleged that the law provides insufficient guidance on how to comply with its mandates, and is therefore void for vagueness.  The Attorney General moved to dismiss.  The businesses responded by moving for summary judgment.

On September 2, 2014, the District Court granted the Attorney General's motion, dismissing with prejudice the businesses' complaint.  Because the court held that the no-surcharge law is a "[r]estriction[] on pricing" that fell within "the

4

Florida Legislature's broad discretion in regulating economic affairs," it subjected the law to rational-basis review.

The District Court hypothesized three possible justifications for the no-surcharge law.[2]  First, the court considered an antifraud rationale viewing the no-surcharge law as designed to prevent "bait and switch" tactics.  That is, the law could be aimed at preventing merchants from "initially communicating only the lower price—the cash price" and then later charging a higher price—the credit-card price.  Second and relatedly, the court turned to a notice rationale that perhaps the no-surcharge law prevents "unpleasant surprises" not rising to the level of a full-blown bait and switch.  Finally, the court entertained a fairness rationale whereby no merchant would have the discretion to impose credit-card surcharges, preventing "competitive disadvantage" in the marketplace.

The District Court concluded that, though none of these justifications are "compelling" and "might not even be persuasive," the no-surcharge law nonetheless survives rational-basis review.[3]  Notably, the District Court declined to

---

[2] Before the District Court, the Attorney General advanced only a generalized and cursory interest in "protecting consumers."  And the Attorney General declines to elaborate on the State's purported interest on appeal.  We will therefore adopt the three potential justifications identified by the District Court.

[3] To the extent that the District Court speculated the no-surcharge law could have survived intermediate scrutiny, we find that musing to be mere dictum, rather than an alternative holding.  The entirety of the court's speculation on this front consists of the following:  "And if [the no-surcharge law] were viewed as a restriction on commercial speech, the outcome would be the

apply any level of First Amendment scrutiny despite its understanding that "the difference between a cash discount and a credit-card surcharge makes no difference in the price a customer must pay" and that the effect of the no-surcharge law is "a matter of semantics, not economics."

The businesses appealed.  We now reverse.

## II.

Before addressing the merits, we briefly address the Attorney General's argument that we lack jurisdiction to hear a portion of this appeal.  The "irreducible constitutional minimum of standing" requires litigants in federal court to demonstrate:  (1) that they suffered an "injury in fact," which is a "concrete and particularized" and "actual or imminent" legally cognizable harm; (2) that a "causal connection" exists between the injury in fact and the opposing party's conduct; and (3) that the injury "will be redressed by a favorable decision."  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–62, 112 S. Ct. 2130, 2135–37, 119 L. Ed. 2d 351 (1992) (citations and quotation marks omitted).  When First Amendment protections are implicated, we apply "most loosely" the injury-in-fact

---

same."  An offhand comment that lacks substantiating reasoning is exactly the sort of judicial statement we recognize as lacking any authoritative weight.  *See, e.g.*, *Denno v. Sch. Bd. of Volusia Cty., Fla*, 218 F.3d 1267, 1283 (11th Cir. 2000) ("*Dictum* may be defined as 'a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding.'" (citation omitted)).

requirement "lest free speech be chilled." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1253–57 (11th Cir. 2010).

The businesses have properly alleged standing on their free-speech claim. Each business has been injured by the receipt of a cease-and-desist letter from the Attorney General threatening enforcement action, which could result in fine or imprisonment; that action is, and any future enforcement action would be, directly traceable to the State of Florida; and a declaration by this court that the no-surcharge law is unconstitutional will remedy the businesses' harm. The businesses' harm is sufficiently particularized and imminent, and the likelihood of their speech being chilled is sufficiently great, for review by this court.

Nor are the businesses barred from pursuing their void-for-vagueness claim because they seek pre-enforcement review. The general rule provides that litigants can raise void-for-vagueness challenges only as a defense during an actual prosecution because that defense turns on whether the State provided fair warning, as a matter of due process, to the litigants that their conduct would expose them to liability. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1348–50 (11th Cir. 2011). "Litigants may not comb the statute books for poorly drafted laws and sue to enjoin their enforcement." *Id.* at 1349. Litigants who are being "chilled from engaging in constitutional activity," however, suffer a discrete harm independent of enforcement, and that harm creates the basis for our jurisdiction.

7

*Id.* at 1349–50.  Here, though the businesses properly raised it, we need not reach the void-for-vagueness issue because any reasonable construction of Florida's no-surcharge law fails any level of heightened scrutiny.

With our jurisdiction established, we proceed to the merits.

III.

This appeal presents a pure question of law:  the facial validity of Florida's no-surcharge law under the First Amendment to the United States Constitution. Our review is de novo.  *Burk v. Augusta-Richmond Cty.*, 365 F.3d 1247, 1250 (11th Cir. 2004).

The fate of Florida's no-surcharge law hinges on a single determination: whether the law regulates *speech*—triggering First Amendment scrutiny—or whether it regulates *conduct*—subject only to rational-basis review as a mine-run economic regulation.  The First Amendment provides, in relevant part, that "Congress shall make no law … abridging the freedom of speech."  U.S. Const. amend. I.[4]  Laws passed by the federal or state governments that restrict, compel, or silence speech are disfavored, and presumptively unconstitutional.  *See United States v. Alvarez*, 567 U.S. __, __, 132 S. Ct. 2537, 2543–44, 183 L. Ed. 2d 574

---

[4] The First Amendment, despite its express language, has long since been incorporated against the several states under the Due Process Clause of the Fourteenth Amendment.  *See Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 629–30, 69 L. Ed. 1138 (1925).

(2012); *Wooley v. Maynard*, 430 U.S. 705, 714–15, 97 S. Ct. 1428, 1435–36, 51 L. Ed. 2d 752 (1977). By contrast, legislatures are given wide latitude to "balance the advantages and disadvantages" when choosing whether and how to regulate commercial behavior. *See Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88, 75 S. Ct. 461, 464–65, 99 L. Ed. 563 (1955).

To make the dispositive speech–conduct determination, we turn first to the text of the statute. *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). We do not lightly make the decision to strike down laws passed by the people through their democratically accountable representatives. Bound as all human communication is by the confines of language, legislatures will at times enact statutes capable of sustaining multiple interpretations. Cognizant of this reality, before holding that a statute violates the Constitution we therefore look to "reasonable" alternative constructions. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, __ U.S. __, __, 132 S. Ct. 2566, 2593–94, 183 L. Ed. 2d 450 (2012). At times, this means that we will adopt saving interpretations of constitutionally dubious laws that are not "the most natural." *Id.* at __, 132 S.Ct. at 2594. We will not, however, contort, disfigure, or vitiate a law's plain meaning and readily discerned purpose merely for the sake of statutory preservation. *See, e.g.*, *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379, 53 S. Ct. 620, 622, 77 L. Ed. 1265 (1933)

9

(Cardozo, J.) ("But avoidance of a [constitutional] difficulty will not be pressed to the point of disingenuous evasion.").

Proceeding to the matter at hand, the relevant language of the no-surcharge law provides:

(1) *A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means*, if the seller or lessor accepts payment by credit card. A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make payment.
…
*This section does not apply to the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card*, if the discount is offered to all prospective customers.

(2)  A person who violates the provisions of subsection (1) is guilty of a misdemeanor of the second degree, …

Fla. Stat. § 501.0117 (emphasis added).[5]  As a second-degree misdemeanor, the no-surcharge law exposes violators to the possibility of sixty days' imprisonment and a $500 fine.  *See id.* §§ 501.0117, 775.082(4)(b), 775.083(1)(e).

---

[5] In its entirety, Florida's no-surcharge law provides:

(1) A seller or lessor in a sales or lease transaction may not impose a surcharge on the buyer or lessee for electing to use a credit card in lieu of payment by cash, check, or similar means, if the seller or lessor accepts payment by credit card.  A surcharge is any additional amount imposed at the time of a sale or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make payment. Charges imposed pursuant to approved state or federal tariffs are not considered to be a surcharge, and charges made under such tariffs are exempt from this

Attempting to read Florida's no-surcharge law as a regulation of economic conduct rather than as a restriction on speech casts the judicial Theseus into the depths of a lexical labyrinth. Given the potential for confusion, we find our bearings by beginning with what the no-surcharge law *does not do* before explaining what it *does do*. We conclude that no saving effort, however valiant, can overcome the clear thrust of the statute's plain meaning.

The statute might appear at first blush to ban merchants from engaging in dual-pricing. That is, it would prohibit merchants from charging different prices to different customers depending on whether payment is made in cash[6] or by credit card. Yet, by the statute's own terms, that cannot be. Merchants are expressly allowed to offer a "discount for the purpose of inducing payment by cash." Fla. Stat. § 501.0117(1). The ordinary meaning of *discount*—there is no statutory

---

section. A convenience fee imposed upon a student or family paying tuition, fees, or other student account charges by credit card to a William L. Boyd, IV, Florida resident access grant eligible institution, as defined in s. 1009.89, is not considered to be a surcharge and is exempt from this section if the amount of the convenience fee does not exceed the total cost charged by the credit card company to the institution. The term "credit card" includes those cards for which unpaid balances are payable on demand. This section does not apply to the offering of a discount for the purpose of inducing payment by cash, check, or other means not involving the use of a credit card, if the discount is offered to all prospective customers.

(2) A person who violates the provisions of subsection (1) is guilty of a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083.

Fla. Stat. § 501.0117.

[6] Though the statute also allows for discounts if customers pay with cash equivalents such as personal checks, we refer to these collectively as *cash* for the sake of convenience and clarity.

11

definition—is a "deduction (typically a certain percentage) made from a price or an amount due." *Discount*, Oxford English Dictionary (2015); *Redus Fla. Commercial, LLC v. Coll. Station Retail Ctr., LLC*, 777 F.3d 1187, 1191 (11th Cir. 2014) ("Generally, words are interpreted with their ordinary and plain meaning because we assume that [the legislature] uses words in a statute as they are commonly understood." (citation, quotation marks, and alterations omitted)). Notably, this sense of *discount* is used especially when "the deduction made from a price or an amount due" is so made "in return for prompt or early payment, or *payment in cash*." *Id.* (emphasis added). The connection between lower prices and payments made in cash—as well as the corollary between higher prices and payments made by credit card—is a commonsense reality. The parties neither advance, nor do we find, any basis to call into question the continued propriety of this state of affairs.

If the no-surcharge law does not ban dual-pricing, we presume that it does something else. *See Bouchard Transp. Co., Inc. v. Updegraff*, 147 F.3d 1344, 1351 (11th Cir. 1998) ("[W]e avoid statutory constructions that render provisions meaningless"). Perhaps the statute instead bans the selective raising of previously announced prices "imposed at the time of a sale" for credit-card users. Fla. Stat. § 501.0117(1). That is, perhaps the statute is only a prohibition on bait-and-switch schemes. Under this reading of the no-surcharge law, a merchant could charge

customers different rates based on their method of payment, but could charge a

higher price to credit-card users only if that price is announced before the

transaction occurs.

The anti-bait-and-switch construction, however, fares no better than reading

the statute as a complete ban on dual-pricing.  We reject this construction because

it would narrow the no-surcharge law into nothingness.  All a merchant need do to

avoid liability would be to announce to potential customers the price difference in

advance of any sale.  Assuming proper notice had been given, credit-card

*surcharges* could be declared with impunity on signs, on price tags, as a line item

on receipts, and in response to credit-card-wielding customers' questions as to why

they are being charged more than their cash-flush peers.  Under this strained

reading, even the cheeky merchant who hung a sign on the till that read "You, the

buyer, will have a surcharge imposed on the price of your purchase if you elect to

use a credit card in lieu of payment by cash"—complete with citation to Fla. Stat.

§ 501.0117—would get off scot-free.

Our conclusion rejecting this alternative construction is bolstered by the

Attorney General's own reading of the no-surcharge law.  Not only did the

Attorney General disavow such a narrow reading of the statute in her brief and at

oral argument, but there is also no indication in the record that any of the

businesses' purportedly illegal surcharges referenced in the cease-and-desist letters

13

were concealed from their customers until the point of sale.  Indeed, the letter

directed to Dana's Railroad Supply was issued in response to the decision to post a

sign announcing its policy of imposing credit-card fees.  Moreover, construing the

statute as a bait-and-switch offense would cover only conduct already covered by

the Florida Deceptive and Unfair Trade Practices Act, the State's unfair-

competition law.  Fla. Stat. §§ 501.201–501.213; *see also Dep't of Legal Affairs v.*

*Rogers*, 329 So. 2d 257, 265–67 (Fla. 1976).  Without any textual or contextual

indication that the Florida Legislature intended the no-surcharge law to function

solely as a backstop to its unfair-competition law, we decline to read the law

contrary to its plain meaning.[7]

---

[7] The dissent faults us for rejecting the anti-bait-and-switch construction.  Because the statute defines *surcharge* as "any additional amount imposed at the time of a sale," the dissent argues that this temporal limitation provides a reasonable, constitutionally viable alternative of Florida's no-surcharge law as a regulation of conduct, not speech.  Fla. Stat. § 501.0117(1).  Remarkably, this "is not only a 'fairly possible' interpretation, it is also the most natural one."  Dissent at 42.

Not so.  The dissent's position is essentially that Florida's no-surcharge law can be saved by grafting onto the definition of *surcharge* a notice requirement that would enable a merchant to "speak in any way he chooses so long as he does not ambush the credit-card-using customer with a higher price at the register."  *Id.* at 32.  But the dissent puts far too much stock in the "at the time of sale" language.  Read in full, the statutory definition provides:  "*A surcharge is any additional amount imposed at the time of a sale* or lease transaction by the seller or lessor that increases the charge to the buyer or lessee *for the privilege of using a credit card to make payment*."  § 501.0117(1) (emphasis added).

As we understand the dissent's position, the merchant who hangs a sign on the register announcing a generally applicable surcharge for all credit-card sales need not fear prosecution under § 501.0117 because customers, armed with notice prior to the time of sale, would not fall prey to commercial "ambush."  Similarly immune from liability, however, would be the deceitful huckster who kept his mouth shut and added $5 to a customer's bill unless a prosecutor could show that the additional amount was imposed "for the privilege of using a credit card" rather

Having considered and rejected these alternative constructions, we are left with the conclusion that the Florida Legislature meant what it said in its no-surcharge law:  merchants can engage in dual-pricing so long as they offer only cash *discounts*, while credit-card *surcharges* are verboten.  In order to violate the statute, a defendant must communicate the price difference to a customer and that communication must denote the relevant price difference as a credit-card *surcharge*.  Calling § 501.0117 a "no-surcharge law," then, is something of a misnomer.  The statute targets expression alone.  More accurately, it should be a "surcharges-are-fine-just-don't-call-them-that law."

After all, what is a surcharge but a negative discount?  If the same copy of Plato's *Republic* can be had for $30 in cash or $32 by credit card, absent any communication from the seller, does the customer incur a $2 *surcharge* or does he

---

than for naked pecuniary gain—a dubious proposition, at best.  Under the dissent's preferred anti-bait-and-switch construction, then, the only scenario in which § 501.0117 applies would be where a merchant gave no prior warning about an additional charge whatsoever *and* somehow expressed that the charge was "for the privilege of using a credit card" at the time of a sale.  It strains credulity that it was this vanishingly small, perhaps entirely fanciful, set of circumstances upon which the Florida Legislature fixed its attention in enacting the broadly sounding § 501.0117.  And this strain is too much for the constitutional-doubt canon to bear.

Finally, we briefly address two other points raised by the dissent.  First, the dissent is of course correct that we do not cede our authority over questions of law to parties' litigation postures.  That the Attorney General's understanding of Florida's no-surcharge is out of sync with the dissent's preferred reading, though not controlling, strongly suggests the likely confusion about the statute's meaning and enforcement that would follow from adopting an anti-bait-and-switch construction.  Second, to the extent that § 501.0117 criminalizes only conduct that is already punishable civilly under the Florida Deceptive and Unfair Trade Practices Act, that should raise more First Amendment and Due Process concerns, not fewer.

15

receive a $2 *discount*?  Questions of metaphysics aside, there is no real-world

difference between the two formulations.  Accordingly, Florida's no-surcharge law

is a restriction on speech, not a regulation of conduct.  *Cf. Rumsfeld v. Forum for*

*Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 60–62, 126 S. Ct. 1297, 1307–09, 164 L.

Ed. 2d 156 (2006) (holding that laws that neither "limit[] what [people] may say

nor require[] them to say anything" regulate conduct, not speech).

To more fully understand why the statute restricts speech, rather than

regulates conduct, imagine the following.  Ostensibly worried about customers'

dining experiences being adversely affected by their unquenched thirst, a state

makes it a crime for restauranteurs to serve *half-empty* beverages.  Restauranteurs

are, however, expressly allowed to serve *half-full* beverages.  The state has no

greater regulatory scheme requiring restaurants to provide beverage refills, nor

does it even require that beverages be served at all.  Would we say that what the

state has done merely regulates the economic affairs of the food-service industry?

Of course not.  Liability for violating this glass-half-full mandate turns solely on

the restauranteurs' choice of words.  It is therefore a restriction of speech, not

conduct.  And it is a restriction that discriminates against expression on the basis of

content—dictating *what* restauranteurs can talk about—as well as on the basis of

viewpoint—dictating *how* restauranteurs can speak about those subjects.

16

We see no legally salient difference between a glass-half-full mandate and Florida's no-surcharge law. Both govern only how to express relative values,[8] imposing criminal liability for making the "wrong choice" between equally plausible alternative descriptions of an objective reality. Given our abhorrence of putting citizens of a free society to such "choices," laws that restrict speech in this fashion must overcome the robust protections of the First Amendment.

## IV.

Having decided that Florida's no-surcharge law triggers First Amendment scrutiny as a restriction on speech, we turn next to what level of scrutiny it must face. Content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. __, __, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015) (citations omitted). A restriction on speech is content based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at __, 1355 S. Ct. at 2227.

---

[8] It may well be the case that economic consequences flow from what a cash–credit price difference is called. Customers facing a price difference that is framed as a *surcharge* may be more willing to cough up cash than those presented with the same choice framed as a *discount*. As a legal matter, potential incidental effects, whether intended by the legislature or not, do not alter the fact that the no-surcharge law directly restricts speech.

As is so often true, the general rule that content-based restrictions trigger strict scrutiny is not absolute.  Content-based restrictions on certain categories of speech such as commercial and professional speech, though still protected under the First Amendment, are given more leeway because of the robustness of the speech and the greater need for regulatory flexibility in those areas.  *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. __, 131 S. Ct. 2653, 180 L. Ed. 2d 544 (2011) (commercial speech); *Wollschlaeger v. Governor of Florida*, No. 12-14009, 2015 WL 4530452 (11th Cir. July 28, 2015) (professional speech).  For these categories of speech, the inquiry is the more flexible, yet still searching, standard of intermediate scrutiny.  *See Cent. Hudson Gas v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564, 100 S. Ct. 2343, 2350, 65 L. Ed. 2d 341 (1980) (describing the test for commercial speech); *Wollschlaeger*, WL 4530452, at *23–25 (applying the same test to professional speech).  Under intermediate scrutiny "restrictions directed at commerce or conduct" may be upheld—assuming they further a substantial government interest and are narrowly tailored—even if they "impos[e] incidental burdens on speech."  *Sorrell*, 564 U.S. at __, 131 S. Ct. at 2664–65.

Florida's no-surcharge law proves difficult to categorize, skirting the line between targeting commercial speech and restricting speech writ large.  We need not, however, decide on which side of that line the statute ultimately falls because it collapses under any level of heightened scrutiny.  *Cf. id.* at __, 131 S. Ct. at 2667

18

(declining to specify the level of "heightened scrutiny" applied when the challenged law would fail under either possible standard).  Thus, we analyze the no-surcharge law under the more-forgiving standard of intermediate scrutiny, which it nonetheless fails.

## A.

Commercial speech is a narrow category of necessarily expressive communication that is "related solely to the economic interests of the speaker and its audience," *Cent. Hudson*, 447 U.S. at 561, 100 S. Ct. at 2349, or that "does 'no more than propose a commercial transaction.'" *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762, 96 S. Ct. 1817, 1825, 48 L. Ed. 2d 346 (1976) (quoting *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 385, 93 S. Ct. 2553, 2558, 37 L. Ed. 2d 669 (1973)).  Though inextricably linked to underlying economic conduct, commercial speech has long been given limited First Amendment protection based on society's "strong interest in the free flow of commercial information," which is an "indispensable" prerequisite for creating the "intelligent and well informed" consumers needed to "preserve a predominantly free enterprise economy." *Id.* at 764–65, 96 S. Ct. at 1827.  With the core concerns of autonomy and the public availability of information in mind, we disregard any potential state interest that would "keep[] the public in ignorance" for their own good because such "paternalis[m]" is abhorrent to the

First Amendment.  *See id.* at 770, 96 S. Ct. at 1829.  That is not to suggest, of course, that the government may not fiercely advocate for its own world view.  "But a State's failure to persuade does not allow it to hamstring the opposition."  *Sorrell*, 564 U.S. at __, 131 S. Ct. at 2671.

Florida's no-surcharge law clearly touches on economic activity.  On its face, the law appears to regulate businesses engaged in dual-pricing, applies to "[a] sellor or lessor in a sales or lease transaction," turns on the method of payment used, and defines the offense as occurring "at the time of a sale or lease transaction."  Fla. Stat. § 501.0117.  There can be no doubt that the no-surcharge law has the flavor of commercial speech.

Yet the law's taste is muddled by less savory notes of plain old-fashioned speech suppression.  The statute goes to great length to avoid direct regulation of any actual conduct—that is, it fails to limit at all merchants' discretion to engage in dual-pricing—in favor of limiting speech alone.  And the speech it limits contains elements of core political speech.[9]  By effectively purging from merchants'

---

[9] No-surcharge laws are not unique to Florida, and have a long and bitter political provenance.  *See generally* Adam Levitin, *Priceless?  The Economic Costs of Credit Card Merchant Restraints*, 55 UCLA L. Rev. 1321, 1363–92 (2008); *see also Italian Colors Rest. v. Harris*, No. 2:14-cv-00604-MCE-DAD, 2015 WL 1405507 (E.D. Cal. Mar. 26, 2015), *appeal docketed* No. 15-15873 (9th Cir. Apr. 30, 2015) (holding unconstitutional California's no-surcharge law); *Roswell v. Pettijohn*, No. 1:14-cv-00190-LY, 2015 U.S. Dist. LEXIS 40739 (W.D. Tex. Feb. 4, 2015) (upholding Texas's no-surcharge law).  The Second Circuit, the only other circuit to confront a similar case, recently upheld New York's no-surcharge law based on a

vocabularies the doubleplusungood *surcharge* and replacing it with the State's

preferred term, *discount*, the constituency most impacted by the no-surcharge law

has been deprived of its full rhetorical toolkit.  *See Cohen v. California*, 403 U.S.

15, 26, 91 S. Ct. 1780, 1788, 29 L. Ed. 2d 284 (1971) ("[W]e cannot indulge the

facile assumption that one can forbid particular words without also running a

substantial risk of suppressing ideas in the process. Indeed, governments might

soon seize upon the censorship of particular words as a convenient guise for

banning the expression of unpopular views.").  In turn, Florida's no-surcharge law

deprives the marketplace of ideas of the full range of public sentiment.

Moreover, its extraordinary breadth suggests the no-surcharge law is more

than a mere regulation of commercial speech.  A law enacted for the sole purpose

of forbidding a price difference to be labelled a *surcharge*, while allowing the

same to be called a *discount*, does not impose an "incidental burden" on speech.

*Sorrell*, 564 U.S. at__, 131 S. Ct. at 2664–65.  On the contrary, imposing a direct

and substantial burden on disfavored speech—by silencing it—is the whole point.

The no-surcharge law is content based:  it applies only to how a merchant may

frame the price difference between cash and credit-card payments.  *See Reed*, 576

---

combination of *Pullman* abstention and a narrow reading of the relevant statutory text and legislative history, both of which differ from § 501.0117's.  *See Expressions Hair Design v. Schneiderman*, No. 13-4533, 13-4537, 2015 WL 5692296 (2d Cir. Sept. 29, 2015).

U.S. at __, 135 S. Ct. at 2227. The no-surcharge law is speaker based: it applies only to those merchants who accept payment by both cash and credit card and engage in dual-pricing. *See Turner Broad. Sys., Inc. v. Fed. Commc'ns Cmm'n*, 512 U.S. 622, 657–58, 114 S. Ct. 2445, 2466–67, 129 L. Ed. 2d 497 (1994). And the no-surcharge law is viewpoint based: it denies the expression of one equally accurate account of reality in favor of the State's own. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 391, 112 S. Ct. 2538, 2547–48, 10 L. Ed. 2d (1992).

Viewpoint-based restrictions on speech are among governments' most insidious methods of eliminating unwelcome opinion. As such, they warrant the greatest level of First Amendment protection. Ceding to any government the power to police expression on the basis of its message poses the most obvious threat to Americans' most fundamental liberties: the freedom of speech and the freedom of conscience. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187, 87 L. Ed. 1628 (1943) (Jackson, J.). The exacting standard of strict scrutiny stands as sentinel against the diminution of that liberty. Appropriately tailored regulations of commercial speech—such as those imposing limits on lawyers' ability to make in-person

22

solicitations or advertise using direct mailings after a personal injury has occurred,
*see Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 115 S. Ct. 2371, 132 L. Ed. 2d 541
(1995)—will necessarily target specific content and speakers. *See Wollschlaeger*,
2015 WL 4530452, at *24. But merely wrapping a law in the cloak of
"commercial speech" does not immunize it from the highest form of scrutiny due
government attempts to discriminate on the basis of viewpoint.

The Sixth Circuit faced a similar "hybrid" law "that implicates commercial
*and* political speech" in *BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499 (6th
Cir. 2008). In that case, Kentucky had passed a law requiring that telecom
providers collect a tax from their customers while forbidding the providers from
directly collecting the tax and from communicating to consumers any additional
charges as a "tax." *See id.* at 501 (citing Ky. Rev. Stat. Ann. § 136.616 (2005)).
Given the dual nature of Kentucky's "no-stating-the-tax clause"—a law "that
draws its heritage as much from protests over the Townshend Acts as from the
*Wealth of Nations*"—Judge Sutton, writing for the majority, confessed having
"difficulty in placing a label on the law." *Id.* at 504–06. As Judge Sutton astutely
observed in his discussion of the challenged provision, though, "what is going on
here is more than just a debate about how best to sell toothpaste." *Id.* at 505.
Ultimately, the court concluded that it could "save the issue for another day"

because the challenged law "does not survive even the less-stringent intermediate level of scrutiny applicable to commercial speech." *Id.*

We find the Sixth Circuit's approach in *Farris* a prudent one. We will therefore analyze Florida's no-surcharge law as if it were commercial speech because it crumbles under even this lower form of heightened scrutiny. Accordingly, were the no-surcharge law subject to strict scrutiny, it would likewise fail.

B.

Turning to the commercial-speech analysis, we make short shrift of Florida's no-surcharge law. The constitutionality of regulations on commercial speech is assessed under the four-part *Central Hudson* test, which asks the following questions. First, does the challenged law regulate speech that is "neither misleading nor related to unlawful activity"? Second, does the government have a "substantial interest" at stake? Third, does the law "directly advance" the government's interest? Fourth, would "a more limited restriction" be insufficient for that interest to "be served as well"? *Cent. Hudson*, 447 U.S. at 564, 100 S. Ct. at 2350. If a law can go four for four, it passes constitutional muster. If not, the challenged law unconstitutionally hampers speech.

Florida's no-surcharge law founders at every step of this inquiry. To start, we reject the Attorney General's notion that the no-surcharge law circumvents the

24

commercial-speech inquiry altogether because it restricts speech as part of addressing an "illegal course of conduct."  Reasoning that the no-surcharge law "at minimum regulates *some* conduct," it therefore outlaws speech only as "part of an integrated course of conduct" and the targeted speech did not need to "be prohibited by some independent law."  We reject any notion that merely because *some* modicum of economic conduct is implicated therefore a law cannot also unconstitutionally restrict speech.  The First Amendment is not so easily circumvented.  And, in any event, the no-surcharge law does not sweep up only speech that is incidental and necessary to the enforcement of another important state interest; speech is the only behavior being targeted.  *Cf. Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502, 69 S. Ct. 684, 690, 93 L. Ed. 834 (1949) ("But [speech] used as an essential and inseparable part of a grave offense against an important public law cannot immunize that unlawful conduct from state control").

Nor is the no-surcharge a regulation of misleading speech.  Calling the additional fee paid by a credit-card user a *surcharge* rather than a *discount* is no more misleading than is calling the temperature *warmer* in Savannah rather than *colder* in Escanaba.  Florida's no-surcharge law thus does not target false or misleading speech.  Because, as discussed above, the no-surcharge law regulates speech and not conduct, we continue to the second *Central Hudson* prong.

25

We struggle to identify a plausible governmental interest that would be served by the no-surcharge law, much less one that could be considered substantial. The candidate advanced by the Attorney General—a generalized interest in "consumer protection"—is formulated too abstractly to provide a meaningful benchmark for weighing the no-surcharge law against the State's purported interest. The three potential interests hypothesized by the District Court, though more concrete, likewise prove unavailing. First, the law may serve as an antifraud measure against bait-and-switch tactics, whereby a merchant advertises a lower price only to later charge a higher price. Second and relatedly, the law may be viewed as a prophylactic measure that protects consumers against "unpleasant surprises" that do not rise to the level of fraud. Finally, the law may be seen as leveling the playing field among merchants, some of whom may otherwise select a policy of assessing credit-card *surcharges* while others opt for cash *discounts*.

We conclude, as did the District Court, that "[n]one of these assertions is compelling" and go a step further to confirm the court's suspicion that they are "not even … persuasive." Our conclusion that the foundation provided by such interests is nothing more than shifting sand is underscored by the fact that Florida has exempted certain state agencies from its no-surcharge law—allowing them to charge "convenience fees" for the privilege of using a credit card, Fla. Stat. § 215.322(2), (3)(b)—without advancing any relevant distinction between private

26

merchants and state agencies that references the asserted interests being served.  If customers would be harmed by learning that they faced *surcharges* but not *discounts* from private merchants, creating an exception allowing the State to impose *convenience fees* betrays the frailty of any potential state interests.[10]  Even should we assume that one or more of these rationales formed a "substantial" government interest, the no-surcharge law proves too broad and too blunt a means to its ends.

Considering the third and fourth *Central Hudson* prongs together, the no-surcharge law neither directly advances any potentially substantial state interest nor is it narrowly tailored.  Any of the asserted interests—preventing bait-and-switch tactics, providing advance notice to customers, and levelling the playing field among merchants—would be better served by direct and focused regulation of actual pricing behavior.  Florida could simply prohibit dual-pricing altogether.  Or it could cap the difference in price that can be charged to customers paying with cash and those using credit cards, just as it has done for the use of credit cards at

---

[10] Specifically, Florida allows "state agenc[ies]" and "the judicial branch" to "accept credit cards, charge cards, debit cards, or electronic funds transfers in payment for goods and services." Fla. Stat. § 215.322(2).  If someone doing business with a state agency chooses to pay with a credit card or other enumerated means, the agency may "impose a convenience fee upon the person making the payment."  *Id.* § 215.322(3)(b).  Given the State's posture in this litigation, it is more than ironic that state agencies are required to frame the additional amount charged to credit-card users as a *convenience fee* rather than as a cash *discount*.

state agencies and for the use of a "money transmitter service."[11]  *See* Fla. Stat.

§§ 215.322(3)(b), 560.208(2).  Or it could ban specific false and deceptive trade

practices, such as bait-and-switch tactics, as it does generally for acts of unfair

competition under the State's Deceptive and Unfair Trade Practices Act.  Fla. Stat.

§§ 501.201–501.213.  Or it could require merchants to disclose to their customers

the workings of their pricing policy.  *See Zauderer v. Office of Disciplinary*

*Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 650–51, 105 S. Ct. 2265,

2281–82, 85 L. Ed. 2d 652 (1985) (upholding disclosure requirements of "purely

factual and uncontroversial information" that "are reasonably related to the State's

interest in preventing deception of consumers").  The available less strict-

restrictive alternatives are legion.  What Florida cannot do, as a constitutional

matter, is what its no-surcharge law does:  abridge protected speech.  The no-

surcharge law, therefore, fails intermediate scrutiny.

Finally, we conclude by highlighting the extraordinary nature of Florida's

no-surcharge law and the modest scope of our holding.  We rule today only on a

law that, though it purports to regulate commercial behavior, has the sole effect of

---

[11] A "money transmitter" is defined as "a corporation, limited liability company, limited liability partnership, or foreign entity qualified to do business in this state which receives currency, monetary value, or payment instruments for the purpose of transmitting the same by any means, including transmission by wire, facsimile, electronic transfer, courier, the Internet, or through bill payment services or other businesses that facilitate such transfer within this country, or to or from this country."  Fla. Stat. § 560.103(23).

banning merchants from uttering the word *surcharge*, criminalizing speech that is neither false nor misleading. The First Amendment does not return us to the heyday of *Lochner v. New York*, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905). Laws that target real-world commercial activity need not fear First Amendment scrutiny. Such run-of-the-mill economic regulations will continue to be assessed under rational-basis review.

The First Amendment does not, however, allow the Government to directly restrict speech in an attempt to control conduct in response to that speech. Paternalistic efforts at social engineering are anathema to constitutional first principles. As the District Court correctly observed, a criminal prohibition on credit-card *surcharges* that nevertheless allows for cash *discounts* "is a matter of semantics, not economics." Though our Constitution does not dictate an economic orthodoxy—Spencerian or otherwise, *see Lochner*, 198 U.S. at 75, 25 S. Ct. at 546 (Holmes, J., dissenting)—it does care a great deal about "semantics." A free marketplace of ideas abhors command and control, and will accommodate regulatory needs of only the highest order. By holding out *discounts* as more equal than *surcharges*, Florida's no-surcharge law overreaches to police speech well beyond the State's constitutionally prescribed bailiwick. For that reason, we conclude that § 501.0117 is an unconstitutional abridgment of free speech.

V.

Accordingly, we REVERSE the District Court's grant of summary judgment to the Attorney General and REMAND for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

ED CARNES, Chief Judge, dissenting:

The statute at issue in this case bars surcharges for using credit cards but permits discounts for using other methods of payment. <u>See</u> Fla. Stat. § 501.0117(1). What is the difference between a surcharge and a discount? It depends on whether you go along with the majority opinion's statute-killing definition of "surcharge," which renders the statute unconstitutional, or instead heed the statute-saving definition of the term that the legislature itself crafted.

The statutory definition specifies that a surcharge is "any additional amount <u>imposed at the time of a sale</u> or lease transaction by the seller or lessor that increases the charge to the buyer or lessee for the privilege of using a credit card to make payment." <u>Id.</u> (emphasis added). That is a narrower definition than the ordinary meaning of "surcharge," which is simply "[a]n additional tax, charge, or cost." Black's Law Dictionary 1670 (10th ed. 2014). By defining "surcharge" narrowly — using the limiting words "imposed at the time of a sale" — the statute distinguishes forbidden surcharges from permissible discounts based on when the business informs the customer of the actual price terms of its offer to the customer. By disregarding the statute's limiting definition of "surcharge," the majority opinion creates constitutional infirmity where none would otherwise exist.

An example illustrates the distinction drawn by the statutory definition. A store would violate the statute if it placed an item on its shelf with a sticker price of

$100.00 and then charged the customer an unposted $103.00 at the register because the customer used his credit card. The "additional amount" of $3.00 is a "surcharge" because it was "imposed at the time of a sale." <u>See</u> Fla. Stat. § 501.0117(1). On the other hand, a store would not violate the statute if it placed an item on its shelf with two sticker prices — a $100.00 "cash" price and a $103.00 "credit" price — and then charged the customer at the register based on the method of payment. The "additional amount" is not a "surcharge" because it was "imposed" before "the time of a sale." <u>See</u> <u>id.</u> It does not matter whether the store characterizes the difference in price as a credit card surcharge, a cash discount, or both. The merchant can speak in any way he chooses so long as he does not ambush the credit-card-using customer with a higher price at the register. What matters is <u>when</u>, from the customer's perspective, the merchant adds the additional amount to the price because a credit card is used, not how the merchant describes it.

## I.

The majority opinion rejects the statute's narrow definition of the term "surcharge" in favor of what it perceives to be the more colloquial meaning of the word. It is wrong to do so. We are to use the "common and ordinary meaning" of a statutory term only if there is no "statutory or regulatory definition" of it. <u>Wooten v. Quicken Loans, Inc.</u>, 626 F.3d 1187, 1193 (11th Cir. 2010); <u>see</u> <u>W.</u>

Union Tel. Co. v. Lenroot, 323 U.S. 490, 502, 65 S. Ct. 335, 341 (1945)

("[S]tatutory definitions of terms used therein prevail over colloquial meanings."). Where there is a statutory definition, we must follow the well-established and common sense principle that "statutory definitions control the meaning of a statute's terms." Stansell v. Revolutionary Armed Forces of Colom., 704 F.3d 910, 915 (11th Cir. 2013); accord Burgess v. United States, 553 U.S. 124, 129, 128 S. Ct. 1572, 1577 (2008) ("Statutory definitions control the meaning of statutory words . . . in the usual case.") (quoting Lawson v. Suwannee Fruit & S.S. Co., 336 U.S. 198, 201, 69 S. Ct. 503, 504 (1949)).  After all, the legislature has the right to define the terms it uses, which is why the statutory definition of a statutory term controls statutory construction of the term.

Instead of following that cardinal principle, the majority opinion uses what are — by its own admission — tautological definitions of "surcharge" and "discount," defining a surcharge as "simply a 'negative' discount" and a discount as "a 'negative' surcharge."  Maj. Op. at 2.  The result is a rewritten Florida Statute § 501.0117 with a great big First Amendment bullseye on it.  Having redesigned the target so that the only distinction between a "surcharge" and a "discount" is speech labeling it, the majority opinion has no trouble hitting what it aims at.  See Maj. Op. at 2–3 ("[A] simple slip of the tongue calling the same price difference a surcharge runs the risk of being fined and imprisoned."); id. at 15 ("[I]t should be a

'surcharges-are-fine-just-don't-call-them-that-law.'").  The majority opinion treats the annoying inconvenience of the statutory definition of "surcharge" as nothing more than an "alternative construction," Maj. Op. at 14, which it disparages as a "strained reading" of the statute, id. at 13–14.  It is passing strange for a court to dismiss a legislature's definition of its own words as a strained reading of the legislature's own words.

Because the statute defines "surcharge," we are bound to construe the statute using that definition.  See Burgess, 553 U.S. at 129–30, 128 S. Ct. at 1577; W. Union Tel. Co., 323 U.S. at 502, 65 S. Ct. at 341; Stansell, 704 F.3d at 915.  It is not our role to rewrite, revise, or improve statutes.  See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 228, 128 S. Ct. 831, 841 (2008) ("We are not at liberty to rewrite the statute to reflect a meaning we deem more desirable."); Redus Fla. Commercial, LLC v. Coll. Station Retail Ctr., LLC, 777 F.3d 1187, 1196 (11th Cir. 2014) (same); United States v. Griffith, 455 F.3d 1339, 1344 (11th Cir. 2006) ("[W]e are not licensed to practice statutory remodeling."); Wright v. Sec'y for Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002) ("Our function is to apply statutes, . . . not to 'improve' statutes by altering them.").  Especially not in order to strike down a statute as unconstitutional.

## II.

We should use the statutory definition of "surcharge" to save Florida Statute

§ 501.0117 from a fatal constitutional flaw.  Under the constitutional-doubt canon,

a federal court must construe a state statute to avoid a constitutional problem if the

statute is "susceptible of [such] a construction."  <u>S. Utah Mines & Smelters v.</u>

<u>Beaver Cnty.</u>, 262 U.S. 325, 331, 43 S. Ct. 577, 579 (1923).  The majority opinion

acknowledges that duty.  <u>See</u> Maj. Op. at 9–10.  It also admits that the statute

would be constitutional if read as "a prohibition on bait-and-switch schemes" that

"bans the selective raising of previously announced prices at the 'time of a sale' for

credit-card users."  <u>Id.</u> at 13 (quoting Fla. Stat. § 501.0117(1)).  But that is, of

course, exactly what the statute does through its definition of "surcharge" as an

additional amount "imposed at the time of sale" for use of a credit card.[1]  So

perhaps the correct interpretation of the statute should be called "the statutory

---

[1] The majority suggests that we should ignore the statutory definition's "at the time of sale" language because the government might have difficulty proving another part of the definition, which is that a merchant imposed the surcharge "for the privilege of using a credit card."  <u>See</u> Maj. Op. at 15 n.7.  Demonstrating again its fondness for tautology, the majority reasons that if the government can't prove a violation of the statute, it can't prove a violation of the statute.  <u>Id.</u> Two things about that.  First, there is no support in law or logic for the proposition that if a statute is going to be difficult to enforce, we should rewrite a key statutory definition in order to make the statute unconstitutional and therefore completely unenforceable.  Second, enforcement of the statute will not be difficult.  To prove that a merchant is imposing an extra charge at the point of sale for the use of a credit card the government could call the store's clerks to testify, could call customers to testify about different prices for the same merchandise depending on the method of payment, or it could simply use testers to gather evidence of different charges for the same merchandise depending on whether cash or credit was used.

definition interpretation."  The majority opinion rejects that interpretation for three reasons, none of which is convincing.  See id. at 13–14.

The opinion's first reason for rejecting the statutory definition is that it would reduce the statute "into nothingness."  Maj. Op. at 13.  How?  Because, the majority opinion says, interpreting the statute as "a prohibition on bait-and-switch schemes" would allow merchants to avoid liability by "announc[ing] to potential customers the price difference in advance of any sale."  Id.  Well hello.  That is precisely the point of the statutory definition: to limit the conduct forbidden by the statute so that merchants can comply with the statute.  Why is it bad to interpret a statute in a way that allows people to conform their conduct to its requirements, that carries out the statutory purpose, and that saves the statute from being declared unconstitutional?  That is not only not bad, and not even half bad, but instead is tripleplusgood.[2]

The majority opinion's second reason for refusing to interpret the statute using the statutory definition is its belief that the Florida Attorney General has disavowed this reading of the statute in her brief, at oral argument, and in the

---

[2] The majority opinion's position would make sense only if, as it believes, Florida Statute § 501.0117(1) bans all surcharges.  See Maj. Op. at 16.  But the statute does not do that.  It does not ban them all because it limits the definition of the statutory term "surcharge" to additional amounts "imposed at the time of a sale or lease transaction."  Fla. Stat. § 501.0117(1).  As a result, surcharges not imposed for the first time at the time of the sale or lease are permitted.  See United States v. Meister, 744 F.3d 1236, 1238 (11th Cir. 2013) ("[A] statutory definition excludes any meaning that is not stated.") (quotation marks omitted).

cease-and-desist letters sent to the plaintiffs.  See Maj. Op. at 14.  The majority

opinion is wrong on each count.

As to the cease and desist letters, while they might be relevant to an as

applied challenge, the plaintiffs did not challenge the statute as applied.[3]  Instead,

they brought a facial challenge seeking to enjoin any enforcement of the statute

against anyone in any and all circumstances.  And their facial challenge claims that

the statute violates the right to free speech but does not claim that it is overbroad.[4]

Where plaintiffs bring a free-speech facial challenge that is not based on

overbreadth, the only way they can succeed is by demonstrating that "no set of

circumstances exist" where the law could be validly applied.  See United States v.

Stevens, 559 U.S. 460, 472–73, 130 S. Ct. 1577, 1587 (2010) (quotation marks

omitted).  That the Attorney General's cease and desist letters set out some facts

that she believes would violate Florida Statute § 501.0117 does not exclude the

possibility that the statute could be validly applied to other facts.  As we have held,

"[i]n a facial challenge such as this, the facts of the challenging party's case are

---

[3] In their reply brief, the plaintiffs contend for the first time that they are also making an as applied challenge.  But their amended complaint brings only a facial challenge, and the relief it requests is for the court to "[d]eclare that Florida's no-surcharge law is unconstitutional and enjoin its enforcement" generally.  A complaint seeking relief that "reach[es] beyond the particular circumstances of the[] plaintiffs" must meet the standards for a facial challenge — regardless of whether the plaintiff later tries to frame it as an as applied challenge.  Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott, 717 F.3d 851, 863 (11th Cir. 2013) (first alteration in original) (quotation marks omitted).

[4] The plaintiffs also challenge the statute as unconstitutionally vague.  I address that claim later.  See infra Part III.

irrelevant." <u>Miami Herald Pub. Co. v. City of Hallandale</u>, 734 F.2d 666, 674 n.4 (11th Cir. 1984).

As to the Florida Attorney General's position in her brief, at oral argument, or generally, there are two things about that. The first is that the majority opinion is mistaken in its assumption that the Attorney General disavowed in her brief and at oral argument "a narrow reading of the statute" that would limit its proscriptions to surcharges announced and applied only at the time of sale. Maj. Op. at 14. The Attorney General argued in favor of that narrow reading repeatedly throughout her brief. <u>See, e.g.</u>, Appellee Br. at 5 ("Under the law, a retailer may, for example, price a loaf of bread at $1.00 and charge customers 95 cents if they pay in cash; but the retailer may not use a 95-cent label on the shelf and charge credit card users a dollar at the register."); <u>id.</u> at 10 ("The Statute prohibits merchants from imposing a surcharge, defined as 'any additional amount imposed at the time of a sale or lease transaction,' and does not prohibit anyone from expressing any view about the cost of credit or any other subject."); <u>id.</u> at 14 ("The Statute's plain terms demonstrate that it regulates a particular form of pricing <u>conduct</u>—'impos[ing] a surcharge,' defined as 'any additional amount imposed at the time of a sale or lease transaction . . . that increases the charge,' if the customer uses a credit card.") (quoting Fla. Stat. § 501.00117(1)); <u>id.</u> at 15 ("Nowhere in the Statute is there a reference to speech or any indication that a merchant may run afoul of the law by

characterizing a shelf price as including an 'extra charge' for credit, telling a customer she is paying 'more for credit,' or doing anything other than imposing an 'additional amount . . . at the time of a sale or lease transaction . . . that increases the charge' to the consumer.").

As to OA, the Assistant Attorney General argued that we should follow the statutory definition:  "[I]f the sweater has a price tag of $100.00, you go to the register and it's $103.00, that is an extra charge imposed at the time of the transaction.  That is a surcharge."  <u>See</u> Oral Argument Recording at 10:22–10:32, <u>Dana's R.R. Supply v. Att'y Gen., State of Fla.</u>, No. 14-14426 (11th Cir. June 11, 2015).  If the majority opinion sees all of that as a "disavowal" of the statutory definition, which turns on what happens at the time of sale, what would an avowal of it look like?

Even if the Attorney General had somehow conceded that the statutorily defined meaning of the key statutory term "surcharge" ought to be ignored, the concession would not bind us.  The interpretation of a statute is a question of law, <u>see</u> <u>United States v. Pistone</u>, 177 F.3d 957, 958 (11th Cir. 1999), and we are not obliged to accept a party's concession on such questions, <u>see</u> <u>Roberts v. Galen of Va., Inc.</u>, 525 U.S. 249, 253, 119 S. Ct. 685, 687 (1999) ("[T]he concession of a point on appeal by respondent is by no means dispositive of a legal issue . . . .");  <u>United States v. Lee</u>, 586 F.3d 859, 866 (11th Cir. 2009) (refusing to accept the

government's concession as to the interpretation of a statutory term). The interpretation that the Attorney General has adopted in this case or any other case does not control us because it is our duty, not hers, to interpret and apply statutory language in cases that come before us. See Thompson v. Kentucky, 209 U.S. 340, 346, 28 S. Ct. 533, 536 (1908) ("[I]t is the province of the courts to interpret the laws of the state . . . ."); Harris v. Garner, 216 F.3d 970, 976 (11th Cir. 2000) ("[T]he role of the judicial branch is to apply statutory language . . . ."). We do not cede our authority to interpret statutes to the parties or their attorneys.

The majority opinion's final reason for rejecting the statutory definition of "surcharge" is that it will result in the statute "cover[ing] only conduct already covered by the Florida Deceptive and Unfair Trade Practices Act" (FDUTPA). Maj. Op. at 14 (citing Fla. Stat. §§ 501.201–213). In the majority's view, it is better to strike down Florida Statute § 501.0117 in its entirety than to read it "to function solely as a backstop" to the FDUTPA. Id. Even assuming that the statutory definition creates some overlap with FDUTPA, that is not a reason to reject it.

To begin with, there is no authority for the proposition that a saving construction of a statute should be rejected simply because it would create an overlap with another statute. "The Supreme Court has noted that statutes may 'overlap' or enjoy a 'partial redundancy,' and yet be 'fully capable of coexisting.'"

United States v. Zheng, 306 F.3d 1080, 1085 (11th Cir. 2002) (citation omitted) (quoting United States v. Batchelder, 442 U.S. 114, 118, 122, 99 S. Ct. 2198, 2201, 2203 (1979)). For that reason, the Court has refused to consider one statute's overlap with another one as an important factor in statutory construction. See Pasquantino v. United States, 544 U.S. 349, 358 n.4, 125 S. Ct. 1766, 1773 n.4 (2005) ("The Federal Criminal Code is replete with provisions that criminalize overlapping conduct. The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either.") (citations omitted). The majority opinion defies the teachings of the Supreme Court by insisting that it is better to strike down a statute than to read it in a manner that creates some overlap with another statute.

Not only that, but the majority opinion is simply wrong about the statutory definition interpretation reducing Florida Statute § 501.0117 to a mere "backstop" for the FDUTPA. It is wrong, among other reasons, because one statute is criminal while the other is civil. Florida Statute § 501.0117 provides a criminal penalty for violation of its provisions and has no civil remedy. See Fla. Stat. § 501.0117(2). By contrast, the FDUTPA provides various civil penalties and a private cause of action as remedies and has no criminal penalties. See Fla. Stat. §§ 501.206(5), 501.207, 501.2075, 501.2077, 501.208(7), and 501.211. The statutes are anything but redundant. It is perfectly acceptable for a legislature to "impose both a

criminal and civil sanction in respect to the same act or omission." Helvering v. Mitchell, 303 U.S. 391, 399, 58 S. Ct. 630, 633 (1938).  And for a legislature to do it in two statutes instead of one.  See, e.g., United States v. Ward, 448 U.S. 242, 254, 100 S. Ct. 2636, 2644 (1980) (noting that two federal laws prohibited discharge of pollution into navigable waters, and "the civil remedy and the criminal remedy are contained in separate statutes"); Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 631 n.4, 108 S. Ct. 1423, 1429 n.4 (1988) (noting that California "defines civil and criminal contempts in separate statutes").  There is nothing wrong with the Florida legislature deciding that the civil penalties in the FDUTPA were not enough to address the problem of credit card surcharges imposed at the time of sale or lease and to fill in that gap by enacting Florida Statute § 501.0117.

We must adopt a saving interpretation so long as it is "fairly possible," even if it is not "the most natural" reading of the statutory language.  Nat'l Fed'n of Indep. Bus. v. Sebelius, — U.S. —, 132 S. Ct. 2566, 2594 (2012) (quotation marks omitted).  Here the statutory definition interpretation is not only a "fairly possible" interpretation, it is also the most natural one.

## III.

The statute's narrow definition of surcharge makes resolving the plaintiffs' two facial challenges relatively easy.  Here's why.

The plaintiffs' first claim is that Florida Statute § 501.0117 violates their right to free speech.  But there is certainly a "set of circumstances" where the law would be a valid regulation of economic conduct.  See Stevens, 559 U.S. at 472, 130 S. Ct. at 1587 (quotation marks omitted).  As I explained earlier, by limiting the definition of "surcharge" to an "additional amount imposed at the time of a sale or lease transaction," Fla. Stat. § 501.0117(1), the statute prohibits adding an additional amount — at the time of the sale — to the sale price.  That is why a surcharge openly posted on the store shelf is permissible, while one that comes up for the first time when the customer is paying for her purchase is not.  Prescribing when a business can add an additional amount to its price controls the timing of conduct and not the speech describing that conduct.  The Supreme Court has long held that the government can regulate economic conduct — including the prices charged by merchants — without violating the First Amendment.  See, e.g., 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 504–09, 116 S. Ct. 1495, 1508–10 (1996) (striking down a categorical ban on liquor price advertising under the First Amendment but emphasizing that states remain free to make certain prices unlawful through "direct regulation").

The Second Circuit recently applied that well-settled principle to uphold a New York statute banning all credit card surcharges in the face of a free speech

challenge.[5]  See Expressions Hair Design v. Schneiderman, __ F.3d __, 2015 WL 5692296, at *1 (2d Cir. Sept. 29, 2015).  The court began with the basic premise that "prices, although necessarily communicated through language, do not rank as 'speech' within the meaning of the First Amendment."  Id. at 8.  So "prohibiting certain relationships between prices also does not implicate the First Amendment."  Id. at 9.  As the court noted, the "central flaw" in the plaintiffs' position in that case was their "bewildering persistence in equating the actual imposition of a credit-card surcharge…with the words that speakers of English have chosen to describe that pricing scheme."  Id. at *9.  Under § 518, merchants cannot charge customers additional fees for using credit cards.  Under Florida Statute § 501.0117, merchants cannot charge customers additional fees "at the time of sale" for using credit cards.  Both statutes regulate "the actual imposition of a credit-card surcharge."  Neither regulates what merchants can say about those fees, so neither implicates the First Amendment.  Despite what the majority says, the Second Circuit's interpretation of § 518 is anything but "narrow."  Maj. Op. at 21 n.9.  The majority places our circuit in direct conflict with our sister circuit on this issue.

---

[5] See N.Y. Gen. Bus. Law § 518 (providing that "[n]o seller in any sales transaction may impose a surcharge on a holder who elects to use a credit card in lieu of payment by cash, check, or similar means").  The law does not define "surcharge," so the Second Circuit gave that word its ordinary meaning.  See 2015 WL 5692296, at *6.

The plaintiffs' second claim is that Florida Statute § 501.0117 is void for vagueness.  A statute is impermissibly vague if either:  (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732, 120 S. Ct. 2480, 2498 (2000).  Because the plaintiffs brought a facial challenge, they must establish that the law is "impermissibly vague in all of its applications."  Ala. Educ. Ass'n v. State Superintendent of Educ., 746 F.3d 1135, 1138 (11th Cir. 2014).

The statute's narrow definition of "surcharge" eliminates both vagueness concerns.  The key vagueness-busting words are "at the time of a sale or lease transaction."  Fla. Stat. § 501.0117.  A person of "ordinary intelligence" can easily understand that the law prohibits increasing the price of an item at the time of sale or lease based on whether a credit card is used.  See Hill, 530 U.S. at 732, 120 S. Ct. at 2498.  Similarly, the statute's timing requirement prevents the kind of "arbitrary and discriminatory enforcement" that the void-for-vagueness doctrine forbids.  See id.  A business can avoid liability under the statute by informing its customers of credit card surcharges before they go to pay for the purchase or sign the lease, instead of afterwards.  The statute is not "impermissibly vague in all of its applications."  Ala. Educ. Ass'n, 746 F.3d at 1138.

45

## IV.

The majority opinion describes the Court's role in this case as that of a "judicial Theseus" cast "into the depths of a lexical labyrinth."  Maj. Op. at 11. The mythological Theseus followed the path laid out by Ariadne's thread, made his way out of Minos' labyrinth, and rescued the young Athenians held by Minos. Here, the judicial Theseus should have done the same by following the path laid out by the statutory definition of "surcharge," making its way out of the supposed lexical labyrinth, and rescuing the statute.  Instead, we have a Greek tragedy consisting of a state statute being struck down by a federal court for no good reason.