# EXHIBIT A

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14009
_____

D.C. Docket No. 1:11-cv-22026-MGC

DR. BERND WOLLSCHLAEGER,
DR. JUDITH SCHAECHTER,
DR. TOMMY SCHECHTMAN,
AMERICAN ACADEMY OF PEDIATRICS, FLORIDA CHAPTER,
AMERICAN ACADEMY OF FAMILY PHYSICIANS, FLORIDA CHAPTER,
AMERICAN COLLEGE OF PHYSICIANS, FLORIDA CHAPTER, INC.,
ROLAND GUTIERREZ,
STANLEY SACK,
SHANNON FOX-LEVINE,

Plaintiffs - Appellees,

Versus

GOVERNOR OF THE STATE OF FLORIDA,
SECRETARY, STATE OF FLORIDA,
SURGEON GENERAL OF THE STATE OF FLORIDA,
SECRETARY, HEALTH CARE ADMINISTRATION OF THE STATE OF
FLORIDA,

DIVISION DIRECTOR, FLORIDA DEPARTMENT OF HEALTH,
Division of Medical Quality Assurance,
GEORGE THOMAS,
JASON ROSENBERG,
ZACHARIAH P. ZACHARIAH,
ELISABETH TUCKER,
TRINA ESPINOLA,
MERLE STRINGER,
JAMES ORR,
GARY WINCHESTER,
NABIL EL SANADI,
ROBERT NUSS,
ONELIA LAGE,
FRED BEARISON,
DONALD MULLINS,
BRIGETTE RIVERA GOERSCH,
BRADLEY LEVINE,

Defendants - Appellants.


BROWARD COUNTY MEDICAL ASSOCIATION,
BROWARD COUNTY PEDIATRIC SOCIETY,
PALM BEACH COUNTY MEDICAL SOCIETY,
FLORIDA PUBLIC HEALTH ASSOCIATION,
UNIVERSITY OF MIAMI SCHOOL OF LAW AND YOUTH CLINIC,
CHILDREN'S HEALTHCARE IS A LEGAL DUTY, INC.,
EARLY CHILDHOOD INITIATIVE FOUNDATION,
AMERICAN ACADEMY OF PEDIATRICS,
AMERICAN ACADEMY Of CHILD AND ADOLESCENT PSYCHIATRY,
AMERICAN ACADEMY OF FAMILY PHYSICIANS,
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS,
AMERICAN COLLEGE OF SURGEONS,
AMERICAN COLLEGE OF PREVENTIVE MEDICINE,
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGIST,
AMERICAN CONGRESS OF OBSTETRICIANS AND GYNECOLOGISTS,
AMERICAN PSYCHIATRIC ASSOCIATION,
CENTER FOR CONSTITUTIONAL JURISPRUDENCE,
DOCTORS FOR RESPONSIBLE GUN OWNERSHIP,
NATIONAL RIFLE ASSOCIATION OF AMERICA,

2

AMERICAN MEDICAL ASSOCIATION,
ACLU FOUNDATION OF FLORIDA,
ALACHUA COUNTY MEDICAL SOCIETY,
AMERICAN PUBLIC HEALTH ASSOCIATION,
AMERICAN ASSOCIATION OF SUICIDOLOGY,
SUICIDE AWARENESS VOICES OF EDUCATION,
LAW CENTER TO PREVENT GUN VIOLENCE,

Amicus Curiae

————————————

Appeal from the United States District Court
for the Southern District of Florida
————————————

(December 14, 2015)

## ON PETITION FOR REHEARING

Before TJOFLAT and WILSON, Circuit Judges, and COOGLER,[*] District Judge.

TJOFLAT, Circuit Judge:

We *sua sponte* vacate and reconsider our revised opinion in this matter, reported at 797 F.3d 859. We substitute in its place the following opinion.

The Governor of the State of Florida, other Florida officials, and members of the Board of Medicine of the Florida Department of Health (collectively, the "State"), appeal from the District Court's grant of summary judgment and an injunction in favor of a group of physicians and physician-advocacy groups

———————————

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

3

(collectively, "Plaintiffs") enjoining enforcement of Florida's Firearm Owners Privacy Act[1] (the "Act") on First and Fourteenth Amendment grounds.

The Act seeks to protect patient privacy by restricting irrelevant inquiry and record-keeping by physicians on the sensitive issue of firearm ownership and by prohibiting harassment and discrimination on the basis of firearm ownership. The Act does not prevent physicians from speaking with patients about firearms generally. Nor does it prohibit specific inquiry or record-keeping about a patient's firearm-ownership status when the physician determines in good faith, based on the circumstances of that patient's case, that such information is relevant to the patient's medical care or safety, or the safety of others.

Society has traditionally accorded physicians a high degree of deference due to their superior knowledge, educational pedigree, position of prestige, and "charismatic authority," resulting from their "symbolic role as conquerors of disease and death." Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 226 (1994). This deference reaches its apex in the examination room where patients are in a position of relative powerlessness. Patients must place their trust in the physicians' guidance and submit to the physicians' authority.

---

[1] 2011 Fla. Laws 112 (codified at Fla. Stat. §§ 381.026, 456.072, 790.338).

With this great authority comes great responsibility.  To protect patients, society has long imposed upon physicians certain duties and restrictions that define the boundaries of good medical care.  In keeping with this tradition, the State passed the Act.  The Act codifies the commonsense conclusion that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient's care—especially not when that inquiry or record-keeping constitutes such a substantial intrusion upon patient privacy—and that good medical care never requires the discrimination or harassment of firearm owners.

In doing so, the Act plays an important role in protecting what gets into a patient's record, thereby protecting the patient from having that information disclosed, whether deliberately or inadvertently.  The Act closes a small but important hole in Florida's larger patient-privacy-protection scheme.  Given this understanding of the Act, and in light of the longstanding authority of States to define the boundaries of good medical practice, we hold that the Act is, on its face, a permissible restriction of physician speech.  Physicians remain free—as they have always been—to assert their First Amendment rights as an affirmative defense in any actions brought against them.  But we will not, by striking down the Act, effectively hand Plaintiffs a declaration that such a defense will be successful.

Accordingly, we reverse the District Court's grant of summary judgment in favor of Plaintiffs, and vacate the injunction against enforcement of the Act.

## I.

On June 2, 2011, Florida Governor Rick Scott signed the Act into law. The Act created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms; prohibitions; penalties; exceptions," and amended the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. § 381.026, to include several of the same provisions. The Act also amended Fla. Stat. § 456.072, entitled "Grounds for discipline; penalties; enforcement," to provide for disciplinary measures for violation of the Act. The Florida legislature passed the Act in response to complaints from constituents that medical personnel were asking unwelcome questions regarding firearm ownership, and that constituents faced harassment or discrimination on account of their refusal to answer such questions or simply due to their status as firearm owners.[2]

---

[2] For example, in a widely publicized incident that took place in Ocala, Florida, a pediatrician, during a routine visit, asked a patient's mother whether she kept any firearms in her home. Because she felt that the question constituted an invasion of her privacy, the mother refused to answer. The pediatrician then terminated their relationship and advised the mother that she had 30 days to find a new doctor. Fla. H.R. Comm. on Health & Human Servs., H.B. 155 (2011) Staff Analysis 2 (Apr. 7, 2011); s*ee also* Fred Hiers, *Family and pediatrician tangle over gun question*, Ocala StarBanner, July 24, 2010, http://www.ocala.com/article/20100724/articles/7241001.

In another incident, physicians refused to provide medical care to a nine-year-old "because they wanted to know if [the child's family] had a firearm in their home." Audio CD: Regular Session Senate Floor Debate on HB 155, held by the Florida Senate (Apr. 27–28, 2011) at 26:32 (remarks of Sen. Evers) (on file with Florida Senate Office of the Secretary). In another example, a legislator stated that, during an appointment with his daughter, a pediatrician asked

The Act provides, in relevant part, that licensed healthcare practitioners and facilities (1) "may not intentionally enter" information concerning a patient's ownership of firearms into the patient's medical record that the practitioner knows is "not relevant to the patient's medical care or safety, or the safety of others," *id.* § 790.338(1); (2) "shall respect a patient's right to privacy and should refrain" from inquiring as to whether a patient or their family owns firearms, unless the practitioner or facility believes in good faith that the "information is relevant to the patient's medical care or safety, or the safety of others," *id.* § 790.338(2); (3) "may not discriminate" against a patient on the basis of firearm ownership, *id.* § 790.338(5); and (4) "should refrain from unnecessarily harassing a patient about firearm ownership," *id.* § 790.338(6).[3]

---

that the legislator remove his gun from his home. Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida House of Representatives (Apr. 26, 2011) at 26:20 (remarks of Rep. Artiles) (on file with Florida House of Representatives Office of the Clerk). Another legislator reported a complaint from a constituent that a healthcare provider falsely told him that disclosing firearm ownership was a Medicaid requirement. *Id.* at 13:40 (remarks of Rep. Brodeur). That legislator also relayed a complaint about a mother who was separated from her children while medical staff asked the children whether the mother owned firearms. *Id.*

   Further incidents are recounted in a Joint Statement of Undisputed Facts filed by the parties in the District Court below. *Wollschlaeger v. Farmer*, No. 1:11-CV-22026 (S.D. Fla. Nov. 11, 2011), Doc. 87.

   [3] The full text of the challenged provisions are as follows:

   (1) A health care practitioner licensed under chapter 456 [of the Florida Statutes] or a health care facility licensed under chapter 395 may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.

   (2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the

Violation of any of the provisions of the Act constitutes grounds for

disciplinary action under § 456.072(2).  Fla. Stat. § 456.072(1)(nn).  Furthermore,

"[v]iolations of the provisions of subsections (1)–(4) constitute grounds for

disciplinary action under [Fla. Stat. §§] 456.072(2) and 395.1055."  Fla. Stat.

§ 790.338(8).  Thus, if the Board of Medicine of the Florida Department of Health

(the "Board") finds that a physician has violated the Act, the physician faces

disciplinary measures including a fine, restriction of practice, return of fees,

probation, and suspension or revocation of their medical license.  Fla. Stat.

§ 456.072(2).  An investigation culminating in disciplinary action may be initiated

against a physician by the Department of Health or may be triggered by a citizen's

complaint.  Fla. Stat. § 456.073.  The minutes of a June 2, 2011, meeting of the

---

patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient.  Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.

. . .

(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.

(6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's legal right to own or possess a firearm and should refrain from unnecessarily harassing a patient about firearm ownership during an examination. . . .

Fla. Stat. § 790.338.

The Act also contains related provisions concerning emergency medical personnel and insurance companies, affirming the right of patients to decline to answer physician questions, and affirming that the Act does not alter existing law regarding a physician's authorization to choose patients.  *Id.* § 790.338(3), (4), (7).  Plaintiffs do not appear to challenge these provisions, and, as the District Court held, because these provisions do not apply to physicians or do not regulate any conduct by physicians, Plaintiffs lack standing to challenge them.

Rules/Legislative Committee of the Board indicate that the Board is prepared to initiate disciplinary proceedings against a physician who violates the Act, stating that "the Committee [has] determined [that] violation of [the Act] falls under failure to comply with a legal obligation and the current disciplinary guidelines for this violation would apply."  Fla. Bd. of Medicine Rules/Legislative Comm., Meeting Report, at 3 (Jun. 2, 2011), *available at* http://ww10.doh.state.fl.us/pub/medicine/Agenda_Info/Public_Information/Public_Minutes/2011/Committees/R-L/060211_Minutes.pdf.

On June 6, 2011, four days after Governor Scott signed the Act into law, Plaintiffs filed a 42 U.S.C. § 1983 action seeking declaratory and injunctive relief against the State in the United States District Court for the Southern District of Florida, alleging that the inquiry, record-keeping, discrimination, and harassment provisions of the Act facially violate the First and Fourteenth Amendments of the United States Constitution.  Plaintiffs contended that the Act imposes an unconstitutional, content-based restriction on speech, is overbroad, and is unconstitutionally vague.

On September 14, 2011, finding that Plaintiffs were likely to succeed on the merits, the District Court preliminarily enjoined enforcement of the inquiry, record-keeping, discrimination, and harassment provisions of the Act, together

with the provisions providing for discipline of physicians who violate the Act.
*Wollschlaeger v. Farmer*, 814 F. Supp. 2d 1367, 1384 (S.D. Fla. 2011).

On June 2, 2012, the District Court permanently enjoined enforcement of the
inquiry, record-keeping, discrimination, and harassment provisions of the Act—
together with the related disciplinary provisions—holding, on cross motions for
summary judgment, that all four provisions facially violated the First Amendment,
and that the inquiry, record-keeping, and harassment provisions of the Act were
void for vagueness. *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1267–69
(S.D. Fla. 2012).

The District Court held that Plaintiffs had standing to sue because Plaintiffs
were engaging in self-censorship to avoid potential disciplinary action, which
constituted a cognizable injury-in-fact that was fairly traceable to the Act and
redressable by injunction. *Id.* at 1258–59.  The District Court also held that
Plaintiffs' claims were ripe, noting that delayed review would "cause hardship to
Plaintiffs, who would continue to engage in self-censorship," and that further
factual development of the issues was unnecessary. *Id.* at 1259.

Turning to the merits, the District Court held that the Act imposed on
physicians a content-based restriction of speech on the subject of firearms. *Id.* at
1261.  The District Court rejected the State's argument that the Act "constitute[s] a
permissible regulation of professional speech or occupational conduct that imposed

a mere incidental burden on speech." *Id.* at 1262. The District Court noted that, unlike the provisions of the Act, "[s]uch regulations govern the access or practice of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession." *Id.*

The District Court then assessed the State's asserted interests in passing the Act. The District Court acknowledged that the State has an interest in protecting its citizens' Second Amendment right to keep and bear arms, but found that such a right is "irrelevant" to the Act and therefore is not "a legitimate or compelling interest for it." *Id.* at 1264. The District Court found that, because the State acted on the basis of purely anecdotal information and provided no evidence that discrimination or harassment based on firearm ownership is pervasive, the State does not have a legitimate or compelling interest in protecting its citizens "from barriers to the receipt of medical care arising from [such] discrimination or harassment." *Id.* (quotation marks omitted). However, the District Court found that Florida has legitimate—but perhaps not compelling—interests "in protecting patients' privacy regarding their firearm ownership or use" and in the regulation of professions. *Id.* at 1265.

Balancing physicians' free speech rights against the State's interests in protecting patient privacy and regulating the medical profession, the District Court held that—regardless of whether strict scrutiny or some lesser standard applied—

11

the inquiry, record-keeping, discrimination, and harassment provisions of the Act

could not pass constitutional muster. *Id.* at 1265–67.  The District Court found that

the State had failed to provide any evidence that the confidentiality of information

regarding patients' firearm ownership was at risk, noting that a patient may simply

decline to provide such information, and that state and federal laws pertaining to

the confidentiality of medical records provide adequate protection to patients. *Id.*

at 1267.  With regard to the regulation of the medical profession, the District Court

found that the Act lacked "narrow specificity," because the Act directly targets

speech rather than merely imposing an incidental burden on speech. *Id.* at 1266–

67 (quotation marks omitted).  For similar reasons, the District Court further found

that the Act is not the least restrictive means of achieving the State's interests. *Id.*

at 1267.  Thus, the District Court held that the "balance of interests tip significantly

in favor of safeguarding practitioners' ability to speak freely to their patients." *Id.*

The District Court also held that the inquiry, record-keeping, and harassment

provisions of the Act were unconstitutionally vague. *Id.* at 1267–69.  With regard

to the inquiry and record-keeping provisions, the District Court found that the

"relevance standard" failed to provide sufficient guidance as to what conduct the

Act prohibits. *Id.* at 1268.  With regard to the harassment provision, the District

Court noted that the term "harass" has an ordinary meaning that is readily clear,

but "[w]hat constitutes 'unnecessary harassment' is left to anyone's guess." *Id.* at

12

1268–69.  The District Court noted that it did not need to address Plaintiffs'

argument that the Act is overbroad because doing so would not change the

outcome.  *Id.* at 1270 n.7.

Thus, the District Court—concluding the remaining provisions of the Act are

severable—granted Plaintiffs' motion for summary judgment, and granted in part

and denied in part the State's motion for summary judgment.[4]  *Id.* at 1270.

Accordingly, the District Court permanently enjoined the State from enforcing the

record-keeping, inquiry, harassment, and discrimination provisions of the Act,

§ 790.338(1), (2), (5), (6), and from enforcing § 790.338(8), to the extent that it

provided that violations of § 790.338(1) and (2) constitute grounds for disciplinary

action, and § 456.072(1)(nn), to the extent that it provided that violations of

§ 790.338(1), (2), (5) and (6) constitute grounds for disciplinary action.  *Id.*

On July 30, 2012, the State timely appealed the District Court's judgment.

We have jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1291.

## II.

We review a district court's grant of summary judgment de novo.  *Thomas v.

Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).  "Summary judgment

is appropriate when 'there is no genuine issue of material fact and . . . the moving

---

[4] The District Court granted the State's motion for summary judgment with respect to the provisions of the Act that neither apply to practitioners nor regulate any conduct by physicians, § 790.338(3), (4), (7), finding that Plaintiffs lacked standing to challenge these provisions. *Wollschlaeger*, 880 F. Supp. 2d at 1258.

party is entitled to a judgment as a matter of law.'"  *Id.* (alteration in original) (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quotation marks omitted).

We review a district court's legal determinations de novo and ordinarily review its factual findings for clear error.  In the context of the First Amendment, however, we conduct an independent examination of the whole record, subjecting the District Court's findings of "'constitutional facts'"—those facts "that involve the reasons the [defendant] took the challenged action"—to de novo review. *ACLU of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1206 (11th Cir. 2009).  We also review de novo questions concerning our subject-matter jurisdiction, such as standing and ripeness.  *Elend v. Basham*, 471 F.3d 1199, 1204 (11th Cir. 2006).

## III.

We begin by taking up the issue of justiciability.  The District Court held that Plaintiffs had standing to sue because they were engaging in self-censorship, which constituted a cognizable injury-in-fact fairly traceable to the Act and redressable by injunction.  880 F. Supp. 2d at 1258–59.  The State contends that this was error because the Act does not prohibit physicians from asking patients

14

about firearm ownership, providing firearm safety counseling, or recording information concerning patients' firearm ownership. The State argues that physicians may engage in such conduct when it is relevant to patients' care, and even when not relevant, the Act merely suggests that physicians "should refrain" from inquiring as to firearm ownership. Fla. Stat. § 790.338(2). Such hortatory language, the State argues, does not constitute a mandate that physicians not inquire. Thus, the State argues that because the Act does not in fact actually prohibit the conduct Plaintiffs wish to engage in, Plaintiffs lack standing to challenge the Act because they have not demonstrated injury-in-fact. Moreover, the State argues, we have an obligation to read the Act as a mere recommendation that physicians refrain from irrelevant inquiry and record-keeping about firearms, in order to construe the Act as valid.

We find that the District Court properly held that Plaintiffs' claims are justiciable. In order to have standing, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." *Davis v. FEC*, 554 U.S. 724, 733, 128 S. Ct. 2759, 2768, 171 L. Ed. 2d 737 (2008). However, "[s]tanding is not dispensed in gross. Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief

15

that is sought." *Id.* at 734, 128 S. Ct. at 2769 (citations and quotation marks omitted).

At the outset, we note that Plaintiffs' First Amendment challenge to the Act may be viewed as the functional equivalent of a First Amendment argument raised as an affirmative defense in a hypothetical case brought against a physician for asking irrelevant questions about firearms contrary to good medical practice. A physician could raise such a defense in a disciplinary proceeding brought under the Act for such conduct or in a malpractice action. For example, a patient could file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about firearm ownership—just as a patient could potentially file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about any other topic. The physician could choose to admit to the purportedly harassing speech and plead the First Amendment as an affirmative defense, in effect contending that the court's rejection of the affirmative defense would constitute state action in violation of the Constitution. Indeed, leaving aside the Act, a physician facing malpractice liability for a wide swath of professional activity involving speech could theoretically raise a First Amendment defense.

In mounting a facial challenge to the Act, however, Plaintiffs sought a First Amendment defense to any action brought against a physician based on speech targeted by the Act. The State contends that the only proper vehicle for Plaintiffs'

First Amendment defense is a live proceeding brought under the Act.  In other words, in arguing that Plaintiffs' facial challenge is not justiciable, the State is saying that Plaintiffs must wait to challenge the Act until they have been subjected to some adverse action.

Crucial to resolving the standing question is the nature of Plaintiffs' claims.  "Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced."  *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citing *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991)).

Plaintiffs' sole alleged injury is self-censorship, which may be a cognizable injury-in-fact for standing purposes.  *See id.* ("[I]t is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001))).

To establish a cognizable self-censorship injury for the purposes of a First Amendment claim, a plaintiff "must show that, as a result of his desired expression, (1) he was threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution."  *Id.* at 1260 (quotation marks omitted).  If a plaintiff proceeds under the credible-threat-of-prosecution prong, he must

demonstrate: "[F]irst, that he seriously wishes to engage in expression that is at least arguably forbidden by the pertinent law, and second, that there is at least some minimal probability that the challenged rules will be enforced if violated." *Id.* (emphasis, citations, and quotation marks omitted). "If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Id.* at 1257.

Plaintiffs explain that, as part of the practice of preventive care, some physicians routinely ask patients whether they own firearms—either verbally or via a screening questionnaire—and provide firearm safety counseling, as part of a larger battery of questions and counseling regarding health and safety risks (including, for example, poisonous chemicals in the home, alcohol, tobacco, and swimming pools). After passage of the Act, Plaintiffs have curtailed or eliminated this practice for fear of facing discipline.[5]

---

[5] Plaintiffs' Complaint lays out the specifics of individual physicians' practices regarding firearm inquiries and safety counseling. For example, prior to passage of the Act, Dr. Wollschlaeger asked his patients to complete a questionnaire that included questions regarding firearm ownership, and routinely orally asked patients whether they owned firearms if other risk factors were present—such as when patients had children in the home; were suffering from addiction, depression, or suicidal ideation; had an unstable family environment; or were involved in a domestic-violence situation—to provide firearm safety counseling tailored to the patient's circumstances. After passage of the Act, Dr. Wollschlaeger has removed the firearms-related questions from his questionnaire and no longer orally asks questions regarding firearm ownership or discusses firearms as part of his standard preventive counseling.

The other physicians who are party to this suit have limited their practice of asking questions and providing counseling about firearm safety, but still do so to varying degrees. For example, prior to passage of the Act, Dr. Schaechter and Dr. Schectman routinely asked their patients questions regarding firearm ownership and entered related information into their patients' medical records. They have continued this practice even after passage of the Act

Plaintiffs have established that they wish to engage in conduct that is at least arguably forbidden by the Act. In their practice of preventive medicine, Plaintiffs wish to ask questions and record information regarding firearms as a matter of routine—without making a particularized determination of relevance—which implies that some such inquiry and recordation will not be relevant to the health and safety of patients or others and thus would be prohibited by the Act. The Act was recently enacted, and the State is defending it, so we may infer that there is at least some probability that the Act will be enforced if violated.[6] Thus, Plaintiffs have established a cognizable self-censorship injury for their First Amendment claims.[7]

---

because they believe in good faith that such questions and information are relevant to their patients' care. However, they now refrain from asking follow-up questions when patients or their parents seem upset by the initial screening question when, prior to passage of the Act, they would not have refrained. Similarly, Dr. Gutierrez continues to use a patient questionnaire that includes a question about firearm ownership, but has resolved to refrain from asking any follow-up questions should a patient initially appear disinclined to discuss the topic. Dr. Sack has ended his previous practice of beginning his firearm safety counseling by asking patients whether they have a firearm in the house. However, he has continued to provide firearm safety counseling, framing it in hypothetical terms not tailored to his patients' individual circumstances. Dr. Fox-Levine has, since passage of the Act, removed questions regarding firearm ownership from her intake questionnaire but continues to advise some patients about firearm safety, framing her advice in hypothetical terms.

[6] We note that the Act does not provide for criminal penalties, but only disciplinary action by the Board. Nevertheless, for standing purposes, the threat of disciplinary action may be sufficient. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1248, 1260 (11th Cir. 2010) (finding an attorney had standing to challenge the state bar's attorney advertising rules when the consequence for noncompliance was disciplinary action, such as disbarment).

[7] We acknowledge that the harassment and discrimination provisions of the Act in particular, § 790.338(5) and (6), prohibit conduct that may involve little to no speech. Nevertheless, Plaintiffs claim self-censorship as a result of all four challenged provisions of the Act. As all four challenged provisions regulate conduct that arguably involves speech, this is

Similarly, to establish a cognizable self-censorship injury for the purposes of a vagueness claim, a plaintiff must show that: "(1) he seriously wishes to [speak]; (2) such [speech] would arguably be affected by the rules, but the rules are at least arguably vague as they apply to him; and (3) there is at least a minimal probability that the rules will be enforced, if they are violated." *Id.* at 1254 (emphasis, footnote, and citations omitted). Notably, "it is the existence, not the imposition, of standardless requirements that causes [the] injury." *Id.* (alteration in original) (quoting *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006)).

For the reasons discussed above, Plaintiffs have met the first and third prongs of the cognizable-injury test for vagueness challenges. With regard to the second prong, Plaintiffs argue that it is unclear whether routine inquiries and record-keeping regarding firearms, made as part of the practice of preventive medicine and not based on patients' particularized circumstances, qualify as "relevant" to health and safety. They also argue the law does not define the terms "unnecessarily harassing" or "discriminate," leaving physicians without guidance as to what conduct the Act prohibits and when physicians may be subject to discipline for conduct patients may unpredictably deem objectionable. Without determining, at this stage, the ultimate merits of Plaintiffs' argument, we accept

---

sufficient for standing purposes. We need not, of course, evaluate the merits of these claims at the standing stage.

that the language Plaintiffs point to is at least arguably vague.  Thus, Plaintiffs

have established a cognizable self-censorship injury for their vagueness claim.

Plaintiffs claim that they curtailed their firearms inquiry and counseling

practices due to the Act, and that they would resume those practices but for the

Act.  Thus, Plaintiffs' self-censorship injury is fairly traceable to passage of the

Act, and redressable by injunction.  Accordingly, Plaintiffs have standing.

The State argues that Plaintiffs lack standing with regard to the inquiry

provision of the Act because that provision in fact prohibits nothing at all.  Thus,

the State claims, Plaintiffs' fear that they will face discipline is not objectively

reasonable.  *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)

("A party's subjective fear that she may be prosecuted for engaging in expressive

activity will not be held to constitute an injury for standing purposes unless that

fear is objectively reasonable.").  Under the State's proposed construction, the Act

merely recommends that physicians "should refrain" from asking questions about

firearms unless relevant, and such hortatory language does not constitute a bar on

speech.  The State points out that the Executive Director of the Board stated in a

letter—posted to the Board's website shortly after Plaintiffs filed suit—that the

Board does not interpret the inquiry provision as a prohibition, but rather as a

recommendation (contradicting a letter the Executive Director had previously

mailed to Florida physicians stating the opposite).  Accordingly, the State

contends, there is no credible threat of enforcement with regard to the inquiry provision.

We disagree.  Laws that provide for disciplinary action in case of violation—such as the Act— should generally not be interpreted as hortatory. *Compare Liesegang v. Sec'y of Veterans Affairs*, 312 F.3d 1368, 1377 (Fed. Cir. 2002) ("In the absence of any consequences for noncompliance, [a law's] timing provisions are at best precatory rather than mandatory."), *with Kittay v. Kornstein*, 230 F.3d 531, 538 n.3 (2d Cir. 2000) (noting that attorney disciplinary rules "are mandatory in character" because they "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action" (quotation marks omitted)), *and Edwards v. Born, Inc.*, 792 F.2d 387, 391–92 (3d Cir. 1986) (noting that attorney disciplinary rules "are mandatory" because attorneys are subject to discipline for violating them).  Thus, despite the Board's position— insofar as the Executive Director's letters represent it—that the inquiry provision constitutes a recommendation rather than a mandate, the fact that the Act provides for disciplinary action against Plaintiffs in case of a violation provides evidence that Plaintiffs' fear that they may face discipline is objectively reasonable for standing purposes.  Notably, this is not a generalized fear of disciplinary action, but rather a specific apprehension by a specific group—physicians—whose conduct the Act targets.  *But cf. Clapper v. Amnesty Int'l USA*, 568 U.S. ___, 133

S. Ct. 1138, 1143, 185 L. Ed. 2d 264 (2013) (holding that attorneys and various

human rights, labor, legal, and media organizations cannot "manufacture standing"

to challenge a provision of the Foreign Intelligence Surveillance Act of 1978 "by

choosing to make expenditures based on hypothetical future harm" where plaintiffs

merely speculate that the government will target their communications, and so the

costs they incurred were a product of their generalized fear of surveillance).

Moreover, we note that the Board has not been consistent in its position that

the inquiry provision is hortatory, as indicated by the Executive Director's first

letter stating the contrary.  The State is also inconsistent in its interpretation of the

"should refrain" language in its briefs.  For instance, it repeatedly characterizes

identical language in the harassment provision of the Act as a mandatory

prohibition against unnecessary harassment.  It also describes the inquiry provision

itself as "proscrib[ing] . . . inquiries," *id.* at 11, and "prohibit[ing] conduct," *id.* at

39.  *Cf. Wilson*, 132 F.3d at 1428–29 (holding that disbarred attorneys lacked

standing to challenge rules that limit the ways in which disbarred attorneys can

represent themselves to the public or have contact with clients where "the State Bar

ha[d] repeatedly and consistently taken the position that the [challenged rules]

ha[d] no application to the types of scenarios the disbarred attorneys have posed").

Neither is it controlling that, as the State contends, the Florida Supreme

Court interpreted the term "should" as hortatory in reviewing Florida's Code of

Judicial Conduct.  *See In re Code of Judicial Conduct*, 643 So. 2d 1037, 1041 (Fla. 1994).  Such interpretation is irrelevant to determining what effect the Florida legislature intended to give language in the Act.  Thus, Plaintiffs' fear that they may face discipline under the inquiry provision is objectively reasonable.[8]

The State also argues that Plaintiffs lack standing with regard to the record-keeping provision of the Act because it proscribes only the entry of firearm information that is not relevant to medical care or safety, and Plaintiffs claim no injury arising from a wish to record irrelevant information.  However, Plaintiffs claim an injury to their practice of preventive medicine arising from not being free to record the firearm information of every patient as a matter of course.  Some— perhaps the majority—of these records will therefore be irrelevant to the care and safety of patients and others.  Thus, the State's argument is unavailing: Plaintiffs claim an injury arising, in part, from a desire to record irrelevant information.

---

[8] We do not accept Plaintiffs' argument that construing the inquiry provision's "should refrain" language as hortatory would render meaningless the portion of the provision allowing physicians to nevertheless make firearm inquiries when doing so would be relevant to care and safety.  *See Corley v. United States*, 556 U.S. 303, 314, 129 S. Ct. 1558, 1566, 173 L. Ed. 2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quotation marks omitted)).  Even if we were to construe the inquiry provision as a mere recommendation that physicians refrain from inquiring about firearms, it is perfectly reasonable that the legislature may wish to withdraw this recommendation should the inquiry be relevant in a given case.  Nevertheless, we find that the inquiry clause is not a mere recommendation, and our rejection of Plaintiffs' argument does not alter the result of our standing inquiry.

Accordingly, we find that the District Court properly held that Plaintiffs have standing to challenge the Act. We also find that the District Court properly held that Plaintiffs' claims are ripe for adjudication.[9]

## IV.

Now for the merits of Plaintiffs' claims. Plaintiffs' facial attacks on the Act arise under two separate provisions of the Constitution. First, they contend that § 790.338(1), (2), (5), and (6)—the record-keeping, inquiry, discrimination, and harassment provisions of the Act[10]—impermissibly trench upon their rights under the First Amendment. In their view, the Act is a content-based restriction on speech and, as such, is subject to—and fails—strict scrutiny. Plaintiffs also assert that the Act is overbroad; that is, they claim that even if the Act's regulation of speech is constitutional in a limited number of situations, it nonetheless proscribes a substantial amount of legitimate speech, and must fall. Second, Plaintiffs argue that the Act violates their procedural rights under the Due Process Clause of the Fourteenth Amendment, in that the Act's terms are so vague that they fail to put a person of ordinary intelligence on notice as to what the Act prohibits.

We will begin with the latter contention and then move to the First Amendment challenges. *See Borgner v. Brooks*, 284 F.3d 1204, 1208 (11th Cir.

---

[9] The State does not renew on appeal its argument that Plaintiffs' claims are not ripe.

[10] Plaintiffs' challenge is limited to these four provisions. Accordingly, unless context demands otherwise, future references to the Act should be understood to refer only to these provisions.

2002) ("Before analyzing [the challenged state statute] under the [appropriate level of First Amendment scrutiny], we must first determine whether the statute, taken as a whole, is clear as far as what is required and what is prohibited.").

A.

Under "[t]he void-for-vagueness doctrine[,] . . . 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (third alteration in original) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629, 104 S. Ct. 3244, 3256, 82 L. Ed. 2d 462 (1984)).  Thus, a statute is unconstitutionally vague if "it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–03, 86 S. Ct. 518, 520–21, 15 L. Ed. 2d 447 (1966).

The Supreme Court has explained that "standards of permissible statutory vagueness are strict in the area of free expression." *NAACP v. Button*, 371 U.S. 415, 432, 83 S. Ct. 328, 337, 9 L. Ed. 2d 405 (1963).  Nonetheless, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct.

2746, 2755, 105 L. Ed. 2d 661 (1989) (citation omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S. Ct. 2294, 2300, 33 L. Ed. 2d 222 (1972) ("Condemned to the use of words, we can never expect mathematical certainty in our language."). When a statute is challenged for vagueness prior to enforcement, the litigants must allege that they are "chilled from engaging in constitutionally protected activity." *See Bankshot Billiards v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) ("[P]re-enforcement review provides law-abiding citizens with a middle road between facing prosecution and refraining from otherwise constitutional conduct."). Still, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 733, 120 S. Ct. 2480, 2498, 147 L. Ed. 2d 597 (2000) (citation and quotation marks omitted).

We begin by setting forth our understanding of the meaning of each of the challenged provisions, after which we address Plaintiffs' specific contentions. *See Broadrick v. Oklahoma*, 413 U.S. 601, 617 n.16, 93 S. Ct. 2908, 2919, 37 L. Ed. 2d 830 (1973) ("[A] federal court must determine what a state statute means before it can judge its facial constitutionality."). We do so in light of the familiar principle that where a statute is "readily susceptible to a narrowing construction that avoids

constitutional infirmities," we must uphold it.  *See Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1326 (11th Cir. 2001).

1.

The record-keeping provision prohibits physicians from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record if the [physician] knows that such information is not relevant to the patient's medical care or safety, or the safety of others."  Fla. Stat. § 790.338(1).  We note three salient points with regard to this provision.  First, the substantive prohibition contained in the first clause—that a physician may not "intentionally enter any disclosed information concerning firearm ownership," *id.*—is conditioned on a relevancy requirement in the second clause.  *See If*, Oxford English Dictionary (2015) (defining "if" as a conjunction that "introduc[es] a clause of condition or supposition").  The substantive prohibition applies only when the condition in the second clause is met—that is, when a physician knows that information concerning firearm ownership is not relevant to the patient's medical care or safety, or the safety of others.  Logically, when a physician does *not* know that information concerning firearm ownership is irrelevant to the patient's medical care or safety, or the safety of others, the prohibition does *not* apply.

Second, and relatedly, the statute is written to require a high degree of certainty as to non-relevance on the part of the physician before the prohibition takes effect.  By its terms, the record-keeping provision prohibits physicians from entering information concerning firearm ownership only when the physician has knowledge of that information's irrelevance to medical care or safety.  Any mental state regarding irrelevance that does not rise to the level of knowledge would not trigger the prohibition.

Finally, of course, if the prohibition applies *only* when a physician *knows* the information to be irrelevant, then the critical issue is the meaning of the relevancy requirement.  Plaintiffs argue that the provision is vague because it does not provide them with sufficient notice as to when record-keeping regarding firearms is relevant to medical care or safety.  Plaintiffs note that the Act does not specify whether a physician must make a particularized finding of relevance for each patient or whether a physician's general belief that firearms are always relevant will suffice.  They also argue that the Act does not specify if a physician must believe that firearm information is relevant at the time of inquiry and record-keeping, or if a good-faith belief that the information may later become relevant (such as in the practice of preventive medicine) satisfies the requirements of the Act.  Plaintiffs contend that, because a reading that information about firearms is

always relevant would render the Act meaningless, physicians reasonably fear that the Act requires some higher, unspecified level of relevance.

We find that recourse to plain meaning resolves the issue. *See Johnson v. Governor of Fla.*, 405 F.3d 1214, 1247 (11th Cir. 2005) (en banc) ("The first step in statutory interpretation requires that courts apply the plain meaning of the statutory language unless it is ambiguous.").  "Relevant" means "[b]earing on or connected with the matter in hand; closely relating to the subject or point at issue; pertinent to a specified thing." *Relevant*, Oxford English Dictionary (2015).  We agree that the Act's relevancy requirement does not have a neat, one-size-fits-all definition; rather, relevancy is necessarily determined on a case-by-case basis. That is, whether information is related to the matter at hand depends entirely on the specifics of the matter at hand.  A reading that information about firearm ownership is relevant in every case would, indeed, render the record-keeping provision superfluous, but this problem is easily avoided by adhering to a plain-meaning construction of relevancy as an ad hoc determination, requiring physicians to base their calculation as to the relevancy of a patient's firearm-ownership status on particularized information about the patient.  By employing a flexible relevancy standard, the Act provides physicians with the freedom to record information regarding firearm ownership whenever doing so would be part of the practice of good medicine.

Taking these three points together, we think the record-keeping provision stands for the simple proposition that a physician may not record a patient's firearm-ownership status unless the physician believes that—because of some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies—the patient's firearm-ownership status pertains to the patient's medical care or safety, or the safety of others.  The record-keeping provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

2.

The inquiry provision is phrased slightly differently, but we think it is substantially similar to the record-keeping provision in terms of its practical effect. The inquiry provision directs physicians to

> refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient.  Notwithstanding this provision, a [physician] . . . that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry.

Fla. Stat. § 790.338(2).

Here again, the substantive prohibition is qualified by a relevancy requirement, effectively providing that physicians may inquire whenever they believe in good faith that firearm ownership information is relevant to medical care

or safety.  Again, the provision sets a high bar as to the mental state necessary to trigger the prohibition: a physician must lack any good-faith belief as to the relevancy of the information.  The provision does not require physicians to have *knowledge* of relevance before speaking, but only a good-faith *belief* as to relevance.  Although this is phrased differently than the record-keeping provision's relevancy requirement, we think the inquiry and record-keeping provisions form two sides of the same coin.  The prohibitions apply when a physician knows the information to be *irrelevant* and do not apply if the physician has a good-faith belief that the information is *relevant*.

And, as with the record-keeping provision, the relevancy clause is also key here.  Plaintiffs again assert that the term "relevant" is vague, but as we observed above, in context, this requirement simply means that physicians should base their calculation as to the relevancy of a patient's ownership of firearms on particularized information about the patient.  Thus, physicians may make inquiries as to the firearm-ownership status of any or all patients, so long as they do so with the good-faith belief—based on the specifics of the patient's case—that the inquiry is relevant to the patient's medical care or safety, or the safety of others.  If, for example, a physician seeks firearm information to suit a personal agenda unrelated to medical care or safety, he would not be making a "good-faith" inquiry, and so the Act plainly directs him to refrain from inquiring.

Accordingly, we conclude that the inquiry provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

3.

Finally,[11] the harassment provision also contains the same basic elements as the first two provisions, albeit with a few modifications.  The harassment provision directs physicians to "refrain from unnecessarily harassing a patient about firearm ownership during an examination."  Fla. Stat. § 790.338(6).  Like the record-keeping and inquiry provisions, the harassment provision does not impose a flat ban on the speech at issue, but rather qualifies its ban—here, with a necessity requirement.  Under the terms of the statute, physicians are prohibited from harassing patients about firearm ownership only when such harassment is unnecessary.

One way in which the harassment provision differs from the previous two provisions, however, is with regard to the mental state that triggers the substantive prohibition.  Instead of imposing a high bar before *prohibiting* the speech—requiring knowledge of irrelevance or the absence of a good-faith belief of relevance—the harassment provision flips this formula, imposing a relatively high bar before *permitting* the speech.  Harassment about firearm ownership is

---

[11] Plaintiffs have not cross-appealed the District Court's holding that the discrimination provision, § 790.338(5), is not void for vagueness.  As a result, we need not address their argument that what constitutes "discrimination" under this provision is unclear.

permitted only when necessary. We are not troubled by this inversion, however, because although, as we discuss below, we can imagine scenarios in which "harassment" might be warranted, even advisable, we think that in the majority of cases, it will not be. Imposing a more rigorous standard before permitting record-keeping or inquiry might present a more difficult question, but we do not think it inappropriate as a prerequisite to permitting "harassing."

Finally, we think that the necessity requirement, like the record-keeping and inquiry provisions, when read in the context of the Act as a whole, also has the effect of requiring a particularized determination by the physician as to relevance. *See Young v. Progressive Se. Ins. Co.*, 753 So. 2d 80, 84 (Fla. 2000) ("[A]ll parts of a statute must be read *together* in order to achieve a consistent whole," and "'[w]here possible, courts must give effect to *all* statutory provisions and construe related statutory provisions in harmony with one another.'"), *cited with approval in Borgner*, 284 F.3d at 1208 (Wilson, J.).

Two points inform this conclusion. First, the harassment provision contains an explicit temporal limitation: unnecessary harassment is prohibited "during an examination." Fla. Stat. § 790.338(6). Since the purpose of a medical examination is the provision of medical care, it seems logical to assume that *if* any harassment is permissible within that context, it must be related to the purpose of the medical examination. Second, the relevancy requirements present in both the record-

keeping and inquiry provisions illuminate the meaning of the necessity requirement in the harassment provision.  These requirements manifestly turn on a particularized determination by the physician as to the relevancy of the speech to the medical care or safety of the patient, or the safety of others.  While that link is not made explicit in connection with the necessity requirement, the clear implication, given this pattern, is that the necessity requirement is directed to the same object: the medical care or safety of the patient, or the safety of others.

Plaintiffs express concern that the relevancy determination will hinge solely on a particular patient's subjective understanding of what constitutes "unnecessary harassment," and that as a result, they may be subjected to liability or discipline on an arbitrary basis.  Were this indeed the case, the provision would likely be invalid. *See Conant v. Walters*, 309 F.3d 629, 639 (9th Cir. 2002) (holding a statute providing for administrative action against physicians who engage in speech that "the patient believes to be a recommendation of marijuana" lacks the requisite narrow specificity under the First Amendment); *see also Thomas v. Collins*, 323 U.S. 516, 535, 65 S. Ct. 315, 325, 89 L. Ed. 430 (1945) (striking down on First Amendment grounds a statute criminalizing solicitation of union membership without state license because the statute did not distinguish between solicitation and advocacy, and so "put[] the speaker . . . wholly at the mercy of the varied

35

understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning").

Again, we find the plain meaning of the term "harass" sufficient to dispel these fears. "Harass" means "[t]o wear out, tire out, or exhaust with fatigue, care, trouble, etc." *Harass, v.*, Oxford English Dictionary (2015). When read in the context of the Act as a whole, the harassment provision communicates that physicians should not disparage firearm-owning patients, and should not persist in attempting to speak to patients about firearm ownership when the subject is not relevant to medical care or safety. Like the other provisions of the Act, the harassment provision targets physicians who wish to pursue an agenda unrelated to medical care or safety.

Although the District Court understood the modifier "unnecessarily" to be problematic, we disagree. The modifier in fact allows a physician the freedom to challenge—that is, "harass"— a patient regarding firearms when, under the particularized circumstances of the patient's case, doing so is necessary for health or safety reasons, even if the patient might find the physician's advice unwelcome. For example, if a patient is suicidal, a physician may wish to attempt to persuade the patient to remove firearms from the patient's home, even if the patient initially objects. So even if the patient considers the physician's firearm-related health and safety advice to be harassing, the inclusion of the modifier "unnecessarily" leaves

room for the physician to deliver such advice when necessary to medical care or safety, consistent with the Act's other provisions.  The harassment provision is sufficiently clear that a person of common intelligence need not guess as to what it prohibits.

As a final point, we note that patients by themselves cannot subject physicians to discipline.  Patients may file a complaint, which triggers an investigation by the Board, or they may bring a malpractice action.  But, so long as a physician is operating in good faith within the boundaries of good medical practice, and is providing only firearm safety advice that is relevant and necessary, he need not fear discipline at the hands of the Board or a money judgment in a court of law.

4.

To summarize, we read the Act to prohibit record-keeping about firearm ownership only when the physician knows such information to be irrelevant to the patient's medical care or safety, or the safety of others; inquiry about firearm ownership only when the physician lacks a good-faith belief that the information is relevant to the patient's medical care or safety, or the safety of others; and harassment about firearm ownership only when the physician does not believe it necessary for the patient's medical care or safety, or the safety of others.

Having determined that the record-keeping, inquiry, and harassment provisions are of sufficient clarity to conform to the requirements of due process, we hold that the District Court erred in holding them void for vagueness.

## B.

We turn now to the first of Plaintiffs' First Amendment challenges. We apply First Amendment scrutiny to the Act only if it regulates activity that falls within the ambit of the First Amendment's protections. Therefore, we begin our analysis by resolving a necessary preliminary issue: whether any of the challenged provisions implicate a significant amount of "speech" as that term is understood in the context of First Amendment law.

## 1.

Under the First and Fourteenth Amendments, States are prohibited from "mak[ing] [any] law . . . abridging the freedom of speech." U.S. Const. amend. I.[12] "The First Amendment literally forbids the abridgment only of 'speech,' but we have long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 2539, 105 L. Ed. 2d 342 (1989). Conduct may also be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."

---

[12] The First Amendment's prohibition is applied against the States through the Fourteenth Amendment's Due Process Clause. *Schneider v. New Jersey*, 308 U.S. 147, 160, 60 S. Ct. 146, 150, 84 L. Ed. 155 (1939); *see also Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940).

*Spence v. Washington*, 418 U.S. 405, 409, 94 S. Ct. 2727, 2730, 41 L. Ed. 2d 842

(1974).  To determine whether particular conduct implicates the protections of the

First Amendment, we look to whether it is "inten[ded] to convey a particularized

message," and whether, under the circumstances, it is highly likely "that the

message would be understood by [observers]."  *Johnson*, 491 U.S. at 404, 109 S.

Ct. at 2539 (quoting *Spence*, 418 U.S. at 410–11, 94 S. Ct. at 2730).

It would seem under this definition— indeed, under almost any measure—

that asking questions and writing down answers constitute protected expression

under the First Amendment.  However, the State argues that the Act escapes First

Amendment scrutiny because it is directed toward conduct—the practice of

medicine.  While seemingly conceding (as it must) that asking questions and

writing down answers would receive First Amendment protection if it occurred

between strangers on a street corner, the State asserts that because the activity is

conducted by a physician as part of the practice of the medical profession, and

because the medical profession has long been subject to close regulation by the

State, the fact that the law restricts oral and written communication is of no

consequence whatever.

The State finds support for this proposition in *Locke v. Shore*, 634 F.3d 1185

(11th Cir. 2011).  In that case, we said that "[a] statute that governs the practice of

an occupation is not unconstitutional as an abridgement of the right to free speech,

so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Id.* at 1191 (quoting *Accountant's Soc. of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988)).  That is true so far as it goes, but the State's proffered interpretation begs the question we must answer here.  An inhibition of professionals' freedom of speech does not violate the First Amendment "*so long as*" it is "merely the incidental effect of . . . an otherwise legitimate regulation." *Id.* (emphasis added).  The State's analysis proceeds at such a high level of generality that *all* laws regulating the practice of a profession would necessarily impose only incidental burdens on speech, and so would always pass muster under the First Amendment.  This cannot be the case.

The State also cites Justice White's concurring opinion in *Lowe v. SEC*, 472 U.S. 181, 211–36, 105 S. Ct. 2557, 2573–86, 86 L. Ed. 2d 130 (1985), but we do not find anything in that opinion that would countenance the idea that the entire category of professional regulation touches only on conduct, and thus lies beyond the reach of the First Amendment.  Indeed, Justice White recognized that "[a]t some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment." *Id.* at 230, 105 S. Ct. at 2583; *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28, 130 S. Ct. 2705, 2724, 177 L. Ed. 2d 355 (2010) (explaining that when "the conduct triggering coverage

under [a] statute consists of communicating a message . . . we must [apply] a more demanding standard" of scrutiny than that applied to regulations of noncommunicative conduct) (second modification in original); *Miller v. Stuart*, 117 F.3d 1376, 1382 (11th Cir. 1997) (holding that a state may not insulate a regulation of commercial speech from First Amendment review simply by classifying the speech as part of the profession of accountancy); *King v. Governor of N.J.*, 767 F.3d 216, 228–29 (3d Cir. 2014) (rejecting the argument that verbal communications become "conduct" when they are used to deliver professional services), *cert. denied sub nom King v. Christie*, 575 U.S. ___, 135 S. Ct. 2048, 191 L. Ed. 2d 955 (2015).

Our task, then, is to determine whether any provision of the Act crosses the boundary between a law regulating professional *conduct* with an incidental effect on speech and a law regulating protected *speech*, which "must survive the level of scrutiny demanded by the First Amendment." *Lowe*, 472 U.S. at 230, 105 S. Ct. at 2583 (White, J., concurring).

The record-keeping provision of the Act, § 790.338(1), prohibits physicians from "intentionally enter[ing] any disclosed information concerning firearm ownership into the patient's medical record" under certain circumstances. This provision clearly targets activity—making an entry in a medical record—that is intended to convey a particular message—information about firearm ownership.

And, (legibility aside) we think that under the circumstances it is highly likely that the expressive content contained in these entries would be understood by those viewing them.  Therefore, we hold that the record-keeping provision regulates speech, and as such, must survive some level of First Amendment scrutiny.

The inquiry provision of the Act, § 790.338(2), requires physicians to "refrain from making a written inquiry or asking questions concerning the ownership of a firearm . . . ."  On its face, this provision also inhibits protected speech—inquiring about firearm ownership.  It too must survive some level of First Amendment scrutiny.

The discrimination provision of the Act, § 790.338(5), if not a horse of a different color, is at least a steed of a different shade.  This provision prohibits "discriminat[ion] against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition."  *Id.*  Unlike the first two provisions considered, the discrimination provision does not facially implicate a substantial amount of protected speech.  Of course, it is possible to discriminate via speech, by hanging a sign on the examination room wall proclaiming "Gun Owners Not Welcome Here," for example.  But this does not transform antidiscrimination laws into restrictions on speech.  *See Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 62, 126 S. Ct. 1297, 1308, 164 L. Ed. 2d 156 (2006) ("Congress, for example, can prohibit employers from

discriminating in hiring on the basis of race.  The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.");  *accord Wisconsin v. Mitchell*, 508 U.S. 476, 487–88, 113 S. Ct. 2194, 2201, 124 L. Ed. 2d 436 (1993) (compiling cases upholding state and federal antidiscrimination laws against First Amendment challenge).  The provision does not single out speech, or target speech that carries a specific message; rather "the focal point of its prohibition [is] the act of discriminating against individuals in the provision of [medical treatment] on the proscribed ground[]."  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572, 115 S. Ct. 2338, 2347, 132 L. Ed. 2d 487 (1995).  Especially in light of the facial nature of Plaintiffs' challenge, we hold that the discrimination provision is a regulation of conduct with only an incidental effect on speech.  As such, it does not implicate, let alone offend, the First Amendment.

The harassment provision of the Act, § 790.338(6), requires physicians to "refrain from unnecessarily harassing a patient about firearm ownership . . . ."  Plaintiffs point us to *Saxe v. State College Area School District*, which stands for the proposition that "[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause."  240 F.3d 200, 204 (3d Cir. 2001) (Alito, J.).  Of course, "non-expressive, physically harassing *conduct* is entirely outside the

ambit of the free speech clause," but the First Amendment also "protects a wide variety of speech that listeners may consider deeply offensive . . . ." *Id.* at 206; *see, e.g*, *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 179 L. Ed. 2d 172 (2011); *Brandenburg v. Ohio*, 395 U.S. 444, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969).

A natural reading of the provision would seem to indicate that it is primarily concerned with verbal harassment, since it defines a subject about which unnecessary harassment is prohibited. It is difficult to imagine how one would physically "harass[] a patient *about* firearm ownership." *See* Fla. Stat. § 790.338(6) (emphasis added). Even assuming, however, that there are some situations in which the provision could be applied without involving speech, we think that on balance the provision substantially regulates speech and so must survive some level of First Amendment scrutiny.[13]

---

[13] We note that Plaintiffs bring two types of facial challenges to this provision under the First Amendment: a traditional facial challenge, which can succeed only if "no set of circumstances exists under which the Act would be valid," *Am. Fed'n of State, Cty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013) *cert. denied*, 134 S. Ct. 1877, 188 L. Ed. 2d 912 (2014) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)), and an overbreadth challenge, "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quotation marks omitted).

If there are some plainly legitimate applications of the harassment provision, such as to physical harassment, that would seem to doom the first of Plaintiffs' facial First Amendment challenges. This is not necessarily dispositive, however, because a substantial number of its applications may still be found to be unconstitutional in an overbreadth analysis.

In sum, we conclude that while the discrimination provision is a regulation of professional conduct with merely an incidental effect on speech, and thus does not implicate the First Amendment, the record-keeping, inquiry, and harassment provisions *do* regulate a significant amount of protected speech. Accordingly, we must proceed to determine what level of scrutiny the First Amendment demands of these provisions. *See Lowe*, 472 U.S. at 230, 105 S. Ct. at 2583 (White, J., concurring).

2.

Not all restrictions on speech are created equal. Restrictions may be content-neutral or content-based. Content-based restrictions on speech are restrictions that "appl[y] to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. ___, ___, 135 S. Ct. 2218, 2227, 192 L. Ed. 2d 236 (2015). The First Amendment does not suffer content-based restrictions of speech lightly. They are presumptively invalid and generally subject to strict scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542, 120 L. Ed. 2d 305 (1992) ("Content-based regulations are presumptively invalid.").

There are, however, certain types of content-based speech restrictions that have traditionally received less-demanding judicial scrutiny. For example, restrictions on commercial speech receive lesser scrutiny because "there can be no

constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563, 100 S. Ct. 2343, 2350, 65 L. Ed. 2d 341 (1980). Restrictions on commercial speech traditionally receive intermediate scrutiny. *Id.* at 564, 100 S. Ct. at 2350.

The status of professional speech is murkier. The Supreme Court has never precisely addressed the proper level of scrutiny for professional speech. Plaintiffs here contend that even if the First Amendment's waters were previously murky, the Supreme Court's recent decision in *Reed v. Town of Gilbert* makes clear that all content-based restrictions on speech are subject to strict scrutiny.[14] As explained below, there was ample evidence before *Reed* that professional speech also received, at most, intermediate scrutiny and it is hardly clear that anything has changed.

---

[14] In *Reed*, the Supreme Court found that a municipal sign code "governing the manner in which people [could] display outdoor signs" violated the First Amendment. 576 U.S. at ___, 135 S. Ct. at 2224–25. The Court seemed to suggest that strict scrutiny applies broadly to all content-based regulations of speech. *See id.* at ___, 135 S. Ct. at 2231 ("Because the Town's Sign Code imposes content-based restrictions on speech, those provisions can stand only if they survive strict scrutiny."). The Court first determined whether the law was content-neutral or content-based. *Id.* at ___, 135 S. Ct. at 2228–29. Having determined it was content-based, the Court applied strict scrutiny without further inquiry. *Id.* Quoting precedent, the Court emphasized that a state's "interest in the regulation of professional conduct" did not offer protection from strict scrutiny. *Id.* at ___, 135 S. Ct. at 2229 (internal quotation marks omitted).

Justice Breyer, concurring in the judgment, wrote that content discrimination "cannot and should not *always* trigger strict scrutiny." *Id.* at ___, 135 S. Ct. at 2234 (Breyer, J., concurring) (emphasis in the original). In particular, he noted that "[r]egulatory programs almost always require content discrimination," and that holding that this always "triggers strict scrutiny is to write a recipe for judicial management of ordinary government regulatory activity." *Id.* (noting doctor–patient confidentiality as an example of content-based discrimination).

As an initial matter, we agree with the Plaintiffs' characterization of the Act as a content-based restriction on speech.  The Act fits squarely within the definition of content-based restrictions because it applies to speech based on the "topic discussed."  *See Reed*, 576 U.S. at ___, 135 S. Ct. at 2227.  "Plaintiffs want to speak to [their patients], and whether they may do so under [the Act] depends on what they say." *Holder*, 561 U.S. at 27, 130 S. Ct. at 2723–24.  Because the Act is a content-based restriction, it can avoid strict scrutiny only if it is a restriction on professional speech and professional speech receives lesser scrutiny.

Fortunately, we need not decide this difficult question.  We ultimately hold that the Act survives even strict scrutiny as the State has asserted a compelling interest and the Act is narrowly tailored to advance that interest.  Given this conclusion, we pass no judgment on what level of scrutiny should apply here, but would of course hold that the Act also survives any less demanding level of scrutiny.  *See Sorrell v. IMS Health Inc.*, 564 U.S. ___, ___, 131 S. Ct. 2653, 2667, 180 L. Ed. 2d 544 (2011) (declining to decide the precise level of scrutiny when the result would be the same under either of the two possible standards).  Although we apply strict scrutiny, we include an overview of professional speech below as we believe it helpful in understanding the nature of the interests at play here.

a.

47

First, we must examine what constitutes professional speech. Two concepts orient our discussion: profession and relationship. Physicians are not only members of the medical profession, they are also fiduciary members of various physician–patient relationships. *See, e.g.*, 61 Am. Jur. 2d *Physicians, Surgeons, and Other Healers* § 141 (2012); *Mangoni v. Temkin*, 679 So. 2d 1286, 1288 (Fla. Dist. Ct. App. 1996).

Of course, not all speech by professionals is equal. It is common sense that "[t]here is a difference, for First Amendment purposes, between . . . professionals' speech to the public at large versus their direct, personalized speech with clients." *Locke*, 634 F.3d at 1191; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 634, 115 S. Ct. 2371, 2381, 132 L. Ed. 2d 541 (1995) ("Speech by professionals obviously has many dimensions."). While a professional may speak on a variety of topics in a variety of contexts, only some of this speech falls under the doctrinal category of "professional speech."

For example, a physician may meet with a patient in an examination room and explain the risks of a particular surgical procedure. This conversation is easily classified as professional speech. *See King*, 767 F.3d at 232 (defining professional speech as speech that "is used to provide personalized services to a client based on the professional's expert knowledge and judgment"); *Moore-King v. Cty. of Chesterfield, Va.*, 708 F.3d 560, 569 (4th Cir. 2013) (finding "the relevant inquiry

to determine whether to apply the professional speech doctrine" to be "whether the speaker is providing personalized advice in a private setting to a paying client"); *see also* Robert Post, *Informed Consent to Abortion: A First Amendment Analysis of Compelled Physician Speech*, 2007 U. Ill. L. Rev. 939, 949 ("[W]hen a physician speaks to a patient in the course of medical treatment, his opinions are normally regula[ble] . . . .").

On the other hand, a physician may also speak to a crowd at a rally, extolling the merits of a particular political candidate. Although this speech is also uttered by a professional, it clearly does not constitute "professional speech." *See Lowe,* 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring) ("Where the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation . . . becomes regulation of speaking or publishing as such, subject to the First Amendment's command that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'"); *cf. Sedivy v. State ex rel. Stenberg*, 567 N.W. 2d 784, 793 (Neb. Ct. App. 1997) (suggesting in dicta that the First Amendment would bar the State from revoking a veterinarian's license solely because he expressed disagreement with government tax policies).

Not all physician speech is so clear cut, however. A physician may also speak to the public in furtherance of the practice of medicine. And a physician may speak to a client on a matter irrelative to medicine. [15] As for the former, it includes promotional or advertising speech to the public for the purpose of furthering the physicians' practice and giving general health advice to the public on a television talk show or in a newspaper column. *See, e.g.*, *Bailey v. Huggins Diagnostic & Rehab. Ctr., Inc.*, 952 P.2d 768, 773 (Colo. App. 1997) (disallowing on First Amendment grounds a negligent-misrepresentation claim against a dentist for publicly suggesting that mercury-amalgam fillings are harmful and should be removed).

---

[15] These four hypothetical scenarios illustrate the universe of physician speech and turn on two factors: the professional effectivity of the speech—whether the physician is speaking in furtherance of the practice of medicine or not, and the relational context of the speech—whether the physician is speaking within a fiduciary relationship or not. It may be helpful to think about these four categories in the form of a grid, like so:



Conversely, conversation between a physician and a patient about their mutual love of golf would fall in the latter category: speech unrelated to the practice of medicine but within the confines of a physician–patient relationship. A more sinister example of this type of speech is harassing or intimidating speech by a physician to a patient. *See, e.g.*, *In re Suspension or Revocation of License of Singh*, No. A-2181-06T2, 2007 WL 1753567, at *1 (N.J. Super. Ct. App. Div. June 20, 2007) (affirming revocation of a physician's license in part for repeatedly pressuring elderly patient to conceal the physician's attempt to solicit a loan from her).

When a physician speaks to a patient in furtherance of the practice of medicine, not one, but two state interests are implicated: regulation of the profession for the protection of the public and regulation of the relationship for the protection of the patient and the benefit of society. Conversely, when a physician speaks to the public on a matter irrelative to the practice of medicine, neither state interest adheres with any special force; instead, the countervailing interests—the physician's interest in speaking freely and society's interest in listening freely—come to the fore.

This framework aligns with and illuminates the limited guidance the Supreme Court has provided on professional speech. Take, for example, promotional speech by professionals. Under our analysis, regulations of this type

of speech implicate two primary interests: the state's interest in protecting the public by regulating the profession, and society's interest in the free flow of information. Notably, these are precisely the interests the Supreme Court has found relevant to analyzing regulations of professional advertising. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 764, 766–68, 96 S. Ct. 1817, 1827, 1828–29, 48 L. Ed. 2d 346 (1976) (characterizing the countervailing interests as society's "strong interest in the free flow of commercial information," and the state's "strong interest" in protecting the public by maintaining "high professional standards"); *accord Bates v. State Bar of Ariz.*, 433 U.S. 350, 364–79, 97 S. Ct. 2691, 2699–2707, 53 L. Ed. 2d 810 (1977); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 454–60, 98 S. Ct. 1912, 1918–20, 56 L. Ed. 2d 444 (1978).

The Supreme Court has also addressed, in passing, another category of speech by a professional—a regulation compelling physicians to discuss certain information with their patients about the risks of abortion and childbirth. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884, 112 S. Ct. 2791, 2824, 120 L. Ed. 2d 674 (1992) (joint opinion). Under our framework, this type of regulation falls at the intersection of two governmental interests: regulation of the medical profession for the protection of the public, and regulation of the fiduciary relationship for the protection of the patient and the benefit of society. When one

understands that both of the primary interests at play cut in favor of government regulation in such cases, the Supreme Court's succinct conclusion that the regulation implicated "the physician[s'] First Amendment rights" but survived some level of heightened scrutiny as a "reasonable" regulation of the practice of medicine makes more sense.  *Id.*

While the Court's brief treatment of this issue in *Casey* does not provide much insight into how to analyze regulations of professional speech, or why the statute at issue survived First Amendment scrutiny, the holding is helpful insofar as it is consistent with our conclusion that speech by a professional is best understood when evaluated along two dimensions—whether it is uttered in furtherance of a profession and whether it occurs within a professional–client relationship.

We need not mark out today the full metes and bounds of professional speech.  It is sufficient to observe that speech by a physician that is uttered in furtherance of the practice of medicine and within the confines of a fiduciary relationship falls squarely within this category.  As this is what the Act seeks to regulate, we conclude that it is a regulation of professional speech.[16]

---

[16] There can be no argument that Plaintiffs view inquiries about firearm ownership as a matter of preventive care—that is, in furtherance of the practice of medicine—or that they wish to raise these issues with their patients—that is, within the context of a fiduciary relationship. Indeed, stripped to its essentials, Plaintiffs' theory of the case appears to be that the Act prohibits them from speaking to their patients in furtherance of the practice of medicine, but that the State's objective in passing the Act was to prohibit them from speaking on a matter irrelative to the practice of medicine, and that it will seek to punish them for doing so.

With these principles in mind, we are now prepared to address the issue of the appropriate level of First Amendment scrutiny accorded professional speech.

b.

The Supreme Court has never directly addressed the appropriate level of scrutiny accorded professional speech regulations.  We therefore must proceed from the known to the unknown.  First, we know that when professionals speak on a matter irrelative to the practice of their profession and outside any particular relationship, their status as a professional is entirely incidental to their speech.  When this is true, the government generally may not treat professional speakers differently than nonprofessional speakers.  *See Pickup v. Brown*, 740 F.3d 1208, 1227–28 (9th Cir. 2013) ("[O]utside the doctor-patient relationship, doctors are constitutionally equivalent to soapbox orators and pamphleteers, and their speech receives robust protection under the First Amendment."); *see also City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n,* 429 U.S. 167, 176, 97 S. Ct. 421, 426, 50 L. Ed. 2d 376 (1976) ("[The government] may not . . . discriminate between speakers on the basis of their employment . . . ."); *Pickering*

---

We do not understand Plaintiffs to argue that they have a First Amendment right to speak to their patients within the examination room on matters irrelative to the practice of medicine.  So, because we find that the Act is tailored to permit inquiry about firearms whenever the physician believes in good faith that such information is relevant to the health or safety of any individual, *see supra* part IV.A.2, we need not—indeed, we cannot—address the propriety of applying the Act to prohibit physicians from discussing matters irrelative to their patients' health or safety.  Because Plaintiffs concede that the Act regulates speech in furtherance of the practice of medicine, we proceed to analyze it as such.

*v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734, 20 L. Ed. 2d 811 (1968) ("[T]eachers may [not] constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest . . . .").

We also know that because the State's interest in imposing content-based restrictions on speech is at low ebb when a professional speaks to the public irrelative to the practice of his profession, the State is required to meet the demands of strict scrutiny demonstrating that its course of action is "the least restrictive means of advancing a compelling government interest." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258 (11th Cir. 2005).

Another parcel of *terra cognita* is the level of scrutiny with which to evaluate regulations of speech by a professional to the public in promotion of their profession. The Supreme Court has noted that this type of speech "occurs in an area traditionally subject to government regulation," and has therefore concluded that it warrants a lower level of protection under the First Amendment. *Ohralik*, 436 U.S. at 456, 98 S. Ct. at 1918. Correspondingly, the Court has set a lower bar by which to measure State regulation of such speech—intermediate, rather than strict scrutiny. *Fla. Bar*, 515 U.S. at 623, 115 S. Ct. at 2375. To survive this level of review, the State "must assert a substantial interest in support of its regulation" and demonstrate that the restriction "directly and materially advances" that interest

without sweeping more widely than necessary. *Id.* at 624, 115 S. Ct. at 2376

(citing *Cent. Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351).

The Court's holdings in this area follow a clear trend. When the State seeks

to impose content-based restrictions on speech in a context in which its regulatory

interests are diminished, such as when a professional speaks to the public in a

nonprofessional capacity, courts apply the most exacting scrutiny. When the State

seeks to regulate speech by professionals in a context in which the State's interest

in regulating for the protection of the public is more deeply rooted, a lesser level of

scrutiny applies.

We think that the restriction at issue here fits cleanly within the latter

category, because both of the State interests implicated by the Act have deep

regulatory roots. First, courts have long recognized the authority—duty, even—of

States to regulate the practice of professions to "shield[] the public against the

untrustworthy, the incompetent, or the irresponsible." *Thomas v. Collins*, 323 U.S.

516, 545, 65 S. Ct. 315, 329, 89 L. Ed. 430 (1945) (Jackson, J., concurring); *see,*

*e.g.*, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792, 95 S. Ct. 2004, 2016, 44 L. Ed.

2d 572 (1975) ("We recognize that the States have a compelling interest in the

practice of professions within their boundaries, and that as part of their power to

protect the public health, safety, and other valid interests they have broad power to

establish standards for licensing practitioners and regulating the practice of

professions."); *Watson v. Maryland*, 218 U.S. 173, 176, 30 S. Ct. 644, 646, 54 L.

Ed. 987 (1910) ("It is too well settled to require discussion at this day that the

police power of the states extends to the regulation of certain trades and callings,

particularly those which closely concern the public health.").[17]

---

[17] Pursuant to that authority, states commonly enact laws touching on what professionals may say. Florida, for example, has quite a few regulations implicating speech by physicians. *See, e.g.*, Fla. Stat. § 381.026 (requiring physicians to communicate various information to patients on request, including: the physician's "name, function, and qualifications"; information concerning the patient's "diagnosis, planned course of treatment, alternatives, risks, and prognosis"; various financial information; and a written "statement of patient rights and responsibilities"); *id.* § 381.986 (requiring physicians who prescribe low-THC cannabis to provide information to patients about the potential risks and side effects of, alternatives to, and effectiveness of the treatment, as well as imposing various recording and reporting requirements); *id.* § 456.41 (requiring physicians offering complementary or alternative healthcare treatments to communicate to the patient, orally or in writing, "the nature, benefits, and risks of the treatment," as well as "the practitioner's education, experience, and credentials in the field," and to indicate the provision of such information in the patient's medical records); *id.* § 458.324 (requiring physicians treating patients diagnosed with or at a high risk for breast cancer to provide to their patients various information about treatment alternatives and document the provision of such information in their patients' medical records); *id.* § 458.325 (requiring physicians, prior to administering electroconvulsive or psychosurgical procedures, to disclose information regarding the procedure); *id.* § 458.331 (listing various grounds for disciplinary action, including "the use of fraud, intimidation, undue influence, or a form of overreaching or vexatious conduct" to solicit patients; "failing to keep legible . . . medical records" that identify responsible physicians "by name and professional title" and that include sufficient information to "justify the course of treatment of the patient"; and "failing . . . to provide patients with information about their patient rights and how to file a patient complaint"); Fla. Admin. Code R. 64B8-9.007 (requiring surgeons to "verbally confirm the patient's identification, the intended procedure and the correct surgical/procedure site" before operating, and to document such confirmation in the patient's medical records ); *id.* R. 64B8-9.008 (proscribing all "verbal behavior" between a physician and a patient that could "reasonably be interpreted as romantic involvement with [the] patient"); *id.* R. 64B8-9.013 (mandating detailed information physicians must record prior to and during the course of prescribing controlled substances for a patient, requiring physicians to use a "written treatment plan" with specific content, and requiring physicians to "discuss the risks and benefits of the use of controlled substances with the patient"); *id.* R. 64B8-9.0141 (prohibiting physicians from "provid[ing] treatment recommendations . . . via electronic or other means" unless the physician completes a "documented patient evaluation," discusses "treatment options and the risks and benefits of treatment" with the patient, and "[m]aint[ains] . . . contemporaneous medical records"); *id.* R. 64B8-11.001 (imposing various restrictions on physician advertising); *id.* R. 64B8-11.002

Moreover, the authority of the State to regulate relationships of a fiduciary character via the common law is, if anything, a more venerable proposition than the principle that the State possesses regulatory authority over professions.  *See, e.g.*, *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 588–89, 23 L. Ed. 328 (1875) ("That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings . . . with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others."); *see also* 1 Joseph Story, *Commentaries on Equity Jurisprudence* § 218, at 235–36 (13th ed. 1886) ("In . . . cases [in which there is a fiduciary relation between the parties,] the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost degree of good faith . . . in all transactions between the parties.  If there is any misrepresentation, or any concealment of a material fact, or any just suspicion of artifice or undue influence, Courts of Equity will interpose . . . ."); *see generally* Tamar Frankel, *Fiduciary Law*, 79–99 (2011) (tracing the roots of government regulation of fiduciary relations back to Hammurabi).

---

(prohibiting licensed physicians from representing in their promotional communications that they "are HIV negative or free from AIDS," or implying or stating "that any other licensee is or may be a greater risk to patients due to a failure or refusal to provide similar advertising or notice"); *id.* R. 64B8-11.003 (requiring licensed physicians to identify themselves as such to their patients).

Indeed, one could make the case that when enacting laws governing the type of quintessential professional speech with which we are concerned here, the State has even more regulatory leeway than when regulating promotional speech by professionals, given the fiduciary context within which the former occurs.

Broadly reading the Supreme Court's recent *Reed* decision may suggest that any and all content-based regulations, including commercial and professional speech, are now subject to strict scrutiny.[18] *See supra* note 14.  We need not, however, determine conclusively whether a lesser form of scrutiny ever applies to regulations of professional speech, because in this case the outcome is the same whether strict or intermediate scrutiny applies.  *See supra* part IV.B.2.  Given that, we next apply strict scrutiny to the Act.

3.

Strict scrutiny requires that the State show that it is acting to further a compelling governmental interest and that its actions are "narrowly tailored to achieve that interest."  *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 464, 127 S. Ct. 2652, 2664, 168 L. Ed. 2d 329 (2007).  The state bears a "heavy burden of justification" based on its "asserted purposes."  *Dunn v.*

---

[18] It is worth noting that lower courts applying *Reed* have found that it does not apply to commercial speech.  *See, e.g.*, *Chiropractors United for Research & Educ., LLC v. Conway*, No. 3:15-CV-00556-GNS, 2015 WL 5822721, at *5 (W.D. Ky. Oct. 1, 2015); *Contest Promotions, LLC v. City and County of San Francisco, Cal.*, No. 15-cv-00093, 2015 WL 4571564, at *4 (N.D. Cal. July 28, 2015).

*Blumstein*, 405 U.S. 330, 343, 92 S. Ct. 995, 1003, 31 L. Ed. 2d 274 (1972).  We

turn first to determining whether Florida has a compelling interest.

a.

The State of Florida asserts four compelling interests: (1) protection of the

Second Amendment right to keep and bear arms; (2) protection of patients' privacy

rights; (3) elimination of barriers to healthcare access; and (4) prevention of

discrimination and harassment of firearm owners.[19]

To begin, the State's interest in regulating the practice of professions for the

protection of the public is not merely substantial, but "compelling."  *Goldfarb*, 421

U.S. at 792, 95 S. Ct. at 2016.  The asserted interests "obviously factor[] into" the

State's "paramount . . . objective," *Fla. Bar*, 515 U.S. at 624, 115 S. Ct. at 2376, in

the area of professional regulation—protecting its citizens from harmful or

ineffective professional practices.  *See* Fla. Stat. § 456.003(2) (stating the Florida

legislature's belief that "the preservation of the health, safety, and welfare of the

public" is the only permissible objective of regulations of the health professions).

While the Supreme Court has never precisely defined what constitutes a

"compelling interest," *see Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 286, 106

S. Ct. 1842, 1853, 90 L. Ed. 2d 260 (1986) (O'Connor, J., concurring) (observing

---

[19] We find the third and fourth reasons (prevention of discrimination and harassment and ensuring access to healthcare) to be inherently wrapped-up in the other two asserted interests and do not discuss them separately.

that the term's "precise contours are uncertain"), it has examined the gravity of the interests asserted by the State here.

The Second Amendment provides that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  It is now undisputed that the Second Amendment right to keep and bear arms is a fundamental right.  *See McDonald v. City of Chicago*, 561 U.S. 742, 778, 130 S. Ct. 3020, 3042, 177 L. Ed. 2d 894 (2010) ("[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty.").  Ensuring the full guarantee of fundamental rights certainly can be a compelling interest.  *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 199, 211, 112 S. Ct. 1846, 1851, 1858, 119 L. Ed. 2d 5 (1992) (plurality opinion) (holding that a free-speech restriction on election-day solicitation is a compelling interest because it protects the fundamental right to vote).

We do not hesitate to conclude that states have a compelling interest in protecting the fundamental right to keep and bear arms.  A right expressly guaranteed by the Constitution.  The Act protects the right to keep and bear arms by protecting patients from irrelevant questioning about guns that could dissuade them from exercising their constitutionally guaranteed rights, questions that a

patient may feel they cannot refuse to answer, given the significant imbalance of

power between patient and doctor behind the closed doors of the examination

room.  The stories that prompted the Florida legislature to act illustrate this

obvious problem.  One legislator stated that, during an appointment with his

daughter, a pediatrician asked that the legislator remove his gun from his home.

Audio CD: Regular Session House Floor Debate on HB 155, held by the Florida

House of Representatives (Apr. 26, 2011) at 26:20 (remarks of Rep. Artiles) (on

file with Florida House of Representatives Office of the Clerk).  Another legislator

reported a complaint from a constituent that his healthcare provider falsely told

him that disclosing firearm ownership was a Medicaid requirement.  *Id.* at 13:40

(remarks of Rep. Brodeur).  Neither of these circumstances required anyone to

remove a gun from their home, but they did chill lawful activity protected by the

Second Amendment.  The same can be said of the election-day solicitation statute

in *Freeman*: solicitation would not require citizens to give up the right to vote, but

it could chill the right.  *See Freeman*, 504 U.S. at 199, 211, 112 S. Ct. at 1851,

1858.  These doctors' irrelevant requests and misinformation threatened their

patients' exercise of fundamental rights, and likely those of countless others who

remained silent, while their patients were in a position of great vulnerability,

lacking the power to fully stand up for themselves and their rights.  *See infra* note

26.

Next, the State asserts a compelling interest in protecting the privacy of gun owners' status as such from inclusion in their medical records.  The Supreme Court has long "recognized [a] privacy interest in keeping personal facts away from the public eye."  *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 769, 109 S. Ct. 1468, 1480, 103 L. Ed. 2d 774 (1989).  Specifically, previously recognized privacy interests include "limiting exposure" even when something already is not "wholly private."  *Id.* (quotation marks omitted).

Privacy interests, of course, come in varying degrees.  An asserted privacy interest rises to the level of being a "compelling" interest only when it can be said to be truly "sacrosanct."  *See Cal. Democratic Party  v. Jones*, 530 U.S. 567, 585, 120 S. Ct. 2402, 2413, 147 L. Ed. 2d 502 (2000).  While the Supreme Court has not given us clear guidance on what is "sacrosanct," we do know what is not.  In *California Democratic Party v. Jones*, the Court found that a right to privacy in one's party affiliation could not be considered sacrosanct—and therefore not compelling—given that many federal statutes "require a declaration of party affiliation as a condition of appointment to certain offices."  *Id.*  Importantly, the Court noted that the interest in privacy of one's party affiliation was not akin to an interest in "*confidentiality of medical records* or personal finances."  *Id.* (emphasis added).

63

In our view, the logic of *Jones* easily leads to the conclusion that the right to privacy in one's status as a firearm owner is sacrosanct and thus compelling. Plaintiffs rely on *Jones* to argue otherwise, but *Jones* only undercuts their argument. Plaintiffs maintain that the privacy interest here cannot be sacrosanct because, like party affiliation, information on firearm ownership is already subject to disclosure to the state and federal governments. We disagree. The rights at issue here are indisputably more valued and cherished by American society than mere privacy in one's party affiliation. As the Court specifically noted in *Jones*, the privacy of party affiliation is not the same as "confidentiality of medical records." *Id.* Florida's commitment to keeping the firearm ownership status of its citizens out of their medical records, then, is exactly the type of sacrosanct and compelling privacy interest the *Jones* Court appears to have contemplated.

Further, the situation here is actually the opposite of that in *Jones*. Although Florida and the federal government require disclosure of certain information in regards to background checks when purchasing a firearm, *see* Fla. Stat. § 790.065; 18 U.S.C. § 922(t), as was the case with party affiliation in *Jones*, Florida also evinces an exceedingly strong policy of protecting this information to the greatest extent possible.[20] For example, it is a felony in Florida to compile a list of firearm

---

[20] Florida's reverence for the Second Amendment has led some to begin referring to it as the "Gunshine" state. *See, e.g.*, Editorial Board, *More Stand your Ground Mischief in Florida*,

owners.[21]  *See* Fla. Stat. § 790.335.  The State maintains this policy because such

lists, rather than being a tool for law enforcement, are a means for harassing or

profiling innocent residents and could fall into the wrong hands.  *See id.*

§790.335(1)(a)(2).  As hacking and other data breaches have become increasingly

common, the wisdom of such a ban is increasingly apparent.[22]  Thus, while

regulations abound in relation to gun ownership, Florida rightfully treats the

privacy of such information as sacrosanct and acts aggressively to protect it.  The

Act furthers this policy by limiting what information gets into patients' medical

records that could one day fall into the wrong hands or be used for purposes of

harassment.  Therefore, we hold that protecting the privacy of patients' status as

firearm owners by prohibiting physicians from inquiring about and recording

---

N.Y. Times, Nov. 2, 2015, at A22, *available at*
http://www.nytimes.com/2015/11/02/opinion/more-stand-your-ground-mischief-in-florida.html.

[21] The ban on compiling lists of firearm owners apples to state and local governments and agencies, including their employees, and to any other "persons, public or private."  Fla. Stat. § 790.335(2).  There are a handful of exceptions that include their own additional privacy safeguards.  *See id.* § 790.335(3).  Physicians are not excepted from the ban.  *See id.*

[22] The digital revolution has enabled, on a massive scale, the unauthorized disclosures of private information.  Despite existing privacy laws and security technology, neither government agencies nor private actors have been immune from this threat.  For example, in 2015, hackers gained access to employee data for 4.2 million federal employees.  *See* Lisa Rein and Andrea Peterson, *What You Need to Know about the Hack of Government Background Investigations*, The Washington Post (July 9, 2015), https://www.washingtonpost.com/news/federal-eye/wp/2015/07/09/what-you-need-to-know-about-the-hack-of-government-background-investigations/. In the private sector, hackers successfully accessed credit card information for Target customers in 2013.  *See* Robin Sindel, Danny Yadron and Sara Germano, *Target Hit by Credit-Card Breach*, The Wall Street Journal (Dec. 19, 2013), http://www.wsj.com/articles/SB10001424052702304773104579266743230242538.

medically irrelevant information about firearm ownership is also a compelling state interest.

In conclusion, we find the State's asserted interests in protecting Second Amendment rights and protecting privacy to be compelling. We turn now to the narrow-tailoring requirement.

b.

In order for a law to survive strict scrutiny, it also must be narrowly tailored to achieve the state's asserted compelling interest. *Wisconsin Right to Life, Inc.*, 551 U.S. at 464, 127 S. Ct. at 2664. A law is not, however, required to be perfectly tailored. *See Williams-Yulee v. Florida Bar*, 575 U.S. ___, ___, 135 S. Ct. 1656, 1671, 191 L. Ed. 2d 570 (2015) (noting that "most problems arise in greater and lesser gradations, and the First Amendment does not confine a State to addressing evils in their most acute form"). The State "must demonstrate narrow tailoring of the challenged regulation to the asserted interest—'a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.'" *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188, 119 S. Ct. 1923, 1932, 144 L. Ed. 2d 161 (1999) (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S. Ct. 3028, 3035, 106 L. Ed. 2d 388 (1989)).

The Plaintiffs first argue that the Act cannot be narrowly tailored to the protection of Second Amendment rights because the speech in question does not interfere with such rights. This argument could not be farther off base. It is of course an interference with Second Amendment rights for a trusted physician to tell his patient—for no medically relevant reason whatsoever—that it is unsafe to own a gun. Though such actions, on their own, may not stop the patient from owning a gun, complete prohibition is hardly required to infringe on constitutionally guaranteed rights. Such speech chills the patient's exercise of his rights and that is sufficient.[23]

Plaintiffs next argue that the Act cannot be narrowly tailored because it does not protect patients from speech on other sensitive topics (such as drug use, sexual activity, and domestic violence) and because it does not protect patients from other sources of speech about guns (such as speech from lawyers, accountants, clergy, and gardeners). This argument is also easily disposed of for two reasons. First, by answering questions asked by a doctor about guns, the answers to those questions become part of the patient's medical record. This is not so for questions by other

---

[23] Although the concept of chilling rights generally comes up in the context of facial challenges to statutes for violations of the First Amendment, *see supra* part IV.A, it can be extended to the Second Amendment as well. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011) ("Labels aside, we can distill this First Amendment doctrine and extrapolate a few general principles to the Second Amendment context."); *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010) ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment.") (citing *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010)).

persons who are prohibited by Florida law from creating any sort of list regarding gun ownership. *See* Fla. Stat. § 790.335. In that statute, such lists are prohibited because they can be used to harass or profile. *See id.* As we will address momentarily, the protection of what information *gets into* a patient's record is crucial in today's world. Second, as to the Plaintiffs' argument regarding other sensitive areas of inquiry, while we take no position on whether a legislature could ban irrelevant inquiry into a patient's sexual history or Plaintiffs' other posited topics, we have no trouble believing that such information is relevant with much greater frequency. More to the point, the fact that the law does not prohibit inquiry into other sensitive areas of discussion evidences the Act's narrow focus on protecting the identified compelling interest: the right to privacy in the exercise of one's Second Amendment rights. That the legislature did not make the Act more expansive than necessary is certainly not fatal. In *Hill v. Colorado*, the Supreme Court held that an eight foot buffer zone around persons within 100 feet of medical clinics was Constitutional in order to protect abortion rights. *See* 530 U.S. at 714, 716, 120 S. Ct. at 2488–89. Just as that buffer zone was not unconstitutional because it did not also apply when a woman purchased birth control at a pharmacy, the Act is not unconstitutional because it does not apply to other areas of sensitive inquiry.

Plaintiffs further contend that because firearm ownership is heavily regulated, and individuals who wish to own a firearm must provide considerable personal information to the State, *see* Fla. Stat. § 790.065 (requiring prospective firearm buyers to submit a wide range of personal information and undergo a background check), patients should have no qualms about revealing their status as firearm owners to physicians, and thus the Act does not further patient privacy. Again, we find this argument to be inapposite. The fact that *the State* may possess some information about its residents' firearm ownership for the purpose of conducting background checks is utterly immaterial to whether or not *private physicians* should have access to such information for their own, medically irrelevant purposes. Although privacy interests may sometimes yield to the State's need to collect information, that does not mean the interest is so destroyed that individuals will not still have reason to wish to keep the same information private from the public at large. Further, since firearms may be present in a home without the patient being the owner, the Plaintiffs wish to be able to gather even more information than the government.[24] Moreover, Plaintiffs again mistake the actual working of the Act. The purpose of the Act is not to protect patients by shielding them from any and all discussion about firearms with their physicians; the Act

---

[24] For the sake of simplicity, we refer almost exclusively to firearm ownership in this opinion. It is of course the case that this critique about the presence of firearms in the home also applies in many of the circumstances in which we discuss only ownership.

merely requires physicians to refrain from broaching a concededly sensitive topic when they lack any good-faith belief that such information is relevant to their patients' medical care or safety, or the safety of others.

The importance of protecting what gets into a patient's record is beyond doubt.  The Act does just that.  It would not be able to protect the identified compelling interests were it not to provide this all important protection.  Plaintiffs dispute this commonsense conclusion by arguing that existing federal and state laws sufficiently protect patient privacy.[25]  But these laws protect information *only after* it has been disclosed to physicians; they do nothing to protect information from the *initial* disclosure.  In 2009, the federal government implemented requirements mandating that all healthcare providers begin transitioning to electronic medical records.  *See* 42 U.S.C. § 300jj-11(c)(3)(A)(ii).  Although the government requires this transition, service providers are responsible for maintaining the security of the electronic records.  *See* Office of the National Coordinator for Health Information Technology, *Federal Health IT Strategic Plan 2015–2020*, at 16, available at https://www.healthit.gov/sites/default/files/federal-healthIT-strategic-plan-2014.pdf.  This information may be shared with as many as

---

[25] Under regulations promulgated pursuant to the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, covered healthcare providers may not disclose information kept in their patients' medical records except to an enumerated list of entities.  45 C.F.R. § 164.502.  Florida law also provides that a patient's medical records must be kept confidential and enumerates only limited circumstances in which a healthcare provider may share patient records with a third party.  Fla. Stat. § 456.057(7)(a).

thirty-five government agencies.  *See id.* at 2.  It is not difficult to imagine this

information being accessed by any number of unauthorized persons due to

negligence or the sheer impossibility of guaranteeing impenetrable security.  *See*

*supra* note 22.  More to the point—and keeping in mind, once again, that the Act

applies only when physicians have no medically relevant reason to gather such

information in the first place—there is no reason for patients to fear for the

confidentiality of their status as firearm owners if information about it is simply

not collected at all.

Finally, Plaintiffs contend that the Act is not narrowly tailored because the

problem the legislature seeks to cure is fully protected by Fla. Stat. § 790.338(4),

which provides that patients may decline to answer questions about their firearm

ownership.  That argument is also unpersuasive because of the significant power

imbalance between patient and doctor. [26]  It is important to keep in mind the

---

[26] One scholar has summarized the power dynamics of the physician–patient relationship thusly:

> [R]esearch shows [that] the purpose and structure of the doctor–patient relationship vest physicians with immense authority and power in the eyes of patients.  Physicians' authority derives from their superior knowledge and education, their prestigious social and economic status, and the "charismatic authority" that derives from their symbolic role as conquerors of disease and death. . . .  The confluence of these factors leads to an institutionalization of physicians' "professional dominance" within the structure of doctor–patient interaction that in itself legitimizes physician expressions.
>
> In the face of this dominance, patients suspend their critical faculties and defer to physicians' opinions.  Patients' disempowered position stems from a number of factors, including lack of medical knowledge, the anxiety that accompanies illness, and the need to believe that physicians have the power and competence needed to cure them.

circumstances of a typical visit to the doctor's office. First, there exists a highly

disparate balance of power between doctor and patient. A patient is in a

relationship of trust and confidence with a doctor and looks to the doctor's

informed opinion for guidance.[27] This relationship is not conducted in an open

forum; it takes place behind the closed doors of the examination room. As such, a

doctor will usually have a captive audience of one: the patient. When patients

must visit a specialist or visit any doctor in a rural area, any choice between

available doctors may be virtually nonexistent.[28] In other words, a rural patient

---

. . .
> These structural inequities also counteract patients' ability to question physicians and redirect the course of a conversation, even if patients have an acute desire to acquire information. Moreover, socio-economic differences between doctor and patient, particularly differences of race, class, gender, or age, further impede communication.

Paula Berg, *Toward A First Amendment Theory of Doctor-Patient Discourse and the Right to Receive Unbiased Medical Advice*, 74 B.U. L. Rev. 201, 225–28 (1994) (footnotes omitted).

[27] It is common sense that a positive doctor–patient relationship has a positive effect on health outcomes and that a negative relationship—which may be created by doctors' unwanted questioning on irrelevant topics—has a negative effect. *See* The Advisory Board Company, *Study: Physicians' Bedside Manner Affects Patients' Health* (April 14, 2014), https://www.advisory.com/daily-briefing/2014/04/14/study-physicians-bedside-manner-affects-patients-health.

[28] Barriers to healthcare access in rural areas are well documented. *See Rural Health Services*, Florida Dep't of Health, http://www.floridahealth.gov/programs-and-services/community-health/rural-health/rural-health-services.html (last visited Dec. 4, 2015) ("Ten of Florida's 30 rural counties currently lack an acute care hospital facility."); *What's Different about Rural Health Care?*, Nat'l Rural Health Ass'n, http://www.ruralhealthweb.org/go/left/about-rural-health (last visited Dec. 4, 2015) (noting that "[o]nly about ten percent of physicians practice in rural America despite the fact that nearly one-fourth of the population lives in these areas" and "[r]ural residents have greater transportation difficulties reaching health care providers, often travelling great distances to reach a doctor or hospital"). Sen. Craig Thomas, *Understanding Rural Health Care Needs and Challenges: Why Access Matters to Rural Americans*, 43 Harv. J. on Legis. 253, 256 (2006) ("Rural populations suffer from a distinct lack of insurance, high transportation costs, and demographic challenges.

may feel that angering his doctor by refusing to answer an irrelevant question about gun ownership would result in a total lapse in medical care, as there may not be another physician in close geographical proximity from whom to seek needed treatment.  In these moments of vulnerability, patients could hardly be expected to affirmatively rebuff their doctors by demanding all non-medically relevant questioning cease.  The cited provision, which proposes that patients do exactly that, fails to alleviate this problem.

Frankly, we read the Act to be precisely tailored to the State's compelling interests.  In explaining this conclusion it is worth first reviewing what the Act *actually does*.  The Act actually prohibits record-keeping about firearm ownership only when the physician knows such information to be irrelevant, *see supra* part IV.A.1, inquiry about firearm ownership only when the physician lacks a good-faith belief that the information is relevant, *see supra* part IV.A.2, and harassment about firearm ownership only when the physician does not believe it necessary, *see supra* part IV.A.3.

It is also important to understand what the State has *not* done in passing the Act.  The State has not made a sweeping ex ante judgment that all inquiry and medical record-keeping by doctors about firearm ownership is inappropriate.  The

---

There are also significant barriers in rural health to obstetrical services, oral health, mental health, substance abuse recovery services, and many other types of care.  Furthermore, rural areas face higher rates of obesity, depression, and suicide.") (citations omitted).

Act does not even represent a legislative conclusion that a subset of physician speech is categorically inappropriate.  Instead, the Act's prohibitions are directly and entirely coupled to physicians' *own* good-faith judgments about whether such inquiry or record-keeping is medically appropriate in the circumstances of a particular patient's case.  *See supra* part IV.A.  If, as we have concluded, the State has a compelling interest in regulating the medical profession to prevent ineffective medical care—in this instance by protecting patients from unnecessary breaches of privacy and threatened chilling of the continued exercise of their right to keep and bear arms—what narrower way to advance this interest could there be than by requiring physicians to base any inquiry or record-keeping about firearm ownership on a genuine, subjective determination of medical need?

We also find support for our conclusion in Supreme Court's line of captive-audience cases.  Although the First Amendment usually requires that the burden of avoiding unwanted speech be placed on the listener, *Snyder v. Phelps*, 562 U.S. 443, 459, 131 S. Ct. 1207, 1220, 179 L. Ed. 2d 172 (2011), the captive-audience doctrine applies in certain instances where the listener cannot avoid being exposed to that speech. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210–11, 95 S. Ct. 2268, 2273, 45 L. Ed. 2d 125 (1975).  The party asserting that he is a captive audience must show that a substantial privacy interest is "being invaded in an essentially intolerable" way.  *Snyder*, 562 U.S. at 459, 131 S. Ct. at 1220 (quoting

*Cohen v. California*, 403 U.S. 15, 21, 91 S. Ct. 1780, 1786, 29 L. Ed. 2d 284

(1971)).  The captive-audience doctrine is based on a common law right to be left

alone that is better understood today as an "interest that States can choose to

protect in certain situations."  *Hill*, 530 U.S. at 717 n.24, 120 S. Ct. at 2490 n.24

(internal quotation marks omitted).  This interest is "placed in the scales" against

the speaker's right to express his message.  *Id.* at 718, 120 S. Ct. at 2490

(quotations and citations omitted).

The captive-audience doctrine has special force in confrontational settings

and in cases regarding access to medical facilities.[29]  *Id.* at 717, 120 S. Ct. at 2490.

In such situations, the government's interest is in "protecting people already tense

or distressed in anticipation of medical attention . . ." *Id.* at 731, 120 S. Ct. at 2501

(Souter, J., concurring).  In *Hill*, the Court upheld a law mandating "buffer zones"

around healthcare facilities intended to "protect listeners from unwanted

---

[29] It is true, however, that the two primary scenarios in which the captive-audience doctrine has been applied involve speech targeted at private homes: offensive mail sent to a private home and picketing a private home.  *Snyder* at 459–60, 131 S. Ct. at 1220.  Though the Court has narrowly defined who may constitute a "captive audience" such that its application is limited outside the home, *see Snyder*, 562 U.S. at 460, 131 S. Ct. at 1220 (holding that attendees of a funeral held on church property that was being picketed by protestors on nearby public land were not a captive audience); *Erznoznik*, 422 U.S. at 212, 95 S. Ct. at 2274 (finding no captive audience when the public could easily avoid exposure to nude films shown at a private drive-in theatre that were visible from the public sidewalk), the Court nevertheless recognizes that the doctrine retains some force in situations outside the home.  *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S. Ct. 2714, 2718, 41 L. Ed. 2d 2714 (1974) (plurality opinion) (finding no First Amendment forum but also noting that a municipal law banning political advertisements on public transportation served to minimize the risk of creating a captive-audiences problem).

communication." *Id.* at 714, 716, 120 S. Ct. at 2488–89; *but see McCullen v. Coakley*, 573 U.S. ___, ___, 134 S. Ct. 2518, 2541, 189 L. Ed. 2d 502 (2014) (holding unconstitutional a thirty-five foot buffer zone around abortion clinics because it was not narrowly tailored when it "clos[ed] a substantial portion of a traditional public forum to all speakers"). The Court explained that while offensive speech cannot be curtailed just because a listener does not wish to hear it, that general rule does not extend so far as to include speech "so intrusive that the unwilling audience cannot avoid it." *Hill*, 530 U.S. at 716, 120 S. Ct. at 2489 (citing *Frisby v. Schultz*, 487 U.S. 474, 487, 108 S. Ct. 2495, 2504, 101 L. Ed. 2d 420 (1988)). The "deliberate 'verbal or visual assault'" of such a situation may "justif[y] proscription." *Id.* (quoting *Erznoznik*, 422 U.S. at 211 n.6, 95 S. Ct. at 2273 n.6) (brackets omitted). The Court specifically rejected the idea that it mattered if the speakers were spreading "good ideas." *Id.* at 718, 120 S. Ct. at 2490 (quoting *Rowan v. U.S. Post Office Dep't.*, 397 U.S. 728, 738, 90 S. Ct. 1484, 1491, 25 L. Ed. 2d 736 (1970) (quotation marks omitted).

We must, therefore, place the doctors' right to question their patients on the scales against the State's compelling interest in fully effecting the guarantees of the Second Amendment and protecting the privacy of its citizens' medical records. Not only does the Act apply solely to speech irrelevant to medical care, it also applies almost exclusively in cases in which a doctor is alone in an examination

room with a patient.[30]  In such a situation the balance of power between doctor and

patient will often make a patient feel as if he has no choice but to listen and answer

a doctor's questions, especially when seeing another doctor may not be practicable,

or even possible.  *See supra* note 26.  Patients being questioned about their

firearm-ownership status by their doctor are more like the patient in *Hill* who had

no choice but to endure unwanted speech in her pursuit of obtaining medical care,

*see* 530 U.S. at 714, 716, 120 S. Ct. at 2488–89, than the citizens on a sidewalk

who may avoid seeing an offensive film by simply turning away their gaze.  *See*

*Erznoznik*, 422 U.S. at 212, 95 S. Ct. at 2274.

We also learn from Supreme Court precedent that narrowly tailored

abridgments of speech can be tolerated when they vindicate other fundamental

rights.  In *Burson v. Freeman*, the Court considered a conflict of rights between the

freedom of speech and the right to vote.  504 U.S. 191, 112 S. Ct. 1846, 119 L. Ed.

2d 5 (1992).  In *Freeman*, the challenged Tennessee statute proscribed

campaigning within 100 feet of a polling place.  *Id.* at 193–94, 112 S. Ct. at 1848–

49.  A four justice plurality of the Court found Tennessee's interest in protecting

the right to vote to be compelling.  *Id.* at 199, 112 S. Ct. at 1851.  The plurality

then found the law both necessary and narrowly tailored to furthering that

compelling interest: "Given the conflict between these two rights, we hold that

---

[30] We say "almost" because we are aware that there may be exceptions.

77

requiring solicitors to stand 100 feet from the entrances to polling places does not

constitute an unconstitutional compromise." *Id.* at 211, 112 S. Ct. at 1858.  In

essence, *Freeman* shows that surviving strict scrutiny is rare, but not unheard of

and may, at least, be more likely as a Constitutional "compromise" between

competing rights.

The *Freeman* plurality validates the State's approach here by endorsing the

propriety of making narrowly tailored compromises between competing rights.

*See id.*  Here, the compromise is between Second Amendment and privacy rights

and freedom of speech.  The compromise is certainly akin to the minor

inconvenience of a 100 foot buffer zone because, as we cannot stress enough, the

Act does *not* prohibit *all* speech about guns, but only speech for which there is no

good faith basis for relevance to medical care.[31]

We are not alone in upholding a state law implicating physician speech

against the application of First Amendment scrutiny.  The Supreme Court did

exactly that in *Casey*.  *See supra* Part IV.B.2.a.  While the posture of our case is

different (*Casey* involved compelled speech, rather than refraining from speech),

the conclusion is the same: the First Amendment is not a bar to states achieving

---

[31] Of course, the Act does not prohibit physicians from speaking publicly about the need to safely use and store firearms or from providing literature and brochures that say as much. Such speech remains protected even if it is wholly unrelated to medical care.

their compelling interests in the regulation of medicine, instead it requires them to appropriately tailor their chosen solutions.

Though the Act applies in only a small number of circumstances, when it does apply it plays an extremely important role in protecting patients.  The Act is not a legislative revolution, but it does not need to be.  It narrowly protects patients in a focused manner in order to advance the State's compelling interest in protecting the Second Amendment's guarantee to keep and bear arms and patients' privacy rights in their medical records, exactly the sort of tailoring strict scrutiny requires.  Those are rights that must always be protected in ways big and small.

Accordingly, we hold that the District Court erred by concluding that the Act violates the First Amendment.  The Act withstands strict scrutiny as a permissible restriction of speech.

## C.

Finally, we address the second of Plaintiffs' facial First Amendment challenges: overbreadth.  A statute is "overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quotation marks omitted).  "The overbreadth doctrine is 'strong medicine' that generally should be administered 'only as a last

resort.'" *Locke*, 634 F.3d at 1192 (quoting *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830, 1838, 170 L. Ed. 2d 650 (2008)).

We reject this challenge for the same reasons that we rejected Plaintiffs' conventional facial free-speech challenge. The Act does not prohibit a substantial amount of protected speech because, even accepting that the Act "regulates and restricts every practitioner's speech on the subject of firearms," it burdens only speech that, as judged by the physician in good faith, lacks a sufficient nexus to the medical care or safety of a particular patient. As the State may validly legislate to ensure "the practice of professions within their boundaries," *Goldfarb*, 421 U.S. at 792, 95 S. Ct. at 2016, and as no one argues that concededly irrelevant speech lies within the scope of good medical practice, we hold that the Act is not overbroad.

## D.

Concluding, we think it appropriate to reiterate one final point. Although we hold today that the Act does not facially conflict with the requirements of the Constitution, we do not, by that holding, foreclose as-applied challenges. Plaintiffs remain free to assert the First Amendment as an affirmative defense in any proceeding brought against them based upon speech made in the course of treatment that allegedly fell outside the bounds of good medical care. By rejecting Plaintiffs' facial challenge to the Act, we are simply refusing to provide Plaintiffs with a declaration that such a defense will be successful. Having concluded that the

80

Act does not offend either the First or the Fourteenth Amendments of the

Constitution, we must uphold it.

V.

Accordingly, we **REVERSE** the District Court's grant of summary

judgment in favor of Plaintiffs, and **VACATE** the injunction against enforcement

of the Act.

SO ORDERED.

WILSON, Circuit Judge, dissenting:

Numerous voices have weighed in on this appeal, which requires us to assess the constitutionality of Florida's Firearm Owners Privacy Act. Thirty amici curiae filed briefs, and the Majority has now filed its third iteration of an opinion seeking to uphold the Act. *See Wollschlaeger v. Governor of Fla.* (*Wollschlaeger I*), 760 F.3d 1195 (11th Cir. 2014), *opinion vacated and superseded on reh'g*, *Wollschlaeger v. Governor of Fla.* (*Wollschlaeger II*), 797 F.3d 859 (11th Cir. 2015). Having considered all these arguments for and against the constitutionality of this state law, I continue to believe that it does not survive First Amendment scrutiny. However, I have already written two dissents to this effect, and the plaintiffs have sought en banc review. Accordingly, I decline to pen another dissent responding to the Majority's evolving rationale. I rest on my previous dissents.