# EXHIBIT C

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-14009

_____

D.C. Docket No. 1:11-cv-22026-MGC

DR. BERND WOLLSCHLAEGER,
DR. JUDITH SCHAECHTER,
DR. TOMMY SCHECHTMAN,
AMERICAN ACADEMY OF PEDIATRICS, FLORIDA CHAPTER,
AMERICAN ACADEMY OF FAMILY PHYSICIANS, FLORIDA CHAPTER,
AMERICAN COLLEGE OF PHYSICIANS, FLORIDA CHAPTER, INC.,
ROLAND GUTIERREZ,
STANLEY SACK,
SHANNON FOX-LEVINE,

Plaintiffs - Appellees,

Versus

GOVERNOR OF THE STATE OF FLORIDA,
SECRETARY, STATE OF FLORIDA,
SURGEON GENERAL OF THE STATE OF FLORIDA,
SECRETARY, HEALTH CARE ADMINISTRATION OF THE STATE OF

FLORIDA,
DIVISION DIRECTOR, FLORIDA DEPARTMENT OF HEALTH,
Division of Medical Quality Assurance,
GEORGE THOMAS,
JASON ROSENBERG,
ZACHARIAH P. ZACHARIAH,
ELISABETH TUCKER,
TRINA ESPINOLA,
MERLE STRINGER,
JAMES ORR,
GARY WINCHESTER,
NABIL EL SANADI,
ROBERT NUSS,
ONELIA LAGE,
FRED BEARISON,
DONALD MULLINS,
BRIGETTE RIVERA GOERSCH,
BRADLEY LEVINE,

Defendants - Appellants.


BROWARD COUNTY MEDICAL ASSOCIATION,
BROWARD COUNTY PEDIATRIC SOCIETY,
PALM BEACH COUNTY MEDICAL SOCIETY,
FLORIDA PUBLIC HEALTH ASSOCIATION,
UNIVERSITY OF MIAMI SCHOOL OF LAW AND YOUTH CLINIC,
CHILDREN'S HEALTHCARE IS A LEGAL DUTY, INC.,
EARLY CHILDHOOD INITIATIVE FOUNDATION,
AMERICAN ACADEMY OF PEDIATRICS,
AMERICAN ACADEMY Of CHILD AND ADOLESCENT PSYCHIATRY,
AMERICAN ACADEMY OF FAMILY PHYSICIANS,
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS,
AMERICAN COLLEGE OF SURGEONS,
AMERICAN COLLEGE OF PREVENTIVE MEDICINE,
AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGIST,
AMERICAN CONGRESS OF OBSTETRICIANS AND GYNECOLOGISTS,
AMERICAN PSYCHIATRIC ASSOCIATION,

2

CENTER FOR CONSTITUTIONAL JURISPRUDENCE,
DOCTORS FOR RESPONSIBLE GUN OWNERSHIP,
NATIONAL RIFLE ASSOCIATION OF AMERICA,
AMERICAN MEDICAL ASSOCIATION,
ACLU FOUNDATION OF FLORIDA,
ALACHUA COUNTY MEDICAL SOCIETY,
AMERICAN PUBLIC HEALTH ASSOCIATION,
AMERICAN ASSOCIATION OF SUICIDOLOGY,
SUICIDE AWARENESS VOICES OF EDUCATION,
LAW CENTER TO PREVENT GUN VIOLENCE,

                                                        Amicus Curiae.

                        _____

                Appeal from the United States District Court
                    for the Southern District of Florida
                        _____

                            (July 25, 2014)

Before TJOFLAT and WILSON, Circuit Judges, and COOGLER,[*] District Judge.

TJOFLAT, Circuit Judge:

        The Governor of the State of Florida, other Florida officials, and members of

the Board of Medicine of the Florida Department of Health (collectively, the

"State"), appeal from the District Court's grant of summary judgment and an

_____

        [*] Honorable L. Scott Coogler, United States District Judge for the Northern District of
Alabama, sitting by designation.

injunction in favor of a group of physicians and physician advocacy groups (collectively, "Plaintiffs") enjoining enforcement of Florida's Firearm Owners Privacy Act[1] (the "Act") on First and Fourteenth Amendment grounds.

The Act seeks to protect patients' privacy by restricting irrelevant inquiry and record-keeping by physicians regarding firearms.  The Act recognizes that when a patient enters a physician's examination room, the patient is in a position of relative powerlessness.  The patient must place his or her trust in the physician's guidance, and submit to the physician's authority.  In order to protect patients, physicians have for millennia been subject to codes of conduct that define the practice of good medicine and affirm the responsibility physicians bear.  In keeping with these traditional codes of conduct—which almost universally mandate respect for patient privacy—the Act simply acknowledges that the practice of good medicine does not require interrogation about irrelevant, private matters.

As such, we find that the Act is a legitimate regulation of professional conduct.  The Act simply codifies that good medical care does not require inquiry or record-keeping regarding firearms when unnecessary to a patient's care.  It is

---

[1] Act of April 26, 2011, 2011 Fla. Laws 112 (codified at Fla. Stat. §§ 381.026, 456.072, 790.338).

uncontroversial that a state may police the boundaries of good medical practice by routinely subjecting physicians to malpractice liability or administrative discipline for all manner of activity that the state deems bad medicine, much of which necessarily involves physicians speaking to patients. Although the Act singles out a particular subset of physician activity as a trigger for discipline, this does little to alter the analysis. Any burden the Act places on physician speech is thus entirely incidental. Plaintiffs remain free—as physicians always have been—to assert their First Amendment rights as an affirmative defense in any actions brought against them. But we will not, by striking down the Act, effectively hand Plaintiffs a declaration that such a defense will be successful. Furthermore, when the Act is properly understood as a regulation of physician conduct intended to protect patient privacy and curtail abuses of the physician-patient relationship, it becomes readily apparent from the language of the Act the type of conduct the Act prohibits. Accordingly, we reverse the District Court's grant of summary judgment in favor of Plaintiffs, and vacate the injunction against enforcement of the Act.

## I.

On June 2, 2011, Florida Governor Rick Scott signed the Act into law. The Act created Fla. Stat. § 790.338, entitled "Medical privacy concerning firearms; prohibitions; penalties; exceptions," and amended the Florida Patient's Bill of

Rights and Responsibilities, Fla. Stat. § 381.026, to include several of the same

provisions.  The Act also amended Fla. Stat. § 456.072, entitled "Grounds for

discipline; penalties; enforcement," to provide for disciplinary measures for

violation of the Act.  The Florida legislature passed the Act in response to

complaints from constituents that medical personnel were asking unwelcome

questions regarding firearm ownership, and that constituents faced harassment or

discrimination on account of their refusal to answer such questions or simply due

to their status as firearm owners.[2]

The Act provides, in relevant part, that licensed health care practitioners and

facilities (i) "may not intentionally enter" information concerning a patient's

---

[2] During the debates leading up to passage of the Act, legislators cited several incidents. For example, in a widely publicized incident that took place in Ocala, a pediatrician, during a routine visit, asked a patient's mother whether she kept any firearms in her home.  Because she felt that the question constituted an invasion of her privacy, the mother refused to answer.  The pediatrician then terminated their relationship and advised the mother that she had thirty days to find a new doctor.

In another incident, a mother was separated from her children while medical staff asked the children whether the mother owned firearms.  In another, physicians refused to provide medical care to nine-year-old "because they wanted to know if [the child's family] had a firearm in their home."  Doc. 87, at 3.  In another example, a legislator stated that, during an appointment with his daughter, a pediatrician asked that the legislator remove his gun from his home.

Another legislator reported a complaint from a constituent that a health care provider falsely told him that disclosing firearm ownership was a Medicaid requirement.  At a March 8, 2011, hearing held by the Florida House Criminal Justice Subcommittee, Marion Hammer of the National Rifle Association reported several similar incidents, including one involving a family that had been falsely advised by a pediatrician's office that Medicaid would not pay claims if the family did not answer questions regarding firearm ownership.

ownership of firearms into the patient's medical record that the practitioner knows

is "not relevant to the patient's medical care or safety, or the safety of others,"

§ 790.338(1); (ii) "shall respect a patient's right to privacy and should refrain"

from inquiring as to whether a patient or his or her family owns firearms, unless

the practitioner or facility believes in good faith that the "information is relevant to

the patient's medical care or safety, or the safety of others," § 790.338(2); (iii)

"may not discriminate" against a patient on the basis of firearm ownership,

§ 790.338(5); and (iv) "should refrain from unnecessarily harassing a patient about

firearm ownership," § 790.338(6).[3]

---

[3] The full text of the challenged provisions is as follows:

(1) A health care practitioner licensed under chapter 456 [of the Florida Statutes] or a health care facility licensed under chapter 395 [of the Florida Statutes] may not intentionally enter any disclosed information concerning firearm ownership into the patient's medical record if the practitioner knows that such information is not relevant to the patient's medical care or safety, or the safety of others.

(2) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's right to privacy and should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home or other domicile of the patient or a family member of the patient. Notwithstanding this provision, a health care practitioner or health care facility that in good faith believes that this information is relevant to the patient's medical care or safety, or the safety of others, may make such a verbal or written inquiry. . . .

(5) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 may not discriminate against a patient based solely upon the patient's exercise of the constitutional right to own and possess firearms or ammunition.

(6) A health care practitioner licensed under chapter 456 or a health care facility licensed under chapter 395 shall respect a patient's legal right to own or possess a firearm and should

7

Violation of any of the provisions of the Act constitutes grounds for disciplinary action under § 456.072(2). § 456.072(1)(nn). Furthermore, "[v]iolations of the provisions of subsections (1)–(4) constitute grounds for disciplinary action under [Fla. Stat. §§] 456.072(2) and 395.1055." § 790.338(8). Thus, if the Board of Medicine of the Florida Department of Health (the "Board") finds that a practitioner has violated the Act, the practitioner faces disciplinary measures including fines, restriction of practice, return of fees, probation, and suspension or revocation of his or her medical license. § 456.072(2). An investigation culminating in disciplinary action may be initiated against a practitioner by the Department of Health or may be triggered by a citizen's complaint. § 456.073. The minutes of a June 2, 2011, meeting of the Rules/Legislative Committee of the Board indicate that the Board is prepared to initiate disciplinary proceedings against a practitioner who violates the Act, stating

---

refrain from unnecessarily harassing a patient about firearm ownership during an examination. . . .

Fla. Stat. § 790.338.

The Act also contains related provisions concerning emergency medical personnel and insurance companies, affirming the right of patients to decline to answer physician questions, and affirming that the Act does not alter existing law regarding a physician's authorization to choose patients. § 790.338(3), (4), (7). Plaintiffs do not appear to challenge these provisions, and, as the District Court held, because these provisions do not apply to practitioners or do not regulate any conduct by practitioners, Plaintiffs lack standing to challenge them.

that "the Committee [has] determined [that] violation of [the Act] falls under

failure to comply with a legal obligation and the current disciplinary guidelines for

this violation would apply."  Doc. 87, at 5.

On June 6, 2011, four days after Governor Scott signed the Act into law,

Plaintiffs filed a 42 U.S.C. § 1983 action against the State in the United States

District Court for the Southern District of Florida, alleging that the inquiry, record-

keeping, discrimination, and harassment provisions of the Act facially violate the

First and Fourteenth Amendments of the United States Constitution, and seeking

declaratory and injunctive relief.  Plaintiffs contended that the Act imposes an

unconstitutional, content-based restriction on speech, is overbroad, and is

unconstitutionally vague.

On September 14, 2011, finding that Plaintiffs were likely to succeed on the

merits, the District Court preliminarily enjoined enforcement of the inquiry,

record-keeping, discrimination, and harassment provisions of the Act, together

with the provisions providing for discipline of practitioners who violate the Act.

Wollschlaeger v. Farmer, 814 F. Supp. 2d 1367, 1384 (S.D. Fla. 2011) (citing

§§ 456.072(1)(nn), (2), 790.338(1), (2), (5), (6), (8)).

On June 2, 2012, the District Court permanently enjoined enforcement of the

inquiry, record-keeping, discrimination, and harassment provisions of the Act—

9

together with the related disciplinary provisions—holding, on cross motions for summary judgment, that all four provisions facially violated the First Amendment, and that the inquiry, record-keeping, and harassment provisions of the Act were void for vagueness. Wollschlaeger v. Farmer, 880 F. Supp. 2d 1251, 1267–69 (S.D. Fla. 2012) (citing §§ 456.072(1)(nn), (2), 790.338(1), (2), (5), (6), (8)).

The District Court found that Plaintiffs had standing to sue because Plaintiffs were engaging in self-censorship to avoid potential disciplinary action, which constituted a cognizable injury-in-fact that was fairly traceable to the Act and redressable by injunction. Id. at 1258–59. The District Court also held that Plaintiffs' claims were ripe, finding that delayed review would "cause hardship to Plaintiffs, who would continue to engage in self-censorship," and that further factual development of the issues was unnecessary. Id. at 1259.

Turning to the merits, the District Court found that the Act imposed a content-based restriction on practitioners' speech on the subject of firearms. Id. at 1261. The District Court rejected the State's argument that the Act "constitute[s] a permissible regulation of professional speech or occupational conduct that imposed a mere incidental burden on speech." Id. at 1262. The District Court noted that, unlike the provisions of the Act, "[s]uch regulations govern the access or practice

of a profession; they do not burden or prohibit truthful, non-misleading speech within the scope of the profession." Id.

The District Court then assessed the State's asserted interests in passing the Act. The District Court acknowledged that the State has an interest in protecting its citizens' Second Amendment right to keep and bear arms, but found that such a right is "irrelevant" to the Act and therefore is not "a legitimate or compelling interest for it." Id. at 1264. The District Court found that, because the State acted on the basis of purely anecdotal information and provided no evidence that discrimination or harassment based on firearm ownership is pervasive, the State does not have a legitimate or compelling interest in protecting its citizens "from barriers to the receipt of medical care arising from [such] discrimination or harassment." Id. (internal quotation marks omitted). However, the District Court found that Florida has legitimate—but "perhaps" not compelling—interests "in protecting patients' privacy regarding their firearm ownership or use" and in the regulation of professions. Id. at 1265.

Balancing physicians' free speech rights against the State's legitimate interests in protecting patient privacy and regulating the professions, the District Court held that—regardless of whether strict scrutiny or some lesser standard applied—the inquiry, record-keeping, discrimination, and harassment provisions of

11

the Act could not pass constitutional muster. Id. at 1265–67. The District Court

found that the State had failed to provide any evidence that the confidentiality of

information regarding patients' firearm ownership was at risk, noting that a patient

may simply decline to provide such information, and that state and federal laws

pertaining to the confidentiality of medical records provide adequate protection to

patients. Id. at 1267 (citing Health Insurance Portability and Accountability Act of

1996, Pub. L. No. 104-191, 110 Stat. 1936 (providing, among other things,

confidentiality of medical records); Fla. Stat. § 456.057 (same)). With regard to

the regulation of professions, the District Court found that the Act lacked "narrow

specificity," id. at 1266 (internal quotation marks omitted), because the Act

directly targets speech rather than merely imposing an incidental burden on speech.

Id. at 1266–67. For similar reasons, the District Court further found that the Act is

not the least restrictive means of achieving the State's interests. Id. at 1267. Thus,

the District Court held that the "balance of interests tip significantly in favor of

safeguarding practitioners' ability to speak freely to their patients." Id. at 1267.

The District Court also held that the inquiry, record-keeping, and harassment

provisions of the Act were unconstitutionally vague. Id. at 1267–69. With regard

to the inquiry and record-keeping provisions, the District Court found that the

"relevance standard" failed to provide sufficient guidance as to what conduct the

Act prohibits.  Id. at 1268.  With regard to the harassment provision, the District

Court noted that the term "harass" has an ordinary meaning that is readily clear,

id., but that the "[w]hat constitutes 'unnecessary harassment' is left to anyone's

guess," id. at 1269.  The District Court noted that it did not need to address

Plaintiffs' argument that the Act is overbroad because doing so would not change

the outcome.  Id. at 1270 n.7.

Thus, the District Court—finding the remaining provisions of the Act

severable—granted Plaintiffs motion for summary judgment, and granted in part

and denied in part the State's motion for summary judgment.[4]  Id. at 1270.

Accordingly, the District Court permanently enjoined the State from enforcing the

record-keeping, inquiry, harassment, and discrimination provisions of the act,

§ 790.338(1), (2), (5), (6), and from enforcing § 790.338(8), to the extent that it

provided that violations of § 790.338(1) and (2) constitute ground for disciplinary

action, and § 456.072(1)(nn), to the extent that it provided that violations of

§ 790.338(1), (2), (5) and (6) constitute grounds for disciplinary action.  Id.

---

[4] The District Court granted the State's motion for summary judgment with respect to the
provisions of the Act that neither apply to practitioners nor regulate any conduct by practitioners,
§ 790.338(3), (4), (7), finding that Plaintiffs' lacked standing to challenge these provisions.
Wollschlaeger, 880 F. Supp. 2d at 1258.

On July 30, 2012, the State appealed the District Court's judgment.  The State contends that the District Court erred in holding Plaintiffs' claims justiciable, because the Act does not prohibit physicians from asking patients about firearm ownership, providing firearm safety counseling, or recording information concerning patients' firearm ownership.  The State argues that physicians may engage in such conduct when it is relevant to patients' care, and even when not relevant, the Act merely suggests that physicians "should refrain" from inquiring as to firearm ownership.  § 790.338(2).  Such hortatory language, the State argues, does not constitute a mandate that physicians must not inquire.  Thus, the State argues, because the Act does not in fact actually prohibit the conduct Plaintiffs wish to engage in, Plaintiffs lack standing to challenge the Act because they have not demonstrated injury-in-fact.  Moreover, the State argues, we have an obligation to read the Act as a mere recommendation that physicians refrain from irrelevant inquiry and record-keeping about firearms, in order to construe the Act as valid.

The State also argues that the District Court erred in holding that the Act imposes a facially unconstitutional content-based speech restriction, because the Act is a regulation of professional conduct that imposes only incidental burdens on speech, and because the discrimination and harassment provisions regulate conduct and cannot be challenged on free speech grounds.  Even if the Act imposes more

14

than an incidental burden on speech, the State argues, the Act should be upheld as a valid restriction on commercial speech because the Act is narrowly tailored to further substantial governmental interests in patient privacy, protecting Second Amendment rights, preventing barriers for firearm owners to receive medical care, and preventing harassment and discrimination of firearm-owning patients.

The State further contends that the District Court erred in holding the inquiry, record-keeping, and harassment provisions of the Act unconstitutionally vague because a plain meaning reading of the Act's terms makes it reasonably clear what conduct is prohibited.  Finally, the State argues that the Act is not overbroad because the inquiry and record-keeping provisions do not unconstitutionally prohibit any speech, and the discrimination and harassment provisions are indistinguishable from legitimate antidiscrimination statutes such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (1976), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (1994).  Thus, the State contends, the District Court erred in granting summary judgment for Plaintiffs and enjoining the enforcement of the Act.

Plaintiffs argue that the District Court properly held Plaintiffs' claims justiciable.  Plaintiffs contend that their self-censorship constitutes a cognizable injury-in-fact because they wish to engage in speech that is at least arguably

forbidden by the Act, the challenged provisions are at least arguably vague, and there is some minimal probability that the provisions will be enforced if violated. Plaintiffs contend that the "should refrain" language of the Act's inquiry provision may not be interpreted as hortatory when physicians face discipline for its violation, and when the provision contains a safe-harbor clause that would be irrelevant if the provision were read as hortatory. Thus, Plaintiffs argue that they have standing.

On the merits, Plaintiffs argue that the Act is not properly understood as a regulation of professional medical conduct, because all four challenged provisions were enacted in response to—and were intended to prohibit—communications regarding firearm safety. Thus, Plaintiffs contend, the Act is an impermissible viewpoint-discriminatory restriction on speech, subject to strict scrutiny, which cannot be justified by any of the State's proffered interests, and which in any case is not the least restrictive means of accomplishing the State's objectives. Plaintiffs also argue that the Act is unconstitutionally vague because the statute does not define "relevant" in the inquiry and record-keeping provisions, and does not define "unnecessarily harassing" or "discrimination." Finally, Plaintiffs argue, the Act is overbroad because it affects a wide swath of physicians' daily interactions with patients, and appears to preclude even consented-to inquiries and recordation of

16

information regarding firearms.  Thus, Plaintiffs contend, we should affirm the District Court's grant of summary judgment for Plaintiffs and issuance of an injunction against enforcement of the Act.

## II.

We review a district court's grant of summary judgment de novo.  Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1363 (11th Cir. 2007).  "Summary judgment is appropriate when 'there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law.'"  Id. (quoting Fed. R. Civ. P. 56(c)).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991).  "In making this determination, we review the record, drawing all reasonable inferences in the light most favorable to the nonmoving party."  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999).  We also review de novo questions concerning our subject matter jurisdiction, such as standing and ripeness.  Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006).

## III.

## A.

We find that the District Court properly held that Plaintiffs' claims are justiciable.  In order to have standing, "a claimant must present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling." Davis v. Fed. Election Comm'n, 554 U.S. 724, 733, 128 S. Ct. 2759, 2768, 171 L. Ed. 2d 737 (2008).  However, "[s]tanding is not dispensed in gross.  Rather, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Id. at 734, 128 S. Ct. at 2769 (citations omitted) (internal quotation marks omitted).

At the outset, we note that Plaintiffs' First Amendment challenge to the Act may be viewed as the functional equivalent of a First Amendment argument raised as an affirmative defense in a hypothetical case brought against a physician for asking irrelevant questions about firearms contrary to good medical practice.  A physician could raise such a defense in a disciplinary proceeding brought under the Act for such conduct, or, for that matter, in a malpractice action brought in court for such conduct.  For example, a patient could file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about firearm ownership—just as a patient could potentially file a lawsuit alleging that a physician committed malpractice by unnecessarily harassing the patient about any

18

other topic.  The physician could choose to admit to the purportedly harassing speech and plead the First Amendment as an affirmative defense, in effect contending that the court's rejection of the affirmative defense would constitute state action in violation of the Constitution.  Indeed, leaving aside the Act, a physician facing malpractice liability for a wide swath of professional activity involving speech could theoretically raise a First Amendment defense.

In mounting a facial challenge to the Act, however, Plaintiffs sought a First Amendment defense to any action brought against a physician based on speech targeted by the Act.  The State contends that the only proper vehicle for Plaintiffs' First Amendment defense is a live proceeding brought under the Act.  In other words, in arguing that Plaintiffs' facial challenge is not justiciable, the State is saying that Plaintiffs must wait until they have been subjected to discipline pursuant to the Act.

Crucial to resolving the standing question is the nature of Plaintiffs' claims. "Under controlling case law, we apply the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced."  Harrell v. The Fla. Bar, 608 F.3d 1241, 1254 (11th Cir. 2010) (citing Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 760 (11th Cir. 1991)).

19

Plaintiffs' sole alleged injury is self-censorship, which may be a cognizable injury-in-fact for standing purposes.  See id. ("[I]t is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" (quoting Pittman v. Cole, 267 F.3d 1269, 1283 (11th Cir. 2001))).

For their First Amendment claims, to establish a cognizable self-censorship injury, Plaintiffs "must show that, as a result of [their] desired expression, (1) [they were] threatened with prosecution; (2) prosecution is likely; or (3) there is a credible threat of prosecution." Id. at 1260 (internal quotation marks omitted).  To establish that there is a credible threat of prosecution, Plaintiffs must demonstrate: "first, that [they] seriously wish[] to engage in expression that is 'at least arguably forbidden by the pertinent law,' and second, that there is at least some minimal probability that the challenged rules will be enforced if violated." Id. (citations omitted).  "If a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." Id. at 1257.

Plaintiffs explain that, as part of the practice of preventative care, some physicians routinely ask patients whether they own firearms—either verbally or via a screening questionnaire—and provide firearm safety counseling, as part of a

20

larger battery of questions and counseling regarding health and safety risks

(including, for example, poisonous chemicals in the home, alcohol, tobacco, and

swimming pools).  After passage of the Act, Plaintiffs have curtailed or eliminated

this practice for fear of facing discipline.[5]

Plaintiffs have established that they wish to engage in conduct that is at least

arguably forbidden by the Act.  In their practice of preventative medicine,

---

[5] Plaintiffs' Complaint lays out the specifics of individual physicians' practices regarding firearm inquiries and safety counseling.  For example, prior to passage of the Act, Dr. Wollschlaeger asked his patients to complete a questionnaire that included questions regarding firearm ownership, and routinely orally asked patients whether they owned firearms if other risk factors were present—such as when patients had children in the home, were suffering from addiction, depression, or suicidal ideation, had an unstable family environment, or were involved in a domestic-violence situation—to provide firearm safety counseling tailored to the patient's circumstances.  After passage of the Act, Dr. Wollschlaeger has removed the firearms-related questions from his questionnaire and no longer orally asks questions regarding firearm ownership or discusses firearms as part of his standard preventative counseling.

The other physicians who are party to this suit have limited their practice of asking questions and providing counseling about firearm safety, but still do so to varying degrees.  For example, prior to passage of the Act, Dr. Schaechter and Dr. Schectman routinely asked their patients questions regarding firearm ownership and entered related information into their medical records.  They have continued this practice even after passage of the Act because they believe in good faith that such questions and information are relevant to their patients' care.  However, they now refrain from asking follow-up questions when patients or their parents seem upset by the initial screening question, when, prior to passage of the Act, they would not have refrained.  Similarly, Dr. Gutierrez continues to use a patient questionnaire that includes a question about firearm ownership, but has resolved to refrain from asking any follow-up questions should a patient initially appear disinclined to discuss the topic.  Dr. Sack has ended his previous practice of beginning his firearm safety counseling by asking patients whether they have a firearm in the house.  However, he has continued to provide firearm safety counseling, framing it in hypothetical terms not tailored to his patients' individual circumstances.  Dr. Fox-Levine has, since passage of the Act, removed questions regarding firearm ownership from her intake questionnaire, but continues to advise some patients about firearm safety, framing her advice in hypothetical terms.

Plaintiffs wish to ask questions and record information regarding firearms as a matter of routine—without making a particularized determination of relevance—which implies that some such inquiry and recordation will not be relevant to the health and safety of patients or others and thus would be prohibited by the Act. The Act was recently enacted, and the State is defending it, so we may infer that there is at least some probability that the Act will be enforced if violated.[6] Thus, Plaintiffs have established a cognizable self-censorship injury for their First Amendment claims.[7]

For Plaintiffs' vagueness claim, the test for establishing a cognizable self-censorship injury is similar. "[Plaintiffs] must establish that: (1) [they] seriously wish[] to [engage in speech], (2) such [speech] would arguably be affected by the rules, but the rules are <u>at least arguably vague</u> as they apply to [them], and (3) there is at least a minimal probability that the rules will be enforced, if they are

---

[6] We note that the Act does not provide for criminal penalties, but only disciplinary action by the Board. Nevertheless, for standing purpose, the threat of disciplinary action may be sufficient. <u>See</u> <u>Harrell</u>, 608 F.3d at 1248, 1260 (finding an attorney had standing to challenge the state bar's attorney advertising rules, when the consequence for noncompliance was disciplinary action, such as disbarment).

[7] We acknowledge that the harassment and discrimination provisions of the Act in particular, § 790.338(5) and (6), prohibit conduct that may involve little to no speech. Nevertheless, Plaintiffs claim self-censorship as a result of all four challenged provisions of the Act. As all four challenged provisions regulate conduct that could arguably involve speech, even if only incidentally, this is sufficient for standing purposes. We need not, of course, evaluate the merits of these claims at the standing stage.

violated." Id. at 1254 (citations omitted).  Notably, "it is the existence, not the imposition, of standardless requirements that causes [the] injury." Id. (alteration in original) (quoting CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1275 (11th Cir. 2006)).

For the reasons discussed above, Plaintiffs have met the first and third prongs.  With regard to the second prong, Plaintiffs argue that it is unclear whether routine inquiries and record-keeping regarding firearms, made as part of the practice of preventative medicine and not based on patients' particularized circumstances, qualify as "relevant" to health and safety, and that the law does not define the terms "unnecessarily harassing" or "discriminate," leaving practitioners without guidance as to what conduct the Act prohibits and when physicians may be subject to discipline for conduct patients may unpredictably deem objectionable. Without determining, at this stage, the ultimate merits of Plaintiffs' argument, we accept that the language Plaintiffs point to is at least arguably vague.  Thus, Plaintiffs have established a cognizable self-censorship injury for their vagueness claim.

Plaintiffs claim that they curtailed their firearms inquiry and counseling practices due to the Act, and that they would resume those practices but for the

Act.  Thus, Plaintiffs' self-censorship injury is fairly traceable to passage of the Act, and redressable by injunction.  Accordingly, Plaintiffs have standing.

The State argues that Plaintiffs lack standing with regard to the inquiry provision of the Act because the provision in fact prohibits nothing at all.  Thus, the State claims, Plaintiffs' fear that they will face discipline is not objectively reasonable.  See Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998) ("A party's subjective fear that she may be prosecuted for engaging in expressive activity will not be held to constitute an injury for standing purposes unless that fear is objectively reasonable.").  Under the State's proposed construction, the Act merely recommends that physicians "should refrain" from asking questions about firearms unless relevant, and that such hortatory language does not constitute a bar on speech.  The State points out that the Executive Director of the Board stated in a letter—posted to the Board's website shortly after Plaintiffs filed suit—that the Board does not interpret the inquiry provision as a prohibition, but rather as a recommendation (contradicting a letter the Executive Director had previously mailed to Florida physicians stating the opposite).  Accordingly, the State contends, there is no credible threat of enforcement with regard to the inquiry provision.

We disagree.  Laws—such as the Act—that provide for disciplinary action in case of violation should generally not be interpreted as hortatory.  Compare Liesegang v. Sec'y of Veterans Affairs, 312 F.3d 1368, 1377 (Fed. Cir. 2002) ("In the absence of any consequences for noncompliance, [a law's] timing provisions are at best precatory rather than mandatory."), with Kittay v. Kornstein, 230 F.3d 531, 538 n.3 (2d Cir. 2000) (noting that attorney disciplinary rules "are mandatory in character" because they "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action" (internal quotation marks omitted)), and Edwards v. Born, Inc., 792 F.2d 387, 391–92 (3d Cir. 1986) (noting that attorney disciplinary rules "are mandatory" because attorneys are subject to discipline for violating them).  Thus, despite the Board's position— insofar as the Executive Director's letters represent it—that the inquiry provision constitutes a recommendation rather than a mandate, the fact that the Act provides for disciplinary action against Plaintiffs in case of a violation provides evidence that Plaintiffs' fear that they may face discipline is objectively reasonable for standing purposes.  Notably, this is not a generalized fear of disciplinary action, but rather a specific apprehension by a specific group—physicians—whose conduct the Act targets.  But cf. Clapper v. Amnesty Int'l USA, ___ U.S. ___, 133 S. Ct. 1138, 1143, 185 L. Ed. 2d 264 (2013) (holding that attorneys and various

25

human rights, labor, legal, and media organizations cannot "manufacture standing" to challenge a provision of the Foreign Intelligence Surveillance Act of 1978 "by choosing to make expenditures based on hypothetical future harm" where plaintiffs merely speculate that the government will target their communications, and so the costs they incurred were a product of their generalized fear of surveillance).

Moreover, we note that Board has not been consistent in its position that the inquiry provision is hortatory, as indicated by the Executive Director's first letter stating the contrary. The State is also inconsistent in its interpretation of the "should refrain" language in its briefs, repeatedly characterizing identical language in the harassment provision of the Act as a mandatory prohibition against unnecessary harassment, State's Br. at 1, 6, 18, 27, 35 n.8, 39, and describing the inquiry provision itself as "proscrib[ing] . . . inquiries," id. at 11, and "prohibit[ing] conduct: health care providers must not interrogate patients about firearms . . . if it is not relevant to a patient's medical care or safety, or the safety of others," id. at 39 (emphasis added). But cf. Wilson, 132 F.3d at 1428–29 (holding disbarred attorneys lacked standing to challenge State Bar rules that limit the ways in which disbarred attorneys can represent themselves to the public or have contact with clients where "the State Bar ha[d] repeatedly and consistently taken the position

that the [challenged rules] ha[d] no application to the types of scenarios the disbarred attorneys have posed").

Neither is it controlling that—as the State contends—the Florida Supreme Court interpreted the term "should" as hortatory in reviewing Florida's Code of Judicial Conduct.  See In re Code of Judicial Conduct, 643 So. 2d 1037, 1041 (Fla. 1994).  Such interpretation is irrelevant to determining what effect the Florida legislature intended to give language in the Act.  Thus, Plaintiffs' fear that they may face discipline under the inquiry provision is objectively reasonable.[8]

The State also argues that Plaintiffs lack standing with regard to the record-keeping provision of the Act because it only proscribes the entry of firearm information that is not relevant to medical care or safety, and Plaintiffs claim no injury arising from a wish to record irrelevant information.  However, Plaintiffs claim an injury to their practice of preventative medicine arising from not being

---

[8] We do not accept the State's argument that construing the inquiry provision's "should refrain" language as hortatory would render meaningless the portion of the provision allowing physicians to nevertheless make firearm inquiries when doing so would be relevant to care and safety.  See Corley v. United States, 556 U.S. 314, 129 S. Ct. 1558, 1566, 173 L. Ed. 2d 443 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation mark omitted)).  Even if we were to construe the inquiry provision as a mere recommendation that physicians refrain from inquiring about firearms, it is perfectly reasonable that the legislature may wish to withdraw this recommendation should the inquiry be relevant in a given case.  Nevertheless, we find that the inquiry clause is not a mere recommendation, and our rejection of the State's argument does not alter the result of our standing inquiry.

free to record the firearm information of every patient as a matter of course. Some—perhaps the majority—of these records will therefore be irrelevant to the care and safety of patients and others. Thus, the State's argument is unavailing: Plaintiffs claim an injury arising, in part, from a desire to record irrelevant information.

Accordingly, we find that the District Court properly held that Plaintiffs' have standing to challenge the Act. We also find that the District Court properly held that Plaintiffs' claims are ripe for adjudication.[9]

## B.

Before addressing the State's other arguments, however, we must evaluate the Act in order to assess the interests at stake. The essence of the Act is simple: medical practitioners should not record information or inquire about patients' firearm-ownership status when doing so is not necessary to providing the patient with good medical care. The Act's harassment and discrimination provisions serve to reinforce these prohibitions.

As suggested by the complaints the Florida legislature received prior to passage of the Act, patients are aware that their answers to physicians' inquiries

---

[9] The State does not renew on appeal its argument that Plaintiffs' claims are not ripe. Thus, we will not address the issue in detail.

will be entered into their medical record, and may fear that their record will be

shared with third parties, including, for example, government bureaucrats.[10]  We

need not speculate as to the reasons a patient may have for objecting to the sharing

of his or her firearm-ownership status, but we note that a patient might be

concerned about disclosing to a physician information regarding any number of

private topics when such information is not relevant to his or her medical care for

similar reasons.  For example, a patient may not wish to disclose his or her

religious or political affiliations, sexual preferences, or bank account balance to a

physician.  The Act merely circumscribes the unnecessary collection of patient

information on one of many potential sensitive topics.  It does so as a means of

---

[10] Plaintiffs argue that existing federal and state law sufficiently protects the confidentiality of medical records.  Under regulations promulgated pursuant to the federal Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104–191, 110 Stat. 1936, covered health care providers may not disclose health information except to an enumerated list of entities.  45 C.F.R. § 164.502.  Florida law provides that a patients' medical records must be kept confidential and enumerates only limited circumstances in which a health care provider may share a patient's records with a third party.  Fla. Stat. § 456.057(7)(a).  Thus, Plaintiffs contend, patients' fears that their firearm-ownership status will be shared with third parties are unfounded and the Act is unnecessary, insofar as its purpose is to protect the confidentiality of patients' firearm-ownership status.

Nevertheless, the Florida legislature perceived a particular problem surrounding the eliciting and recording of firearm ownership information by physicians, and passed the Act in response.  It is not our place to pass on the wisdom of the legislature's motivations, nor—at this stage—to evaluate the extent to which the Act furthers the legislature's stated interests.  See City of New Orleans v. Dukes, 427 U.S. 297, 303, 96 S. Ct. 2513, 2517, 49 L. Ed. 2d 511 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines . . . .").

protecting a patient's ability to receive effective medical treatment without compromising the patient's privacy with regard to matters unrelated to healthcare.

In the physician-patient relationship, a patient may need protection because there is an "imbalance of power between patient and physician." American College of Physicians, Ethics Manual (6th ed. 2012), <u>available at</u> http://www.acponline.org/running_practice/ethics/manual/manual6th.htm#physician-patient. When a patient enters a physician's office, the patient depends on the physician's knowledge and submits to the physician's authority, sometimes on matters of life and death. It is no exaggeration to state that a patient may be in some cases essentially at the mercy of his or her physician. As such, physicians bear a great responsibility toward their patients, and the relationship of patient to physician is one of trust and dependence, in which the patient consigns him- or herself to the physician's care, and depends on the physician to act with integrity, fidelity, and competence. <u>See</u> John Ladd, <u>Medical Ethics: Who Knows Best?</u>, 316 The Lancet 1127, 1129 (1980) ("The physician's power is awesome, and power carries responsibility. . . . Power, of course, presupposes trust and confidence.").

The Dissent states that "[o]f course," patients are free not to answer their doctors' questions about firearms if they choose not to. Dissenting op. at 137. In support, the Dissent cites precedent holding that residents who wish not to answer

30

questions from unwelcome visitors at their doorsteps receive "'ample protection' from [their] 'unquestioned right to refuse to engage.'" Sorrell v. IMS Health Inc., ___ U.S. ___, 131 S. Ct. 2653, 2670, 180 L. Ed. 2d 544 (2011) (quoting Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton, 536 U.S. 150, 168, 122 S. Ct. 2080, 2091, 153 L. Ed. 2d 205 (2002)).  But the Dissent's assumption ignores the reality that when patients are in examining rooms, they may feel powerless vis-à-vis their physicians.  So when physicians inquire about the presence of firearms in patients' homes, some patients may feel that their physicians demand an answer.  While an individual is certainly free to refuse to answer a question posed by another in the public square, a patient may not feel that same freedom when the question comes from his or her physician.

This is particularly true in circumstances in which a patient is especially powerless vis-à-vis his or her physician.  For example, a patient in a rural area may have access to only a single physician.  Without the option to seek treatment from a different physician, and without the protections imposed by professional codes of conduct and the law of malpractice, such a patient would have no recourse if the physician chooses to abuse the physician-patient relationship in some way—for instance by exploiting his or her authority over a patient for personal financial gain, to make inappropriate sexual advances, or, as we are concerned with here, to

31

extract private information, for whatever reason, unrelated to the patient's medical care.

Thus, at least in part to protect patients from physicians who abuse their position of power, physicians have long been subject to codes of conduct. In Classical Greece, the Hippocratic Oath—as it comes down to us today—required physicians to affirm their responsibilities by swearing that they will uphold a number of professional ethical standards, including that they will keep patients' private information in confidence and "keep [patients] from harm and injustice." Ludwig Edelstein, The Hippocratic Oath: Text, Translation, and Interpretation (1943), available at http://guides.library.jhu.edu/content.php?pid=23699&sid=190555. Today, most graduating medical students swear to a modernized form of the Oath. Peter Tyson, The Hippocratic Oath Today, PBS (Mar. 27, 2001), http://www.pbs.org/wgbh/nova/body/hippocratic-oath-today.html.

Other modern ethical models abound. For example, the American Medical Association (the "AMA") invites physicians to pledge to a Declaration of Professional Responsibility, which provides that physicians must, among other things, "[t]reat the sick and injured with competence and compassion and without prejudice" and "[p]rotect the privacy and confidentiality of those for whom [they]

32

care and breach that confidence only when keeping it would seriously threaten their health and safety or that of others." American Medical Association, *Declaration of Professional Responsibility: Medicine's Social Contract with Humanity* (2001), <u>available at</u> http://www.ama-assn.org/resources/doc/ethics/decofprofessional.pdf.

As the Hippocratic Oath and the AMA's Declaration of Professional Responsibility suggest, the practice of good medicine should not require inquiry into private matters unless such inquiry is necessary for the practice of good medicine. What better way to protect patients' privacy than to not inquire unnecessarily about private matters? The Act merely reaffirms the boundaries surrounding what constitutes good medical practice by codifying into law this common-sense proposition, and serves the important purpose of protecting the privacy rights of patients who do not wish to answer questions about irrelevant and private matters.

Insofar as Plaintiffs claim a generalized interest in being able to speak freely to their patients, such conversation (if not relevant to medical care) is outside the boundaries of the physician-patient relationship. Thus, insofar as Plaintiffs wish to make inquiries and keep records regarding firearm ownership as a matter of routine, even when not relevant to an individual patient's case, the Act places such

conduct outside of the bounds of good medical practice, recognizing that routine inquiries and recordkeeping regarding firearm ownership are not within the province of medicine but are rather, perhaps, law enforcement issues.[11]

Plaintiffs' ultimate concern, then, must lie in the close case: where it may be debatable whether a firearm inquiry is relevant to a given patient's care. At one extreme, if a patient's firearm-ownership status is plainly irrelevant to a patient's care, it will be clear that the Act bars inquiry. At the other extreme, if good medical care clearly requires inquiry—for example, in case of a suicidal patient— the physician will know that inquiry is relevant and thus not barred. The close case lies somewhere in the middle, where a physician may be forced to act without

---

[11] Plaintiffs contend that physician inquiries about firearm ownership comply with professional medical standards, even in situations (presented by the practice of preventative care) where such inquiries may initially appear irrelevant to medical care or safety. Several medical associations—including the AMA, and those associations that are party to this suit—have policies that endorse physicians' practice of asking questions and providing counseling regarding firearms. See, e.g., Brief for American Medical Association, et al., as Amici Curiae Supporting Plaintiffs/Appellees at 21–22 (citing American Medical Association Policy H-145.990, Prevention of Firearm Accidents of Children).

We observe that these policies may be in conflict with the AMA's Declaration of Professional Responsibility, which, as noted, mandates respect for patient privacy. In any case, it is well-established that Florida may regulate professional standards of medical care within its borders—regardless of what medical associations may recommend. See, e.g., Barsky v. Bd. of Regents, 347 U.S. 442, 449, 74 S. Ct. 650, 654, 98 L. Ed. 829 (1954) ("It is elemental that a state has broad power to establish and enforce standards of conduct within its borders relative to the health of everyone there. . . . The state's discretion in that field extends naturally to the regulation of all professions concerned with health.").

definitive guidance as to whether or not his or her conduct falls within the bounds

of good medical care.

This problem, however, is not unique to a physician's decision regarding the

propriety of firearm inquiries under the Act. A physician must continually make

decisions regarding what constitutes appropriate care under the relevant

professional standards, while running the risk that he or she may be subject to

discipline or exposed to malpractice liability for making a poor decision. As

leading bioethicists recognize,

> [b]y entering into the profession of medicine, physicians accept a
> responsibility to observe the standards specific to their profession. If
> their conduct falls below these standards, they act negligently. . . .
> [However,] [t]he line between due care and inadequate care (that
> which falls below what is due) is often difficult to draw.

Tom. L. Beauchamp & James F. Childress, Principals of Biomedical Ethics 154–

55 (6th ed. 2009). Whether a physician's transgression concerns unnecessary

inquiry or record-keeping regarding private matters or anything else the State

chooses to define as grounds for discipline, the law of malpractice—and the

statutory disciplinary measures the Board is authorized to impose for violations of

specific professional standards—remain the same. Likewise, under the Act, the

challenge a physician faces in treating a patient remains the same: he or she must

use professional judgment to determine what constitutes good medical care for that

particular patient, and proceed accordingly.  The Act merely delineates one factor—privacy regarding firearm ownership—in the physician's calculation.

It does little to alter the analysis that the Act singles out a single factor as a trigger for discipline, nor that this factor involves what the legislature considers appropriate for physicians to ask or record about their patients.  Even leaving aside statutory disciplinary measures such as the Act, a physician may face liability in state courts under malpractice or tort law for a wide swath of professional activity, much of which necessarily involves physicians speaking or failing to speak. Indeed, "doctors are routinely held liable for giving negligent medical advice to their patients, without serious suggestion that the First Amendment protects their right to give advice that is not consistent with the accepted standard of care." Pickup v. Brown, 740 F.3d 1208, 1228 (9th Cir. 2014).

For example, "[a] doctor may not counsel a patient to rely on quack medicine.  The First Amendment would not prohibit the doctor's loss of license for doing so."  Id. (internal quotation marks omitted).  "When a drug is banned, . . . a doctor who treats patients with that drug does not have a First Amendment right to speak the words necessary to provide or administer the banned drug."  Id. at 1229. A doctor might face malpractice liability for communicating an inaccurate diagnosis to a patient, or for failing to timely communicate an accurate diagnosis.

A doctor might face malpractice liability for giving a patient improper instructions, or for failing to provide a patient with proper instructions.  In all of these scenarios, a court might hold a doctor liable for actions which involve speech and, given such state action, presumably infringe the doctor's First Amendment rights.  With this in mind, we proceed to evaluate the Act's constitutionality.

## C.

We find that the Act is a valid regulation of professional conduct that has only an incidental effect on physicians' speech.   As such, the Act does not facially violate the First Amendment.[12]  To define the standards of good medical practice and provide for administrative enforcement of those standards is well within the State's long-established authority to regulate the professions.  See generally Barsky v. Bd. of Regents, 347 U.S. 442, 449, 74 S. Ct. 650, 654, 98 L. Ed. 829 (1954) (holding that states may regulate "all professions concerned with health"); Semler v. Oregon State Bd. of Dental Exam'rs, 294 U.S. 608, 611, 55 S. Ct. 570, 571, 79

---

[12] We note that, insofar as individual Plaintiffs are concerned that their particular practice of asking questions about firearm ownership and providing individualized firearm safety counseling (in the manner that they did prior to the Act's passage) constitutes a "close case," they may seek an advisory opinion from the Board to determine whether they will face discipline for engaging in that practice.  Florida law provides that "[a]ny substantially affected person may seek a declaratory statement regarding an agency's opinion as to the applicability of a statutory provision, or of any rule or order of the agency, as it applies to the petitioner's particular set of circumstances."  Fla. Stat. § 120.565(1).  Plaintiffs do not, however, challenge the Act here as applied to their specific conduct, but rather argue that the Act is invalid on its face.

L. Ed. 1086 (1935) ("That the state may regulate the [professions] . . . and to that end may . . . establish supervision by an administrative board, is not open to dispute.").

Moreover, as discussed above, and as Justice White observed in <u>Lowe v. S.E.C.</u>, "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech." 472 U.S. 181, 228, 105 S. Ct. 2557, 2582, 86 L. Ed. 2d 130 (1985) (White, J., concurring in the result). Rather, "[a] statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." <u>Locke v. Shore</u>, 634 F.3d 1185, 1191 (11th Cir. 2011) (quoting <u>Accountant's Soc'y. of Va. v. Bowman</u>, 860 F.2d 602, 604 (4th Cir. 1988) (relying on Justice White's reasoning in <u>Lowe</u> to uphold a state statute restricting the use of certain terms in the work product of persons not licensed as certified public accountants)).

As a general matter, of course, speech by professionals is not immune from the protections of the First Amendment. <u>See, e.g.</u>, <u>Fla. Bar v. Went For It, Inc.</u>, 515 U.S. 618, 634–35, 115 S. Ct. 2371, 2381, 132 L. Ed. 2d 541 (1995). These protections are at their apex when a professional speaks to the public on matters of public concern; they approach a nadir, however, when the professional speaks

privately, in the course of exercising his or her professional judgment, to a person

receiving the professional's services.  As Justice White explained in the context of

a licensing scheme for professional investment advisors,

> One who takes the affairs of a client personally in hand and purports
> to exercise judgment on behalf of the client in the light of the client's
> individual needs and circumstances is properly viewed as engaging in
> the practice of a profession.  Just as offer and acceptance are
> communications incidental to the regulable transaction called a
> contract, the professional's speech is incidental to the conduct of the
> profession. . . . Where the personal nexus between professional and
> client does not exist, and a speaker does not purport to be exercising
> judgment on behalf of any particular individual with whose
> circumstances he is directly acquainted, government regulation ceases
> to function as legitimate regulation of professional practice with only
> incidental impact on speech; it becomes regulation of speaking or
> publishing as such, subject to the First Amendment's command that
> "Congress shall make no law . . . abridging the freedom of speech, or
> of the press."

Lowe, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result)

(footnote omitted); see also Locke, 634 F.3d at 1191 ("There is a difference, for

First Amendment purposes, between regulating professionals' speech to the public

at large versus their direct, personalized speech with clients." (citing Lowe, 472

U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result))).

Thus, "[t]he key to distinguishing between occupational regulation and

abridgment of [F]irst [A]mendment liberties is in finding 'a personal nexus

between professional and client,'" Bowman, 860 F.2d at 605 (quoting Lowe, 472

U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result)), where the

professional is "exercis[ing] judgment on behalf of the client in the light of the

client's individual needs and circumstances," Lowe, 472 U.S. at 232, 105 S. Ct. at

2584 (White, J., concurring in the result).

Accordingly, we afford speech to the public "by attorneys on public issues

and matters of legal representation the strongest protection our Constitution has to

offer." Went For It, Inc., 515 U.S. at 634, 115 S. Ct. at 2381 (citing Gentile v.

State Bar of Nev., 501 U.S. 1030, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991)). At

the opposite end of the spectrum, there is no "constitutional infirmity" where the

speech rights of physicians are "implicated, but only as part of the practice of

medicine, subject to reasonable licensing and regulation by the State." Planned

Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 884, 112 S. Ct. 2791, 2824, 120 L.

Ed. 2d 674 (1992) (plurality opinion of O'Connor, Kennedy, and Souter, JJ.)

(citations omitted) (holding that a provision of a Pennsylvania statute requiring

health care providers to inform patients of the availability of certain information

regarding abortion and childbirth prior to obtaining an abortion was a valid

regulation of the practice of medicine and so did not violate physicians' First Amendment right not to speak).[13]

For example, in <u>Locke</u> we applied Justice White's framework in <u>Lowe</u> in upholding a requirement that professional interior designers obtain a license to practice.  <u>Locke</u>, 634 F.3d at 1191–92.  We noted that, although the practice of interior design involves speech, the license requirement regulates only "professionals' . . . direct, personalized speech with clients."  <u>Id.</u> at 1191 (citing <u>Lowe</u>, 472 U.S. at  232, 105 S. Ct. at 2584) (White, J., concurring in the result)).  "Because of this 'personal nexus' between the designer and the client and because the designer is exercising judgment on behalf of the client in light of the client's specific circumstances, Florida's law is properly viewed as a legitimate regulation of professional practice."  <u>Id.</u> at 1197 (Black, J., concurring).  Therefore, we held, "the license requirement governs occupational conduct, and not a substantial amount of protected speech, [and so] it does not implicate constitutionally

---

[13] The section of <u>Planned Parenthood of Southeast Pennsylvania v. Casey</u> upholding the Pennsylvania statute's informed consent provision, which required physicians to provide patients with certain information prior to obtaining an abortion, is found in the plurality opinion written by Justices O'Connor, Kennedy, and Souter.  505 U.S. 833, 881–85, 112 S. Ct. 2791, 2822–25, 120 L. Ed. 2d 674 (1992).  However, both Chief Justice Rehnquist—joined by Justices White, Scalia, and Thomas—and Justice Scalia—joined by Chief Justice Rehnquist and Justices White and Thomas—wrote separately to concur in upholding this provision.  <u>Id.</u> at 967, 981, 112 S. Ct. at 2867, 2875.

protected activity under the First Amendment." Id. at 1191 (majority opinion) (internal quotation marks omitted).

Insofar as the inquiry provision of the Act, § 790.338(2), regulates physician speech, it does so where the "personal nexus between professional and client" is perhaps at its most significant: within the confines of the physician's examination room, where the physician exercises his or her judgment to deliver professional treatment and advice to a particular patient, tailored to that patient's personal circumstances, in private. See Lowe, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result). Thus, although the Act restricts physicians' ability to ask questions about firearm ownership when doing so would be irrelevant to patients' medical care, it does so only in the service of defining the practice of good medicine, in the context of the very private, physician-patient relationship. The inquiry provision places no burdens whatsoever on physicians' ability to speak outside the physician-patient relationship.[14] The Act simply informs physicians that inquiring about a private matter irrelevant to medical care is not part of the practice of good medicine, and that, as always, a physician may face discipline for not practicing good medicine. Therefore, the inquiry provision of the Act is a

---

[14] For example, a physician would not face discipline under the Act for giving a lecture, publishing a pamphlet, or speaking to a person who is not a patient about firearm safety.

regulation of professional conduct that implicates physicians' speech only "as part of the practice of medicine, subject to reasonable licensing and regulation," and does not offend the First Amendment.  See Casey, 505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion).

The Act's record-keeping provision, § 790.338(1), is similarly a valid regulation of professional conduct.   Here too, the Act regulates one aspect of the making of records within the confines of the physician-patient relationship.  A medical record is merely a reduction to writing of a physician's course of treatment of his or her patient, based on his or her professional judgment, and tailored to the patient's personal circumstances.  Thus, to the extent that the record-keeping provision implicates speech, it is non-public, personalized speech made by a physician in the course of using his or her professional judgment to care for a particular patient.  Accordingly, insofar as the making of medical records has a speech aspect, it also occurs where the "personal nexus between professional and client" is at its most significant, and so the Act may regulate it without running afoul of the First Amendment.  See Lowe, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result).

We acknowledge that a business's record-keeping activities are not categorically excluded from the protections of the First Amendment.  As Plaintiffs

43

point out, in <u>Sorrell v. IMS Health Inc.</u>, the Supreme Court held that "the creation and dissemination of information are speech within the meaning of the First Amendment", 131 S. Ct. at 2667, and that "[a]n individual's right to speak is implicated when information he or she possesses is subjected to 'restraints on the way in which the information might be used' or disseminated," <u>id.</u> at 2665 (quoting <u>Seattle Times Co. v. Rhinehart</u>, 467 U.S. 20, 32, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984)).  Thus, the Court found that a Vermont statute that restricted the sale, disclosure, and use for marketing purposes of pharmacy records that reveal prescribing practices of individual doctors imposed a content-based regulation on protected expression, and, applying heightened scrutiny, struck down the statute. <u>Id.</u> at 2672.

We note, however, that in <u>Sorrell</u>, the statute in question restricted the manner in which pharmacies could disseminate business records to third parties or use them in a way which involved communicating their contents to third parties. In contrast, the Act does not clearly prohibit the dissemination of information. Plaintiffs characterize the act of entering information in a patient's record as "communicating in writing with the patient's current and future care-providers." Plaintiffs' Br. at 32.  However, whatever communicative function medical records serve is, with only limited exception, contained within the medical profession—

44

physicians do not, of course, make medical records for public consumption.

Moreover, what health care providers may do with medical records is, of course,

already highly regulated.  See, e.g., Health Insurance Portability and

Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936; § 456.057.

Thus, the reasoning of Sorrell is inapposite.  The Act merely recognizes that good

medical practice does not require the keeping of irrelevant records.  Any burden

the record-keeping provision may place on physicians' ability to create information

in the form of medical records or to communicate such information to other health

care providers is incidental to the Act's regulation of the practice of medicine.

The Act's discrimination provision, § 790.338(5), also regulates professional

conduct within the physician-patient relationship.  Although physician

discrimination could potentially involve speech, on balance discrimination

involves conduct.  To the extent that the discrimination provision does prohibit

conduct involving physician speech, the same analysis applies as to its place within

the private physician-patient relationship, where the "personal nexus between

professional and client" is at its strongest.  See Lowe, 472 U.S. at 232, 105 S. Ct. at

2584 (White, J., concurring in the result).  Thus, the discrimination provision is

also a valid regulation of professional conduct that only incidentally—if at all—

affects physician speech.

45

The Act's harassment provision, § 790.338(6), similarly targets professional conduct within the physician-patient relationship.  Harassment can involve speech, but any speech that the harassment provision reaches is—like that involved in the Act's other provisions—private, personalized speech between a physician and patient, involving the physician's professional judgments and tailored to the patient's individual circumstances.  Of course, harassing speech may in some cases be protected by the First Amendment, such as when such speech is made in a public place regarding a matter of public concern.  See Snyder v. Phelps, ___ U.S. ___, 131 S. Ct. 1207, 1219, 179 L. Ed. 2d 172 (2011) (holding that picketers at military funerals who held signs communicating their belief that God hates the United States for its tolerance of homosexuality were shielded by the First Amendment from tort liability because this activity constituted speech in "a public place on a matter of public concern").  Although we accept that firearm safety may be a matter of public concern, the reasoning of Snyder is inapposite in the context of a regulation of professional conduct that provides that the privacy of a physician's examination room is not an appropriate forum for unrestricted debate on such matters.  Thus, the harassment provision is also a valid regulation of professional conduct that only incidentally affects speech.

46

Plaintiffs argue that the cases establishing that professional regulations may incidentally burden speech without offending the First Amendment concern licensing and supervision requirements.[15]  The purpose of these requirements, Plaintiffs explain, is to "shield[] the public against the untrustworthy, the incompetent, or the irresponsible, or against unauthorized representation of agency."  Thomas v. Collins, 323 U.S. 516, 545, 65 S. Ct. 315, 329, 89 L. Ed. 430 (1945) (Jackson, J., concurring).  In contrast, Plaintiffs contend, the Act directly targets physicians' speech about firearms and so any speech restriction cannot be merely incidental.

---

[15] The Dissent would have the reasoning as to why a state may regulate a professional's personalized, one-to-one speech with a client as part of its regulation of the profession—as set forth in Justice White's concurrence in Lowe v. S.E.C., 472 U.S. 181, 105 S. Ct. 2557, 86 L. Ed. 2d 130 (1985), and cited in our decision in Locke v. Shore, 634 F.3d 1185 (11th Cir. 2011)— apply only where the law at issue is a licensing scheme regulating entry into the profession, the incidental impact on speech is felt only by unlicensed, would-be practitioners, and the burden on speech is content-neutral.

We do not find the reasoning set forth in Justice White's Lowe concurrence and in Locke valid only in such a narrow context.  As we have explained, see supra section III.B, it is uncontroversial that a state may impose discipline on professionals for all manner of activity that involves the professional speaking with a client.  Justice White's concurrence in Lowe merely helps explain why this is so.  Casey affirms that states may directly regulate what physicians say to their patients "as part of the practice of medicine."  505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion).  Finally, as we will discuss in more detail, the Ninth Circuit has already drawn a line from Justice White's reasoning in Lowe to the informed consent provision the Supreme Court upheld in Casey, and invoked this reasoning in upholding a state statute that directly regulates what physicians may say to their patients.  See Pickup v. Brown, 740 F.3d 1208, 1227–29 (9th Cir. 2014).

However, it is well-established "that a state's legitimate concern for maintaining high standards of professional conduct extends beyond initial licensing." Barsky, 347 U.S. at 451, 74 S. Ct. at 655. In Casey, the Supreme Court—although without invoking the "personal nexus" framework set forth in Justice White's Lowe concurrence and applied by this Court in Locke—upheld a statutory provision that directly regulated physicians' conversations with patients as a valid regulation of the practice of medicine. Casey, 505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion).[16] We are not convinced that a licensing

---

[16] Of course, the Supreme Court upheld the informed consent provision of the Pennsylvania statute at issue in Casey on several other grounds, including that the information the provision requires physicians to provide regarding abortion and childbirth is truthful and non-misleading, that the provision furthers an important interest in protecting the life of the unborn, and that the provision did not "not prevent the physician from exercising his or her medical judgment," which the Court attributed to the statute's safe harbor, under which a physician need not provide the information if doing so would adversely affect the health of the patient (not unlike the safe harbor of the Act's inquiry provision, under which physicians may inquire as to firearms when doing so is relevant to medical care or safety). See Casey, 505 U.S. at 881–87, 112 S. Ct. at 2822–26 (plurality opinion).

We do not mean to imply that the instant case is analogous. However, the Court's First Amendment analysis of the informed consent provision in Casey—that the State may to some extent regulate physician speech within the confines of the physician-patient relationship "as part of the practice of medicine" without violating the First Amendment, see id. at 884, 112 S. Ct. at 2824 (plurality opinion)—stands on its own, and applies here, despite the fact that the Act prohibits inquiries and record-keeping about irrelevant information, rather than requires discussion of relevant information. That the Pennsylvania statute's informed consent provision required the disclosure of truthful, non-misleading information and did not interfere with physicians' judgment was not, as Plaintiffs suggest, the basis for the Court's determination that the provision did not violate the First Amendment. Rather, the Court considered these factors in determining, respectively, that the statute did not impose an undue burden with regard to obtaining an abortion, and did not "interfere[] with a constitutional right of privacy between a pregnant woman and her physician." Id. at 883, 112 S. Ct. at 2823–24 (plurality opinion).

requirement is the only form of professional regulation that may validly touch on professional speech.

In Pickup v. Brown, the Ninth Circuit invoked Casey together with Justice White's Lowe concurrence in rejecting a First Amendment challenge to a statute that directly regulated what a healthcare provider may say to a patient. Pickup, 740 F.3d at 1227–29. In Pickup, plaintiffs—practitioners, advocacy organizations, patients, and patients' parents—challenged a California statute that prohibited state-licensed mental health providers from engaging in therapy with a minor in an effort to change the minor's sexual orientation. Id. at 1222–24. The Ninth Circuit

---

The Dissent suggests that the Court in Casey, without explaining that it was doing so, applied intermediate scrutiny in reviewing the informed consent provision. However, the language the Dissent cites to support this reading of Casey is, as discussed above, directed at other issues and is set forth in the opinion before the Court turned to its discussion of the First Amendment, noting that the First Amendment issue was "[a]ll that is left of petitioners' argument" and then dispatching of that argument in a short paragraph explaining that there is "no constitutional infirmity" because the provision reaches physician speech only as part of a reasonable regulation of the practice of medicine. Id. at 885, 112 S. Ct. at 2823–24 (plurality opinion).

The Dissent also suggests that, even if Casey applied something less than intermediate scrutiny, Casey involved compelled speech whereas the Act involves a prohibition on speech, and so a more exacting test is required here. See Zauderer v. Office of Disciplinary Counsel of Sup. Ct. of Ohio, 471 U.S. 626, 651, 105 S. Ct. 2265, 2282, 85 L. Ed. 2d 652 (1985) (subjecting a provision of disciplinary rules prohibiting certain subject matter in attorney advertising to intermediate scrutiny and a provision compelling inclusion of certain subject matter to a less demanding "reasonably related to the State's interest" standard). However, we do not find this distinction compelling. Zauderer involved a regulation of attorney advertising to the public and not of, as here, a professional's one-on-one interaction with his or her client. Moreover, a state's interest in regulating the practice of medicine is no less important when a state prohibits physician activity than when it compels physician activity.

upheld the statute as a valid regulation of professional conduct that has only

"incidental effect on speech." Id. at 1229.

In so holding, the Ninth Circuit recognized a "continuum" along which "the

First Amendment rights of professionals, such as doctors and mental health

providers" may be evaluated. Id. at 1227. The Ninth Circuit noted that "where a

professional is engaged in a public dialogue," this represents "the high end of the

continuum, where First Amendment protection is greatest." Id. (citing Lowe, 472

U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring)). The Ninth Circuit placed

the requirement that health care providers communicate certain information to

patients that was challenged in Casey "[a]t the midpoint of the continuum," noting

that the speech at issue there took place "within the confines of a professional

relationship." Id. at 1228. Citing the reasoning of Justice White's Lowe

concurrence, the Ninth Circuit noted that:

> Outside the professional relationship, such a requirement would
> almost certainly be considered impermissible compelled
> speech. . . . [However,] the First Amendment tolerates a substantial
> amount of speech regulation within the professional-client
> relationship that it would not tolerate outside of it. And that toleration
> makes sense: When professionals, by means of their state-issued
> licenses, form relationships with clients, the purpose of those
> relationships is to advance the welfare of the clients, rather than to
> contribute to public debate.

Id. at 1228–29 (citing Lowe, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring)).  The Ninth Circuit proceeded to locate the therapy prohibited by the California statute even lower on the continuum of First Amendment protections than the activity at issue in Casey, describing it as a "regulation of professional conduct, where the state's power is great, even though such regulation may have an incidental effect on speech."  Id. at 1229.

However, the Ninth Circuit reached a different conclusion in an earlier case with regard to a federal policy that threatened physicians with administrative discipline—including revocation of a physician's license—for recommending that a patient use medical marijuana, holding that this policy interfered with expression protected by the First Amendment.  Conant v. Walters, 309 F.3d 629, 632 (9th Cir. 2002).

In Pickup, the Ninth Circuit distinguished Conant by noting that in Conant, it was the policy against physicians recommending marijuana that offended the First Amendment.  Pickup, 740 F.3d at 1226.  The policy prohibiting physicians from prescribing or distributing marijuana was unchallenged.  Id.  Thus, "the demarcation between conduct and speech in Conant was clear. . . . [T]he policy against merely 'recommending' marijuana was both [a] content- and viewpoint-based" restriction on speech.  Pickup, 740 F.3d at 1226.  In Pickup, however, the

51

Ninth Circuit held that the therapy targeted by the California statute was itself treatment, and so the statute "regulates conduct.  It bans a form of treatment for minors; it does nothing to prevent licensed therapists from discussing the pros and cons of [sexual orientation change efforts] with their patients."  Id. at 1229.

Plaintiffs characterize the Act as regulating not treatment, as in Pickup, but speech per se, as in Conant.  However, the line between treatment and communication about treatment is not necessarily so clear.  In some cases, medical treatment—such as may occur when, for example, a physician attempts to help a patient cease smoking—may begin with an inquiry ("do you smoke?"), followed by a recommendation and some amount of counseling ("you should quit smoking because smoking has been shown to cause cancer").  In many cases, a physician's efforts may go no further than this.  Nevertheless, the physician would almost certainly characterize an attempt to convince a patient to cease smoking as part of his or her treatment of that patient.

Thus, although the Ninth Circuit chose to drawn a bright line between the recommendation at issue in Conant and the therapy at issue in Pickup, we do not find such a line here.  A physician's inquiry about the presence of firearms in a patient's home may be viewed as the opening salvo in an attempt to treat any issues raised by the presence of those firearms.  When a physician enters a

52

patient's firearm ownership status into the patient's medical records—along with the rest of the patient's course of treatment—this is part and parcel with the physician's treatment of the patient.  Moreover, under the Act, physicians remain largely free—up to the point of unnecessarily harassing a patient about the patient's ownership of firearms—to discuss firearm safety, make recommendations with regard to firearm safety, and express opinions about firearms.  Cf. Pickup, 740 F.3d at 1229 ("[T]he law allows discussions about treatment, recommendations to obtain treatment, and expressions of opinions about [sexual orientation change efforts] and homosexuality.").  The Act simply targets inquiry and record-keeping, along with related harassment and discrimination.

Furthermore, unlike the state statute at issue here (and the one upheld in Pickup), Conant involved a federal policy that purported to regulate physicians' conduct, and in upholding an injunction against enforcement of the policy, the Ninth Circuit took into account that "states [are] the primary regulators of professional conduct."  Conant, 309 F.3d at 639.

Thus, we do not find that the reasoning of Conant mandates a different result in our analysis of the Act.  Nor do we find Pickup inapposite because of the Ninth Circuit's characterization of the therapy prohibited in Pickup as pure conduct deserving of even less First Amendment protection than the compelled disclosure

at issue in <u>Casey</u>.  <u>Pickup</u> is instructive as a recent example of a court applying

Justice White's reasoning in <u>Lowe</u> in conjunction with <u>Casey</u> to uphold a

regulation of professional conduct with incidental effect on speech, outside of the

context of a license requirement.

The Act as a whole "governs occupational conduct, and not a substantial

amount of protected speech."  <u>See</u> <u>Locke</u>, 634 F.3d at 1191 (internal quotation

marks omitted).  Any burden the Act places on speech is thus incidental to its

legitimate regulation of the practice of medicine.[17]

Moreover, the Dissent's assertion that the Act violates the First Amendment

because it targets and prohibits physicians' speech on the topic of firearms is

actually belied by the plain language of the Act itself.  As noted, so long as

---

[17] In reaching this conclusion, we are not, as the Dissent claims, declaring "a new category of speech immune from First Amendment review."  Dissenting op. at 85.  As discussed above, <u>see</u> <u>supra</u> section III.B, our holding simply recognizes that a state may—just as it routinely does in state court malpractice and tort actions—impose discipline on a physician for activities that the state deems bad medicine even when those activities involve the physician speaking, and that when a state does so the First Amendment generally does not provide the physician with a shield.

Neither are we, as the Dissent suggests, creating a rule whereby any law burdening speech—such as a law barring doctors from discussing the Affordable Care Act, Medicare/Medicaid, medical malpractice laws, or any other topic—will avoid First Amendment scrutiny so long as the law applies within the confines of a one-on-one professional relationship. We note that the Act does not ban discussion of any topic, but only irrelevant inquiry, record-keeping, and related harassment and discrimination.  In any case, we must decide this case based on the facts before us, and in doing so we need not—indeed, we must not—speculate as to the constitutionality of hypothetical laws.

physicians do not ask patients irrelevant questions about their firearm ownership,

the Act nowhere prohibits physicians from discussing firearm safety with their

patients, except in the case where such firearms counseling might rise to the level

of unnecessary harassment prohibited by the Act.  Indeed, a physician need not

find out whether his patient owns a firearm in order to provide information to that

patient on any possible health consequences that might go along with firearm

ownership.  A physician might offer such counseling by providing literature on

firearm safety that does not make inquiries of patients or by briefly advising

patients of safe firearms storing practices without demanding answers from

patients as to whether they own firearms at home.  Counseling, without inquiring,

as long as it does not harass, maintains patients' right to privacy regarding firearms

and at the same time enables physicians to advise patients on safe practices.  As

such, the Act actually neither infringes on physicians' rights to speak on a topic of

their choosing nor infringes on the rights of those patients who would welcome

information on firearm safety.

For the same reasons, we reject Plaintiffs' argument that the Act is

overbroad.  "In the First Amendment context, . . . a law may be invalidated as

overbroad if 'a substantial number of its applications are unconstitutional, judged

in relation to the statute's plainly legitimate sweep.'"  <u>United States v. Stevens</u>,

559 U.S. 460, 473, 130 S. Ct. 1577, 1587, 176 L. Ed. 2d 435 (2010) (quoting

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449, n. 6, 128

S. Ct. 1184, 170 L. Ed. 2d 151 (2008)).  "The overbreadth doctrine is 'strong

medicine' that generally should be administered 'only as a last resort.'"  Locke,

634 F.3d at 1192 (quoting United States v. Williams, 553 U.S. 285, 293, 128 S. Ct.

1830, 1838, 170 L. Ed. 2d 650 (2008)).

Plaintiffs argue that that Act is overbroad because it regulates every

practitioner's speech on the subject of firearms, and appears to preclude even

consented-to inquiries or record-keeping regarding firearms.  However, as

discussed, the Act does not prohibit relevant inquiries and record-keeping, and the

State may legitimately regulate the practice of medicine to exclude irrelevant

inquiries and record-keeping.  Because the Act "is a professional regulation with a

merely incidental effect on protected speech, we cannot say that its impermissible

applications are substantial relative to its plainly legitimate sweep."  Id.  Thus, the

Act is not overbroad.[18]

---

[18] Because it would not alter our holding, we need not address the State's argument that the discrimination and harassment provisions of the Act are not overbroad because these provisions are indistinguishable from valid antidiscrimination regulations such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17 (1976), and the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (1994).

Accordingly, we find Plaintiffs' claims that the Act facially violates the First Amendment without merit. The State may validly regulate the practice of medicine to protect patients' privacy. Any speech that the Act reaches takes place entirely within the confines of the physician-patient relationship, where the "personal nexus between professional and client" is strong, and so is entirely incidental to the Act's regulation of physicians' professional conduct. See Lowe, 472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring in the result).

In reaching this conclusion, we note that we are not curtailing Plaintiffs' First Amendment rights. Plaintiffs remain free to assert the First Amendment as an affirmative defense in any proceeding brought against them based upon speech made in the course of treatment that fell outside the bounds of good medical care. By rejecting Plaintiffs' facial challenge to the Act, we are simply refusing to provide Plaintiffs with a declaration that such a defense will be successful.

Thus, we hold that the District Court erred in finding that the Act facially violates the First Amendment.

## D.

We also find that the Act is not unconstitutionally vague. Under "[t]he void-for-vagueness doctrine[,] . . . 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily

guess at its meaning and differ as to its application, violates the first essential of due process of law.'" Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1310 (11th Cir. 2009) (third alteration in original) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 629, 104 S. Ct. 3244, 3256, 82 L. Ed. 2d 462 (1984)). Thus, a statute is unconstitutionally vague if "it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." Giaccio v. Pennsylvania, 382 U.S. 399, 402–03, 86 S. Ct. 518, 520–21, 15 L. Ed. 2d 447 (1966).

As an initial matter, we note that the Act provides only for civil penalties in the form of disciplinary action by the Board—physicians do not face criminal penalties for the Act's violation. "The Supreme Court has warned against the mechanical application of vagueness doctrine, emphasizing that . . . there should be 'greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.'" Harris, 564 F.3d at 1310 (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99, 102 S. Ct. 1186, 1193, 71 L. Ed. 2d 362 (1982)).[19]

---

[19] Plaintiffs point out that the Supreme Court has held that "a content-based regulation of speech . . . raises special First Amendment concerns because of its obvious chilling effect on free

58

Plaintiffs argue that the record-keeping and inquiry provisions of the Act, § 790.338(1), (2), are vague because the Act does not provide sufficient notice as to when record-keeping or inquiry regarding firearms is "relevant" to medical care or safety. Plaintiffs note that the Act does not specify whether a physician must make a particularized finding of relevance for each patient or whether a physician's general belief that firearms are always relevant will suffice, and does not specify if a physician must believe that firearm information is relevant at the time of inquiry and record-keeping, or if a good faith belief that the information may later become relevant (such as in the practice of preventative medicine) satisfies the requirements of the Act. Plaintiffs contend that, because a reading that information about firearms is always relevant would render the Act meaningless, physicians reasonably fear that the Act requires some higher, unspecified level of relevance. See In re Davis, 565 F.3d 810, 823 (11th Cir. 2009) ("We cannot read statutory language in a way that renders it wholly meaningless or nonsensical.").

---

speech." Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871–72, 117 S. Ct. 2329, 2344, 138 L. Ed. 2d 874 (1997). Thus, if a "law interferes with the right of free speech . . . , a more stringent vagueness test should apply." Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499, 102 S. Ct. 1186, 1193–94, 71 L. Ed. 2d 362 (1982). However, because the Act is not a content-based regulation of speech but rather a regulation of professional conduct that only incidentally impacts speech, we need not apply a more stringent version of our vagueness analysis.

We find recourse to plain meaning resolves the issue.  "Relevant" means "[r]elated to the matter at hand; to the point; pertinent."  American Heritage Dictionary of the English Language 1098 (William Morris, ed., 1969).  An ordinary person of common intelligence need not guess as to the meaning of the term.  It is apparent that the Act's relevancy standard is only vague insofar as "relevancy" is necessarily determined on a case-by-case basis—that is, whether information is related to the matter at hand depends entirely on the specifics of the matter at hand.  A reading that firearms information is relevant in every case would, indeed, render the inquiry and record-keeping provisions superfluous, but this problem is easily avoided by adhering to a plain-meaning construction of relevancy as an ad hoc determination, requiring a physician to base his or her calculation as to the relevancy of a patient's firearms ownership status on particularized information about the patient.  By employing a flexible "relevancy" standard, the Act provides physicians with the freedom to make inquiries and record information regarding firearms whenever doing so would be part of the practice of good medicine.

For example, under the record-keeping provision, the Act prohibits recordation of firearm information only if the physician "knows" that the information is not relevant.  § 790.338(1).  This simply means that a physician may

not record a patient's firearm-ownership status unless the physician has knowledge that—because of some particularized information about the individual patient, for example, that the patient is suicidal or has violent tendencies—the patient's firearm-ownership status pertains to the patient's medical care or safety, or the safety of others.  Therefore, the record-keeping provision is not vague.

The key to the inquiry provision's relevancy clause is that a physician must believe in "good faith" that firearm ownership information is relevant to medical care or safety.  § 790.338(2).  Thus, a physician may make firearms inquiries of any or all patients, so long as he or she does so with the good faith belief—based on the specifics of the patient's case—that the inquiry is relevant to the patient's medical care or safety, or the safety of others.  If, for example, the physician seeks firearm information to suit an agenda unrelated to medical care or safety, he or she would not be making a "good faith" inquiry, and so the Act plainly directs him to refrain from inquiring.  Thus, the inquiry provision is not vague.

Plaintiffs argue that the discrimination provision of the Act, § 790.338(5), is vague because the Act does not define "discrimination."  Plaintiffs point out that,

given the context of the Act's passage,[20] one might expect this provision to

prohibit a physician from terminating his or her care of a patient based on the

patient's refusal to answer questions about firearm ownership, but that another,

unchallenged provision of the Act makes it explicit that the Act does not alter the

rule that a physician is free to cease providing services to a patient for any reason.

See § 790.338(4) ("A patient's decision not to answer a question relating to the

presence or ownership of a firearm does not alter existing law regarding a

physician's authorization to choose his or her patients."). Thus, Plaintiffs contend,

physicians are left to guess what activity would be prohibited by the discrimination

provision.

We agree with the District Court that the term "discriminate" has an

ordinary meaning that is readily clear to persons of common intelligence. In this

context, "discriminate" means "[t]o act on the basis of prejudice." American

Heritage Dictionary of the English Language, supra, at 376. Under this plain-

meaning reading, the discrimination provision of the Act simply means that

physicians may not provide a lower level of medical care on the basis of a patient's

firearm-ownership status. Although the particulars may vary—a physician could

---

[20] In particular, Plaintiffs point out that the Act was in large part passed in response to the incident in Ocala in which a pediatrician terminated care of a patient because the patient's mother refused to answer the pediatrician's questions regarding firearm ownership.

discriminate against firearm-owning patients by, for example, making them wait an excessively long time for an appointment, or by refusing them equal opportunities for referrals to specialists—the discrimination provision is sufficiently clear in apprising physicians that they may not provide firearm-owning patients with less medical care than they would other patients, in any circumstances.  Thus, the discrimination provision of the Act is not vague.

Finally, Plaintiffs argue that the harassment provision of the Act, § 709.338(6), is vague because the Act does not define "unnecessarily harassing." Plaintiffs contend that patients may hold diverse views as to what constitutes unnecessary harassment.  Plaintiffs argue that what conduct is prohibited thus depends on what a particular patient understands it to be, and that the resulting uncertainty as to what the Act prohibits "is not permissible under the First Amendment."  See Conant, 309 F.3d at 639 (holding a statute providing for administrative action against physicians who engage in speech that "the patient believes to be a recommendation of marijuana" lacks the requisite narrow specificity under the First Amendment) (citing Collins, 323 U.S. at 535, 65 S. Ct. at 325 (striking on First Amendment grounds a statute criminalizing solicitation of membership for certain unions without state license because the statute did not distinguish between solicitation and advocacy, and so "put[] the speaker . . . wholly

at the mercy of the varied understanding of his hearers and consequently of whatever inference may be drawn as to his intent and meaning")).

However, the term "harass" has an ordinary meaning that is readily clear to persons of common intelligence: "harass" means "[t]o disturb or irritate persistently."  American Heritage Dictionary of the English Language, supra, at 600.  When read in the context of the Act as a whole, the harassment provision communicates that health care providers should not disparage firearm-owning patients, and should not continue over a patient's objection to attempt to speak to the patient about firearm ownership when not relevant to medical care or safety.  Like the other provisions of the Act, the harassment provision targets physicians who wish to pursue an agenda unrelated to medical care or safety.

Although the District Court found that the modifier "unnecessarily" rendered the harassment provision vague, we disagree.  The modifier in fact allows physicians the freedom to challenge—i.e., "harass"— patients regarding firearms when doing so is necessary for health or safety reasons, even if the patient might find the physicians' advice unwelcome.  For example, if a patient is suicidal, a physician may wish to attempt to persuade the patient to remove firearms from the patient's home, even if the patient initially objects.  Even if the patient considers the physician's health and safety advice related to firearms harassing, the inclusion

of the modifier "unnecessary" leaves room for physicians to deliver such advice when necessary, consistent with the Act's other provisions.

Plaintiffs' fears that physicians may face discipline for offending a patient's subjective sensibilities are therefore unfounded. Leaving aside that <u>Conant</u> and <u>Collins</u> did not turn on vagueness challenges, we note that patients by themselves cannot subject physicians to discipline. Patients may file a complaint which triggers an investigation by the Board, or they may bring a malpractice action, but so long as a physician is operating in good faith within the boundaries of good medical practice, and is providing only firearm safety advice which is relevant and necessary, he or she need not fear discipline at the hands of the Board or a money judgment in a court of law. Thus, the harassment provision of the Act is not vague.

Persons of "common intelligence" need not guess as to the meaning of any of the four challenged provisions of the Act. <u>See</u> <u>Harris</u>, 564 F.3d at 1310. Thus, we hold that the District Court erred in finding the record-keeping, inquiry, and harassment provisions void for vagueness.

IV.

Accordingly, we REVERSE the District Court's grant of summary judgment in favor of Plaintiffs, and VACATE the injunction against enforcement of the Act.

SO ORDERED.

WILSON, Circuit Judge, dissenting:

Numerous medical organizations, including the American Medical Association (AMA), view firearm related deaths and injuries as a serious public health problem with particularly pernicious effects on children.  These organizations believe that this public health problem can be alleviated by providing people, particularly children and their parents, with information about firearm safety.[1]  Accordingly, the AMA has, among other things, adopted a policy encouraging "members to inquire as to the presence of household firearms as a part of childproofing the home."  Prevention of Firearm Accidents in Children, AMA Policy H-145.990.  From the AMA's perspective, this inquiry could not be more vital, as the policies are specifically designed to "reduce pediatric firearm morbidity and mortality."  *Id.*

Consistent with their beliefs about how best to address this public health problem, a number of Florida doctors, including plaintiffs, followed the AMA's advice.  They routinely spoke with patients about firearms, asking patients if

---

[1] *See* Christine S. Moyer, "Public Health Approach: Physicians Aim to Prevent Gun Violence," *American Medical News*, Sept. 10, 2012, *available at* http://www.amednews.com. *American Medical News* is published by the AMA.  Moyer's article describes efforts in the medical community to reduce firearm related injuries by using preventive care methods that have been used to address other public health problems such as motor vehicle accidents, smoking, and the spread of diseases.

firearms were present in the home in order to specifically tailor follow-up safety information.  There is no doubt that many doctors genuinely believe that these conversations can help protect their patients and the public.  Indeed, some doctors believed these conversations to be so important that they were willing to lose the business of patients who refused to engage.

In response to complaints by patients who found doctors' questioning and counseling on the subject of firearms to be irritating, offensive, and overly political, Florida passed the Firearm Owners' Privacy Act (Act).  Simply put, the Act is a gag order that prevents doctors from even asking the first question in a conversation about firearms.  The Act prohibits or significantly chills doctors from expressing their views and providing information to patients about one topic and one topic only, firearms.

Regardless of whether we agree with the message conveyed by doctors to patients about firearms, I think it is perfectly clear that doctors have a First Amendment right to convey that message.  This Act significantly infringes upon that right, and it is therefore subject, at the very least, to intermediate scrutiny.  Subject to this level of scrutiny, the Act cannot pass constitutional muster.

The State's asserted interests in protecting the rights of firearm owners, including their privacy rights, their rights to be free from harassment and

discrimination, and their ability to access medical care, are incredibly important.

Were the Act necessary to protect those rights, I believe the Act might survive an

intermediate scrutiny challenge.  But the State has offered no evidence to show that

those rights are under threat, nor is there evidence in the record suggesting that the

Act will either directly or materially advances those interests.

Further, those interests must be weighed against doctors' rights to convey

their chosen message about firearm safety and to play their chosen role in

addressing what they view to be a public health crisis.  If there is disagreement in

the medical community with the plaintiffs' view that providing patients with

information about firearm safety is good for public health, it is certainly not

presented in the record before us.[2]  Indeed, the record and common sense lead

---

[2] At its annual meeting in August of 2012, the American Bar Association (ABA) adopted
Resolution 111,

> oppos[ing] governmental actions and policies that limit the rights of physicians
> and other health care providers to inquire of their patients whether they possess
> guns and how they are secured in the home or to counsel their patients about the
> dangers of guns in the home and safe practices to avoid those dangers.

Citing the AMA policy quoted above, the ABA specifically recognized that

> [p]reventive care through safety counseling is a pillar of modern medicine, and is
> vitally important to the health and welfare of patients.  It is also the ethical and
> legal responsibility of physicians.  Failure to fulfill these duties results in a breach
> of the objective standard of care owed to patients. . . .  Firearms in the home are
> another known risk factor that doctors may choose to discuss with their patients or
> the parents of young patients.

inexorably to the conclusion that children will suffer fewer firearm related injuries if they—and their parents—know more about firearm safety. But now they will know less. As a result of the Act, there is no doubt that many doctors in Florida will significantly curtail, if not altogether cease, discussions with patients about firearms and firearm safety.

Thus, while the Act does not advance the State's asserted interests, the Act does significantly limit doctors' ability to speak to their patients in ways that they believe will protect the public and save lives. The poor fit between what the Act actually does and the interests it purportedly serves belies Florida's true purpose in passing this Act: silencing doctors' disfavored message about firearm safety. This, the State cannot do.

The district court properly invalidated the Act as a content-, speaker-, and viewpoint-based restriction that "chills practitioners' speech in a way that impairs the provision of medical care and may ultimately harm the patient." *Wollschlaeger v. Farmer*, 880 F. Supp. 2d 1251, 1267 (S.D. Fla., 2012). In an unprecedented decision, the Majority reverses and holds that this law is immune from First Amendment scrutiny. This is so because the State labeled the speech it wished to quell "conduct" and the speakers it wished to silence "professionals," and because these professionals were prohibited only from speaking privately to patients.

69

Precedent firmly establishes that the speech proscribed or chilled by this Act—
speech that ranges from potentially lifesaving medical information conveyed from
doctor to patient, to political discussions between private citizens, to conversations
between people who enjoy speaking freely with each other about a host of
irrelevant topics—is protected by the First Amendment.

I would affirm the district court's order, and I therefore respectfully dissent.

## I.

The Act contains four provisions at issue in this appeal.  (1) The "record
keeping provision" states that doctors cannot record firearm-related information in
medical files that they "know" not to be "relevant."  Fla. Stat. § 790.338(1).  (2)
The "inquiry provision" states that doctors "shall respect a patient's right to
privacy and should refrain" from asking patients about firearm ownership, unless
the doctor believes in good faith that the information is medically relevant.  Fla.
Stat. § 790.338(2).  (3) The "discrimination provision" states that practitioners
"may not discriminate" against patients on the basis of firearm ownership.  Fla.
Stat. § 790.338(5).  (4) Finally, the "harassment provision" states that practitioners
"shall respect a patient's legal right to own or possess a firearm and should refrain
from unnecessarily harassing" patients about firearm ownership.  Fla. Stat. §
790.338(6).

This Act was passed in response to constituent complaints about the manner and extent to which doctors were discussing firearm ownership with patients. Specifically, as the State explains:

> [A]ctual discrimination experienced by gun owners in Florida directly motivated the Legislature to pass the Act.  Among other things, the Legislature heard that: a woman was given 30 days to find a new physician after she refused to answer questions about firearms in her home; a patient was asked by a physician to remove firearms from his home; a facility separated a mother from her children while interrogating them about firearms; a physician refused to care for a nine-year-old boy because he wanted to know about firearms in the home; citizens were falsely told that Medicaid required them to disclose their firearm ownership and would not pay if they refused to answer; a doctor refused to examine a child when the mother refused to answer firearms questions; and a facility billed for services not delivered after a family refused to answer questions about their firearms.

> These experiences show that the Legislature's action in passing the Act overwhelmingly was based on real concerns about protecting constituent privacy and preventing discrimination and harassment during doctor's visits.

A Legislator's own experience was similar: "After answering a pediatrician's question about gun ownership, the pediatrician asked that [the Legislator] remove the gun from his home.  To the [L]egislator, the doctor's conduct constituted 'a political . . . attack on the constitutional right to own a . . . firearm.'"  A National Rifle Association representative also complained that questioning patients about gun ownership "to satisfy a political agenda needs to

stop." The State asserts that these are examples of what the Act was designed to stop.

Tellingly, the State attempts on appeal to narrow the scope of the Act—though it does so inconsistently. In any event, the Supreme Court has explained that a law restricting speech may be rendered unconstitutional based on "the inevitable effect of [the] statute on its face . . . [or its] stated purposes." *Sorrell v. IMS Health Inc.*, __ U.S. __, 131 S. Ct. 2653, 2663 (2011) (internal quotation marks omitted). Therefore, in assessing the constitutionality of the Act, we cannot ignore that this Act will inevitably silence doctors on the topic of firearms in all but the rarest of circumstances. Doctors risk losing their licenses if they are found to have violated the Act, so they cannot safely assume that the State will only advance the narrow reading of the Act it suggests here.

In a revealing portion of its brief, the State asserts that the "Act *proscribes* only inquiries within the doctor-patient relationship and recordkeeping about firearms that is not relevant to medical and safety concerns."[3] At this point,

---

[3] Here is one of the State's contradictions. Elsewhere in its briefing, the State asserts that the inquiry provision is not, as it just stated, a proscription but is instead merely advisory. From a doctor's perspective, however, the Act must be treated as mandatory. Indeed, the Executive Director of the body responsible for enforcing the Act, the Board of Medicine of the Florida Department of Health (Board), mailed a letter to physicians stating that the inquiry provision was mandatory. But in a change of course, the Board posted to its website shortly after Appellees filed suit that, in fact, the provision was only advisory. The State's argument that the provision

difficulties arise because Appellees and the State have different definitions of

"relevant."  Many doctors and medical organizations assert that it is always

relevant to ask about—and thus, to record—firearm-ownership information.  As

discussed, the AMA, as well as the American Academy of Pediatrics, its Florida

chapter, the American Academy of Family Physicians, its Florida chapter, the

American College of Physicians, and its Florida chapter all recommend providing

counseling and guidance on a variety of injury-prevention topics including firearm

safety.  Doctors thus quite legitimately insist that asking firearm-related questions

as a matter of course and recording the information in medical files is good for

their patients' health and for the public's safety.

    As the incidents discussed in the legislative history suggest, however, the

Act was apparently designed to prohibit doctors from routinely asking about

firearm ownership on prescreening, informational forms.  Appellees rightly

suspect, despite the State's present assurance to the contrary, that the standard of

---

is only advisory is not a bad one, because unlike other provisions which use the clearly
mandatory word "shall," the inquiry provision uses the ambiguous word "should."  But it would
be extremely risky for doctors to rely on this interpretation, given that the timing of the Board's
change in course suggests that it may only have been part of the State's litigation strategy.  There
are no assurances that, once this litigation ends, the Board will not revert back to its broader
interpretation.  Further, the State interprets the same word ("should") to be mandatory in the
context of interpreting the harassment provision—though the State vacillates on this
interpretation, as well.

relevance contemplated by the Act is higher than the Appellees' own standard. Consequently, for purposes of assessing the Act's constitutionality, I assume that many doctors, absent some particularized fact or circumstance indicating that firearm ownership is particularly relevant, will stop asking about and recording this information.[4]

The Act also prohibits "discrimination" on the basis of gun ownership. One might reasonably expect, based on the incidents that prompted passage of the Act, that this provision bars doctors from declining to treat a patient who refuses to answer questions regarding firearm ownership. The Act explicitly affords doctors the continued right to refuse to treat such patients, however, *see* Fla. Stat. § 790.338(4), so the Legislature apparently intended to prevent other forms of discrimination when it passed the Act. The State asserts that "actual *discrimination* experienced by gun owners in Florida directly motivated the

---

[4] It appears that the Act determines as a matter of State law that firearm ownership is not medically relevant in all cases for preventive medicine purposes. Elsewhere in its briefing, however, the State emphasized that the Act specifically allows doctors to ask about firearms whenever they believe "in good faith" that the information is relevant and to record such information unless they "know" it to be irrelevant. From this, the State concludes that "the Legislature enabled physicians to make these inquiries *of any or all patients*" if the doctor holds a different view of medical relevance than the State. This interpretation, of course, would *allow* the inquiries detailed in the legislative history; precisely the same inquiries the State previously stated that the Act was designed to prevent. Given this uncertainty, doctors who wish to ask about firearm ownership in all cases would be taking a significant risk if they continued to do so.

A bit more is said on this point in Part IV, *infra*, in relation to my brief discussion on vagueness.

Legislature to pass the Act." This statement is followed by the list of incidents contained in the legislative history. As noted above, the State also explained that the Act was passed in response to questioning about gun ownership and follow-up recommendations to make such ownership safer, including recommendations to remove guns from the home entirely. These discussions, which some constituents and Legislators perceive to be a political attack, could be viewed as discriminatory. Based on their status as gun owners, some patients are subjected to uncomfortable conversations about firearms, while others are not. Because the State explicitly acknowledges that the legislative history provides examples of what constitutes discrimination, doctors reasonably fear punishment for discrimination under the Act for speaking as the doctors did in the above-cited incidents. Accordingly, the discrimination provision, like the record keeping and inquiry provisions, will cause doctors not to ask about or make recommendations regarding firearm ownership, particularly if patients are initially resistant to information on this topic.[5]

---

[5] Given the overall purpose of the Act and the Act's legislative history—considered in light of the State's assertions that that legislative history is illustrative of what constitutes "discrimination"—we must view the harassment and discrimination provisions as designed to reinforce the inquiry and record keeping provisions. Moreover, the fact that the Act explicitly allows the primary form of discrimination that actually occurred—that is, doctors turning away patients who refused to answer questions about firearms—belies the notion that the discrimination provision is meant to address *actual* discrimination experienced by firearm owners. It may indeed prohibit some of the discriminatory conduct that the State speculates *might* occur, and it would not create a constitutional problem if that is all it did. In this context,

The harassment provision chills doctors' speech even further.  The State explains that "the Legislature enabled physicians to make [firearm ownership] inquiries of *any or all patients*, provided they do so with the belief that the inquiry is relevant to the patient's care.  Logically then, if a physician seeks firearms information to suit only a political agenda unrelated to the patient's well-being, . . . he *may be unnecessarily harassing his patient . . . .*"  As Appellees' brief explains, consistent with AMA policy, many doctors believe that asking about firearm ownership is related to the patient's well-being in all cases, which is why questions about firearm ownership were asked by many doctors before the passage of this Act.  As the legislative history makes clear, however, these routine inquiries and the follow-up conversations they prompted were deemed by constituents and Legislators to be part of an anti-firearm political agenda which the State defines in its briefing as unnecessary harassment.

Most of the incidents discussed in the legislative history appear to involve nothing more than a disagreement between the doctor, who perceived the gun-related information to be relevant to the patient's well-being, and the patient, who perceived the information to be part of an unwelcome political attack.  The

---

however, it is difficult to see the discrimination provision as anything other than reinforcement of the other provisions prohibiting doctors from saying and writing certain things.

harassment provision of the Act suggests that the State has taken the patients' side in this disagreement.  There is nothing to suggest that the doctors' inquiries or messages regarding firearms were not genuinely believed to be in the patients' best medical interest when given.  But there is evidence in the legislative history to suggest that the harassment provision is designed to prevent these conversations from taking place in the future.  That is certainly the result it will achieve.  Doctors will largely cease inquiring into and counselling on the topic of firearms, lest they be accused of crossing the line between providing life-saving preventive medical information and promoting an anti-firearm political agenda.[6]

Under this Act, then, one group of speakers, medical professionals, is prohibited or at least chilled from engaging in a great deal of speech about one topic, firearms.  Doctors cannot ask routine questions about firearm ownership of

---

[6] In its initial brief, the State asserted (most, though not all of the time) that the word "should" in the inquiry provision rendered the provision purely advisory.  Regarding the harassment provision, which included the exact same word, "should," the State asserted that the provision "*prohibit[s]* facilities and practitioners from . . . unnecessarily harassing patients who own guns."  The same word used in the same statute rendered one provision advisory but the other mandatory.  In an effort to correct this contradiction, the State asserted in its Reply Brief that "the Legislature provided physicians with the freedom to . . . unnecessarily harass patients about firearms, while . . . *suggesting* that they not broach these areas."  If the State cannot even decide from one brief to the next whether the Act prohibits or merely advises against unnecessarily harassing patients, doctors certainly cannot rely on the State's self-contradictory assurances that they will not seek to punish doctors under the harassment provision for speaking in ways that some constituents deem to be political.  As Judge Tjoflat recognized at oral argument, these rules will simply cause doctors to "steer clear."

all incoming patients as they did before, despite the fact that a host of medical associations suggest that they should.  Doctors cannot record information about their patients' firearm ownership in highly-confidential medical files, even though the information may later prove essential to the doctor in a medical malpractice suit or to the patient in an emergency situation.  Doctors also cannot provide firearm safety information and advice without running the risk of facing discipline if their medical efforts are construed to be part of a political agenda.  Though the State offers reasons to believe that the Act might not be interpreted to prohibit all of these things, at various points in its briefing, the State accepts that these forms of speech are the intended targets of this Act.  Under a reasonable interpretation of the Act, then, doctors are potentially subject to discipline for talking about firearms with their patients in all but a few narrow circumstances.

One final observation is in order regarding the Act's interpretation.  The State deemed the district court's decision to treat the inquiry and harassment provisions as mandatory rather than advisory as an intentional "effort to render the Act unconstitutional."  The Majority, however, accepts the district court's interpretation that the inquiry and harassment provisions are mandatory.  Thus, despite accepting an interpretation of the Act that even the State suggests would "render the Act unconstitutional," the Majority strikingly holds that the Act is valid

and is not even subject to First Amendment scrutiny.  In other words, the Majority has gone further in limiting speech rights than the State argued it should or could.

## II.

The Act proscribes speech about one topic (firearms) by one group of speakers (medical professionals).  Despite this, the Majority concludes that the Act entirely evades First Amendment scrutiny because the speech occurs in private and within the confines of a doctor-patient relationship.  Precedent undermines this conclusion.  Supreme Court authority consistently subjects content-, speaker-, and viewpoint-based restrictions to at least intermediate First Amendment scrutiny.  I believe we should decide this case based on this straightforward authority.

## A.

Recently, in *Sorrell*, the Court invalidated a "statute [that] disfavors marketing, that is, speech with a particular content.  More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers."  131 S. Ct. at 2663.  Here, the Act directly prohibits firearm related inquiries and record keeping, as well as persistent discussions on the topic,[7] "that is, speech with a particular

---

[7] The Majority defines "to harass" as "[t]o disturb or irritate persistently."  Many firearm owners—as evidenced by the legislative history—are irritated by virtually all discussions with their doctors about firearms.  Thus, doctors "harass" their patients by persistently discussing firearms.

content.  More than that, the statute disfavors specific speakers, namely," doctors.
*See id.*  Thus, "[t]he law on its face burdens disfavored speech by disfavored
speakers, [and] [i]t follows that heightened judicial scrutiny is warranted."  *Id.* at
2663–64.  Indeed, "[t]he First Amendment requires heightened scrutiny *whenever*
the government creates a regulation of speech because of disagreement with the
message it conveys."  *Id.* at 2664 (emphasis added) (internal quotation marks
omitted).  The word "whenever" does not invite exceptions, but the Majority
creates one anyway.  Notwithstanding the Court's command, the Majority
concludes that *no* First Amendment scrutiny applies even when a message is
regulated based on disagreement with its content, so long as the message is
delivered in private from a doctor to her patient.

Modifying the level of scrutiny applicable to content-based restrictions in
this manner is "startling and dangerous," and courts are not to adopt "free-floating
test[s] for First Amendment coverage" in light of the substantial and expansive
threats to free speech posed by content-based restrictions.  *United States v. Stevens*,
559 U.S. 460, 470, 130 S. Ct. 1577, 1585 (2010); *see also United States v. Alvarez*,
__ U.S. __, 132 S. Ct. 2537, 2544 (2012) (plurality opinion).  Indeed, "content-
based restrictions on speech have been permitted, as a general matter, only when
confined to the few historic and traditional categories of expression long familiar

to the bar." *Alvarez*, 132 S. Ct. at 2544 (internal quotation marks omitted).  Private

speech between doctors and patients does not make this list—a list reserved for

things like obscenity, defamation, inciting violence, speech integral to criminal

conduct, child pornography, and fraud.  *See id.*

Precedent also forbids creating exceptions to First Amendment review out of

whole cloth: "the First Amendment stands against any 'freewheeling authority to

declare new categories of speech outside the scope of the First Amendment.'

*Stevens*, 559 U.S. at [472], 130 S. Ct., at 1586."  *Alvarez*, 132 S. Ct. at 2547.  But

creating a new category of speech immune from First Amendment review is

exactly what the Majority has done here.  "Before exempting a category of speech

from the normal prohibition on content-based restrictions . . . the Court must be

presented with 'persuasive evidence that a novel restriction on content is part of a

long (if heretofore unrecognized) tradition of proscription,' *Brown v.*

*Entertainment Merchants Assn.*, 564 U.S. ___, ___, 131 S. Ct. 2729, 2734 . . .

(2011)."  *Alvarez*, 132 S. Ct. at 2547.

If anything, the speech restricted here is part of a tradition of exceptional

protection, and it certainly is not within an area traditionally subject to

"proscription."  The Court has explicitly recognized the importance of a free flow

of information between doctor and patient, which this Act explicitly and directly

limits.  "[T]he physician must know all that a patient can articulate in order to identify and to treat disease; barriers to full disclosure would impair diagnosis and treatment."  *Trammel v. United States*, 445 U.S. 40, 51, 100 S. Ct. 906, 913 (1980). Relatedly, a "consumer's concern for the free flow of . . . speech . . . has great relevance in the fields of medicine and public health, where information can save lives."  *Sorrell*, 131 S. Ct. at 2664 (internal quotation marks omitted).

And even if we assume that only speech which the State defines as medically irrelevant will be proscribed, Justice White's concurrence in *Lowe v. S.E.C.*, upon which the Majority heavily relies, explains that while "the [S]tate may prohibit the pursuit of medicine as an occupation without its license, . . . I do not think it could make it a crime publicly *or privately* to speak urging persons to follow or reject any school of medical thought."  472 U.S. 181, 231, 105 S. Ct. 2557, 2584 (1985) (White, J., concurring) (emphasis added) (internal quotation marks omitted).  Under the Act, doctors run the serious risk of being disciplined for harassing patients by pushing a "political agenda" if they speak (too forcefully or persistently) to their patients about schools of medical thought which deem firearm ownership relevant.  Based on the Majority's holding, doctors could be prohibited in the future from speaking to their patients about any particular topic,

including the virtues of any school of medical thought, because such conversations are, strictly speaking, irrelevant to a patient's care.

More disturbingly, under the rule announced by the Majority, any law burdening or eliminating speech will avoid First Amendment scrutiny so long as the law only applies within the confines of a one-on-one professional relationship. Then, according to the Majority, the speech is merely professional conduct and is entirely unprotected. States are left free to eliminate all irrelevant speech from a doctor's office, all relevant speech from a doctor's office, or just that speech which conflicts with the State's preferred viewpoints. Under the Majority's new exception to content-based restrictions, if the State believes that doctors are complaining to their patients that the Act itself is bad for public safety, the State could pass a law banning doctors from speaking about the Act to patients—so long as the State asserts that these complaints are irrelevant to medical care. Such a law would not be subject to First Amendment scrutiny. Nor would First Amendment scrutiny apply to an act barring doctors from talking to their patients about the Affordable Care Act, Medicare or Medicaid, medical malpractice laws, or any other topic whatsoever.

This suggests a second reason why the speech being silenced here deserves a higher place in the First Amendment hierarchy. Greater protections are afforded to

83

speech dealing with matters of public concern, which include "any matter of political, social, or other concern to the community." *Snyder v. Phelps*, __ U.S. __, 131 S. Ct. 1207, 1216 (2011) (internal quotation marks omitted).  Firearm safety qualifies as a public concern under that standard.  So, too, does state regulation of health care.  Under the Act, speech by Florida doctors to their patients regarding the former is almost entirely prohibited, and speech about the latter, as it relates to the Act itself, is significantly chilled lest a doctor's complaint about the Act be perceived as harassing, anti-gun politicking.  Further, under the Majority's holding, speech about the latter could be eliminated entirely from the doctor-patient relationship.[8]

---

[8] *Snyder* also explains that "whether speech is of public or private concern requires us to examine the content, form, and context of that speech." 131 S. Ct. at 1216 (internal quotation marks omitted).  The content of the speech prohibited by the Act certainly concerns the public, as the speech prohibited by this Act has been recognized by the AMA to be part of an effort to address a public health problem.  The form and context perhaps cut in the opposite direction, but not necessarily.  When a doctor speaks in private to her patients about a topic like firearm safety during the course of an examination, the message may have a fairly significant impact on the patients' views about guns because doctors are trusted, knowledgeable, and presumably genuinely interested in the health consequences of firearms rather than the political consequences of them.  To many listeners, even those well-attuned to Second Amendment political debates, a doctor's advice could offer a new, perhaps previously unconsidered perspective that may well change public views as well as personal practices.  The State was no doubt aware of the great influence doctors' knowledge and information sharing might have on the public firearm debate, and because the State disagreed with the doctors' powerful message, it silenced them.

On topics concerning public health, doctors' ability to inform their patients one-on-one about the consequences of legislation—an area of speech that the Majority's holding would allow to be restricted without First Amendment review—seems even more clearly to be a matter of public concern, even though the speech is conveyed in private.

Further still, "the law's express purpose and practical effect are to diminish the effectiveness" of firearm safety messages delivered by doctors. *Sorrell*, 131 S. Ct. at 2663 (explaining that "the inevitable effect of a statute on its face" and "a statute's stated purposes" may be considered for purposes of evaluating constitutionality (internal quotation marks omitted)). Doctors asked patients about firearms in order to give specifically tailored—and thus more effective—firearm safety information. Indeed, amicus curiae supporting the State's legislation explain that the Act is necessary because a "doctor's questions can interfere with patients' exercise of the right [to bear arms] by putting patients in a hesitant position where *they question their ownership of firearms* because of physician disapproval." That statement is staggering. It suggests that the perceived problem with doctors' truthful, non-misleading message regarding firearm safety was that it was working, so the message was silenced. That is classic viewpoint discrimination.

Despite the State's contention that pro-gun doctors are silenced on the topic just as surely as anti-gun doctors, the Act's legislative history erases any doubt as to which viewpoint the State sought to silence. As discussed, the legislative history confirms that the purpose of the Act was to silence firearm-safety messages that were perceived as "political attacks" and as part of a "political agenda" *against*

85

firearm ownership.  Thus, "[i]n its practical operation, [Florida's] law goes even beyond mere content discrimination, to actual viewpoint discrimination."  *Id.* (internal quotation marks omitted).  "It follows that heightened judicial scrutiny is warranted."  *Id.* at 2664.

The Supreme Court has recognized that "[i]t is rare that a regulation restricting speech because of its content will ever be permissible."  *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818, 120 S. Ct. 1878, 1889 (2000).  Content-based statutes, therefore, "are presumptively invalid."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542 (1992).  Based on the foregoing, the only choice I believe we have to make is one between strict and intermediate First Amendment scrutiny.  As Part III below shows, the Act is unconstitutional under either standard so deciding between the two is unnecessary.

## B.

Against the great weight of this authority, the Majority disagrees and instead suggests that these content-, speaker-, and viewpoint-based regulations do not implicate the First Amendment.  Accordingly, the Majority applies rational-basis review.  Most of the cases cited by the Majority, however, do not involve content-based regulations, and the only cases cited that do, *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S. Ct. 2791 (1992), and

86

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2013), directly contradict the Majority's conclusion.

## 1.

The Majority's analysis begins with Justice White's concurrence in *Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring), and *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011).  As will be shown, these cases stand for the proposition that a law regulating professional conduct that burdens speech may evade First Amendment scrutiny only when: (1) the law is a licensing scheme regulating entry into a profession; (2) the impact on speech (an impact felt only by unlicensed, would-be practitioners) is incidental to a broader State goal (ensuring the quality of the State's professionals); (3) the burden on speech is content-neutral; and (4) the prohibition on unlicensed individuals' speech does not extend beyond the confines of a one-on-one professional-client relationship.  Only the fourth condition is present here.  Thus these cases are readily distinguishable.

The Majority is correct that some laws burdening speech evade First Amendment scrutiny where the burdens occur within a professional setting.  *See Locke*, 634 F.3d at 1191 ("'If the government enacts generally applicable licensing provisions limiting the class of persons who may practice the profession, it *cannot be said to have enacted a limitation on freedom of speech . . . subject to First*

*Amendment scrutiny*.'" (alteration in original) (emphasis added) (quoting *Lowe*,

472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring))). Where this rule

applies, the law is subject only to rational basis review. *Lowe*, 472 U.S. at 228,

105 S. Ct. at 2582 (requiring only that the regulation "have a rational connection

with the applicant's fitness or capacity to practice the profession" (internal

quotation marks omitted)).

But I disagree with the Majority's conclusion that this rule applies here,

because, while there is one similarity between the regulations at issue in those

cases and the Act here, there are several critical differences.

The similarity is that *Lowe*, *Locke*, and this case all consider speech that

occurs within the confines of a one-on-one professional relationship. In *Lowe*, the

defendant was accused of providing investment advice without a license, in

violation of federal law. *Id.* at 227, 105 S. Ct. at 2582. Justice White considered

the First Amendment implications of the fact that the investment "advice" was

published broadly, suggesting that Lowe might not be not engaged in the practice

of investment advising at all. *Id.* Ultimately, Justice White concluded that the

First Amendment protected Lowe's right to convey this investment-related

information for a profit, even if he had no license. *Id.* at 233, 105 S. Ct. at 2584–

85. In discussing the First Amendment implications of licensing schemes

88

generally, Justice White concluded that a professional who "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances is properly viewed as engaging in the practice of a profession." *Id.* at 232, 105 S. Ct. at 2584. On the other hand,

> [w]here the personal nexus between professional and client does not exist, and a speaker does not purport to be exercising judgment on behalf of any particular individual with whose circumstances he is directly acquainted, government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment[] . . . .

*Id.* Justice White concluded that because the defendant's activities fell into the latter category, the First Amendment applied.

The Majority reasons that if a person who is *not* operating within the confines of a professional relationship has First Amendment protections, then a person who *is* operating within the confines of such a relationship has *no* First Amendment protections. This logic is faulty. *Lowe* established only that the existence of a professional relationship is a *necessary* condition if a law burdening speech is to evade First Amendment scrutiny. Nothing in *Lowe* implied that such a

condition was *sufficient* to support this conclusion.[9]  In fact, *Lowe* suggests three

more conditions, all of which have been present in subsequent cases applying

*Lowe*'s rule, and none of which are present here.[10]

   In addition to the above condition, *Lowe* also contemplated that speech

would be burdened without First Amendment scrutiny only if the burden was a

consequence of a professional licensing scheme.  *Id.* at 229, 105 S. Ct. at 2583

(discussing "the principle that the government may restrict entry into professions

and vocations through *licensing schemes*" (emphasis added)).  And there is a third

condition, which recognizes that the government's ability to burden speech through

a licensing scheme without implicating the First Amendment "has never been

extended to encompass the licensing of speech *per se* or of the press."  *Id.* at 229–

30, 105 S. Ct. at 2583.  This reasoning has developed into a rule that "any

inhibition [must be] merely the *incidental effect* of observing an otherwise

legitimate regulation."  *Locke*, 634 F.3d at 1191 (emphasis added) (internal

quotation marks omitted).  In cases contemplated by *Lowe* (and subsequently,

---

[9] Justice White recognized only that "[t]he power of government to regulate the professions is not lost whenever the practice of a profession entails speech."  *Id.* at 228, 105 S. Ct. at 2582.  From this the Majority reads the far broader principle that the right of the professional to speak is lost whenever he is practicing his profession.  This conclusion does not follow from Justice White's statement in *Lowe*.

[10] There is one exception from the Ninth Circuit, which is readily distinguishable from the instant case, as will be discussed below.

*Locke*), the State's regulation was not directed at speech but instead at improving the overall quality of a profession, broadly speaking, by ensuring that only qualified individuals practice the profession. *See, e.g.*, *id.* (relying on *Lowe* to uphold a statute restricting the practice of interior design to licensed professionals); *Accountant's Soc'y of Va. v. Bowman*, 860 F.2d 602, 604 (4th Cir. 1988) (relying on Justice White's reasoning in *Lowe* to uphold a statute restricting the use of certain terms in the work product of unlicensed accountants).

A fourth and final condition that is implicit in the rule contemplated in *Lowe* is content-neutrality—at least to a far greater extent than is present here. To be sure, the SEC's prohibition applied only to the topic of investment advising, but within that field, it did not differentiate. It was not as if unlicensed advisers were left free to recommend investment products the government preferred—such as government bonds—but restricted from recommending anything else. Similarly, in *Locke*, unlicensed designers were not left free to recommend design techniques the government might prefer—such as energy saving, "green" designs—but restricted from recommending anything else. In this way, at least, the burden on speech in cases like *Lowe* is content-neutral.

Further, First Amendment scrutiny is not eliminated simply because burdened speech occurs in the course of conducting one's business as a

91

professional.  Even in cases involving speech that is spoken only in pursuit of

one's profession, the Court has applied intermediate First Amendment scrutiny.

*See Sorrell*, 131 S. Ct. at 2667–71 (applying intermediate First Amendment

scrutiny to a law prohibiting pharmacies from selling records of doctors'

prescribing patterns to pharmaceutical salespeople); *Fla. Bar v. Went For It, Inc.*,

515 U.S. 618, 620, 623–24, 115 S. Ct. 2371, 2374, 2375–76 (1995) (subjecting a

regulation prohibiting lawyers from engaging in certain forms of direct advertising

to intermediate First Amendment scrutiny); *cf. Holder v. Humanitarian Law

Project*, 561 U.S. 1, 28, 130 S. Ct. 2705, 2724 (2010) (recognizing that when

"conduct triggering coverage under the statute consists of communicating a

message," First Amendment scrutiny still applies).[11]

In *Locke*, all four conditions were satisfied.  The challenged provision was a

content-neutral professional licensing scheme applicable to interior designers that

incidentally burdened the speech of unlicensed designers by prohibiting them from

---

[11] The Majority's approach converts protected speech into unprotected conduct too freely. Even if speech may fairly be characterized as conduct, a regulation which targets conduct that consists almost entirely of speech is not immune from First Amendment scrutiny.  To be sure, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was *in part* initiated, evidenced, or carried out by means of language . . . ."  *Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring) (emphasis added) (internal quotation marks omitted).  If conduct is primarily carried out by language, however, it becomes difficult to claim that a regulation of that conduct creates merely an incidental burden on speech.  The speech then seems to fall under the rubric of commercial speech, subject to intermediate scrutiny.  *See, e.g.*, *Sorrell*, 131 S. Ct. at 2667–68.

giving one-on-one design advice. 634 F.3d at 1191. The four conditions from *Lowe* were met, and First Amendment scrutiny was not applied. *See also Lowe*, 472 U.S. at 228, 105 S. Ct. at 2582 (White, J., concurring) (recognizing that First Amendment scrutiny does not apply to "[r]egulations *on entry into a profession*" (emphasis added)). With one readily distinguishable exception, the only cases cited by the Majority in which *Lowe* is applied involve this same, narrow set of circumstances where an unlicensed individual is challenging some restriction on his or her ability to engage in a regulated profession. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1429–30 (11th Cir. 1998) (restricting disbarred attorneys from practicing law); *Bowman*, 860 F.2d at 604 (restricting the use of certain terms in the work product of unlicensed accountants).

The Act here is distinguishable from all of these cases. It is not a licensing scheme, rendering *Locke* and *Lowe* inapposite, and the differences do not stop there. The Act's purpose is not to regulate the profession of medicine as a whole but rather to regulate one, narrow aspect of professional speech. Further, the Act does not incidentally burden speech as a consequence of the State's pursuit of improving the overall quality of the profession as a whole. Instead, the Act directly targets speech per se by licensed professionals, not just speech incidental

93

to the practice of a profession by the unlicensed.[12]  The Act prohibits inquiries,

record keeping, and unnecessarily harassing and discriminatory expression—which

may consist of nothing more than recommendations to store firearms more safely

or to remove them from homes with children if those recommendations are taken

to be "political attacks"—on one topic, firearm ownership and safety.  This of

course renders the Act content-based rather than content-neutral, distinguishing

this case even further from *Locke*.

The Majority offers only two reasons for extending *Lowe* beyond the narrow

context in which it has been previously applied.  First, it explains that a State's

concern for maintaining standards of professional conduct goes beyond initial

licensing.  This is of course true, but it in no way justifies the Majority's position

---

[12] Indeed, considering exactly what the inquiry provision purports to do shows how far removed the Act is from the scenario contemplated in *Lowe*.  The inquiry provision prohibits doctors from asking irrelevant questions about firearms.  For example, if a doctor and his patient have gotten to know each other over the years, the doctor may ask the patient whether he owns a firearm in order to see if the patient might like to go hunting.  That inquiry is plainly irrelevant to the patient's care, so it is an obvious example of what the inquiry provision prohibits.  The Majority relies on *Lowe* to conclude that the State's ban on such irrelevant inquiries implicates no First Amendment concerns, but *Lowe* directly states that such inquiries are speech, not professional conduct: "Where . . . a speaker does not purport to be exercising judgment on behalf of any particular individual," as would obviously be the case when a doctor is asking his patient if he owns a firearm because he wants to arrange a hunting trip, "government regulation ceases to function as legitimate regulation of professional practice with only incidental impact on speech; it becomes regulation of speaking or publishing as such, subject to the First Amendment[]."  472 U.S. at 232, 105 S. Ct. at 2584.  Thus, *Lowe* directly states that the inquiries prohibited by the Act are not legitimate regulations of professional conduct but are instead direct regulations of speech.

that *no* First Amendment scrutiny applies to laws like the Act that directly burden speech in pursuit of maintaining those standards.  Instead, regulations of this kind are subjected to intermediate scrutiny.  *See Went For It, Inc.*, 515 U.S. at 623, 115 S. Ct. at 2375–76 (applying intermediate scrutiny to a regulation limiting direct-mail solicitations by lawyers to victims in the wake of accidents which was justified as "an effort to protect the flagging reputations of Florida lawyers by preventing them from engaging in conduct that . . . is universally regarded as deplorable and beneath common decency" (internal quotation marks omitted)); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1074, 111 S. Ct. 2720, 2744 (1991) (applying "a less demanding standard" of First Amendment scrutiny to regulations limiting lawyers from speaking to the press about pending cases).  The Majority's second reason for extending *Lowe* is based on a misreading of *Casey*, which will be addressed in great detail below.  For now, it is enough to point out that the Majority explicitly recognizes that *Casey* does not apply the *Lowe* framework and that, contrary to the Majority's holding, *Casey* explicitly states that "First Amendment rights . . . are implicated" when the State burdens professional speech. 505 U.S. at 884, 112 S. Ct. at 2824.  Thus, the Majority is left with no basis for extending *Lowe* beyond the licensing context.

95

*Lowe*'s rationale has wisely not been extended—until now. *Lowe* articulated reasons for *limiting* government intrusion into free expression. It recognized only that a very narrow category of speech—speech by unlicensed professionals engaging in the one-on-one practice of a profession for which they are unqualified—could be incidentally burdened as a consequence of licensing an entire profession. The holding of *Lowe* and the purpose of Justice White's concurrence was to narrow that category, and thus to expand the free speech rights even of unlicensed professionals. By saying that unlicensed professionals' free speech rights expanded, *Lowe* was not implying that licensed professionals' free speech rights narrowed. The Supreme Court has explicitly warned against reading First Amendment case law in this way: "A rule designed to tolerate certain speech ought not blossom to become a rationale for a rule restricting it." *Alvarez*, 132 S. Ct. at 2545 (plurality opinion).

*Lowe*'s rationale further undermines the Majority's holding that licensed professionals do not enjoy First Amendment rights whenever they are speaking within the confines of a professional relationship. Justice White explained that

> a State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar. . . .
> . . . .
>    . . . Clients trust in investment advisers, if not for the protection of life and liberty, at least for the safekeeping and accumulation of

property.  Bad investment advice may . . . lead to ruinous losses for the client.  To protect investors, the Government . . . may require that investment advisers, like lawyers, evince the qualities of truth-speaking, honor, discretion, and fiduciary responsibility.

472 U.S. at 229, 105 S. Ct. at 2582–83 (White, J., concurring) (internal quotation marks omitted).  Licensed professionals thus occupied a venerated position in *Lowe*, as these professionals perform functions in society that cannot be trusted to just anyone.  And it was only because of this compelling rationale that the unqualified could be silenced at all.  The Majority's reliance on *Lowe* in this case is in deep tension with that rationale.  Far from venerating professionals who deliver what *Lowe* recognized to be critical advice, the Act here prohibits licensed medical professionals from exercising their judgment, making inquiries, and engaging in the kind of persistent counseling that they believe will improve the well-being of their patients.

Instead of recognizing that licensed professionals' speech is particularly valuable, the State's decision to silence certain speech is approved by the Majority precisely because the speakers are so qualified.  The State could not rely on the Majority's rationale to, for example, silence non-professionals, who are unqualified to give firearm safety advice, from making inquiries in private about firearm ownership, even though silencing that type of speaker is what *Lowe* envisioned.  Instead, the Majority's rationale would allow the State to silence any

97

and all professionals who *are* qualified to give such advice because their speech, when spoken in a private, professional setting is converted from protected private speech to unprotected professional conduct.  This turns *Lowe* on its head.

As amicus favoring the Act seemed to admit, doctors were silenced because their speech was causing patients to question whether the safety concerns associated with firearm ownership outweighed the benefits.  The Court has very recently rejected this as an appropriate rationale for silencing speech: "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers."  *Sorrell*, 131 S. Ct. at 2671.  It is thus clear that *Lowe* is distinguishable both factually and based on its rationale.  We should not set aside a compelling body of case law that consistently applies First Amendment scrutiny to content-based restrictions based on an extension of an inapplicable line of cases.

## 2.

*Casey* presents a much closer analogy, but it serves only to reaffirm that intermediate scrutiny is appropriate here.  The regulation in *Casey* compelled doctors to advise women seeking abortions about various health consequences and alternatives.  505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion).  The personal nexus between professional and client that exists here and that existed in *Locke* was also present in *Casey*.  Unlike *Locke*, however, *Casey* involved a regulation

targeted at speech about a specific topic within the medical profession rather than a general regulation restricting entry to the profession as a whole.  *Casey* is thus more analogous to this case and helpful in identifying the applicable level of scrutiny, though it is worth noting that the relevant First Amendment discussion consisted only of three sentences in a three-member opinion that did not speak for the Court.[13]

Though the Majority cites *Casey* in support of its extension of *Lowe*'s rule that the First Amendment is not implicated here, *Casey* actually stated the exact opposite: "First Amendment rights . . . are implicated."  505 U.S. at 884, 112 S. Ct. at 2824.  Thus, the Majority's conclusion that *Lowe* applies and that First Amendment rights are not implicated inside the confines of a one-on-one professional relationship is simply incorrect.  The Majority apparently drew its conclusion from *Locke*—where we held that the licensing requirement at issue "does *not* implicate . . . the First Amendment," 634 F.3d at 1191 (emphasis

---

[13] Justice O'Connor's opinion constituted the judgment of the Court as to Parts I, II, III, V-A, V-C, and VI only.  The First Amendment discussion falls in Part V-B, and Justice O'Connor was joined only by Justices Kennedy and Souter in this Part.

added)—and mistakenly conflated it with *Casey* even though, again, that case said the opposite.[14]

Thus, it is clear that unlike *Locke*, the regulation in *Casey* was subjected to some level of First Amendment scrutiny. Given the brevity of *Casey*'s First Amendment discussion, identifying what level of scrutiny was applied is difficult. *Casey* noted only that, although the First Amendment applied, the speech was "subject to reasonable licensing and regulation" because it was "part of the practice of medicine." 505 U.S. at 884, 112 S. Ct. at 2824 (plurality opinion). It is clear from this statement that strict scrutiny was not applied. *See, e.g.*, *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 575 (5th Cir. 2012) ("The plurality response to the compelled speech claim is clearly not a strict

---

[14] As the Majority recognizes, in "*Casey*, the Supreme Court—although without invoking the 'personal nexus' framework set forth in Justice White's *Lowe* concurrence and applied by this Court in *Locke*—upheld a statutory provision that directly regulated physicians' conversations with patients as a valid regulation of the practice of medicine." Maj. Op. at 49–50. That is of course true, but the fact that *Casey* upheld the provision does not mean that the provision was not subject to *any* First Amendment scrutiny. That Justice O'Connor's opinion in *Casey* did not apply Justice White's framework from *Lowe* is not an insignificant detail that can be cast aside. *Casey* did not apply Justice White's framework because Justice White's framework was inapplicable. That is why Justice White in *Lowe* and Justice O'Connor in *Casey* reached opposite conclusions about whether the First Amendment was implicated, and that is why the two opinions cannot be treated as if they applied the same level of scrutiny.

The only case cited by the Majority that extends *Lowe* beyond the licensing context, the Ninth Circuit's decision in *Pickup*, explicitly recognized that laws like the one at issue here and in *Casey* belong on "the midpoint of the continuum" of First Amendment protections. 740 F.3d at 1228. The Majority simply acts as if *Casey* placed the regulation there at the low end of the continuum, but it did not. We should not place the Act at the low end, either.

scrutiny analysis.").  The Fourth Circuit was more specific, and characterized *Casey* as applying "intermediate scrutiny."  *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 683 F.3d 539, 554 (4th Cir. 2012), *vacated on reh'g en banc on other grounds*, 721 F.3d 264 (4th Cir. 2013); *see also Pickup*, 740 F.3d at 1228 (placing *Casey* at the midpoint on the continuum of First Amendment protections).  Other Circuits have not definitively answered the question.

Although *Casey* did not explicitly state that intermediate scrutiny applied, I believe the Fourth and Ninth Circuits are correct.  Immediately before addressing the First Amendment issue, the Court in *Casey* recognized that the State had "a substantial government interest justifying a requirement that a woman be apprised of the health risks of abortion and childbirth."  505 U.S. at 882, 112 S. Ct. at 2823 (plurality opinion).  The requirement also advanced the "legitimate goal" of ensuring that women do not unwittingly suffer "devastating psychological consequences" of less-than-fully-informed decision making and "protecting the life of the unborn."  *Id.* at 882, 884, 112 S. Ct. at 2823–24.  To advance these goals, the Court found "legislation *aimed at* ensuring a decision that is mature and informed" to be constitutional.  *Id.* at 883, 112 S. Ct. at 2824 (emphasis added).  Further, the Court discussed the ways in which the speech requirement was narrowly drawn: it

101

was limited to "truthful and not misleading" information, and "the statute [did] not prevent the physician from exercising his or her medical judgment" not to provide the information in certain situations. *Id.* at 882, 884, 112 S. Ct. at 2823–24.

This analysis mirrors an intermediate scrutiny analysis and shows that the law in question passes constitutional muster under that standard. *See Sorrell*, 131 S. Ct. at 2667–68 (explaining that to survive intermediate scrutiny, "the State must show at least that the statute [1] directly advances [2] a substantial governmental interest and [3] that the measure is drawn to achieve that interest" (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S. Ct. 2453 (1980))). I therefore believe that *Casey* applied something akin to intermediate First Amendment scrutiny.

Even if *Casey* applied something less than intermediate scrutiny, *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 105 S. Ct. 2265 (1985), confirms that intermediate scrutiny applies here. In that case, the Court applied a "reasonable relation" standard of First Amendment review, similar—in wording, though not necessarily in form—to the one applied in *Casey*. *Id.* at 651, 105 S. Ct. at 2282 (holding that although the First Amendment was implicated, the regulation compelling disclosure of certain information in advertisements was constitutional as long as it was "reasonably related to the

State's interest"). *Zauderer* explained that the reasonableness standard applied there was less rigorous than intermediate scrutiny, *see id.* at 651 n.14, 105 S. Ct. at 2282 n.14, but the case highlights a distinction that proves intermediate scrutiny applies here, even if it did not in *Casey*. *Zauderer* recognized that a *restriction* on advertising would be subject to intermediate First Amendment scrutiny under the test applied in *Sorrell* and *Central Hudson*. *Id.* at 644, 105 S. Ct. at 2278. "Reasonableness" scrutiny applied only where the provision at issue *compelled* truthful speech but did not prohibit speech in any way. *Id.* at 651, 105 S. Ct. at 2281–82. Thus, when speech is *prohibited* rather than compelled, reasonableness-scrutiny is ratcheted up to intermediate scrutiny. *Casey* involved a provision compelling speech, while this case involves a prohibition on speech, so even if reasonableness scrutiny was applied in *Casey*, scrutiny should be ratcheted up to the intermediate level here.[15] This again confirms that a content-based restriction like the Act here will always receive at least intermediate scrutiny.

**3.**

---

[15] The significance of compelling speech as opposed to restricting it can be observed in *Casey* itself. It is difficult to imagine that a statute *prohibiting* a doctor from providing truthful, non-misleading information concerning the risks of abortion and abortion alternatives would survive a First Amendment challenge. Though under the Majority's approach, it certainly would because the Majority says the First Amendment does not apply to regulations on speech between doctors and patients, all of which is no more than unprotected professional conduct.

103

Two cases from the Ninth Circuit support this conclusion as well.  In *Conant v. Walters*, the court invalidated a federal regulation prohibiting doctors from recommending the use of medical marijuana after applying heightened First Amendment scrutiny.  309 F.3d 629, 632 (9th Cir. 2002).  Despite taking place within the confines of a doctor-patient relationship, the regulation was analyzed as a classic content-, speaker-, and viewpoint-based restriction.  *Id.* at 637, 639.  By contrast, in *Pickup v. Brown*, the court held that a California law prohibiting mental health professionals from offering sexual orientation change efforts (SOCE) therapy to minors was immune from First Amendment scrutiny, even though the therapy itself was carried out through words.  740 F.3d at 1225.

Distinguishing *Conant*, the court drew lines between a professional's public speech, *id.* at 1227, a professional's speech "within the confines of a professional relationship," *id.* at 1228 (citing *Casey* as an example of such speech, and noting that the burdened speech in that case fell on the *midpoint* of the continuum where First Amendment protections are diminished but not eliminated), and a professional's conduct which is carried out through speech, *id.* at 1229.  The regulation in *Conant*, which prohibited doctors from *recommending* medical marijuana, burdened speech that was entitled, at the very least, to intermediate First Amendment protections.  *Id.* at 1226–27.  At the same time, *Conant* recognized

104

that any speech burdened as a result of the law's ban on prescribing medical

marijuana fell into the third, unprotected category, *id.* at 1226, because the ban

targets professional conduct (i.e., giving patients drugs) and only incidentally

burdens speech (i.e., writing the name of a drug on a prescription pad).

Similarly, the court in *Pickup* concluded that SOCE therapy, though carried

out in verbal form, was indistinguishable from prescribing a drug or performing a

surgery.  In other words, the burdened speech was exclusively the functional

equivalent of the treatment itself.  Therefore, banning SOCE therapy was no

different than outlawing certain drugs, and the burden on speech (i.e., the ban on

speaking words that constitute SOCE therapy) was incidental and necessary to the

ban on the disfavored medical conduct (i.e., performing the therapy).  *Id.* at 1230.

*Pickup* recognized that the law at issue went no further in banning speech than

necessary to regulate the proscribed medical conduct.  Doctors' right to "express

their views to anyone, including minor patients and their parents, about any

subject, including SOCE," was explicitly protected by the act in question.  *Id.* at

1230.

The regulations here, like the regulations in *Casey* and *Conant*, burden

speech that fits, at the very least, into the intermediate category where First

Amendment protections apply.  To avoid this conclusion, the Majority lumps all

105

speech, so long as it occurs within the confines of a professional relationship—whether the speech is speech per se, speech about medically-related topics, or the functional equivalent of a medical procedure—into one, unprotected category.

By contrast, when the Ninth Circuit expanded *Lowe*'s reasoning in *Pickup*, it was very careful to narrowly circumscribe the category of speech that was left unprotected. Only speech that is the functional equivalent of performing a surgery or prescribing a drug can be burdened without scrutiny under *Pickup*. It is well worth noting that the speech burdened in *Casey* received intermediate scrutiny even though the speech was exclusively intended to fully inform patients about a medical procedure. Thus, even if speech that is the functional equivalent of medical treatment can be regulated without scrutiny, speech that is directly related to medical treatment does not fit within that category under *Pickup*.

Here, in stark contrast to *Pickup* where all of the burdened speech was the functional equivalent of providing a drug, none of the speech burdened by the Act fits in that exceedingly narrow category. Asking irrelevant questions about firearm ownership, recording the answers, or harassing a patient based on firearm ownership—by persistently and irritatingly discussing the subject—is nothing like giving a patient a drug or performing SOCE therapy. Further, some, though by no means all, of the speech burdened by the Act is similar to the speech burdened by

the regulation in *Casey*.  To the extent that the Act burdens speech designed to inform patients about the dangers of firearms or speech designed to inform patients of safer ways to own firearms, the speech is much like the speech in *Casey*. Accordingly, such speech should be given intermediate protections, but the Majority gives the speech no protection at all, blurring a line that, as the Ninth Circuit recognized, the Supreme Court itself required.  Worse still, while the law in *Casey exclusively* concerned speech necessary to fully inform patients about a medical procedure, the Act here also burdens speech that is unrelated to this purpose.  The Act bans irrelevant questioning and irritating politicking on the subject of firearm ownership, which by definition has nothing whatsoever to do with medical treatment or a medical procedure and is in no way designed to inform patients about anything of medical relevance.

Ultimately, then, the Majority treats speech that is nothing like medical conduct—either in the exceedingly narrow sense contemplated by *Pickup* or the somewhat broader sense contemplated by *Casey*—as unprotected medical conduct. Were the Majority's holding as narrow as *Pickup*'s, I would have fewer objections, though for reasons discussed below, I would still probably find it incorrect.  Were the Majority's holding as narrow as *Casey*, I would find it incorrect because the Majority uses a lower level of scrutiny than did the Court did in *Casey*, but today's

decision would be less objectionable if that were its only error.  Here, however, the Majority's holding not only decreases the level of scrutiny applied to regulations like the one in *Casey*, it also expands the category of speech that can be burdened without review.

Because the Act burdens such a broad swath of physician speech on the topic of firearms—including speech that by definition has nothing to do with medical treatment—*Conant*, which applied heightened scrutiny, is directly applicable.  Doctors have a First Amendment right to ask questions about firearms and to discuss—even persistently—the pros and cons of firearm ownership with their patients just as surely as they have the right to discuss the pros and cons of medical marijuana.  Such communication cannot be labelled unprotected conduct simply because it takes place within the confines of a professional relationship. *Pickup* does nothing to undermine this principle and in fact reaffirms it, 740 F.3d at 1228, though I make no comment on whether *Pickup* was correctly decided.[16]

---

[16] The Ninth Circuit's decision not to take the case en banc drew a spirited dissent, which stated that "[b]y labeling . . . speech as 'conduct,' the panel's opinion has entirely exempted such regulation from the First Amendment.  In so doing, the panel . . . insulates from First Amendment scrutiny California's prohibition—in the guise of a professional regulation—of politically unpopular expression."  740 F.3d at 1215 (O'Scannlain, J., dissenting from the denial of rehearing en banc).  I share the concern that the difference between the intermediate category (speech within the professional relationship that is related to medical conduct but is not itself conduct) and the unprotected category (conduct within the professional relationship that is

## 4.

By subjecting speech that is irrelevant to medical conduct to regulation without First Amendment scrutiny, under the guise of regulating professional conduct, the Majority holds that all speech between professionals and patients/clients—so long as it occurs within the confines of a one-on-one professional relationship—can be burdened by States without scrutiny.  Despite clearly reaching this holding, the Majority disputes those implications, so I must explain my point further.  I do not do so simply to identify a slippery slope.  Instead, this section shows that today's decision brings us to the bottom of that slope.  All private speech from professionals to patients/clients is, after today, subject to regulation without scrutiny.

Because the Majority holds that a State's direct regulation of speech from doctor to patient about a particular topic draws only rational basis review, then, regardless of whether the State here has actually banned *all* speech by doctors to

---

carried out through speech) may prove to be illusory.  The Majority proves the point by explaining that the line between unprotected conduct and protected speech in the professional setting is not clear here and indeed cannot be found.  Shockingly, the Majority turns the absence of a clear dividing line between these very different categories of speech into an invitation for States to regulate all of it without scrutiny.  If the court in *Pickup* erred, it did so by putting too much speech into the unprotected category.  *Cf. Humanitarian Law Project*, 561 U.S. at 28, 130 S. Ct. at 2724 (applying First Amendment scrutiny even when "conduct triggering coverage under the statute consists of communicating a message").  The Majority has multiplied that error many times over.

patients on the topic of firearms, today's holding undoubtedly gives States license

to do so in the future.[17]   That is why I assert that today's holding authorizes States

to prohibit doctors from discussing with patients the Act itself, the Affordable Care

Act, Medicare and Medicaid, medical malpractice laws, or any other topic.  If the

State passed an Act regulating speech by professionals to patients/clients about any

of those topics, the Majority's holding says that such a regulation is, even though it

directly targets speech that is irrelevant to the professional's task, a regulation of

professional conduct immune from First Amendment scrutiny.  If States can

---

[17] While it is true that Florida doctors still technically have the right to discuss firearm safety with patients, *see* Maj. Op. at 56–57, this Act ensures that these discussions, to the extent they occur at all, will be brief, tame, generic, and untailored to patients' particular circumstances. And such discussions cannot involve inquiry.  Thus, there is no escaping the reality that even if all speech by doctors to patients about firearms is not prohibited, a great deal of it is.  Despite directly targeting physician speech about firearms, the Majority specifically concludes that the Act does not "infringe[] on physicians' rights to speak on a topic of their choosing."  Maj. Op. at 57.  By holding that the State may directly burden physician speech without infringing on First Amendment rights, the Majority has announced a rule that all such speech—speech from professional to patient/client within the confines of a one-on-one professional relationship—is unprotected conduct.

The fact that doctors retain *some* ability to discuss firearms with patients does nothing to limit the significance of this holding.  To conclude otherwise, one would have to accept the unbelievable premise that if the State bans *most* speech on a topic, it has not infringed on First Amendment rights at all, but that if it banned *all* speech on the topic, suddenly First Amendment rights would apply.  That would essentially create, as a prerequisite to asserting First Amendment rights, a showing by the burdened party that the State's regulation is the *most* restrictive means available.  Anything less, and this view would lead to the conclusion that speech rights are not infringed upon at all.  That notion is clearly incompatible with the First Amendment.  The Majority's rationale is different: it holds that the Act here is not subject to First Amendment scrutiny because even direct, content-specific regulations on speech, such as the law in *Casey* and the Act, evade review because they are regulations on professional conduct.

declare, without scrutiny, that questioning about firearms is bad medicine, then
States can declare, without scrutiny, that discussions about any topic are bad
medicine that can be eliminated from the doctor-patient relationship.

To show how much previously protected speech the Majority's holding
renders unprotected, I begin with the Majority's treatment of the inquiry provision.
Under that provision, there are times when asking a question about firearm safety
is obviously irrelevant to medical care and thus obviously prohibited by the
Act.  For example, if a doctor only asks about firearm ownership because he wants
to go hunting with his patient or because he wants to lecture his patient on the evils
of the Second Amendment, his question is obviously irrelevant to medical
care.  The Majority holds, based on the rationale articulated in *Lowe*, that such
questions are regulable professional conduct that receive no First Amendment
protections.  In applying *Lowe* here, however, the Majority has eliminated the
limiting principle recognized in *Lowe* itself.

When a doctor asks his patient obviously irrelevant questions, the doctor
"does not purport to be exercising judgment on behalf of any particular
individual," so *Lowe* says that "government regulation ceases to function as
legitimate regulation of professional practice with only incidental impact on
speech; it becomes regulation of speaking . . . as such, subject to the First

111

Amendment[].ʺ  472 U.S. at 232, 105 S. Ct. at 2584 (White, J., concurring).  The

Majority clearly rejects this limitation, as the inquiry provision primarily burdens

questions that—by virtue of being "irrelevant"—will usually be unrelated to the

doctor's exercise of judgment on behalf of a particular patient.  Thus, the principle

*Lowe* articulated to limit the category of speech that can be burdened without First

Amendment scrutiny has been eliminated by the Majority.

Further, as discussed above, the only case that extends *Lowe* beyond the

licensing context, *Pickup*, also set a limiting principle that the Majority

disregards.[18]  Irrelevant questioning by doctors about firearms (for purposes of

arranging a hunting trip or going on a political rant) is clearly not the functional

equivalent of providing care, which was the only context in which *Pickup* extended

*Lowe*'s rule.  740 F.3d at 1225.

And to the extent that the Majority is asserting that the Act is like a general

medical malpractice regime, its assertion is flatly incorrect.  The Majority errs in

---

[18] The Majority asserts that *Casey*, without citing *Lowe* or discussing its rationale, also applied *Lowe*'s rule that no First Amendment scrutiny applies.  Not surprisingly, the Majority cites no cases supporting this proposition.  Indeed, *Pickup* recognized the opposite.  *See* 740 F.3d at 1228 (placing the burdened speech in *Casey* on the midpoint of the continuum of First Amendment protections).  As discussed *supra* in Part II.B.2, *Casey* does not apply mere rational basis review as contemplated in *Lowe*, and even if *Casey* did, scrutiny would be ratcheted up here both because the regulation here is a prohibition on speech rather than a requirement to speak and because, unlike the regulation in *Casey*, the Act here burdens some speech that has absolutely nothing to do with medical care.

analogizing the Act to other State laws that only *incidentally* burden speech. The Act *directly* bans questioning. How can it possibly be argued that a law telling doctors, "Do not ask irrelevant questions about guns," only *incidentally* burdens the right to ask irrelevant questions about guns? The burden could not be more direct. By contrast, a medical malpractice regime that holds a doctor liable when his unreasonable treatment causes a patient harm has only incidental burdens on speech. Under that regime, liability attaches for prescribing the wrong drug, directly burdening the bad practice of giving patients harmful drugs and *incidentally* burdening the right to write the name of the drug on a prescription pad. Liability also attaches for failing to properly diagnose a disease, burdening the bad practice of failing to identify a health problem and *incidentally* burdening the right to remain silent about a medical problem or tell a patient he has a clean bill of health when he does not. *Pickup* was justified on the same basis. SOCE therapy is analogous to prescribing a harmful drug. Liability could attach for providing SOCE therapy because the therapy had the chance to harm minors psychologically.

As *Pickup* and *Lowe* recognized, however, even if quack medicine (or what the State deems to be quack medicine) can be prohibited without scrutiny, doctors cannot be prohibited from talking to their patients about quack medicine. *See* 472 U.S. at 231, 105 S. Ct. at 2584 (White, J., concurring) ("I do not think [the State]

could make it a crime . . . privately to speak urging persons to follow or reject any school of medical thought." (internal quotation marks omitted)); 740 F.3d at 1228 (holding only that "[a] doctor may not counsel a patient *to rely* on quack medicine" but recognizing that a doctor may talk to patients about quack medicine such as SOCE (emphasis added) (internal quotation marks omitted)).  I believe, apparently unlike the Majority, that a doctor's First Amendment challenge would prevail if a doctor faced liability for speaking about but not performing or inducing reliance upon quack medicine, because such a burden on speech would be direct, not incidental to the State's goal of preventing bad medical care.

Applying this rationale here, had the State drafted a law stating that it is bad medicine to counsel patients on firearm safety and that, accordingly, doctors may not, as part of the practice of preventive medicine, counsel patients on firearm safety, we might be dealing with a regulation like malpractice laws and like the law in *Pickup*.  Further, had the State drafted such a law, then the opening question in a firearm safety counseling session—a session that is prohibited as bad medicine under this hypothetical—would likely also be prohibited.  In that case, the ban on the question might truly be *incidental* to the overall ban on (what the State deems) bad medical practice.  I have expressed my doubts as to whether such a ban would

114

evade First Amendment scrutiny, but that ban would be more likely to do so than the Act.

By contrast, the Act allows firearm counseling to continue, so it is not directly regulating medical conduct or declaring a certain form of treatment bad medicine. At the same time, the Act directly bans asking irrelevant questioning about firearms—even, indeed especially, those questions having nothing to do with medical conduct. The Act thus *directly* targets questioning and only *incidentally* advances whatever medical interests might be served by a law eliminating irrelevant questions about firearms from the doctor's office. The burden on speech is direct. The benefit to medical care is, at best, incidental and indirect. The Supreme Court has explicitly recognized that States cannot advance their interests in this way. *See Sorrell*, 131 S. Ct. at 2670 (recognizing that the First Amendment prohibits laws where "[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers").

In an attempt to salvage its claim that the Act's inquiry provision prohibits professional conduct and only incidentally burdens speech, the Majority discusses the closer case where questioning about firearms is the opening salvo in a discussion about preventive medical care. It is certainly true that in such cases, the questioning moves closer to being "conduct" in the sense discussed in *Lowe* and

*Pickup*.  But this only proves how inapplicable the Majority's rationale is to a First Amendment analysis of the inquiry provision.  As the Majority must concede, the clearest violations of the inquiry provision—i.e., questioning that is most obviously irrelevant to care—is the prohibited activity that looks the *least* like professional conduct.  So the Majority's rationale for allowing the inquiry provision to evade First Amendment scrutiny is least applicable when the inquiry provision is most applicable.  On the other hand, as questioning becomes more relevant to medical care (and thus less obviously in violation of the Act), it becomes more like professional conduct (and thus more regulable without scrutiny).  In other words, the Majority's rationale only applies in the closest, most ambiguous cases but does not apply in the mine-run, obvious case.  Aside from more or less making the Plaintiffs' vagueness argument for them,[19] this proves that the Majority's rationale is inapposite.

While the Majority explains that it cannot find the lines drawn in *Pickup*, it is unquestionable that a ban on wholly irrelevant questioning like the inquiry provision is far broader than a ban on speech that is the functional equivalent of professional conduct.  And even in the closer case where questioning is not clearly

---

[19] *See infra*, Part IV.

irrelevant, the most that can be said for the Majority's opinion is that some of the questioning prohibited by the Act may look like the speech in *Casey* (i.e., speech directly related to a medical procedure). The burdened questioning here never looks like the burdened speech in *Pickup* (i.e., speech that *is* a medical procedure). Moreover, the Act goes further than either *Pickup* or *Casey* by burdening questioning that is neither related to a medical procedure nor the functional equivalent of such a procedure. By holding that the Act evades First Amendment scrutiny, the Majority's holding is thus far broader than any other case even arguably applying *Lowe*'s rationale.

The Majority's refusal to accept the breadth of its holding is perplexing in light of its treatment of *Casey*. Essential to the Majority's holding is an assumption that the law in *Casey* compelling doctors to speak in certain ways about abortion was a regulation of conduct subject to the rational basis review contemplated by *Lowe*. The Majority holds that no First Amendment scrutiny applied in *Casey* so none applies here because this Act, like the regulation in *Casey*, burdens speech related to medical conduct (here, firearm safety counseling; there, abortion). Yet the Majority for some reason resists my conclusion that its holding opens the door for States to prohibit, without First Amendment scrutiny, all discussions about firearm safety under the exact same rationale.

117

It is impossible to envision what within the Majority's holding would render its rationale and holding inapplicable in a situation where the State banned all discussions by doctors to patients on a topic such as firearms.  The Majority explicitly recognizes that—and indeed justifies its holding because—the Act bans questions that may constitute the opening salvo in a medical discussion about firearm safety.  It is precisely because that question may *lead to* a discussion, a discussion that itself constitutes medical conduct, that the question can be treated as conduct.  So if the question can be regulated as conduct because it precipitates conduct (i.e., a discussion about firearm safety), then the Majority has necessarily and conclusively defined the discussion about firearm safety as conduct that can be regulated without First Amendment scrutiny, as well.  So, while it may be true that the Act here does not totally ban such discussions, my point is that the Majority's holding necessarily allows States to do so in the future.

Even if we were to overlook the Majority's explicit rationale—that the discussion following the question would be conduct and thus regulable—then we would still be left with the indefensible proposition that a *question* is unprotected conduct, while a *discussion following the question* may be protected speech.  That proposition cannot be correct.  Asking someone whether they engage in a practice ("Do you smoke?") is far less like medical conduct than discussing the dangers of

118

engaging in the practice ("Smoking causes lung cancer, so you should use X, Y, or Z method to stop.").  It is even more obvious that asking someone an irrelevant question ("Do you own a gun?  If so, we should go hunting.") is far less like medical conduct than discussing firearm safety ("You should store your firearm and ammunition in separate, locked safes and use a trigger lock.").  Given that the Majority's rationale for extending *Lowe* is that the questioning, even when irrelevant, is conduct, the discussion itself is even more clearly subject to regulation without scrutiny on the same basis.  If the Majority does not like the implications of its holding, the Majority should change that holding rather than obfuscating it.[20]

---

[20] And the Act, which the Majority declares to be a regulation on conduct immune from First Amendment review, does not stop at prohibiting questioning.  It also prohibits doctors from persistently discussing firearm safety with patients.  Persistent discussion, the Majority apparently reasons, just like the opening salvo in the discussion, is regulable as professional conduct.  This necessarily forecloses any argument that a regulation of brief discussions by doctors to patients about firearms might still be protected by the First Amendment.  A three sentence recitation of generalized safety information cannot be converted from speech to conduct by the addition of a fourth, twentieth, or even fiftieth sentence.  The notion is illogical, as the longer a discussion becomes, the more like speech and the less like conduct it becomes.  If a doctor limits himself to three sentences, he has probably not strayed far from directly stating the basics of firearm safety, but if a doctor has entered a more extended a discussion about firearm safety, he is far more likely to stumble onto topics like Second Amendment politics that have nothing whatsoever to do with medical conduct.  Of course, if a discussion becomes so intense and carries on for so long that it begins to harm others, the State's need to burden the speech would increase.  Thus, a ban on intense, protracted political discussions by doctors with their patients may be more likely to *survive* intermediate scrutiny, but the length of the discussion cannot somehow convert the discussion from protected speech to unprotected conduct.  Unless the Majority is willing to embrace that distinction, the Majority appears to have no option but to accept that its holding would permit States to ban, without scrutiny, brief discussions about

Thus, by reaching the unprecedented holding that *Casey* applied only rational basis review, the Majority has subjected discussions about firearms that are related to preventive care to regulation without scrutiny. Further, as discussed above, the Majority has also held that rational basis review applies even to laws like the Act that burden doctors' speech that has no relation whatsoever to medical conduct (i.e., questioning about firearm ownership for purposes of arranging a hunting trip). By applying *Casey* here, the Majority is saying that *Casey* would have come out the same even if the informed consent law had compelled doctors to provide *irrelevant* information about, or to ask irrelevant questions related to, abortion. Consider if the law in *Casey*, like the law here, had burdened irrelevant questioning. For example, had Pennsylvania compelled all Ob-Gyns to ask their patients about abortion, even if the questioning was irrelevant (because the patient was not considering an abortion, was not pregnant, or could not even conceive), the Majority's holding would render any burden on speech created by such a law merely incidental to the regulation of professional conduct. And First Amendment scrutiny would not apply. Even if the Majority is correct about what level of scrutiny was applied in *Casey*, I have little doubt that more scrutiny would have

---

firearms just as surely as States are allowed by today's holding to prohibit persistent discussions and questioning about the same topic.

been applied in reviewing a regulation like the one just mentioned, and like the Act here, which burdens irrelevant questioning that is unrelated to medical care.[21]

Given that obviously irrelevant questioning and lengthy political diatribes about the Second Amendment are nothing like the functional equivalent of providing medical care and are not at all like the compelled disclosure in *Casey*, the Majority must be relying on a different rationale. Instead of implausibly suggesting that such speech actually is professional conduct, the Majority must be asserting that irrelevant questioning is not itself "conduct" but that it can nevertheless be proscribed without First Amendment scrutiny on the basis that irrelevant questioning harms the practice of medicine. That is, while irrelevant questioning and irritating political discussions cannot be characterized as "bad medicine" (because they are not medicine at all), the Majority may be claiming that such speech is bad *for* medicine. Under this view, any question a doctor might

---

[21] The fact that the Act does more than burden inquiries further proves that *Casey*, as the Majority interprets it, is inapplicable. Imagine if Pennsylvania's informed consent law had compelled doctors to engage in lengthy discussions about the details of partial birth abortion or about the evils of *Roe*, just as the Act prohibits doctors from engaging in lengthy, irritating, politically-motivated discussions about firearms. The Majority holds that States may regulate and burden such discussions *without First Amendment review*, under the guise of regulating medical conduct—so long as the discussions occur within the confines of a professional relationship. It is nearly impossible to believe that such a regulation would not be scrutinized, but we must believe that now in light of the Majority's holding that lengthy, politically-charged discussions between doctor and patient can be regulated without First Amendment scrutiny.

ask a patient could be proscribed if the State can rationally assert that asking the question is detrimental to professional conduct.[22]

Given this rationale, I fail to see how today's holding would ever permit a future court to strike down on First Amendment grounds a law stating that, for example, doctors cannot talk to their patients about the Affordable Care Act. Certainly the State could rationally assert that such political discussions make patients uncomfortable and therefore should be eliminated when spoken from doctor to patient within the confines of a professional relationship.  This ban would be upheld under the Majority's rationale as a regulation of medical conduct designed to improve medical care.

Perhaps the Majority's holding only stands for the proposition that *irrelevant* speech can be purged from a profession under the guise of regulating conduct.  But since the Majority holds that the State's assertion that irrelevant questioning is bad for the profession will not be subject to scrutiny, in future cases the State's assertion that the questioning is irrelevant and therefore harmful will be accepted

---

[22] As discussed above, Supreme Court precedent has explicitly recognized that, where this is the State's rationale for burdening speech, intermediate scrutiny applies.  *See, e.g.*, *Went For It, Inc.*, 515 U.S. at 620, 623–24, 115 S. Ct. at 2374, 2375–76 (subjecting a regulation prohibiting lawyers from engaging in certain forms of direct advertising to intermediate First Amendment scrutiny where the law was designed to improve the quality and reputation of the profession).

unless it is wholly irrational. Further, the Majority holds that we must accept the State's view on relevance even if that view is contradicted by evidence in the record.[23] And as already discussed, if "irrelevant" questioning can be proscribed because it is bad for the profession, such a holding obviously allows "irrelevant" discussions about the same topic to be banned without scrutiny. That is because, if an irrelevant question is bad for the profession, an irrelevant discussion—which will multiply the extent to which "irrelevant," harmful topics are injected into the profession—is sure to be as bad or worse.

Thus, today's holding allows States to ban clearly irrelevant questioning under the false pretense that the questioning is conduct, or, in the alternative, based on the un-scrutinized assertion that the questioning is bad for the profession. This holding also allows States to ban arguably irrelevant questioning based on a theory that questions might be the opening salvo in a discussion that might constitute conduct, or, in the alternative, on a theory that the questioning or follow-up discussion might be bad for the profession. This holding also allows States to ban

---

[23] Here, the medical community approves of—and thus deems "relevant"—inquiries about firearms as a matter of course. *See* AMA Policy H-145.990. The State asserts the contrary view that some particularized showing of relevance is required to make the questioning relevant. Because no scrutiny is applied by the Majority to determine if the State's assertion that routine questioning is actually irrelevant, States in the future can do exactly what Florida did here: reject professional opinions about relevance without evidence and deem certain questions per se irrelevant.

what the profession itself overwhelmingly deems to be relevant questioning (so long as the State asserts that the questioning is irrelevant) under the same rationales.  And if questioning can be banned without scrutiny on the basis that the questioning is conduct (or detrimental to the profession), discussions can be banned under the same rationale(s) because discussions are more like conduct than—or, in the alternative, just as likely to be detrimental to the profession as— questioning.  In short, whether the Majority is willing to acknowledge the implications or not, today's holding does indeed announce a rule that no speech from professional to patient within the confines of a one-on-one relationship is entitled to First Amendment protection.

Finally, in another attempt to obfuscate its holding, the Majority asserts that doctors facing discipline under this Act may still assert a First Amendment challenge.  That is true, but after today's holding, that challenge will fail.  As the Majority repeatedly stated, *any burden* placed on speech by the Act is merely incidental to the regulation of professional conduct.  As the Majority also repeatedly stated, burdens placed on speech by the State that are merely incidental to the regulation of a profession receive no First Amendment protections.  Hence, if the doctor facing discipline for violating the Act asserts a First Amendment defense, the court considering his challenge will simply cite today's Majority

124

opinion to reject the defense.  The doctor's assertion that his speech is protected must fail since the burden placed on that speech is unequivocally, according to the Majority, merely incidental to the regulation of a profession.  Though the Majority asserts that it is doing no more than refusing to guarantee that doctors will prevail when they assert a First Amendment defense against disciplinary action under this Act, the Majority is in fact guaranteeing that doctors will fail.

## III.

The foregoing leads to the conclusion that nothing less than intermediate First Amendment scrutiny applies.  For the Act to survive, "First, the government must assert a substantial interest in support of its regulation; second, the government must demonstrate that the restriction . . . directly and materially advances that interest; and third, the regulation must be narrowly drawn."  *Went For It*, 515 U.S. at 624, 115 S. Ct. at 2376 (internal quotation marks omitted); *see also Sorrell*, 131 S. Ct. at 2667–68; *Central Hudson*, 447 U.S. at 566, 100 S. Ct. at 2351.  "[Intermediate scrutiny] standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message."  *Sorrell*, 131 S. Ct. at 2668.

Under the first prong of this analysis, we may not "supplant the precise interests put forward by the State with other suppositions."  *Went For It*, 515 U.S.

at 624, 115 S. Ct. at 2376 (internal quotation marks omitted).  Intermediate scrutiny's second prong "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 626, 115 S. Ct. at 2377 (internal quotation marks omitted).

The Court has not clearly established the evidentiary requirements necessary to survive the second prong of intermediate scrutiny, but *Went For It* explains that if the State presents "no studies," and "the record [does] not disclose any anecdotal evidence . . . [but instead] tended to contradict, rather than strengthen" the State's argument, then the evidence is insufficient.  *Id.  Sorrell* clarifies that "a few" anecdotal stories are not necessarily sufficient to establish that the harm posed to the State's interest is real.  *See* 131 S. Ct. at 2669.

Finally, under the third prong of intermediate scrutiny, we do not apply the least restrictive means test, at the one extreme, or rational basis review, at the other.  *Went For It*, 515 U.S. at 632, 115 S. Ct. at 2380.  Instead we look for a narrowly tailored fit between the State's chosen means and its asserted ends, though the Act need not be a perfect fit.  *Id.  Sorrell* also clarifies that if a regulation burdening speech is under-inclusive, addressing but one area of a larger

126

problem, this is evidence that the justification may be insufficient to sustain the law under intermediate scrutiny.  131 S. Ct. at 2668.

The State asserts the following interests: (1) securing and improving healthcare, particularly for firearm owners; (2) protecting firearm owners' privacy rights; (3) protecting Second Amendment rights; and (4) preventing discrimination against and harassment of firearm owners.  I assume that each of the State's asserted interests is substantial but ultimately conclude that all four relevant provisions of the Act fail under the second and third prongs of this analysis because, while the interests are substantial, the interests are either not under threat by activities proscribed by the Act, or the Act at most indirectly and marginally advances them.

## A.

The record suggests that the Act will make healthcare in Florida worse, not better.  That is not my opinion.  It is the opinion of many leading medical associations, including the AMA.  If there is significant disagreement with this opinion in the medical community, the State did not mention it.  There is simply no evidence showing that inquires about firearms during medical examinations negatively affected medical care or the health and well-being of patients.

The available evidence does establish two things: first, the healthcare of everyone who is happy to answer their doctors' inquiries about firearms may suffer as a result of the Act; second, the First Amendment rights of everyone who welcomes their doctors' inquiries and information on firearms have been infringed. As to the first point, the medical community thinks doctors ought to be free to ask about firearms in order to provide patients with potentially life-saving information, but because of this law, they will not do so.  A vivid imagination is not required to think of the innumerable adverse health consequences that go along with unsafe firearm ownership, but those health consequences are now more likely to befall people who would have welcomed a doctor's inquiry into firearms ownership.

As to the second point, "the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both . . . . [F]reedom of speech necessarily protects the right to receive." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57, 96 S. Ct. 1817, 1823 (1976) (internal quotation marks omitted).  The right to receive is burdened here, and by cutting off even the opening question in the firearm conversation, the Act virtually eliminates that right altogether.  To the Majority, cutting off this flow of life-saving information is no different than cutting off the flow of an unapproved pharmaceutical, but it is manifestly different.  It is anathema to the First

Amendment to treat truthful, non-misleading information the same way we would treat a dangerous drug. "The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *Sorrell*, 131 S. Ct. at 2671 (internal quotation marks omitted).

This Act does not even give patients the option to consent to the doctors' questioning on firearms. In *Sorrell*, the Court explained that "private decisionmaking can avoid governmental partiality and thus insulate privacy measures from First Amendment challenge." *Id.* at 2669. Here, because there is no mechanism for patients to consent, private decisionmaking between doctors and patients on the topic of firearms has been drastically reduced. Governmental partiality favoring firearm ownership predominates, and messages against firearm ownership are drastically limited if not entirely prevented from reaching people who want to hear them.

Considering only the healthcare of firearm owners, there is no evidence that the quality of their care diminished when doctors found out they owned guns. There is also no evidence that their ownership status was improperly disclosed. Indeed firearm owners are the ones most likely to benefit from the information provided by doctors on this subject, and there is evidence suggesting that many

firearm-owning patients appreciated the information.  As in *Sorrell*, "The defect in [the] law is made clear by the fact that many listeners find [the information] instructive."  *Id.* at 2671.

The only people who arguably stand to benefit medically from the Act are those who voluntarily choose not to answer their doctors' questions about firearms. Without the Act, doctors are free to ask firearm-related questions, and people who refuse to answer such questions may be denied care as a result.  With the Act, people who refuse to answer questions may still be denied care, *see* Fla. Stat. § 790.338(4), but firearm-related questions will be asked very rarely, giving doctors fewer occasions to find out that patients would be non-cooperative and thus fewer occasions to deny care on this basis.  That is a potential benefit, but it is a slight one with great costs.  Therefore, the burden on speech does not meet the standards of proportionality discussed in *Sorrell*.

It is important to recall that there is no evidence suggesting that firearm owners were denied care *because* they were firearm owners.  The only patients who were denied care were those who refused to answer a doctor's questions, and thus, the doctor did not even know whether the patient was a firearm owner. Doctors understand that they cannot do their jobs—and risk medical malpractice liability—if they fail to inquire broadly.  Patients who resist inquiries make

130

doctors' jobs more difficult and present doctors with risks that compliant patients do not. Doctors thus have a significant interest in speaking freely, making inquiries, and recording patients' answers.

Of course, if patients wish not to answer, they are free not to. Ordinarily, those who wish not to answer questions receive "ample protection from [their] unquestioned right to refuse to engage." *Sorrell*, 131 S. Ct. at 2670 (internal quotation marks omitted). These patients may freely choose another doctor whose questioning comports with the patients' sensibilities, and there is no evidence in the record suggesting that any non-compliant patients who were turned away could not find other doctors.[24]

To justify forcing doctors to relinquish their freedom to ask questions solely as a means to protect patients' freedom not to answer questions, the State would

---

[24] The Majority acknowledges only that the right to refuse to answer questions is sufficient to protect people from unwelcomed questioning when they enter the public square. But the Court has said that the First Amendment sometimes requires people to face far more intrusive questioning, shielded only by their right to refuse to engage, than the Majority seems to suggest. As *Sorrell* explained, "[p]ersonal privacy even in one's own home receives 'ample protection' from the 'resident's unquestioned right to refuse to engage in conversation with unwelcome visitors.'" 131 S. Ct. at 2670 (quoting *Watchtower Bible & Tract Soc. of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 168, 122 S. Ct. 2080, 2091 (2002)). *Sorrell* applied the same logic in concluding that doctors in their *own offices* are "entitled to no greater protection." *Id.* Despite this precedent, the Majority suggests that patients who voluntarily select a particular physician and ask the physician for her services are entitled to more protection from the doctors' questioning than the person in his own home or the doctor in her own office who faces questioning from an unwelcome visitor. It would be quite odd to give greater rights to the unwelcome visitor in a doctor's office than to the doctor herself, but that is how the Majority would have it.

have to show that patients faced a dilemma of sorts and that refusing to answer was not a sufficient solution. Beyond failing to offer evidence that patients were unable to find other doctors, the State has offered no evidence to suggest that patients would have sacrificed anything by answering the doctors' questions. There is no evidence that the information obtained through these inquiries was misused. It has not been disclosed, and care did not diminish for those who answered. Thus, patients appear from the record to face a perfectly free choice when presented with a doctor's questions about firearms: they may find a new doctor or answer the question (which has no adverse consequences and, if anything, may lead to a lifesaving conversation). These are not bad options, and are far better options than those available to the grieving father whose son's funeral draws harassing, vile protests. *See Snyder*, 131 S. Ct. at 1213. If the First Amendment protects funeral protests, the "benign and, many would say, beneficial" inquiries and conversations about firearms that are burdened by the Act are "also entitled to the protection of the First Amendment." *Sorrell*, 131 S. Ct. at 2670.

Further, there is no evidence that the options faced by patients who refused to answer questions about firearms were any worse than the options faced by those who refused to answer any other private, potentially irrelevant question. That the

132

right to refuse to answer questions about firearms garners special protection belies the State's preference—a preference not designed to ensure that patients who wish to protect their privacy will have access to medical care but instead designed to protect a pro-firearm message the State prefers. *See id.* at 2668 (explaining that a State's failure to address a wider problem through a "coherent policy" addressing the problem as a whole is evidence that the asserted interest cannot justify the burden placed on speech (internal quotation marks omitted)).

Finally, one amicus curiae favoring the Act suggests that the Act will improve healthcare by improving the doctor-patient relationship. The argument, as far as I can tell, goes as follows: previously, firearm owners were unwilling to share firearm-ownership information with their doctors because they feared— without any evidence to validate this fear—that doctors might be gathering this information for nefarious purposes. Once doctors had the information, patients feared that doctors would, in violation of ethical principles and several laws, pass the information to government bureaucrats.

Now, however, because doctors are told not to ask irrelevant questions about firearms, patients can rest assured that if doctors ask about firearms, it is relevant, so patients know it is in their best interest to answer the question. Of course, there are no additional protections prohibiting the doctor from disclosing this

133

information, so the original fear remains in full force.  But firearm owners also know that the health consequences of not answering are probably more serious now, because the question is more relevant.  Thus, the calculus changes slightly: answering, while potentially detrimental to privacy rights, becomes more appealing because not doing so is more likely to be detrimental to healthcare.

This argument accepts the premise that conveying information about a patient's firearm ownership to her physician is potentially beneficial to the patient's health.  The argument also accepts the premise that, because this information is potentially vital to effective healthcare, it is important that the flow of information between doctor and patient be unobstructed.  Thus, the amicus curiae reasons, the Act improves healthcare because it removes a potential obstruction—suspicion that the privacy consequences of disclosing firearm ownership outweighs the health benefits—that was blocking the free flow of information between doctor and patient on the subject of firearms.  If this was the Legislature's goal, its chosen means are poorly suited to the task.  In order to *remove* an obstruction to the flow of information, the State eliminated the flow altogether.  This simply does not withstand intermediate scrutiny.

Even if we accept the unlikely premise that firearm owners who were unwilling to disclose firearm ownership information to their doctors before this Act

134

was passed will be willing to do so now, there is no doubt that this law will cause doctors to know *less*, not *more*, about their patients' firearm ownership status. As the amicus curiae suggests, this information is potentially important to patients' well-being. Much of that lost information will include information of initially questionable relevance that, only after it is too late, will prove to be critical. That is bad for people's health. The State falls far short of showing that the Act directly and materially advances healthcare for anyone. At most, "[t]he State seeks to achieve its policy objectives through the indirect means of restraining certain speech by certain speakers." *Sorrell*, 131 S. Ct. at 2670. Such efforts do not survive intermediate scrutiny.

## B.

The State next asserts an interest in promoting the privacy of firearm owners. It may be assumed that firearm owners "have an interest in keeping their [ownership status] confidential. But [the Act] is not drawn to serve that interest." *Id.* at 2668. Indeed, it is entirely unnecessary to serve that interest.

The Majority disagrees, and asks, "What better way to protect patients' privacy than not to inquire unnecessarily into private matters?" Maj. Op. at 34. Of course the *best* way to protect privacy is not to share any information at all, but if we took that view to disclosing information to our doctors, doctors would not be

very effective.  The information we give them has the potential to save our lives, so we should give it rather freely, and doctors should ask for it without hesitation. The Majority lists a host of ethical canons designed to protect the *confidentiality* of a patient's medical information in support of its point, but contrary to the Majority's assumption, these canons do not exist to limit the flow of information *between* doctor and patient or to protect the privacy of the patient from the doctor. They serve the *opposite* purpose, by giving us confidence that we can share information freely with our doctors, without hesitation and without fear that the information will be revealed to others.  We need these assurances because hesitation in these situations might cause us, quite literally, to die.  Implicit in the fact that the medical community has erected such high walls around the doctor-patient relationship is the concept that within those walls, there should be no secrets.  The entire edifice of doctor-patient confidentiality is built around a simple, common sense principle: it is better for doctors to know more rather than less about their patients because the consequences of not knowing are life-threatening.

Failing to recognize that medical ethics prioritize confidentiality as a means to encourage an unrestrained flow of information from patient to doctor, the Majority suggests that medical policies advising doctors to inquire about firearm

136

ownership as a matter of course "may be in conflict" with ethical principles.  Maj.

Op. at 35, n.11.  As just explained, however, such polices are in perfect harmony

with confidentiality principles.  Doctors need to know as much as they can, so they

ask questions freely, even questions that may be of limited (or no) immediate

relevance.  Both the policy and the principle encourage greater information sharing

*within* the doctor-patient relationship, premised on an assumption of

confidentiality.  Contrary to the Majority's conclusion, it is this Act, not the

medical practice of over-inquiring, that is out of line with millennia of medical

tradition.

 The State undoubtedly has an interest in reinforcing these ethical principles

to ensure that breaches of confidentiality do not occur.  For the State to justify

burdening speech in order to serve this interest, however, it must show that this Act

directly and materially addresses a real concern.  The concern that firearm

ownership status, if recorded in medical files, will not remain confidential is

entirely speculative and therefore insufficient.  *Went For It*, 515 U.S. at 626, 115 S.

Ct. at 2377.

 The record reflects no incidents of firearm-ownership information from

medical records being disclosed to outside parties, and there are a variety of

measures in place to ensure that such incidents will never occur.  In addition to

ethical principles, the confidentiality of medical records is secured by state and federal laws discussed by the Majority, Maj. Op. at 30, n.10.  It was also suggested at oral argument that, as a result of the Affordable Care Act and the digitization of medical records, government bureaucrats may somehow gain access to medical records, providing the government with information on firearm ownership.  To the extent that such information is not already available from other sources, the Affordable Care Act explicitly prohibits the information from being gathered through medical records: "None of the authorities provided to the Secretary under the [Affordable Care Act] . . . shall be construed to authorize or may be used for the collection of any information relating to (A) the lawful ownership or possession of a firearm or ammunition; (B) the lawful use of a firearm or ammunition; or (C) the lawful storage of a firearm or ammunition."  42 U.S.C. § 300gg-17(c)(2).  Patients also may refrain from disclosing their firearm ownership status, which, as discussed above, has not proven to be detrimental to anyone's care except in ways that befall all uncooperative patients, not just those who refuse to answer questions about firearms.

Given that the confidentiality of medical records is closely guarded already, the need to further ensure privacy to prevent misuse cannot justify the burden placed on doctors' speech by the Act: "The choice between the dangers of

suppressing information, and the dangers of its misuse if it is freely available is one that the First Amendment makes for us." *Sorrell*, 131 S. Ct. at 2671 (internal quotation marks omitted).

The State also suggests that, even if information is kept confidential from the outside world, patients may still incur adverse consequences and a loss of privacy if other medical professionals are able to determine firearm ownership status from medical records. Again, the harm addressed here is entirely speculative. Those doctors and medical personnel are bound by the same confidentiality restrictions just discussed. And there is no evidence to validate the State's fear that patients whose firearm ownership is recorded in their medical files will receive worse care from subsequent doctors as a result of this information. Fear of this type is purely speculative and cannot satisfy the State's burden under intermediate scrutiny.[25]

---

[25] Given that the State is only speculating that irrelevant notations in patients' medical files will cause them to receive worse care from subsequent doctors, it seems equally if not more plausible to think that subsequent doctors would provide worse care based on a documented history of a patient's recalcitrance, tardiness, failure to pay bills on time, or frequent follow-up calls. Yet doctors remain free to make these—and any other—medically irrelevant notations in patients' records, even though the consequences would seem to be just as severe as the concerns the Act purportedly addresses. When a statute is so under-inclusive, it belies the fact that the statute has another purpose. As the Court explained in *Sorrell*, "[p]erhaps the State could have addressed . . . confidentiality through a more coherent policy. . . . A statute of that type would present quite a different case than the one presented here. But the State did not enact a statute with that purpose or design." 131 S. Ct. at 2668. Instead, the State enacted a viewpoint-based restriction on speech just like the one invalidated in *Sorrell* with at most incidental privacy benefits. *See id.* at 2669 ("To obtain the limited privacy [provided for] by [the Act, patients] are forced to acquiesce in the State's goal of burdening disfavored speech by disfavored speakers.").

139

*See Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377.  As the Court has explained, "[p]rivacy is a concept too integral to the person and a right too essential to freedom to allow its manipulation to support just those ideas the government prefers." *Sorrell*, 131 S. Ct. at 2672.

## C.

The State next asserts that the Act protects Second Amendment rights. There is no doubt that the right to keep and bear arms is guaranteed by the Second Amendment and that the State has an interest in protecting that right.  It is unclear, however, what threat doctors pose to Second Amendment rights.  Doctors do not have the ability to seize patients' weapons nor is there any evidence that they have ever tried to do so.  Doctors are also not agents of the government, so to the extent that doctors send a one-sided message that firearm ownership causes more harm than good, that message does not convey government disapproval that might raise Second Amendment concerns.  Like any other group of private citizens, doctors are free to express their views on firearm ownership, and the ordinary expectation is that a person's rights to be free from unwanted speech are amply protected by the "unquestioned right to refuse to engage in conversation." *Id.* at 2670.

While it is true that within the confines of a doctor's office, doctors can persuade us to do things we would not do for other private citizens, it is also true

140

that as soon as we leave, that power diminishes drastically.  If a doctor recommends that I remove a firearm from my home, I am perfectly free to ignore him when I get home.  If I take his advice, however, I cannot complain that my *right* to own a gun was infringed upon any more than a patient who quits smoking after his doctor told him to do so can complain that his doctor violated his right to smoke.  The Second Amendment does not include a right to be free from private persuasion.  The State's Second Amendment argument is essentially "that the force of [doctors'] speech can justify the government's attempts to stifle it.  Indeed the State defends the law by insisting that [doctors] ha[ve] a strong influence . . . .  This reasoning is incompatible with the First Amendment."  *Id.* at 2671.

The State clearly has *not* expressed a general interest in preventing doctors from "infringing on patients' rights" by giving advice not to exercise certain rights in certain ways.  The State has not expressed this general interest even though doctors routinely ask about a range of things other than firearms which are not immediately relevant to our care and which may implicate our rights.  This is almost certainly because the State *approves* of doctors asking about these other topics.  As for guns, however, the State disagrees with doctors that questioning patients about firearms is relevant to medical care, and it disapproves of persistent discussion on the topic that might passionately convey an anti-firearm message.

141

So the State silenced that message and that message alone, under a guise of protecting rights. It is clear that "[t]he State's interest in burdening the speech of [doctors] turns on nothing more than a difference of opinion." *Id.* at 2672. Such differences of opinion cannot be regulated out of existence.

For the right to bear arms to be under serious threat from doctors—a threat sufficient to justify a State response that intrudes on doctors' rights to speak—doctors must be doing more than simply persuading firearm owners to voluntarily relinquish their arms. They must be doing more than what one amicus curiae favoring the Act claims doctors are doing, which is "*question[ing]* [patients and thereby] interfer[ing] with patients' exercise of the right [to bear arms] by putting patients in a hesitant position where they question their ownership of firearms because of physician disapproval." Indeed much of what good doctors do is question patients about certain behavior thereby expressing disapproval of the behavior (psychologists ask us why we say certain things to people we are having difficulties with; cardiologists ask us if we routinely eat unhealthy foods; internists ask us if we get enough sleep, drink too much soda and not enough water, and whether we engage in unsafe sexual practices), and (hopefully) causing us to question whether we should continue to engage in that harmful behavior. No one disputes that it is anyone's *right* to engage in any of the aforementioned activities,

and there is absolutely no evidence that doctors are intruding on firearm owners'
rights any more than doctors are intruding on any of the above-mentioned rights.
That we have a right to do something does not mean we have a right to be free
from questioning about that right or from suggestions of other people—people we
voluntarily went to see for advice on how to live healthy lives—who may tell us
that exercising a particular right in a particular way is a bad idea.

    As for other potentially more compelling means of persuasion a doctor could
use, such as refusing treatment or providing worse treatment unless patients give
up their arms, there is absolutely no evidence that such means are being used.
Such speculative fears are insufficient to justify a regulation that is subject to
intermediate scrutiny. *Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377.

    Perhaps one could respond, as noted above, that preventing doctors from
asking firearm-related questions in most situations will ensure that fewer people
are put in a position of being turned away for failing to answer such questions.  But
the right to bear arms does not include a right not to be asked a question about
whether one bears arms.  "Personal privacy even in one's own home receives
'ample protection' from the 'resident's unquestioned right to refuse to engage in
conversation with unwelcome visitors.' *Watchtower Bible & Tract Soc. of N.Y.,
Inc. v. Village of Stratton*, 536 U.S. 150, 168, 122 S. Ct. 2080 . . . (2002).  A

physician's office is no more private and is entitled to no greater protection."
*Sorrell*, 131 S. Ct. 2670 (second citation omitted).  This statement was rendered
with regard to doctors in *their own* offices.  If they do not have a right to be free
from unwelcomed visitors in their own offices, patients who voluntarily chose to
visit doctors certainly do not have greater protections from questioning by the
doctors themselves.  That is particularly true when, as already explained, the
answer to any question about firearms will not lead to adverse consequences.

With regard to the State's asserted Second Amendment justification, like its
medical justification, "[t]he State seeks to achieve its policy objectives through the
indirect means of restraining certain speech by certain speakers . . . . But the fear
that people would make bad decisions [such as relinquishing their firearms] if
given truthful information cannot justify content-based burdens on speech."  *Id.* at
2670–71 (internal quotation marks omitted).  The fact that a doctor's message on
firearm safety may be incompatible with the State's desire to protect firearm
owners from uncomfortable questioning or counseling on firearm safety does not
implicate Second Amendment concerns and belies the State's desire simply to
silence a message with which it disagrees.

**D.**

144

The State finally asserts that the Act is designed to prevent harassment and discrimination against firearm owners. The State provides very little evidence—no more than a few anecdotes—to support its contention that patients are being discriminated against and harassed on the basis of firearm ownership. It is doubtful whether such evidence is sufficient to establish that the Act will advance an interest in a "direct and material way." *Went For It*, 515 U.S. at 625, 115 S. Ct. at 2377 (internal quotation marks omitted). A "governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are *real* and that its restriction will in fact alleviate them to a material degree." *Id.* at 626, 115 S. Ct. at 2377 (internal quotation marks omitted).

Regarding harassment in particular, the chill that the harassment provision puts on doctors' protected speech is significant, and the benefit of the provision is minimal given how innocuous the "harassment" that allegedly takes place seems to be. As discussed in Part I, a doctor's simple recommendation to remove firearms from a home where children were present was one of the incidents that prompted passage of this Act and that presumably would constitute "harassment."[26] Even if

---

[26] Again, the Majority defines "to harass" as "[t]o disturb or irritate persistently." I am certain that most smokers are "harassed" by their doctors about smoking under this definition. If doctors apply the same persistence to firearm safety recommendations—including removing firearms from homes with children—as they do to smoking cessation recommendations, they are, according to the Majority, harassing their patients and therefore subject to discipline. One would

145

doctors might not ultimately be disciplined for such behavior, this Act will certainly cause many of them not to engage in it.

Were the evidence of harassment against firearm owners greater, and had the legislative history not explicitly stated that the Act was needed to prohibit doctors from advising patients to relinquish firearms in pursuit of a political agenda—that is, were it not apparent that the State's goal was to eliminate unpopular speech rather than harassment—the constitutionality of the harassment provision may well be different.  But that is not the case before us.  Confronted with nearly identical anecdotal evidence of harassment in *Sorrell*, the Supreme Court stated: "[A] few have reported that they felt coerced and harassed. . . .  It is doubtful that concern for 'a few' physicians who may have 'felt coerced and harassed' . . . can sustain a broad content-based rule like" the Act.  131 S. Ct. at 2669.  The same is true here, and the harassment provision cannot withstand intermediate scrutiny as a result. Indeed, "[m]any are those who must endure speech they do not like, but that is a necessary cost of freedom."  *Id.*

The discrimination provision presents a closer question.  To begin with, unlike the inquiry, recording, and harassment provisions, speech is less directly

---

think that doctors ought to persist in encouraging their patients to do what the doctors genuinely believe is best for their patients' health and well-being.

targeted by this provision of the Act.  A doctor could inquire into and record information about firearms with little fear of facing a discrimination charge simply for doing those things.  That does not mean, however, that if the discrimination provision remained, no speech would be prohibited or chilled.

While less obviously so, a doctor who presses a patient on the issue of firearm ownership, engages in tough questioning on the subject, and recommends repeatedly that a patient remove firearms from his home could be seen as discriminating against that patient.  We would typically think of such behavior more as harassment than as discrimination, but the Act itself does not define either.[27]  A patient who is subjected to relatively harsh, tough-love treatment from a doctor could easily believe he is being discriminated against because he owns a firearm—other patients who do not own firearms are not being persistently lectured by their doctors, but patients who do own firearms are being scolded precisely because they own firearms.  That, it seems to me, could be discrimination prohibited by the Act.

---

[27] In a case confronting a somewhat similar issue, then Circuit Judge Alito used the term "discriminatory harassment" to describe federal prohibitions.  *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001).  Even if the harassment provision is invalidated, then, it seems that the same speech which constitutes harassment might constitute "discriminatory harassment" and thus be proscribed by the discrimination provision.  Further, as noted *supra* in Part I, the legislative history cited by the State was said to contain examples of "actual discrimination" faced by firearm owners.  Those examples almost exclusively involved speech.

Further, even if the other three provisions of the Act are struck down, doctors' inquiries will be chilled as a result of the discrimination provision. Inquiries constitute strong evidence of discriminatory motive, *see, e.g.*, *Barbano v. Madison Cnty.*, 922 F.2d 139, 141–46 (2d Cir. 1990), and doctors will rightly fear that if they ask about firearms and patients subsequently complain about any aspect of their treatment, the doctors' initial inquiries will be used as ammunition against them to support discrimination claims. Even standing alone, the discrimination provision thus prohibits and significantly chills firearms related speech by doctors, though it probably has a lesser effect on speech than the Act's other provisions.

Accordingly, I reject the State's assertion that the discrimination provision evades First Amendment scrutiny as a regulation of discriminatory conduct, not speech. To be sure, the Supreme Court has explained that anti-discrimination provisions designed to address discriminatory conduct "do not, *as a general matter*, violate the First or Fourteenth Amendments." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 571–72, 115 S. Ct. 2338, 2346 (1995) (emphasis added). But this is not a typical anti-discrimination law or a typical case, because unlike the statute before the Court in *Hurley*, the Act here is "unusual in an[] obvious way, since it does . . . , on its face, target speech . . . on the basis of its content." *Id.* at 572, 115 S. Ct. at 2347.

148

The State offered almost no evidence of conduct-based discrimination. Indeed, the only actual examples of adverse conduct cited by the State befell people who refused to disclose firearm status, not people who were known firearm owners. There was an incident involving billing for services allegedly not rendered, but that involved a patient who was turned away for refusing to answer questions. And other patients were declined for service, which constitutes discriminatory conduct, not speech, but they were declined for service because, again, they refused to answer questions, not because they were known firearm owners. Thus, there is evidence that people are being discriminated against for refusing to answer their doctors' questions, but there is no evidence that patients are being discriminated against because they own firearms.[28]

The State simply cannot support its assertion that the Act is a means of preventing that type of discrimination against firearm owners because those examples do not constitute discrimination against firearm owners. And even if they did, the Act expressly allows doctors to turn away patients who refuse to answer questions, *see* Fla. Stat. § 790.338(4), so it cannot be justified as an effort

---

[28] There is no evidence in the record one way or the other on this point, but I suspect that doctors would turn patients away for refusing to answer questions on any topic. Indeed, if doctors continued to treat patients who refused to answer questions, doctors would seemingly be exposed to significant malpractice liability as a result.

to eliminate that form of discrimination, either.  Further, the Act is unnecessary to

protect patients from being billed for services not rendered, as other remedies

surely exist to resolve that problem.  As for the State's list of other examples of

discriminatory conduct that *might* occur on the basis of firearm ownership (denial

of referrals, longer wait times, and cancelled appointments, to name a few), the

State has presented no evidence that any of these forms of discrimination against

firearm owners have ever occurred.

Thus, while it is clear that speech will be burdened as a result of this

provision, it is unclear that any discriminatory conduct will be eliminated.  As

*Went For It* explains, a statute cannot survive intermediate scrutiny on the

assumption that it will solve an entirely speculative problem.  *See* 515 U.S. at 626,

115 S. Ct. at 2377.  This also proves that, unlike in *Hurley*, where a discrimination

provision was found not to implicate the First Amendment, here the "focal point of

[the] prohibition [is not] on the *act* of discriminating against individuals in the

provision of publicly available . . . services."  515 U.S. at 572, 115 S. Ct. at 2347

(emphasis added).  The legislative history makes clear that the Act was intended

primarily to prohibit speech, though I recognize that it may prohibit some

discriminatory conduct if that type of conduct ever occurs in the future.  Given

these facts, the First Amendment applies even to anti-discrimination laws.  *See,*

*e.g.*, *Saxe*, 240 F.3d at 206–07 ("'Where pure expression is involved,' anti-discrimination law 'steers into the territory of the First Amendment.' *DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596 (5th Cir. 1995). This is especially true because, as the Fifth Circuit has noted, when anti-discrimination laws are 'applied to . . . harassment claims founded solely on verbal insults, pictorial or literary matter, the statute[s] impose[] content-based, viewpoint-discriminatory restrictions on speech.' *DeAngelis*, 51 F.3d at 596–97." (alterations in original)).

Therefore, the discrimination provision is also subject to intermediate scrutiny, and the State has failed to show that this provision addresses a real harm or advances a State interest in a direct, material way. *See Went For It*, 515 U.S. at 626, 115 S. Ct. at 2377. The Act is instead directed at silencing doctors who advance an anti-firearm—not an anti-firearm *owner*—viewpoint with which the State disagrees. This it cannot do. *See Sorrell*, 131 S. Ct. at 2668 ("[Intermediate scrutiny standards] ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.").

## IV.

I also believe the Act to be void for vagueness.  At the outset, because this "law interferes with the right of free speech . . . , a more stringent vagueness test should apply."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499, 102 S. Ct. 1186, 1193–94 (1982); *see also Reno v. ACLU*, 521 U.S. 844, 871–72, 117 S. Ct. 2329, 2344 (1997) (explaining that the "vagueness of [a speech-related] regulation raises special First Amendment concerns because of its obvious chilling effect on free speech").  The Majority does not find this more stringent test applicable because it does not believe that the First Amendment is implicated at all by the Act.  Based on the foregoing, it is clear that I disagree, so I would apply that more stringent vagueness standard.

Under this standard, based on the Majority's own interpretation of the Act, the Act is vague as to one of the most common firearms-related practices doctors actually engage in—namely, the practice of asking patients about firearm ownership in questionnaires that are given as a matter of course before the doctor and patient ever meet.  Many doctors claim that such inquiries are always potentially relevant and that making them is part of the practice of good medicine.  Consequently, doctors need to know if they can continue to ask patients about firearm ownership as a matter of course by using intake questionnaires.

Because the inquiry provision is written "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, [it] violates the first essential of due process of law." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (internal quotation marks omitted).  One might think that when doctors ask questions about firearm ownership as a matter of course, they do not "know" the questions to be irrelevant, nor is the record (the questionnaire itself is a record) kept in the absence of a "good faith" belief that the record is relevant.  Some might conclude from this that doctors are free to continue asking all patients about firearm ownership as they did before the Act's passage.  On the other hand, the legislative history suggests that such questioning, absent patient-specific information, is exactly the type of speech the Act was designed to prohibit.  The Act itself is not clear on this point.

As far as I can tell, the Majority believes that doctors who continue to ask about firearm ownership as a matter of course will be in violation of the Act.  The Majority says that "a physician may make firearms inquiries of any or all patients, so long as he or she does so with the good faith belief . . . that the inquiry is relevant to the patient's medical care or safety, or the safety of others."  Maj. Op. at 63.  But the Majority adds the following caveat: the good faith belief must be "based on the specifics of the patient's case."  Maj. Op. at 63.  That requirement is

153

not in the Act itself, and many doctors do not believe that such specificity is necessary to make the inquiry and record relevant.  However, the Act's purposes would not be achieved without such a requirement.  Therefore, I do not know whether the Majority is right or wrong to add that requirement, nor do I know whether state courts would agree.  It is also unclear to me how doctors could ask the question of all patients, as the Majority states they may, if doctors must also base inquiries on the specifics of each patient, as the Majority suggests they must.  The Act itself gives no indication as to whether or not that specificity is required to shield doctors from discipline.  People of common intelligence are left guessing.

Further highlighting the Act's vagueness, the State is not even clear on whether the inquiry provision is advisory or mandatory.  Initially, the Board responsible for enforcing the Act informed doctors that it was mandatory.  Then, the Board changed course and stated that it was advisory.  Similarly, as discussed in Part I, the State's characterization of the inquiry provision is internally contradictory, describing it at times as advisory and at times as a proscription.  Again, people of common intelligence are left guessing what the Act prohibits.

Not surprisingly, plaintiffs have responded to this Act in a variety of ways, further confirming that people of common intelligence do not know what the Act prohibits.  *See* Maj. Op. at n.5.  Some doctors have continued making inquiries

154

about firearm ownership as a matter of course because they believe the Act allows them to do so.  Others have stopped this questioning—even though they believe, consistent with AMA policy, that the inquiries are good for patients—because they believe the Act requires them to do so.  Plaintiffs possess at least common intelligence, and they, too, are left guessing.

The Majority opinion and its rationale only add to the confusion.  The Majority likens supposedly medically "irrelevant" questioning about firearm ownership to questioning about a patient's smoking habits, which is clearly medically relevant.  Of course, the Majority could have likened the "irrelevant" questioning to questions about last night's baseball game, but that would actually prove that the Majority's chosen rationale is inapplicable here.  Based on its argument that the Act regulates conduct and only incidentally burdens speech, the Majority had no choice but to liken questioning about firearm ownership to other medically-relevant inquiries because the Majority's entire argument hinges on equating questioning about firearm ownership to medical conduct.  If the questioning is not at least arguably medically relevant, how can it possibly be considered medical conduct, subject to regulation without scrutiny?  And if the questioning is (at least in many cases) so much like medical conduct that it is

always subject to regulation, how will doctors know when that medical conduct is not medically relevant?

Compounding this problem, the State suggests that doctors can and should continue to counsel patients on firearm safety.  The Majority explains that they are free to do so—albeit briefly.  So if it is good to give patients firearm safety instructions, how can it possibly be bad to ask questions of patients in order to specifically tailor those instructions?  That, it seems to me, suggests that asking about firearm ownership is indeed always relevant.  Assuming the Act is mandatory, however, I must confess that I myself am left guessing what the inquiry provision prohibits.

The harassment provision, which bans only unnecessary harassment, also leaves people of common intelligence guessing about how far doctors may go in counseling patients on firearm safety.  Intuitively, when doctors are initially met with resistance from patients on a medically important subject, doctors should persist for the good of the patient.  For example, if a doctor knows a patient smokes and advises him of the dangers of doing so, a patient may become irritated.  While the doctor should perhaps take a different approach to his counseling, he certainly should not simply cease the counseling because the patient is irritated.  Indeed, the doctor will likely have to be more persistent and irritating with this

smoker than with the smoker who responds favorably to the doctor's initial counseling, signaling that the doctor's message has been received.

One might think that the same is true of firearm owners. If a doctor's initial counseling is well-received by the patient, the doctor knows that the message has been received, so he need not broach the subject again. But if a doctor's initial counseling is met with resistance, intuition suggests that this patient may be—like the smoker resistant to counseling on the subject—the one most in need of further counseling. Here, the Act creates uncertainty. If the doctor persists, he is no doubt harassing the patient. The question is, however, is that harassment necessary?

Of course, the doctor does not know with any great precision because he cannot ask about firearm ownership, compounding the problem further. Medical intuition perhaps tells the doctor that persistence is necessary, but the doctor is left with no guidance on whether this intuition is sufficient to render persistence (i.e., harassment) necessary for purposes of the Act. Legislative history would suggest that this is exactly the point at which doctors are supposed to stop, but it simply is not clear from the Act what doctors may be punished for doing. The Majority's suggestion that doctors may engage in brief, generalized discussions does no good because the doctor may know, from the patient's reaction, that the initial discussion did no good whatsoever. The Majority's further suggestion that, in

157

some cases, the need to persist will be clear, also offers doctors no guidance on how to proceed in the vast majority of cases, where the need to persist will not be obvious. Yet again, people of common intelligence are left guessing.

Again, the uncertainty is compounded by the fact that the State claims firearm safety counseling is often, if not always, good for patients. If that counseling is good for patients, then it makes no sense to limit that counseling to the distribution of a pamphlet and a generic discussion that is likely to have little to no impact. Instead, if the counseling is good, common sense tells doctors that they ought to persist in that counseling, even past the point of irritation. It is anyone's guess whether doctors may continue doing so after today's holding, or whether they will instead lose their licenses to practice medicine.

The people who put forward these contradictory and at times internally inconsistent interpretations of the Act possess common, if not exceptional intelligence. If they are left guessing about what the Act prohibits, that all but proves that the Act is vague. Sadly, I suspect that some of the practices doctors have continued to engage in despite the Act will probably subject these well-intentioned doctors to discipline, but like them, I simply do not know.

Exacerbating the situation is the prospect of malpractice liability. If firearm safety counseling—whether brief of extended—is capable of reducing the prospect

of accidental firearm related injuries, as the AMA believes it is, then to avoid liability, doctors should provide firearm safety counseling.  If that counseling is too brief or too generic—because a pediatrician sought to comply with the inquiry and harassment provisions of the Act—but it can be proven that more persistent, specifically tailored counseling would have prevented a child who found her father's loaded, unlocked firearm from accidentally shooting herself, I suspect a jury may well find the doctor liable.  And regardless of whether malpractice liability attaches, I feel for that doctor who will have the death of a child on her conscience for the rest of her life.

Doctors' jobs are hard enough when the State does not enact laws that force them to think twice about asking questions and providing information that may save lives.  Given how vague this Act is, thinking twice will not be nearly enough for doctors to figure out what to do to protect their patients, on the one hand, and to comply with the Act, on the other.

## V.

The Act silences a great deal of speech by one group of speakers on one topic.  Precedent therefore directs us to subject the Act to at least intermediate scrutiny.  The Majority's attempts to distinguish this case law are not persuasive, and its justifications for expanding a heretofore exceedingly narrow class of speech

159

that may be burdened without implicating the First Amendment are equally unavailing.  The holding reached today is unprecedented, as it essentially says that all licensed professionals have no First Amendment rights when they are speaking to their clients or patients in private.  This in turn says that patients have no First Amendment right to receive information from licensed professionals—a frightening prospect.

Had the Majority applied the appropriate level of scrutiny, we would have to affirm the district court's decision.  This law is not designed to prevent irrelevant speech from harming the doctor-patient relationship, because it allows irrelevant speech within that relationship to continue much as it did before.  Far from stopping irrelevant speech in a doctor's office, the Act instead allows virtually all irrelevant speech to continue while stopping virtually all speech—relevant and irrelevant alike—about a single topic: firearms.  This law is not designed to improve healthcare because, as far as the medical community is concerned, this law will make healthcare worse.  This law is not designed to protect privacy because privacy of the information at issue is already secured.  This law is not designed to protect Second Amendment rights because doctors have no authority— and have not used their private positions of power—to compel firearm owners to relinquish their weapons.  This law is instead designed to stop a perceived political

160

agenda, and it is difficult to conceive of any law designed for that purpose that could withstand First Amendment scrutiny.

Even if—perhaps particularly if—doctors were actually waging a political campaign rather than merely being perceived as doing so, the First Amendment would protect them from laws like the Act.  What is more troubling is that there is no evidence that doctors are actually pursuing a political agenda with patients. Doctors are not *prohibiting* patients from exercising the right to bear arms; they are, perhaps, *convincing* patients not to do so—or to do so more safely.  This is precisely the type of speech the First Amendment is designed to protect.  Because the Act prohibits doctors from even asking the first question in this conversation, the Act is unconstitutional.  Accordingly, the district court's decision should be affirmed, and I therefore respectfully dissent.