Case No. 12-14009

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT
_____

DR. BERND WOLLSCHLAEGER, *et al.*,
Plaintiffs/Appellees/Petitioners,

vs.

GOVERNOR OF THE STATE OF FLORIDA, *et al.*,
Defendants/Appellants/Respondents.
_____

Appeal from the United States District Court
For the Southern District of Florida
_____

**BRIEF *AMICUS CURIAE* OF AMERICAN MEDICAL
ASSOCIATION, AMERICAN ACADEMY OF PEDIATRICS,
AMERICAN ACADEMY OF CHILD AND ADOLESCENT
PSYCHIATRY, AMERICAN ACADEMY OF FAMILY PHYSICIANS,
AMERICAN OSTEOPATHIC ASSOCIATION, AMERICAN
COLLEGE OF PHYSICIANS, AMERICAN COLLEGE OF
SURGEONS, AMERICAN COLLEGE OF OBSTETRICIANS AND
GYNECOLOGISTS, AND AMERICAN CONGRESS OF
OBSTETRICIANS AND GYNECOLOGISTS
SUBMITTED IN SUPPORT OF PLAINTIFFS/APPELLEES' 2016
PETITION FOR REHEARING *EN BANC***

Jon N. Ekdahl
Leonard A. Nelson
American Medical Association
330 N. Wabash Ave
Chicago, IL 60611
(312) 464-5532

Richard H. Levenstein
Kramer, Sopko & Levenstein, P.A.
2300 SE Monterey Rd., Suite 100
Stuart, FL 34995
(772) 288-0048

*Of Counsel*

*Counsel of Record for Amici*

**<u>Certificate of Interested Persons and Corporate Disclosure Statement</u>**

*Amici* certify that, to the best of their knowledge, the Certificate of Interested Persons in the Petition for Rehearing *En Banc* is complete.

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* state that they have no parent corporation and no corporation, publicly held or otherwise, owns 10% or more of any of their stock.

**<u>Rule 35 Certification</u>**

*Amici* and their counsel adopt the Rule 35 Certification set forth in the 2016 Petition for Rehearing *En Banc*.

__<u>S/Richard H. Levenstein Esquire</u>___
Richard H. Levenstein
Attorney for *Amici Curiae*

# Table of Contents

**Page**

**Certificate of Interested Persons and**
    **Corporate Disclosure Statement**          i

**Rule 35 Certification**          i

**Table of Authorities**          iii

**Statement of the Issues**          1

**Statement of Facts**          1

**Summary of the Argument**          4

**Argument and Citations of Authority**          6

**I.  FOPA Violates the First and Fourteenth Amendments.**          6

    **A.  FOPA Should be Subjected to Strict Scrutiny.**          6

    **B.  Whether Examined under Strict or Intermediate**
       **Scrutiny, FOPA is Unconstitutional.**          6

      **1.  FOPA does not Materially Remedy any Genuine**
        **Injuries or Even Reasonably Threatened Injuries to**
        **Protectable State Interests.**          6

      **2.  The Harm FOPA Causes by Restricting**
        **Communications between Patients and Physicians is**
        **Disproportional to any Purported Benefits.**          9

**II.  This Case is of Special Importance, Even Beyond its Impact**
    **On Florida Residents.**          13

**Conclusion**                                                            14

**Certificate of Service**                        16

# Table of Authorities

**Page(s)**

**Cases**

*Bates v. State Bar of Arizona*, 433 U.S. 350 (1977)     10

*Baze v. Rees*, 553 U.S. 35 (2008)     10

*Central Hudson Gas & Electric Corp. v.*     6, 9
     *Public Services Commission*, 447 U.S. 557 (1980)

*Cruzan v. Missouri Dep't. of Health,* 497 U.S. 261 (1990)     10

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001)     10

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995)     6-7

*Gonzales v. Oregon*, 546 U.S. 243 (2003)     10

*National Federation of Independent Business v. Sebelius*,     10
     132 S.Ct. 2566 (2012)

*Roe v. Wade*, 410 U.S. 113 (1973)     10

*Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011)     6-8, 14

*Trammel v. United States*, 445 U.S. 40 (1980)     10

*Turner Broadcasting System, Inc. v. FCC,*     6
     512 U.S. 622 (1994)

*Vacco v. Quill*, 521 U.S. 793 (1997)     10

*Washington v. Glucksberg*, 521 U.S. 702 (1997)     10

*Wollschlaeger v. Governor of Florida*,     2, 4
     760 F.3d 1195 (11th Cir. 2014)

*Wollschlaeger v. Governor of Florida*,
    797 F.3d 859 (11th Cir. 2015)    2, 4, 13, 15

**United States Constitution**

First Amendment    1, 5-6, 13-14

Second Amendment    4, 8

Fourteenth Amendment    1

**Statutes**

Fla. Stat. § 790.338    *Passim*

**Bills Introduced in State Legislatures**

Indiana HB 1494 (2015)    13

North Carolina HB 699 (2015)    13

Ohio SB 177 (2015)    13

Texas HB 2823 (2105)    13

Texas SB 613 (2015)    13

**Other Authorities**

    **American Medical Association**
    *Code of Medical Ethics*    10-11

Preamble    11

Principle of Medical Ethics IV    11

Principle of Medical Ethics VIII    11

E-10.01, Fundamental Elements of the Patient-Physician    10-11
    Relationship

E-10.015, The Patient-Physician Relationship      11

**American Medical Association Health Policy**

H-145.990, Guidelines for Prevention of      1-3, 7
         Firearm Accidents in Children

**Medical Journal Articles**

B. Cooke, *et al.*, "Firearms Inquiries in Florida:      12
         'Medical Privacy' or Medical Neglect?"
         40 *J. Am. Acad. Psychiatry Law* 399 (2012)

L. Snyder, "American College of Physicians Ethics      12
         Manual (6th Ed.), 156 *Annals of Internal*
         *Medicine* 73 (2012)

J. Schaechter, *et al.*, "Protecting the Patient-Physician      13
         Relationship in Florida,"
         167 *JAMA Pediatrics* 317 (2013)

S. Weinberger, *et al,* "Legislative Interference with the      14
         Patient-Physician Relationship,"
         367 *N Engl. J Med.* 1557 (2012)

## Statement of the Issues

This case will decide whether the Florida Firearm Owners Privacy Act ("FOPA"), Fla. Stat. § 790.338, which restricts the ability of physicians to communicate freely with their patients on the issues of firearm possession and safety and to make notations in their medical records regarding these subjects, violates the First and Fourteenth Amendments to the United States Constitution. *Amici* further adopt the Statement of the Issues set forth in the 2016 petition for rehearing *en banc*.

## Statement of Facts

In 1989, the American Medical Association ("AMA") enacted Health Policy H-145.990, which states as follows:

### Prevention of Firearm Accidents in Children

Our AMA (1) supports increasing efforts to reduce pediatric firearm morbidity and mortality by encouraging its members to (a) inquire as to the presence of household firearms as a part of childproofing the home; (b) educate patients to the dangers of firearms to children; (c) encourage patients to educate their children and neighbors as to the dangers of firearms; and (d) routinely remind patients to obtain firearm safety locks, to store firearms under lock and key, and to store ammunition separately from firearms; (2) encourages state medical societies to work with other organizations to increase public education about firearm safety; and (3) encourages organized medical staffs and other physician organizations, including state and local medical

societies, to recommend programs for teaching firearm safety to children.[1]

This and similar policies of the AMA and other medical associations memorialize the duty of preventive care that physicians owe their patients to protect against accidental injuries from firearms. Depending on the circumstances, physicians may also owe non-pediatric patients a similar educational obligation. Such counseling is facilitated through routine questioning about, *inter alia*, poisonous chemicals in the home, swimming pools, or alcohol or tobacco usage. [Op. 18].

Notwithstanding their obviously salutary purposes, these policies relating to firearm safety represent the supposed danger against which the Florida Legislature determined its citizenry needed protection. *See* Judge Wilson's dissents in *Wollschlaeger v. Governor of Florida*, 760 F.3d 1195, 1230 (11th Cir. 2014) ("*Wollschlaeger I*"), and *Wollschlaeger v. Governor of Florida*, 797 F.3d 859, 901-902 (11th Cir. 2015) ("*Wollschlaeger II*").

The principal "incidents" upon which the Legislature relied to justify its enactment of FOPA were, essentially:

- A mother in Ocala, Florida became embroiled in a dispute with her pediatrician over a question about firearms possession. As a result,

---

[1] Found at https://searchpf.ama-assn.org/SearchML/searchDetails.action?uri=%2FAMADoc%2Fhod.xml-0-543.xml.

the pediatrician terminated their relationship and advised her she had 30 days to find a new doctor.

- Physicians refused to provide medical care to a nine-year-old because they wanted to know if the child's family had a firearm in their home. The context of the physicians' inquiry was undisclosed, and it may be they wanted the information for their personal safety.

- During a pediatric appointment, a pediatrician asked a state legislator to remove his gun from his home.

- A health care provider falsely stated that disclosing firearm ownership was a Medicaid requirement.

- While they were separated from their mother, medical staff asked her children whether the mother owned a firearm. Again, the context was undisclosed, so it is unclear whether the inquiry may have been related to the physical safety of those asking or if the mother may have exhibited aggressive actions against her children.

See Op. at 6-7 and the parties' Joint Statement of Undisputed Facts, which is filed as Doc. 87 in the District Court below. FOPA has led Florida physicians, including the individual plaintiffs, to self-censor their patient communications (Op. 18-19) – thereby abridging the guidance due their patients under AMA Policy H-145.990 and similar medical standards.

*Amici* further adopt the facts stated in Judge Wilson's dissenting opinions in *Wollschlaeger I*, 760 F.3d at 1232, 1257-1259, and in *Wollschlaeger II*, 797 F.3d at 901-902, 906, 920-922.

## Summary of the Argument

*Amici* believe FOPA should be subjected to strict scrutiny under the First Amendment. It does not matter, however, whether strict or intermediate scrutiny is applied. FOPA is unconstitutional under either test.

The Supreme Court has ruled that under either strict or intermediate scrutiny a statute restricting speech must be founded on genuine state interests threatened with real harm, not unbounded speculation arising from imaginary or superficial grievances. Moreover, the statute must materially advance those interests, without disproportionately injuring free expression. FOPA fails on all counts.

Most basically, the discussions physicians have with their patients do not threaten those patients' rights of gun ownership. The Second Amendment protects citizens against governmental confiscation of their firearms. Physicians neither confiscate nor facilitate anyone else's confiscation of firearms – nor is it likely that they could or would do so. The concerns expressed by the panel majority as a result of physicians' making the firearms inquiries are far-fetched. The likelihood that information

resulting from these inquiries will "fall into the wrong hands" or be "used for purposes of harassment" (Op. 65) is exceedingly remote. Moreover, whatever that likelihood may be, it is no greater for firearms information than for any other information provided to physicians.

Furthermore, any intrusion on patient privacy engendered through physician inquiries about firearm possession is *de minimis.* Those inquiries are a part of routine questioning on similar subjects. [Op. 18]. Medical care regularly invokes vastly more intrusive interactions between physicians and patients than communications about gun ownership. The supposed fear of a loss of privacy is actually a screen used to advance a political agenda at the expense of First Amendment rights.

This is no ordinary free speech case, where the claimed infringement to the plaintiffs is cabined within their right to express themselves – and the inevitably slippery slope concomitant to all infringements of First Amendment liberties. To the contrary, this case, which has attracted considerable national attention, affects the right of patients to be given the best possible medical care from their physicians – and not just on the topic of firearm safety. Even beyond the curtailment of free expression, the injury to health care is grossly disproportionate to the posited benefits of the law. Lives hang in the balance.

<u>**Argument and Citations of Authority**</u>

**I.      FOPA Violates the First and Fourteenth Amendments.**

**A.      FOPA Should be Subjected to Strict Scrutiny Analysis.**

The 2016 petition for rehearing *en banc* argues that FOPA should be subject to strict scrutiny under the First Amendment.  *Amici* agree, but they have nothing to add to the argument.

**B.      Whether Examined under Strict or Intermediate Scrutiny, FOPA is Unconstitutional.**

**1.      FOPA does not Materially Remedy any Genuine Injuries or Even Reasonably Threatened Injuries to Protectable State Interests.**

*Central Hudson Gas & Electric Corp. v. Public Services Commission*, 447 U.S. 557, 564 (1980), states:  "[T]he restriction [of communications] must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose."  *Accord*, *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2667-2669 (2011) ("State must show that the statute directly advances a substantial governmental interest," with proof needed beyond "a few" anecdotal stories), (*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 644 (1994) (advancement of state's interest must be "real, not merely conjectural"), and *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 624-626

(1995) (threat to state interests must be "real" and not based on "mere speculation or conjecture"). FOPA falls far short of this requirement.

The legislative record nowhere demonstrates the need to restrict physicians' communications. Notwithstanding a lapse of 22 years between the adoption of AMA Policy H-145.990 and the enactment of FOPA, the State has been able to cite to only a handful of isolated, anecdotal incidents to justify its opposition to that policy. No one was more than temporarily deprived of medical care, no one suffered adverse medical effects, and no patients actually answered any questions unrelated to their medical condition. Likewise, nothing suggests that physicians violated patient confidences, that they improperly disclosed information about their patients' gun ownership, or that they subjected patients to personal expressions about gun control, outside the boundaries of Policy H-145.990. There was no evidence that physicians undertook any punitive measures relating to patients' provision or withholding of firearms information. A few "feathers" may have been ruffled, but that is all.

The panel asserts that the law protects against "irrelevant questioning about guns that could dissuade [patients] from exercising their constitutionally guaranteed rights." [Op. at 61]. However, this purported justification flies in the face of the pronouncement that "the fear that speech

might persuade provides no lawful basis for quieting it." *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653, 2670 (2011). Thus, a concern that physicians might cause patients to reconsider their gun ownership has little or nothing to do with the preservation of these patients' Second Amendment rights. Any interest the State of Florida may purport to have in shielding patients from their physicians' advice is not a lawful one.

The panel further posits that a physician's records of patients' firearm ownership might "fall into the wrong hands" or be "used for purposes of harassment" as a result of "hacking and other data breaches." [Op. at 65]. This concern is based on extreme speculation, unsupported by the record or by a realistic evaluation of medical practice. Physicians are legally and ethically bound to preserve patient confidences. [Op. 70]. There is no reason to suspect that physician records pertaining to gun ownership are or will be a target for hackers. Even if such records were hacked, it is hard to see how they could be used for harassment.

Nothing in the legislative record suggests that, politics aside, firearm possession is more deserving of protection against obtrusive questions from physicians or against computer hacking than myriad other topics, such as sexual practices or illegal drug usage. The legislature's under-inclusiveness (not to mention the explicit testimony of the National Rifle Association

lobbyist) leaves little doubt that FOPA was enacted to silence speech which might draw a political viewpoint into question, rather than to protect patient confidences.  It is therefore unconstitutional.

## 2. The Harm FOPA Causes by Restricting Communications between Patients and Physicians is Disproportional to any Purported Benefits.

In addition to its demand that the curtailment on speech be supported by a substantial nexus between the restriction and the state's purported interest, *Central Hudson* also requires that the restriction be "in proportion to that interest."  447 U.S. at 564.  Again, FOPA fails this test.

Effective medical care requires unfettered communications between physicians and their patients.  This necessity certainly applies to counseling on gun safety.  Physicians who care for children routinely inquire about firearm ownership on intake forms during "well-child" visits, along with a host of questions on a variety of topics.  There is no way for the physician to know, during this initial questioning, which answers will prove irrelevant to a patient's medical care and which will prove lifesaving.[2]

Furthermore, the deleterious consequences of limiting speech about firearms will inevitably impact other aspects of patient care.  For example,

---

[2] The panel opinion asserts:  "no one argues that concededly irrelevant speech lies within the scope of good medical practice."  [Op. 80].  In fact, *amici* do argue the point.  Assuming "relevant" is confined to circumstances in which there is an immediate concern for suicide or violence – a construction many reasonable physicians may make – FOPA imposes a very real burden on patient care.  What at one time may seem irrelevant may ultimately turn out to lie within the scope of good medical practice.

physicians are regularly called upon to counsel about or prescribe treatments with potentially unpleasant consequences for their patients. Medications have side effects; surgery may risk complications. Thus, medicine is not always a straightforward process. Physicians must know as many of the facts as possible before recommending (or not recommending) a treatment option. *See Trammel v. United States*, 445 U.S. 40, 51 (1980) (a physician must know "all that a patient can articulate"). Patients must believe in their physician's absolute honesty and fidelity when relying on their medical advice. The exchange of information must not be limited, as without a sense of complete openness the practice of medicine is compromised.

The AMA *Code of Medical Ethics*,[3] which is the most widely recognized standard of ethical medical conduct in the United States and which is regularly cited as authoritative by the judicial system,[4] recognizes these core principles as the basis of effective medical practice. Thus, Ethical

---

[3] The *Code of Medical Ethics* can be found on the AMA website at http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics.page.

[4] *E.g., National Federation of Independent Business v. Sebelius*, 132 S.Ct. 2566, 2611 (2012) (Ginsberg, J., concurring in part and dissenting in part); *Baze v. Rees*, 553 U.S. 35, 64 (2008) (Alito, J., concurring); *Gonzales v. Oregon*, 546 U.S. 243, 286 (2003) (Thomas, J., dissenting); *Ferguson v. City of Charleston*, 532 U.S. 67 (2001); *Vacco v. Quill*, 521 U.S. 793, 801 (1997); *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997); *Cruzan v. Missouri Dep't. of Health*, 497 U.S. 261 (1990); *Bates v. State Bar of Arizona*, 433 U.S. 350, 369-370, n. 20 (1977); *Roe v. Wade*, 410 U.S. 113, 144 n. 9 (1973).

Opinion E-10.01,[5] entitled "Fundamental Elements of the Patient-Physician

Relationship," states the following:

> From ancient times, physicians have recognized that the health and
> well-being of patients depends upon a collaborative effort between
> physician and patient. Patients share with physicians the responsibility
> for their own health care. The patient-physician relationship is of
> greatest benefit to patients when they bring medical problems to the
> attention of their physicians in a timely fashion, provide information
> about their medical condition to the best of their ability, and work
> with their physicians in a mutually respectful alliance. … The patient
> has the right to receive information from physicians and to discuss the
> benefits, risks, and costs of appropriate treatment alternatives.

Likewise, Ethical Opinion E-10.015, entitled "The Patient-Physician

Relationship," observes:  "The relationship between patient and physician is

based on trust."  Ethically, physicians "must recognize responsibility to

patients first and foremost."  While physicians also have responsibilities "to

society" and "to self," patient care is "paramount."  AMA *Principles of

Medical Ethics*, Preamble and Principle VIII.

It is certainly true that physicians should respect the right of patients

to make their own medical choices.  *E.g.*, Principle of Medical Ethics IV[6]

and Ethical Opinion 10.01(3).  However, FOPA only detracts from that goal,

---

[5] Ethical opinions and reports of the AMA Council on Ethical and Judicial Affairs are a part of the *Code of Medical Ethics*.  Ethical opinions are designated by the letter "E" followed by a number indicating where the opinion is catalogued within the *Code of Medical Ethics*.
[6] The *Principles of Medical Ethics*, which are somewhat distinct from the opinions and reports of the AMA Council on Ethical and Judicial Affairs, are also part of the *Code of Medical Ethics*.

as it prevents doctors from making fully informed recommendations and prevents patients from making fully informed choices.

When, as a result of legal pressures, physicians must restrict their patient communications, FOPA inherently creates distrust. Physicians cannot fully respect their patients' rights if they must simultaneously attend a boundary imposed by political, not medical, considerations.

Conversely, patients are astute observers of their physicians' speech and conduct. They will know when their physicians are being "straight" with them and when their advice is guarded. See, B. Cooke, *et al.*, "Firearms Inquiries in Florida: 'Medical Privacy' or Medical Neglect?" 40 *J. Am. Acad. Psychiatry Law* 399, 403 (2012) (Noting probable disinclination of patients to seek counseling from their physicians when their physicians deliberately avoid topics). The ability to create a feeling of mutual respect and trust depends on human interactions, developed with a sense of openness. *See*, L. Snyder, "American College of Physicians Ethics Manual (6th Ed.), 156 *Annals of Internal Medicine* 73, 78 (2012) ("Physicians must strive to create an environment in which honesty can thrive").

A politically motivated legal restriction on physician speech with a patient, such as that mandated under FOPA, undermines the needed respect and trust. It would be the most commonplace of reactions for patients to

distrust physicians who are lacking in candor.  Further, if physicians are

guarded in one aspect of their patient relationships, it is natural for patients

to suspect they may be untrustworthy in others.   In such a circumstance,

patients and physicians will be unable to collaborate on an optimal course of

treatment.  A patient's distrust can lead to a dangerous deferral or even

complete foregoing of needed medical care.

> As Judge Wilson summarized:
>
> The available evidence does establish two things:  first, the healthcare of everyone who is happy to answers their doctors' inquiries about firearms may suffer as a result of [FOPA]; second the First Amendment rights of everyone who welcomes their doctors' inquiries and information on firearms have been infringed.

*Wollschlaeger II*, 797 F.3d at 920-921.

## II.  This Case is of Special Importance, Even Beyond its Impact on Florida Residents.

Speech of licensed professionals is "particularly valuable."

*Wollschlaeger II*, 797 F.3d at 914 (Wilson dissent).  Notwithstanding this

value, the panel repeatedly noted the "murkiness" of existing guidance on

how the First Amendment is to apply to physicians' professional speech.

[Op. 45-54].  That gap alone makes this an important case.

Also, as is apparent, *inter alia*, from the many *amicus* briefs which

have been filed, this case has attracted considerable national attention.

Legislation similar to FOPA has been introduced in other states, which

would curtail discussion of firearm ownership.  J. Schaechter, *et al.*, "Protecting the Patient-Physician Relationship in Florida," 167 *JAMA Pediatrics* 317 (2013)**.**  While FOPA was the first law of its kind, just in 2015 bills were filed in Indiana (HB 1494), North Carolina (HB 699), Ohio (SB 177), and Texas (HB 2823/ SB 613).

Furthermore, encroachment on the patient-physician relationship, an increasingly common subject of legislative attention in many areas, is likely to be galvanized if the panel decision stands.  *See*, S. Weinberger, *et al,* "Legislative Interference with the Patient-Physician Relationship," 367 *N Engl. J Med.* 1557 (2012).  Thus, the injury to healthcare may spread.

The conclusion, then, is that this is no ordinary Freedom of Speech case, in which the harm to society is "merely" that a voice is muted.  Certainly, that element is present here.  But, more than that, FOPA deprives patients of optimal medical advice, not only in regard to firearm safety but in regard to healthcare generally.  "[I]n the fields of medicine and public health, information can save lives."  *Sorrell v. IMS Health Inc.*, 131 S.Ct. 2653 (2011).  As *amici* stated at the outset, this is a case of life and death.

## Conclusion

FOPA concerns more than the imposition of superficially minor restrictions on how Florida physicians are to communicate with their

patients on a narrow subject and what entries physicians can make in their office records. FOPA violates the First Amendment, whether under strict or intermediate scrutiny analysis. What makes this closely watched case different from the usual First Amendment case is that the communications at issue – those between physicians and their patients – are both a ubiquitous element of ordinary activity and of critical importance to societal welfare.

Judge Wilson said it well: "Doctors' jobs are hard enough when the State does not enact laws that force them to think twice about asking questions and providing information that may save lives." *Wollschlaeger II*, 797 F.3d at 933. This case is of exceptional importance, and *amici* therefore urge the Court to grant the 2016 petition for rehearing *en banc*.

*S/ Richard H. Levenstein Esquire*

_____

Richard H. Levenstein,
Attorney for *Amici Curiae*

| | |
|---|---|
| Jon N. Ekdahl | Richard H. Levenstein |
| Leonard A. Nelson | Kramer, Sopko & Levenstein, P.A. |
| American Medical Association | 2300 SE Monterey Rd., Suite 100 |
| 330 N. Wabash Ave | Stuart, FL 34995 |
| Chicago, IL 60611 | (772) 288-0048 |
| (312) 464-5532 | |

*Counsel for Amici Curiae*

## Certificate of Service

I HEREBY CERTIFY that a true copy of the foregoing brief has been delivered to a third-party carrier for express delivery to the following attorneys on January 13, 2016:

Pamela Jo Bondi
Allen c. Winsor
Timothy D. Osterhaus
Jason Vail
Diane G. DeWolfe
Rachel E. Nordby
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050

Douglas H. Hallward-Driemeier
Mariel Goetz
Ropes & Gray LLP
2099 Pennsylvania Ave NW
Washington, D.C. 20006

An electronic version of the same was delivered to the Clerk and served electronically via the Court's CM/ECF system. In addition, 15 copies were sent by overnight courier, next business day delivery, to the Clerk of Court.

Date: January 13, 2016

*S / Richard H. Levenstein Esquire*

Richard H. Levenstein
Attorney for *Amici Curiae*