No. 12-14009

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

DR. BERND WOLLSCHLAEGER, *et al.*,
*Plaintiffs-Appellees,*
*v.*
GOVERNOR OF THE STATE OF FLORIDA, *et al.*,
*Defendants-Appellants.*

### On Appeal from the United States District Court
### for the Southern District of Florida

## BRIEF *AMICUS CURIAE* OF MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA IN SUPPORT OF PETITION FOR REHEARING *EN BANC*

J. Adam Skaggs
MOMS DEMAND ACTION FOR GUN
SENSE IN AMERICA
P.O. Box 4184
New York, NY 10163
(646) 324-8201

Gregory A. Castanias
Charlotte H. Taylor
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Peter C. Canfield
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309-3053
(404) 521-3939

_____

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT
_____

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Moms Demand Action for Gun Sense in America discloses it is a part of a non-profit organization, Everytown for Gun Safety, which has no parent corporations and issues no stock. Accordingly, no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 26.1-1, in addition to the parties and entities identified in the Certificate of Interested Persons in the Petition for Rehearing *En Banc*, Moms Demand Action for Gun Sense in America submits that the following persons and entities have an interest in the outcome of this matter:

*Amicus Curiae*:

Moms Demand Action for Gun Sense in America

Everytown for Gun Safety Action Fund

Everytown for Gun Safety Support Fund

Counsel for *Amicus Curiae*:

JONES DAY,

    Peter C. Canfield

    Gregory A. Castanias

    Charlotte H. Taylor

MOMS DEMAND ACTION FOR GUN SENSE IN AMERICA,

J. Adam Skaggs

Dated: January 14, 2016                    /s/ Gregory A. Castanias

                                           Counsel for *Amicus Curiae*

# RULE 35 CERTIFICATION

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves a question of exceptional importance: whether the State of Florida may, consistent with the First Amendment, forbid physicians from providing truthful information to patients—and, concomitantly, whether it may forbid patients from receiving such truthful information—regarding firearm safety and storage.

I further express a belief, based on a reasoned and studied professional judgment, that this appeal merits *en banc* rehearing for the same reasons of importance and decisional conflict set forth in the Petition for Rehearing *En Banc* at pages viii-ix.

Dated: January 14, 2016                    Respectfully submitted,


                                           /s/ Gregory A. Castanias
                                           Gregory A. Castanias
                                           JONES DAY
                                           51 Louisiana Ave., N.W.
                                           Washington, DC 20001-2113
                                           (202) 879-3939


                                           *Counsel for Amicus Curiae*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................ i

RULE 35 CERTIFICATION ........................................................................ iii

TABLE OF AUTHORITIES ....................................................................... vi

INTEREST OF THE *AMICUS CURIAE* .................................................. 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE FACTS .................................................................. 1

ARGUMENT AND AUTHORITIES ......................................................... 1

I.  THE ACT SUBJECTS DOCTORS TO DISCIPLINARY ACTION FOR PROVIDING INFORMATION TO PATIENTS ON ONE PARTICULAR SUBJECT—GUN OWNERSHIP AND SAFETY ................ 3

II.  THE DOCTOR-PATIENT RELATIONSHIP PROVIDES PARENTS VITAL HEALTH AND SAFETY INFORMATION, INCLUDING INFORMATION ABOUT FIREARM SAFETY .................... 4

   A.  Doctor-Patient Communications Play An Important Role In The Marketplace Of Ideas ................................................................... 4

   B.  Parents In Particular Reply On Their Doctors For Accurate Health And Safety Information About Raising Their Children. ............. 5

   C.  Studies Show That Doctor-Patient Communications About Firearm Safety Lead To Better Firearm Storage Practices. ...................... 6

III.  THE PANEL MAJORITY'S OPINION ESTABLISHES THREE ERRONEOUS PRECEDENTS THAT THREATEN PATIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION ............... 7

   A.  The First Amendment Protects Individuals' Right To Receive Information, And This Right Does Not Disappear Within The Context Of The Doctor-Patient Relationship ........................................... 8

   B.  The Act Is A Content-Based Restriction That Will Silence A Significant Amount Of Protected Speech And, In Turn, Deprive Many Patients Of Important Information About Firearm Safety ............ 9

   C.  The Majority's First Amendment Analysis Errs In Three Important Ways That Undermine The Rights of Listeners .................. 11

CONCLUSION ........................................................................................................... 15

CERTIFICATE OF SERVICE ................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Burson v. Freeman,*
504 U.S. 191 (1992) ........................................................ 14

*Conant v. Walters,*
309 F.3d 629 (9th Cir. 2002) ........................................... 5

*Dana's R.R. Supply v. Florida,*
807 F.3d 1235 (11th Cir. 2015) ........................................ 2

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ........................................................ 14

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978) .......................................................... 9

*Frisby v. Schultz,*
487 U.S. 474 (1988) ........................................................ 13

*Hill v. Colorado,*
530 U.S. 703 (2000) ........................................................ 14

*King v. Governor of New Jersey,*
767 F.3d 216 (3d Cir. 2014) ..................................... 5, 6, 11

*Lorillard Tobacco Co. v. Reilly,*
533 U.S. 525 (2001) ..................................................... 8, 12

*Martin v. City of Struthers,*
319 U.S. 141 (1943) ................................................ 9, 12, 13

*McCullen v. Coakley,*
134 S. Ct. 2518 (2014) .................................................... 14

*Police Dep't of Chicago v. Mosley*,
  408 U.S. 92 (1972) ........................................................................ 9

*Reno v. ACLU*,
  521 U.S. 844 (1997) ................................................................. 12, 13

*Rowan v. United States Post Office Dep't*,
  397 U.S. 728 (1970) ..................................................................... 13

*Sorrell v. IMS Health Inc.*,
  131 S. Ct. 2653 (2011) .......................................................... 9, 11, 14

**STATUTES**

Fla. Stat. § 790.338(1) ...................................................................... 3

Fla. Stat. § 790.338(2) ............................................................... 3, 9, 10

Fla. Stat. § 790.338(5) ................................................................. 4, 10

Fla. Stat. § 790.338(6) ................................................................. 4, 10

Fla. Stat. § 790.338(8) ...................................................................... 4

**OTHER AUTHORITIES**

Teresa Albright & Sandra Burge, *Improving Firearm Storage Habits: Impact of
  Brief Office Counseling by Family Physicians*, 16 J. Am. Bd. of Family Prac.
  40 (2003) ................................................................................ 7, 15

American Academy of Pediatrics, *How Pediatricians Can Advocate for
  Children's Safety in Their Communities*, *available at*
  http://bit.ly/1RHF63O .................................................................... 7

Shari L. Barkin et al., *Is Office-Based Counseling About Media Use, Timeouts,
  and Firearm Storage Effective?* 122 Pediatrics 15 (2008)................................. 6

R.Butkus & A.Weissman, *Internists' Attitudes Toward Prevention of Firearm
  Injury*, 160 Annals of Internal Med. 821 (2014)........................................... 7

Tamera Coyne-Beasley et al., *"Love Our Kids, Lock Your Guns," A Community-Based Firearm Safety Counseling and Gun Lock Distribution Program*, 155 Archives of Pediatric & Adolescent Med. 659 (2001) ........................... 7

*Everytown Poll Memo: Gun Storage and Child Access Prevention*, June 23, 2014, *available at* http://every.tw/1UdgJt4 ........................................................... 15

Fed. R. App. P. 29 ............................................................................................. 1

Fed. R. App. P. 35 ......................................................................................... 2, 8

Lawrence O. Gostin, *Public Health Law: Power, Duty, Restraint* (2d ed. 2008) .................................................................................................... 4

Dahlia Lithwick & Sonja West, "The Absurd Logic Behind Florida's Docs v. Glocks Law," *Slate.com*, Jan. 8, 2016 ............................................... 8

Alexis Macias, *When States Practice Medicine: Physician Gag Laws*, Bull. of the Am. Coll. of Surgeons, Feb. 1, 2012 ............................................. 7

Moms Demand Action & Everytown for Gun Safety, *Innocents Lost: A Year of Unintentional Gun Deaths* (2014) ........................................................ 7

Eugene Volokh, "Content-Based Restriction on Doctors' Speech to Patients About Guns Passes 'Strict Scrutiny,'" *The Washington Post*, Dec. 16, 2015 ..................................................................................................... 8

# INTEREST OF THE *AMICUS CURIAE*[1]

As set forth in the accompanying motion for leave to file this *amicus* brief, Moms Demand Action for Gun Sense in America ("Moms Demand Action") is a grassroots movement of Americans fighting for public safety measures that respect the Second Amendment and protect people from gun violence. A part of Everytown for Gun Safety, Moms Demand Action promotes firearm safety nationwide and believes that doctors—in particular, pediatricians—play an indispensable role in promoting responsible gun ownership and storage because they are often parents' primary source of information about children and gun safety.

## STATEMENT OF THE ISSUES

Whether the State can, consistent with the First Amendment, place content-based restrictions on doctor-patient communications that restrict the flow of truthful information from doctor to patient.

## STATEMENT OF THE FACTS

*Amicus* adopts the statement of facts set forth in Judge Wilson's second dissenting opinion (Op. II 78-90) and adopted by petitioners here (Pet. 4).

## ARGUMENT AND AUTHORITIES

"Viewpoint-based restrictions on speech are among governments' most

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting this brief. No person—other than *amicus curiae* and its counsel—contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

insidious methods of eliminating unwelcome opinion." *Dana's R.R. Supply v. Florida*, 807 F.3d 1235, 1248 (11th Cir. 2015) (Tjoflat, J.). And yet the panel majority here, purporting to apply strict scrutiny, upholds a law that does just that. As Petitioners have shown, the "whole point" of Florida's "Firearm Owners Privacy Act" (variously, "FOPA" or "the Act") is to "impos[e] a direct and substantial burden on disfavored speech—by silencing it." *Id.* The Act is an improper content-based restriction on physicians' speech that impedes doctors' ability to counsel their patients in ways that diverge from the State of Florida's preferred political stance. Petitioners have further shown how the fractured panel opinion, in upholding the Act, "directly conflicts with established [Supreme Court] precedent," Pet. 4, and "interfer[es] with open communication between doctors and patients on critical issues of gun safety," Pet. 5.

*Amicus* submits this brief to underscore the "question of exceptional importance," Fed. R. App. P. 35(a)(2), presented by this case: May a state restrict the transmission of truthful, accurate, and literally lifesaving information within the marketplace of ideas? By restricting doctors' speech regarding gun safety, FOPA infringes doctors' First Amendment right to speak. *Amicus* submits this brief to demonstrate that FOPA also infringes patients' rights to hear that speech.

The doctor-patient relationship is a critical means of conveying accurate, unbiased public health information in a marketplace crowded with behavioral messages. Parents rely on their pediatricians for medically sound advice for raising healthy, safe children. In particular, studies show that when doctors make routine

inquiries about firearm ownership and follow up with brief, one-time counseling about storage practices, families improve the safety of their gun storage practices.

Florida, however, has enacted a content-discriminatory law that will chill doctor-patient communications about firearm safety. This law violates patients' long-recognized First Amendment right to receive information. In coming to the opposite conclusion, the majority contravenes established Supreme Court precedent and establishes a dangerous rule that will undermine the protection of speech. *En banc* rehearing is necessary to correct the majority's errors.

## I.     THE ACT SUBJECTS DOCTORS TO DISCIPLINARY ACTION FOR PROVIDING INFORMATION TO PATIENTS ON ONE PARTICULAR SUBJECT—GUN OWNERSHIP AND SAFETY.

Florida passed FOPA in 2011, in response to a handful of complaints to legislators by patients who had been asked about firearm ownership by their physicians. Op. III 6 & n.2. The Act places a number of sweeping restrictions on doctor-patient communications and related activities. Most salient here, it provides that doctors "should refrain from making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home," unless the doctor "in good faith believes that this information is relevant to the patient's medical care or safety." Fla. Stat. § 790.338(2). The Act also restricts information about firearm ownership being entered into patients' medical records, *id.* § 790.338(1), and provides that doctors may not discriminate against or "unnecessarily harass" patients

on the basis of firearm ownership, *id.* § 790.338(5)-(6). A violation of the Act subjects a doctor to disciplinary action. *Id.* § 790.338(8).

## II. THE DOCTOR-PATIENT RELATIONSHIP PROVIDES PARENTS VITAL HEALTH AND SAFETY INFORMATION, INCLUDING INFORMATION ABOUT FIREARM SAFETY.

The Act unconstitutionally burdens doctor-patient communications—which for many parents are the sole reliable source for vital, accurate, research-based information pertinent to their children's health and safety.

### A. Doctor-Patient Communications Play An Important Role In The Marketplace Of Ideas.

Patients rely on their doctors for information and advice that will allow them to make optimal decisions about medical treatment and their lifestyles. In a marketplace of ideas saturated with commercial advertising and other messages aimed at influencing behavior, there is a pressing need for accurate and unbiased health information. To quote a leading health-law scholar, "[t]he population must at least be aware of the health consequences of risk behaviors to make informed decisions." Lawrence O. Gostin, *Public Health Law: Power, Duty, Restraint* 333 (2d ed. 2008). "The citizenry is bombarded with behavioral messages that affect its health—by the media and entertainment, trade associations and corporations, religious and civic organizations, and family and peers. Public health officials strive to be heard above the din of conflicting and confusing communications." *Id.*

Doctor-patient communications are often patients' sole source of reliable

health information: "[P]rofessionals have access to a body of specialized knowledge to which laypersons have little or no exposure. . . . [T]his information . . . will often be communicated to [citizens] directly by a licensed professional during the course of a professional relationship. Thus, professional speech . . . serves as an important channel for the communication of information that might otherwise never reach the public." *King v. Governor of New Jersey*, 767 F.3d 216, 234 (3d Cir. 2014). *See also Conant v. Walters*, 309 F.3d 629, 644 (9th Cir. 2002) (Kozinski, J., concurring).

This information is no less essential simply because it may at times provoke patient discomfort; indeed, it could well be said that the most important information that doctors dispense is the least welcome. Doctors frequently counsel patients that they should lose weight, eat less, or exercise more, and often tell patients that habits they find pleasurable—such as smoking, drinking excessive alcohol, or eating rich foods—are unhealthy. They also must frequently ask questions that touch on extremely private, sensitive subjects like sexual behavior and domestic abuse. But doctors are guided in their actions by the medical community's consensus about appropriate care. Patients expect their doctors to tell them what is good for them, whether or not the government has decided it might make them feel uncomfortable.

### B. Parents In Particular Rely On Their Doctors For Accurate Health And Safety Information About Raising Their Children.

Visits to the pediatrician are often parents' primary source of information about how to raise safe and healthy children. Pediatricians inform new parents what

sleeping practices minimize the risk of crib death; what foods babies should eat and avoid; and how to "babyproof" the child's home. As the children grow, these conversations move to topics such as household safety—*e.g.*, using gates at staircases to prevent falls; swimming pool safety; proper storage of dangerous chemicals; and using helmets for bicycle- or skateboard-riding. Storing firearms safely out of reach of curious children is a logical and important part of this dialogue.

Indeed, before children begin attending school, parents have few or no other reliable contacts with public health or medical experts who can bring health and safety issues to their attention. To be sure, friends, relatives, and religious communities can and do provide information and opinions about child-rearing. But doctors are uniquely positioned to provide parents with accurate, empirically based information about child health and safety. *See King*, 767 F.3d at 234. Even after children start school, doctors remain an important source of such information.

### C. Studies Show That Doctor-Patient Communications About Firearm Safety Lead To Safer Firearm Storage Practices.

Several studies show that when doctors inquire about firearm ownership and provide brief follow-up counseling to gun owners, patients are significantly more likely to follow safe firearm storage practices. One found that this approach led to a 21.4% increase in safe storage practices among patients receiving counseling. Shari L. Barkin et al., *Is Office-Based Counseling About Media Use, Timeouts, and Firearm Storage Effective?*, 122 Pediatrics 15 (2008). Another found that after a single instance of verbal

counseling by a family doctor (or counseling coupled with a brochure), families were three times more likely to make a safe change in firearm storage habits than families that received no counseling.[2] And research conducted by *amicus* showed that more than two-thirds of fatal, unintentional shootings of children could be avoided if gun owners stored their firearms responsibly. *See* Moms Demand Action & Everytown for Gun Safety, *Innocents Lost: A Year of Unintentional Gun Deaths* (2014). Thus, the American Academy of Pediatrics holds that inquiries about firearm ownership should be part of routine pediatric care.[3] Simply put, pediatricians' information about firearm safety—if parents are allowed to receive it—will save children's lives.

## III. THE PANEL MAJORITY'S OPINION ESTABLISHES THREE ERRONEOUS PRECEDENTS THAT THREATEN PATIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION.

The First Amendment protects the right to receive information, and this right

---

[2] Teresa Albright & Sandra Burge, *Improving Firearm Storage Habits: Impact of Brief Office Counseling by Family Physicians*, 16 J. Am. Bd. of Family Prac. 40, 44 (2003). *See also* Tamera Coyne-Beasley et al., *"Love Our Kids, Lock Your Guns," A Community-Based Firearm Safety Counseling and Gun Lock Distribution Program*, 155 Archives of Pediatric & Adolescent Med. 659, 663 (2001) (concluding that tailored physician counseling can improve rate of safe firearm storage).

[3] *See* American Academy of Pediatrics, *How Pediatricians Can Advocate for Children's Safety in Their Communities*, *available at* http://bit.ly/1RHF63O. The overwhelming majority of the medical community agrees. An American Medical Association resolution defends the right of doctors to discuss firearm safety with their patients. *See* Alexis Macias, *When States Practice Medicine: Physician Gag Laws*, Bull. of the Am. Coll. of Surgeons, Feb. 1, 2012. A 2013 survey found that 85% of internists believed that firearm injury is a public health issue; two-thirds believed that physicians should be able to counsel patients on gun safety. R.Butkus & A.Weissman, *Internists' Attitudes Toward Prevention of Firearm Injury*, 160 Annals of Internal Med. 821 (2014).

does not evaporate within the context of the doctor-patient relationship. Because the Act will chill physician speech, and thus withhold firearm safety information from patients who would prefer to receive it, it is unconstitutional. Failing to understand these principles, the panel majority makes three crucial errors in its analysis, each of which establishes a dangerous precedent that threatens listeners' rights and contravenes Supreme Court precedent. *First*, the majority establishes a "framework" of constitutional interests relevant to the regulation of professional speech that improperly excludes patients' First Amendment right to receive information. *Second*, the majority applies a weakened version of "strict" scrutiny that ignores the Supreme Court's teaching that the speech available to *willing* listeners may not be curtailed to protect a minority of *unwilling* listeners. *Third*, the majority misapplies the Supreme Court's precedents when it relies on a "captive audience" theory to uphold the Act. *En banc* rehearing is called for to correct these errors.[4] *See* Fed. R. App. P. 35(b)(1)(A).

### A. The First Amendment Protects Individuals' Right To Receive Information, And This Right Does Not Disappear Within The Context Of The Doctor-Patient Relationship.

The First Amendment protects listeners' right to receive information just as much as speakers' right to disseminate it. *See, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 565 (2001) ("[A] speech regulation cannot unduly impinge on . . . the adult

---

[4] The panel opinion has already attracted criticism. *See, e.g.,* Eugene Volokh, "Content-Based Restriction on Doctors' Speech to Patients About Guns Passes 'Strict Scrutiny,'" *The Washington Post*, Dec. 16, 2015; Dahlia Lithwick & Sonja West, "The Absurd Logic Behind Florida's Docs v. Glocks Law," *Slate.com*, Jan. 8, 2016.

listener's opportunity to obtain information."); *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978) ("the First Amendment goes beyond protection of … the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw"); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (freedom of speech "embraces the right to distribute literature and necessarily protects the right to receive it" (citation omitted)). This established First Amendment principle applies to the doctor-patient relationship. As shown above, doctors' communications to patients are an important means of disseminating valuable public health information. They are therefore especially worthy of constitutional protection. Indeed, the free flow of information is uniquely important "in the fields of medicine and public health, where information can save lives." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011).

### B. The Act Is A Content-Based Restriction That Will Silence A Significant Amount Of Protected Speech And, In Turn, Deprive Many Patients Of Important Information About Firearm Safety.

The Act is a classic content-based restriction on doctor-patient communications. Op. III 47. On its face, the Act distinguishes between inquiries and questions concerning firearm ownership and inquiries and questions on all other topics, and limits only speech pertaining to firearm ownership. *See* Fla. Stat. § 790.338(2). This is quintessential content discrimination. *See Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) ("above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its

subject matter, or its content").

As Judge Wilson's second dissent explained in detail, the Act will silence or significantly chill communications about "one topic and one topic only"—firearms—between doctors and patients. Op. II 79. The Act bans written and oral inquiries about firearm ownership. Fla. Stat. § 790.338(2). Although the Act goes on to provide that such inquiries are permissible when "a health care practitioner . . . in good faith believes that this information is relevant to the patient's medical care or safety," *id.*, this will not eliminate the Act's effect: The "good faith" determination can only be made *post hoc*, and so cannot provide a clear safe harbor. In consequence, doctors will take the safe, speech-restrictive course and refrain from routine inquiries or follow-up conversations on the topic. In turn, a substantial number of gun-owning patients—those who give doctors no *specific* reason to raise the issue of gun safety—will never receive the counseling that their doctors would otherwise have provided.

Similarly, the legislative history shows that the Act's ban on "unnecessar[y] harass[ment]," Fla. Stat. § 790.338(6), seeks to minimize doctor-patient conversations about firearm safety—the Act was ostensibly passed in response to a handful of reports of patient discomfort with doctors' inquiries about gun ownership. *See* Op. III 6 n.2. This in mind, doctors will reasonably fear that asking follow-up questions to an initially non-responding patient would be *ex post* deemed "unnecessary harassment" under the Act. A reasonably risk-averse physician will just avoid the topic entirely. Finally, the anti-discrimination provision, Fla. Stat. § 790.338(5), is likely to have a

similar effect. *See* Op. II 140-44 (Wilson, J., dissenting).

Together, these provisions mean that a substantial number of gun-owning patients will not receive lifesaving information about safe firearm storage. The First Amendment cannot tolerate this harm.

### C. The Majority's First Amendment Analysis Errs In Three Important Ways That Undermine The Rights Of Listeners.

The majority justifies the Act's suppression of speech by ignoring patients' First Amendment rights. Specifically, the majority's analysis contradicts the Supreme Court's teachings about those rights in three important ways.

*First*, the majority contravenes Supreme Court precedent and the law of other circuits by establishing a "framework" of constitutional interests for the evaluation of regulations of professional speech that excludes patients' interest in receiving information during consultations with their doctors. Op. III 51. *See Sorrell*, 131 S. Ct. at 2664; *King*, 767 F.3d at 234. The majority recognizes that when doctors and other professionals speak to the public, "society's interest in listening freely . . . come[s] to the fore." Op. III 51. But the majority contrasts this scenario with physician speech to a patient "in furtherance of the practice of medicine." Op. III 50. In this setting, the majority holds, "two state interests" predominate: "regulation of the profession for the protection of the public and regulation of the relationship for the protection of the patient and the benefit of society." Op. III 51. The majority conspicuously and erroneously omits any mention of patients' "interest in listening freely" to advice that

public health experts deem medically necessary.

*Second*, the majority opinion contradicts Supreme Court authority and waters down strict scrutiny when it concludes that Florida may prevent *willing* listeners from receiving information in order to protect a minority of *unwilling* listeners. The majority disregards the fact that the Supreme Court has *repeatedly* held that a law fails the First Amendment's tailoring requirement when it restricts the speech available to the general public, including willing listeners, in order to protect the sensibilities of a minority who might find the speech offensive. *See, e.g., Martin*, 319 U.S. at 143-44 (striking down ordinance prohibiting door-to-door distribution of leaflets despite claimed justification of "the protection of the householders from annoyance," because it improperly "substitute[d] the judgment of the community for the judgment of the individual householder"); *Reno v. ACLU*, 521 U.S. 844, 874 (1997) (Communications Decency Act failed tailoring requirement because it suppressed "a large amount of speech that adults have a constitutional right to receive and to address to one another"); *Lorillard Tobacco*, 533 U.S. at 561-62, 564 (ban on tobacco advertising aimed at children lacked "a reasonable fit between the means" employed and the goal of reducing juvenile tobacco use, because "adults have [an] interest in receiving truthful information about tobacco products," but "[i]n some geographical areas, [the law] would constitute nearly a complete ban on the communication of truthful information about smokeless tobacco and cigars to adult consumers").

As Petitioners note, Pet. 12-13, it takes little imagination to think of more

narrowly tailored means of achieving the legislature's ends—most simply, by requiring doctors to cease inquiries about a particular topic when a patient indicates that she does not want to discuss it. That would leave it up to the individual patient to decide whether or not to receive firearm safety (or other) information, without blocking willing patients from receiving it. *See Martin*, 319 U.S. at 147 ("leaving to each householder the full right to decide whether he will receive strangers as visitors"); *Reno*, 521 U.S. at 877 (instead of penalizing content-providers for making indecent material available on the Internet, a less-speech-restrictive means of protecting children would be to allow each household to control whether particular messages are received). But the majority ignores the teaching of these cases in finding the Act adequately tailored to survive strict scrutiny.

*Third*, the majority misapplies Supreme Court precedent when it relies on a "captive audience" theory to buttress its conclusion that the Act—a content-based regulation of speech—survives strict scrutiny. Op. III 72-76. The Supreme Court has *never* upheld a content-based regulation of speech on the theory that it protects a "captive audience," not even when the listener is targeted in the privacy of her own home. *See Frisby v. Schultz*, 487 U.S. 474, 487-88 (1988) (upholding a law prohibiting picketing on residential streets only after finding it content-neutral); *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 735-40 (1970) (upholding a content-neutral law allowing addressees to refuse delivery of mail). The Court's general governing principle is that "the Constitution does not permit government to decide which types

of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210 (1975).[5]

This rule does not change because of a supposed "power imbalance" between doctor and patient. Op. III 71. Even while recognizing that "[p]ersons who are attempting to enter health care facilities—for any purpose—are often in particularly vulnerable physical and emotional conditions," *Hill v. Colorado*, 530 U.S. 703, 729 (2000), the Supreme Court has upheld laws restricting speech in this context *only where the laws are content-neutral*, *id.* at 719-25. *See also McCullen v. Coakley*, 134 S. Ct. 2518, 2529-34 (2014) (finding the "buffer zone" law in that case to be content-neutral but striking it down as insufficiently tailored); *Sorrell*, 131 S. Ct. at 2670 (rejecting the argument that "anxi[ety]" about "whether doctors have their patients' best interests at heart" can justify a content-based limitation on speech).

*In sum*, the majority's First Amendment analysis upends the Supreme Court's precedents addressing listeners' rights. It is simply impermissible to place content-based restrictions on speech in order to protect a minority of listeners. These First Amendment concerns are highly salient here, because most patients would welcome inquiries and information about firearm safety from their doctors. In one study, 70%

---

[5] *Burson v. Freeman*, 504 U.S. 191 (1992), relied on by the majority, *see* Op. III 61, 77, made no reference to a "captive audience" theory. Under strict scrutiny, the plurality upheld a ban on vote solicitation within 100 feet of polling stations as the most narrowly drawn means of furthering the state's compelling interest in combating the centuries-old problems of voter fraud and intimidation. *See* 504 U.S. at 198-208.

of gun owners said "no" when asked if they were bothered by inquiries about gun storage and safety by their doctors. Albright & Burge at 44. More generally, data show that gun owners and non-owners alike strongly favor responsible gun storage practices. *Everytown Poll Memo: Gun Storage and Child Access Prevention*, June 23, 2014, at 2-3, *available at* http://every.tw/1UdgJt4. But Florida, ostensibly to stop "harassment" of a few gun owners, has prescribed a law that will chill those discussions from taking place with *all* patients, including the significant majority who would not object to—indeed, would welcome—those discussions.

The majority's approach to speech is nothing short of a radical rewriting of the First Amendment, not to mention the basic compact between doctor and patient. Under the majority's approach, sellers of products that might be the subject of future doctor-patient health conversations would be well-advised to lobby for identical "anti-harassment" legislation, making discussions of tobacco, alcohol, fast food, motorcycle helmets, family planning, and so on, all subject to the risk of reprisal. The cumulative effect would reduce doctors from trusted advisers to mere merchants of medical services, afraid to tell their patients anything negative lest they risk charges of "harassment." *En banc* rehearing is necessary to correct the majority's errors.

## CONCLUSION

The Court should grant rehearing *en banc*, vacate the panel decision, and affirm the judgment and injunction of the district court.

Dated: January 14, 2016

Respectfully submitted,

/s/ Gregory A. Castanias
Gregory A. Castanias
Charlotte H. Taylor
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939

Peter C. Canfield
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
(404) 521-3939

J. Adam Skaggs
MOMS DEMAND ACTION
 FOR GUN SENSE IN AMERICA
P.O. Box 4184
New York, NY 10163
(646) 324-8201

Counsel for *Amicus Curiae*
Moms Demand Action for
Gun Sense in America

# CERTIFICATE OF SERVICE

I hereby certify that, on January 14, 2016, the foregoing Brief of *Amicus Curiae* was served via Electronic Case Filing (ECF) on all counsel of record as indicated below, and that fifteen paper copies were sent to the Clerk of the Court by overnight courier.

Douglas H. Hallward-Driemeier, Esq.
Mariel Goetz, Esq.
Ropes & Gray LLP
700 12th Street, NW, Suite 900
Washington, D.C. 20005

Erin R. Macgowan, Esq.
Ropes & Gray LLP
800 Boylston Street
Boston, MA 02199-3600

Edward M. Mullins, Esq.
Astigarrage Davis Mullins & Grossman, P.A.
701 Brickell Avenue, 16th Floor
Miami, FL 33131-2847

Jonathan E. Lowy, Esq.
Brady Center to Prevent Gun Violence
1225 Eye Street, NW, Suite 1100
Washington, D.C. 2005

Pam Bondi, Esq.
Allen C. Winsor, Esq.
Timothy Osterhaus, Esq.
Jason Vail, Esq.
Diane G. DeWolf, Esq.
Rachel E. Nordby, Esq.
Office of the Attorney General
PL01- The Capitol
Tallahassee, FL 32399-1050

/s/ Gregory A. Castanias
Gregory A. Castanias